1 | MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
2 | WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
3 | THE BUSINESS LITIGATION GROUP, P.C.
150 Spear Street, Suite 800
4 | San Francisco, CA 94105
Telephone: 415.765.6633
5 | Facsimile: 415.283.4804

6 | Attorneys for Plaintiff
UAB "PLANNER5D"
7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN FRANCISCO DIVISION

11

12

13 | UAB "PLANNER5D" dba PLANNER 5D,          **Case No. 3:19-cv-03132-WHO**

14 |                    Plaintiff,

15 |          v.                              **PLANNER 5D'S OPPOSITION TO THE DISMISSAL MOTION OF THE TRUSTEES OF PRINCETON UNIVERSITY**

16 | FACEBOOK INC.,

17 | FACEBOOK TECHNOLOGIES, LLC, THE
TRUSTEES OF PRINCETON UNIVERSITY,        Judge: Honorable William H. Orrick
18 | DOES 1-200, ABC CORPORATIONS 1-20,      Courtroom: 2, Seventeenth Floor
and XYZ UNIVERSITIES 1-20.               Hearing Date: November 6, 2019
19 |                                          Hearing Time: 2:00 p.m.

20 |                    Defendants.

21

22

23

24

25

26

27

28

---

**Planner 5D's Opp. to Princeton MTD**                    **Case No. 3:19-cv-03132-WHO**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND AND WORKS AT ISSUE .................................................. 1

III.   LEGAL STANDARD .......................................................................................... 2

IV.   ARGUMENT ......................................................................................................... 3

    A.     Planner 5D Need Not Plead the Inapplicability of § 411(a)'s Registration
           Requirement to the Infringement of Foreign Works. ...................................... 3

           1.     Even if Owners of U.S. Works Are Required to Plead Compliance
                    with § 411(a), Planner 5D Is Not Required to Plead "Exemption"
                    from That Requirement. .............................................................................. 3

           2.     Under the DMCA's Revisions to the Copyright Act, Lack of
                    Registration Is an Affirmative Defense to Be Pleaded by the
                    Defendant. ................................................................................................... 5

                  a.     Under the Post-DMCA § 411(a), the Registration
                            Requirement Is an Exception to the General Rule against
                            Formalities for Infringement Claims. ........................................... 5

                  b.     Because Registration Is Now the Exceptional Case,
                            Princeton Must Plead and Prove Planner 5D's Failure to
                            Comply with § 411(a) as an Affirmative Defense. ....................... 6

           3.     If the Court Concludes That Planner 5D Is Required to Plead the
                    Non-Applicability of the Registration Requirement, It Should
                    Grant Leave to Amend. ............................................................................. 8

                  a.     Internet Posting Is Not Necessarily "Publication." ....................... 8

                  b.     Even if the P5D Works Were Published by Posting Them
                            Online, That Publication Was Not Necessarily
                            Simultaneous Within the United States. ....................................... 11

    B.     Planner 5D States a Claim for Trade Secret Misappropriation. ........................... 13

           1.     A Trade Secret Is Information That Is Secret, Valuable, and
                    Reasonably Protected. ............................................................................... 13

                  a.     Releasing a Product Does Not Disclose Trade Secrets Used
                          to Make It. ................................................................................... 13

                  b.     Absolute Secrecy Is Not Required. .............................................. 14

                  c.     Compilations Can Be Trade Secrets Even if Individual
                          Elements Are in the Public Domain. ............................................ 14

                  d.     Preserving Trade Secret Status Requires Only Efforts That
                          Are Reasonable in the Circumstances. ......................................... 15

2.    Planner 5D Has Adequately Pleaded That Its Data Files Are Trade Secrets. ........................................................................... 16

    a.    Planner 5D Adequately Alleges Its Data Files' Value. ............... 16

    b.    Planner 5D Adequately Alleges Its Data Files' Secrecy. ............ 16

    c.    Planner 5D Adequately Alleges Its Data Files' Reasonable Protection. ................................................................................. 18

3.    Planner 5D's Vast Library of Data Files Is a Trade Secret, Even Apart from the Status of Individual Data Files. ........................................ 19

4.    Planner 5D Has Adequately Alleged That Princeton Misappropriated Its Trade Secrets. ........................................................... 19

    a.    Multiple Acts Qualify as Trade Secret "Misappropriation." ........ 19

        i.    "Misappropriation" includes acquisition or disclosure by "improper means." .............................. 19

            (a)    "Improper means" includes cribbing from the work of a trade secret owner, rather than deriving results independently. ........................... 20

            (b)    "Improper means" includes acquisition or disclosure through a breach of a contractual duty to maintain secrecy. .................................... 20

        ii.    Even short of "improper means," "misappropriation" can occur if information that was disclosed or used was subject to an obligation of secrecy. .......................................................... 20

    b.    Planner 5D Has Adequately Alleged Princeton's Acquisition of the Data Files by Improper Means, by Defeating Technical and Legal Measures Protecting Them. ....... 21

        i.    Technical circumvention. ................................................ 21

        ii.    Legal violation. ................................................................. 22

    c.    Princeton Does Not Address Misappropriation *Other* Than by "Improper Means." .............................................................. 24

5.    If the Court Concludes Planner 5D Has Not Adequately Pleaded Its Trade Secret Claims, Planner 5D Should Be Granted Leave to Amend. ...................................................................................................... 25

V.    CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Albino v. Baca*,
 747 F.3d 1162 (2014) .......................................................................................................... 7

*Art of Living Found. v. Does 1-10*,
 No. 5:10-CV-05022, 2012 WL 1565281 (N.D. Cal. May 1, 2012) ......................................... 14

*Ashcroft v. Iqbal*
 556 U.S. 662 (2009) ............................................................................................................ 2

*Bell Atl. Corp. v. Twombly*
 550 U.S. 544 (2007) ...................................................................................................... 2, 3

*Broker Genius, Inc. v. Zalta*,
 280 F. Supp. 3d 495 (S.D.N.Y. 2017) .................................................................................. 22

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
 No. 04-CV-04825-JW,  2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ....................................... 23

*CFTC v. Monex Credit Co.*,
 931 F.3d 966 (9th Cir. 2019) ............................................................................................ 6, 7

*Corning Glass Works v. Brennan*,
 417 U.S. 188 (1974) ............................................................................................................ 7

*CTFC v. So. Trust Metals, Inc.*,
 894 F.3d 1313 (11th Cir. 2018) ............................................................................................ 7

*DigitAlb, Sh.A. v. Setplex, LLC*,
 284 F. Supp. 3d 547 (S.D.N.Y. 2018) .................................................................................. 4

*DVD Copy Control Assn., Inc. v. Bunner*,
 116 Cal. App. 4th 241 (2004) ............................................................................................ 14

*Dytch v. Yoon*,
 No. 10-CV-02915-MEJ, 2011 WL 839421 (N.D. Cal. Mar. 7, 2011) ..................................... 24

*E.I. duPont deNemours & Co. v. Christopher*,
 431 F.2d 1012 (5th Cir. 1970) ................................................................................. 15, 18, 20, 21

*Earthbound Corp. v. MiTek USA, Inc.*,
 No. 16-CV-167223-DMG, 2017 WL 2919101 (C.D. Cal. Feb. 10, 2017) ....................... 14, 19

*Einhorn v. Mergatroyd Products*,
 426 F. Supp. 2d 189 (S.D.N.Y. 2006) .................................................................................. 9

*Elliott v. Gouverneur Tribune Press, Inc.*,
 No. 7:13-CV-00055, 2014 WL 12598275 (N.D.N.Y. Sept. 29, 2014) ............................... 9, 10

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*,
 No. 14-CV-02496, 2015 WL 12655484 (C.D. Cal. Nov. 19, 2015) ......................................... 5

iii

*Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*,
  139 S. Ct. 881 (2019) ................................................................. 4, 10

*Getaped.com, Inc. v. Cangemi*,
  188 F. Supp. 2d 398 (S.D.N.Y. 2002) ................................................. 10

*Hatfield v. Halifax PLC*,
  564 F.3d 1177 (9th Cir. 2009) ........................................................ 23

*In re Providian Credit Card Cases*,
  96 Cal. App. 4th 292 (2002) .......................................................... 17

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
  No. 16-CV-1318, 2017 WL 696126 (S.D.N.Y. Feb. 15, 2017) ............................. 5

*Jones v. Bock*,
  549 U.S. 199 (2007) ..................................................................... 7

*Kern[e]l Records Oy v. Mosley*,
  794 F. Supp. 2d 1355 (S.D. Fla. 2011) ......................................... 4, 9, 12

*Kernel Records Oy v. Mosley*,
  694 F.3d 1294 (11th Cir. 2012) ............................................... 4, 10, 12

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974) ............................................................... 15, 20

*Krommenhock v. Post Foods, LLC*,
  No. 16-CV-04958-WHO, 2018 WL 1335867 (N.D. Cal. Mar. 15, 2018 .......................... 3

*Kubota Corp. v. Shredderhotline.com Co., Inc.*,
  No. 12-CV-6065, 2013 WL 6096999 (N.D. Ill. Nov. 20, 2013) ............................ 12

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ................................................................. 14

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir.1993) ........................................................... 15

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
  519 F.3d 1025 (9th Cir. 2008) .......................................................... 3

*Mattel, Inc. v. MGA Entm't, Inc.*,
  782 F. Supp. 2d 911 (C.D. Cal. 2011) ................................................. 15

*McLaren v. Chico's FAS, Inc.*,
  No. 10-CV-2481, 2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010) .............................. 9

*Moberg v. 33T LLC*,
  666 F. Supp. 2d 415 (D. Del. 2009) ............................................. 9, 11, 12

*N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*,
  No. 4:17-CV-00062, 2017 WL 2402579  (E.D. Tex. Jun. 2, 2017) ..................... 14, 19

iv

*Nat'l Org. for Women v. Scheidler*
    510 U.S. 249 (1994) .................................................................................................... 3

*Neothermia Corp. v. Rubicor Med., Inc.,*
    345 F. Supp. 2d 1042 (N.D. Cal. 2004) ....................................................... 20, 22

*Nguyen v. Barnes & Noble Inc.,*
    763 F.3d 1171 (2014) ....................................................................................... 23, 24

*Oklevueha Native Am. Church, Inc. v. Holder,*
    676 F.3d 829 (9th Cir. 2012) ........................................................................... 3

*Palmer/Kane LLC v. Gareth Stevens Publ'g,*
    No. 1:15-CV-7404, 2017 WL 3973957 (S.D.N.Y. Sept. 7, 2017)........................... 9

*Pyro Spectaculars N., Inc. v. Souza,*
    861 F. Supp. 2d 1079 (E.D. Cal. 2012) ....................................................... 15, 20

*Reed Elsevier, Inc. v. Muchnick,*
    559 U.S. 154 (2010) .......................................................................................... 4

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ............................................................................ 24

*Saleh v. Bush,*
    848 F.3d 880 (9th Cir. 2017) ........................................................................... 12

*Schlemmer v. Buffalo, R & P R Co,*
    205 U.S. 1 (1907) .............................................................................................. 7

*Scottsdale Ins. Co. v. Hudson Specialty Ins. Co.*
    2016 WL 1169378 (N.D. Cal. Mar. 25, 2016) .................................................. 3

*Seoul Broad. Sys. Int'l, Inc. v. Korea Int'l Satellite Broad.,*
    No. CV 08-05119, 2009 WL 10673370 (C.D. Cal. Jan. 27, 2009)........................ 3

*Shropshire v. Canning,*
    809 F. Supp. 2d 1139 (N.D. Cal. 2011) .......................................................... 13

*Silvaco Data Sys. v. Intel Corp.,*
    184 Cal. App. 4th 210 (2010)...................................................................... 13, 16

*Sleep Science Partners v. Lieberman,*
    No. 09-CV-4200-CW, 2010 WL 1881770 (N.D. Cal. May 10, 2010) ................. 10

*Sw. Airlines Co. v. BoardFirst, L.L.C.,*
    No. 3:06-CV-0891-B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007).......... 23, 24

*United States v. First City Nat'l Bank,*
    386 U.S. 361 (1967) .......................................................................................... 6

*United States v. Nosal,*
    844 F.3d 1024 (9th Cir. 2016) ......................................................................... 14

v

*Veronica Foods Co. v. Ecklin*,
   No. 16-CV-07223-JCS, 2017 WL 2806706 (N.D. Cal. Jun. 29, 2017) .................................. 17

*Way.com, Inc. v. Singh*,
   No. 3:18-CV-04819-WHO, 2018 WL 6704464 (N.D. Cal. Dec. 20, 2018) .......................... 13

*William Wade Waller Co. v. Nexstar Broadcasting, Inc.*,
   No. 4:10-cv-764, 2011 WL 2648584 (E.D. Ark. July 6, 2011) ....................................... 10, 11

*Yagman v. Garcetti*,
   852 F.3d 859 (9th Cir. 2017) ................................................................................... 8, 13, 25

## Statutes

17 U.S.C. § 411(a) ................................................................................................. passim

18 U.S.C. § 1836 ................................................................................................... 13

18 U.S.C. § 1839 ................................................................................................... 19

Berne Convention ............................................................................................. 3, 12

Berne Convention Implementation Act of 1988
   Pub. L. No. 100-568, Sec. 9 ........................................................................... 4, 5, 12

Cal. Civ. Code § 1559 .......................................................................................... 23

Cal. Civ. Code § 3426 .......................................................................................... 13

Cal. Civ. Code § 3426.1 ............................................................................... 15, 19, 20

Copyright Act of 1976,
   P.L. 94-553 § 411(a), 90 Stat. 2583 (1976) ......................................................... 3

Digital Millennium Copyright Act of 1998, P.L. 105-304, 112 Stat. 2860 .................................. 1

Fed. R. Civ. P. 12 ............................................................................................. 2, 11

## Other

Bruce P. Keller et al.,
   *Copyright Law: A Practitioner's Guide* (2010) ....................................................... 11

Graeme W. Austin,
   "The Berne Convention as a Canon of Construction: Moral Rights After *Dastar*," 61 *N.Y.U.
   Ann. Surv. Am. L.* 111, (2011) ............................................................................ 12

H.R. Rep. 105-551 ................................................................................................. 6

Joint Explanatory Statement on House-Senate Compromise Incorporated in Senate Amendment
   to H.R. 4262,
   134 Cong. Rec. H10096 (daily ed. Oct. 12, 1988) ................................................. 6

RayMing Chang,
   "Publication Does Not Really Mean Publication: The Need to Amend the Definition of
   Publication in the Copyright Act," 33 *AIPLA Quarterly J*. 225 (2005)....................................... 11

Restatement (Third) Unfair Competition
   § 39 (Am. Law Inst. 1995) ..................................................................................................... 14

S. Rep. 105-190 ..................................................................................................................................... 6

Senate Joint Explanatory Statement on Amendment to S. 1301,
   134 Cong. Rec. S14554 (daily ed. Oct. 5, 1988)......................................................................... 6

United States Copyright Office,
   19 *The Compendium of U.S. Copyright Office Practices* 5 § 1905.1 ..................................... 10

**Planner 5D's Opp. to Princeton MTD**                                         **Case No. 3:19-cv-03132-WHO**

## I.   INTRODUCTION

Princeton's motion turns on the novel premise that owners of foreign works cannot sue for copyright infringement unless they expressly plead that they are not subject to a registration requirement applicable only to United States works. This position is at odds with federal pleading practice and international intellectual property policy, in two ways. First, the Copyright Act no longer imposes filing or pleading preconditions on foreign works. Section 411(a) of the Copyright Act, which requires pre-suit registration only of *U.S.* works, does not require foreign works owners to plead "exemption" from a statute that no longer applies to them.

Second, a close review of the text and legislative history of the Digital Millennium Copyright Act of 1998 ("DMCA"), P.L. 105-304, 112 Stat. 2860, reveals that the DMCA modified the Copyright Act such that *no* plaintiff is required to plead compliance with the registration requirement. After the DMCA, failure to register a United States work under § 411(a) is an affirmative defense for defendants to plead and prove.

Princeton's trade secret challenge also fails. Princeton's primary argument is that its own unauthorized acquisition of Planner 5D's files proves the files were not sufficiently secret, or protected. But the Complaint alleges Planner 5D's protection of its data files both technologically and legally. In finding and scraping the files, Princeton defeated the company's technological measures and also violated its Terms of Service. Questions of the degree of secrecy of the files, the adequacy of Planner 5D's protection of them, and the propriety of Princeton's means are all questions of fact unsuited for a pleadings challenge.

## II.   BACKGROUND AND WORKS AT ISSUE

This case alleges a scheme by two prominent institutions to steal tens of thousands of copyrighted files defining 3D objects and scenes (collectively, the "P5D Works") for use in artificial scene-recognition research. (Dkt. 1 ¶¶ 3, 5-6, 9, 11, 13.) Planner 5D's object and scene file collection is likely the world's largest. (*Id.* ¶¶ 3, 6.) Developed over many years at a cost of millions of dollars, it presently encompasses over 4,500 objects and 1,000,000 scenes. (*Id.* ¶¶ 29-30.)

Object and scene data have become essential to the emerging field of computer vision. (*Id.* ¶¶ 3-4, 36.) The quantity and quality of Planner 5D's files make them particularly valuable, and thus a tempting target for misappropriation. (*Id.* ¶ 39.) Planner 5D structured its website to prevent users from seeing the underlying data files, and users are prohibited from accessing or saving the data files for use elsewhere. (*Id.* ¶ 32.)

Computer vision scientists at Princeton University were among those interested in Planner 5D's data. (*Id.* ¶¶ 36-40.) Acting without Planner 5D's authorization or knowledge, these scientists downloaded about five gigabytes of files—some 48,000 objects and scenes—from Planner 5D's server in Europe. (*Id.* ¶¶ 6, 7, 13, 43-45.) They did this by crawling tens of thousands of webpages, cataloging the object and scene locations, and then scraping the data, all in an end-run around Planner 5D's public-facing website software and in violation of Planner 5D's Terms of Service. (*Id.* ¶¶ 31, 32, 43, 45.) The Terms prohibited "download[ing] . . . any portion of the Planner5D project, the Materials or any information contained therein or us[ing] the Planner5D project or the Materials other than for their intended purposes." (*Id.* ¶¶ 31, 45.) The Terms specifically prohibited Princeton method here: using a "'page-scrape,' 'robot,' 'spider[,]' or other automatic device . . . to access, acquire, copy, or monitor any portion of the Planner5D project." (*Id.*.)

Princeton researchers publicly admitted downloading the data files. (*Id.* ¶¶ 7, 38-40.) Princeton also uploaded the files to a publicly-accessible Princeton URL. (*Id.* ¶¶ 7-8, 40.)

## III.   LEGAL STANDARD

Complaints must state claims permitting relief. Fed. R. Civ. P. 12(b)(6). They will be sustained if they allege facts sufficient to make them "plausible on [their] face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facially-plausible claims are those with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts weighing 12(b)(6) dismissal "'accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party.'" *Krommenhock v. Post Foods, LLC*, No. 16-CV-04958-WHO, 2018 WL 1335867, at *3 (N.D.

Cal. Mar. 15, 2018) (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)). Complaints don't need "'detailed factual allegations,'" but only enough facts to make relief "'above the speculative level.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Courts need not credit "'conclusory allegations and unwarranted inferences.'" *Id.* (quoting *Oklevueha Native Am. Church, Inc. v. Holder*, 676 F.3d 829, 834 (9th Cir. 2012)). Finally, general allegations encompass the specific facts necessary to support them. *Scottsdale Ins. Co. v. Hudson Specialty Ins. Co.*, No. 15-CV-02896-HSG, 2016 WL 1169378, at *4 (N.D. Cal. Mar. 25, 2016) (citing *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994)).

## IV.   ARGUMENT

### A.   Planner 5D Need Not Plead the Inapplicability of § 411(a)'s Registration Requirement to the Infringement of Foreign Works.

#### 1.   Even if Owners of U.S. Works Are Required to Plead Compliance with § 411(a), Planner 5D Is Not Required to Plead "Exemption" from That Requirement.

The Copyright Act states that, with irrelevant exceptions, "no civil action for infringement of the copyright *in any United States work* shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a) (emphasis added). There is thus no registration requirement for foreign works. *Seoul Broad. Sys. Int'l, Inc. v. Korea Int'l Satellite Broad.*, No. CV 08-05119, 2009 WL 10673370, at *4 (C.D. Cal. Jan. 27, 2009). Planner 5D is a Lithuanian corporation asserting infringement of foreign works. It is not required to register the P5D Works. Nor is it required to plead that the § 411(a) registration requirement does not apply.

This is so because inapplicability of the registration requirement is not an element of the claim. While foreign works are often referred to as "exempt" from § 411(a), this mischaracterizes the statute. Before the United States implemented the Berne Convention in 1989, pre-suit registration was required "for infringement of copyright *in any work*." Copyright Act of 1976, P.L. 94-553 § 411(a), 90 Stat. 2583 (1976) (emphasis added). But that language was incompatible with Article 5(2) of the Berne Convention, which states that "[t]he enjoyment and exercise of [copyright by foreign authors] shall not be subject to any

formality." To correct this, the Berne Convention Implementation Act of 1988 ("Berne

Convention Implementation Act"), Pub. L. No. 100-568, § 9, changed § 411(a) to remove the

requirement for any "Berne Convention works whose country of origin is not the United

States," 17 U.S.C. § 411(a) (1989). At that point, § 411(a) *did* require plaintiffs to plead

compliance with or exemption from the registration requirement. But in 1998, the DMCA

changed the statute. Section 411(a) now states simply that only "United States works" must be

registered. The result is that copyright registration is a precondition to suit for United States

works, but not for foreign works. *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166, 169

(2010).

To support its contention that foreign copyright owners must plead the inapplicability

of § 411(a), Princeton cites two cases: *Fourth Estate Pub. Benefit Corp. v. Wall-Street.com,*

*LLC*, 139 S. Ct. 881 (2019)  and *DigitAlb, Sh.A. v. Setplex, LLC*, 284 F. Supp. 3d 547

(S.D.N.Y. 2018). (Dkt. 31 at 8-9.)

Neither supports Princeton's position. In *Fourth Estate*, the Supreme Court held that

"registration" for purposes of § 411(a) occurs when the Copyright Office issues a certificate

of registration, and not when the applicant submits its application. 139 S. Ct. at 888. There

was no suggestion that the works in *Fourth Estate* were not United States works, and the

Supreme Court said nothing about any obligation on owners of foreign works to plead the

non-applicability of the registration requirement. Fourth Estate is thus irrelevant to the

question here, which is whether compliance with § 411(a) must be pleaded in a foreign-work

case.

*DigitAlb* does state that copyright plaintiffs must plead exemption from registration for

non-U.S. works. But that court confused the requirement that exemption from registration be

*proved* with a requirement that it be *pleaded*. This is evident from the cases *DigitAlb* cited to

support of its proposed rule. Each concerned requirements not for pleading, but for proof.

*Kernel Records Oy* was a summary judgment decision. *Kern[e]l Records Oy v. Mosley*, 794

F. Supp. 2d 1355, 1358 (S.D. Fla. 2011), *aff'd on alternate grounds*, 694 F.3d 1294 (11th Cir.

2012). And *Joint Stock Co.* merely noted in *dicta* that "'the party seeking to protect a work

must first *establish* that the subject of copyright is not a United States work.'" *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, No. 16-CV-1318, 2017 WL 696126, at *13 (S.D.N.Y. Feb. 15, 2017) (emphasis added). "Establish" here means "prove." The court did not say foreign work status must be *pleaded*. Indeed, *Joint Stock Co.* drew its *dicta* from *Elohim EPF USA,* which, like *Kernel Records Oy*, was a summary judgment decision. *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. 14-CV-02496, 2015 WL 12655484, at *1, *5 (C.D. Cal. Nov. 19, 2015). Thus it is not the case that "any party seeking to surmount the registration requirement could simply omit any allegation about first publication." (*Cf.* Dkt. 31 at 8:18-23.) To "surmount" the registration requirement, foreign first-publication still needs to be *proved*.

### 2. Under the DMCA's Revisions to the Copyright Act, Lack of Registration Is an Affirmative Defense to Be Pleaded by the Defendant.

The previous section showed that, even if copyright holders of United States works are required to plead registration, holders of foreign works such as Planner 5D are not required to plead the *inapplicability* of the requirement. But it's separately the case that the prevailing understanding of § 411(a) is incorrect. A careful study of revisions to the Copyright Act made by the DMCA shows that the revised statute does not require pleading the pre-suit registration of *either* U.S. works or foreign works. The revised statute instead shifts the burden to defendants to plead and prove failure to register as an affirmative defense.

### a. Under the Post-DMCA § 411(a), the Registration Requirement Is an Exception to the General Rule against Formalities for Infringement Claims.

The old § 411(a) did treat foreign works as an exception to the general pre-suit registration requirement:

> *Except for actions for infringement of copyright in Berne Convention works whose country of origin is not the United States* . . . no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.

17 U.S.C. § 411(a) (1988) (emphasis added). The legislative history of the Berne Convention Implementation Act indicated that owners of foreign works bore the burden of pleading and

proving this exception. Joint Explanatory Statement on House-Senate Compromise Incorporated in Senate Amendment to H.R. 4262 (Berne Convention Implementation Act of 1988), 134 Cong. Rec. H10091 (daily ed. Oct. 12, 1988); Senate Joint Explanatory Statement on Amendment to S. 1301, contained in 134 Cong. Rec. S14549 (daily ed. Oct. 5, 1988).

But this was changed by the DMCA, which introduced the definition of "United States work" in § 101 and amended § 411(a) to its current form. Those revisions were intended to change § 411(a) from an *exception* for foreign works to a *limited precondition* for United States works. The Senate Judiciary Committee Report on the DMCA explains:

> The amendments made by subsection (d) <u>reframe the registration requirement in the affirmative--essentially the converse of the current section 411(a)</u>. In other words, the provision would state affirmatively that "United States works" must be registered before suit. Rather than frame an exemption from that requirement for certain works whose origin *is not* the United States, section 411(a) would, as amended by this subsection, <u>merely limit the requirement of registration as a precondition to suit to those works whose country of origin *is* the United States.

S. Rep. 105-190 at 27 (underscore added; italics in original). The House concurred:

> Amendments to section 411(a) *reframe the registration requirement in the affirmative—essentially the converse of the current section*. In other words, the provision would state affirmatively that "United States works" must be registered before suit, with "United States works" defined as the converse of the current definition of works whose country of origin is not the United States.

H.R. Rep. 105-551 Pt. I at 16 (emphasis added). The DMCA thus intentionally inverted the pre-existing presumption of § 411(a). Registration was no longer a de facto element of an infringement claim. Instead, it became an affirmative defense, as we now show.

### b. Because Registration Is Now the Exceptional Case, Princeton Must Plead and Prove Planner 5D's Failure to Comply with § 411(a) as an Affirmative Defense.

The inversion of the pre-suit registration requirement worked a mirror-image change to the burdens of pleading and proof. "Placing the burden on the defendant is . . . the 'general rule where the defendant claims the benefits of an exception to the prohibition of a statute.'" *CFTC v. Monex Credit Co.*, 931 F.3d 966, 973 (9th Cir. 2019) (alterations omitted) (quoting *United States v. First City Nat'l Bank*, 386 U.S. 361, 366 (1967)); *see also Corning Glass*

*Works v. Brennan*, 417 U.S. 188, 196-97 (1974) ("[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."); *Schlemmer v. Buffalo, R & P R Co*, 205 U.S. 1, 10 (1907) ("The general rule of law is, that a proviso carves special exceptions only out of the body of the act; and those who set up any such exception must establish it."). Here, Princeton claims the benefit of the exception to the general rule that copyright holders may bring infringement suits without complying with copyright registration formalities.

In *Reed Elseveir*, the Supreme Court compared the § 411(a) registration requirement to the requirement under the Prison Litigation Reform Act (PLRA) that plaintiffs exhaust administrative remedies as a precondition to suit. 559 U.S. at 166 n.6 (citing *Jones v. Bock*, 549 U.S. 199 (2007)). The Court noted that under the PLRA, administrative exhaustion was "an affirmative defense even though there is no question that exhaustion is mandatory under the PLRA." *Id.* (internal quotation and citation omitted). Likewise here. Section 411(a)'s registration requirement, like the PLRA's exhaustion requirement, is an affirmative defense.

The Ninth Circuit's recent decision in *Monex* further illustrates that defendants bear the burden of pleading statutory exceptions as an affirmative defense. *Monex Credit Co.*, 931 F.3d at 973 (statutory exception from commodities broker registration requirement was an affirmative defense); *accord CTFC v. So. Trust Metals, Inc.*, 894 F.3d 1313, 1324 (11th Cir. 2018) (same).

Applying these principles to this case, Princeton, and not Planner 5D, bears the burden to plead and prove that § 411(a)'s registration requirement was not met. Further, with lack of registration an affirmative defense, the Court could grant Princeton's dismissal motion only in the "rare case[]" that the defense is "clear from the face of the complaint." *Albino v. Baca*, 747 F.3d 1162, 1169 (2014). As explained below, Planner 5D's allegations come nowhere near establishing that its works are U.S. works.

### 3.     If the Court Concludes That Planner 5D Is Required to Plead the Non-Applicability of the Registration Requirement, It Should Grant Leave to Amend.

If the Court concludes that § 411(a) is not an affirmative defense and that Planner 5D is required to plead the non-applicability of the registration requirement, any dismissal should be with leave to amend. *Yagman v. Garcetti*, 852 F.3d 859, 863 (9th Cir. 2017).

Here, Princeton contends the pleading could not be cured because the allegations demonstrate that the P5D Works are United States works. This is far from the case. The Complaint does not allege when the P5D Works were first posted to the Internet, what use of them was originally made, where they were made available and to whom, whether the works (or individual files within them) were first published in some other place, form, or format, or where any such alternate publication first occurred. As shown below, all of this affects whether copyrighted works are "United States works" requiring pre-suit registration. *Cf.* 17 U.S.C. § 101 (defining "United States works").

The Complaint states only that the P5D Works were authored in Europe by foreign individuals (Dkt. 1 ¶¶ 29-30), and that they were accessible through Planner 5D's website. (*Id.* ¶ 27.) As we now show, posting copyrighted works to the Internet is not tantamount to "publication," much less "first publi[cation]," and even if it *were*, it would not automatically qualify as a publication "simultaneously in the United States." In the absence of pleadings specifically describing the manner in which the P5D works were *first* distributed, there is no basis to conclude that "the pleading could not possibly be cured by the allegation of other facts." *Yagman*, 852 F.3d at 863 (internal quotation marks and citations omitted).

#### a.     Internet Posting Is Not Necessarily "Publication."

The Copyright Act defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. (Offering to distribute copies can also constitute "publication," *id.*, but only for purposes of "further distribution, public performance, or public display," none of which is pleaded here.) The Complaint does not allege that the P5D Works,

1   or any individual files, were "published" when Princeton downloaded them from

2   Planner 5D's European server.

3        Merely placing a file on an Internet server does not automatically constitute

4   "publication" under the Copyright Act. *Einhorn v. Mergatroyd Products.*, 426 F. Supp. 2d

5   189, 197 n.45 (S.D.N.Y. 2006) ("merely posting a digital file . . . on the Internet" does not

6   amount to  publication because it "lacks the element of commercial exploitation"); *McLaren*

7   *v. Chico's FAS, Inc.*, No. 10-CV-2481, 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010)

8   (allegation that images were posted on website did not "suffice to plead 'publication'").

9        Whether a given Internet posting constitutes publication "requires resolution of factual

10   disputes regarding the extent to which [the posted material] was available to the general

11   public and the purpose for which [it was] posted." *Palmer/Kane LLC v. Gareth Stevens*

12   *Publ'g*, No. 1:15-CV-7404, 2017 WL 3973957, at *12 (S.D.N.Y. Sept. 7, 2017). *See also*

13   *Elliott v. Gouverneur Tribune Press, Inc.*, No. 7:13-CV-00055, 2014 WL 12598275, at *3

14   (N.D.N.Y. Sep. 29, 2014) (observing that whether Internet posting amounted to publication

15   was a "fact intensive" inquiry and denying summary judgment after limited discovery).

16        The law on this point has been described as "unsettled." *Moberg v. 33T LLC*, 666 F.

17   Supp. 2d 415, 422 (D. Del. 2009). *See also Palmer/Kane*, 2017 WL 3973957, at *12

18   (S.D.N.Y. Sept. 7, 2017) ("Courts have reached differing conclusions as to whether merely

19   placing a file on a website constitutes 'publication' within the meaning of the Copyright

20   Act."). But the many decisions finding Internet posting *not* to be publication undermine any

21   claim to a per se rule.

22        Certainly Princeton's cited cases do not support a per se rule, or else they have been

23   widely criticized. Princeton cites the district court's decision in *Kern[e]l Records Oy* for the

24   proposition that publication occurs when a work is "available for downloading and copying."

25   794 F. Supp. 2d at 1358. But the court's decision in that case was based on evidence that the

26   plaintiff's songs were "not merely viewable (audible) on the Internet," but also "available for

27   downloading and copying." *Id.* at 1364. Here, as the Complaint clearly alleges, Planner 5D's

28   website did *not* allow its files to be downloaded or copied. (Dkt. 1 ¶¶ 31-32.) Further, the

Eleventh Circuit *rejected* the district court's standard, holding that publication is not established by "proof of distribution or an offer to distribute, alone," but also involves consideration of "the method, extent, and purpose of distribution." *Kernel Records Oy,* 694 F.3d at 1303. *Cf.* United States Copyright Office, 19 *The Compendium of U.S. Copyright Office Practices* 5 § 1905.1 ("[A] work may be considered unpublished if, in addition to communicating a work to a definitely selected group and for a limited purpose, the copyright owner imposed any express or implied restrictions concerning the disclosure of the content of that work."). Based on this standard, the Eleventh Circuit held that the defendant failed to show the absence of genuine dispute. *Kernel Records Oy*, 694 F.3d at 1309. The court affirmed, but on alternate grounds. *Id.*

*Sleep Science Partners* likewise does not support Princeton's theory. The plaintiff in that case did not contest the court's assumption that, in the circumstances there, its content had been "published" on the Internet. *Sleep Science Partners v. Lieberman*, No. 09-CV-4200-CW, 2010 WL 1881770 at *5-*6 (N.D. Cal. May 10, 2010). Rather, the question was the same one recently resolved in *Fourth Estate*—whether, in the case of an acknowledged U.S. work, mere application for a copyright satisfied § 411(a)'s requirement of pre-suit "registration." *Sleep Science* is therefore silent on the question here, which is whether and under what circumstances posting content to the Internet constitutes "publication."

In support of its argument that Internet posting is automatically publication, Princeton cites *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002), and *William Wade Waller Co. v. Nexstar Broadcasting, Inc.*, No. 4:10-CV-764, 2011 WL 2648584 (E.D. Ark. Jul. 6, 2011).

*William Wade Waller* follows *Getaped* without analysis. *Getaped*, for its part, has been widely condemned for blurring the distinction between "publication" and "public display," and for ducking the fact-intensive inquiry required. *E.g.*, *Elliot*, 2014 WL 12598275, at *3 (noting that *Getaped* has been "widely criticized" and holding that "[t]he fact intensive nature of this inquiry [whether posting the photos at issue online constituted publication] demonstrates the inappropriateness of summary judgment at this time") (citing Bruce P.

Keller et al., *Copyright Law: A Practitioner's Guide* § 6:1.2 n.94 (2010) ("The holding in *Getaped* is difficult to reconcile with the principle that a public display of a work is not a publication and may be an example of bad facts making bad law.")); RayMing Chang, *Publication Does Not Really Mean Publication: The Need to Amend the Definition of Publication in the Copyright Act*, 33 AIPLA Quarterly J. 225, 239-40 (2005) (describing *Getaped* as "wrongly decided" for equating publication with distribution without regard to the copyright owner's consent to reproduction).

The Court should decline to adopt *Getaped*'s per se rule. To properly determine whether and where Planner 5D's works were published requires consideration of when, where, and how the P5D Works were made available to the public. It is no coincidence that neither *Getaped* nor *William Wade Waller* addressed this issue in the context of a Rule 12(b)(6) dismissal motion . At this juncture, the Court need only determine the Complaint does not *foreclose* the possibility that the P5D Works are unpublished, and that granting leave to amend would therefore not be futile.

### b. Even if the P5D Works Were Published by Posting Them Online, That Publication Was Not Necessarily Simultaneous Within the United States.

Even *if* the Court concludes that the mere fact of posting the P5D Works online—no matter how, where, or when they were posted—constituted "publication," the Complaint would still not establish that the P5D Works were "United States works" requiring pre-suit registration. Princeton relies not just on the assumption that the P5D Works have been published, but also on the further assumption that they were either "*first* published" or "*simultaneously* published" in the U.S. (Dkt. 31 at 12-13.)

The Complaint does not support either assumption. It alleges that Planner 5D's website is hosted on a server in Europe. (Dkt. 1 ¶ 43.) But it is silent about whether data posted to that server was simultaneously available in the United States. Three cases have addressed whether works posted to a foreign Internet server are published "simultaneously" in the United States. Two remain good law, both *rejecting* Princeton's position: *Moberg* and

1   *Kubota Corp. v. Shredderhotline.com Co., Inc.*, No. 12-CV-6065, 2013 WL 6096999 (N.D.

2   Ill. Nov. 20, 2013).

3         The district court in *Moberg* held that posting the plaintiff's photographs to a German

4   website was not worldwide publication. 666 F. Supp. 2d at 422-24. To hold otherwise, the

5   court reasoned, would subject foreign plaintiffs "to the very formalities that the Berne

6   Convention eschews," and do so under the copyright laws of all countries of the world, *id.* at

7   422, while enabling "domestic users" to infringe foreign works with impunity, *id.* at 423; *see*

8   *also Kubota*, 2013 WL 6096999, at *8 (holding that the works at issue were "foreign works"

9   because they were "first published in January 2004 in Japan on Kubota's Japanese corporate

10  website"). In light of the overriding purpose of the Berne Convention and the Berne

11  Convention Implementation Act to eliminate formalities as prerequisites to international

12  copyright enforcement, *Moberg*'s interpretation correctly avoids conflict with the Berne

13  treaty. *Saleh v. Bush*, 848 F.3d 880, 891 (9th Cir. 2017); *see generally* Graeme W. Austin,

14  *The Berne Convention as a Canon of Construction: Moral Rights After Dastar,* 61 N.Y.U.

15  Ann. Surv. Am. L. 111, 150 (2011).

16        Princeton also relies on the district court's decision in *Kern[e]l Records Oy*, the

17  relevant part of which was *reversed.* The Eleventh Circuit held that the evidence was

18  insufficient to establish a song's simultaneous publication in the United States because it was

19  unclear whether the online publication was actually accessible worldwide or was a more

20  limited distribution. 694 F.3d at 1311. The court expressly declined to decide "what effect

21  simultaneous worldwide publication would have under 17 U.S.C. § 101's definition of a

22  United States work." *Id.* It affirmed the district court only on an alternate ground. *Kernel*

23  *Records Oy* was also a summary judgment decision, not a pleadings challenge.

24        Princeton also argues that the P5D Works were first published in the United States

25  because Planner 5D purposefully availed itself of the laws of California. This is irrelevant.

26  Princeton points to no authority—and Planner 5D is aware of none—holding that a "minimum

27  contacts" analysis has any bearing on where a copyrighted work was first published. The sole

28  case Princeton relies on in support of this novel theory concerned not publication, but whether

uploading an infringing video from Canada to a California server was extraterritorial activity and not subject to the U.S. Copyright Act. *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1146 (N.D. Cal. 2011).

Given the absence of allegations about the nature and timing of the posting of P5D's works to the Internet, the Court has no way to determine whether the P5D Works were "published" by online posting and, if so, whether that publication was "simultaneously" within the United States. Accordingly, it is impossible for the Court to conclude at this juncture that the Complaint could not possibly be cured by alleging of other facts. *See Yagman*, 852 F.3d at 863.

### B.   Planner 5D States a Claim for Trade Secret Misappropriation.

Planner 5D has adequately pleaded its data files as trade secrets, and Princeton's misappropriation of them.

#### 1.   A Trade Secret Is Information That Is Secret, Valuable, and Reasonably Protected.

Under both the Defense of Trade Secrets Act, 18 U.S.C. § 1836, and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, a trade secret is "secret" information whose "owner has made reasonable efforts to keep secret" and that "derives independent economic value from not being generally known to other persons." *Way.com, Inc. v. Singh*, No. 3:18-CV-04819-WHO, 2018 WL 6704464, at *4 (N.D. Cal. Dec. 20, 2018) (citations, internal quotation marks, and ellipses omitted). Applying these elements to concrete cases, courts have developed guiding principles.

##### a.   Releasing a Product Does Not Disclose Trade Secrets Used to Make It.

Secrecy is not lost by releasing a product made using a trade secret, as long as the trade secret itself is not disclosed. As a useful analogy, a baker can sell a "pie" without revealing the trade secret "recipe used to make it." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 224, 226 (2010), *overruled on other grounds by Kwikset Corp. v. Super. Ct.*, 51

Cal. 4th 310, 337 (2011). Likewise, a developer can distribute finished software and still maintain the secrecy of source code from which it was compiled. *Id.* at 218.

### b. Absolute Secrecy Is Not Required.

Secrecy is "a relative concept." *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). As such, "[p]ublication on the Internet does not necessarily destroy the secret." *Id.* Destruction may result if publication is "[w]idespread" and "anonymous." *Id.* But secrecy is preserved if Internet publication is "sufficiently obscure or transient or otherwise limited so that it does not become generally known to . . . persons to whom the information would have some economic value." *Id.* "The concern is whether the information has retained its value to the creator in spite of the publication." *Id.* (citing Restatement (Third) Unfair Competition (Restatement) § 39 cmt. f (Am. Law Inst. 1995)).

Because secrecy is a relative concept, it "requires a fact-intensive analysis." *Id.* at 251, 256 (reversing preliminary injunction on free speech grounds but cautioning that "[t]he ultimate determination of trade secret status and misappropriation would be subject to proof to be presented at trial"); *accord Art of Living Found. v. Does 1-10*, No. 5:10-CV-05022-LHK, 2012 WL 1565281, at *19 (N.D. Cal. May 1, 2012).

### c. Compilations Can Be Trade Secrets Even if Individual Elements Are in the Public Domain.

Compilations can be trade secrets even when some or all of their individual elements reside in the public domain. *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("'The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements . . . .'" (quoting Restatement § 39 cmt. f)); *N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, No. 4:17-CV-00062, 2017 WL 2402579, at *8 (E.D. Tex. Jun. 2, 2017) (uniquely large registry of genetic information about deer was trade secret, despite potential, with "significant amount of time and effort," to compile "solely off the public disseminations"); *Earthbound Corp. v. MiTek USA, Inc.*, No. 16-CV-7223-DMG, 2017 WL 2919101, at *12 (C.D. Cal. Feb. 10, 2017) (lists of calculated project estimates for earthquake retrofitting were "classic

14

examples" of trade secrets despite competitors' access to the underlying data, because the "compiled lists present all of that information in one location such that an independent and time-consuming review is unnecessary").

### d.  Preserving Trade Secret Status Requires Only Efforts That Are Reasonable in the Circumstances.

A trade secret must be subject to secrecy efforts that are "reasonable under the circumstances." Cal. Civ. Code § 3426.1 (d)(2). Restrictive licenses, confidentiality agreements, and other contractual restrictions are regularly found to be reasonable efforts. *E.g., MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir. 1993); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1090-91 (E.D. Cal. 2012); *DVD Copy Control Assn.*, 116 Cal. App. 4th at 251. An obligation to maintain secrecy may also be implied from the circumstances of disclosure. *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1046 (C.D. Cal. 2011) (*citing Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974)).

Efforts to maintain secrecy may be reasonable even if "unauthorized actions" can overcome them. *Pyro Spectaculars*, 861 F. Supp. 2d at 1091. Courts "should not require a person or corporation to take unreasonable precautions to prevent another from doing that which he ought not do in the first place." *E.I. duPont deNemours & Co. v. Christopher,* 431 F.2d 1012, 1017 (5th Cir. 1970); *see also* Cal. Civ. Code § 3426.1 legis. comm. cmts.— Senate, 1984 addition (West) (citing *E. I. duPont deNemours* with approval); *Kewanee Oil Co*, 416 U.S. at 476 (same); *Pyro Spectaculars*, 861 F. Supp. 2d at 1091 (following *E.I. duPont deNemours*); Restatement § 43 cmt. f, illus. 3 (based on *E.I. duPont deNemours*).

Whether efforts to maintain secrecy are reasonable under the circumstances is a question of fact for the jury. *Mattel*, 782 F. Supp. 2d at 1046.

2. **Planner 5D Has Adequately Pleaded That Its Data Files Are Trade Secrets.**

a. **Planner 5D Adequately Alleges Its Data Files' Value.**

Planner 5D possesses over a million digitized and realistic three-dimensional objects and scenes, each one created by human hands. (Dkt. 1 ¶¶ 5, 29, 30.) This data file library is far and away the largest set of digitized, realistic, three-dimensional objects and scenes in the world. (*See id.* ¶¶ 3-6.) Planner 5D compiled its unique library over many years at a cost of millions of dollars. (*Id.* ¶ 5.) Its data files have become vital to scene recognition research and exceedingly valuable in developing scene recognition technology. (*Id.* ¶¶ 4, 34-35.)

b. **Planner 5D Adequately Alleges Its Data Files' Secrecy.**

Planner 5D's proprietary software uses these data files to render images that users can select, view, and arrange on screen. (Dkt. 1 ¶ 32.) But critically, Planner 5D's website is structured to prevent users from seeing the underlying data files, or accessing or saving the data for use elsewhere. (*Id.*)

Planner 5D does not claim the on-screen three-dimensional images as its trade secrets. But just as a baker can sell a pie without revealing its secret recipe, Planner 5D's software displays images without revealing the data files used to render them. *See Silvaco Data Sys.*, 184 Cal. App. 4th at 229 (holding that distributing finished software does not reveal its underlying source code).

Princeton argues that its own unauthorized actions negate the secrecy of Planner 5D's data file library. It observes that "it was possible for Princeton researchers . . . to locate the 'object and scene files'" and that "the Princeton researchers obtained downloads of those files." (Dkt. 31 at 18:15-18.) But the mere possibility of access does not destroy a trade secret. *See DVD Copy Control Assn.*, 116 Cal. App. 4th at 251 (observing that Internet publication that is "obscure or transient or otherwise limited" does not destroy secrecy).

Princeton is also incorrect that "Planner 5D allowed its users to obtain these downloads, consistent with the access Planner 5D provided on its website." (Dkt. 31 at 17:7-

8; *see also id.* at 18:11-19.) The Complaint avers the opposite. Users can interact with Planner 5D's website, and with the images the website software generates from the data files. (Dkt. 1 ¶ 32.) But the website is structured *not* to allow users to download the underlying data files for use elsewhere, much less appropriate a five-gigabyte collection of over 48,000 data files. (*Id.* ¶¶ 31-32; *see id.* ¶ 7.)

Princeton cites *Art of Living Foundation* (Dkt. 31 at 18:1-2), but that case supports the pie / recipe distinction that Princeton ignores. The plaintiff in *Art of Living Foundation* claimed that certain yoga, meditation, and breathing teachings were trade secrets. *Art of Living,* 2012 WL 1565281, at *19. The court found the text of the meditation exercises not to be secret because it was disclosed in publicly-available media. *Id.* But the court also held that the plaintiff's *teaching methods* were *not* publicly disclosed, and thus "sufficiently substantiated" as trade secrets. *Id.* The court thus denied a motion to dismiss as to the non-public teaching methods. Here, the images displayed by Planner 5D's software, like the exercise texts in *Art of Living Foundation*, are not trade secrets. But the data files used to generate those images, like the teaching methods in *Art of Living Foundation,* are trade secrets.

Princeton cites several other decisions, none of which contradicts this basic distinction between secret process and disclosed product. In each case, secrecy was destroyed because the alleged trade secret itself was disclosed. In one decision, telemarketing scripts were read to customers and, for that reason, were not secret. *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 305 (2002). In the two other decisions, the plaintiffs publicized many customer relationships and, as a result, their customer lists were not trade secrets. *Veronica Foods Co. v. Ecklin*, No. 16-CV-07223-JCS, 2017 WL 2806706, at *14 (N.D. Cal. Jun. 29, 2017) (noting that the plaintiff had failed to specify whether the allegedly poached customers were among those it had publicized); *Way.com, Inc*, 2018 WL 6704464, at *10 (noting that Way.com's customer list was readily ascertainable through public sources—namely, Way.com's own website).

It is notable that *Way.com* involved both a motion for preliminary injunction by Way.com and a motion to dismiss by the defendant. While this Court denied the preliminary injunction based on Way.com's website publication, the Court also found that Way.com had adequately pleaded its trade secrets despite the potential disclosure, denying the defendant's motion to dismiss. *Way.com, Inc.*, 2018 WL 6704464, at *9-*11.

### c.   Planner 5D Adequately Alleges Its Data Files' Reasonable Protection.

Planner 5D uses both technical and legal measures to protect its trade secrets.

Technically, as already explained, Planner 5D's website is structured to prevent users from directly accessing data files, or downloading them for use elsewhere. (Dkt 1 ¶¶ 31-32.) As a result, Planner 5D's data files cannot be saved or used outside its software without bypassing Planner 5D's public interface. This requires technical skill and effort. (*See id.* ¶¶ 6, 43.) How much technical and skill and effort is a fact question, unsuitable for resolution on the pleadings.

As explained above, Planner 5D's files were not just there for the taking. Princeton's scrapers had to do systematic work crawling tens of thousands of webpages, cataloging the object and scene locations, and then scraping the data, bypassing Planner 5D's public-facing software and website. (*Id.* ¶¶ 6, 32, 43, 45.) These unauthorized actions do not negate the reasonable efforts Planner 5D took to protect the secrecy of its data file library. *See Pyro Spectaculars*, 861 F. Supp. 2d at 1091 ("The unauthorized actions by some employees do not negate reasonable efforts to maintain the confidentiality of its proprietary information."); *E.I. duPont deNemours,* 431 F.2d at 1017 ("We should not require a person or corporation to take unreasonable precautions to prevent another from doing that which he ought not do in the first place.").

As a legal matter, Planner 5D only offers its service subject to Terms of Service that specifically prohibit using any "'page-scrape,' 'robot,' 'spider[,]' or other automatic device . . . . to access, acquire, copy, or monitor any portion of the Planner5D project." (Dkt. 1 ¶¶ 31, 45.) The Terms also prohibit "download[ing] . . . any portion of the Planner5D project, the

Materials or any information contained therein or us[ing] the Planner5D project or the Materials other than for their intended purposes." (*Id.*¶¶ 31, 45.) The "intended purposes" are using the Planner 5D website to design floor plans. (*Id.* ¶ 32.)

In the end, whether Planner 5D's combined technical and legal secrecy efforts were reasonable is a fact question unsuitable for resolution in a pleadings challenge. *See Mattel*, 782 F. Supp. 2d at 1046.

### 3. Planner 5D's Vast Library of Data Files Is a Trade Secret, Even Apart from the Status of Individual Data Files.

Although each of Planner 5D's data files is a trade secret, Planner 5D also enjoys trade-secret protection in its vast, unparalleled *library* of data files. As alleged in the Complaint, scene-recognition researchers crave large volumes of object and scene data. (Dkt. 1 ¶¶ 3-4.) The size and quality of Planner 5D's data file library is what is truly special about it. (*See id.* ¶¶ 3-6.) Creating it was expensive and timing consuming. (*Id.* ¶ 5.)

Because the collection of Planner 5D files is valuable in and of itself, and the library is not public as a collection, it enjoys trade secret protection distinct from that enjoyed by individual elements. *See N. Am. Deer Registry*, 2017 WL 2402579, at *8 (uniquely large registry of deer genetic information held trade secret despite potential to compile it from public information); *Earthbound Corp.*, 2017 WL 2919101, at *12 (calculated pricing estimates held trade secret despite public availability of underlying information).

### 4. Planner 5D Has Adequately Alleged That Princeton Misappropriated Its Trade Secrets.

#### a. Multiple Acts Qualify as Trade Secret "Misappropriation."

##### i. "Misappropriation" includes acquisition or disclosure by "improper means."

"[M]isappropriation" includes the acquisition or disclosure of another's trade secret, without consent, by a person who "[u]sed improper means to acquire knowledge of the trade secret" or "knows or has reason to know that the trade secret was acquired by improper means Cal. Civ. Code § 3426.1(b)(1),(b)(2)(A); 18 U.S.C. § 1839(5)(A), (5)(B)(ii)(I). "Improper

means" is defined to "*include*[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Cal. Civ. Code § 3426.1(a) (emphasis added); 18 U.S.C. § 1839(6).

### (a) "Improper means" includes cribbing from the work of a trade secret owner, rather than deriving results independently.

"Reverse engineering or independent derivation alone shall not be considered improper means." Cal. Civ. Code § 3426.1(a). "[B]ut one may not avoid these labors by taking the process from the discoverer without his permission at a time when he is taking reasonable precautions to maintain its secrecy." *E.I. duPont deNemours,* 431 F.2d at 1015. "To obtain knowledge of a process without spending the time and money to discover it independently is improper unless the holder voluntarily discloses it or fails to take reasonable precautions to ensure its secrecy." *Id.* at 1015-16; *see also* Cal. Civ. Code § 3426.1 legis. comm. cmts.—Senate, 1984 addition (West) (citing *E. I. duPont deNemours* with approval); *Kewanee Oil Co.*, 416 U.S. at 476 (same); *Pyro Spectaculars*, 861 F. Supp. 2d at 1091 (following *E.I. duPont deNemours*); Restatement § 43 cmt. c, illus. 3 (based on *E.I. duPont deNemours*).

### (b) "Improper means" includes acquisition or disclosure through a breach of a contractual duty to maintain secrecy.

Another form of "improper means" is acquisition or disclosure through breach of a contractual "duty to maintain secrecy." Cal. Civ. Code § 3426.1(a); *see DVD Copy Control Assn.*, 116 Cal. App. 4th at 253; *Neothermia Corp. v. Rubicor Med., Inc.*, 345 F. Supp. 2d 1042, 1044 (N.D. Cal. 2004).

### ii. Even short of "improper means," "misappropriation" can occur if information that was disclosed or used was subject to an obligation of secrecy.

Even absent "improper means," trade secrets are "misappropriated" if they are disclosed or used by someone who knew, or had reason to know, that the trade secret was acquired under a duty to keep it secret or limit its use, or was derived from someone who had

1    such a duty. Cal. Civ. Code § 3426.1(b)(2)(B)(ii), (iii); 18 U.S.C. § 1839(5)(B)(ii)(II), (III).

2    Princeton does not mention, or treat, this additional form of trade secret misappropriation

            **b.**      **Planner 5D Has Adequately Alleged Princeton's**
3                                **Acquisition of the Data Files by Improper Means, by**
4                                **Defeating Technical and Legal Measures Protecting**
                            **Them.**
5

6    Planner 5D has sufficiently alleged that Princeton defeated the technical and legal

7    measures protecting Planner 5D's trade secrets in order to get data file copies to use outside

8    the Planner 5D website.

9                           **i.  Technical circumvention.**

10   Planner 5D alleges that Princeton created computer code to bypass Planner 5D's

11   website and software, in order to locate and scrape data files. (Dkt. 1 ¶¶ 6, 43.) Princeton did

12   this by crawling through thousands of pages of Planner 5D's website HTML code. (*Id.*)

13   Princeton thereby circumvented the security measures alleged in the Complaint, acts

14   constituting improper means. *See E.I. duPont deNemours,* 431 F.2d at 1015.

15   Princeton argues that it only did what "presumably . . . anyone else could have done,"

16   and that it encountered no "security measure" when downloading Planner 5D's data file

17   library. (Dkt. 31 at 18:18-21.) Princeton further contends that "Planner 5D made its alleged

18   trade secrets available online for users to download." (Dkt. 31 at 18:24-5.) Both contentions

19   are misleading. They rest on the unfounded, and certainly unpleaded, premise that conduct

20   like Princeton's conformed to the site's design and structure.

21   As already discussed, Princeton's conduct didn't. Users can sign in to and interact

22   with Planner 5D's website to create scenes. But the website does not allow users to see the

23   underlying data files, nor to *download* them for use elsewhere. (Dkt. 1 ¶ 32.) Planner 5D's

24   allegations that, despite these protections, Princeton designed and executed computer code to

25   identify, crawl, and scrape web pages containing over 48,000 data files more than meets its

26   burden of pleading improper technical means.

27

28

                                                        21

### ii.  Legal violation.

Planner 5D likewise adequately alleges that Princeton violated Planner 5D's Terms of Service, Terms prohibiting just what Princeton did. (Dkt. 1 ¶¶ 31, 45.) This too constitutes improper means. *DVD Copy Control Assn.*, 116 Cal. App. 4th at 253; *Neothermia Corp.*, 345 F. Supp. 2d at 1044.

Princeton does not dispute that the Terms prohibit what it did. It argues instead that the Terms do not impose a sufficient duty of confidentiality to constitute a reasonable effort to maintain secrecy. (Dkt. 31 at 19:16-19.) But the Terms prohibit users from "download[ing] . . . any portion of the Planner5D project . . . or us[ing] the Planner5D project . . . other than for their intended purposes." (Dkt. 1 ¶¶ 31, 45.) The sole "intended purpose" is interior design. (*See* Dkt. 1 ¶ 27.) The Terms likewise prohibit "scrap[ing]" or crawling the Planner 5D site to "access, acquire, copy, or monitor any portion of the Planner 5D project." (*Id.*)

Together, these terms preclude all possible means of acquiring (and thus disclosing) Planner 5D's data files, or of using them, for any purpose other than interior design. While not labeled "confidentiality" or "non-disclosure" provisions, to be sure, in their operation the Terms do enforce secrecy because there is no way to acquire Planner 5D's data files without violating them. A contract's effect does not depend on formal labels.

*Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 522 (S.D.N.Y. 2017), cited by Princeton, does not alter this outcome. In *Broker Genius,* the alleged trade secrets were "user-facing elements" of the plaintiff's software. *Id.* at 498. Discussing New York law, the court recognized that terms of service violations can constitute trade secret misappropriation. *Id.* at 510-11. But it held that the particular terms there, while enforceable, did not require secrecy. That was because the terms "essentially track[ed] the language of the Copyright Act," and thus did not "notif[y] users of the secrecy" of the software or "preclude[] them from describing to others the software's functions, structure, and appearance." *Id.* at 521-22. *Broker Genius* is inapt. Because users could see the alleged trade secrets, acquisition was unpreventable. Here, the trade secrets are data files that users cannot see without crawling, downloading, or hacking. By prohibiting these activities (Dkt. 1 ¶¶ 31, 45) Planner 5D's

1   Terms of Service effectively maintain the secrecy of the files, prohibiting users from

2   acquiring them, and thus disclosing them.

3       Princeton contends Planner 5D lacks standing to enforce the Terms of Service.

4   (Dkt. 31 19:14-15.) This is incorrect. It is true that the Terms recite "Farminers Limited" as

5   the counterparty. But the Terms clearly protect Planner 5D and its technology. Entitled

6   "Terms of Service of the **Planner5D project**," (emphasis added), the Terms describe

7   "Planner5D" as the "exclusive owner and operator" of the Planner5D platform and refer

8   throughout to Planner 5D and the Planner 5D project. (Dkt. 32-1 at 1 & *passim.*) At a

9   minimum, then, Planner 5D has standing to enforce the Terms as an express intended

10  beneficiary. Cal. Civ. Code § 1559; *Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir.

11  2009) ("Under . . . California law . . . an express third-party beneficiary . . . has the right to

12  enforce a contract made expressly for her benefit . . . .").

13      Because Princeton surfaced this issue by asking for judicial notice of the complete

14  Terms, Planner 5D had no occasion to plead its relationship to Farminers. It is Farminers'

15  successor-in-interest. But amendment is not needed to add this allegation. Planner 5D can

16  clearly enforce the Terms as an express intended beneficiary.

17      Finally, Princeton states that it "does not believe that the Terms of Service are

18  enforceable." (*See* Dkt. 31 at 19 n.11.) Because Princeton never develops this argument,

19  Planner 5D assumes that Princeton is not moving to dismiss on this basis. In case that

20  assumption is wrong, Planner 5D responds.

21      The enforceability of a website's terms is a fact-intensive question inappropriate for

22  resolution on the pleadings. Website terms are enforceable if (1) the user had actual notice or

23  (2) "a reasonably prudent user would have inquiry notice." *Nguyen v. Barnes & Noble Inc.*,

24  763 F.3d 1171, 1176-77 (2014); *see Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-CV-04825-

25  JW, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005) (enforcing browsewrap agreement

26  based on actual notice); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06-CV-0891-B, 2007

27  WL 4823761, at *7 (N.D. Tex. Sept. 12, 2007) (same).

28

1    Thus if Princeton *in fact* saw Planner 5D's Terms of Service, it is bound by them.

2   *Nguyen.*, 763 F.3d at 1176-77; *Cairo*, 2005 WL 756610, at *5; *Sw. Airlines Co.*, 2007 WL

3   4823761, at *7. Alternatively, if Princeton was on inquiry notice of the Terms, it is also

4   bound. Inquiry notice depends on a variety of factors, including "the conspicuousness and

5   placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use,

6   and the website's general design." *Nguyen*, 763 F.3d at 1177. Other factors include the user's

7   sophistication and degree of interaction with the website. *See Cairo*, 2005 WL 756610, at *5

8   (imputing knowledge of website's terms based on "repeated and automated use");

9   *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 431 (2d Cir. 2004) (imputing knowledge of

10  terms based on repeated use of website's database).

11   Whether Princeton had actual or inquiry notice are fact questions. Planner 5D alleges

12  the Princeton was bound by the Terms. From this, it is reasonable to infer Princeton had

13  actual or inquiry notice. Nothing more is required.

14                    **c.    Princeton Does Not Address Misappropriation *Other***
                             **Than by "Improper Means."**

15

16   As noted above, trade secret misappropriation can occur absent improper means.

17  Section IV.B.3.a.ii. This occurs when trade secrets are disclosed or used by someone who

18  knew, or had reason to know, that the trade secret was acquired under a duty to keep it secret

19  or limit its use, or was derived from someone who had such a duty. *See id.* Although

20  Planner 5D contends Princeton's very acquisition of Planner 5D's data files was improper, if

21  the Court concludes otherwise, but nonetheless concludes that Princeton acquired the files

22  under a duty to keep them secret, or acquired them from a third party who had such a duty

23  (*e.g.*, a non-Princeton data scraper), the trade secret claims must be sustained. Princeton does

24  not address this kind of misappropriation in its motion, and so has waived the argument.

25  *Dytch v. Yoon*, No. 10-CV-02915-MEJ, 2011 WL 839421, at *3 (N.D. Cal. Mar. 7, 2011).

26  Princeton's motion should thus be denied.

27

28

1

2

**5.      If the Court Concludes Planner 5D Has Not Adequately Pleaded Its Trade Secret Claims, Planner 5D Should Be Granted Leave to Amend.**

3      If Princeton's motion is granted on Planner 5D's trade secret claims, Planner 5D

4 should be granted leave to amend. *Yagman*, 852 F.3d at 863, 867. Planner 5D can allege many

5 additional facts to support the elements of its trade secret claim, including secrecy, reasonable

6 efforts to maintain secrecy, and "improper means."

7 **V.      CONCLUSION**

8      For these reasons, Planner 5D respectfully requests that the Court deny Princeton's

9 motion to dismiss in its entirety.

10

11 RESPECTFULLY SUBMITTED,

12

13 August 30, 2019                              THE BUSINESS LITIGATION GROUP, P.C.

14

15                                             By:      /s/*Marc N. Bernstein*
                                                         Marc N. Bernstein
16
                                               Attorneys for Plaintiff UAB "PLANNER5D"
17

18

19

20

21

22

23

24

25

26

27

28

Planner 5D's Opp. to Princeton MTD                              Case No. 3:19-cv-03132-WHO