Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>              Plaintiff,<br><br>  VS.<br><br>META PLATFORMS, INC.,<br>FACEBOOK TECHNOLOGIES, LLC,<br>THE TRUSTEES OF PRINCETON<br>UNIVERSITY, DOES 1-200, ABC<br>CORPORATIONS 1-20 and XYZ<br>UNIVERSITIES 1-20,<br><br>              Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)   **NO. C 19-03132 WHO**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Tuesday, November 23, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:

                    THE BUSINESS LITIGATION GROUP, P.C.
                    150 Spear Street, Suite 800
                    San Francisco, California 94105
          BY:  **MARC N. BERNSTEIN**
               **CHRISTIAN ANDREU-VON EUW**
               **ATTORNEYS AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED REMOTELY BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                       CSR No. 7445, Federal Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Defendants Meta Platforms, Inc. and Facebook Technologies,
     LLC:

3                              KIRKLAND & ELLIS LLP
                               601 Lexington Avenue
4                              New York, New York 10022
                    BY:   **DALE CENDALI, ATTORNEY AT LAW**
5                         **JOHANNA SCHMITT, ATTORNEY AT LAW**
                          **MICHELLE SIX, ATTORNEY AT LAW**

6

7    For Defendant Trustees of Princeton University:
                               JENNER & BLOCK LLP
8                              919 Third Avenue
                               New York, New York 10022
9                   BY:   **JACOB L. TRACER, ATTORNEY AT LAW**
                          **ANDREW H. BART, ATTORNEY AT LAW**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Tuesday - November 23, 2021</u>**                                   **<u>2:11 p.m.</u>** |
| 2 | **<u>P R O C E E D I N G S</u>** |
| 3 | **---o0o---** |
| 4 | **THE CLERK:**  Okay.  So this is Case Number 19-3132, |
| 5 | UAB "Planner5D" versus Meta Platforms Incorporated. |
| 6 | Counsel, if you would please state your appearance for the |
| 7 | record. |
| 8 | **THE COURT:**  Mr. Bernstein, you're sounding better than |
| 9 | ever, but if you unmuted yourself, that would be great. |
| 10 | **MR. BERNSTEIN:**  Thank you.  I apologize, Your Honor.  Mark |
| 11 | Bernstein for plaintiff, Planner5D. |
| 12 | **MR. ANDREU:**  Excuse me.  And Christian Andreu for |
| 13 | plaintiff, Planner5D, as well. |
| 14 | **MS. CENDALI:**  And for the Meta defendants, formerly known |
| 15 | as Facebook, it's Dale Cendali of Kirkland & Ellis, along with |
| 16 | my partners Johanna Schmitt and Michelle Six. |
| 17 | **THE COURT:**  Good afternoon. |
| 18 | **MR. TRACER:**  And on behalf of the Trustees of |
| 19 | Princeton University, it's myself -- Jacob Tracer -- and my |
| 20 | colleague Andrew Bart. |
| 21 | **THE COURT:**  Great.  Good afternoon to you as well. |
| 22 | All right.  We have a few different matters to take up. |
| 23 | I saw the discovery dispute that was filed yesterday.  I'm |
| 24 | wondering, Ms. Cendali, whether there is any case that has |
| 25 | litigated -- where this restriction has been litigated and it's |

1    been accepted by a court, as opposed to when parties are able

2    to agree on it.

3        **MS. CENDALI:**  I think the closest one, Your Honor, is from

4    Arizona, which we cited, where they -- I can't say that it

5    rises to the level of a judicial decision; but the parties at

6    that point were initially similar to how we were here when

7    Facebook was, at that point, taking the position that there

8    should be no access outside the United States and the other

9    side was objecting to that.

10       And they reached a compromise, which is that things could

11   be viewed outside the United States but not printed or

12   downloaded.  And that is the compromise that we put forward to

13   plaintiff here and we put before the Court.

14       But I think you would be the first judge that would

15   actually assess the pros and cons of it.

16       **THE COURT:**  Okay.  As far as you know, this has not been

17   brought and been rejected by any court either?

18       **MS. CENDALI:**  No, no.  And as we said in our briefs,

19   you know, given how much Meta has been in the news, given the

20   fact that there's already been an instance of real abuse of

21   protective orders in the United Kingdom which prevented a

22   California judge from being able to reach and enforce and

23   protect -- and enforce the protective order in that nation --

24   again, this has nothing to do with casting any aspersions

25   whatsoever on Planner5D here.  It's just, the world is a

complicated place, and so we are trying to come up with a

compromise that would be reasonable under the circumstances and

protect Meta's pretty well-documented concern for protecting

its confidential information so litigation can proceed while,

at the same time, giving Planner5D access to be able to read

and view the documents.

**THE COURT:**  I understand the concern, and I think it's not

just -- there's some substance behind it.

But I'm concerned, as I balance the equities here, that

you're dealing with a party with a lot less resources that

needs not only to know what's going on, but to actually help in

the technical implementation of the case.  And I think the

prejudice to that party, particularly when you have the

protective order and the clawback order and the ESI order in

place, outweighs the concern that Facebook has.

And Mr. Bernstein, I know, will alert his client to the

sanctionable potential of these documents getting out into the

world instead of full compliance with the orders.

So that's where I'm inclined to be, unless there's some

case law to the contrary.  It doesn't seem like there is, so...

**MS. CENDALI:**  No, Your Honor.  And I'm not -- I'm

not going to tell you there was if there wasn't.  That's not

usually a good strategy for anyone before a court.

But I do think here -- and it sounded like you almost

ruled but didn't completely rule; so just two points.

1      We understand the issue of their being able to participate

2  and help.  But we all use e-discovery tools like Relativity and

3  Citrix for remote access.  It's not hard to, you know, read

4  things and not to download them and print them.  And I

5  appreciate, I'm very confident, that Mr. Bernstein will do his

6  utmost to explain everything to his client.

7      It's just, if someone knows about this case, which is

8  easily possible, and wishes to try to take advantage, hack

9  into, do something, we really -- you don't have the ability to

10  probably enforce, if it happened in the U.K., the clawback

11  orders or other -- or the protective order itself.

12      So we're just asking you, Your Honor, in this situation

13  where they are able to view it -- and we're only saying just

14  don't download it and print it -- we ask you to consider

15  whether that might be a fair compromise in light of documented

16  issues and other orders that have been entered, admittedly not

17  in a litigated fashion.

18      **THE COURT:**  Okay.  Mr. Bernstein, do you want to respond

19  to this?

20      **MR. BERNSTEIN:**  If Your Honor wants any sort of detailed

21  response, I'll defer to my colleague, Mr. Andreu.

22      But the one thing I'll say that should be highlighted is,

23  we travel with laptops and this would also prohibit counsel --

24  not just Planner5D, but counsel from having work documents on

25  their laptop if they should fly outside of the -- whether for

business or otherwise, outside of the territorial boundaries of the United States.

But if Your Honor wants any -- has further questions, Mr. Andreu is prepared to answer them.

**THE COURT:**  So, Mr. Andreu, tell me about the technical difficulties that your client would have in using the compromise that Ms. Cendali is proposing.

**MR. ANDREU:**  The tech- -- excuse me, Your Honor.

The technical difficulty is that connections between here and there are slow.  Now, we're talking, you know, fractions of a second or a second or two.  So for viewing one or two documents, that is sometimes manageable.  But every time -- if you can't download the document, every time you change a page, every time you do anything, every time you scroll, that has a delay.  And we already have a very narrow window in the day when we can work with our clients.

And I also want to go back a little bit to a few things Ms. Cendali said.  First of all, with one exception, all the cases we're talking about where parties agreed to it were parties where all of the parties were domestic parties.  They were either U.S. companies or companies with a U.S. place of business.  So this was a very low burden on those parties.  That's why they agreed to it.  The fourth case, there was one domestic and then a foreign related party.

She also brought up hacking.  And frankly, that's a red

1    herring.   Putting a computer in the United States by itself

2    doesn't make it any more or less hackable than putting a

3    computer anywhere else in the United States.

4         Back to Mr. Bernstein's point.  Just by way of example,

5    I'm going to Mexico with my family in a few months.  And if

6    this were entered, before that trip, I would have to scrub my

7    entire computer and to be careful and diligent that I'm

8    complying with the order.  Just that scrubbing process would be

9    a big affair.

10        And then, once in Mexico or traveling on the plane or

11   wherever, I'm at the mercy of whatever Internet connections I

12   have between that point and wherever these U.S. servers are, in

13   being able to represent my clients.

14        **THE COURT:**  All right.

15        **MS. CENDALI:**  May I respond, Your Honor?

16        **THE COURT:**  Go ahead.

17        **MS. CENDALI:**  Two points.

18        One, on the issue of this lag time, we had KPMG, our

19   discovery vendor -- we just got the results this morning.

20   There is, as they say, a negligible, an incontestable lag time.

21   So they made that comment, but we tested it and it doesn't fit.

22        Second, on the idea that counsel needs to travel with

23   their laptops with Meta's confidential information on vacations

24   to Mexico, I think in the scheme of things -- I know I work on

25   vacations too; but in the scheme of things, that's a bug, not a

1  feature, in the sense of confidential laptops traveling around

2  the world is exactly the worries we're in.

3      And it is very common practice, Your Honor -- and I can

4  speak from personal experience -- that law firms know to not

5  take phones or laptops to certain countries because there is a

6  significant risk that they might be looked at or hacked into or

7  confiscated.  And I think that that is a concern.

8      I think the speculative idea that counsel might someday

9  want to go on a vacation somewhere and needs a laptop with our

10  confidential information on it seems a pretty thin read under

11  the circumstances.

12      **MR. ANDREU:**  Your Honor?

13      **THE COURT:**  Go ahead.

14      **MR. ANDREU:**  I mean, when I travel, I bring my laptop,

15  which has, among other people's, my clients' information; and

16  as such, every piece of equipment I bring with me -- and

17  I think that's probably true of everybody on this call -- is

18  fully encrypted to avoid the issues Ms. Cendali is talking

19  about.

20      And also, I want to step back and just sort of talk about

21  this request as it is.  Facebook has had a problem where, in

22  this context and others, their internal documents have gotten

23  out and they've caused embarrassment and problems with

24  regulators.  And what Facebook is saying is, Facebook would

25  like special rules for litigating against Facebook.

1          They freely admit there's no concern about our clients, no

2     concern about us, no specific concern that I've heard about the

3     issues in this case.  It's just a concern that Facebook says,

4     "We are so worried about our documents; litigating against us

5     should be different."

6          **MS. CENDALI:**  I don't think that's fair, Your Honor.

7          I mean, plaintiff's chosen to avail itself of the courts

8     of the United States.  They're entitled to do so.  All

9     litigants are entitled to fairness and reasonableness.  That's

10    baked into the federal rules.

11         I keep going back to the speculation of "Well, maybe I

12    want something" -- "to read something on my vacation," to the

13    practicalness that they are able to read and review and look at

14    these documents in Lithuania.

15         And given the documented instances in the past, it doesn't

16    seem that the compromise reached in the Arizona case is

17    untenable.  And we just -- I feel like we're repeating

18    ourselves now, so I'll stop.  But it's a serious issue or we

19    wouldn't be raising it.

20         **MR. BERNSTEIN:**  If I may, Your Honor.

21         **THE COURT:**  You may.  And this time, can you explain a

22    little further what the problem is for your client?  I

23    understand the lawyer problem, but I'm interested in the client

24    problem.  And what I had understood was the need for your

25    clients to be doing a fair amount of the technical work, in

1    addition to having the information, to understand how the case

2    was proceeding.

3        **MR. ANDREU:**  Yes, Your Honor.  And if I may, I'll also

4    address the point about speculation after I answer your

5    question.

6        The difference between what would normally happen and what

7    would happen under this rule is the following:  Normally, we

8    would have questions about some group of documents.  We would

9    send those documents to our client and we'd say, "Review them,

10   and here are our questions," or "We want to talk about them,"

11   or whatever.  Excuse me.  Then we would use sort of the narrow

12   window, when the times kind of overlap, to talk about them.

13   From a technical point of view, what the client does is

14   download the documents, then reads them.

15       What Facebook is essentially proposing -- and this is an

16   oversimplification -- is a little bit of a remote control.  So

17   there's a computer in the U.S., and that client is remotely

18   controlling.

19       So when you are downloading a document, you know, or a

20   body of documents and there's a three- or four-second or

21   ten-second or five-minute, or whatever, delay, it's a pretty

22   minor impediment, because you wait till it's there and then you

23   look at it.

24       Once you're in a remote-control world, every time you make

25   any change to what you see, you have to wait.  You read a page;

1   you wait.  You read a page; you wait.  That is slow and that is

2   also depending on the fickle nature of the Internet.

3       Now, Ms. Cendali says that there is some testing they've

4   done between one point and another point.  I don't know what

5   those points are.  I don't know what the conditions are.  I

6   don't know anything about that.

7       I can tell you that's very contrary to my experience

8   traveling in western Europe which has, as a general rule,

9   pretty good Internet.

10      **THE COURT:**  Okay.

11      **MS. CENDALI:**  May I respond?

12      **THE COURT:**  This will be the last thing on this topic.

13      **MR. ANDREU:**  I apologize, Your Honor.  I said I wanted to

14  address the point about speculation.  May I do that real fast?

15      **THE COURT:**  Yeah, why don't you do that, and then I'll let

16  Ms. Cendali have the last word.

17      **MR. ANDREU:**  And Ms. Cendali is saying that my vacation is

18  speculation or these problems are speculations.  These are real

19  problems.  We're arguing about their import.

20      What is speculation is that this will happen at all.

21  Facebook had one case with what seems to be a rather unique

22  counterparty where there was an issue.  This is the only time

23  that I'm aware of this has ever happened to Facebook.  And any

24  concern that it would happen in this case, which I can assure

25  Your Honor it wouldn't, that's just speculation.

1    **THE COURT:**  I wouldn't make that representation because

2  you never know.

3    But, Ms. Cendali?

4    **MR. ANDREU:**  Fair enough, Your Honor.

5    **MS. CENDALI:**  Two points.

6    One, we have Michelle Six, Kirkland's e-discovery expert,

7  who specifically was working with KPMG on the latency.  And I

8  know that counsel says, "Well, maybe there's a five-minute

9  delay or X-minute delay," but there's no support for their

10  claim that there really would be a delay, and we did test it

11  and found none.

12    Second, they wanted to say that they're -- in answer to

13  Your Honor's question, it was:  What's the problem for them?

14    They said, well, normally, they would send them documents

15  and then they would download them and then they'd have a call.

16    They can still send them an e-mail with "Look at X

17  documents," and they can still look at X documents.  They just

18  can't download them and print them in light of the concerns we

19  have.

20    And then, finally, it's standard practice at law firms,

21  Your Honor, there are many parts of the world that people just

22  know not to travel.  And law firms have big protocols, that not

23  traveling with phones and e-mails and laptops, because of this

24  fear, which is not speculation.

25    **THE COURT:**  So I imagine that Meta and Facebook have been

1   involved in dozens of cases -- scores; maybe more -- with

2   opposing parties overseas.  And is it the case that there has

3   been this one significant breach in all those cases?

4       **MS. CENDALI:**  I think that this is -- this is the one that

5   has been most recent that we know about.  We did not try to

6   boil the ocean for everything.  But it's become front-page news

7   now, and therefore, it creates more opportunity for --

8   sometimes something bad creates ideas for other people.

9       **THE COURT:**  Okay.  So I will think about this when I turn

10  off my computer, but as I sit here, I'm inclined to stick where

11  I was.  But I will put whatever I decide in the minute order so

12  that you'll have that.

13      **MS. CENDALI:**  Thank you, Your Honor.

14      **MR. ANDREU:**  Thank you.

15      **THE COURT:**  All right.  Then the second issue is the

16  depositions, the number of depositions.

17      And, Mr. Bernstein, first I had -- I don't know whether

18  you're the right person to ask, but you described some

19  depositions of Microsoft and Adobe as preliminary.  Tell me,

20  what's the purpose of those, and how are they preliminary to

21  the depositions in this case?

22      **MR. BERNSTEIN:**  Well, thank you, Your Honor.

23      So, you know, they're -- I guess they're preliminary in

24  the sense that they are plowing the ground and giving us an

25  understanding of the market and the work that's done in this

area of computer vision, of other companies before we get the
documents and then turn to Facebook and Princeton in terms of
what they're doing with this technology.

So Microsoft and Adobe have both had licensing discussions
with Planner5D -- Microsoft, before Planner5D knew about
Princeton's acquisition and publication of this stuff -- and
Microsoft was very interested in this data.  And then at one
point Microsoft said:  Hey, this stuff's available for free at
Princeton's website.

So we want to know from Microsoft, you know, what were you
planning on doing for the data?  What were you planning on --
you know, what was the role?  What was its value?  And how does
this fit into the larger scheme of this very hot and important
research topic of computer vision in recognizing interiors of
spaces?

And so those would be preliminary in the sense that we
would take those, and maybe some other individual witnesses, to
get the background that we need before -- to make it the most
productive we can by the time we take Facebook Technologies and
Princeton.  That's really what I mean by that.  We would like
to take these major depositions later, after we have the
documents and after we've had a chance to understand the lay of
the land in this area.

THE COURT:  Okay.  Well, so as I read through this -- and
I appreciate you giving me a little more identification of the

depositions that you want.  But I couldn't tell, and I suspect

you don't really know at this point either, why you would --

how many of the 12 Princeton researchers or the five scrapers

you're actually going to need in order to do the necessary

discovery in this case.  And I'm not inclined to sort of give

either the generous number that you're looking for for

depositions or set any real limit at the moment until you know

more about what you actually need for the case.

What I was thinking of doing is to give you two

preliminary depositions without counting against the ten, and

tell you:  Come back when you've got enough information to say

you need this person because she knows X and you didn't get

that information out of a 30(b)(6).

**MR. BERNSTEIN:**  Your Honor, I do think it would be very

helpful for us to have some relief from the ten when we

schedule the first depositions, as you're suggesting.  I

would -- I would tell you that we hope to not need all of these

witnesses.  If it turns out we don't, we certainly are not

interested in cumulative depositions.  The plaintiff has no

interest in spending money on that.

But we think that a placeholder for these kinds of people

is very important because this is a very -- the data set has

spread far and wide, and discovering what happened to it and

what's -- and what it's being used for is going to be central

to the case, not just by Facebook but by these other

1   researchers.

2       So having some slack that we're not going to be cutting

3   off depositions at the far end by scheduling them now, I agree,

4   is very helpful.  I would only ask Your Honor if you could,

5   you know, give us a little bit more slack and then we can come

6   back to you.

7       And also, I'd be interested in what the criteria is or

8   what you want to see.  Because I thought these were fairly

9   specific.  You know, we took some time to show why we wanted

10  these.  But if Your Honor has in mind something, you know, more

11  specific than this, you know, we can try to -- we can try to

12  provide that at a later time.

13  **THE COURT:**  Well, so the thing that I'm -- first of all,

14  what I'm thinking of is to have you all back here on March 1st,

15  just to see where things sit with respect to discovery and

16  everything else and to keep this process moving, because it's

17  complicated, I understand, and it is taking a while to get off

18  the ground.  So I want to see some progress between now and

19  then.

20      But what I would prefer is that you know enough to have a

21  realistic meet-and-confer session with the defendants so that

22  you can talk about the kinds of people who you need that you

23  haven't gotten through the 30(b)(6) so that you could then come

24  to me and say:  I need 15 and they won't give me 15, and it's

25  these five people that I really need.

1        Then I could make some sort of informed judgment about

2   this.  But I can't based on what you've got right now.

3        And I don't think the defendants -- the defendants,

4   I think, are within their rights to say:  Show me why it needs

5   to be more than the presumptive number.

6        **MR. BERNSTEIN:**  Okay.  So, Your Honor, you know, I think

7   that it's -- given how you feel, that this is the best

8   resolution.  But I just want to make sure you understand that

9   the 30(b)(6) -- this is a case where the third-party witnesses

10  are actually going to be quite important because what we need

11  to -- what we need to understand is the scope of what's

12  happened with this data, where it's spread, especially how it's

13  being used.  That's important for damages.  You know, we're

14  talking about license -- you know, prospective licenses; we're

15  talking about the value of this.

16       It got out to the world.  There's over 700 papers on this

17  data set now.  We're not going to take, you know, hundreds of

18  depositions, but we want to get a sense of the scope of the

19  problem and we want to understand the different uses to which

20  this is put, even outside of the parties.

21       And so both because of that and the importance, therefore,

22  of third-party witnesses, and because, you know, how we were

23  hoping to do this is do the 30(b)(6) toward the end, when we

24  could really ask focused and meaningful questions based both on

25  the documents and our homework, with the third-party witnesses,

1  for that reason it would be our discovery plan to start with

2  the third parties, really.  That's what we prefer to do.

3      And if we could know that we're not going to run out of

4  party depositions on the back end, that's what my concern is.

5  So I would ask Your Honor to consider maybe a couple more than

6  the 12 so that we could get started without worrying about the

7  back end, and we can regroup and see where we are at some later

8  point.

9      **THE COURT:**  All right.  So I've just been communicating

10 with Mr. Bernstein.  Let me bring in Princeton for the moment.

11     What do you all think?

12     **MR. TRACER:**  Well, thank you, Your Honor.

13     I think -- you know, I think Mr. Bernstein sort of

14 articulated the problem that we have with this proposal, which

15 is that, you know, he said that he hopes he's not going to need

16 all the people he identified on his list.  And I think that's

17 sort of precisely our concern here, which is that he's asking

18 for room to depose people based on the fact that they may have

19 relevant knowledge because they're identified in interrogatory

20 responses or because, you know, he served a subpoena on them.

21 But there's sort of no articulable basis that's sort of in the

22 record that they have non-cumulative testimony to offer.

23     **THE COURT:**  And, Mr. Bernstein, when you referred to the

24 12 Princeton researchers in the CMC statement, are they

25 Princeton people or are you thinking of them as third parties?

1        **MR. BERNSTEIN:**   Right.   So right now, we've got Princeton,

2    Meta, and Facebook Technologies.   That's three.

3        Thomas Funkhouser and Shuran Song have unclear

4    connections.   Shuran Song has graduated with her Ph.D.   She's

5    at Columbia.   So, you know, she's not a party witness; but

6    I guess she qualifies as a third party, in my understanding,

7    and a very important one because she's had a central role in

8    the articles and the research, and so on, and using this data.

9        Dr. Funkhouser is -- was the professor that headed up the

10   Computer Vision Department, published -- you know, he's like

11   the senior person on these published articles.   I think he may

12   be emeritus now.   I'm not sure if he's still there.   I know he

13   was on a sabbatical at Stanford.

14       So, yes, I count central witnesses like Shuran Song and

15   Thomas Funkhouser as third parties here because they're no

16   longer, as far as I know -- maybe Dr. Funkhouser still is

17   affiliated but Shuran Song isn't.

18       And then we have, you know, people like Daniel Huber,

19   Dr. Huber, who's disclosed in Meta's disclosures as the top

20   computer vision person at Meta and who ran the SUMO challenge

21   competition that used this data.   So we're listing him as a

22   third party, although he's presumably still connected with

23   Facebook.

24       And there are a number of other very key people.   Manolis

25   Savva is somebody who published on the original article with

Princeton and, yet, is a Facebook-affiliated person.

And it's very important for us to show the connections between Facebook and Princeton here.  You may recall in the pleadings challenges there was questions about:  Well, how much was Facebook involved, and how soon, in this data?

So these are -- you know, so that's why we've listed these particular witnesses.  So if you count central ones -- and I think Microsoft and Adobe and Stanford, which hosted the SUMO challenge data, those are very key -- Microsoft, Adobe, Stanford are very key.  So is Manolis Savva, Dr. Funkhouser, Dr. Song.  So that's what -- we get up really quickly to ten, twelve depositions; and that's not with a lot of, you know, uncertainty.  I think it's going to be hard to avoid those.

**THE COURT:**  All right.  Ms. Cendali, do you want to chime in here?

**MS. CENDALI:**  It would seem like two adages apply here: one, putting the cart before the horse, which is -- you know, he's allowed to start the third parties if he wants.  Most people try to find out what they can from the parties, then do third parties.  But whatever.  The other adage is work expands to fit the time.  And the corollary to that is, the number of depositions brought to -- will be filled.

And there's a reason the federal rules were amended to say the default is ten and the burden was on a party to show cause. I can't believe that, whether it's 12 Princeton researchers or

1    whoever it is, that all those depositions make sense and would

2    be cumulative.  And it's far too early to tell now, is the

3    bottom line.

4         We've been meeting and conferring with them productively

5    if it makes sense; and I'll promise you, Your Honor, we would

6    continue to meet and confer with them productively.  But this

7    case is not so unusual a case to need to start now with this

8    showing of increasing the default.

9         That's our position.

10        **THE COURT:**  Well, I think what we'll do is, I'm going to

11   allow the two to be outside the ten.  So the two preliminary

12   depositions -- and I shouldn't even define them.  I'm raising

13   the number to 12.

14        And, Mr. Bernstein, I'm going to set a CMC for March 1st

15   to see where we are.  And you've identified depositions that

16   you think are important that definitely need to be taken; and

17   if you want to take them sooner rather than later, it's up to

18   you.  And hopefully, you'll have sufficient discovery between

19   now and March 1st to understand things better.

20        I'm not going to go further at this point.  I recognize

21   that this may be a big case or a case that requires a lot of

22   depositions of people who won't be able to come to trial in my

23   courtroom, and so I think everybody -- it's in everybody's

24   interest to work together to figure out who matters and get

25   them in a place where discovery can happen effectively.

1    So that'll be the order of the day on that.

2    And then, with respect to the documents, the CMC indicated

3    that the defendants were going to make a proposal of some sort

4    on timing, I think.

5    **MS. CENDALI:**  Yes, Your Honor, if I may address that.

6    I'm very pleased to say that we have reached all the

7    intermediate states, and upon agreement of lots of arm

8    wrestling with Ms. Schmitt and Mr. Bernstein and his

9    colleagues, save for one issue, because we need Your Honor to

10   have to do things.  So, you know, lucky you.

11   And the one issue is the date for the substantial

12   completion of document production.  Our position -- and I speak

13   for both Princeton and Meta here; but obviously, Princeton can

14   correct me if I don't -- is that we need March 4th to have that

15   done, have that be a real date.

16   The position of the plaintiff is January 31st.  And we

17   don't think that's possible or realistic.  We'd like to have a

18   real date.  But this is what we've agreed to do, which I think

19   shows that the parties are not planning on dumping documents on

20   the last day.  No one wants to do that for anyone's reasons.

21   So the parties have agreed that on December 17th there

22   will be the first of a rolling production.  I can tell you that

23   on behalf of Meta, we have 80,000 e-mails that we are reviewing

24   right now on SUMO challenge and all sorts of things, and we're

25   going to give a substantial production to them and then keep it

1    up and keep going.

2         We're also having meet and confers, one we scheduled

3    conveniently -- I don't know if it'll stick -- for tomorrow

4    afternoon but, if not that, Monday, on whether there might be a

5    way of prioritizing certain types of documents, so things

6    parties -- both parties -- all parties want can be produced and

7    staged in an order.  That may not always be possible, but it's

8    a thought.

9         So our point is, we are trying very hard to produce

10   documents.  We want them to, too.  And real documents, business

11   documents.  But we think that given everything, that March 4th

12   is a really logical, clear date; and an earlier date is just

13   not -- not possible, not just because of the holidays but

14   because of the scope of the documents and the time it takes to

15   review so many tens of thousands of e-mails.

16        **THE COURT:**  All right.  Mr. Bernstein?

17        **MR. BERNSTEIN:**  Yes, Your Honor.

18        So we did agree on very much.  I wouldn't call it arm

19   wrestling.  I think we had very productive discussions.

20        I would say that the -- and Ms. Cendali can be forgiven

21   for having heard this secondhand; we negotiated with her

22   colleagues.  But we notice that the CMC focused people's minds

23   and attention, and I think that's very helpful.  We now have a

24   clawback order on file, an ESI protocol that's just been agreed

25   today that will be on file shortly --

 1        **THE COURT:**  Great.

 2        **MR. BERNSTEIN:**  -- and as you know, the protective order

 3   issue.

 4        We have agreed on interrogatory deadlines and early

 5   document production deadlines.

 6        The things that are of concern to us, we think that it's

 7   important to have objective criteria for what's going to be

 8   staged between the opening substantial production on

 9   December 17th and whatever date is the date we end up with for

10   substantial completion.

11        We do think that it's realistic to have substantial

12   completion by January 31st.  That's our proposed date.  The

13   defendants say March 4th.  We think that, you know, there's --

14   they've known the categories since June 30th.  That's when we

15   served the document requests.  So that's a long time to have to

16   review things.

17        So we do think January 31st will give us a better shot at

18   getting everything in without that, you know, end-of-discovery

19   crunch and difficulty.  So we think it's important.  And we did

20   try to resolve it.  We resolved everything except for this

21   question of January 31st versus March 4th for what we call,

22   quote, substantial completion of the pending document requests.

23        **THE COURT:**  Okay.  So --

24        **MS. CENDALI:**  I --

25        **THE COURT:**  Excuse me.  I'm going to go with the

1   defendants' date and make sure that it's a real date.  We're

2   going to meet again on March 1st, and I'm going to know whether

3   the representations have been met or not.  I think if you get

4   substantial production on December 17th and it's rolling

5   thereafter, you're going to be catching up to that for a while

6   to be making sense of it.  So I think this will work, and so I

7   would set the March 4th date as the date for substantial

8   completion.

9         **MS. CENDALI:**  Thank you, Your Honor.

10        **MR. BERNSTEIN:**  Thank you, Your Honor.

11        **THE COURT:**  And so that's what I want to know on

12  March 1st.  I want you to tell me where you are on these

13  pending issues.  And then we can see how to make sure that this

14  case stays on track.

15        And I do want to congratulate you all for working through

16  the number of issues that you have worked through.  It's what

17  good lawyers do and often doesn't happen.  So I appreciate

18  that.  So keep it up.

19        And enjoy Thanksgiving.  Well, I shouldn't jump the gun.

20        Mr. Bernstein, are there other issues that you think I

21  ought to deal with today?

22        **MR. BERNSTEIN:**  No, Your Honor.

23        **THE COURT:**  Ms. Cendali?

24        **MS. CENDALI:**  No, Your Honor.

25        **THE COURT:**  Mr. Tracer?

1          **MR. TRACER:**  No, Your Honor.

2          **THE COURT:**  Great.  Okay.  Happy Thanksgiving.  Happy

3    Holidays, and I will see you on March 1st.

4          **MR. BERNSTEIN:**  Thank you, Your Honor.

5          **THE COURT:**  Thank you.

6          **MS. CENDALI:**  Thank you.

7          **MR. ANDREU:**  Thank you, Your Honor.  Happy Holidays.

8               (Proceedings adjourned at 2:49 p.m.)

9                       ---o0o---

10

11               <u>**CERTIFICATE OF REPORTER**</u>

12          I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14

15   DATE:  Thursday, December 2, 2021

16

17

18   _____

19        Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                  Official United States Reporter
20

21

22

23

24

25