| | |
|---|---|
| THE BUSINESS LITIGATION GROUP, P.C.<br>MARC N. BERNSTEIN (SBN 145837)<br>mbernstein@blgrp.com<br>WILL B. FITTON (SBN 182818)<br>wfitton@blgrp.com<br>150 Spear Street, Suite 800<br>San Francisco, CA 94105<br>Telephone: 415.765.6633<br>Facsimile: 415.283.4804<br><br>Attorneys for Plaintiff<br>UAB "PLANNER5D" d/b/a Planner 5D | WALKER STEVENS CANNOM LLP<br>HANNAH CANNOM (SBN 245635)<br>hcannom@wscllp.com<br>BETHANY STEVENS (SBN 245672)<br>bstevens@wscllp.com<br>500 Molino Street, Suite 118<br>Los Angeles, CA 90013<br>Phone: 213.337.9972<br><br>Attorneys for Apple Inc. |

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>    Plaintiff,<br>v.<br><br>META PLATFORMS, INC., FACEBOOK TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.<br><br>    Defendants. | **Case No. 3:19-cv-03132-WHO**<br>Case No. 3:20-cv-02198-WHO<br>Case No. 3:20-cv-08261-WHO<br><br>The Honorable William H. Orrick<br><br>**JOINT LETTER BRIEF RE: DISCOVERY DISPUTE**<br><br>**April 21, 2022** |

Counsel for plaintiff UAB "Planner 5D" (P5D) and non-party Apple Inc. attest that before filing this letter they met and conferred telephonically and complied with Section 9 of the Northern District's Guidelines for Professional Conduct regarding discovery.

Dated: April 21, 2022

| | |
|---|---|
| */s/ Marc N. Bernstein* | */s/ Bethany Stevens* |
| Marc N. Bernstein (SBN 145837) | Bethany Stevens (SBN 245672) |
| mbernstein@blgrp.com | bstevens@wscllp.com |
| Will B. Fitton (SBN 182818) | Hannah Cannom (SBN 245635) |
| wfitton@blgrp.com | hcannom@wscllp.com |
| Christian Andreu-von Euw (SBN 265360) | WALKER STEVENS CANNOM LLP |
| christian@blgrp.com | 500 Molino Street, Suite 118 |
| THE BUSINESS LITIGATION GROUP, P.C. | Los Angeles, CA 90013 |
| 150 Spear Street, Suite 800 | Phone: 213.337.9972 |
| San Francisco, CA 94105 | |
| Telephone: (415) 765-6633 | Attorneys for Apple Inc. |

Attorneys for Plaintiff UAB "Planner5D"

**The Dispute:** P5D served Apple the attached subpoena on October 26, 2021. (Ex. A.) Apple served objections on November 16, 2021. (Ex. B) After extensive meet-and-confer, Apple still objects to producing: (1) the license by which Apple obtained the digital objects and scenes it used to create its Hypersim dataset, an alternative to SUNCG; (2) records of Apple's other expenses in developing Hypersim; (3) records of other alternative datasets Apple uses for scene recognition work, including licenses and other development expense records. P5D asks the Court to compel Apple to produce. these responsive documents.

The fact discovery cutoff is August 10, 2022. (ECF No. 149.) The final pretrial conference is July 10, 2023. (*Id.*) The trial date is August 21, 2023. (*Id.*)

**Planner 5D's Position:** Princeton scraped P5D's 3D representations of home and office interiors and converted them into the SUNCG dataset, which quickly became a leading computer-vision machine-learning dataset. After SUNCG's release, Apple contacted Princeton about obtaining a commercial license. Princeton declined. Apple then reached out to P5D about licensing the works found in SUNGC. P5D declined. Unable to acquire P5D's dataset legally, Apple licensed other digital objects and scenes from a different company, Evermotion, and used them to create its own computer vision dataset, Hypersim. Apple may also have developed or acquired other non-public computer-vision datasets.

How much Apple spent to develop Hypersim and other computer-vision datasets after failing to legally license P5D's files bears directly on the value of P5D's works, and thus on P5D's damages. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014) (hypothetical license for copyright); *see also* Cal. Civ. Code § 3426.3 (reasonable royalty for trade secret). For this same reason, the Court recently ordered Meta to produce documents about its own alternative datasets and their value. (ECF No. 150.) Apple now refuses to produce this same discovery.

The present facts make evidence about alternative datasets particularly important. Princeton and Meta propagated P5D's works so widely that P5D never had the chance to commercially exploit its works in the computer vision market. Princeton alone distributed over 870 copies of SUNCG to commercial and research institutions around the globe. (*See* Princeton's 4th Suppl. Resp. to P5D's Interrog. 5, 1st Set.) P5D seeks evidence of the cost of other computer-vision datasets to reconstruct

the market value of its own works. Apple is one of only a handful of companies that approached P5D for a license. What Apple subsequently paid for alternative datasets is thus uniquely relevant to the value of P5D's works.

Public information shows that Apple used 3D scene and object data it licensed from Evermotion to develop its own dataset. (*See* Hypersim: A Photorealistic Synthetic Dataset for Holistic Indoor Scene Understanding at 4, *https://arxiv.org/pdf/2011.02523.pdf*.) Requests for Production 5, 16–19, 23, 27, and 32–33 concern Apple's development, acquisition, and evaluation of alternative datasets. (*See* Exs. A, B.) But, despite extensive meet-and-confer efforts, Apple refuses to produce its license with Evermotion or records sufficient to show its other costs in developing Hypersim. Apple also refuses to produce similar records for any other scene recognition datasets Apple developed or acquired—or even to reveal whether such datasets exist.

Apple bases its refusal on objections of relevance, burden, and confidentiality. These objections are wholly without merit. On relevance, this Court has already ruled that information about alternative datasets pertains directly to P5D's damages claim. (ECF No. 150.) Apple's claims of burden fail because they are unsupported. Apple refuses to provide even basic information about how or why producing the requested information would be difficult. Producing the Evermotion license cannot plausibly require significant undue effort, let alone undue burden. Apple has refused to even disclose what records exist of Hypersim's development costs, much less demonstrate that they would be unduly burdensome to find or produce.

Hypersim is unlikely to be Apple's only computer vision dataset. It's just the one Apple has publicly disclosed. Apple likely has developed or acquired other scene-recognition datasets, and the price it paid to buy these, or develop them in-house, is, again, very relevant to P5D's damages. It is impossible to evaluate Apple's claims of burden when it refuses to disclose even whether in-house datasets exist, or disclose whether Apple uses other alternative datasets, and, if so, how many. Apple has declined repeated invitations to provide such basic information—or even rough estimates to support its burden claim. Given the complete lack of evidence supporting it, Apple's burden objection should be overruled.

Apple cites the commercial sensitivity of its licenses as an element of burden, but these

concerns are adequately addressed by the Protective Order. *See Gradillas Ct. Reps., Inc. v. Cherry Bekaert, LLP*, No. 18-MC-80064-KAW, 2018 WL 2197544, at *6–*7 (N.D. Cal. May 14, 2018) (non-party's confidentiality concerns outweighed by protective order and party's substantial need for information); *AFMS LLC v. United Parcel Serv. Co.*, No. Civil No. 12-cv-15032012, 2012 WL 3112000, at *7 (S.D. Cal. July 30, 2012) ("A protective order allowing 'confidential' or 'highly confidential' designations is sufficient to protect a nonparty's trade secrets.") (citing *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 603 (N.D. Cal. 2009)). Apple's concerns are not valid grounds for refusing to provide the discovery sought by the subpoena, which is relevant and cannot be obtained from anyone else.

**Apple's Position:**  In serving this subpoena and in subsequent negotiations with Apple, P5D has ignored its obligation to avoid imposing an undue burden on a non-party and has violated the basic tenets of non-party discovery by demanding highly sensitive documents that are, at best, only peripherally relevant to the underlying litigation. For its part, Apple has worked diligently to try to reach agreement with P5D to narrow the scope of the subpoena and to obviate the need to bring this dispute before the Court. As of the writing of this motion, Apple is in the midst of conducting an onerous document and privilege review of more than a thousand internal and external emails collected from current and former Apple employees related to P5D and the SUNCG dataset. Notwithstanding this review, P5D continues to demand internal development documents from non-party Apple and agreements and invoices between Apple and other non-parties.

P5D's demands are improper. The three buckets of documents which are the subject of P5D's instant motion—stated above as "(1) the license by which Apple obtained the digital objects and scenes it used to create its Hypersim dataset, an alternative to SUNCG; (2) records of Apple's other expenses in developing Hypersim; (3) records of other alternative datasets ... including licenses and other development expense records"—have scant relevance to the instant litigation and any relevance identified by P5D is outweighed by the burden to non-party Apple to identify, collect, review, and produce to its competitors such sensitive information. Indeed, P5D's document requests and subsequent demands in its meet and confers with Apple go far beyond the permissive scope of non-party discovery. Not only did P5D's subpoena seek documents in thirty-five broad categories, but in

more than twenty of those categories, P5D requested all records, documents and communications related to overbroad, untailored categories. *See Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 209 F.R.D. 208, 215 (D. Kan. 2002) (finding that requests to non-parties that "seek 'any and all' documents … [are] overly broad, vague and ambiguous on their face"). To date, P5D has refused to meaningfully limit the subpoena—for example, seeking all licenses that Apple has for any alternate datasets—making compliance with it nearly impossible. Far from seeking discovery that is "proportional to the needs of the case," the investigation and production proposed by P5D would impose a burden on Apple that would outweigh any possible benefit of such discovery. Fed. R. Civ. P. 26(b)(1). The Court should therefore decline to order additional production by Apple here.

**P5D seeks the production of non-party licenses and internal Apple information that has little, if any, relevance to the underlying litigation.** Apple's investigation to date has revealed that in 2017, Apple separately reached out to Evermotion and Princeton regarding various datasets that Apple was interested in licensing. That same year, Apple entered into a license with another third-party to use certain of the Evermotion data. Apple did not license the SunCG dataset from Princeton. Nearly two years later, Apple reached out to P5D to inquire about a license, but P5D indicated that it was not interested in licensing its dataset.

In demanding documents from Apple, P5D misconstrues the timeline to increase the import of any Apple internal information regarding the licenses that Apple has with other non-parties. But the actual timeline—that Apple licensed Evermotion data *at least two years before* any discussions with P5D—proves false the premise of P5D's motion: Apple did not license the Evermotion assets because it could not acquire P5D's dataset. Moreover, Apple's discussions with P5D two years later did not advance beyond only the most preliminary contact. As such, there is no indication that the terms of Apple's license to certain of the Evermotion assets bear at all on what, if any, value Apple may have later ascribed to the P5D dataset.

Further, P5D's reliance on the Court's order requiring Meta to produce licenses to alternative data sets is misplaced. This Court ruled that Meta must produce "information about Defendant Meta's willingness to pay for datasets to show the value (or lack thereof) of Plaintiff's datasets." (ECF No. 159.) But Apple's licenses have absolutely no bearing on what Meta would have paid, nor do

Apple's licenses with other non-parties provide guidance as to the value of P5D's datasets to Meta. To the extent that any licenses are relevant, it is licenses that Meta had with other non-parties, not licenses between non-parties. Ordering the production of these documents from Apple would be a departure from the norms of discovery. Indeed, allowing P5D, as a competitor that rejected a license inquiry from Apple, to uncover Apple's proprietary licensing terms in an attempt to justify (or determine) the value of its own dataset goes far beyond the permissible scope of damages discovery.

Even further afield is P5D's demand for Apple's costs related to development of its own dataset. P5D can provide no support for its demand for internal Apple cost information related to development of Apple's own internal datasets. Indeed, internal development by Apple has no bearing on the hypothetical negotiation in the underlying litigation, and such internal Apple documents—to the extent that they even exist and can be produced in a usable format—would have no bearing on what damages Meta should pay to P5D for its alleged infringement. This demand must be denied as an impermissible fishing expedition against a non-party. *See Blagman v. Apple Inc.*, Case No. 13-cv-8496-PSG, 2014 WL 12607841 at *2 (N.D. Cal. Jan. 6, 2014) ("discovery must be narrowly tailored … and must not be a fishing expedition.") (citations omitted).

***Even if P5D establishes the relevance of the information sought, such relevance is outweighed by the signification burden to non-party Apple.*** P5D's arguments demanding production ignore the burden to non-party Apple of producing (i) internal cost documents regarding the development of Hypersim to Apple competitors, and (ii) sensitive agreements between Apple and third party competitors of P5D to Apple's competitors in this litigation. And by citing to this Court's order requiring Meta to produce similar licenses, PD all but ignores Apple's role as a non-party. *See also Fears v. Wilhelmina Model Agency, Inc.,* 2004 WL 719185, at *1 (S.D.N.Y. Apr.1, 2004) ("[W]here, as here, discovery is sought from a non party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party."). Courts have nearly universally acknowledged that "[w]hen balancing the relevance of a particular discovery request against the burden of production, 'special weight [should be given] to the burden on non-parties of producing documents to parties involved in the litigation.'" *Arista Records LLC v. Lime Group LLC,* 2011 WL 781198, at *2 (S.D.N.Y. Mar. 4, 2011) (citations omitted) (denying motion to

compel non-party licensees to produce internal communications regarding plaintiff licensor); *Dart Indus. Co., Inc. v. Westwood Chem. Co., Inc.,* 649 F.2d 646, 649 (9th Cir .1980) (recognizing that it may be necessary to impose additional restrictions on non-party discovery to protect third parties).

Because the documents are so minimally (if at all) relevant, any burden is undue, but the burden to Apple here is significant. As to the licenses between Apple and other third parties, identifying the relevant universe of datasets would require the subjective determination of Apple or its attorneys as to what datasets are comparable with or alternatives to the P5D dataset. Such a determination will take interviews with Apple employees across multiple countries and business groups. Once those datasets are identified, obtaining the licenses and supporting documentation is not straightforward. Indeed, Apple's efforts to collect the license regarding the Evermotion data is instructive. The license itself was not with Evermotion, but another third party, which counsel determined through custodial interviews. While that license is available in Apple's central database, the financial and specific terms are not contained in that document, but are believed to be contained in various purchase orders. These purchase orders are not held in a centralized database at Apple and must be obtained from the individual Apple employees who entered into those purchase orders. But finding all relevant purchase orders across the company will take the interview of many Apple witnesses, including those outside of the United States. If P5D believes it needs and is entitled to documents regarding the valuation and licensing of its competitors' datasets, it can seek such documents directly from its competitors, rather than putting Apple in the position of arbitrarily determining who is, and is not, a competitor of P5D. By using non-party Apple as a conduit and quasi-expert to identify and obtain documents regarding P5D's competitors, P5D impermissibly attempts to shift the burden of discovery to non-party Apple. Fed. R. Civ. P. 45(d)(3)(B)(ii) (subpoena may be quashed when it requires disclosure of "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party").

Moreover, the burden to Apple continues after identification and collection of responsive licenses, as it would require Apple to comply with its notice and disclosure obligations to impacted third-party licensors and would require production of highly sensitive commercial Apple documents to Apple's direct competitors (*e.g.*, Meta and P5D) . *See, e.g. American Standard v. Pfizer Inc.,* 828

F.2d 734, 741 (Fed. Cir. 1987) ("Courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor."). P5D dismisses Apple's confidentiality concerns by pointing to the protective order entered in the litigation. While the existence of a protective order mitigates concerns regarding disclosure of commercially sensitive information, it does not and cannot eliminate them. *Realtime Data, LLC v. MetroPCS Texas, LLC*, No. 12CV1048-BTM MDD, 2012 WL 1905080, at *3 (S.D. Cal. May 25, 2012) (denying motion to compel, noting a non-party's "concerns regarding the security of its source code, despite the protective order, cannot be ignored"). Here, it cannot be disputed that Apple's production of its highly sensitive information in a case involving Apple's direct competitors puts Apple at risk of competitive injury. Given the scant relevance of Apple's confidential information to the parties' claims and defenses in the underlying case, any risk of competitive injury poses an undue burden on Apple as a non-party. In view of the foregoing, Apple respectfully requests that the Court deny P5D's demand for additional documents and information from Apple.[1]

**Planner 5D's Reply Position:** Apple's response twists and misrepresents the history of its negotiations with P5D claiming that it "has worked diligently to try to reach agreement with P5D to narrow the scope of the subpoena" and that P5D "has refused to meaningfully limit the subpoena." Quite the opposite is true.

This motion is about a specific license agreement, specific cost records, documents showing what other datasets Apple has, if any, and the licenses and cost records documents for those other datasets. As focused as these categories are, P5D has offered to narrow them even further if complying turned out to be truly burdensome. P5D asked only that Apple share basic information about the quantity and nature of the records to enable the requests to be narrowed in a sensible way. Again and again, P5D asked. Again and again, Apple refused to disclose even the most basic information, or even to gather it. For the first time in its response, Apple provides a little information and a lot of speculation about its burden—all of which is news to P5D.

---

[1] Apple objects to the consideration of the below reply as not called for in this Court's standing order and contrary to the agreement between Apple and P5D as to the joint letter. Nevertheless, P5D's reply makes clear that it believes that any license for any dataset regardless of what type of dataset, when it was entered, or with whom is relevant and discoverable from non-parties. Such a belief goes far beyond the acceptable limitations of non-party discovery.

As an example, P5D asked Apple several times about the timeline of its Evermotion license. Each time Apple stayed mum. Now in its response, Apple has the temerity to accuse P5D of getting the timeline wrong, revealing for the first time that Apple entered the Evermotion license before approaching P5D for a license. This revelation hardly diminishes the license's relevance. A company's willingness to pay for *any* comparable scene-recognition dataset is relevant to the market value of P5D's works. The comparability is simply more obvious if SUNCG was considered as an alternative. And in fact, Apple did consider SUNCG before going with Evermotion. Apple appears to have entered the Evermotion license after *Princeton's* 2017 refusal of a commercial license to SUNCG. Apple concedes this by its silence, conspicuously discussing the timing only of *P5D's* 2019 refusal.

Also new are Apple's claims about the difficulty of identifying licenses and other datasets. Before last week, Apple refused even to look for the Evermotion license. Apple's counsel learned and revealed that the license and purchase orders are separate in the day or two before P5D submitted its portion of this brief. As for other datasets, Apple seems to be speculating. Thus far, Apple has refused to even identify its head of scene recognition programs to ask what other datasets Apple uses, if any. Without taking that first step, how can Apple know whether further effort would be needed? Similarly, Apple points to confidentiality concerns and notice and disclosure obligations, but admits it has not determined the "relevant universe," let alone identified the licenses involved. Without having done that, Apple cannot know whether the licenses implicate sensitive information or impose notice or other obligations. Such speculation is insufficient to support Apple's claims of undue burden given P5D's need for responsive information.

Finally, Apple suggests that P5D subpoena its "competitors," by which it means the licensors of its other datasets. Apple fails to show how those non-party licensors' burden might be any less than Apple's. And the suggestion isn't helpful. Apple refuses to disclose its other datasets or anything about them. Thus, P5D has no idea who Apple's other licensors are, and can't possibly subpoena them.

The Court should order Apple to produce (1) the Evermotion license and purchase orders; (2) other records of Hypersim's development cost; and (3) records of other computer vision datasets that Apple uses, if any, including records of development or acquisition costs and records sufficient to show how those datasets compare to SUNCG.

8

Joint Letter Brief Re: Discovery Dispute                                          CASE NO. 3:19-cv-003132

Respectfully submitted,

/s/ Marc N. Bernstein
Marc N. Bernstein (SBN 145837)
mbernstein@blgrp.com
Will B. Fitton (SBN 182818)
wfitton@blgrp.com
Christian Andreu-von Euw (SBN 265360)
christian@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
150 Spear Street, Suite 800
San Francisco, CA 94105
Telephone: (415) 765-6633

Attorneys for Plaintiff UAB "Planner5D"

/s/ Bethany Stevens
Bethany Stevens (SBN 245672)
bstevens@wscllp.com
Hannah Cannom (SBN 245635)
hcannom@wscllp.com
WALKER STEVENS CANNOM LLP
500 Molino Street, Suite 118
Los Angeles, CA 90013
Phone: 213.337.9972

Attorneys for Apple Inc.

**Joint Letter Brief Re: Discovery Dispute**  **CASE NO. 3:19-cv-003132**

**ATTESTATION**

I, Marc N. Bernstein, am the ECF user whose ID and password are being used to file this Joint Letter Brief. In compliance with Local Rule 5-1(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from all signatories.

DATED: April 21, 2022                    By:         /s/ *Marc N. Bernstein*
                                                              Marc N. Bernstein