# EXHIBIT B

MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
150 Spear Street, Suite 800
San Francisco, CA 94105
Telephone: 415.765.6633
Facsimile: 415.283.4804

Attorneys for Plaintiff
UAB "PLANNER5D"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., FACEBOOK TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.<br><br>Defendants. | **Case No.  3:19-cv-03132-WHO**<br>**Case No.  3:20-cv-08261-WHO**<br><br>**PLANNER 5D'S OBJECTIONS AND RESPONSES TO META PLATFORMS, INC.'S AND FACEBOOK TECHNOLOGIES, LLC'S SECOND SET OF INTERROGATORIES** |

| | |
|---|---|
| PROPOUNDING PARTY: | Defendant META PLATFORMS, INC. and FACEBOOK TECHNOLOGIES, LLC |
| RESPONDING PARTY: | Plaintiff UAB "PLANNER5D" (Planner 5D) |
| SET NO.: | Two (2) |

**GENERAL OBJECTIONS**

Planner 5D objects to the definitions of CONCERNING, DESCRIBE, IDENTIFY/IDENTITY, and PLANNER 5D as overly broad, rendering the interrogatories compound and unduly burdensome. Planner 5D objects that Instruction Nos. 3-5 impose obligations greater than those required by the Federal Rules of Civil Procedure and relevant case law.

**Interrogatory No. 14**

DESCRIBE the complete factual and legal bases for any claim for damages against META, including the categories of damages YOU are claiming (such as, without limitation, lost sales, unjust enrichment, reasonable royalty, etc.), the amount YOU claim YOU should receive for each category of damages, whether the theory is a remedy for trade secret misappropriation, copyright infringement, or both, and, if both, explain how apportionment was applied between YOUR trade secret and

copyright infringement claims, and YOUR basis for the apportionment, and IDENTIFY all DOCUMENTS supporting YOUR contentions.

**Response to Interrogatory No. 14**

Planner 5D objects that the request for "the complete factual and legal basis" for Planner 5D's response, as well as the demand that Planner 5D "IDENTIFY all DOCUMENTS and witnesses that support [its] contentions" renders the interrogatory compound and burdensome, and causes it, alone or in combination with other interrogatories, to exceed META's 25-interrogatory limit. Planner 5D further objects that the definition of DESCRIBE uses sub-definitions and subparts, the latter containing three subparts that themselves encompass at least 16 sub-subparts rendering the interrogatory exceedingly

1

compound. This large volume of subparts is exacerbated by the multiple categories of information the interrogatory seeks. All of this renders the interrogatory exceedingly burdensome and causes it, alone or in combination with other interrogatories, to exceed META's 25-interrogatory limit. Planner 5D responds to this interrogatory without reference to the definition of "DESCRIBE." Planner 5D further objects to the extent that the definition of IDENTITY/INDENTIFY requires disclosure of personal identifying information in violation of G.D.P.R.

Planner 5D objects to this interrogatory to the extent it requires disclosure of information protected by the attorney-client privilege or the attorney work product doctrine. Planner 5D objects to this interrogatory as it calls for conclusions of law and prematurely seeks discovery that should be sought in the expert phase of the lawsuit.

Finally, Planner 5D objects that the interrogatory prematurely seeks Planner 5D's contentions.  Planner 5D's response below is without prejudice to its right to modify or supplement its answer in light of additional information that comes to light through discovery or expert analysis and investigation.

Subject to the above objections and reservations, Planner 5D responds that it is entitled to its actual damages and any additional profits of defendants. Planner 5D's actual damages include the reduction of the fair market value of the copyrighted material caused by Defendants infringement, measures of which include the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement, or the lost license fees Planner 5D would have received for the Defendants' unauthorized use of its work. Discovery is ongoing and Planner 5D is still waiting for licensing data from defendants and third parties that it has subpoenaed.

The information Planner 5D has obtained to date shows that some 3D models of interior scenes that have been used for scene recognition research currently sell for approximately €50 per room. (*See*, *e.g.*, https://evermotion.org/shop/show_product/ scene-4-ai59-archinteriors/18024 (as visited on May 16, 2022)). SUNCG's authors have written that it "contain[s] 404,058 rooms." And Princeton has admitted to distributing over 800

copies of SUNCG. Meta has also admitted to downloading numerous copies of SUNCG, making it available to all FAIR researchers, and to its subsequent widespread use, including copying the dataset dozens of times, as well as distributing the SUMO Challenge Dataset over 50 times. This preliminary information suggests that Planner 5D's actual damages could exceed a billion dollars.

Because Defendants have yet to provide much needed discovery, Planner 5D cannot provide further detail regarding its damages at this time. For example, Meta recently refused to produce any documents responsive to Planner 5D's requests for production numbers 47-52 (seeking documents relevant to its potential profits). Planner 5D reserves the right to supplement this response as more information becomes available.

**Interrogatory No. 15**

DESCRIBE the cost YOU expended developing each ASSERTED TRADE SECRET and/or ASSERTED COPYRIGHTED WORK, including but not limited to the total number of employees that worked on developing each ASSERTED TRADE SECRET and/or ASSERTED COPYRIGHTED WORK, the amount of time each employee worked developing each ASSERTED TRADE SECRET and/or ASSERTED COPYRIGHTED WORK, the amount each employee was paid to develop each ASSERTED TRADE SECRET and/or ASSERTED COPYRIGHTED WORK.

**Response to Interrogatory No. 15**

Planner 5D objects that the definitions of ASSERTED COPYRIGHTED WORKS, ASSERTED TRADE SECRETS, and DESCRIBE each use sub-definitions and subparts, the latter containing three subparts that themselves encompass at least 16 sub-subparts rendering the interrogatory compound. This large volume of subparts is exacerbated by the multiple categories of information the interrogatory seeks, all of which renders the interrogatory exceedingly burdensome and causes it, alone or in combination with other interrogatories, to exceed META's 25-interrogatory limit. Planner 5D responds to this interrogatory without reference to the definition of "DESCRIBE." Planner 5D further objects to the extent that the

definition of IDENTITY/INDENTIFY requires disclosure of personal identifying information in violation of G.D.P.R.

Planner 5D objects to this interrogatory to the extent it requires disclosure of information protected by the attorney-client privilege or the attorney work product doctrine. Planner 5D objects to this interrogatory prematurely seeks discovery that should be sought in the expert phase of the lawsuit.

Finally, Planner 5D objects that the interrogatory prematurely seeks Planner 5D's contentions. Planner 5D's response below is without prejudice to its right to modify or supplement its answer in light of additional information that comes to light through discovery or expert analysis and investigation. Subject to the above objections and reservations, Planner 5D responds as follows:

Up until February 2016, nearly all of Planner 5D's operations and the activities of its personnel were focused on creating a platform for users to design scenes that utilized the objects that Planner 5D personnel hand-crafted. Thus, nearly all of Planner 5D's company expenditures, as well as its personnel's efforts, up until that time, were associated with Planner 5D's efforts to develop the trade secrets and copyrighted materials at issue in this case. Planner 5D has already produced documentation for expenses incurred and payroll made during much of the relevant period and is determining whether additional documentation is merited by META's accompanying document requests. FRCP Rule 33(d). Allocation of expenses detailed in these documents would be the subject of expert testimony.

**Interrogatory No. 16**

Explain PLANNER 5D's position in response, if any, to META's affirmative defense that Planner 5D's claims are barred in whole or in part by fair use as described in META's response to Interrogatory No. 7, including the complete factual and legal basis therefore, and IDENTIFY all DOCUMENTS and witnesses that support YOUR contentions.

**Response to Interrogatory No. 16**

Planner 5D objects to this interrogatory to the extent it requires disclosure of information protected by the attorney-client privilege or the attorney work product doctrine. Planner 5D objects that the request for "the complete factual and legal basis" for Planner 5D's response, as well as the demand that Planner 5D "IDENTIFY all DOCUMENTS and witnesses that support [its] contentions" renders the interrogatory compound and burdensome, and causes it, alone or in combination with other interrogatories, to exceed Meta's 25-interrogatory limit. Planner 5D further objects that META has not provided a full response yet to Planner 5D's contention Interrogatory No. 7 and has not provided the discovery Planner 5D needs to evaluate META's assertions in its interrogatory response. Until it has done so, Planner 5D will respond to this interrogatory only in part, and will not be identifying all documents and witnesses that support Planner 5D's contentions until such time. Planner 5D accordingly reserves all rights to modify this response as META's contention evolves.

Finally, Planner 5D objects that the interrogatory prematurely seeks Planner 5D's contentions. Planner 5D's response below is without prejudice to its right to modify or supplement its answer in light of additional information that comes to light through discovery or expert analysis and investigation. Subject to the above objections and reservations, Planner 5D responds as follows:

META claims in its response to Interrogatory No. 7 that its "use of the SUNCG Dataset is of a different purpose and character than the original works" and that "Meta's purpose in using the SUNCG Dataset (including adapting it to create the SUMO Dataset) was to train artificial intelligence programs to recognize the arrangements and orientation of elements in a visual space."

Planner 5D's response is that appropriation of Planner 5D's works to train artificial intelligence programs did not "add[] something new, with a further purpose or different character" to those works by altering them "with new expression, meaning, or message."

*See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Accordingly, META's purpose was not "transformative." *Id.*

Moreover, there is no precedent to support the view that META's appropriation of an enormous body of copyrighted material for the specific purpose of making use of its expressive content constitutes a transformative or fair use. META's alleged "training" use—which depended upon wholesale copying, manipulation and analysis of the expressive content of Planner 5D's works—was by definition consumptive, which is contrary to fair use. Unlike non-substitutional copying—e.g., to facilitate searches or achieve interoperability—the purpose of META's use was specifically to exploit and derive value from Planner 5D's expressive content in its original form, and in its entirety.

Further, META misapprehends Planner 5D's purposes in creating and continuing to develop the Objects and Scenes files. Planner 5D's purposes were not limited to the design and showcasing uses META describes, but encompassed other uses, including for research, development, and commercialization of machine learning tools. In any event, the question of whether a use qualifies as a transformative fair use is broader and more searching than META suggests, for it considers the impact of the alleged infringer's taking on both existing and potential markets for, and the value of, the appropriated work. 17 U.S.C. § 107.

In addition, Planner 5D disputes that META's infringing conduct was limited to using the SUNCG Dataset to train artificial intelligence: META also distributed the SUNCG Dataset and the SUMO Challenge Dataset, and it had no control over how recipients of those additional infringing copies used them.

META also asserts that its use of the SUNCG Dataset was "noncommercial and purely for research purposes." Planner 5D disputes that assertion. The evidence produced in discovery to date shows that META's research was intended to further its commercial efforts. Since the time META began using the SUNCG Dataset, it has renamed the company to reflect its transformation into an augmented and virtual reality environment,

and it has deployed enormous resources into researching commercial applications related to visual learning.

The use of a copyrighted work for research purposes does not make that use noncommercial, nor does it make it for a "nonprofit educational purpose[]" under 17 U.S.C. § 107. Otherwise, every commercial entity's research and development units would have carte blanche to exploit protected works for profit. Furthermore, META's SARA agreement with Princeton explicitly grants META the right to commercialize the research Princeton conducted on its behalf, which includes Princeton's research using the SUNCG Dataset. This belies META's claim that research involving the SUNCG Dataset was for noncommercial purposes.

META asserts that it "acted in good faith by using the SUNCG Dataset only after it became publicly available and was used widely by other researchers." Planner 5D responds that META's claimed knowledge that other researchers were using Planner 5D's works has no bearing on its good faith.

Meta asserts that "the SUNCG Dataset is primarily comprised of third-party material which is not owned by Planner 5D." Planner 5D responds that this is false. Planner 5D further responds that to the extent the SUNCG Dataset includes material Planner 5D does not own, an act infringing Planner 5D's works still constitutes an actionable act of infringement.

Meta asserts that "[a]ny limited copying of the renderings of individual Objects or the selection criteria of the Scene Compilation was incidental to the purpose of learning from the user-generated arrangements in the Scenes themselves." Planner 5D responds that "incidental copying" is inapplicable to the SUNCG Dataset. The SUNCG Dataset is created entirely around Planner 5D's Objects arranged in Scenes. The Objects are not "incidental" but instead occupy a central position within SUNCG. All Scenes are composed of Objects. Without the Objects, there would be nothing in the Scenes from which artificial intelligence could learn. Thus, the Objects were central to META's

objective rather than incidental, and the copying of those Objects was indispensable to META's purpose.

Furthermore, Planner 5D's selection of the Scene Compilation was in part because of those Scenes' quality, diversity, and verisimilitude, all of which are related to META's "learning" purpose of teaching computers to recognize real interiors. Planner 5D also disputes that the copying of the Objects was "limited." Rather, each Object present in the SUNCG Dataset was copied in its entirety, and all Scenes used had been pre-selected for inclusion according to Planner 5D's selection criteria.

META asserts that "the copied material is unoriginal to the extent it is functional in nature and inherently bound together with uncopyrightable ideas." Planner 5D's position is that this assertion is tautological in that it merely alludes to the unprotectability of ideas without identifying what aspects of any copied material META asserts is affected by that doctrine.

META also asserts that its need for "large amounts of high-quality data" makes its copying of the SUNCG Dataset "reasonable." Planner 5D's position is that needing a large amount of data does not constitute a fair use defense.

META asserts that Planner 5D cannot "identify [a] cognizable impact on the market for its Objects and Scene Compilation." Planner 5D responds that there is a robust market for licensing works for use to train artificial intelligence and that META's conduct has harmed the market for the Objects and Scene Compilation by, among other things, distributing it widely and without controls. Indeed, META itself appears to be a party to multiple paid licenses to use works for training artificial intelligence.

META asserts that "third-party exploitation of the SUNCG Dataset for noncommercial research purposes produces benefits to the public." Planner 5D responds that META's exploitation is not "noncommercial research" and that META's exploitation of the SUNCG dataset is much more likely to benefit META than the public. Without further specificity as to the "benefits to the public," Planner 5D cannot address those supposed benefits. Regardless, however, the fact that the public might benefit from an

8

unauthorized use (for example, free distribution of a copyrighted work) is not determinative of fair use.

**Interrogatory No. 17**

Explain PLANNER 5D's position in response, if any, to META's affirmative defense that Planner 5D's claims are barred in whole or in part for failure to satisfy the Copyright Act's registration requirement before filing suit under 17 U.S.C. § 411(a) as described in META's response to Interrogatory No. 9, including the complete factual and legal basis therefore, and IDENTIFY all DOCUMENTS and witnesses that support YOUR contentions.

**Response to Interrogatory No. 17**

Planner 5D objects to this interrogatory to the extent it requires disclosure of information protected by the attorney-client privilege or the attorney work product doctrine. Planner 5D objects that the request for "the complete factual and legal basis" for Planner 5D's response, as well as the demand that Planner 5D "IDENTIFY all DOCUMENTS and witnesses that support [its] contentions" renders the interrogatory compound and burdensome, and causes it, alone or in combination with other interrogatories, to exceed Meta's 25-interrogatory limit. Planner 5D further objects that META has not provided a full response yet to Planner 5D's contention Interrogatory No. 9.

Finally, Planner 5D objects that the interrogatory prematurely seeks Planner 5D's contentions. Planner 5D's response below is without prejudice to its right to modify or supplement its answer in light of additional information that comes to light through discovery or expert analysis and investigation.

Subject to the above objections and reservations, Planner 5D responds as follows:

META's affirmative defense fails, first, because Planner 5D's right to prosecute its copyright claims in federal court is wholly independent of whether its works satisfied Copyright Offices registration procedures, as long as applications for the works were delivered to the Copyright Office in proper form, with the required fees paid. Here, the Copyright Office expressly stated that Planner 5D had "delivered to the Office a deposit,

9

1  application, and fee required for registration of the computer programs 'in proper form,'
2  as required to institute a civil action for infringement under 17 U.S.C. § 411(a)."

3  Although META's allegations of procedural defects in the copyright application
4  process are thus irrelevant, they are also wrong. Planner 5D's deposit copies did consist of
5  source code. A "computer program" is defined in the Copyright Act as "as set of
6  statements or instructions to be used directly or indirectly in a computer in order to bring
7  about a certain result." 17 U.S.C. § 101. In order to register a claim in a computer
8  program, Copyright Office regulations require the applicant to submit "one copy of
9  identifying portions of the program," which must consist of source code or object code. 37
10 C.F.R. § 202.20(vii)(A)(1). "Source code" refers to instructions that are readable and
11 writable by humans, which indicate the processing that a computer is to do. "Source
12 code" is not limited to lines of a programming language that require conversion into object
13 code for execution.

14 The Copyright Office has acknowledged that source code does not always require
15 compilation: "Source code is a set of statements and instructions written by a human being
16 using a particular programming language …. [I]n *most cases* a computer or other electronic
17 device cannot execute these statements or instructions unless they have been converted
18 into object code."[1] *Compendium of U.S. Copyright Office Practices* (3d ed. 2021)
19 ("*Compendium*") § 721.3 (emphasis added). As Planner 5D explained to the Copyright
20 Office, some languages, like Java or C, have compilers that translate the source code into
21 another form for computer processing, such as object code. But others, like JSON and the
22 hugely popular computer languages Python and JavaScript, exist only in source form and
23 are executed directly. Because Planner 5D's JSON files are instructions readable and

---

[1] Similarly, the Office indicates in the Glossary to the *Compendium* that although source code "typically" requires compilation into object code, that may not always be the case.  *See* https://www.copyright.gov/comp3/docs/glossary.pdf (defining source code as "a set of statements and instructions written by a human being using a particular programming language …. *Typically*, these statements are comprehensible to a person who is familiar with the relevant programming language, but they are not comprehensible to a computer or other electronic device.") U.S. Copyright Office, *Glossary*, https://www.copyright.gov/comp3/docs/glossary.pdf (last visited Aug. 26, 2020).

writable by humans and govern the processing a computer is to do, they qualify as source code.

Limiting source code to code requiring compilation before execution, while simultaneously imposing that inaccurate definition of source code as the only possible deposit copy for a computer program (apart from object code), would unacceptably narrow the category of "computer program" established by Congress. *See* 17 U.S.C. § 101. Such unacceptable narrowing would improperly exclude works like Planner 5D's that unquestionably meet Congress's definition of "computer program."

The Copyright Office *Compendium* indicates that "in most cases" source code is converted into object code—which means not always. When the Office's own rule allows for the possibility that source code is *not* converted, it makes no sense—and violates basic precepts of administrative law—to insist on an interpretation that is incompatible with the Copyright Act.

Planner 5D's deposited JSON files constituted both a "computer program" and "source code," as those terms are properly construed under section 101—and as those terms are understood in the software community. Moreover, the JSON code is the very code that comprises the computer programs sought to be registered. If the code that makes up the computer program does not qualify as a deposit copy, then works such as these that unquestionably qualify as "computer programs" under the Act would be ineligible for registration as such, contrary to the Act.

META's allegation in its interrogatory regarding renderings is also wrong. The lack of renderings in the deposit copies was not a valid basis to refuse registration of the screen displays inherent in the deposited computer program.

It has long been established that for purposes of copyright, a computer program is considered to include screen displays generated by the program. *See Williams Electronics, Inc. v. Artic, Int'l, Inc.*, 685 F.2d 870, 874 (3d Cir. 1982). The Copyright Office recognizes this rule in the *Compendium*, which provides that

> [a]s a general rule, a computer program and the screen displays generated by that program are considered the same work, because the program code contains fixed expression that produces the screen displays. If the copyright in the source code and the screen displays are owned by the same claimant, the program and any related screen displays may be registered with the same application.
>
> ….
>
> A registration for a computer program covers the copyrightable expression that appears in any screen that may be generated by the program, *even if the applicant does not submit identifying material depicting the screen displays* or merely submits a representative sampling of those displays.

*Compendium* § 721.10(A)-(B) (emphasis added). Thus, under Copyright Office rules, it was not necessary for Planner 5D to submit identifying material for the screen displays.

META's affirmative defense also fails because the Copyright Office's classification system for purposes of copyright registration is not determinative of copyrightability or a federal court's determination thereof. 17 U.S.C. § 408(c)(1).

DATED: May 18, 2022                         THE BUSINESS LITIGATION GROUP, P.C.


                                            By:      /s/*Will B. Fitton*__
                                                     Will B. Fitton


                                            Attorneys for Plaintiff
                                            PLANNER 5D