Dale M. Cendali (S.B.N. 1969070)
dale.cendali@kirkland.com
Johanna Schmitt (admitted *pro hac vice*)
johanna.schmitt@kirkland.com
Abbey Elizabeth Quigley (admitted *pro hac vice*)
abbey.quigley@kirkland.com
Aaron Schroeder (admitted *pro hac vice*)
aaron.schroeder@kirkland.com
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Phone: (212) 446-4800

Kristen Reichenbach
kristen.reichenbach@kirkland.com
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104

Attorneys for Defendants
*Meta Platforms, Inc.* and
*and Facebook Technologies, LLC*

David R. Singer (S.B.N. 204699)
dsinger@jenner.com
**JENNER & BLOCK LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 239-5100

Andrew H. Bart (admitted *pro hac vice*)
abart@jenner.com
Jacob L. Tracer (admitted *pro hac vice*)
jtracer@jenner.com
Cayman C. Mitchell (admitted *pro hac vice*)
cmitchell@jenner.com
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1600

Attorneys for Defendant
*The Trustees of Princeton University*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" d/b/a PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., FACEBOOK TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20 and XYZ UNIVERSITIES 1-20,<br><br>Defendants. | CASE NO. 3:19-CV-03132-WHO<br>CASE NO. 3:20-CV-08261-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: July 12, 2023<br>Time: 2:00 PM<br>Courtroom:  2, 17th Floor<br><br>Judge: Honorable William H. Orrick |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

TAKE NOTICE that on Wednesday, July 12, 2023, at 2:00 p.m. Courtroom 2 of this Court, the Honorable William H. Orrick presiding, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Meta Platforms, Inc. Facebook Technologies, LLC; and The Trustees of Princeton University (collectively, "Defendants"), will move for an Order granting summary judgment in Defendants' favor and against Plaintiff UAB "Planner5D" ("Planner 5D") pursuant to the Court's orders of June 22, 2022 and November 16, 2022.  (Dkts. 182, 212).  In light of the anticipated briefing schedule for this Motion and Defendants' counsels' respective trial and travel commitments in the spring of 2023, July 12, 2023 is the earliest date on which they can appear for oral argument.

This Motion is based upon this Notice of Motion and Motion, the below Memorandum of Points and Authorities, the concurrently filed Declarations and their associated exhibits, the pleadings and papers on file in this action, and any further evidence as may be presented at the hearing of this Motion.

**STATEMENT OF ISSUES FOR RELIEF**

Pursuant to Local Rule 7-2(b)(3), Defendants hereby seek an Order granting their motion for summary judgment in Defendants' favor as it relates to the following issues:

ISSUE 1: That Planner 5D cannot establish ownership of a valid copyright or that it fulfilled the statutory deposit requirement as a matter of law.

ISSUE 2: That Planner 5D failed to take reasonable measures to protect its alleged trade secrets and thus it cannot establish the information constitutes trade secrets as a matter of law.

Dated: February 17, 2023

KIRKLAND & ELLIS LLP


/s/ Dale M. Cendali
Dale M. Cendali (S.B.N. 1969070)

Attorneys for Defendants
Meta Platforms, Inc.and Facebook Technologies, LLC



JENNER & BLOCK LLP


/s/ Andrew H. Bart (with consent)
Andrew H. Bart

Attorneys for Defendant
The Trustees of Princeton University

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**          **CASE NO. 3:19-CV-003132**

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................1

II.     FACTUAL BACKGROUND...............................................................................3

        A.      Planner 5D's Objects were created to resemble real-world furniture and
                other items...............................................................................................3

        B.      Scenes were created by users of Planner 5D's home design Tool......................6

        C.      Planner 5D's Website transmits its individual Scene Data File URLs, Scene
                Data Files, Object Data File URLs, and Object Data Files to its users .............6

        D.      ███████████████████████████████████.................................8

        E.      In 2016, Planner 5D did not require its users to review or agree to its
                Terms of Service.........................................................................9

        F.      Copyright Office's refusal to register Planner 5D's asserted works......................9

III.    LEGAL STANDARD .....................................................................................10

IV.     SUMMARY JUDGMENT ON PLANNER 5D'S COPYRIGHT CLAIMS
        IS WARRANTED .........................................................................................11

        A.      The Office correctly concluded that the works are "data files," not
                "computer programs.".................................................................12

        B.      Because Planner 5D's alleged works are not "computer programs," Planner 5D failed
                 to satisfy the pre-suit application-and-deposit requirement of Section 411(a). ...............14

        C.      Planner 5D's attempt to register its works as "computer programs" enabled it
                to avoid the Act's application-and-deposit requirements. ...................................16

                1.      Planner 5D's attempt to register the works as "computer programs"
                        enabled it to argue that it need not submit full deposit copies...............................17

                2.      Planner 5D's attempt to register the works as "computer programs" permitted
                        Planner 5D to hide the true nature of its Objects from the Office. .........................18

                3.      Planner 5D's attempt to register the works as "computer programs" allowed
                        Planner 5D to obscure the nature of its Asserted Scene Compilation. ..................19

                4.      Planner 5D's attempt to register the works as "computer programs" allowed
                        it to take improper advantage of the Office's rules for trade secrets in
                        source code......................................................................................20

        D.      Permitting Planner 5D to proceed with this suit would render the Act's
                application-and-deposit system meaningless..................................................20

        E.      Planner 5D failed to comply with Section 411 and thus its claims cannot proceed .........21

i

F.      Planner 5D cannot establish ownership of a valid copyright.............................................22

    1.      The JSON data files Planner 5D sought to register are not protectable because they lack human authorship.............................................22

    2.      The Objects are 3D models of pre-existing furniture and other real-life objects and lack originality. .............................................23

V.      **SUMMARY JUDGMENT ON THE TRADE SECRET CLAIMS IS WARRANTED. .......27**

A.      Trade secrets cannot exist in the face of disclosure without confidentiality. ....................28

B.      Planner 5D publicly disclosed its alleged trade secrets to users of its Website.................29

C.      Planner 5D did not obligate its users to maintain the confidentiality of its alleged trade secrets. .............................................31

    1.      Planner 5D's Terms of Service are an unenforceable "browsewrap" agreement. .............................................31

    2.      The plain language of the Terms of Service did not create a duty of confidentiality.............................................35

VI.     **CONCLUSION** .............................................**35**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABS Ent., Inc. v. CBS Corp.*,
   908 F.3d 405 (9th Cir. 2018) ........................................................................22

*Action Tapes, Inc. v. Mattson*,
   462 F.3d 1010 (8th Cir. 2006) ...........................................................12, 16, 22

*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*,
   226 Cal. App. 4th 26 (Cal. App. 2014)...........................................................28

*Am. Home Shield of California, Inc. v. Fid. Nat. Home Warranty Co.*,
   No. D039241, 2003 WL 21085278 (Cal. Ct. App. May 14, 2003) ..................28

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................11

*Arkeyo, LLC v. Cummins Allison Corp.*,
   342 F. Supp. 3d 622 (E.D. Pa. 2017) .......................................................29, 30

*Atari Games Corp. v. Nintendo of Am., Inc.*,
   No. 88 Civ. 4805, 1993 WL 214886 (N.D. Cal. Apr. 15, 1993) ................12, 13

*ATC Distribution Grp, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*,
   402 F.3d 700 (6th Cir. 2005) .........................................................................24

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ...............................................................32, 33, 34

*Bespaq Corp. v. Haoshen Trading Co.*,
   No. 04 Civ. 3698, 2004 WL 2043522 (N.D. Cal. Sept. 13, 2004)...................27

*Broker Genius, Inc. v. Zalta*,
   280 F. Supp. 3d 495 (S.D.N.Y. 2017)........................................................31, 35

*Brooks v. IT Works Mktg., Inc.*,
   No. 21 Civ. 1341, 2022 WL 2079747 (E.D. Cal. June 9, 2022)...................33, 34

*CTC Glob. Corp. v. Huang*,
   No. 17 Civ. 02202, 2019 WL 4148184 (C.D. Cal. July 29, 2019) ...................29

*Doe v. Roblox Corp.*,
   No. 21 Civ. 3943, 2022 WL 1459568 (N.D. Cal. May 9, 2022) ......................33

*Durham Indus., Inc. v. Tomy Corp.*,
   630 F.2d 905 (2d Cir. 1980)............................................................................24

*ELT Sight, Inc. v. EyeLight, Inc.*,
  No. 19 Civ. 5545, 2020 WL 7862134 (C.D. Cal. Aug. 28, 2020) ............................................31

*Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ................................................................................24, 25, 27

*Evans v. Presidio Trust*,
  No. 19 Civ. 8025, 2019 WL 11270441 (N.D. Cal. Dec. 23, 2019) ......................................11

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991) ................................................................................................11, 24

*Fourth Est. v. Wall-Street.com*,
  139 S. Ct. 881 (2019) ..............................................................................................2, 15

*Geoscan, Inc. v. Tex. v. Geotrace Techs., Inc.*,
  226 F.3d 387 (5th Cir. 2000) ........................................................................................15

*HiRel Connectors, Inc. v. United States*,
  No. 01 Civ. 11069, 2006 WL 3618011 (C.D. Cal. Jan. 25, 2006) ................................28, 35

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
  816 F. Supp. 2d 793 (N.D. Cal. 2009) ......................................................................11, 14

*Kelley v. Chicago Park Dist.*,
  635 F.3d 290 (7th Cir. 2011) ........................................................................................23

*Kodadek v. MTV Networks, Inc.*,
  152 F.3d 1209 (9th Cir. 1998) ......................................................................................15

*Long v. Provide Com., Inc.*,
  245 Cal. App. 4th 855 (Cal. App. 2016) ..................................................................32, 34

*Lowry v. City of San Diego*,
  858 F.3d 1248 (9th Cir. 2017) ......................................................................................11

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
  528 F.3d 1258 (10th Cir. 2008) (Gorsuch, J.)........................................................24, 25, 27

*Milos Misha Subotincic v. 1274274 Ontario Inc.*,
  No. 10 Civ. 1946, 2013 WL 3964994 (C.D. Cal. Apr. 9, 2013)........................................29

*Nextdoor.com, Inc. v. Abhyanker*,
  No. 12 Civ. 5667, 2014 WL 1648473 (N.D. Cal. Apr. 23, 2014) ......................................28

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ................................................................................32, 34

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**               **CASE NO. 3:19-CV-003132**

*Olivier v. Baca*,
913 F.3d 852 (9th Cir. 2019) ..................................................................................................11

*Patel Burica & Assocs., Inc. v. Lin*,
No. 19 Civ. 1833, 2019 WL 6954256 (C.D. Cal. Dec. 19, 2019) .........................................27

*Pollstar v. Gigmania, Ltd.*,
170 F. Supp. 2d 974 (E.D. Cal. 2000)...................................................................................22

*In re Providian Credit Card Cases*,
96 Cal. App. 4th 292 (Cal. App. 2002)..................................................................................28

*Reed Elsevier, Inc. v. Muchnick*,
559 U.S. 154 (2010)...............................................................................................................15

*Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*,
531 F.3d 962 (9th Cir. 2008) .................................................................................................14

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)...............................................................................................................27

*Rudnicki v. WPNA 1490 AM*,
580 F. Supp. 2d 690 (N.D. Ill. 2008) ....................................................................................21

*S. Cal. Darts Ass'n v. Zaffina*,
762 F.3d 921 (9th Cir. 2014) .................................................................................................10

*Sifuentes v. Dropbox, Inc.*,
No. 20 Civ. 7908, 2022 WL 2673080 (N.D. Cal. June 29, 2022) .........................................34

*Sit-Up Ltd. v. IAC/InterActiveCorp.*,
No. 05 Civ. 9292, 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ...........................................18

*Skidmore v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) .................................................................................15, 18, 20

*SMH Enters, L.L.C. v. Krispy Krunchy Foods, L.L.C.*,
No. 20 Civ. 2970, 2021 WL 4460522 (E.D. La. Sept. 29, 2021) .........................................35

*SocialApps, LLC v. Zynga, Inc.*,
No. 11 Civ. 4910, 2012 WL 381216 (N.D. Cal. Feb. 6, 2012)........................................28, 30

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*,
307 F.3d 775 (9th Cir. 2002) .................................................................................................12

*Telemasters, Inc v. Vintage Club Master Ass'n*,
No. 05 Civ. 5139, 2007 WL 9706067 (C.D. Cal. May 11, 2007) .........................................29

*Torres-Negron v. J & N Recs, LLC*,
    504 F.3d 151 (1st Cir. 2007)..................................................................................14, 15, 19

*Urantia Found. v. Kristin Maaherra*,
    114 F.3d 955 (9th Cir. 1997) .................................................................................................23

*Ward v. Barnes & Noble, Inc.*,
    93 F. Supp. 3d 193 (S.D.N.Y. 2015)......................................................................................23

*World Resorts Int'l, LLC v. Interval Int'l, Inc.*,
    No. 12 Civ. 6847, 2014 WL 12567170 (C.D. Cal. Aug. 22, 2014)......................................28

**Statutes**

17 U.S.C. § 101 ...................................................................................................... *passim*

17 U.S.C. § 103(a) .........................................................................................................26

17 U.S.C. § 408(a) ...........................................................................................................2

17 U.S.C. § 408(b) ............................................................................................1, 16, 21

17 U.S.C. § 408(c)(1) ....................................................................................................16

17 U.S.C. § 410(c) .........................................................................................................11

17 U.S.C. § 411(a) ................................................................................................ *passim*

18 U.S.C. § 1839(3) .......................................................................................................28

Cal. Civ. Code § 3426.1(d) ...........................................................................................28

California's Uniform Trade Secrets Act .........................................................................28

**Other Authorities**

37 C.F.R. §§ 202.5(f), (g) ..............................................................................................13

37 C.F.R. § 202.20(c)(2)(vii).............................................................................16, 17, 20

37 C.F.R. § 202.21 .........................................................................................................22

Compendium of U.S. Copyright Practices...................................................... *passim*

Fed. R. Civ. P. 56(a) ......................................................................................................10

*Report of the National Commission on New Technological Uses of Copyrighted Works*
    17–18 (1978)...........................................................................................................31

Restatement (First) of Torts § 757 (1939) .....................................................................28

S. Rep. No. 352, 100th Cong., 2d Sess. 45 (1988) ...............................................................15, 20

Second Request for Reconsideration for Refusal to Register Sunset LumenScript and
    LumenScript for Replicating the Sun as Seen from Mount Fuji (U.S. Copyright
    Review Board Mar. 16, 2017)..............................................................................................13, 14

United States Copyright Office, Circular 66, Copyright Registration of Websites and
    Website Content (2021) .......................................................................................................22, 23

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**                    **CASE NO. 3:19-CV-003132**

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

When Planner 5D first filed this action, it asserted (1) a copyright infringement claim despite the fact that it had not attempted to obtain a copyright registration from the U.S. Copyright Office and (2) a trade secret misappropriation claim without having explained how its alleged trade secrets "were not publicly available." Dkt. 52 at 16.[1] Now, nearly four years later, Planner 5D still cannot substantiate its bare-boned allegations with evidence. Indeed, discovery has confirmed that Planner 5D's works are data files that cannot be copyrighted as computer programs. They cannot be copyrighted as literary works as they lack human authorship, or as pictorial works because they lack originality. Discovery has also confirmed that Planner 5D sought to avoid judicial scrutiny of the fact that its website actually made its alleged trade secrets available to the public. With the benefit of that discovery, Defendants now jointly move for summary judgment on all of Planner 5D's claims.

The vast majority of copyright cases involve copyrights that have been validated and registered by the U.S. Copyright Office (the "Office") after submission of a proper application and deposit. This case is unusual not only because Planner 5D's applications have been rejected by the Office, but also because Planner 5D refused the Office's repeated requests that it comply with the deposit requirement by submitting a "complete copy" of its work to the Office for examination. 17 U.S.C. § 408(b). Instead, Planner 5D insisted that its works are "computer programs" to take advantage of the Office's unique rules for software, which excuse applicants from the full-deposit requirement and instead permit submission of only a small portion of "source code" as a deposit. Planner 5D's avoidance of the deposit requirement prevented the Office from recognizing that Planner 5D's works are unprotectable. And, Planner 5D was able to obscure (and then repeatedly change) the works at issue in this case, prejudicing Defendants' ability to investigate its allegations and build a defense.

Summary judgment is warranted on Planner 5D's copyright claims for two independent reasons. *First,* Planner 5D has failed to comply with the deposit requirement and is therefore statutorily barred from pursuing these claims. Section 411(a) of the Copyright Act, 17 U.S.C. § 101 *et seq.*, states that an applicant

---

[1] Unless otherwise noted, citations to Docket Entries (Dkt. __) refer to entries on the docket for the initial action, No. 19 Civ. 03132.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**         **CASE NO. 3:19-CV-003132**

whose registration has been refused may only bring a "civil action for infringement" if it first deposits its work with the Copyright Office "in proper form," 17 U.S.C. § 411(a), which ordinarily requires "complete copies" of each work asserted in the litigation, *id.* § 408(a). This requirement is a vital part of the copyright system: it forces the applicant to define the scope of the asserted work; it enables the Office to evaluate the work as so defined and provide its expert opinion as to the work's protectability; and it creates a reliable, permanent record of the claimed copyright. *Cf. Fourth Est. v. Wall-Street.com*, 139 S. Ct. 881, 887 (2019) (owner "must satisfy" requirements under § 411(a) "before suing to enforce ownership rights"). Planner 5D, however, has submitted only a small fraction of its works to the Office—*e.g.*, only 50 pages of text of the digital files that underlie ████ out of the 3,719 Objects, as defined *infra*, it claims here. And while this may be a deposit in "proper form" if the work is a "computer program," Planner 5D's works are demonstrably ***not*** computer programs, as the Office has repeatedly explained. For that reason, Planner 5D's deposit was not in "proper form" and it cannot continue with—much less prevail on—this "civil action for infringement." 17 U.S.C. § 411(a).

**Second,** Planner 5D has failed to establish ownership of a valid copyright interest for two independent reasons. The first reason is that, setting aside Planner 5D's evasion of the deposit requirement, the works it did submit to the Office for registration are not human‑generated 3D models, but rather ***machine-generated text of data files***, which are not protectable as "literary works" as they lack human authorship. Moreover, even if they were protectable, that copyright interest would protect only the text in the files themselves—not the Objects and Scenes that form the basis of Planner 5D's copyright claims. This is no doubt part of the reason that Planner 5D has tried to register its works as "computer programs," which are a unique category of copyrights that cover not only the registered "source code," but also the visual outputs of that code. The second independent reason Planner 5D cannot establish ownership is that Planner 5D's Objects are unprotectable because they are nothing more than replicas of real‑world furniture and other items and thus lack originality.

Summary judgment is also warranted on Planner 5D's trade secret misappropriation claims. For nearly 40 years, courts have consistently held that when a plaintiff discloses information to others who are under no obligation to keep it confidential, that information cannot be a trade secret as a matter of law. That principle is dispositive here.

In the specific context of the Internet, an alleged trade secret is disclosed when it is made available to the public online. It is beyond dispute that Planner 5D made all its alleged trade secrets available to the public on its website before the alleged misappropriation occurred in February 2016. Indeed, Planner 5D has admitted over and over again that, using nothing more than a common web browser like Firefox or Chrome, users of its website in 2016 could access the web addresses, or uniform resource locators ("URLs"), at which each of Planner 5D's object and scene files were located. And once users had the relevant URLs, they could (1) access the underlying data files simply by entering the URLs into a browser and hitting "enter" and (2) download those files simply by right-clicking and selecting "save as." Nothing on Planner 5D's website prevented users from accessing or downloading any—or *all*—of Planner 5D's alleged trade secrets in this way.

Further, discovery has confirmed that Planner 5D's Terms of Service were unenforceable as a matter of law, leaving Planner 5D without any basis to claim its users had an obligation to keep anything on its website confidential. It is undisputed that, in 2016, users could access and use Planner 5D's website without—and acquire and download the alleged trade secrets—ever being required to review the Terms of Service or indicate that they agreed to abide by them. Indeed, at that time, Planner 5D disclosed its Terms of Service to its users only via an unadorned link at the bottom of some pages on its website. Under binding Ninth Circuit authority, such disclosure is insufficient to create a contract enforceable against Planner 5D's users. What's more, the Terms of Service did not even contain an express confidentiality provision.

Accordingly, Defendants are entitled to summary judgment on all of Planner 5D's claims.

## II.   FACTUAL BACKGROUND

### A.   Planner 5D's Objects were created to resemble real-world furniture and other items

Planner 5D offers a web-based "user-friendly home design tool that allow[s] anyone to quickly and easily create their own home, office, or landscape designs" (the "**Tool**"), accessible through its website at https://www.planner5d.com/ (the "**Website**"). Dkt. 53 ¶ 30 ("TS Compl."); No. 20 Civ. 08261 Dkt. 1 ¶¶ 27, 31 ("CR Compl."). Using the Tool, people can create "realistic three-dimensional [interior designs]" ("**Scenes**") with "three-dimensional . . . . lifelike models of furniture, appliances, plants, people, lighting, or other objects that could occupy the interior or exterior of a digitally depicted room or structure" ("**Objects**"). CR Compl. ¶ 6; *see also* CR Compl. ¶ 31. Planner 5D has never alleged that Defendants

ever copied the Tool; rather, Planner 5D's claims are based on alleged copying of the Scenes and Objects.

Planner 5D created each Object to ████████████████████████████ that "can be found in [the] real world" in order to enable users of its Tool to design their homes with "realistic, digitized" versions of real-world items, like IKEA furniture. Schmitt Decl. ¶¶9–12;[2] CR Compl. ¶ 33. Planner 5D's "general practice" was to use one or more "reference images" of a real-world item to create a 3D model of that item using Blender, a free and open-source 3D modeling software. Schmitt Decl. ¶¶33–35, 45–46. Some Objects were created at the direction of furniture companies that hired Planner 5D to create 3D models of their products ("**B2B Objects**"), and those clients provided Planner 5D with images and specifications to enable the modelers to match their products ████████████████ *Id.* ¶¶ 84–99. The remaining Objects were selected by Planner 5D (the "**Non-B2B Objects**"), and the "general practice" was to find reference images from, for example, IKEA's website, with the same goal of replicating pre-existing real-world items. *Id.* ¶33. *See e.g., id.* ¶¶ 37–41 (sofa from CB2), 42–44 (furniture from IKEA).

Planner 5D modelers would then "craft the three-dimensional Object while consulting and studying [the reference] images," ████████████████████████████████████████████ ██████████████████ Schmitt Decl. ¶¶ 33, 57–62. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.* ¶¶ 63–66, 69–70. This work was done through Blender's interface, similar to how one might edit an image with Photoshop. *Id.* ¶¶ 48, 52–53. It did not involve writing code. *Id.* ¶ 49.

████████████████████████████████████████████████████ ████████████████ ██ ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

[2]    Citations to the Declarations of Johanna Schmitt ("Schmitt Decl."), Dr. Daniel Lopresti ("Lopresti Decl."), Ryan McKamie ("McKamie Decl."), and Shuran Song ("Song Decl.") herein include the enumerated paragraph numbers as well as the Exhibits cited in those paragraphs.
[3]    Hereinafter, all citations to "Ex. __" are citations to the exhibits attached to the Schmitt Decl.



Schmitt Decl. ¶¶ 60, 62; Ex. 46 at 1:14:11 (left image), 1:34:49 (right image).

The resulting Planner 5D Objects are *identical* to the corresponding real-world products, and often match the dimensions of the product to the centimeter, as shown in the examples below:

| P5D Object No. | Image of P5D Object | Image of Third-Party Product | Name of Product |
|---|---|---|---|
| s/425<br><br>Diameter: 48<br>Height: 74 | | | IKEA URBAN Bar Stool<br>(SKU # 501.356.57)<br><br>Diameter: 48 cm<br>Height: 74 cm |
| s/2878<br><br>Length: 40<br>Width: 48<br>Height: 125 | | | IKEA NORDLI Chest<br>(SKU# 90272727)<br><br>Length: 40 cm<br>Width: 48 cm<br>Height: 125 cm |

Schmitt Decl. ¶ 79. *See also id.* ¶ 82 (depicting additional examples of comparisons to real-world products with matching dimensions)

After an Object is modeled in the Blender interface, ███████████████████ ██ ██
███████████████████████████████████████████████████████████████████████████████
██ Lopresti Decl. ¶ 20. Planner 5D then runs █████████████ through a third-party script to automatically convert it into JavaScript Object Notation ("JSON"), a data-interchange format that facilitates the transfer of data between computer programs (the "**Object Data Files**"). *Id.* ¶¶ 20, 48, 52–53; *see also* Schmitt Decl. ¶ 71. ██████████████████████████████████████████████████████
██████████████████████████████████████████████████████ Schmitt Decl.

¶ 71. █████████████████████████████████████████████████████

███████████████████████████████████

**B.      Scenes were created by users of Planner 5D's home design Tool**

People use Planner 5D's Tool to create Scenes by selecting and placing Objects into virtual floorplans using the visual interface—not by writing code.  CR Compl. ¶¶ 31, 55; Schmitt Decl. ¶¶ 19–20. When a Scene is complete, a user can decide whether to flag it for inclusion in Planner 5D's "public gallery" for anyone to view.  Schmitt Decl. ¶¶ 21–22. █████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████ (a "**Scene Data File**").  *Id.* ¶ 25; Lopresti Decl. ¶ 21. ████████████████

██████████████████████████████████████  CR Compl. ¶ 48; Lopresti Decl. ¶¶ 70, 71, 79.

**C.** ██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████ A browser's cache is its temporary storage area that saves copies of materials transmitted by a website to a browser when a user accesses a webpage.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**                    **CASE NO. 3:19-CV-003132**

1   McKamie Decl. ¶ 42; Song Decl. ¶ 6 & n.2. ████████████████████

2   ████████████████████████████████████ Schmitt Decl. ¶ 190.  For example,

3   if a webpage's design includes an image, the website may transmit a copy of that image to the cache the

4   first time the user visits that webpage so that if the user visits the webpage a second time, a copy of the

5   image will already be stored in the browser and can load more quickly.  Song Decl. ¶ 6 n.2; McKamie

6   Decl. ¶ 42. ████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ████████████████████████████████████████████████

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**          **CASE NO. 3:19-CV-003132**



**D.**

**E.      In 2016, Planner 5D did not require its users to review or agree to its Terms of Service.**

At the relevant time period in 2016, *see* TS Compl. ¶ 40, Planner 5D's Terms of Service were a classic "browsewrap" agreement.  Users were not required to agree to (or even review) the Terms of Service to enter Planner 5D's Website, and thus users could access and use the Website without ever reviewing or agreeing to those Terms. Ex. 9 (ROG No. 6); Ex. 12 (RFA Nos. 90 & 92).  Indeed, the person who accessed and downloaded Planner 5D's alleged trade secrets in this case never saw the Terms of Service on Planner 5D's Website.  Song Decl. ¶ 22.

The only notice Planner 5D provided to users of its Terms of Service was a hyperlink at the bottom of various pages on the Website. Schmitt Decl. ¶ 165; Ex. 12 (RFA Nos. 96 & 97).  Users might be required to scroll to the bottom of a page even to see that link.  Exs. 82 & 83; Ex. 13 (RFA No. 95).

**F.      Copyright Office's refusal to register Planner 5D's asserted works**.

Planner 5D claims copyright in 3,719 Objects (the "**Asserted Objects**").  CR Compl. ¶ 33; *see also* Schmitt Decl. ¶ 15.  In addition, it claims copyright in the *compilation* of the ▮▮▮▮ Scenes on its public gallery as of February 17, 2016 (the "**Asserted Scene Compilation**").  CR Compl. ¶ 46; *see also* Schmitt Decl. ¶ 29.  It also claims ownership of 18 individual Scenes in the Asserted Scene Compilation, which its employees (not third-party users) allegedly created (the "**Asserted Individual Scenes**").  Schmitt Decl. ¶ 31.

After this Court's second dismissal of Planner 5D's copyright claims for failure to comply with the Copyright Act's registration requirement, Dkt. 90, Planner 5D submitted two applications to the Office seeking to register the Asserted Objects and the Asserted Scene Compilation on September 14, 2020.  CR Compl. ¶¶ 95–97; *see also* Schmitt Decl. ¶¶ 118, 126; Exs. 26 & 27 (copyright applications).  Planner 5D

owns valid copyrights and trade secrets. *See Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 816 F. Supp. 2d 793, 797 (N.D. Cal. 2009); *Evans v. Presidio Trust*, No. 19 Civ. 8025, 2019 WL 11270441, at *2 (N.D. Cal. Dec. 23, 2019). As a result, to prevail on summary judgment, "[Defendants] need only point out 'that there is an absence of evidence to support [Planner 5D's] case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019). The burden then shifts to Planner 5D to set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "The mere existence of a scintilla of evidence in support of [Planner 5D]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [Planner 5D]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.     SUMMARY JUDGMENT ON PLANNER 5D'S COPYRIGHT CLAIMS IS WARRANTED

To establish a claim of copyright infringement, a plaintiff must establish "ownership of a valid copyright." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). A registration certificate "constitute[s] prima facie evidence of the validity of the copyright [interest]." 17 U.S.C. § 410(c). But where, as here, the Office refuses to register an alleged copyright, the plaintiff "is not entitled to the *prima facie* presumption[.]" *Browning*, 816 F. Supp. 2d at 796.

As the Office correctly determined after significant deliberation, Planner 5D's Asserted Objects and Asserted Scene Compilation are ***not*** "computer programs," but rather are data files, and thus Planner 5D cannot rely on the Office's special deposit requirements for source code. As such, Planner 5D's submission of only a fraction of the thousands of pages of text from the underlying data files was improper and it failed to satisfy the statutory requirement that deposit be made in proper form before proceeding with its claims.

Even putting that issue aside, Planner 5D cannot establish ownership of a valid copyright. As the Office explained to Planner 5D, the works Planner 5D submitted are data files that were automatically generated, not created by a human author, and therefore are unprotectable. Moreover, even if Planner 5D could show that a human created the data files (which it cannot), any resulting rights would not extend to the corresponding visual 3D models that form the basis of Planner 5D's copyright claim. Finally, Planner 5D's Objects were created as realistic facsimiles of pre-existing furniture and home décor items, which, under binding Ninth Circuit law, are not protectable due to their lack of originality.

**A.      The Office correctly concluded that the works are "data files," not "computer programs."**

As explained above, Planner 5D attempted to register its alleged works as "computer programs." However, the Office determined that the deposit materials Planner 5D submitted for examination were ***not*** computer programs because they did not contain any "source code" but "merely contain[ed] data, namely, a set of coordinates—to be used by a separate computer program in the rendering of a particular shape or shapes." *See supra* at 10.  The Office was correct.

To begin, the definition of a "computer program" in the Copyright Act is "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101.  Courts have explained that a computer program must contain "instructions" that "tell[] the microprocessor what to do."  *Atari Games Corp. v. Nintendo of Am., Inc.*, No. 88 Civ. 4805, 1993 WL 214886, at *4 (N.D. Cal. Apr. 15, 1993).  These instructions "can be expressed in either source code or object code."  *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002). *See also* Lopresti Decl. ¶¶ 29–31, 35.

Planner 5D's works are not a set of instructions but instead are merely digital data files.  Lopresti Decl. ¶¶ 47, 64.  The law is clear that digital files are *not* computer programs merely because their contents "can be represented" in some form of computer language.  *Atari*, 1993 WL 214886, at *5.  Rather, courts must "distinguish between [language] that act[s] as instructions for the microprocessor and [language] that act[s] simply as data."  *Id.*[4]  That distinction—between "program instructions and program data"—is "well-recognized by computer scientists and implicitly acknowledged by Congress" in the statutory definition of "computer program."  *Id.* at *4; *see also* Lopresti Decl. ¶¶ 28, 39, 44.  The mere fact that a digital file can be expressed in a computer language does not qualify it as a "computer program."[5]  Virtually all works are reducible to digital form—whether they consist of text (*e.g.*, a .TXT file), an image (*e.g.*, P2 format of a

---

[4] That distinction is also significant for the purposes of copyright law, as a computer program copyright "protects the instructions that cause a computer to bring about a certain result," whereas a visual arts copyright "protects the result."  *Action Tapes,* 462 F.3d at 1013–14.

[5] "Computer language" is a broad term that encompasses any language used to communicate with a computer.  *See* Lopresti Decl. ¶ 28 n.25.  It includes subsets, *e.g.*, *programming* languages (used to express a computer program and which convey instructions to a computer), *markup* languages (used to convey formatting information), and *data exchange* languages (used to structure and communicate data).  *Id.*

12

.PGM file), or any other kind of data storage format.  *Id.*

The Office has made this distinction crystal clear.  Its Compendium specifically distinguishes between "computer programs," which contain "instructions," and data files that are merely created to store information.  Compendium 721.6.[6]  The Compendium also explicitly recognizes that while applicants might use a variety of "file formats" to store and transmit their works—including, for example, "pdf," "doc," "jpg," or "html," Compendium 1508.1—those files are not themselves registrable as computer programs, *id.* 721.6; *see also id.* 1006.1(A) ("The Office will not register HTML as a computer program because HTML contains only data regarding how to "format[] the text and files on a webpage").  As the Compendium explains:

> The fact that the author used a computer to write an article, short story, or other nondramatic literary work does not mean that the work is a computer program.  The fact that the author saved his or her work onto a hard drive, flash drive, thumb drive, CD-ROM, or other electronic storage device does not mean that the work is a computer program.

The Office has reaffirmed that guidance in decisions of its Review Board,[7] which has held that "data files" consisting of a "table of physical properties" that are "fed into a computer program" are not themselves computer programs.  LumenScript Refusal 4–7 (Mar. 16, 2017).

It is beyond dispute that the works Planner 5D submitted to the Office are ***data files.***  Lopresti Decl. ¶¶ 77–81.  Each of the works is organized according to JSON, which is a "data-interchange file format," not a programming language that can be used to instruct a computer to carry our specific operations.  *Id.* ¶¶ 48, 64–73 ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████  For this reason, the Copyright Office repeatedly explained to Planner 5D that the works at issue in this

---

[6] The Compendium of U.S. Copyright Practices ("Compendium") is published by the Copyright Office to "provide[] instruction to agency staff regarding their statutory duties" and "expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law."  Compendium at 2.

[7] The Review Board includes "the Register of Copyrights and the General Counsel [of the Copyright Office] or their respective designees" and its decisions on requests for reconsideration from registration refusals "constitute[] final agency action."  37 C.F.R. §§ 202.5(f), (g).

lawsuit are not "computer programs." *See supra* at 10.

Indeed, Planner 5D admits that its works are data files, comparable to other data files,[8] like ".jpg" files for images. Lopresti Decl. ¶ 82. Planner 5D's expert admitted during his deposition that JSON is not a "programming language." *Id.* ¶ 85. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ Accordingly, in the Office's view, the Works are not themselves computer programs.").

Planner 5D has proffered no evidence to prove its incorrect claim that its works qualify as "computer programs." Thus, there is no basis for this Court to reverse the determination of the Office. *Browning*, 816 F. Supp. 2d at 797 ("The [Office], and not the Court, has the expertise and experience to make a determination based on its interpretation of its own guiding regulations as well as its own wealth of experience."); *see also Richlin v. Metro-Goldwyn-Mayer Pictures, Inc.*, 531 F.3d 962, 973 (9th Cir. 2008) ("[C]ourts should generally defer to the Register of Copyright's [] interpretation of the copyright statutes.").

**B.     Because Planner 5D's alleged works are not "computer programs," Planner 5D failed to satisfy the pre-suit application-and-deposit requirement of Section 411(a).**

The determination that Planner 5D's works are not computer programs forecloses Planner 5D's copyright claims as a matter of law. It is well established that while "an author whose application for copyright registration has been rejected may still enforce his rights in federal court, he may do so only if he has actually submitted an application *and* a deposit copy" to the Copyright Office. *Torres-Negron v. J*

---

[8] *See e.g.* CR Compl. ¶ 45 ("Planner 5D also owns a much larger set of **data files** that define floor plans, or 'scenes.'"), ¶ 52 (alleging "users always see objects and scenes only as *rendered*, never as **data files**"); Lopresti Decl., 82.

*& N Recs, LLC*, 504 F.3d 151, 160 (1st Cir. 2007) (emphasis in original); *see also* 17 U.S.C. § 411(a) (action permitted only if "deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form"). As the Supreme Court explained in *Fourth Estate*, the requirements of § 411(a) are "akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." 139 S. Ct. at 887. This is not an empty formality; rather, it is a critical "element of the 'quid pro quo' paid by authors and copyright owners for the benefits they enjoy as copyright proprietors." S. Rep. No. 352, 100th Cong., 2d Sess. 45 (1988); *see also Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1062–63 (9th Cir. 2020) (deposit serves to "make a record of the claimed copyright, provide notice to third parties, and prevent confusion about the scope of the copyright"); *Torres-Negron*, 504 F.3d at 161–62 (deposit permits the Office "to make an initial judgment about the validity of copyrights, based on its experience and expertise, and to reduce the burdens of litigation").

For this reason, courts have repeatedly dismissed copyright claims when plaintiffs fail to deposit the work "in proper form" prior to suit. *See, e.g.*, *Geoscan, Inc. v. Tex. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (affirming summary judgment to defendant because "although [plaintiff] had filed an application, paid a fee, and made a deposit with the Copyright Office, the deposit was not a complete copy of the original source code, thus [plaintiff] had not fulfilled [] the statutory formalities"); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (affirming summary judgment to defendant where plaintiff had failed to submit a "copy" of the asserted work as a deposit, which "foreclosed" an "infringement action" based on that work). As Judge Lipez explained in *Torres-Negron*, the deposit requirement "would be undermined if [an] [] invalid [deposit] could provide a plaintiff entree to the federal courts and, once the defect was discovered, the litigation was allowed to continue without the benefit of the [] Office's expertise and consideration." 504 F.3d at 162.[9]

Whether a "deposit" has been delivered "in proper form" depends upon the type of work at issue. "As a general rule, the applicant must submit a *complete copy or copies of the work* [as a deposit] to register

---

[9] *Torres-Negron* held that failure to satisfy Section 411's deposit requirement was a jurisdictional defect. *See* 504 F.3d at 161–62. That holding was overruled by the Supreme Court's decision in *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 170 (2010). But while the Court in *Reed* held that Section 411 was not jurisdictional, it left open whether that section's requirements are "mandatory precondition[s] to suit." *Id.* at 171. The Court later answered that question in the affirmative in *Fourth Estate*, 139 S. Ct. at 887.

a claim to copyright." Compendium 204.3 (emphasis added); *see* 17 U.S.C. § 408(b) (requiring "complete copies"). The Office, however, is statutorily authorized to "grant special relief from the deposit requirements" for particular "classes" of works. Compendium 1508.8(A); *see also* 17 U.S.C. § 408(c)(1). The Office's rules for computer programs, for example, permit an applicant to register such a work by submitting only excerpts—*e.g.*, the first and last 25 pages—of source code as a deposit. 37 C.F.R. § 202.20(c)(2)(vii). Thus, while a deposit of *excerpts* of a copyrighted work may be a deposit "in proper form" if the work is a "computer program," the same deposit would be insufficient if the work at issue fell into a different category. *Cf. Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013–14 (8th Cir. 2006) (registration in one category does not establish registration in another category where application procedures and deposit requirements are different).

Planner 5D attempted to register the works in this lawsuit as two "computer programs," and alleges that its "objects" and "public gallery scenes" are two "computer programs." CR. Compl. ¶ 96; *see generally* ¶¶ 95–102 (relying on its "computer program" application to prove "[e]ntitlement to a [c]ivil [a]ction [u]nder 17 U.S.C. § 411(a)"). But, as discussed above, the Copyright Office correctly and repeatedly held, those works are ***not*** computer programs. Because Planner 5D did not comply with the proper procedures for registering its works in the proper categories—*i.e.* as visual works or compilations— it has failed to submit a "deposit" in "proper form" and therefore cannot proceed with this "civil action for infringement." 17 U.S.C. § 411(a).

### C.  Planner 5D's attempt to register its works as "computer programs" enabled it to avoid the Act's application-and-deposit requirements.

Planner 5D's insistence that these works are computer programs in the face of both controlling case law and administrative guidance to the contrary allowed it to circumvent mandatory administrative review and gave it a litigation advantage. Endorsing this approach would create an untenable loophole in the registration system by permitting a putative copyright owner to reduce any copyrightable work into a digital file and apply to register it as a "computer program," thereby invoking the Copyright Office's special procedures for deposit of computer programs. The Court should not sanction it here.

1.   <u>Planner 5D's attempt to register the works as "computer programs" enabled it to argue that it need not submit full deposit copies.</u>

The works Planner 5D claims in this lawsuit are properly characterized as either "[p]ictorial, graphic, and sculptural works" ("PGS works") or as "compilations." ***First,*** Planner 5D alleges misappropriation of "hand-crafted, digitized, and realistic three-dimensional [O]bjects and [S]cenes." CR Compl. ¶ 6.  As such, those works fall within the Copyright Act's definition of "[p]ictorial, graphic, and sculptural works" (or "PGS" works), a category defined to encompass all "three-dimensional works of fine, graphic, and applied art" including "diagrams," "models," and "technical drawings." 17 U.S.C. § 101. For that reason, applicants seeking to register similar 3D models do so by registering their works as "Visual Material." *See, e.g.*, Ex. 53 (copies of registration certificates for 3D model works). ***Second,*** ███████ ███████████████████████████████████████████████████████ Schmitt Decl. ¶ 32. As such, that work falls into the Act's definition of a "compilation," *i.e.* "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101.

Registration of PGS works and compilations requires submission of a ***full*** deposit copy embodying "all the authorship that the applicant intends to register." Compendium 504. As such, registering its claimed Objects and Scenes as a PGS work would have required Planner 5D to submit copies of ***each*** Object and ***each*** Scene to the Office for examination. *Id.* at 1506 (for three-dimensional visual works, applicant required to submit "photographs taken at every angle of the [work]"). And registering its Asserted Scene Compilation would have required Planner 5D to submit as a deposit the ***full*** compilation— including each component element—so that the Office's examiners could determine whether "selection, coordination, and/or arrangement authorship is [] demonstrated." *Id.* at 618.6.

Planner 5D's baseless assertion that its works are "computer programs" allowed it to evade these requirements by invoking the Copyright Office's special rules for deposits of computer programs, which permit applicants to submit only the "first and last 25 pages" of "source code" as a deposit. 37 C.F.R. § 202.20(c)(2)(vii)(A)(2); *see supra* at 10. By doing so, it was able to avoid disclosing the full scope and extent of its claimed works. *See* Compendium 504.2 (rules for deposit copies in computer programs are a "limited exception[]" to the rule that "a registration for a work of authorship only covers the material that

17

is included in the deposit copy[]").

Indeed, Planner 5D has repeatedly dodged any attempt to nail down the precise works that form the basis of this litigation, which have been a moving target since the start of this case. Planner 5D, for example, initially claimed a compilation of ██████ Scenes and was unable to point to any Scenes that it removed from its public gallery. Schmitt Decl. ¶¶ 150–51. Then, a day before the end of the previously scheduled deadline for fact discovery on August 31, 2022, and more than *three years* after Planner 5D first initiated this suit, Planner 5D revised its claim to state that its Scene Compilation consists of ██████ Scenes, and that it *could* identify Scenes removed from its public gallery. *Id.* ¶¶ 153–155. This hide-the-ball strategy has prejudiced Defendants' ability to build their case and has drastically complicated and extended discovery. It also mirrors a tactic used by trade secret plaintiffs, who often refuse to define their trade secrets at the outset of the case, thereby prejudicing the defendants, complicating the litigation, and incurring disfavor from courts. *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292, 2008 WL 463884, at *9 (S.D.N.Y. Feb. 20, 2008) (criticizing plaintiff's "resistance to explaining fully the basis for its trade secret claim" as a "Dance of the Seven Veils approach"). And it is precisely the kind of prejudice and complication that the Copyright Act's deposit requirement is designed to avoid. *Skidmore*, 952 F.3d at 1062–63 (deposit requirement functions to "prevent confusion about the scope of the copyright").

### 2. Planner 5D's attempt to register the works as "computer programs" permitted Planner 5D to hide the true nature of its Objects from the Office.

Had Planner 5D sought to register its Objects in the appropriate category—as PGS works—it would have been required to submit the models themselves as a deposit "in a form that is visually perceptible without the aid of a machine or device." Compendium 1509.3(C); *see also id.* at 1506 (for three-dimensional visual works, applicant required to submit "photographs taken at every angle of the [work]"). Doing so, however, would have revealed to the Office that the Objects are all uncopyrightable models of pre-existing furniture and other home décor items. Compendium 313.4(A) (Office will refuse registration of a "replica of a . . . useful article"); *infra* at 23–27 (Objects lack originality). This would have been particularly obvious given that Planner 5D would have had to disclose that it had created these models by copying, for example, images from furniture stores' websites. Compendium 923.2 (requiring applicant to "provide a clear description of the creative authorship that the author contributed to [any 3D] model"

sufficient to "distinguish the model from the object depicted").

By attempting to register its works as "computer programs," however, Planner 5D was able to submit its application *without* presenting the Office with visual representations of the Objects themselves. Instead, Planner 5D submitted only a portion of the text from the underlying JSON data files—preventing the Office from seeing what the Objects looked like. *See* Schmitt Decl. ¶¶ 123, 133.  Planner 5D was also able to avoid disclosing to the Office that its Objects were based on pre-existing material, as required on the application, a fact it was forced to admit during discovery. *Id.* ¶¶ 33–35; Ex. 26 (Objects copyright application).  This minimized the risk that the Office would issue refusal letters that would doom Planner 5D's litigation position, and prejudiced defendants by depriving this Court of "the benefit of the Copyright Office's expertise and consideration." *Torres-Negron*, 504 F.3d at 162.

3.  Planner 5D's attempt to register the works as "computer programs" allowed Planner 5D to obscure the nature of its Asserted Scene Compilation.

Applying to register its Asserted Scene Compilation as a compilation would have also required that Planner 5D disclose the "preexisting material . . . that appears in the compilation" and "specif[y] whether [it] selected, coordinated, and/or arranged that material or data."  Compendium 618.6.  ███████ ███████████████████████████████████████████████████████████████████████████████ ████████████████████. Schmitt Decl. ¶¶ 23–24.  Moreover, when it filed its application in September 2020, Planner 5D was unable to even determine the total number of Scenes it "selected" to include in its compilation.  Indeed, at the outset of discovery, on December 17, 2021, Planner 5D claimed there were ████ Scenes in the compilation, and at the end of discovery, on August 30, 2022, it changed that number to ████ Scenes.  Schmitt Decl. ¶¶ 150, 153.  Relatedly, Planner 5D was unable to identify any Scenes it allegedly "selected" to exclude from the compilation until the end of fact discovery.  *Id.* ¶¶ 151, 154. Moreover, Planner 5D would have been forced to disclose to the Office that all but 18 of the Scenes were user-generated, and to expressly disclaim ownership of those user-generated Scenes.  Compendium 618.6.

Planner 5D sidestepped all of these requirements by claiming that the entire public gallery of Scenes was a single "program" of its own creation.  In so doing, Planner 5D withheld critical information about the scope and basis for its claim of authorship in the Asserted Scene Compilation.  This also enabled

19

Planner 5D to delay and obfuscate whether it claimed ownership in each of the user-generated Scenes.[10]

        4.    <u>Planner 5D's attempt to register the works as "computer programs" allowed it to take improper advantage of the Office's rules for trade secrets in source code.</u>

Attempting to register the works at issue as "computer programs" also permitted Planner 5D to avail itself of the Office's special rules providing additional confidentiality protection for "computer programs" that contain "trade secret material." Compendium 1509.1(F)(4)(b); 37 C.F.R. § 202.20(c)(2)(vii)(A)(2). Those rules—which only apply if the work at issue is a "computer program"—permit the applicant to "block[] out" material from its deposit copy. Compendium 1509.1(F)(4)(b). Planner 5D took full advantage of these rules by blocking out entire pages of text from its (already excerpted) deposit copies. Schmitt Decl. ¶¶ 123, 133–134. This further obscured and confused the nature and scope of its claimed works, thereby complicating this litigation. *Cf. Skidmore,* 952 F.3d at 1062–63 (deposit requirement functions to "prevent confusion about the scope of the copyright"). It also permitted Planner 5D to maintain its claim that its works contain trade secrets—which they do not, as explained below. *See infra* at 27–31.

**D.    Permitting Planner 5D to proceed with this suit would render the Act's application-and-deposit system meaningless.**

As discussed above, Planner 5D adamantly refused the Office's numerous requests for Planner 5D to comply with the appropriate procedures, knowing that compliance with the appropriate registration procedures would harm its litigation position. This is an abuse of the Office's special rules for computer programs and, if sanctioned, would up-end the entire application-and-deposit system. *See Skidmore,* 952 F.3d at 1062-63; S. Rep. No. 352, 100th Cong., 2d Sess. 45 (1988). It would also obviate the Copyright Office's detailed procedures for group registration, which permit registration of a "group of related works" in one application in narrow circumstances. Compendium 511 (explaining "limited exceptions" to the "One Work Per Registration" rule); *id.* at 1105.1 & 1105.2 (addressing group registration generally); *see, e.g., id.* at 1112 (explaining eligibility requirements for group registration of databases). Because virtually

---

[10] Planner 5D has claimed—both to this Court and to the Copyright Office—that it "owns" thousands of "scenes" depicting "household and office designs." CR Compl. ¶ 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Schmitt Decl. ¶ 32.

20

all copyrightable works are capable of reduction into a data file—whether TXT files or JSON files—Planner 5D's approach would mean that registrants could simply combine hundreds of literary or visual works into a data file, claim it as a "computer program," and submit only a sample of that file as a deposit copy. That would permit litigants with weak substantive arguments about the copyrightability of their alleged works to do exactly what Planner 5D has done here: file a lawsuit based on the Office's refusal to register a copyright, hope the court permits the claim to proceed past summary judgment, and use the prospect of trial to extract an unjustified settlement. Further, it would achieve this result while also avoiding any kind of substantive review by the Office's examiners—all while maintaining the ability to claim compliance with the registration requirement. This Court should not endorse that kind of end-run around the Copyright Act, the Copyright Office's procedures and regulations, and the U.S. Supreme Court's opinion *Fourth Estate*.

### E.  Planner 5D failed to comply with Section 411 and thus its claims cannot proceed

Planner 5D has not deposited any of its claimed works "in proper form." 17 U.S.C. § 411(a).[11] ***None*** of the Objects or Scenes that Planner 5D claims have been submitted to the Office in "visually perceptible" form. Compendium 1509.3(C). Planner 5D's deposit for the Asserted Objects application includes text files for only ███████████ of the 3,719 Objects Planner 5D claims in this suit, and it has made no attempt to deposit the remaining Objects with the Office in any form, JSON or otherwise. Schmitt Decl. ¶¶ 15, 125. And while Planner 5D claims to own the Asserted Scene Compilation consisting of ████ Scenes, as well as 18 of the individual Scenes therein, its deposit only includes ████ ████████████████████████████████████████████████████ Schmitt Decl. ¶¶ 29, 135. This was not a bona fide attempt to register and deposit a compilation, any more than submitting the first two pages of the "A" section of a phone book would suffice to register a compilation copyright in the entire phone book. *Cf.* 17 U.S.C. § 101 (copyright in "compilation" depends on consideration of the work "as a whole"); *Rudnicki v. WPNA 1490 AM*, 580 F. Supp. 2d 690 (N.D. Ill. 2008) (explaining that plaintiff "was

---

[11] While the Office stated in its November 16, 2020 correspondence that Planner 5D had complied with the "proper form" required "for registration of [] ***computer programs***," Dkt. 112 at 3 (quoting Dkt. 1 Ex. A), the Office did ***not*** state that Planner 5D had complied with the deposit requirement for any other type of work, *e.g.*, a visual work, which would have first required deposit of the "complete" work in a "visually perceptible" form. Ex. 23 at P5D-0065371. *See* 17 U.S.C. § 408(b); Compendium 1509.3(C).

required to deposit one complete copy . . . of each [work] in order to register" and that because plaintiff "included [only] six broadcasts as a representative sample" with application, registration covered only those six broadcasts in litigation).

Because Planner 5D was not entitled to avail itself of the Office's procedures for "computer programs," *see supra* at 12–14, and because Planner 5D has made no attempt to deposit its works "in proper form" for the actual types of works involved, it cannot bring a "civil action for infringement" based on those works. 17 U.S.C. § 411(a). For that reason alone, summary judgment is warranted on Planner 5D's copyright claims. *Action Tapes,* 462 F.3d at 1013-14 (registration in one category does not establish registration in another category for purposes of 17 U.S.C. § 411(a) where deposit requirements differ); *see also supra* at 15 (citing cases affirming summary judgment where plaintiff failed to submit proper deposit).

### F.  Planner 5D cannot establish ownership of a valid copyright.

#### 1.  The JSON data files Planner 5D sought to register are not protectable because they lack human authorship.

Planner 5D's claims also fail for the independent reason that the works it sought to register—the text of data files in JSON format—are not protectable as a "literary work" because the text was not "human-written." Circular 66 at 3.[12] While Planner 5D's employees may have created the ***visual*** models of the Objects (and the 18 Asserted Individual Scenes), Planner 5D made no attempt to register those models, which would have required submitting "renderings of the work[s] in a form that is visually perceptible without the aid of a machine or device." 37 C.F.R. § 202.21 (deposit requirements for visual works).

████████████████████████████████████████████████████

████████  Schmitt Decl. ¶¶ 25, 71, 122, 132, Ex. 26 at P5D-0065414–63 (deposit copy for Objects application); Ex. 27 at P5D-0065467–516 (deposit copy for Scenes application). As such, the JSON files are works "produced by a machine or mere mechanical process that operates . . . automatically" and thus are not works of authorship subject to copyright protection. Compendium 313.2; *see also id.* at 721.6 ("[W]hen a work is created with a computer program, any elements of the work that are generated solely

---

[12] "Circulars provide Copyright Office guidance on various issues." *ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 417 n.5 (9th Cir. 2018); *see also Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 979 (E.D. Cal. 2000) ("Copyright Office Circular 66 is 'generally known' and 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' because it is contained in the United States Copyright Office.")

by the program are not registrable.").[13]   The Office raised precisely the same objection in response to Planner 5D's applications, noting that "it is clear that the data contained within the deposit material was generated by a third-party program" because "[t]he metadata specifically states that this data was generated by Blender 2.62 Exporter."  Schmitt Decl. ¶ 137.  Because the works at issue are automatically generated JSON files, none are works of human authorship falling within the scope of the Copyright Act.  Thus, any claim in the JSON text files should be dismissed.

Moreover, even if the ***text*** of the JSON data files was authored by a human (which it is not), Planner 5D's claims would be limited to the text—and would not extend to the visual models, which Planner 5D made no attempt to register.  Compendium 721.10(A) (noting that a copyright in a data file "does not cover any of the content that may appear" as a result of the use of that data file unless the applicant "expressly asserts a claim in that material"); Compendium 1006.1(A) (protection for "human-written portions" of the data file itself does not cover the ***output*** that results from reading the data file).  This is one of the critical distinctions between copyrights in computer programs, which encompass *both* the registered code *and* "screen displays generated by that program," and the copyrights in other kinds of literary works, which encompass only the content of the work itself.  Compendium 721.10(A).  Accordingly, to the extent Planner 5D's claims are based on infringement of the Objects and Scenes themselves—rather than the text of the data files—those claims should be dismissed.  *See Ward v. Barnes & Noble, Inc.*, 93 F. Supp. 3d 193, 204 (S.D.N.Y. 2015) (granting summary judgment to defendant on portion of claim based on illustrations in book when registration was limited to "text").

## 2.   <u>The Objects are 3D models of pre-existing furniture and other real-life objects and lack originality.</u>

As this Court recognized when it dismissed Planner 5D's original copyright claims, copying a pre-existing design—either from a 2D image or a 3D product—and converting it into a 3D model (like Planner

---

[13] *See also Urantia Found. v. Kristin Maaherra*, 114 F.3d 955, 957-59 (9th Cir. 1997) (authorship requires "some element of human creativity"); *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 304 (7th Cir. 2011) ("Authorship is an entirely human endeavor"); Copyright Review Board, Second Request for Reconsideration for Refusal to Register *A Recent Entrance to Paradise* at 3-5 (Feb. 14, 2022) (reaffirming that only works of "human authorship" are protectable by the Copyright Act) (the "Thaler Opinion"); Copyright Office, Copyright Registration of Websites and Website Content at 3 (Circular 66) (noting that only "the human-written portions of" an HTML file are registrable as literary works).

5D did to create its Objects) may require effort and technical skill, but it does not result in original expression that is entitled to copyright protection.  Dkt. 52 at 13 ("Planner 5D's conten[tion] that it spent time, money and effort to make their objects . . . does not necessarily allege that any creative expression was added into the renderings of real-life objects . . . . [T]he 'sweat of the brow' approach does not establish originality or creativity"); *see also Feist*, 499 U.S. at 359–60 ("[O]riginality, not 'sweat of the brow,' is the touchstone of copyright protection"); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264–65 (10th Cir. 2008) (Gorsuch, J.) ("digital wire-frame models" that are "copies of" car designs not protectable for lack of originality); Compendium 923.1.

In *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, for example, the Ninth Circuit found that creation of costume designs based on pre-existing characters was insufficiently original to justify protection—even though "figuring out how to transform the [2D] characters into [3D] costumes" required "a lot of thought and effort" and involved "creative decisions" relating to, for example, how to design the "texture of the costumes" to reflect the source material.  122 F.3d 1211, 1222–23 (9th Cir. 1997).  Critically, the Ninth Circuit explained that each allegedly "artistic" decision "stemmed from functional considerations" from transferring the source material into a new medium, and that any differences "should not be considered by a court in determining whether sufficient artistic differences exist to constitute 'originality.'"  *Id.*; *see also* Dkt. 52 at 13 (rejecting Planner 5D's argument that "its website reveals 'hand-crafted' objects with various colors, textures, features and embellishments" as "not enough" to survive a motion to dismiss; Planner 5D must show "more than the time and effort that went into making the three-dimensional objects").[14]

Like the costumes in *Genesis Creative*, discovery has shown that Planner 5D created its Objects to be realistic facsimiles of pre-existing items, and side-by-side comparisons of the Objects and the

---

[14] *See also ATC Distribution Grp, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 712 (6th Cir. 2005) (catalog of "hand-drawn sketches of transmissions parts, copied from photographs cut out of competitors' catalogs" not protectable because sketches were "intended to be as accurate as possible . . . a form of slavish copying that is the antithesis of originality"); *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980) ("[T]he mere reproduction of the Disney characters in plastic, even though the adaptation of the preexisting works to this medium undoubtedly involved some degree of manufacturing skill, does not constitute originality…"); Compendium 923.1 ("The copyright law does not protect models that are exact replicas of the source work, regardless of how much skill or labor was involved in creating the work.").

**Defendants' Motion for Summary Judgment**                                    **Case No. 3:19-cv-003132**

corresponding real-world products show that Planner 5D did not add any creative expression.  Thus, the Objects are not protectable.

              a.      *Most Objects were created by copying images of pre-existing items.*

Planner 5D admits that the vast majority (~90%) of its Objects were created by "consulting and studying" reference images of furniture and other home décor items.  Schmitt Decl. ¶ 33.  Indeed, Planner 5D trained its modelers to trace and copy the reference images exactly.  *See supra* at 3–5.  Furniture companies that hired Planner 5D to create 3D models of their products provided reference images and other product specifications ████████████████████████████████████████ ████████████████████████████████ Schmitt Decl. ¶ 85; *see also id.* ¶ 84–91; *Genesis Creative*, 122 F.3d at 1223 ("[B]ecause ERG followed detailed instructions from its customers regarding exactly how they wanted the costumes to appear, it cannot be said that ERG's artistic contributions were more than merely trivial contributions."); *Meshwerks*, 528 F.3d at 1268–69 ("intent" to "copy" pre-existing designs "rather than to create, or even to add, any original expression" supports finding that the copies are not protectable).  Indeed, side-by-side comparisons demonstrate that each of the B2B Objects look identical to the corresponding client product, as exemplified below:

| P5D Object No. | Image of P5D Object | Image of B2B Clients's Product | B2B Client and Source of Image |
|---|---|---|---|
| s/1709 |  |  | Cosmorelax http://www.cosmorelax.ru/catalog/ Podvesnyye/jl7b_podvesnoy_sveti lnik/ |
| s/1739 |  |  | Riter http://www.riter-com.ru/base/node/278 |

Schmitt Decl. ¶ 105, Ex. 49 (summary chart of side-by side comparisons of each of the 113 Objects identified by Planner 5D as B2B Objects).

Similarly, Planner 5D admits that its "general practice" to create Non-B2B Objects was for its modelers to study reference images of furniture and other items found online—either from URLs to listings

on retail websites that Planner 5D provided to modelers or by asking modelers find images themselves through Internet searches.[15]  Schmitt Decl. ¶¶ 33–44.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████  While Planner 5D claimed it "does not have records of the websites visited by the modelers for creation of Objects during the relevant time frame," *id.* ¶ 73, a side-by-side comparison of images of products that Defendants were able to find independently on IKEA's and other retailers' websites show that the resulting Non-B2B Objects look virtually *identical* to the corresponding furniture and other home décor items, as exemplified below:

| P5D Object No. | Image of P5D Object | Image of of Third-Party Product | Name of Product |
|---|---|---|---|
| s/2796<br><br>Length: 60<br>Width: 101<br>Height: 187 |  |  | IKEA PS 2014 Wardrobe<br>(SKU # 002.603.09)<br><br>Length: 60 cm<br>Width: 101 cm<br>Height: 187 cm |
| s/2940<br><br>Length: 44<br>Width: 35<br>Height: 25 |  |  | IKEA BOLMEN Step Stool<br>(SKU # 902.913.30)<br><br>Length: 44 cm<br>Width: 35 cm<br>Height: 25 cm |
| s/2263<br><br>Length: 102<br>Width: 64<br>Height: 122 |  |  | La Lune Collection Rustic<br>Rocking Chair<br><br>Length: 102 cm<br>Width: 64 cm<br>Height: 122 cm |

*See supra* at 5; Schmitt Decl. ¶¶ 72, 80, 82, Ex. 50 (summary chart of side-by-side comparisons for 981

---

[15] Planner 5D made no attempt to contact or obtain permission from the owners of the items or of the images.  Schmitt Decl. ¶¶ 112–114  To the extent that Planner 5D created its Objects based on copyrighted reference material without obtaining permission from the owners, those Objects are not protectable.  17 U.S.C. § 103(a) ("[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.").

Non-B2B Objects).[16]

Given that the Objects look virtually identical to the corresponding reference images, "no reasonable juror could conclude that there are any non-trivial artistic differences sufficient to justify a finding of protectable originality." *Genesis Creative*, 122 F.3d at 1223 (creation of costumes based on images not original); *see also Meshwerks*, 528 F.3d at 1260–61 (creating realistic models of pre-existing objects "based on photographs" is insufficient to justify copyright).

> b.  *Planner 5D has not identified the small subset of Objects allegedly created without a reference image.*

Planner 5D claims that "roughly 10%" of its Objects were created "without reference to an inspirational image" and simply out of "imagination," but refused to identify them from among the 3,719 Objects.  Schmitt Decl. ¶ 115.  As such, this Court has no information as to which of the thousands of Objects were independently created (if any), and Defendants were unable to investigate the process of creating those particular Objects to test whether they are in fact original.  Thus, Planner 5D failed to meet its burden that any of its Objects contain original expression.  *See Patel Burica & Assocs., Inc. v. Lin*, No. 19 Civ. 1833, 2019 WL 6954256, at *3 (C.D. Cal. Dec. 19, 2019) (dismissing copyright claims due to plaintiff's failure to identify with "specificity" the allegedly infringed works).

## V.  SUMMARY JUDGMENT ON THE TRADE SECRET CLAIMS IS WARRANTED.

It is well-established that no trade secret can exist when "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  This is axiomatic; to own a trade secret, the information must be kept secret.  That simple and indisputable proposition dooms Planner 5D's claims for trade secret misappropriation. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[16] For those Objects that Planner 5D did not identify and produce reference images in discovery, it cannot meet its burden of establishing that any of these Objects contain original expression (as opposed to being slavish copies of the real-world items like the others for which reference images were identified by Defendants).  *See* Compendium 923.1 (determining whether model is protectable depends on whether it "contains some original differences from the object depicted"); *see also Bespaq Corp. v. Haoshen Trading Co.*, No. 04 Civ. 3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004) (denying injunction because plaintiff failed to explain what "elements it has added to its miniature furniture that were not otherwise present in preexisting full-size furniture pieces").

██████████████████████████████████████████████████████ Moreover, those users were under no obligation to maintain the confidentiality of any information Planner 5D transmitted to them because, at the relevant time, Planner 5D's Terms of Service constituted the type of "browsewrap" agreement that is unenforceable. And even if enforceable, those Terms of Service did not expressly require confidentiality. Accordingly, Defendants are entitled to summary judgment as to Planner 5D's federal and state law claims for trade secret misappropriation as a matter of law.

### A. Trade secrets cannot exist in the face of disclosure without confidentiality.

To pursue a claim under either the federal Defend Trade Secrets Act ("DTSA") or California's Uniform Trade Secrets Act ("CUTSA"), a plaintiff must, among other things, exercise reasonable efforts to maintain the secrecy of its alleged trade secrets. *See* 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d).[17] This requirement "codifies [the] common law," *Am. Home Shield of California, Inc. v. Fid. Nat. Home Warranty Co.*, No. D039241, 2003 WL 21085278, at *3 (Cal. Ct. App. May 14, 2003), which for at least 40 years has made clear that a plaintiff loses trade secret protections when it "discloses [its] trade secret to others who are under no obligation to protect the confidentiality of the information." *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 304 (Cal. App. 2002) (quoting *Ruckelshaus*, 467 U.S. at 1002); *see also Nextdoor.com, Inc. v. Abhyanker*, No. 12 Civ. 5667, 2014 WL 1648473, at *8 (N.D. Cal. Apr. 23, 2014) (same); *World Resorts Int'l, LLC v. Interval Int'l, Inc.*, No. 12 Civ. 6847, 2014 WL 12567170, at *4 (C.D. Cal. Aug. 22, 2014) (same); Restatement (First) of Torts § 757 (1939) (similar). In other words, a trade secret plaintiff who discloses its alleged trade secret to individuals without legally binding those individuals to an obligation of confidentiality has not taken reasonable measures to protect that alleged secret as a matter of law. *See HiRel Connectors, Inc. v. United States*, No. 01 Civ. 11069, 2006 WL 3618011, at *8 (C.D. Cal. Jan. 25, 2006); *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 57–59 (Cal. App. 2014).

The same standard applies in the particular factual context of a plaintiff who discloses its alleged trade secret on the Internet. *See SocialApps, LLC v. Zynga, Inc.*, No. 11 Civ. 4910, 2012 WL 381216, at

---

[17] Pursuant to the Court's bifurcation order, this motion addresses only the reasonable measures element of Planner 5D's trade secrets claim. Order re Bifurcation and Case Schedule at 1, ECF No. 182. Should that claim survive this motion in whole or in part, Defendants reserve all rights to argue that Planner 5D's trade secrets claim is invalid for any other reason.

*2 (N.D. Cal. Feb. 6, 2012) (striking allegations that information was a trade secret because it was publicly available on the plaintiff's website); *Arkeyo, LLC v. Cummins Allison Corp.*, 342 F. Supp. 3d 622, 630–33 (E.D. Pa. 2017) (finding no trade secret in light of internet publication and lack of confidentiality measures). *Arkeyo* is particularly instructive. There, the court held that a party that made its alleged trade secrets available online at a URL that was "publicly available to anyone who simply typed [it] into a web browser" and did so "to individuals who owed no duty of non-disclosure" to the plaintiff had not taken reasonable measures to protect them. 342 F. Supp. 3d at 631–32.

Accordingly, courts regularly resolve trade secrets claims on summary judgment when the measures purportedly protecting the alleged trade secrets did not prevent third parties from viewing the information, and when there was no legal obligation (such as a binding confidentiality agreement) requiring secrecy of disclosed information. *See, e.g.*, *CTC Glob. Corp. v. Huang*, No. 17 Civ. 02202, 2019 WL 4148184, at *6 (C.D. Cal. July 29, 2019); *Milos Misha Subotincic v. 1274274 Ontario Inc.,* No. 10 Civ. 1946, 2013 WL 3964994, at *19–20 (C.D. Cal. Apr. 9, 2013), *Telemasters, Inc v. Vintage Club Master Ass'n*, No. 05 Civ. 5139, 2007 WL 9706067, at *8 (C.D. Cal. May 11, 2007).[18]

### B.   Planner 5D publicly disclosed its alleged trade secrets to users of its Website.

Planner 5D alleges that its trade secrets are its "JSON object and scene files, individually and as compilations" as well as "the URLs corresponding to each of these files." Ex. 15; *see also* TS Compl. ¶¶ 85, 93; Ex. 16 at 14. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

██████   Accordingly, Planner 5D disclosed and made its alleged trade secrets accessible to the public as

---

[18] Planner 5D originally pled that it protected its alleged trade secrets only by (1) making it "impossible to access them on its website "without circumventing Planner 5D's software" and (2) prohibiting users from accessing them in its Terms of Service. TS Compl. ¶¶ 33, 37, 40–41. In its Trade Secret Disclosures, served at the outset of discovery, Planner 5D reaffirmed that it claimed to protect its alleged trade secrets through the "structural secrecy" of its website and its Terms of Service. Ex. 15. As discovery progressed and it became clear, as described herein, that Planner 5D's website ███████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Those unpled bases are not properly before the Court. More importantly, they are irrelevant to the critical legal inquiry, which is whether Planner 5D disclosed its alleged trade secrets to individuals who owed no duty of confidentiality to Planner 5D.

a matter of law.

Critically, cases interpreting trade secret disclosure in the context of the Internet have held that information is disclosed for the purposes of trade secret law when it is "made available to the public" online. *Arkeyo*, 342 F. Supp. 3d at 631–32 (quoting *Oja v. U.S. Army Corps of Engineers*, 440 F.3d 1122, 1131 (9th Cir. 2006)). Indeed, no other rule could possibly apply, as information publicly available on the Internet "by definition, cannot be protected as a trade secret." *SocialApps*, 2012 WL 381216, at *2.

Applying that standard, it is beyond dispute that Planner 5D disclosed its alleged trade secrets █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

That conclusion is bolstered by the fact that Planner 5D also conceded that it "published" its alleged secrets. Specifically, in its copyright registration applications, Planner 5D stated that its collection of Object Data Files and Scene Data Files were published in the United States in 2016. Ex. 26 at 1–2; Ex. 27 at 1–2. "Publication" is a term of art in the Copyright Act and means the distribution of a work "to the public." 17 U.S.C. § 101. Thus, as part of its effort to pursue its copyright claim, Planner 5D conceded that it had made its alleged copyrighted works—which are also its alleged trade secrets—available to the

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:19-CV-003132

public and thereby disclosed them for the purposes of evaluating its trade secret claim.[19]

### C. Planner 5D did not obligate its users to maintain the confidentiality of its alleged trade secrets.

Since the undisputed record demonstrates Planner 5D disclosed its alleged trade secrets to its users and thus its Website's "structural secrecy," Ex. 15, did not prevent acquisition or download of the alleged trade secrets, the remaining question is whether Planner 5D's Terms of Service—which is the only other security measure that it claims—obligated its users to protect the confidentiality of those alleged secrets. *see id.* It did not. Rather, the undisputed facts confirm that at the relevant time, Planner 5D's Terms of Service were unenforceable against Planner 5D's users as a matter of law. Regardless, the plain language of those Terms did not assert that any information on the Planner 5D's Website was confidential, making it impossible for users to know what particular content Planner 5D considered to be a trade secret and therefore what they might be expected not to disclose.

#### 1. Planner 5D's Terms of Service are an unenforceable "browsewrap" agreement.

Terms of service can protect trade secrets only when they are—at minimum—enforceable contracts. *See ELT Sight, Inc. v. EyeLight, Inc*., No. 19 Civ. 5545, 2020 WL 7862134, at *23 (C.D. Cal. Aug. 28, 2020) (holding no reasonable measures existed to create a "confidentiality obligation" where there was no "applicable NDA" for the alleged trade secrets); *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 520 (S.D.N.Y. 2017) (considering as a threshold issue whether an online license was enforceable). However, the Terms of Service on Planner 5D's Website in 2016 constituted the type of "browsewrap"

---

[19] While the Copyright Office recognizes that computer programs are unusual among copyrighted works in that they can be copyrightable and include trade secret material, that recognition is irrelevant here because Planner 5D's alleged works are **not** computer programs. *See supra* at 13–15. Even if they were, Planner 5D's admission that its alleged programs have been "published" undermines its claim that those same programs are also trade secrets. When Congress added computer programs to the statutory list of copyrightable works in 1980, it did so on the recommendation of the Commission on New Technological Uses of Copyrighted Works ("CONTU"), whose Final Report to Congress recommended adding computer programs to the Copyright Act in part because the widescale distribution of such programs made other legal protections inapplicable, including trade secret law. Indeed, the CONTU Final Report expressly recognized that because secrecy is "paramount" to trade secret law, the widescale distribution of computer programs would extinguish trade secret claims and make potential copyright protection desirable. *Final Report of the National Commission on New Technological Uses of Copyrighted Works* 17–18 (1978). Planner 5D's attempt to simultaneously claim that the same underlying materials are both published computer programs for the purposes of copyright law and trade secret material for the purposes of a misappropriation claim flies in the face of this congressional understanding of how those two types of intellectual property intersect.

31

agreement that is unenforceable against any user who did not have notice of the Terms.

a.    *Internet terms of service are enforceable only under specific circumstances.*

Courts enforce terms of service only when they can ensure the user knew of the existence of those terms.  Historically, Internet terms of service have fallen on a spectrum between two extremes.  At one end, "browsewrap" agreements are those in which a website offers terms that are disclosed only through a hyperlink, and a user manifests assent to those terms merely by using the website.  *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022); *see also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014).  Such agreements are generally unenforceable because there is no certainty that consumers were even aware that contractual terms were even offered, much less that they were accepting those terms though the continued use of the website.  *Berman*, 30 F.4th at 856.  At the other end of the spectrum, "clickwrap" agreements display a pop-up screen with the terms of service on a website as soon as a user accesses it and requires the user to check a box expressly agreeing to the terms before proceeding to use the website.  *Id.*  In that case, the user has received sufficient notice of the terms being offered.  *Id.*

Accounting for these principles, the Ninth Circuit recently held that an online contract is enforceable only if the user (1) had actual notice of the contract or (2) was on inquiry notice of the contract.  *Id.*[20]  Planner 5D's Terms of Service are unenforceable under both standards.

b.    *There is no evidence demonstrating any individual user's actual notice of Planner 5D's Terms of Service.*

Actual notice requires proof the user saw the relevant terms.  *See Nguyen*, 763 F.3d at 1176–77.  In this case, there is no such proof, as the person who accessed and downloaded Planner 5D's alleged trade secrets never saw Planner 5D's Terms of Service.  Song Decl. ¶ 22.  Moreover, it is undisputed that Planner 5D did not track which of its particular users, if any, saw its Terms of Service.  Instead, the data it produced in this litigation showed only that Planner 5D obtained aggregated data of some statistics regarding user visits to its Terms of Service page, but not whether any particular user visited that page.

---

[20] Although *Berman* is the latest articulation of this test, this has been the law in the Ninth Circuit since at least 2014.  *See Nguyen*, 763 F.3d at 1176–79; *see also Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 864–66 (Cal. App. 2016).

Ex. 13 (RFA Nos. 90 & 92). The data that it did produce shows that only 137 out of almost 5 million new users—that is, visitors to the website who had never been on the website before—viewed the Terms of Service page during their first session, less than .01%. Ex. 43.[21] Thus, Planner 5D cannot show that any particular user saw its Terms of Service, and was thus bound by them.

> c. *Planner 5D did not put users on inquiry notice of its Terms of Service.*

Planner 5D did not put its users on inquiry notice of its Terms of Service as a matter of law. Inquiry notice exists only where a website (1) provides "reasonably conspicuous notice" of its terms, and (2) requires the user to take some affirmative action such as clicking a button or checking a box to manifest asset to those terms "unambiguously." *Berman*, 30 F.4th at 856; *see also Doe v. Roblox Corp.*, No. 21 Civ. 3943, 2022 WL 1459568, at *5 (N.D. Cal. May 9, 2022) (applying the *Berman* test). Planner 5D's Terms of Service fail both prongs of this test.

**First**, the only notice Planner 5D provided to users of its Terms of Service was an inconspicuous hyperlink at the bottom of the webpage. *See supra* at 9. Such a link has none of the hallmarks of reasonably conspicuous notice and contains many of the features of unenforceable agreements, which are discussed below.

For notice of terms of service to be "reasonably conspicuous," the notice (such as a hyperlink to the terms) must be in a font size and format that a court could assume a "reasonably prudent Internet user" would have seen, and it cannot be "deemphasized" by the design of the website, such as by the website page having other features or visual elements that draw the user's attention away from the hyperlink. *Berman*, 30 F.4th at 856–57. For instance, notice is insufficient where the text of the hyperlink to the agreement is in a font smaller than that of the font used in the rest of the website and in a color that blends into the background. *Id.*; *Brooks v. IT Works Mktg., Inc.*, No. 21 Civ. 1341, 2022 WL 2079747, at *6 (E.D. Cal. June 9, 2022). Yet, Planner 5D's hyperlink is in a grey font, smaller than the text on the rest of the page, and is deemphasized on the page compared to the brightly-colored text and images of the gallery thumbnails or other images on the screen. Exs. 82 & 83.

Indeed, Planner 5D's design looks strikingly similar to other websites that courts have held did not

---

[21] Planner 5D did not produce data showing the aggregate number of users who visited the Terms of Service page.

provide sufficiently conspicuous notices of their terms of service as a matter of law.  In all these examples, the terms of service were disclosed in an inconspicuous hyperlink at the bottom of the website, under more prominent content designed to attract the user's eye:







*Brooks v. IT Works Mktg., Inc.*, No. 21 Civ. 1341, 2022 WL 2079747 (E.D. Cal. June 9, 2022)

*Nghiem v. Dick's Sporting Goods*, No. 16 Civ. 97, 2016 WL 9131962 (C.D. Cal. July 5, 2016)

Ex. 82
(Planner 5D's Website in 2016)

**Second**, Planner 5D also did not require users to manifest their assent to the Terms of Service before accessing its website.  Sufficient assent requires users to be "explicitly advised" that the "act of clicking" a button on a website will assent to the terms, whether by prompting the user to take affirmative action to indicate the assent, or through a clear notice that such assent is being assumed through use.  *Berman*, 30 F.4th at 857; *Nguyen*, 763 F.3d at 1178–79.  This requirement is necessary because the mere phrase "terms of use" in a hyperlink might not be enough to alert an Internet user that there is a contract at the link.  *Long*, 245 Cal. App. 4th at 867.  However, Planner 5D's website did not comply with any of these requirements. *See supra*, at 9.  That failure renders the terms included in the Terms of Service unenforceable.  *See Brooks*, 2022 WL 2079747, at *7–8; *Sifuentes v. Dropbox, Inc.*, No. 20 Civ. 7908, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022).

2.      The plain language of the Terms of Service did not create a duty of confidentiality.

Even if the Terms of Service on Planner 5D's Website in 2016 were enforceable—which they were not—they could not be a reasonable security measure because they did not contain an express confidentiality provision.  It is the existence of a *confidentiality* agreement that creates the obligation to keep information secret.  *HiRel*, 2006 WL 3618011, at *8; *Broker Genius, Inc.*, 280 F. Supp. 3d at 521–22 (collecting cases); *SMH Enters, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20 Civ. 2970, 2021 WL 4460522, at *13 (E.D. La. Sept. 29, 2021).  Yet, Planner 5D's Terms of Service in 2016 did not include *any* express confidentiality provision that prohibited users from disclosing information transmitted to them by Planner 5D's Website or that even put users on notice that Planner 5D considered information on its Website to be confidential.  Ex. 36.  Further, nothing in the Terms of Service identified what components of the Website materials, if any, Planner 5D considered to be confidential.  To the contrary, the Terms of Service referred only generally to the "Planner5D project" (defined as "a social platform for virtual interaction between users") and "Materials" on the Website, defined broadly as "any text and other materials . . . [the user] may use or create in connection with the Services."  *Id.*  That broad language encompassed both Planner 5D's alleged trade secrets and materials Planner 5D has never claimed are trade secrets.  Thus, the Terms of Service did not notice users about what, if anything, must be kept secret.

**VI.   CONCLUSION**

For all the reasons stated above, the Court should enter summary judgment in Defendants' favor.

Dated: February 17, 2023

KIRKLAND & ELLIS LLP

/s/ Dale M. Cendali
Dale M. Cendali (S.B.N. 1969070)

Attorneys for Defendants
*Meta Platforms, Inc.and Facebook Technologies, LLC*

JENNER & BLOCK LLP

/s/ *Andrew H. Bart* (with consent)
Andrew H. Bart

Attorneys for Defendant
*The Trustees of Princeton University*

## ATTESTATION PURSUANT TO CIVIL L.R. 5-1(i)(3)

I, Dale M. Cendali, am the ECF User whose ID and password are being used to file this document.  I hereby attest that concurrence in the filing of this document has been obtained from the signatories.

DATED:  February 17, 2023

/s/ *Dale M. Cendali*
Dale M. Cendali

## CERTIFICATE OF SERVICE

On February 17, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

DATED:  February 17, 2023

/s/ *Dale M. Cendali*
Dale M. Cendali