1   MARC N. BERNSTEIN (SBN 145837)
    mbernstein@blgrp.com
2   WILL B. FITTON (SBN 182818)
    wfitton@blgrp.com
3   CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
    christian@blgrp.com
4   THE BUSINESS LITIGATION GROUP, P.C.
    150 Spear Street, Suite 800
5   San Francisco, CA 94105
    Telephone: 415.765.6633
6   Facsimile: 415.283.4804

7   Attorneys for Plaintiff
    UAB "PLANNER5D"

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13

14   UAB "PLANNER5D" dba PLANNER 5D,        **Case No.  3:19-cv-03132-WHO (SK)**
                                            **Case No.  3:20-cv-08261-WHO**
15                    Plaintiff,

16           v.

17   META PLATFORMS, INC., FACEBOOK         **PLANNER 5D'S OPPOSITION TO**
     TECHNOLOGIES, LLC, THE TRUSTEES        **DEFENDANTS' MOTION FOR**
18   OF PRINCETON UNIVERSITY, DOES 1-       **SUMMARY JUDGMENT**
     200, ABC CORPORATIONS 1-20, and XYZ
19   UNIVERSITIES 1-20.

20
                      Defendants.
21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    BACKGROUND ..................................................................................................... 2

    A.    Creation of P5D's Objects and Scene Compilation ................................. 2

        1.    P5D's Objects: 3D Models ........................................................ 2

            a.    Human modelers use Blender. ........................................ 2

            b.    Types and sources of objects ......................................... 2

            c.    Creative choices independent of source .......................... 3

        2.    Selection, Coordination, and Arrangement of Scene Compilation ............. 5

    B.    P5D's Copyright Applications ............................................................... 5

        1.    P5D Initiates Litigation and Then Seeks Copyright Registration. Consistent with the Court's Ruling. ............................................ 5

        2.    P5D Refiles Its Suit and Then Refiles Its Copyright Application. ............ 6

        3.    The Copyright Office Refuses Registration, but Expressly States the Works Were Submitted "in Proper Form" and That It "D[id] Not Question" that P5D's Works "Constitute Computer Programs." ............... 6

    C.    Princeton Seeks to Overcome P5D's Trade Secrets ................................. 7

III.    SUMMARY JUDGMENT STANDARD ...................................................................... 7

IV.    ARGUMENT ......................................................................................................... 7

    A.    Planner 5D's Object and Scene Works Are Copyrightable. ....................... 7

        1.    P5D's objects embody many creative choices. ............................... 9

        2.    P5D's scene compilation was the product of creative choices. ............... 13

        3.    The Court should determine now that P5D's works are copyrightable. .... 13

    B.    Planner 5D Satisfied the Prerequisite for Suit, Obviating Defendants' Fault-Finding with Registration Formalities. ................................................. 14

        1.    P5D has met the "proper form" requirement for suit after refusal. .......... 16

        2.    Once the Office grants or refuses registration, issues relating solely to registration formalities fall away. ............................................. 17

            a.    The administrative classification of Planner 5D's works is now irrelevant to this case. ............................................. 18

            b.    P5D properly sought to register computer programs. .................. 20

i

c.    The Court should reject Defendants' effort to relitigate the propriety of P5D's deposit copy. ................................................... 22

d.    P5D's application *does* cover its visual models as well as its source code. ................................................................................... 24

3.    In fact, P5D's works do qualify as computer programs ........................... 25

C.   Planner 5D's URLs and JSON Files Are Trade Secrets. ................................ 27

1.    Secrecy and reasonable measures are almost never amenable to summary judgment. ................................................................................... 27

2.    P5D did not disclose its secrets, and its technical protections were reasonable under the circumstances. ........................................................ 28

a.    Temporarily holding ███████████████ in hidden locations on the user's computer was reasonable. ........................ 29

b.    P5D's proprietary file format was a reasonable measure. ............ 30

c.    P5D's other measures were reasonable. ........................................ 30

d.    The number of P5D's files protected the compilations. .............. 31

e.    P5D's protections were particularly reasonable given the business's circumstances. .............................................................. 31

f.    Defendants' expert could not overcome similar protections. ....... 32

3.    P5D's Terms of Service Were Independently Sufficient Protection. ....... 32

a.    Terms of service are enforceable on inquiry notice. ..................... 33

b.    Princeton was on inquiry notice of P5D's terms of service. ......... 34

c.    The terms of service safeguarded confidentiality. ........................ 35

V.   CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Action Tapes, Inc. v. Mattson*,
    462 F.3d 1010 (8th Cir. 2006) ........................................................... 19, 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................................. 7

*Aqua Creations USA Inc. v. Hilton Hotels Corp.*,
    No. 10-cv-246, 2011 WL 1239793 (S.D.N.Y. Mar. 28, 2011)................ 13

*Aqua Creations USA Inc. v. Hilton Worldwide, Inc.*,
    487 F. App'x 627 (2d Cir. 2012) ........................................................ 13

*Art of Living Found. V. Does 1-10*,
    No. 10-cv-5022, 2012 WL 1565281 (N.D. Cal. May 1, 2012)................ 28

*Atari Games Corp. v. Nintendo of Am., Inc.*,
    No. 88-cv-4805, 1993 WL 214886  (N.D. Cal. Apr. 15, 1993.)................ 25

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ............................................................. 33

*Bespaq Corp. v. Haoshen Trading Co.*,
    No. 04-cv-3698, 2004 WL 2043522 (N.D. Cal. Sept. 13, 2004)................ 10

*Burrow-Giles Lithographic Co. v. Sarony*,
    111 U.S. 53 (1884)............................................................................. 8

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
     No. 04-cv-4825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005)................ 33, 34

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................. 7

*Compulife Software Inc. v. Newman*,
    959 F.3d 1288 (11th Cir. 2020) ....................................................... 33, 35

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
    36 F.3d 1147( 1st Cir. 1994)............................................................. 18, 22

*DHI Grp., Inc. v. Kent*,
     No. H-16-1670, 2017 WL 4837730 (S.D. Tex. Oct. 26, 2017). ................ 34, 35

*DVD Copy Control Ass'n, Inc. v. Bunner*,
    116 Cal. App. 4th 241 (2004) ........................................................... 27, 30

*E.I. duPont deNemours & Co. v. Christopher*,
    431 F.2d 1012 (5th Cir. 1970) ........................................................... 31

iii

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
 122 F.3d 1211 (9th Cir. 1997). ........................................................................ 12

*Ets-Hokin v. Skyy Spirits, Inc.*,
 225 F.3d 1068 (9th Cir. 2000) ........................................................................... 8

*Evox Prods. LLC v. Kayak Software Corp.*,
 No. 15-cv-5053, 2017 WL 5634856 (C.D. Cal. Jan. 20, 2017)............................ 8

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
 499 U.S. 340 (1991)............................................................................... 7, 9, 13

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
 139 S. Ct. 881 (2019).................................................................................. 17, 18

*Geoscan, Inc. v. Geotrace Techs., Inc.*,
 226 F.3d 387(5th Cir. 2000) ............................................................................ 23

*Glass Egg Digital Media v. Gameloft, Inc.*,
 No. 17-cv-04165-MMC, 2018 WL 3659259 (N.D. Cal. Aug. 2, 2018).............. 8, 9, 10, 12

*Harris v. Emus Records Corp.*,
 734 F.2d 1329 (9th Cir. 1984) ......................................................................... 18

*Hilderman v. Enea TekSci, Inc.*,
 551 F. Supp. 2d 1183 (S.D. Cal. 2008)............................................................ 28

*Home Legend, LLC v. Mannington Mills, Inc.*,
 784 F.3d 1404 (11th Cir. 2015). ...................................................................... 13

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
 978 F.3d 653, (9th Cir. 2020) .......................................................................... 28

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
 816 F. Supp. 2d 793 (N.D. Cal. 2009). ............................................................ 12

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
 No. 07-cv-03983, 2009 WL 1764652 (N.D. Cal. June 18, 2009)........................ 14

*Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*,
 808 F. Supp. 2d 542 (S.D.N.Y. 2011) .............................................................. 18

*Kantemirov v. Goldine*,
 No. 05-cv-01362, 2005 WL 1593533 (N.D. Cal. June 29, 2005)........................ 18

*KnowledgePlex, Inc. v. Placebase, Inc.*,
 No. 08-cv-4267, 2008 WL 5245484 (N.D. Cal. Dec. 17, 2008) ....................... 22, 24

*Kodadek v. MTV Networks, Inc.*,
 152 F.3d 1209 (9th Cir. 1998) ......................................................................... 23

iv

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
   676 F.3d 841 (9th Cir. 2012) ...................................................................... 13

*LA Gem & Jewelry Design, Inc. v. Groupon, Inc.*,
   No. 19-cv-35, 2020 WL 5440501 (C.D. Cal. Sept. 10, 2020) .................................. 8

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
   342 F.3d 714 (7th Cir. 2003). ............................................................... 28, 32

*Los Angeles News Serv. v. Tullo*,
   973 F.2d 791 (9th Cir. 1992) ...................................................................... 8

*Mattel, Inc. v. MGA Ent., Inc.*,
   No. 04-cv-9049, 2011 WL 3420571 (C.D. Cal. Aug. 4, 2011). .............................. 28

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
   528 F.3d 1258 (10th Cir. 2008) ................................................................. 12

*Morelli v. Tiffany & Co.*,
   186 F. Supp. 2d 563 (E.D. Pa. 2002) ........................................................... 16

*Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*,
   358 Fed. App'x 643 (6th Cir. 2009) .............................................................. 8

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997) ..................................................................... 18

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ................................................................... 33

*Niemi v. NHK Spring Co.*,
   543 F.3d 294 (6th Cir. 2008) ................................................................ 28, 32

*Nova Stylings, Inc. v. Ladd*,
   695 F.2d 1179 (9th Cir. 1983) ................................................................... 16

*Pasillas v. McDonald's Corp.*,
   927 F.2d 440 (9th Cir. 1991). .................................................................... 14

*Patel Burica & Assocs., Inc. v. Lin*,
   No. 19-cv-01833, 2019 WL 6954256 (C.D. Cal. Dec. 19, 2019) ............................ 9

*Phoenix Ent. Partners, LLC v. Dr FOFO, LLC*,
   No. 17-cv-03327, 2018 WL 4635988 (D.S.C. Sept. 27, 2018) .............................. 19

*Planner5D" v. Facebook, Inc.*,
   534 F. Supp. 3d 1126 (N.D. Cal. 2021) ............................................. 13, 16, 17, 23

*Proline Concrete Tools, Inc. v. Dennis*,
   No. 07-cv-2310, 2013 WL 12116134 (S.D. Cal. Mar. 28, 2013). ............................ 17

v

*Proulx v. Hennepin Tech. Ctrs. Dist.*
  *No. 287*, No. 4-79-637, 1981 WL 1397 (D. Minn. Dec. 7, 1981) ........................... 16

*Pyro Spectaculars N., Inc. v. Souza*,
  861 F. Supp. 2d 1079 (E.D. Cal. 2012). ................................................. 31

*Reed Elsevier, Inc. v. Muchnick*,
  559 U.S. 154 (2010)................................................................. 18, 22

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ...................................................... 33, 34, 35

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) .......................................................... 8, 11

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*,
  925 F.2d 174 (7th Cir. 1991) ......................................................... 28, 31

*Satava v. Lowry*,
  323 F.3d 805 (9th Cir. 2003) ............................................................... 8

*Scentsy, Inc. v. B.R. Chase, LLC*,
  942 F. Supp. 2d 1045 (D. Idaho 2013) .................................................. 16

*Scentsy, Inc. v. Harmony Brands, LLC*,
  585 F. App'x 621 (9th Cir. 2014). .................................................... 16

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.*,
  No. 07-cv-635, 2008 WL 166950 (N.D. Cal. Jan. 17, 2008)............................. 28, 30

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020). .................................................. 8, 18, 23

*Skyline Design, Inc. v. McGrory Glass, Inc.*,
  No. 12-cv-10198, 2014 WL 258564, (N.D. Ill. Jan. 23, 2014)................................ 19

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000), ..................................................... 18, 22, 23, 24

*Torres-Negron v. J & N Recs., LLC*,
  504 F.3d 151 (1st Cir. 2007)........................................................... 23

*UAB "Planner5D" v. Facebook, Inc.*
  No. 19-cv-03132, 2020 WL 4260733 (N.D. Cal. Jul. 24, 2020) ........................... 23

*Vacheron & Constantin-Le Coultre Watches, Inc. v. Benrus Watch Co.*,
  260 F.2d 637 (2d Cir. 1958) (Hand, J.).................................................. 18

*Ward v. Barnes & Noble*,
  93 F. Supp. 3d 193 (S.D.N.Y. 2015) ................................................... 24

vi

*Ward v. Nat'l Geographic Soc'y,*
   208 F. Supp. 2d 429 (S.D.N.Y. 2002). .................................................................. 1, 16, 17, 22

*Williams v. Electronics, Inc. v. Artic, Int'l, Inc.,*
   685 F.2d 870 (3d Cir. 1982) ........................................................................... 20, 24

*Yurman Studio, Inc. v. Castaneda,*
   591 F. Supp. 2d 471 (S.D.N.Y. 2008) ....................................................................... 19

*Zygote Media Grp., Inc. v. Moorefilm Ltd.,*
   No. 13-cv-00294, 2014 WL 12600134(D. Utah Apr. 3, 2014) .................................................. 8

**Statutes**

17 U.S.C. § 101 ............................................................................................ 13, 18, 20, 25

17 U.S.C. § 102(a) ................................................................................................. 7, 18

17 U.S.C. § 109(b)(1)(A) ............................................................................................. 19

17 U.S.C. § 1201 ................................................................................................... 29

17 U.S.C. § 408(a) ................................................................................................. 21

17 U.S.C. § 408(c)(1) ................................................................................... 15, 18, 21, 22

17 U.S.C. § 411(a) ............................................................................................. passim

C.F.R. § 202.20(b)(2)(iii)(C) ........................................................................................ 20

**Other Authorities**

2 William F. Patry, *Patry on Copyright* § 4:30.10 (2023) ............................................................ 11

3 *Nimmer on Copyright* § 12.10[B][1] ............................................................................... 14

88 Fed. Rg. 51, 16192 .............................................................................................. 25

*Compendium* § 1101 ............................................................................................... 21

*Compendium* § 721.10(A) ...................................................................................... 20, 24

Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 472 (2006) ............................................... 33

S. Rep. No. 94-473 ................................................................................................ 18

**Rules**

Fed. R. Civ. P. 56(a). .............................................................................................. 7

**TABLE OF SELECT EXHIBIT ABBREVIATIONS**

1.   Declaration of Christian Andreu-von Euw ("**AvE Decl**")

2.   Exhibit 1, Excerpts from the Deposition of Dr. Shuran Song ("**Song Dep**")

3.   Exhibit 2, Excerpts from the Deposition of Dr. Daniel Lopresti ("**Lop Dep**")

4.   Exhibit 3, Excerpts from the Deposition of Ryan McKamie ("**McK Dep**")

5.   Exhibit 4, Excerpts from the Deposition of Alexey Sheremetyev ("**Sher Dep**")

6.   Exhibit 5, Excerpts from the Deposition of Andrey Ustyugov ("**Ust Dep**")

7.   Exhibit 6, Excerpts from the Deposition of Viacheslav Kondaurov ("**Kon Dep**")

8.   Exhibit 14, Excerpts from the Expert Report of Ryan McKamie ("**McK Rep**")

9.   Declaration of Bruce Webster ("**Web Decl**")

10.  Exhibit 1, Supplemental Expert Report of Bruce F. Webster In Response To Report Of Ryan McKamie ("**Web Rep1**")

11.  Exhibit 2, Supplemental Expert Report of Bruce F. Webster In Response To Report Of Dr. Lopresti ("**Web Rep2**")

12.  Declaration of Andrey Ustyugov ("**Ust Decl**")

13.  Exhibits 4 - 7, Records showing the workflow of Planner 5D's website in 2014, 2016, and 2020.

14.  Declaration of Alexey Sheremetyev ("**Sher Decl**")

1    **I.    INTRODUCTION**

2          Planner 5D owns a collection of hand-crafted 3D objects and a curated compilation of 3D scenes.

3    Each 3D model includes over eight kinds of creative choices. All are apparent in a 3D viewer; almost

4    none appear in the small, two-dimensional thumbnails Defendants' offer. To go over the creative

5    choices in P5D's objects, as we do below, is to dispose of Defendants copyrightability challenge to

6    them. And Defendants do not challenge the creativity of P5D's selection of scenes.

7          The Copyright Office declined to register these works based on technical procedures. But the

8    Office found the applications were submitted "in proper form" for P5D to go to court on them. "In

9    proper form" means facial sufficiency. Facially sufficient applications open the court's doors, and

10   registration formalities drop away. The court determines copyrightability independently.

11         Yet Defendants now treat the "proper form" requirement as a gateway back to the Copyright

12   Office, so they can relitigate every step of the registration process. Under their theory, every refusal case

13   could get stuck in a such a re-litigation, since if an application is refused, the Office thinks *something* is

14   wrong. Here, Defendants ask the court to re-assess P5D's choice of the "computer program" category, to

15   re-examine the Office's deposit requirements, and even to delve into computer science theory to

16   determine whether P5D's works qualify as "computer programs." (They do, as we show.) It would be

17   unworkable if courts in refusal cases had to re-adjudicate every registration question. Fortunately, they

18   don't. *Ward v. Nat'l Geographic Soc'y,* 208 F. Supp. 2d 429, 448 (S.D.N.Y. 2002).

19         Defendants challenge the adequacy of P5D's trade secret protections, a fact-specific question

20   rarely amenable to summary judgment. Security procedures' costs and benefits must be weighed against

21   the exigencies of the trade secret owner's business. Here, like any web application, P5D's service faced

22   tradeoffs between usability and security. Parts of its secrets were transmitted to protected parts of users'

23   *computers*. But the secrets were hidden from *users*. Defendants ignore this distinction. They also ignore

24   the tradeoffs P5D had to make as a business. P5D's secrets were kept sufficiently secret using technical

25   measures that were reasonable under the circumstances.

26         P5D's secrets were also sufficiently protected by its terms of service. Defendants were on

27   inquiry notice of the terms because they circumvented P5D's intended user interface to scrape its entire

28   object and scene collections. This conduct far exceeded the implied permission for ordinary visitors to

**P5D's Opp. to Defs' MSJ**                                    **Case No. 3:19-cv-03132-WHO**

use the site as intended. On records like this, courts have held scrapers to inquiry notice. P5D's terms explicitly prohibited conduct like Princeton's, and adequately protected P5D's trade secrets.

## II.   BACKGROUND

### A.   Creation of P5D's Objects and Scene Compilation

#### 1.   P5D's Objects: 3D Models

##### a.   Human modelers use Blender.

Each object in P5D's collection was hand-created by one of four human modelers: Konstantin Ketko, Viacheslav Kondaurov, Maxim Udin, or Eugeniy Gavrikov. (Sher Dep[1] 80:13-19; Kon Dep 99:11-24 AvE Decl Ex. 13 Resp 1.) All models in P5D's Objects (2016) work were created between 2012 and January 13, 2016. (AvE Decl Ex 8 p.1.)

The modelers used an open-source modeling tool called Blender. (Kon Dep 83:18-23, 86:20-87:1.) Blender opens with a blank starting screen, with a grid and a panel of controls. (Ust Decl ¶ 17) Modelers then create their models from the (virtual) ground up.

The modelers' work was akin to sculpting. (Kon Dep 171:22-172:1; Sher Dep 25:5-10.) "Sculpting" is also the name of a Blender feature used to fashion human beings, animals, and multi-folded furniture surfaces. (Kon Dep 87:23-89:22) When fashioning objects, modelers expressed their personal taste. (*Id.* 171:4-21.)

##### b.   Types and sources of objects

P5D's Objects work spans a vast range of objects and features, including just about every type of item that can be found inside or outside a home or office—and some that can't. (Sher Decl Ex 1.) There are chairs, tables, sofas, loveseats, desks, and wardrobes. (*Id.*) There are computers, flat-screen TVs, and sound systems; carpets and paintings; stoves, mixers, lamps, vacuums, bathtubs and toilets. (*Id.*) There are architectural features, such as stairways, windows, and doors; and there are living things such as plants, humans, and pets. (*Id.*) There are also fanciful items, like gnomes, a reindeer, and a snowflake. (*Id.*) And, for outside, there are swimming pools, shrubs, fences, motorcycles, cars, and more. (*Id.*)

The inspirations for this vast mix of models were diverse. Hundreds came wholly from the modelers' imaginations. (*See infra* § IV.A.1.) Others were inspired by real objects or images the

---

[1] A table of exhibit abbreviations is above.

**P5D's Opp. to Defs' MSJ**                                        **Case No. 3:19-cv-03132-WHO**

modelers encountered in life. (Sher Dep 63:16-64:15.) Many hundreds drew upon reference images modelers saw on the web. (*Id.* 64:25-65:10.) Where reference images were used, modelers extrapolated, interpreted, and modified the reference image, drawing on their imaginations. (*Id.* 104:3-105:18; Kon Dep 177:14-19.) About 113 of P5D's thousands of objects were commissioned by furniture retailers and were meant to look like items from their catalogs. (ECF 221 ¶ 101; Sher Dep 47:22-48:8.) These were the so-called Business-to-Business, or B2B, objects. (*Id.*; Kon Dep 25:20-28:7.)

### c.   Creative choices independent of source

Regardless of source, every P5D object features a host of independent creative choices. Modelers fashion the objects in three-dimensional detail, incorporating choices that cannot be seen in small, 2D thumbnails such as those Defendants compare with reference images. (*See* Ust Decl ¶¶ 19-30; Exs. 9, 10.) These choices include *mesh choices* and *material choices*.

### i. Mesh choices

An essential step in the creation of any 3D model is the choice of number and placement of the polygons, or "polys" (generally triangles), that will describe the object. Modelers must choose both how many triangles to use and how to position each one. (Kon Dep 161:21-162:11, 163:1-4, 166:9-168:21, 236:25-237:2; Sher Dep 168:3-19)

Triangle numbers vary widely according not just to the size and complexity of an object, but also the modeler's own vision, purpose, taste, and judgment. (Sher Dep 168:7-19; Kon Dep 161:21-162:20, 166:15-168:10, 168:23-169:22, 171:4-21.) P5D's modelers could choose up to 30,000 triangles. (*Id.*) Triangle number choices dramatically vary a model's level of detail, and thus overall appearance:

Figure No. 1: Triangle Numbers. (*See* Sher Decl ¶ 5.)



No two modelers make the same choices. (*Id.*) For B2B models as for others, triangle numbers are matters of modelers' judgment and taste. (Kon Dep 234:20-235:18.)

Having chosen the numbers of triangles, modelers must then place them. This, too, is a creative

1    decision with a spectrum of choices, even for a given reference object. (Sher Dep 168:11-19; Kon Dep

2    168:11-21.) Reference images can be helpful, but modelers make their own choices. (Kon Dep 120:9-

3    23.) Even for the 113 B2B models, meant to closely resemble the references, modelers must still make

4    choices about triangle placement. (Kon Dep 236:12-237:4.) And because reference images are 2D,

5    modelers are required to fill in those portions of the model not visible in the 2D image, *e.g.*, its back or

6    bottom. (Kon Dep 158:5-19, 113:10-114:11; Sher Dep 104:3-105:18.) As 3D objects in computer

7    memory, P5D's models had to be able to be rotated and viewed from any angle. (*Id.*) Even for works

8    based on reference images, the addition of modelers' design elements was the rule, not the exception.

9                                    ii.    **Material choices**

10         After choosing triangle number and placement, modelers turn to choices about the characteristics

11   of the materials that make up an object's surface. These choices affect how objects appear and interact in

12   a 3D environment, and many are invisible in 2D thumbnails. (Kon Dep 189:13-225:15, 237:24-240:25;

13   Sher Dep 168:7-170:3.) Modelers control material appearance in at least seven ways: (a) specularity; (b)

14   specular color; (c) transparency; (d) texture; (e) UV mapping; and (f) diffuse color.

15         "Specularity" (or "specular intensity") is how dull or shiny a surface is. The spheres in Figure 2

16   are arranged from low to high specularity. (Kon Dep 221:13-222:17, 200:11-201:4, 215:22-216:8; AvE

17   Decl ¶ 10.) In 3D settings with local light sources, specularity significantly affects an object's

18   appearance. (Ust Decl ¶¶ 19-30, Exs. 9, 10).) Accordingly, modelers specify a specularity setting for

19   each material of each object they model. (Kon Dep 202:5-19.)

20   <u>Figure No. 2: Specularity Variations.</u>          <u>Figure No. 3: Specular color settings.</u>

   

25         "Specular color" refers to the color of specular reflections from an object's surface. (Kon Dep

26   203:3-5, 204:19-24, 224:25-225:15.) Figure 3 above shows different specular colors on the same object.

27   (Sher Decl ¶ 6.) Modelers also choose a specular color for each surface material, which is an

28   independent setting from specularity.

"Transparency," of course, is how opaque or transparent a surface is. (Kon Dep 172:20-173:9; 190:4-191:5.) This is another setting chosen by the modeler. (Sher Dep 168:7-169:19; Ust Decl ¶ 5.)

"Texture" refers an image to be mapped to the object's surface. For example, the modeler can pick a .jpg image of wood grain and map it to a portion of an object intended to be made of wood. (Kon Dep 172:20-174:3, 199:20-24; Sher Dep 168:11, 169:20-170:3.) Texture is another important choice.

"UV mapping" is how a 2D texture image is mapped onto a 3D object's surface. (Kon Dep 210:25-214:8, 259:19-260:22; Sher Dep 96:10-23.) An image can be stretched to fit the surface or it can be tiled in a repeating pattern. (*Id.*) Mapping can also be adjusted manually, such as fixing textures at seams. (Kon Dep 175:2-6.)

A material's "diffuse color" is the color of its surfaces without texture. (Kon Dep 197:17-20.) This variable is in each case chosen by the modeler from over 16 million colors. (Sher Decl ¶ 7.)

### 2. Selection, Coordination, and Arrangement of Scene Compilation

When P5D's users create a scene, they can flag it for inclusion in the public gallery. From the company's founding through the February 17, 2016, completion date of P5D's Scenes work, users flagged tens of thousands of scenes. P5D's co-founders, Alexey Sheremetyev and Sergey Nosyrev reviewed each flagged scene and chose which should be in the public gallery. In choosing scenes, they aimed to show off their software's scope, quality, playfulness, and power to potential users. They chose scenes based on artistic value, humor, novelty, diversity, creativity, completeness, fun, family-friendliness, and realism. (Sher Dep 170:4-173:14, 36:6-37:4, 153:13-154:16.)

### B. P5D's Copyright Applications

#### 1. P5D Initiates Litigation and Then Seeks Copyright Registration. Consistent with the Court's Ruling.

P5D filed this lawsuit June 5, 2019, asserting copyright infringement and misappropriation of trade secrets. (ECF 1.) Defendants moved to dismiss the copyright claim, arguing that P5D had not satisfied the Copyright Act's pre-suit registration requirement. (ECF 31 & 33.) On November 21, the Court granted Defendants' motions, finding that P5D must either register its works with the Copyright Office or allege facts showing that the works were exempt from that requirement. (ECF 52.)

On December 19, 2019, P5D submitted two applications to the Copyright Office to register computer programs comprised of 1) all objects created between 2011 and December 17, 2019 (the P5D Objects); and 2) a compilation of scenes created between 2012 and December 17, 2019 (the P5D Scenes). (*See* 20-cv-2198 ECF 1-1.) On December 20, 2019, the Copyright Office issued the Object and Scene Registrations, each with an effective registration date of December 19. (*Id.*)

### 2. P5D Refiles Its Suit and Then Refiles Its Copyright Application.

On March 31, 2020, P5D filed a second action reasserting its claim for copyright infringement. (*Id.*) Defendants moved to dismiss again, arguing that P5D registered 2019 works, not the works Defendants copied in 2016. (ECF 68; ECF 69.) On July 24, 2020, the Court granted Defendants' motions. (ECF 90.)

On September 14, 2020, P5D submitted two further applications to the Copyright Office: P5D Objects (2016) (Objects Application) and P5D Scenes (2016) (Scenes Application). (AvE Decl Ex 8.) The Objects Application sought to register the computer program consisting of all P5D objects created through January 13, 2016. The Scenes Application sought to register the compilation of public gallery scenes as it existed on February 17, 2016. (*Id.*)

P5D submitted a cover letter with the applications, explaining that its works were written in a programming language called Java Script Object Notation, or JSON and providing an affidavit from one of the world's leading computer scientists, widely credited with having created the Java programming language, explaining why P5D's JSON files "unquestionably qualify as source code." (AvE Decl Ex. 9.)

### 3. The Copyright Office Refuses Registration, but Expressly States the Works Were Submitted "in Proper Form" and That It "D[id] Not Question" that P5D's Works "Constitute Computer Programs."

On September 18, 2020, the Copyright Office issued a refusal of each application, finding that the deposit did not constitute "source code" within the meaning of the Office's regulations. (AvE Decl Ex. 10.) Soon after, on September 22, the Office's General Counsel wrote P5D, stating that the Office would offer P5D further guidance about registering its works and submitting new deposit copies. (AvE Decl Ex 11.)

Then, on October 1, the Office wrote that it did not question P5D's assertion that its works constituted computer programs, but whether source code had been deposited. (AvE Decl Ex 34.) Yet

1    there was no other code to deposit, other than the JSON files themselves. On November 16, the

2    Copyright Office issued new refusals for both applications. (3:20-cv-8261 ECF 1-1.) Notwithstanding its

3    refusals, the Office made clear that P5D's applications were submitted in proper form and that it had

4    satisfied the requirement of 17 U.S.C. § 411(a) for entitlement to bring federal infringement action. (*Id.*)

5           **C.     Princeton Seeks to Overcome P5D's Trade Secrets**

6           Princeton circumvented P5D's protections in 2016, after spending months or years preparing to

7    do so. Princeton's Shuran Song claims she first saw the website in 2016, but describes a version phased

8    out in 2014. (*See* AvE Decl § D.) And P5D's logs show a ten-fold increase in traffic from Princeton in

9    April 2015, when she gave a talk about "large on-line 3D model repositories." (Web Rep1 at 37.)

10          Once she determined how to evade P5D's protections, Dr. Song wrote a program to quietly and

11   systematically ███████████████████████████████████ (Contrary to Defendants' claim,

12   Mot 6:18-24, ███████████████████████████████ ; Web Rep1 26-30.)

13          After downloading the files, Princeton's team took over six months to understand the P5D's non-

14   standard encoding enough to make the files usable for the SUNCG project. (Web Rep1 § 7.3.)

15   **III.    SUMMARY JUDGMENT STANDARD**

16          Summary judgment is appropriate if a movant shows there is no genuine dispute about any

17   material fact, and so is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The opposing party

18   must identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*,

19   477 U.S. 317, 324 (1986). This means presenting affirmative evidence from which a jury could return a

20   verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "Credibility

21   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

22   jury functions." *Id.* at 255. All reasonable inferences are thus drawn in the non-moving party's favor. *Id.*

23   **IV.    ARGUMENT**

24          **A.     Planner 5D's Object and Scene Works Are Copyrightable.**

25          The Copyright Act protects "original works of authorship fixed in any tangible medium of

26   expression, now known or later developed." 17 U.S.C. § 102(a). "Original . . . means only that the work

27   was independently created by the author . . . and that it possesses at least some minimal degree of

28   creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991) (citation omitted).

"[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* A "modicum" is enough, "'no matter how crude, humble or obvious it might be.'" *Id.* at 345-46. "[I]t is not difficult to meet the famously low bar for originality." *Skidmore v. Led Zeppelin,* 952 F.3d 1051, 1069 (9th Cir. 2020).

A work does not lose copyright protection simply by incorporating real-world objects. For over a century, photographs have been recognized as copyrightable under this principle. *E.g.*, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 55 (1884) (photo of Oscar Wilde copyrightable due to choices of composition, light, and shade); *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1119 (9th Cir. 2018) (copyrightable choices include subject matter, pose, camera angle, timing, and shutter speed), *overruled on other grounds by Skidmore*, 952 F.3d at 1068-69; *Evox Prods. LLC v. Kayak Software Corp.*, No. 15-cv-5053, 2017 WL 5634856, at *6 (C.D. Cal. Jan. 20, 2017) (choices include angles, lighting, and background); *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1077 (9th Cir. 2000) (selection of "'subject, posture, background, lighting, and perhaps even perspective alone'") (quoting *Los Angeles News Serv. v. Tullo,* 973 F.2d 791, 794 (9th Cir. 1992)).

Sculptures of real-world things are also protected under this principle. *E.g.*, *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (finding protectable, not the *idea* of in-glass jellyfish sculpture, but creative choices such as "the distinctive curls of particular tendrils; the arrangement of certain hues; [and] the unique shape of jellyfishes' bells"); *LA Gem & Jewelry Design, Inc. v. Groupon, Inc.*, No. 19-cv-35, 2020 WL 5440501, at *5 (C.D. Cal. Sept. 10, 2020) (distinct jewelry pieces).

This includes digital 3D models. *Glass Egg Digital Media v. Gameloft, Inc.*, No. 17-cv-04165-MMC, 2018 WL 3659259, at *4-5 (N.D. Cal. Aug. 2, 2018) (3D models of cars copyrightable where each contained "polygon [triangle] arrangements in differing levels of detail" and "[t]he number, placement and arrangement of [the] triangles is entirely decided by digital artists."); *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 Fed. App'x 643, 649 (6th Cir. 2009) (copyright law is "the legally cognizable form of ownership" of 3D models); *Zygote Media Grp., Inc. v. Moorefilm Ltd.*, No. 13-cv-00294, 2014 WL 12600134, at *1 (D. Utah Apr. 3, 2014) (no dispute that 3D virtual human anatomy models copyrightable).

### 1.    P5D's objects embody many creative choices.

The creative choices of P5D's modelers far exceed *Feist*'s threshold of a "modicum of creativity." *Feist*, 499 U.S. at 345-46. Each of P5D's objects embodies many subjective, creative choices about mesh (triangle number and placement) and material (specularity, transparency, texture, and so on). (*See supra* § II.A.1.c.) Such decisions were always required, even when objects were based on specific reference images; and almost no mesh or material choices P5D's modelers made were dictated by reference objects, even when used. (Kon Dep 177:14-19.) These choices are more than sufficient to establish copyrightability. Further, the evidence showed that P5D's modelers created hundreds of objects wholly from their imaginations, without reference images.[2] (AvE Decl Ex  .). A work containing hundred objects created from scratch surely establishes "a modicum of creativity."

Mesh choices alone—the "customized 'placement and arrangements' of polygons"—meet the threshold for copyrightability. *Glass Egg*., 2018 WL 3659259, at *4-5. In *Glass Egg*, the plaintiff's 3D models were based on real-life cars. The court nonetheless found that polygon arrangements "possess[ed] the requisite level of originality to be afforded copyright protection." *Id.* For a given reference image, there were still many choices of triangle number and placement:

> The number, placement and arrangement of [the] triangles is entirely decided by digital artists. Each LOD [level of detail] for the same car could be drawn differently by different artists. For example, to accomplish the LOD2 requirement of 13,000 triangles, artist A may decide to hand draw and use 12,500 triangles for a car, allotting 5,000 to the rear bumper. In comparison, artist B may decide to hand draw and use 13,000 triangles for the same car, allotting 6,000 to the rear bumper. Each rendition would qualify as a LOD2 model since both use 13,000 or less triangles.

*Id.* So too here. Even for objects inspired by reference images, P5D's modelers still had to choose

---

[2] Defendants falsely assert that P5D "refused to identify" any works created without references. (*See* Mot. 27:9-11.) P5D averred by interrogatory response no. 10 that "the earliest 100 objects or so" were created without references images. (AvE Decl Ex. 33.) Separately, at deposition, Mr. Sheremetyev identified another 100 mostly distinct models created without references, stopping only because Meta's counsel wanted to move on. (Sher Dep 84:14-89:17, 109:18-111:25, 113:22-117:16, 119:2-125:17.) There are likely many more that Mr. Sheremetyev did not get a chance to identify.

Of these 200 or so objects, Defendants found similar images for fourteen that they contend must have been used as references. This isn't clear. But even if all fourteen had been, that would leave close to 200 wholly original objects P5D identified before Mr. Sheremetyev was cut off.

Nor is *Lin* point; there the complaint failed to identify the works at issue. *Patel Burica & Assocs., Inc. v. Lin*, No. 19-cv-01833, 2019 WL 6954256, at *3-4 (C.D. Cal. Dec. 19, 2019). Here, Defendants have known the list of asserted works since Princeton scraped them.

triangle placement and quantity. Yet unlike the *Glass Egg* plaintiff, P5D's choices did not end there. For every material in every P5D object, its modelers chose the texture, color, UV mapping, specularity, specular color, translucency, and so on. (*See supra* § II.A.1.c.) Between these material choices and the mesh choices found sufficient in *Glass Egg*, P5D's objects far exceed *Feist's* threshold.

These 3D mesh and material choices prove that P5D's objects are not merely "slavish copies" of catalog images, as Defendants argue. (*See* ECF 221 ¶ 72 & Ex 50; Mot n.16.)[3] Defendants thumbnail comparisons can't possibly convey the richness and detail of the P5D's 3D objects. To fully appreciate this, the models must be viewed in a virtual, 3D environment where they can be manipulated, and seen from different distances and perspectives, and with different kinds of lighting. (Ust Decl ¶¶ 19-30, Exs. 9. 10.) Defendants' small, flat thumbnails obscure most of P5D's original modeling choices.

Two-D thumbnails offer just one perspective, hiding every other view. Three-D modelers have no such luxury, but must fashion objects that can be viewed from all perspectives. The hidden portions of a 2D reference image are precisely the parts modelers must conjure from imagination. The tablecloth-covered table below is a good example. In the third column is a reference image. In the second is the P5D model that Defendants claim is a slavish copy.

Figure No. 4: "Bottomless" Table. (AvE Decl ¶ 18.)

| P5D Object No. | Image of P5D Object | Image of Third-Party Product | Name and Source of Product |
|---|---|---|---|
| | | | Walmart - Wedding Linens Inc. 132" Round Premium (200 GSM) Polyester Linen Tablecloth - White  https://www.walmart.com/ip/Wedding-Linens-Inc-132-Round-Premium-200-GSM-Polyester-Linen-Tablecloth-White/906863634?wmlspartner=wlpa&selected SellerId=14011 |



Defendants' two thumbnails only show tablecloths. The table is hidden. But P5D's full 3D model is viewable from every angle—including from below. P5D's modeler thus needed to create the table from his imagination. Above, at far right, is another perspective of P5D's same 3D table showing, under the tablecloth, the table that P5D's modelers had to fashion. This happens all the time. The hidden backs, bottoms, crevices, and interiors must all be conjured by the modeler.

All this is before the required material choices. Two-D reference images offer almost no

---

[3] Defendants are wrong to argue that originality can only be proven with reference images. *See* Mot. fn. 16. Neither *Bespaq* nor the Compendium announces any such rule. *Bespaq Corp. v. Haoshen Trading Co.*, No. 04-cv-3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004)

1  guidance to modelers as they choose specular intensities and colors, textures, UV mapping, and diffuse

2  colorings. When these material choices are added to the mesh choices, a 3D object takes shape that bears

3  little resemblance to a crimped, 2D thumbnail. This is illustrated by comparing a thumbnail of an object

4  to the 3D object in its native habitat—a 3D viewer with lighting sources, where mesh and material

5  choices are visible. (*See* Ust Decl ¶¶ 19-30, Exs. 9, 10.) (illustrative videos).)

6      In short, Defendants' thumbnail comparisons fail to grapple with the essence of P5D's objects:

7  they are crafted 3D sculptures. P5D's models possess the many creative choices of photographs, plus

8  more. Despite featuring real-world images, photographs are copyrightable because the photographer

9  chooses subject matter, pose, camera angle, timing, and shutter speed. *Rentmeester*, 883 F.3d at 1119.

10  3D digital sculptures also involve many choices. Although they can be based on real subjects, they still

11  involve creative choices that are entitled to copyright protection.

12      Defendants' attack on the 113 B2B objects fails for the same reasons. As already shown, all 113

13  of the B2B objects, like all P5D objects, embody material and mesh choices. Defendants cite P5D's goal

14  to make its B2B objects "as close as possible" to the supplied reference images. (Mot 4:7-9, 25:3-27:6.)

15  But, as P5D's modeler explained, there are limits to modelers' ability to precisely copy real-world

16  objects in a virtual environment, even when they're trying. Modelers must still choose numbers and

17  placement of triangles, specular intensities, translucency, and, for at least some B2D objects, texture,

18  color, and UV mapping. (Kon Dep 230:17-240:25.) Thus the B2B models, like the other models, meet

19  *Feist*'s standard. Moreover, Defendants' B2B argument would fail even if it were correct that no B2B

20  object contained expressive choices. That would still not establish the lack of such choices for the

21  *remaining* thousands of objects. *See* 2 William F. Patry, *Patry on Copyright* § 4:30.10 (2023) ("That a

22  work is subject to copyright does not mean that every element of it necessarily is.").

23      Defendants devote much attention to the Harvey video, showing B2B techniques used in 2017

24  (Kon Dep 102:11-103:9), a year after the last objects were added to P5D's Object work. The technique

25  shown is not inconsistent with the copyrightability of the B2B works. The video shows tracing of

26  outlines of B2B reference images, and use of prescribed textures. But the 2D reference images still did

27  not dictate triangle count, specularity, or other mesh or material choices. Even for B2B objects, those

28  variables had to be chosen by the modeler. (*See supra* § II.A.1.c.) Also, contrary to Defendants'

1    suggestion, the depicted process was not used for models other than B2B ones. (*See* Mot 4:9-21.)

2          Finally, Defendants cite *Genesis* and *Meshwerks*, but these cases are consistent with this

3    analysis. The plaintiff in *Genesis* made 3D costumes from 2D images of copyrighted corporate mascots,

4    such as the "Pillsbury Doughboy" and "Cap'n Crunch." *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp.,*

5    *Inc.*, 122 F.3d 1211, 1214 & n.2 (9th Cir. 1997). Because the 3D costumes were derivative of others'

6    copyrights and rights in the original works could be affected, a more stringent test applied. *Id.* at 1219-

7    20. The court stressed the test would be different for public domain references. *Id.* Here, when P5D used

8    reference works, they were useful articles, which are not copyrightable. *Jonathan Browning, Inc. v.*

9    *Venetian Casino Resort LLC*, 816 F. Supp. 2d 793, 796 (N.D. Cal. 2009). But even under *Genesis*'s test,

10   P5D's works would pass. The court held that 3D models are copyrightable if they have non-trivial

11   differences that are not purely "functional, utilitarian or mechanical." 122 F.3d*.* at 1221. This last

12   qualifier doomed the 3D costumes in *Genesis*, because they only modified the copyrighted mascots as

13   necessary to fit a human being. (*Id.*) By contrast, none of P5D's choices were purely functional,

14   utilitarian, or mechanical. As shown, the choices of P5D's modelers were based on their taste and

15   expression.

16          In *Meshwerks,* the plaintiff generated 3D models of cars by taking "copious measurements" of

17   the actual vehicles and adding detail to create as precisely as possible "completely unadorned digital

18   replicas." *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1260, 1270 (10th Cir.

19   2008). The court recognized that "[t]here's little question that digital models *can* be devised of Toyota

20   cars with copyrightable features, whether by virtue of unique shading, lighting, angle, background scene,

21   or other choices." *Id.* at 1270. But Meshwerks made no such "decisions regarding lighting, shading, the

22   background, . . . the angle at which to pose it, or the like—in short, . . .  none of the decisions that can

23   make depictions of things or facts in the world . . . new expressions subject to copyright protection" *Id.*

24   at 1265. Here, P5D's objects were not based on precision measurements, but involved triangle number

25   and placement, like the copyrightable works in *Glass Egg*. And P5D's modelers made the very kinds of

26   choices about material properties the court found so conspicuously lacking in Meshwerks' replicas.[4]

27   _____

28   [4] The P5D modelers' creative contributions distinguish Defendants' "slavish copying" cases. *ATC*
     involved 2D illustrations based on photographs that were "as accurate as possible in reproducing the

1

### 2.     P5D's scene compilation was the product of creative choices.

2      P5D's Scenes Work, a compilation, also exceeds the minimal creativity needed for copyright

3    protection. Compilations are collections of preexisting materials that are "selected, coordinated, or

4    arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17

5    U.S.C. § 101. *Feist*'s modicum-of-creativity standard applies to compilation works the same as it does to

6    other works. Compilations of even uncopyrightable elements are copyrightable if they embody "a

7    minimal degree of creativity." *Feist*, 499 U.S. at 348 ("a directory that contains absolutely no protectible

8    written expression, only facts, meets the constitutional minimum for copyright protection if it features an

9    original selection or arrangement"). *Accord L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841,

10   850 (9th Cir. 2012); *Home Legend, LLC v. Mannington Mills, Inc.,* 784 F.3d 1404 (11th Cir. 2015).

11     Here, P5D presented uncontradicted testimony that it curated a selection of scenes for its public

12   gallery out of the many thousands nominated by its users. As discussed, and as is not contested, this

13   selection was based on numerous creative and expressive criteria, including artistic value, humor,

14   novelty, diversity, creativity, completeness, fun, lack of disagreeable or disturbing subject matter, and, in

15   most cases, realism. (Sher Dep 170:4-173:14, 36:6-37:4, 153:13-154:16.) P5D's scene compilation work

16   is copyrightable.

17

### 3.     The Court should determine now that P5D's works are copyrightable.

18     As this Court previously noted, "'[w]here the Copyright Office denies registration, and the

19   unsuccessful applicant subsequently brings an infringement action, courts nonetheless make an

20   independent determination as to copyrightability.'" *"Planner5D" v. Facebook, Inc. ("Planner 5D III")*,

21   534 F. Supp. 3d 1126, 1134 (ECF 112 at 11:13-17) (N.D. Cal. 2021) (quoting *Aqua Creations USA Inc.*

22   *v. Hilton Hotels Corp.*, No. 10-cv-246, 2011 WL 1239793, at *3 (S.D.N.Y. Mar. 28, 2011), *aff'd sub*

23   *nom. Aqua Creations USA Inc. v. Hilton Worldwide, Inc.*, 487 F. App'x 627 (2d Cir. 2012)). The Court

24   can, and should, make this determination now.

25     Copyrightability is generally a pure question of law, to be decided by the trial judge. "[T]o the

26

27   parts shown," which was "the antithesis of originality." *ATC Distrib. Grp, Inc. v. Whatever It Takes*
     *Transms. & Parts, Inc.*, 402 F.3d 700, 712 (6th Cir. 2005). P5D's objects require added original

28   expression to be 3D and interact in 3D environments. In *Durham,* 3D models of well-known Disney
     characters exhibited nothing "recognizably the author's own contribution." P5D's works do exhibit
     modelers' contributions. *Durham Indus., Inc. v. Tomy Corp.* 630 F.2d 905, 910 (2d Cir. 1980).

extent that the defendant challenges the quantum of plaintiff's originality or creativity as a matter of law, or urges other such legal challenges to copyright subsistence, these matters should be resolved solely by the judge." 3 *Nimmer on Copyright* § 12.10[B][1]. *Accord Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, No. 07-cv-03983, 2009 WL 1764652, at *1 (N.D. Cal. June 18, 2009). Copyrightability depends on jury finding only when there is a material dispute as to whether the plaintiff's work is so substantially similar to a preexisting work that it was not independently created by the author. 3 *Nimmer on Copyright* § 12.10[B][1]. But even in such cases, the court can find copyrightability as a matter of law where "no reasonable jury could find that the works are substantially similar in idea and expression." *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991).

In light of the substantial evidence of copyrightability P5D has presented here, no reasonable juror could find that its Objects Work utterly lacked minimal creative choices, or that its Scenes work lacked creative selection. P5D thus requests that the Court rule now that both its works are copyrightable.

### B.      Planner 5D Satisfied the Prerequisite for Suit, Obviating Defendants' Fault-Finding with Registration Formalities.

To get into federal court, a copyright owner must submit a facially valid application for the infringed work, and the Office must act upon it. 17 U.S.C. § 411(a). That's it. Once those things are done, the application history stays in the past. The Court decides for itself whether the works are copyrightable, without revisiting what happened in the Office. While authors must *seek* registration before suing, section 411(a) assures that the procedural quirks of registration practice won't stymie a copyright owner's right to sue for infringement. The law is clear on this. (*See infra* § IV.B.2.)

Section 411(a)'s "proper form" requirement is easy to satisfy. It's met so long as the application is not facially deficient. Because the Copyright Office needs to be able to process the application, it is the best judge of whether it is in proper form. Here, the Office specifically found P5D "delivered to the Office a deposit, application, and fee required for registration of the computer programs 'in proper form,' as required to institute a civil action for infringement under 17 U.S.C. § 411(a)." That answers the question of proper form. (*See infra* § IV.B.1.)

Defendants ignore section 411(a)'s mandate, and instead invite the Court to focus on the

registration history, rather than the merits. But the very purpose of section 411(a)'s refusal clause is to free infringement litigation from the arcana of registration practice. Defendants would upend this regime by expanding the simple "proper form" requirement into a branching, years-long inquiry on whether this Court should "reverse the determination of the Office." (Mot 14:13-14.) This would be exactly the kind of protracted litigation over registration formalities that section 411(a)'s refusal clause was meant to eliminate. (*See infra* § IV.B.2.a.)

Even under the more searching inquiry Defendants propose, their attack fails. Defendants principally argue that "computer programs" wasn't the best administrative class for P5D's works. But picking the right class under the Office's rules is less a science than an art. Here, no option under the Office's current regulations was perfect. But P5D's works do qualify as computer programs, and every other class was a worse choice. The Office ultimately decided its current regulatory requirements for computer programs compelled refusal. But the classes that Defendants suggest had even more onerous requirements, which might have made refusal even more certain. P5D's works are clearly copyrightable, but they don't fit neatly into the Office's current administrative classes. Fortunately, the Copyright Act anticipates these situations by: (1) making clear that the Offices' "administrative classification of works has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title," 17 U.S.C. § 408(c)(1); and (2) allowing an infringement action to commence immediately after "refus[al]," 17 U.S.C. § 411(a). (*See infra* § IV.B.2.b.)

Defendants also attack P5D's deposit, but that attack is contingent on their computer program argument. For a computer program, Defendants concede, P5D's deposit was in proper form. But, Defendants contend, "computer program" wasn't the right class, so P5D should have made a deposit for some different class. Again, such registration arcana has no place in an infringement suit. The deposit was more than adequate to identify the works Defendants copied. And it was more than adequate for the Office to find P5D's application to be in proper form and process it on the merits. (*See infra* § IV.B.2.c.)

Finally, even when applications or deposits have omissions and mistakes, they do not affect an infringement claim's scope unless there was fraud on the Copyright Office and prejudice to the defendants. Here, the Office was in no way misled. And, having scraped them, Defendants know better than anyone what works the applications cover. (*See infra* §§ IV.B.2.a, IV.B.2.c.)

1

### 1.      P5D has met the "proper form" requirement for suit after refusal.

2

To sue for infringement after a refusal of registration, section 411(a) requires only that (1) the

3

required deposit, application, and fee were submitted "in proper form" and (2) the complaint is served

4

on the Register of Copyrights. *Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1181 (9th Cir. 1983); *UAB*

5

*Planner 5D III*, 534 F. Supp. 3d at 1130 (ECF 112 at 5:8-12). Here, the Register was served, and elected

6

not to join. Defendants argue only that the application and deposit were not in proper form.

7

The reason section 411(a) requires pre-suit registration or refusal is to give an incentive to *seek*

8

registration. The requirement encourages "a robust federal register of copyrights." *Scentsy, Inc. v. B.R.*

9

*Chase, LLC*, 942 F. Supp. 2d 1045, 1051 (D. Idaho 2013), *rev'd on other grounds sub nom. Scentsy, Inc.*

10

*v. Harmony Brands, LLC*, 585 F. App'x 621 (9th Cir. 2014). *Accord Ward v. Nat'l Geographic Soc'y*,

11

208 F. Supp. 2d 429, 446 (S.D.N.Y. 2002). It was *not* intended "to give the Register the opportunity to

12

pass final judgment on the question of a work's copyrightability." *Scentsy*, 942 F. Supp. 2d at 1051.

13

Because its purpose is to encourage *applications*, the "proper form" requirement is not a

14

searching one. It is met as long as "the deposit and fee are paid and the application is not deficient on its

15

face." *Morelli v. Tiffany & Co.*, 186 F. Supp. 2d 563, 566 (E.D. Pa. 2002). This is the rule in both the

16

Copyright Office and the courts. *Id.* In the rare case that a court did not find proper form, the application

17

was so deficient in providing basic information that the Copyright Office was unable to complete its

18

review; section 411(a)'s refusal requirement thus was also not met. *Proulx v. Hennepin Tech. Ctrs. Dist.*

19

*No. 287*, No. 4-79-637, 1981 WL 1397, at *4-5 (D. Minn. Dec. 7, 1981).

20

Here, P5D's fee and deposit were submitted, and its application was not facially deficient. The

21

proper form requirement was thus met. *See Morelli*, 186 F. Supp. 2d at 566. The Copyright Office had

22

no problem completing its review and issuing a determination on the merits. Naturally, given this, the

23

Office explicitly found the "proper form" requirement satisfied:

24

> Although the Registration Program Office has concluded that the deposits
> submitted with these applications do not meet the requirements for registering a
> work as a computer program you have delivered to the Office a deposit,

25

> application, and fee required for registration of the computer programs 'in
> proper form,' as required to institute a civil action for infringement under 17

26

> U.S.C. § 411(a).

27

28

*Planner 5D III*, 534 F. Supp. 3d at 1129 (ECF 112 at 3:12-17).

This settles the question: P5D's application and deposit were in "proper form." No other aspect of the registration proceedings matters to this action—including Defendants' ten pages of argument about whether the Copyright Office "correctly determined after significant deliberation" that P5D's works are not computer programs under its regulations, and whether P5D should have complied with some different set of deposit requirements that the Office has established for some different kind of work. (Mot 11:10-22:10.) P5D nonetheless addresses those arguments now.

### 2. Once the Office grants or refuses registration, issues relating solely to registration formalities fall away.

Under section 411(a), once an application is submitted in proper form and registration is refused, a plaintiff "is entitled to institute a civil action for infringement." By the section's plain terms, the infringement action proceeds as normal; section 411(a) does not add any elements for the plaintiff to prove in refusal cases. Without registration, the plaintiff loses the presumption of validity under section 410(c). But issues "relating solely to registration formalities" have no impact in the infringement action. *Ward*, 208 F. Supp. 2d at 448 ("It is inconceivable that Congress intended simultaneously to grant applicants the right to institute an infringement action despite refusal of registration and to allow defects relating solely to registration to defeat these same infringement actions when an applicant potentially possesses a valid copyright."). The plaintiff "need not demonstrate that the Copyright Office's denial of registration was erroneous." *Id.* at 444-45. Likewise, the infringement suit "leaves the Register's refusal to register the copyright claim intact." *Proline Concrete Tools, Inc. v. Dennis*, No. 07-cv-2310, 2013 WL 12116134, at *2 (S.D. Cal. Mar. 28, 2013). *Accord Planner 5D III*, 534 F. Supp. 3d at 1135 (ECF 112 at 12:19-27). "[T]he district court makes an independent determination of copyright ownership . . . just as in any other infringement action." *Ward*, 208 F. Supp. 2d at 445. *Accord Planner 5D III*, 534 F. Supp. 3d at 1134 (ECF 112 at 11:13-15).

Thus, Defendants are wrong to suggest that this Court must "reverse the determination of the Office" for P5D to prevail. (Mot 14:14.) *See Ward*, 208 F. Supp. 2d at 444-45. Section 411(a)'s "refusal" language makes clear that a refusal would *not* need to be reversed as a precondition to suit. *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC,* 139 S. Ct. 881, 890 (2019) (noting that section 411(a) eliminated the mandamus requirement found in *Vacheron & Constantin-Le Coultre Watches, Inc.*

1    *v. Benrus Watch Co.,* 260 F.2d 637 (2d Cir. 1958) (Hand, J.)); S. Rep. No. 94-473, at 139-40 (1975)

2    (same). Judicial remedies are available "[o]nce the Register grants or refuses registration." *Fourth*

3    *Estate*, 139 S. Ct. at 891.

a.    **The administrative classification of Planner 5D's**
4          **works is now irrelevant to this case.**

5

6        The Copyright Act of 1976 protects "original works of authorship fixed in any tangible medium

7    of expression." 17 U.S.C. § 102(a). While section 102(a) lists eight "include[d]" categories, those are

8    "illustrative and not limitative," 17 U.S.C. § 101. *Accord Nat'l Basketball Ass'n v. Motorola, Inc.*, 105

9    F.3d 841, 846 (2d Cir. 1997); *Kantemirov v. Goldine*, No. 05-cv-01362, 2005 WL 1593533, at *4 (N.D.

10   Cal. June 29, 2005). Thus, if a work is an "original work[] of authorship" and is "fixed in [a] tangible

11   medium," 17 U.S.C. § 102(a), it is *copyrightable* without regard to which category it meets, if any.

12       For purposes of registration, works are placed in administrative classes established by the

13   Register of Copyrights. But this administrative classification "has no significance" on a work's

14   copyrightability or its associated exclusive rights; the Act is explicit about this. 17 U.S.C. § 408(c)(1).

15       Although *copyrightability* is unaffected by administrative classifications, courts sometimes need

16   to identify which work was intended to be registered. In such cases, how the application describes the

17   works can be relevant. Even then, consistent with section 408(c)(1)'s clear directive, courts construe

18   registrations liberally, even when the registration uses the wrong form, a wrong description, or makes

19   other mistakes. "Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not

20   bar actions for infringement." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000),

21   *overruled on other grounds, Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020). *Accord Data*

22   *Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994) (citing *Harris v. Emus*

23   *Records Corp.,* 734 F.2d 1329, 1335 (9th Cir. 1984), among others), *abrogated on other grounds by*

24   *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

25       For example, when a catalog is registered, courts have found that three-dimensional works

26   depicted in it are covered, even where the work is described as merely "two-dimensional artwork" or

27   "photographs and text." *Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 808 F. Supp. 542, 546-47

28   (S.D.N.Y. 2011) (registration for "two-dimensional artwork" covered three-dimensional dress designs);

18

1  *Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 494 (S.D.N.Y. 2008) (registration for

2  "photographs and texts" covered jewelry designs). This rule of liberal construction makes sense because

3  the proper regulatory classification is often unclear. *Skyline Design, Inc. v. McGrory Glass, Inc.*, No. 12-

4  cv-10198, 2014 WL 258564, at *4 (N.D. Ill. Jan. 23, 2014) (observing that double-sided etched-glass

5  works didn't obviously fit into "2–dimensional artwork," "3–dimensional sculpture," or "architectural

6  work," and "none of the other categories even come close").[5]

7      Defendants mistakenly look for a contrary holding in *Action Tapes, Inc. v. Mattson*, 462 F.3d

8  1010 (8th Cir. 2006). But Defendants mischaracterize *Action Tapes* as holding that "registration in one

9  category does not establish registration in another category where application procedures and deposit

10  requirements are different." (Mot 16:8-10.) This is incorrect. Action Tapes owned a series of embroidery

11  designs, which it sold in digitized form on memory cards for use in computerized sewing machines.

12  Action Tapes accused the defendant of renting the memory cards without its consent. Such conduct

13  ordinarily would be protected by the first sale doctrine. But Action Tapes invoked 17 U.S.C.

14  § 109(b)(1)(A), which prohibits the unauthorized rental of computer programs notwithstanding the first

15  sale doctrine. *Action Tapes*, 462 F.3d at 1013-14. Action Tapes registered its embroidery designs as

16  visual works (on Form VA), not as computer code (on Form TX), and did not deposit a copy of any

17  source code. Because there was no registration intended to cover any computer programs, the court held

18  that Action Tapes had failed to comply with section 411(a) *as to the anti-rental claim it was pursuing*.

19      Here, in contrast, the classification of works, whether as computer programs or otherwise, is not

20  an element of any of P5D's claims. Its works just need to be copyrightable. Unlike in *Action Tapes*,

21  there is no question about what P5D was seeking to register: the object and scene works that Princeton

22  scraped. And unlike in *Action Tapes*, P5D made a bona fide deposit of the source code for those works.

23  In fact, as discussed below, P5D classified its works as computer programs in part to make clear that it

24  intended its registration to cover both its source code and visual works. (*See infra* §§ IV.B.2.b.)

25

26

27  ───────────

[5] Inconsistent with this line of decisions is *Phoenix Ent. Partners, LLC v. Dr FOFO, LLC*, No. 17-cv-

28  03327, 2018 WL 4635988, at *4 (D.S.C. Sept. 27, 2018). In *Phoenix*, the plaintiff's "sound recording" registrations were held not to cover "karaoke accompaniment tracks" because of "explicit guidance" in the Compendium that such works be registered as audiovisual works. *Phoenix* is distinguishable here because P5D's applications were not inconsistent with any similar explicit Compendium guidance.

b.     **P5D properly sought to register computer programs.**

When P5D sought to register its works, "computer program" was the appropriate category for several reasons. The works consist of code that instructs computers to render specific 3D images, which meets the Copyright Act's definition of "computer program." 17 U.S.C. § 101. The Copyright Office had already *granted* registration of the very same type of files as computer programs when P5D previously applied to register its Objects (2019) and Scenes (2019) works. (*See* 20-cv-2198 ECF 1-1.) And the Office ultimately agreed with P5D that its works were computer programs, stating that "the Office does not question the assertion that the works you seek to register constitute computer programs." (AvE Decl Ex. 34_ p. 2.) Defendants mischaracterize this record by repeatedly saying otherwise.[6]

The computer program category was also appropriate in scope of coverage. The Office recognizes that "a computer program and the screen displays generated by that program are considered the same work, because the program code contains fixed expression that produces the screen displays." *Compendium* § 721.10(A). Courts agree. *Williams v. Electronics, Inc. v. Artic, Int'l, Inc.*, 685 F.2d 870, 874 (3d Cir. 1982) (copyright for videogame program includes displays it generates). In this case, Defendants infringed both P5D's digital images and its underlying code. The logical choice was to register both at once as a computer program.

Defendants argue that P5D should have selected a different class, but each of their suggestions come with disqualifying problems. Defendants identify many of these problems themselves.

Defendants first suggest P5D should have submitted what would have been thousands of separate applications to register its works as individual visual works. (Mot 17:16-19.) This idea has several flaws. Submitting thousands of separate applications wasn't feasible, and wouldn't have made the Office's job easier. Also, while computer program registrations clearly cover generated visual images, it's less clear under the Office's current regulations whether visual work registrations cover any associated code. And for a visual work registration, P5D couldn't deposit its JSON files, because they are not a file type approved by the Office for deposits. *See* 37 C.F.R. § 202.20(b)(2)(iii)(C). Defendants acknowledge this by observing that JSON files do not count as a visually perceptible format. (Mot

---

[6] The "computer program" classification is consistent with Meshwerks' use of that classification for its 3D models. (AvE Decl Ex 16. *See, e.g.,* Mot 24:6-8.)

20

1    18:19-19:5.) These regulatory issues made a computer program application the logical choice.

2            Defendants' second suggestion is that P5D should have pursued some sort of "group

3    registration." (Mot 20:21-23.) But as Defendants concede, group registration is a limited registration

4    option and thus would not have been a genuine possibility. The Copyright Office offers group

5    registration for only a handful of kinds of works, none of which applies here. *See Compendium* § 1101

6    (outlining options for group registration).

7            Defendants' third suggestion is that P5D should have pursued registration of its Scenes work as a

8    compilation. This contention is puzzling because P5D's copyright claim in the Scenes work *is* a

9    compilation. (*See* AvE Decl Ex 9.)

10            In short, the alternative paths Defendants suggest were not viable; Defendants merely seek to

11    make virtues out of the additional obstacles their suggestions would impose.

12            Moreover, even if P5D had attempted to follow Defendants' suggestions, it was still destined to

13    sue on the basis of a refusal. That's because of the Copyright Office's prior registration rule, which

14    Defendants fail to address. This rule, which applies to computer programs, visual works, and other

15    classes, provides that when a work is published in augmented or updated versions over time, like P5D's

16    works here, each new version of the work must be separately registered. Compendium § 1909.3 ("As a

17    general rule, an applicant should prepare a separate application, filing fee, and deposit for each part or

18    installment of a work if those parts or installments were published separately.") This practice may be

19    workable when applied to a physical format, like a treatise, that is revised once a year. But it makes little

20    sense for software that is updated weekly or daily. As calculated by P5D, to comply with this rule as

21    written, it would have had to submit over 1400 separate expedited applications at a cost of over $1.1

22    million. (AvE Decl Ex 36 at 7.) In seeking to register its works, P5D emphasized to the Office that the

23    prior publication rule should be interpreted in a manner to make registration feasible, but the Office

24    declined to offer relief.  (AvE Decl Ex. 35 at 2; Ex. 11 at 2-3.)

25            The Copyright Act does not empower the Office to impose regulatory or interpretative barriers

26    that exclude copyrightable works from its protections. *See* 17 U.S.C. § 408(a) (owner of copyrightable

27    work entitled to obtain registration by delivering application, deposit and required fee to the Copyright

28    Office). This is why, as explained above, section 408(c)(1) dictates that this Court should assess

21

1   copyrightability and infringement independent of Copyright Office registration classifications. The

2   Court should reject Defendants' misguided efforts to relitigate P5D's choice of classification.

3           **c.      The Court should reject Defendants' effort
                       to relitigate the propriety of P5D's deposit copy.**

4           The Court should likewise reject Defendants' effort to relitigate the propriety of P5D's deposit

5   copy, a collateral attack on whether P5D's application was submitted in proper form. (Mot 10:16-21,

6   12:1-22:10.) Defendants concede P5D's deposit was in proper form for an application to register a

7   computer program—which is what P5D filed. (Mot 2:9-10, 16:6-8, 21 n.11.) Their convoluted argument

8   is instead that P5D should have sought a *different* kind of registration and, if it had, the Copyright

9   Office's regulatory requirements for the deposit would have been different. (Mot 16:19-22:10.) This

10  argument fails. As discussed, administrative classifications and other registration formalities have no

11  impact in an infringement action. 17 U.S.C. § 408(c)(1); *Ward*, 208 F. Supp. 2d at 448.

12          As with classifications, deposits can shed light, not on copyrightability, but on which work an

13  owner intended to register. Again, in such cases, courts take a flexible approach, even when there are

14  errors in the deposit copy. Courts recognize that the deposit requirement is "designed to aid the

15  Copyright Office in its record-keeping duties." *KnowledgePlex, Inc. v. Placebase, Inc.*, No. 08-cv-4267,

16  2008 WL 5245484, at *9 (N.D. Cal. Dec. 17, 2008) (citing *Data Gen. Corp. v. Grumman Sys. Support

17  Corp.*, 36 F.3d 1147, 1162 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v.

18  Muchnick*, 559 U.S. 154 (2010)). In particular, the deposit helps the Copyright Office identify "*which*

19  work the author is attempting to register." *Id.* at *9 (quoting *Data Gen.*, 36 F.3d at 1161) (emphasis

20  added). Consistent with these administrative purposes, "the standard governing the sufficiency of

21  copyright deposits for purposes of maintaining an infringement suit is 'broad and deferential.'"

22  *KnowledgePlex*, 2008 WL 5245484, at *9 (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477,

23  486 (9th Cir. 2000). As with inaccuracies in an application, errors in the deposit copy do not bar an

24  action for infringement or limit its scope unless the plaintiff knew about the error and the defendant was

25  prejudiced by it. *Three Boys Music*, 212 F.3d at 486; *KnowledgePlex*, 2008 WL 5245484, at *9.

26          Under this standard, courts generally allow an infringement action to proceed unless the deposit

27  was *not a bona fide copy of the allegedly infringed work.* This includes every decision cited by

28

**P5D's Opp. to Defs' MSJ**                                      **Case No. 3:19-cv-03132-WHO**

Defendants. *See Geoscan, Inc. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000) (deposit of later version of the code did not support action for infringement of original version); *Torres-Negron v. J & N Recs., LLC*, 504 F.3d 151, 157 (1st Cir. 2007) (deposit of reconstruction of song, created from memory, without access to the original work, did not support action for infringement of original song); *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1062-64 (9th Cir. 2020) (deposit of one page of sheet music under the 1909 Act, which did not protect sound recordings, did not support a claim for infringement based on a sound recording, which included further embellishments); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (deposit of 1993 reconstructions from memory could not support claim for infringement of original 1991 drawings). *See also Action Tapes*, 462 F.3d at 1013-14 (2006) (registration of visual embroidery designs without a deposit of source code could not support a claim under an ancillary provision available only for computer programs).

Here, unlike in Defendants' cases, there's no question which works P5D was seeking to register. P5D is suing for infringement of the works that Princeton scraped in 2016. P5D made a bona fide deposit of those original works—not a later version and not a reproduction.[7] P5D deposited the right work. Defendants' authorities are thus distinguishable.

Even if P5D's deposit were defective in some cognizable way, Defendants cannot claim to have been prejudiced by it. Defendants know exactly which works they scraped from P5D's servers.[8] As a result, they know exactly which works P5D intended to register and exactly which works P5D intended to assert in this lawsuit. This means that P5D's deposit was adequate under the Ninth Circuit's broad and deferential standard, and this lawsuit can proceed. *See Three Boys Music*, 212 F.3d at 486.

---

[7] This Court ruled on which version of P5D's works needed to be deposited in its order on Defendants' second round of dismissal motions. *UAB "Planner5D" v. Facebook, Inc. ("Planner 5D II")*, No. 19-cv-03132, 2020 WL 4260733, at * 4-5 (ECF 90 at 4:10-8:9) (N.D. Cal. Jul. 24, 2020). The Court held that section 411(a) had not been met as to the dismissed infringement claims because it "could not conclude that the copyright registrations P5D obtained for works completed and published in 2019 covered the alleged works from 2016." *Planner 5D III*, 534 F. Supp. 3d at 1128-29 (ECF 112 at 3:4-7) (describing the earlier order). P5D addressed that issue with the applications that are the basis of the present action. Defendants filed a further dismissal motion, but did not again challenge the version covered by the applications in their third motion to dismiss. (*See* ECF 105.)

[8] Defendants' claim that P5D obscured its work to "delay and obfuscate" is wrong and makes no sense. (Mot. at 20:1.) Mr. Ustyugov inadvertently gave the wrong number at one deposition, then corrected himself at the next. The wrong number never appears in the interrogatories Defendants discuss, none of which asks for the number of scenes in the compilation. P5D does not benefit from delay. Defendants now have the answer, and identify no prejudice.

23

1

2

### d.   P5D's application *does* cover its visual models as well as its source code.

3

As discussed, both the courts and the Copyright Office recognize that a registration for computer

4 code covers both literal elements—the written code—and non-literal elements—including images

5 displayed by the code. *Williams*, 685 F.2d at 874; *Compendium* § 721.10(A). (*See supra* § IV.B.2.b.)

6 This was a main reason P5D applied to register as computer code: to make clear that P5D intended its

7 application to cover visual models and the underlying code. And again, incorrect descriptions in a

8 registration (which are not present here) do not affect the scope of an infringement claim unless the

9 copyright owner defrauded the Copyright Office *and* defendant is prejudiced. *Three Boys Music,* 212

10 F.3d at 486; *KnowledgePlex*, 2008 WL 5245484, at *9. There is no suggestion of fraud here. And

11 Defendants cannot claim to be surprised that P5D intended to register both the literal code Defendants

12 scraped and the encoded models that Defendants copied. Defendants are thus wrong that P5D's

13 applications covered only the text of its object and scene files rather than the visual models—which

14 Defendants concede were created by P5D. (Mot 22:13-18, 23:7-15.)

15

Defendants' argument is not supported by *Ward v. Barnes & Noble*, 93 F. Supp. 3d 193, 204

16 (S.D.N.Y. 2015). (*See* Mot 23:15-19.) In *Ward*, the district court allowed an action for infringement of a

17 book of hangman word games to proceed on the text instructions, but not the hangman artwork, which

18 "arguably flow[ed] directly from the unprotectable idea with which the [hangman] figures are virtually

19 synonymous: a game that, Plaintiff himself asserts, has existed since 'Queen Victoria's reign.'" *Id.*, 93

20 F. Supp. 3d at 202. The plaintiff listed only "text" as the extent of authorship in his registrations and he

21 admitted that "his U.S. copyright extends, at most, only to 'text or words'"—which made sense given

22 the artwork's likely unprotectable nature. *Id.*, 93 F. Supp. 3d at 204. In contrast, as discussed, P5D's

23 applications were clearly covered its visual models, and those models don't embody any unprotectable

24 idea like a hangman game.

25

Because the applications *do* cover the visual models and the literal text of P5D's works,

26 Defendants' argument about human authorship would go nowhere even if it had merit. (*See* Mot 22:13-

27 24:19.) But it does not. The literal code of P5D's JSON files *do* contain human authorship. Defendants

28 argue that the code is not copyrightable because it was written using one of two development tools:

24

Blender or P5D's scene editor. But it does not matter. Works written with software are only uncopyrightable if are created *without any human creative control. See, e.g.,* 88 Fed. Rg. 51, 16192 (material generated by artificial intelligence is not copyrightable when "users do not exercise creative control") (AvE Decl Ex 20.) But works created with computer tools *are* copyrightable to the extent a human exercises creative control.[9] *See id.* at 16193 ("This policy does not mean that technological tools cannot be part of the creative process. Authors have long used such tools to create their works.")

Graphical tools that generate textual code are common (Web Rep2 § 4.3), and at least one saves programs as JSON source code. (*Id.* § 4.3.5, AvE Decl § F,) The Copyright Office accepts code made with graphical tools. (*See* AvE Decl ¶¶ 22-24, Exs. 17-19.)

### 3. In fact, P5D's works do qualify as computer programs.

Although the Copyright Office's classification of P5D's works no longer affects this action, the works are, in fact, computer programs.

The Copyright Act defines a computer program as "statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17. U.S.C. § 101. This describes P5D's programs, which instruct a computer to draw 3D objects and scenes. (*See* Web Rep2 §§ 6.1, 5.) Defendants are thus wrong to argue that P5D's programs "are not a set of instructions but instead are merely data files." (Mot 12:15.) Computer programs generally consist of instructions *and* data. (*See* Web Rep2 §§ 4.1.1.) This is true of P5D's works. They include the data *and* instructions needed to render the desired 3D feature. (*See Id.* § 5.) The instructions cause the computer to calculate geometric, optical, and other properties of objects and scenes, and render them on the user's screen. (*Id.*) Because the works do contain computer instructions that bring about a result, they meet the statutory definition.[10]

---

[9] Likely because modelers have creative control, the Copyright Office did *not* base its final refusal on human authorship. Defendants refer to the initial decision on the 2016 Objects applications, which made this argument, but that basis was not in the final determination. (*Compare* AvE Ex 9 at 2-3 *with* Ex 12 *passim*.)

[10] Defendants' authorities do not hold otherwise. In *Atari,* Nintendo argued a randomly generated binary stream was a computer program because all programs are binary streams. *Atari Games Corp. v. Nintendo of Am., Inc.*, No. 88-cv-4805, 1993 WL 214886 at *5 (N.D. Cal. Apr. 15, 1993.) But *Nintendo's* random streams had neither instructions nor human authorship. The works in *LumenScript* were measurements "gathered with the aid of a spectrometer measuring actual illumination conditions." (AvE Ex 15 at 1.) They were recorded numeric data with *no instructions or other human authorship*. (*Id.* at 6-7 & Appendix.) The Board contrasted the classic "Hello World" program, which contains one instruction and counts as a computer program.

1    Defendants assert that the works are missing certain instructions: "█████████

2    █████████  (*See* Mot 14:4-6.) But the statute does not require specific kinds of instructions. And

3    Defendants ████████████████████ are merely "*common* to computer program code,"

4    and not considered required.  (████████████).) The opinion Defendants rely on for this test,

5    *LumenScript*, does not say such commands are required. The Board declined to so rule, and decided

6    based on human authorship. (AvE Decl Ex 15 at 5-6.)

7    Programs written in other well-recognized programing languages work similarly to P5D's, which

8    belies Defendants' argument that P5D's files are not programs. P5D's programs instruct a computer to

9    render 3D scenes, and are written in a language P5D developed for that specific task. (Web Rep2 § 5.)

10   OpenSCAD is another, better known "language for creating 3D models." (Web Rep2 § 4.2.3.3) The

11   images below show OpenSCAD source code (left) and the model it creates (right).

12   <u>Figure Nos. 5 & 6: OpenSCAD Source Code & Model It Creates.</u> (*Id*. at Fig. 6.)



17   ████████████████████████████████████████████████████

18   █████████████████████████  (*See Id.* §§ 4.2.3.3, 5.)

19   Defendants argue P5D's files can't be programs because they "are not executable without the use

20   of [another] computer program (i.e., [P5D's] Tool) to read and ***interpret*** them." (Mot 14:8-9 (emphasis

21   added).) But this is normal. Many programming languages require separate interpreter programs. (*See*

22   Web Rep2 §§ 4.2.1.) And the Copyright Office acknowledges that "source code" can be written in such

23   languages, explaining that "in most cases a computer . . . cannot execute the[] statements or instructions

24   unless they have been converted into object code . . . by a separate program . . . known as an *interpreter*,

25   assembler, or compiler." Compendium § 721.3 (emphasis added). The need for an interpreter thus does

26   not negate the fact that P5D's files contain instructions, and thus constitute computer programs under the

27   statutory definition.

28   Defendants also argue that P5D's works are not computer programs because they are stored in

JSON files. But the Copyright Act's definition does not limit on the kinds of files that can contain computer programs. That P5D's works are stored in JSON does not change that they are computer programs. JSON is not itself a programming language. But, as a format for organizing and encoding information, it can encode any information, including instructions. (*See* Web Rep2 §§ 4.5, 5.)  P5D's language is not alone in using JSON to hold programs. At least one other well-known programming language is encoded in JSON. (*Id*. § 4.3.5; *see also* AvE Decl § F.) JSON is a good fit for P5D's language because ███████████████████████████████████████████████

██████████████████████████████████████. (Web Rep2 §§ 4.5, 5; Lop Dep 211:9-213:22.) The Court should thus reject Defendants reductive and misleading argument that P5D's works are not computer programs merely they are stored in JSON files.

### C.     Planner 5D's URLs and JSON Files Are Trade Secrets.

The adequacy of trade secret protections can rarely be resolved on summary judgment, because the inquiry is inherently factual. The law requires only relative secrecy and reasonable protections under the circumstances. Perfection is not required, and the costs of security measures must be considered.

Defendants ignore P5D's protections and the needs and circumstances of P5D's business. Instead, they describe the means of circumvention they developed and assert it was easy. It was not. Princeton spent months studying P5D's site before scraping, and more months figuring out how to use the files it stole. And Defendants' expert couldn't penetrate near-identical protections on competitor sites. This alone proves the efficacy of P5D's protections.

P5D's terms of service also safeguarded the secrets. Defendants contest their enforceability, citing decisions where regular consumers used websites as intended. But different standards apply when attackers use automated tools to bypass the user interface, exceeding any implied authorization to use a website as intended. That is evidence of inquiry notice, and thus enforceability of a website's terms.

### 1.     Secrecy and reasonable measures are almost never amenable to summary judgment.

Secrecy is "a relative concept and requires a fact-intensive analysis." *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). "Publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it

1  does not become generally known to . . . persons to whom the information would have some economic

2  value." *Id. Accord Silicon Image, Inc. v. Analogix Semiconductor, Inc*., No. 07-cv-635, 2008 WL

3  166950, at *16 (N.D. Cal. Jan. 17, 2008).

4  Likewise, "[t]he determination of whether 'reasonable efforts' have been taken is

5  quintessentially fact-specific." *Mattel, Inc. v. MGA Ent., Inc.*, No. 04-cv-9049, 2011 WL 3420571, at *2

6  (C.D. Cal. Aug. 4, 2011). "[W]hat is a 'reasonable' precaution . . . depends on a balancing of costs and

7  benefits that will vary from case to case and so require estimation and measurement by persons

8  knowledgeable in the particular field of endeavor involved." *Rockwell Graphic Sys., Inc. v. DEV Indus.,*

9  *Inc.*, 925 F.2d 174, 179 (7th Cir. 1991) (Posner, J.) "[R]econfigurations of patterns of work and

10  production are far from costless; and therefore perfect security is not optimum security." *Id.* at 180.

11  "Only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary

12  judgment[.]" *Art of Living Found. V. Does 1-10*, No. 10-cv-5022, 2012 WL 1565281, at *22 (N.D. Cal.

13  May 1, 2012) (quoting *Rockwell*). *Accord Mattel*, 2011 WL 3420571, at *2.

14  "[E]xpectations for ensuring secrecy are different for small companies than for large

15  companies." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc*., 342 F.3d 714, 724 (7th Cir. 2003).

16  "[W]hat is reasonable for a small company may be different from what is reasonable for a large

17  company; and that the determination ordinarily represents a question for the jury." *Niemi v. NHK Spring*

18  *Co*., 543 F.3d 294, 301 (6th Cir. 2008).

19  Protections can come from legal *or* technical measures. Contractual restrictions can be

20  reasonable on their own. *InteliClear, LLC v. ETC Glob. Holdings, Inc.,* 978 F.3d 653, 661 (9th Cir.

21  2020) ("licensing agreements constitute reasonable measures"). Other protections can also be reasonable

22  on their own. *See Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) ("lack of

23  confidentiality agreements is not dispositive on the issue of secrecy").

24  **2.      P5D did not disclose its secrets, and its technical protections were**
          **reasonable under the circumstances.**

25

26  P5D's used several layers of protections, which were reasonable under the circumstances.

27  Defendants argue P5D's files weren't kept adequately secret, but this is an exercise in hindsight.

28  Having discovered how to evade them, Defendants claim it was easy. But Princeton spent months

28

studying P5D's site before scraping (Web Rep1 § 7.1), wrote a complex scraping program that evaded

P5D's protections (*Id*. § 7.2) and spent most of a year deciphering the files they stole (*Id*. § 7.3).

      **a.**      **Temporarily holding** ███████████████████ **in**
                   **hidden locations on the user's computer was reasonable.**

       P5D's website is built to hide its trade secrets from users. Computers using P5D's software must

be able to request and download the files that describe 3D scenes, ███████████████████

████████ but that information is provided securely.

       Sending protected information to users' computers in a secure way is a common and necessary

feature of digital commerce. For example, video streaming services send resources to a user's computer

that allow a valuable movie to be viewed as intended but prevents users from saving a usable copy of the

movie from being made. The necessity of this framework for modern digital commerce was recognized

by Congress in the Digital Millennium Copyright Act, which makes it a crime circumvent "a

technological measure" that "controls access to a work" found on a user's device.  *See* 17 U.S.C. § 1201.

P5D does the same thing streaming sites do. Its viewer software lets users interact with its 3D models

but provides no means of accessing the model files (███████████). (Web Rep1 § 6.2.)

       Users of P5D's software work with images of furniture, and floor plans. But they're offered no

means of seeing, much less downloading, the trade secret █████████████.

      ███████████████ are not made available anywhere on the website, the browser address bar, or

the source code of the HTML or JavaScript 3D viewer. (Web Rep1 26-30.) ███████████ are never

transmitted and never appear anywhere. (*Id*.) Instead, ████████████████████████████,

████████████████████████████████████████████████████████████████████

██████ [11] (*Id*. at 26-30, 60.) Thus, Defendants' claims—that ██████████████████████

████████████████████████████████████████████████████████████████

(*E.g.,* Mot 6:18-22, 29:18-19 (emphasis added).) Because P5D's files are sent to the user's *computer*,

but hidden from the *user*, they are protectible. *See Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc*., 226

Cal. App. 4th 26, 59 (2014) (information in software can be protectable if not evident to the end user).

       Defendants argue ████████████████████████████████████████████████

---

[11] Scene files are set to delete immediately. (*See* Web Rep1 at 59-60.) Object files are reused in multiple
scenes and are kept for one day to enable a faster experience to users viewing many scenes.  (*Id*.)

1     ████████████████████████████████ is to circumvent protections.

2     Defendants are also wrong that use of the Internet necessarily means something is publicly

3 available, and unprotectable. (*See* Mot 30:5-6.) It does not. *DVD Copy Control Ass'n*, 116 Cal. App. 4th

4 at 251; *Silicon Imag*, 2008 WL 166950, at *16. Here, ██████████████████ without

5 circumvention techniques. (Web Rep1 §§ 6.2.) This Court and the *Arkeyo* court recognize that random

6 or hard-to-guess URLs can provide sufficient protection. (ECF. 90 at 12:11-20.)

        **b.**    **P5D's proprietary file format was a reasonable measure.**

8     P5D used a proprietary, non-standard encoding method that makes it hard to decipher the three-

9 dimensional characteristics encoded in its files. (Web Rep1 at 31-36.) The files ████████████

10 ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████ (*Id*. at 33-35.) ██████████████████

13 ████████████████████████████" (*Id.*)

14     As a result, Defendants' expert admitted he has no idea how to view P5D's models without

15 P5D's viewer. (McK Dep 245:10-20.) And it took Princeton's over six months of work—in which they

16 were continuously returning to P5D's site to see how objects and scenes should look—before they were

17 able to correct for enough obfuscations to meaningfully use P5D's files. (Web Rep1 § 7.3.)

18     Again, this obfuscation only comes into play if an attacker steals P5D's files. That is not easy.

        **c.**    **P5D's other measures were reasonable.**

20     The evasive features of Princeton's software helped it overcome another protection: P5D's

21 logging and monitoring. P5D continuously logged website activity and reviewed logs daily. (*Id*. at 35-

22 36; Ust Dep 118:10-120:6.) Princeton's scraping software mimics P5D's software ████████████

23 ██████████ (Web Rep1 § 7.2.) ████████████████████████████

24 (*Id*.) ████████████████████ does not mean P5D's efforts were not reasonable.

25     P5D's logs now evidence Princeton's activity and refute Dr. Song's account of events. They

26 show Princeton was studying P5D's site months before scraping, that its software was designed to evade

27 detection, and that Princeton spent all of 2016 returning to P5D's site to study how the scenes should

28

**P5D's Opp. to Defs' MSJ**           **Case No. 3:19-cv-03132-WHO**

appear so they could decode P5D's files. (*Id*. § 7.1-7.3.) [12]

P5D also protected its files in other ways. The files were always transmitted over an encrypted connection, ensuring no one could obtain them in transit. (*Id*. § 6.2). P5D stores its trade secret files on a secure server that is separate from its ordinary web server, which means a successful hack of P5D's web server would not allow access to the secret files. (*Id*.) And P5D actively looks for vulnerabilities in its code through regular code reviews and bug bounty program. (AvE Decl Ex. 33.)

### d.   The number of P5D's files protected the compilations.

Publication of P5D's files was also limited because they weren't retrievable *en masse* from one URL. Princeton's argument focuses on extracting files one at a time. But with the one-by-one manual process that Princeton describes, it would take months or years to gather the entire compilation. Where, as here, a compilation of publicly available information would require a "significant amount of time and effort" to reconstruct based "solely off the public disseminations," it is adequately protected. *See N. Am. Deer Registry, Inc*, 2017 WL 2402579, at *8. Princeton therefore has mounted no real challenge to P5D's allegations that its trade secret compilations were adequately protected.

### e.   P5D's protections were particularly reasonable given the business's circumstances.

"[P]erfect security is not optimum security." *Rockwell*, 925 F.2d at 179. Courts, therefore, "should not require a person or corporation to take unreasonable precautions to prevent another from doing that which he ought not do in the first place." *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1017 (5th Cir. 1970). It follows that precautions are not unreasonable just because "unauthorized actions" can overcome them. *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1091 (E.D. Cal. 2012).

In early 2016, when Princeton stole P5D's files, P5D was a five-year-old company with eleven employees. (Ust Decl § D.) They were managing multiple platforms, including web, iPhone, and Android, in addition to marketing itself and performing all other business functions. (*Id*.) The web application Princeton circumvented had over 3.7 million users. (*Id*.) It was managed by two employees.

---

[12] Dr. Song disputes this but her account is easily refuted. For example, her version would have yielded only 16,000 scenes, less than a third of what she took. (AvE § E.)

(*Id.*) Given these circumstances, the measures P5D implemented can't be judged against the measures that Meta, or the other Fortune 100 clients of Defendants' expert, might be able to implement. *Niemi*, 543 F.3d at 301 ("what is reasonable for a small company may be different from what is reasonable for a large company); *Learning Curve Toys*, 342 F.3d at 724 (same). Whether protections are reasonable under particular circumstances is a jury question. *Niemi*, 543 F.3d at 301.

P5D's expert, Professor Bruce Webster compared P5D's circumstances to his experiences starting multiple software companies. He also reviewed P5D's protections and evidence of Princeton's conduct. (Web Rep1 § 3.3.) He found P5D's protections reasonable, because its secrets were "well-hidden and only ascertainable by determined and sophisticated attackers." (*Id.* § 3.2.)

Defendants' expert had no understanding of P5D's circumstances when he prepared his opinion. He did not know how many employees P5D had, the size of P5D's budget, or the number of users P5D had. (*See* McK Dep 119:8-123:25.) His firm targets Fortune 100 companies, (*id.* at 88:25-89:25) and he knows little about small software firms. The only "small" client he identified had over fifty employees. (*Id.* at 257:10-17.) His opinion that P5D's protections were not reasonable has no foundation.

### f.  Defendants' expert could not overcome similar protections.

Defendants' expert analyzed two other ███████████████ that, he believed, could not be hacked using the techniques Princeton used on P5D. (*E.g.,* McK Rep ¶¶ 119, 120, 127, 130, 132, 138.) He was right to look at similar companies. *See Learning Curve*, 342 F.3d at 726. ("the jury could have considered the size and sophistication of the parties, as well as the relevant industry"). But he was wrong that the two competitors used markedly different measures than P5D. Prof. Webster analyzed the sites and discovered they used equivalent protections to P5D's. He was able to download their 3D models using tools and techniques similar to those used by Princeton against P5D. (Web Rep1 § 8.4.) That Mr. McKamie—a professional hacker with over a decade of experience—was unable to overcome those protections shows that they were more than just reasonable. They were effective.

### 3.  P5D's Terms of Service Were Independently Sufficient Protection.

In addition to the technical measures, P5D's terms of service are an independent, and sufficient, trade secret protection. Defendants are incorrect that the terms are an unenforceable browsewrap.

### a.     Terms of service are enforceable on inquiry notice.

A browsewrap agreement is enforceable if a reasonably prudent user would be on inquiry notice of it. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Contrary to Defendants' claim, actual notice, while sufficient, is not necessary. (*See* Mot 32:3-10.)

For *ordinary consumers* using a website as intended, courts focus on the consumers' experience on the site, finding inquiry notice when "(1) the website provides reasonably conspicuous notice of the terms to which the *consumer* will be bound; and (2) the *consumer* takes some action" to manifest assent. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (emphasis added). But this rule is only for a website's ordinary consumers, *id.,* a key element that Defendants omit in paraphrasing *Berman*, a case about a consumer's ordinary website usage. (Mot 33:6-9.)

Court cast a wider net when users exploit a website in unexpected ways, exceeding the implied permission for consumers to use the website as intended. Then, courts evaluate inquiry notice based on user sophistication, the nature, purpose, and frequency of website interactions, and other factors. *See Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-cv-4825, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005) (imputing knowledge of terms based on "repeated and automated use"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 401-403 (2d Cir. 2004) (imputing knowledge based on repeated use of website's database). *See also* Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 472 (2006) (terms are more often enforced against a business, "who repeatedly accesses the plaintiff's Web site to collect data, often using software 'robots'"); *Nguyen*, 763 F.3d at 1178 n.2 (same, citing Lemley).

A hacker's use of robot software to scrape up large amounts of data is itself evidence of inquiry notice. *Cairo*, 2005 WL 756610, at *5 (a scraper's repeated and automated use of site is basis for imputing knowledge of the terms). By using robot software, a hacker deliberately bypasses the intended interface, which avoids whatever notices an ordinary user might receive. *Id.* at *3 ("Cairo's computer search programs cannot read the Terms of Use"). It also exceeds any implicit permission to use the website as it was meant to be used. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020) (using robot to scrape insurance quotes exceeded the "implicit permission to access as many quotes as is *humanly* possible" and was trade secret misappropriation).

Courts have also found inquiry notice based on the theory of unilateral contracts and the binding

effect of accepting an offer's benefits. *Register.com*, 356 F.3d at 402-403. And Courts have found inquiry notice if a "defendant's conduct demonstrates that it was aware it was violating service terms," such as steps to evade detection or similar terms on the defendant's website. *DHI Grp., Inc. v. Kent*, No. H-16-1670, 2017 WL 4837730, at \*3-4 (S.D. Tex. Oct. 26, 2017).

### b.     Princeton was on inquiry notice of P5D's terms of service.

When Princeton's computer scientists scraped P5D's website, they were not using it as intended, and *Berman*'s rigid rule for ordinary consumers does not apply. Broader considerations govern. When customers visit a shop, it's implied they are free to wander the aisles and examine displayed merchandise. But it's not okay to go in the back to rummage through boxes (let alone sneak everything out the back door) without at least asking. Likewise, a reasonably prudent person would check the terms or ask permission before bypassing a website's user interface and vacuuming up thousands of files— which is why inquiry notice has been found in such cases. *E.g., Cairo*, 2005 WL 756610, at \*5. In such cases, the prominence of signage to ordinary consumers hardly matters, and shouldn't be the focus.

Here, there are many factors supporting inquiry notice. Princeton's scientists were sophisticated users who knew, or should have known, they were exceeding the terms on which P5D was offering its services. Princeton's scraping software was written by Shuran Song, a Ph.D. student, and supervised by Professor Thomas Funkhouser, then director of graduate studies in the Computer Science Department.

They were also subject to ethical guidelines forbidding their conduct. The Association for Computing Machinery (ACM), is the world's largest professional organization for computing. (*See* AvE Decl Ex. 28) Dr. Song was a reviewer for ACM conferences and Dr. Funhkhouser is a fellow. (*See* AvE Decl Exs. 32 at 2, 29.) ACM's code of conduct, forbids "access[ing] another's computer system, software, or data without a reasonable belief that such an action would be authorized." (AvE Decl Ex. 30 § 2,8; *see also* Ex. 31 § 2.8.) "A system being publicly accessible is not sufficient grounds on its own to imply authorization." (*Id.*) Such principles are a regular part of computer science education, even at the undergraduate level. (*See* Web Rep1 at 57, n. 96.) Defendants' experts would not scrape a site without express authorization, as stated in the ACM code. (McK Dep 77:10-79:20; Lop Dep 52:16-53:2.)

Princeton's scraping involved repeated automated use of P5D's servers. This is sufficient for inquiry notice. *Cairo*, 2005 WL 756610, at \*5. The secret files were not available through the intended

34

interface, whereas consumers could access at least individual insurance quotes in *Compulife*, 959 F.3d at 1314. Princeton exceeded its implicit permission by downloading even one hidden file, and certainly by using robot software to download them all. *See id.* Princeton's conduct also suggests it knew its conduct was unwelcome. It built its scraping software to evade detection, ███████████████████████ ████████████████████████████ This is further evidence of inquiry notice. *See DHI*, 2017 WL 4837730, at *3-4.

Finally, Princeton touted P5D's dataset as a cure to the "main roadblock for 3D scene understanding and research," worked with P5D's data for years, and accepted that benefit, all without ever reaching out to P5D to disclose what they were doing or to ask for permission (or for help). (Song Dep 130:9-131:14, 164:16-165:5.) This is grounds for a finding of inquiry notice based on principles of unilateral contract. *See Register.com*, 356 F.3d at 402-403.

Princeton was on inquiry notice of P5D's terms of service, and thus bound by them.

### c.   The terms of service safeguarded confidentiality.

Defendants do not dispute that the terms prohibited scraping. They argue instead that the terms do not impose a sufficient duty of confidentiality (Mot 36:1-10), but this argument was already rejected. (*See* ECF 90 at 11:13-19.) The terms prohibit users from "page-scra[ing] or otherwise "download[ing] . . . any portion of the Planner5D project . . . or us[ing] the Planner5D project . . . other than for their intended purposes." (ECF 53 ¶ 40.) The intended purpose is interior design. (*Id.* at ¶ 60.) The terms forbid all means of acquiring (and thus being able to disclose) P5D's files. While not labeled "confidentiality" provisions, they enforce secrecy.[13]

## V.   CONCLUSION

For these reasons, P5D asks the Court to deny summary judgment, and rule as a matter of law that P5D's Object and Scene works are copyrightable.

---

[13]  *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495 (S.D.N.Y. 2017) does not change this. There, the secrets were user-facing elements of software and the terms did not preclude users from disclosing them. *Id.* at 498, 521-22. Because users could see the secrets, acquisition was unavoidable. Here, users cannot see the secrets without crawling, downloading, or hacking. By prohibiting that, P5D's terms protect them. (*See* ECF 53 ¶ 45)

1   REPECTFULLY SUBMITTED,

2

3   DATED:  April 5, 2023                    THE BUSINESS LITIGATION GROUP, P.C.

4

5                                            By:       /s/*Marc Bernstein*__
                                                       Marc Bernstein
6

7                                            Attorneys for Plaintiff
8                                            PLANNER 5D

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36