1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

<table>
<tr><td>7</td><td>UAB "PLANNER5D" D/B/A PLANNER</td><td>Case No. 19-cv-03132-WHO</td></tr>
<tr><td>8</td><td>5D,</td><td></td></tr>
<tr><td>9</td><td>Plaintiff,</td><td>ORDER GRANTING IN PART<br>DEFENDANTS' MOTION FOR</td></tr>
<tr><td>10</td><td>v.</td><td>SUMMARY JUDGMENT</td></tr>
<tr><td>11</td><td></td><td>Re: Dkt. No. 217</td></tr>
<tr><td>12</td><td>META PLATFORMS, INC., et al.,</td><td></td></tr>
<tr><td>13</td><td>Defendants.</td><td></td></tr>
</table>

14

15                            **INTRODUCTION**

16          UAB Planner 5D ("Planner 5D" or "P5D") operates a home design website that allows

17   users to create virtual interior design scenes.  Users gain access to a library of virtual objects (such

18   as tables, chairs, and sofas) to populate their scenes.  It claims that it owns copyrights in these

19   three-dimensional objects and scenes, and in a compilation of certain scenes.  It also claims that

20   the underlying data files, (including the data files underlying the compilation of objects, for which

21   I found insufficient originality to support a copyright) also qualify for trade secret protection.

22   *UAB "Planner5D" v. Facebook, Inc. ("Planner 5D II")*, No. 19-CV-03132-WHO, 2020 WL

23   4260733, at *6 (N.D. Cal. Jul. 24, 2020).  P5D filed this suit against defendants Facebook, Inc.,

24   Facebook Technologies, LLC, now known as Meta Platforms, Inc. (collectively "Meta"), and the

25   Trustees of Princeton University ("Princeton") for copyright infringement and trade secret

26   misappropriation.

27          Before me is defendants' motion for summary judgment for both the copyrightability and

28   trade secrecy of Planner 5D's works.  Three primary disputes have emerged in relation to the

United States District Court
Northern District of California

copyright claims: (1) whether P5D satisfied the requirements of Section 411(a) of the Copyright Act, 17 U.S.C. § 101 *et seq.*, which is a prerequisite for pursuing these claims in court, Motion for Summary Judgment ("MSJ") [Dkt. No. 217-3] at 31:13-18; (2) whether P5D's works "lack human authorship" and therefore cannot be protected with copyright, MSJ at 32:13-20; and (3) whether P5D's works "lack originality" because they model pre-existing furniture and other real-life objects and therefore cannot be protected with copyright.  MSJ at 33:4-6.  One primary dispute has emerged in relation to the trade secret claims: whether the measures P5D took to protect its files collectively constituted reasonable measures under the circumstances, as required to establish the existence of a trade secret that can be legally protected.  MSJ at 28:2-6.

## FACTUAL BACKGROUND

I detailed Planner 5D's allegations and much of the relevant background in my previous orders.  *See Planner 5D, 2019 WL 6219223*, at *2–4 (N.D. Cal. Nov. 21, 2019); *Planner 5D II* at *6.  I incorporate those discussions by reference and summarize the salient facts here.

## I.     Planner 5D's Home Design Website

In 2011, Planner 5D began offering users access to a digital library of thousands of digital household objects, including "structural features," "furniture," and "exterior features," on its home design website.  Compl. ¶ 27.  Users can create unique designs by "simply dragging any of these objects onto or around a chosen floor plan."  *Id.*  Once added to a design, these objects can be "easily moved, rotated, tilted, re-sized, or otherwise manipulated to create the desired design."  *Id.*  Users can also "easily toggle between two- and three-dimensional renderings of the design" and can rotate and tilt three-dimensional renderings "to any desired perspective."  *Id.*  Planner 5D claims that it currently has over 40 million users worldwide and that it owns "a collection of over a million hand-crafted, digitized, and realistic three-dimensional objects and scenes, depicting a wide variety of household and office designs."  *Id.* ¶¶ 5, 28.

### A.     Creation of Planner 5D's Works

#### 1.     Objects (3D Models)

Planner 5D claims to possess a copyright in 3,719 Objects (the "Asserted Objects").  Copyright Complaint ("CR Compl.") [Dkt. No. 1] in Case No. 20-cv-8261-WHO ¶ 33; *see also*

United States District Court
Northern District of California

Declaration of Johanna Schmitt "Schmitt Decl.") ¶ 15.  It asserts that each of its objects was hand-created by one of four human modelers using an open-source modeling tool called Blender.  Oppo. at 11:7-11.  The "modelers" start with a blank screen in the Blender program that contains a grid and a panel of controls.  They use this interface to create the objects in a manner that Planner 5D analogizes to sculpting.  *Id.* at 11:12-15.  The underlying code is generated automatically based on the modeler's manipulation of the control panel, so the modelers do not write the code directly. Oppo. 14:18-19.

Most of the objects are modeled after existing objects, with only about 10% being designed "without reference to an inspirational image."  Mot. at 37:9-10.[1]  The remaining objects were "inspired by real objects or images the modelers encountered in life," including from reference images on the web.  Oppo. at 11-12.  Finally, 113 of the objects were commissioned by furniture retailers and were meant to look like items from the retailers' catalogs.  This category is referred to as "Business-to-Business, or B2B, objects."  *Id.* 12:3-6.  Each of these objects is available to Planner 5D users for inclusion in the scenes they arrange on Planner 5D's website.

### 2.    Scenes and Scene Compilation

In addition to Planner 5D's claims relating to its individual objects, Planner 5D claims copyright in the compilation of the 49,479 scenes on its public gallery as of February 17, 2016 (the "Asserted Scene Compilation").  CR Compl. ¶ 46.  Of these, 18 individual scenes were created by Planner 5D employees (the "Asserted Individual Scenes").  Schmitt Decl. ¶ 31.  The remaining scenes in P5D's gallery were created by its users, who arrange unique scenes through the web interface and can elect to submit their creations to be considered for inclusion in Planner 5D's "public gallery" for anyone to view.  CR Compl. ¶¶ 31, 55.

Users could "flag" their work for inclusion in P5D's public gallery.  P5D's co-founders—Alexey Sheremetyev and Sergey Nosyrev—reviewed each flagged scene and chose which should be added to the public gallery.  Oppo. 14:13-16.  "In choosing scenes, [Sheremetyev and Nosyrev]

---

[1] Defendants claim that Planner 5D has refused to identify the objects comprising that 10% from among the 3,719 objects Planner 5D claims are subject to copyright.  Mot. at 37:10-11.  At the hearing, I directed Planner 5D to provide a master list of original objects and scenes to defendants by July 19, 2023.

aimed to show off their software's scope, quality, playfulness, and power to potential users." *Id.* at 14:16-17.  They chose scenes based on artistic value, humor, novelty, diversity, creativity, completeness, fun, family-friendliness, and realism.  *Id.* 14:16-19.  The selected scenes were then saved in P5D's proprietary JSON file format as a "scene data file" and uploaded to the public gallery.  Schmitt Decl. ¶ 25.

**B.      User Access to Planner 5D's Works**

Planner 5D's web-based product uses "client-side rendering."  Mot. at 16:14-16; Schmitt Decl. ¶¶ 172, 183, Ex. 16 at 20–21; Declaration of Ryan McKamie ("McKamie Decl.") ¶ 38.  This means that when a user views a Scene using P5D's web interface, Planner 5D transmits data files to the user's web browser and relies on the user's computer to perform the operation of rendering the Scene onto the screen.  Schmitt Decl. ¶ 184, Ex. 16 at 20–21; McKamie Decl. ¶ 38.

There is some dispute over what exactly is transmitted to a user's computer during this process.  Defendants claim that Planner 5D "actively transmits" the following materials to the user's web browser: ██████████████████████████████████████, Ex. 12 (RFA No. 54); Schmitt Decl. ¶ 166; McKamie Decl. ¶¶ 49–50; ████████████████████ ███████████████████████████, Ex. 12 (RFA No. 61); Schmitt Decl. ¶ 167; McKamie Decl. ¶¶ 70–71; and ████████████████████████████████████████ ████████████████████████████████████ ████████████████████, Ex. 12 (RFA Nos. 56 & 63); Song Decl. ¶¶ 7–10, 14–16; McKamie Decl. ¶¶ 34–46, 60–71.

██████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████ Oppo. at 38-39. ████████ █████████████████████████████████████ ████████████████████████████████ Reply at 21:20-24.

Planner 5D disputes this, ███████████████████████████

████████████████████████████████████████████████. *Compare* Mot 6:18-24 *with* Supplemental Expert Report of Bruce F.

Webster ("Web Rep1"), Dkt. No. 255-1, Ex. 1 at 26-30. ██████████████████████

████████████████████████████████████████████████

██████████████████████████████████. Web Rep1 at 26-30, 60. ████████

███████████████████████████████████████

███████████████████████ *Id.* at 59-60. █████████████████████████████

████████████████████████████████████████████████████████. Ex. 12 (RFA Nos. 66 &

67); McKamie Decl. ¶¶ 43–46, 64–68. ████████████████████████████████████

████████████████████████████████████████████████████████. Schmitt Decl. ¶¶ 185–

86, 188; McKamie Decl. ¶¶ 47–51, 69–71; Song Decl. ¶¶ 6–8.  Defendants chose the latter route.

The use of developer tools for this purpose was prohibited by Planner 5D's Terms of Service.

FAC ¶ 40.

## II.    Princeton Downloads Planner 5D's Works to Create the SUNCG Dataset

Planner 5D claims that, in 2016, Princeton circumvented P5D's protections in order to

download a complete set of P5D's works.  P5D contends that prior to executing the download,

Princeton spent months or years preparing to download the works without being detected.  For

example, though Dr. Song claimed that she first saw the Planner 5D website in 2016, she

described a version of the website phased out in 2014.  *See* Declaration of Christian Andreu von-

Euw ("AvE Decl.") § D.   P5D's internal logs also show a ten-fold increase in traffic from

Princeton in April 2015, when Song gave a talk about "large on-line 3D model repositories."  Web

Rep1 at 37.

Planner 5D alleges that once Dr. Song determined how to evade P5D's protections, she

███████████████████████████████████████████

███████████████████████████████████████████

United States District Court
Northern District of California

1  ████████████████████████████████████████████████████████

2  Oppo. 44:4-6.  ████████████████████████████████████████████

3  ███████████████████████████ Web Rep1 § 7.2.  █████████████████████

4  ████████████████████████████████████████████████████████

5  ██████████.  After downloading the files, Princeton's team spent over six months decoding

6  Planner 5D's files in order to make them usable for the SUNCG project.  *Id.* § 7.3.

7  **PROCEDURAL BACKGROUND**

8  **I.      Motions to Dismiss**

9          On March 14, 2019, Planner 5D wrote Facebook, Princeton, and others, demanding that

10  they cease and desist infringement of Planner 5D's copyrights.  Compl. ¶ 55; *see also* Princeton

11  Request for Judicial Notice, Ex. 2 [Dkt. No. 32-2] (copy of cease-and-desist letter sent to

12  Princeton).  On June 5, 2019, Planner 5D filed this Complaint against Princeton, Facebook, and

13  other unknown entities and persons, alleging claims for copyright infringement and trade secret

14  misappropriation.  *See* Compl.  Both Princeton and Facebook moved to dismiss the Complaint on

15  12(b)(6) grounds for failure to state a claim upon which relief can be granted.  *See* Princeton

16  Motion to Dismiss ("Princeton Mot.") [Dkt. No. 31]; Facebook Motion to Dismiss ("Facebook

17  Mot.") [Dkt. No. 33].  After three rounds of motions to dismiss, the only claim that Planner 5D

18  could not revive was the copyright infringement claim for the compilation of objects, which I

19  dismissed with prejudice.  MTD Order [Dkt. No. 90] at 9:20-21.

20  **II.     Copyright Registration**

21          I initially dismissed Planner 5D's copyright claims because Planner 5D failed to allege that

22  it met the threshold registration requirement of section 411(a).  I dismissed the copyright claims a

23  second time when Planner 5D submitted a registration application but could not verify that the

24  works at issue in this case were covered by that registration.  Planner 5D then submitted two

25  applications to the Copyright Office on September 14, 2020, seeking to register all Planner 5D

26  objects created through January 13, 2016, and all public gallery scenes created through February

27  17, 2016.  *See* CR Compl. ¶ 96.  On November 16, 2020, the Copyright Office refused each of the

28  applications.  It wrote:

United States District Court
Northern District of California

6

> Although the Registration Program Office has concluded that the deposits submitted with these applications do not meet the requirements for registering a work as a computer program you have delivered to the Office a deposit, application, and fee required for registration of the computer programs 'in proper form,' as required to institute a civil action for infringement under 17 U.S.C. § 411(a).

*Id.*, Ex. A (November 16, 2020 Copyright Office Letter) at 2.  Planner 5D then sought reconsideration under 37 C.F.R. § 202.5(b), whereby a Registration Program staff attorney not involved in the initial examination conducts a de novo review.  *See* Compendium of U.S. Copyright Office Practices § 1703.2 (3d ed. 2021), available at https://www.copyright.gov/comp3/docs/compendium.pdf.  If the refusal is maintained, the regulations provide that Planner 5D may request a second reconsideration from the Copyright Office Review Board ("Board"), which consists of the Register of Copyrights and the General Counsel (or their designees), and a third member designated by the Register.  37 C.F.R. § 202.5(f).  Planner 5D subsequently submitted a reconsideration request.  *Id.* ¶ 144.  The second request for reconsideration is also subject to de novo review.  *See* Compendium of U.S. Copyright Office Practices § 1704.2.  While decisions by the Board are nonprecedential and constitute final agency action, they can be persuasive authority.  The Board has not granted a copyright registration, and Planner 5D has since chosen not to pursue the registration further.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the

non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.     COPYRIGHT CLAIMS

### A.     Section 411(a)

Though the Copyright Office has denied P5D's registration request, a party may sue for infringement "notwithstanding the refusal of the Register to register the claim to copyright" so long as "notice [is] served on the Register[.]" *Nova Stylings, Inc. v. Ladd*, 695 F.2d 1179, 1181 (9th Cir. 1983).  "Once that has occurred, the district court can determine both the validity of the copyright, which in turn determines its registrability, as well as whether an infringement has occurred." *Id.*  To be sure, the Copyright Office's final determination can have persuasive value. However, I must make "an independent judicial determination [] solely for the purposes of adjudicating [this] infringement suit." *Proline Concrete Tools, Inc. v. Dennis*, No. 07CV2310-LAB (AJB), 2013 WL 12116134, at *4 (S.D. Cal. Mar. 28, 2013).

Defendants argue that Planner 5D submitted its copyright registration application in the wrong category by designating the code as a "computer program."  They say that Planner 5D applied within the "computer program" category in order to avoid satisfying the deposit requirement, which would have provided defendants with better notice of Planner 5D's claims.[2]  Planner 5D contends that the classification is irrelevant because this administrative classification does not bear on the works' copyrightability, *see* 17 U.S.C. § 408(c)(1), and that I should only look to the registration application insofar as it satisfies the "administrative exhaustion" analog created by 411(a).  It urges that I must construe the registration liberally, even if it contains errors. *See Three*

---

[2] I ordered that plaintiffs provide defendants with a complete list of claimed objects and scenes, excluding the list disclosed through interrogatory responses and deposition answers previously provided.  Defendants have had that list for more than two months and have not complained that it was deficient.  Any "notice" issues have been cured.

*Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000) ("Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement.")

Planner 5D points out that the proper regulatory classification is often unclear.  *See Skyline Design, Inc. v. McGrory Glass, Inc.*, No. 12-cv-10198, 2014 WL 258564, at *4 (N.D. Ill. Jan. 23, 2014) (observing that double-sided etched-glass works didn't obviously fit into "2–dimensional artwork," "3–dimensional sculpture," or "architectural work," and "none of the other categories even come close").  It sought to register its works as "computer programs" because the works consist of code that instructs computers to render specific 3D images.  This meets the Copyright Act's definition of "computer program."  17 U.S.C. § 101 ("computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.).  Indeed, the Copyright Office had *granted* registration of the very same type of files as computer programs when P5D previously applied to register its 2019 Objects and Scenes. *See* [Dkt. No. 1-1] in Case No. 20-cv-2198-WHO.  Defendants counter that P5D should have submitted thousands of separate applications to register each of its works as individual visual works.  Mot 17:16-19.  While this was an alternative, defendants do not provide any compelling reason that this inefficient route was more logical than the route plaintiff 5D chose to take.

In sum, I find no intent to defraud or prejudice in Planner 5D's decision to submit its works for registration as computer programs.  Because the alleged lack of notice has been cured, the alleged deficiency of the deposit to the Copyright Office is not material.  While the Copyright Office's determination can be helpful, I must independently determine whether a copyright exists in these works for purposes of adjudicating the dispute before me regardless of that determination.  However, because the Copyright Office did not grant a registration for the relevant works, P5D cannot rely on a presumption of validity.  *Cf. United Fabrics Int'l, Inc. v. C & J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) ("A copyright registration . . . creates a rebuttable presumption of validity.") (quoting 17 U.S.C. § 410(c)).

## B.   Human authorship

Planner 5D's objects and scenes are created on a non-coding interface, and the underlying code is automatically generated by a third-party application (Blender in the case of objects, and

United States District Court
Northern District of California

1    Planner 5D's scene editor in the case of scenes).  Defendants argue that because Planner 5D

2    attempts to register the code, which is not written by a human, it is barred by the copyright

3    requirement that works be produced by a human author.  *Urantia Found. v. Kristin Maaherra*, 114

4    F.3d 955, 957-59 (9th Cir. 1997) (authorship requires "some element of human creativity").

5           Planner 5D counters with two arguments.  First, works written with software are "only

6    uncopyrightable if are created *without any human creative control*."  Oppo. at 34:1-4 (citing 88

7    Fed. Rg. 51, 16192; AvE Decl Ex 20).  Here, the code is generated only when a human

8    manipulates the software for creative use.  Second, Planner 5D claims that its copyright

9    applications cover both the visual models and the literal text of P5D's works, not only the

10   automatically generated code.  *Cf. Jovani Fashion, Ltd. v. Cinderella Divine, Inc.*, 808 F. Supp. 2d

11   542, 546-47 (S.D.N.Y. 2011) (finding that registration of a catalog also covers the three-

12   dimensional works depicted in it, even where the work is described as "two-dimensional artwork"

13   or "photographs and text.").

14          There is no dispute that the visual models are human-created, but the parties dispute

15   whether the copyright registration applications cover the visual models, the auto-generated code,

16   or both.  That distinction is immaterial because both the visual models and the code are generated

17   through human authorship.  Whether that authorship involves typing code directly or manipulating

18   a graphical tool that generates code, a human takes action to generate the works.  This

19   interpretation is supported by the fact that the Copyright Office had previously granted copyright

20   registrations for code generated using graphical tools like the ones used here, including Blender.

21   AvE Decl ¶¶ 22-24, Exs. 17-19.  Accordingly, human authorship is not a bar to copyrightability

22   here.

23          **C.    Originality**

24          In an infringement action, the court must address the threshold question of the ownership

25   of a valid copyright, which starts with consideration of originality.  *Topolos v. Caldewey*, 698 F.2d

26   991, 994 (9th Cir.1983) (holding that the district court erred in not resolving a threshold question

27   of copyright ownership); *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 2009 WL

28   1764652, at *1 (N.D.Cal. June 18, 2009) ("Determinations of copyrightability are indeed

United States District Court
Northern District of California

questions of law reserved for the judge, not the jury."); 2 Nimmer on Copyright § 12.10[B] ("[C]ertain . . . matters are reserved to the judge.  Included are determinations of copyrightability in all instances.").  "The *sine qua non* of copyright is originality."  *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

Originality means that: (1) the author independently created the work, and (2) the work "possesses at least some minimal degree of creativity."  *Id.* at 345, 111 S.Ct. 1282.  The required amount of creativity is "extremely low; even a slight amount will suffice."  *Id.*  Because of this low standard, "[t]he vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be."  *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir.2000) (quoting *Feist Publ'n*, 499 U.S. at 345, 111 S.Ct. 1282).  Nevertheless, the degree of creativity "is not negligible."  *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir.2003).  "There must be something more than a 'merely trivial' variation, something recognizably the artist's own."  *Id.* (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 489 (9th Cir. 2000)).

### 1.    Defendants' "lack of originality" argument

Defendants claim that when the modelers used a reference image, even when not explicitly commissioned as a B2B object, the objects were nearly identical to the reference image.  Mot. at 35:14-15.  As a result, they claim that the objects lack the original expression needed to support a copyright.  Mot. at 34:2-5.  Specifically, they argue that the model must contain elements that are not present in the pre-existing reference item to sustain copyright protection.  *See* Compendium of U.S. Copyright Practices § 923.1 (determining whether model is protectable depends on whether it "contains some original differences from the object depicted"); *see also Bespaq Corp. v. Haoshen Trading Co.*, No. 04 Civ. 3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004) (denying injunction because plaintiff failed to explain what "elements it has added to its miniature furniture that were not otherwise present in preexisting full-size furniture pieces").  "[I]n assessing the originality of a work for which copyright protection is sought, [courts] look only at the final product, not the process" by which it was created.  *ABS Entm't Inc. v. CBS Corp.*, 908 F.3d 405, 416 (9th Cir. 2018) (quoting *Meshwerks, Inc. v. Toyota Motor Sales U.S.A.*, 528 F.3d 1258, 1268

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (10th Cir. 2008)).  Indeed, I noted in my motion to dismiss order that, although creation of these

2   models might require time and effort, "the 'sweat of the brow' approach does not establish

3   originality or creativity."  Dkt. No. 52 at 13.

4        Defendants submit a summary chart of side-by-side comparisons for 981 non-B2B images

5   alongside their reference images.  Below is a sample of three non-B2B objects from that chart.

6   Defendants point out the striking similarity between these objects and the reference image,

7   including identical or near-identical dimensions.  They contend that the models lack any elements

8   that were not present in the existing third-party product, and that this forecloses copyright

9   protection as a matter of law.



| P5D Object No. | Image of P5D Object | Image of of Third-Party Product | Name of Product |
|---|---|---|---|
| Length: 60 Width: 101 Height: 187 | | | IKEA PS 2014 Wardrobe (SKU # 002.603.09) Length: 60 cm Width: 101 cm Height: 187 cm |
| Length: 44 Width: 35 Height: 25 | | | IKEA BOLMEN Step Stool (SKU # 902.913.30) Length: 44 cm Width: 35 cm Height: 25 cm |
| Length: 102 Width: 64 Height: 122 | | | La Lune Collection Rustic Rocking Chair Length: 102 cm Width: 64 cm Height: 122 cm |

Schmitt Decl. ¶¶ 72, 80, 82, Ex. 50.

### 2.    Plaintiff's "creative choices"

20       Planner 5D counters with a litany of "design choices" that its modelers make each time

21  they create an object replicating a real-life item.  It contends that originality need not be proven

22  with reference images alone, and that I should instead look to the design choices the modelers

23  made even when creating objects from reference images, which are only properly represented in

24  three dimensions, as when viewed in the P5D interface.  Oppo. at 12:7-11.  "[E]very P5D object

25  features a host of independent creative choices.  Modelers fashion the objects in three-dimensional

26  detail, incorporating choices that cannot be seen in small, 2D thumbnails such as those Defendants

27  compare with reference images."  *Id.*

United States District Court
Northern District of California

Among these creative choices are in the modeler's selection of (1) the number and placement of polygons or triangles that make up the entire image, referred to as the "mesh choices," and (2) the material, which combines a number of decisions about what how the object should be rendered.  The "mesh" selection is similar to a decision about the resolution of an image, with more polygons (as with pixels) creating a clearer rendering.  This figure illustrates the concept:

Figure No. 1: Triangle Numbers. (*See* Sher Decl ¶ 5.)



Oppo. at 12:21-25.  The decisions relating to the "material" include: (a) specularity (how dull or shiny the surface is), (b) specular color (the colors appearing to reflect from the object's surface), (c) transparency, (d) texture,[3] (e) UV mapping,[4] and (f) diffuse color (the color of its surfaces without texture).  Oppo. at 13:10-19.

Planner 5D asserts that the "placement and arrangements of polygons" by itself satisfies the threshold originality to support copyrightability.  It cites *Glass Egg Digital Media v. Gameloft, Inc.*, No. 17-CV-04165-MMC, 2018 WL 3659259, at *4-5 (N.D. Cal. Aug. 2, 2018).  In *Glass Egg*, the plaintiffs created 3D models based on real cars, but the Court found the "requisite level of originality to be afforded copyright protection" because the modelers could control the placement and arrangement of triangles for each attribute of the car, and different artists could create models that looked different but still represented the car being modeled.  *Id.*  By contrast, Planner 5D has

---

[3] Texture "refers an image to be mapped to the object's surface. For example, the modeler can pick a .jpg image of wood grain and map it to a portion of an object intended to be made of wood."  Opp. at 14:3-4.

[4] "UV mapping" is how a 2D texture image is mapped onto a 3D object's surface. Kon Dep 210:25-214:8, 259:19-260:22; Sher Dep 96:10-23.  An image can be stretched to fit the surface or it can be tiled in a repeating pattern.  *Id.*  Mapping can also be adjusted manually, such as fixing textures at seams.  Kon Dep 175:2-6.

United States District Court
Northern District of California

1  not demonstrated that its modelers' choices yielded an original product, or that more than one way

2  of representing the objects would have been acceptable.  Instead, Planner 5D's Objects are near

3  exact replicas of real-world objects. *See* Dkts. 223-3 & 224-1.

4  Having found that the "mesh" choices are insufficient to establish creativity, I evaluate the

5  choices related to the "material."  Planner 5D concedes that none of the creative choices are

6  apparent from the thumbnails provided as exhibits.  Instead, the side-by-side thumbnails of

7  Planner 5D's Objects and the original products show a perfect match.  The color, transparency,

8  and texture of the Objects does not appear to be a creative choice, but rather the closest replica of

9  the original object that can be produced in the program.

10  As an example of the misleading nature of the two-dimensional thumbnails, plaintiff

11  submits the above representation of a table, which was represented in two dimensions in the

Figure No. 4: "Bottomless" Table. (AvE Decl ¶ 18.)




17  catalog, but in three dimensions by Planner 5D's modeler.  The modeler had to decide what the

18  bottom of the table should look like, without assistance from the version in the third-party catalog.

19  This certainly represents a creative choice.  The creativity required by the threshold

20  copyrightability requirement is low, and this extrapolation easily satisfies that requirement.  It

21  need only possess "some creative spark, 'no matter how crude, humble or obvious' it might be."

22  *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir.2000) (quoting *Feist Publ'n*, 499

23  U.S. at 345, 111 S.Ct. 1282).  Even if this particular bottom to the table, in this color and shape,

24  seems obvious from the portion of the table represented in the catalog, it is not the only way to

25  represent this item.  The modeler could have chosen any color or texture, but chose opaque,

26  metallic-looking gray.  The modeler also chose one central support with a thin bar and a circular

27  base.  These may seem obvious choices, but they nonetheless represent creative decisions on the

28  part of the modeler.  I find that Planner 5D holds a valid copyright in any objects that involved a

demonstrable creative choice, such as the color of the table in the example above.  It does not hold a copyright to objects that were copied wholesale from existing sources with no creative choices.

### 3.    Independently Created Objects

Planner 5D claims that 10% of its objects were created entirely from the modelers' imaginations.  Schmitt Decl. ¶ 115.  This represents more than three hundred objects with sufficient originality to support a copyright.  Because P5D has not succeeded in securing a copyright registration, it bears the burden of establishing the validity of its copyright.  *Cf. United Fabrics*, 630 F.3d at 1257.  Defendants assert that P5D has refused to identify the specific 10% of items generated from pure imagination.  *See Skidmore v. Led Zeppelin,* 952 F.3d 1051, 1062–63 (9th Cir. 2020) (deposits make a record of, provide notice of, and "prevent confusion about" claimed copyrights).  In light of my order that plaintiff provide defendants with a complete list of asserted original objects and scenes by two weeks after the hearing, I will assume that plaintiff has now identified this 10% sufficiently and find that defendants were not prejudiced by any lack of disclosure regarding the asserted copyrights.[5]  I find that Planner 5D holds a valid copyright in its independently created objects.

### 4.    Scene Compilations

For a compilation to qualify for copyright protection, plaintiff must show that it made creative "choices as to selection and arrangement" of the compilation's elements such that they "are made independently by the compiler and entail a minimal degree of creativity."  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991).  I previously dismissed Planner 5D's copyright infringement claim on the Object Compilation because it "[did] not allege that it ha[d] rendered any objects which were omitted from the compilation, and it [did] not allege any creative choices in selecting certain objects among many that it had rendered to include in the compilation."  *Planner 5D*, 2019 WL 6219223, at *8.  Planner 5D then amended its complaint to allege that it "selected" the objects it asked its employees to create from an infinite number of objects it *could* have commissioned.  Planner 5D's Opposition to the Dismissal Motion of

---

[5] If defendants assert that my assumption is incorrect, after conferring with plaintiff the parties should file a joint letter of no more than five pages describing the dispute.

United States District Court
Northern District of California

1   Facebook, Inc. and Facebook Technologies, LLC ("Oppo. Facebook MTD") [Dkt. No. 74] at 11.

2   I rejected this argument and again dismissed Planner 5D's copyright claim concerning the

3   compilation of Objects. *UAB "Planner5D" v. Facebook, Inc.*, No. 19-CV-03132-WHO, 2020

4   WL 4260733, at *5 (N.D. Cal. July 24, 2020).

5          Planner 5D now claims that it holds a copyright in its Scene Compilation.  To support this

6   claim, P5D presented testimony that it curated a selection of scenes for its public gallery out of the

7   many thousands nominated by its users.  It claims that this selection was based on "numerous

8   creative and expressive criteria, including artistic value, humor, novelty, diversity, creativity,

9   completeness, fun, lack of disagreeable or disturbing subject matter, and, in most cases, realism."

10   Oppo. at 22:11-16 (citing Sher Dep 170:4-173:14, 36:6-37:4, 153:13-154:16).  P5D's scene

11   compilation work is copyrightable.

12          Defendants do not contest Planner 5D's claims about how it selected and arranged the

13   Scene Compilation.  However, they accuse Planner 5D of "hiding the ball" with respect to what

14   constituted its Scene Compilation.  Specifically, defendants allege that Planner 5D "initially

15   claimed a compilation of 63,179 Scenes and was unable to point to any Scenes that it removed

16   from its public gallery.  Schmitt Decl. ¶¶ 150–51.  Then, a day before the end of the previously

17   scheduled deadline for fact discovery on August 31, 2022, and more than three years after Planner

18   5D first initiated this suit, Planner 5D revised its claim to state that its Scene Compilation consists

19   of 49,479 Scenes, and that it could identify Scenes removed from its public gallery. *Id.* ¶¶ 153–

20   155." Mot. at 28:4-8.  Defendants claim that they were prejudiced by this backpedal and suggest

21   that compliance with the Copyright Office's deposit requirement would have prevented this

22   situation. *Id.* at 14-15.  Planner 5D responds that Andrey Ustyugov, who served as a 30(b)(6)

23   witness for Planner 5D, inadvertently gave the wrong number at one deposition, then corrected

24   himself at the next.  They also claim that none of the defendants' interrogatories asked for the

25   number of scenes in the compilation, and that there was no prejudice from the mistake.

26          My discussion of the deposit requirement is in Section I.A., *supra*.  I find that there is

27   sufficient creativity in the Scene Compilation to support a copyright.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.     TRADE SECRETS CLAIMS

Planner 5D claims misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and California's Uniform Trade Secrets Act ("CUTSA"), which both "require a plaintiff to show [1] that it possessed a trade secret, [2] that the defendant misappropriated the trade secret, and [3] that the defendant's conduct damaged the plaintiff." *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019); *see also* Cal. Civ. Code § 3426.1(b); 18 U.S.C. § 1839(5).  A trade secret is defined under federal law as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3) and under California law as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1.

### A.  Secrecy

Under both Federal and California law, trade secrets can only be protected if the "owner thereof has taken reasonable measures to keep such information secret."   18 U.S.C. § 1839(3); *see also* Cal. Civ. Code § 3426.1(b).  Defendants' only argument at summary judgment with respect to trade secrecy is that Planner 5D failed to take reasonable measures under the circumstances to keep the information secret, and therefore does not possess a trade secret in any of its files as a matter of law.  Defendants argue that P5D disclosed its alleged trade secrets to individuals without

17

binding them to an obligation of confidentiality, and therefore none of its other protective measures are relevant.  Defendants also urge that it is irrelevant that Princeton's researchers spent months or years to access the files and decipher them.

It is true that a party either has a trade secret or not, and this does not depend on the defendant's actions.  But I disagree with defendants' conclusion that this renders their actions irrelevant to the analysis.  The law requires a plaintiff to take reasonable measures under the circumstances, and no more.  The difficulty Princeton researchers—despite specialized skills and sophisticated knowledge of computer science—faced to access P5D's files is probative of the reasonableness of P5D's protective measures.

### 1.    Structure of the website

Defendants' expert, Ryan McKamie—a professional hacker with over a decade of experience—was unable to access the files of two competitor 3D interior design websites.  *E.g.,* McK Rep. ¶¶ 119, 120, 127, 130, 132, 138.  He concluded that these websites used stronger measures than Planner 5D and that those protections, but not Planner 5D's, were sufficient to support a finding of trade secrecy.  However, P5D's expert, Bruce Webster, "discovered [those websites] used equivalent protections to P5D's" and was able to download the competitors' 3D models using tools and techniques similar to those used by Princeton against P5D.  Web Rep1 § 8.4.  This raises a dispute of fact relating to the strength of Planner 5D's protections.

### 2.    Proprietary file format[6]

Planner 5D claims that its proprietary file format makes it difficult to "decipher" the Object and Scene Data Files once they were downloaded, and therefore constituted a reasonable measure to maintain secrecy.  ██████████████████████████████████████

███████████████████████████████████████████████████ Defendants

---

[6] Defendants contend that this argument is not properly before the Court because Planner 5D failed to raise it in its pleadings or trade secret disclosures served at the outset of discovery.  *See* Mot. At 29 n.18.  But defendants asked Ustyugov this line of questioning during his deposition, which suggests that they had the opportunity to develop their argument regarding this file format issue.  Moreover, defendants encountered this proprietary file format when attempting to make use of Planner 5D's files, and thus had notice of this protective measure even before the litigation began.

1    respond that this deciphering step only comes into play for purposes of converting the data file

2    into a rendering of an image or scene.  Tracer Decl. [Dkt. No. 264-4] ¶¶ 13-14.  Andrey Ustyugov

3    confirmed during his deposition that the file format would not have prevented a user from

4    accessing or downloading the Object Data Files or Scene Data Files.  *Id.*  ¶ 14 (citing Ustyugov

5    Dep. Tr. at 105:21–109:25).  Because Planner 5D asserts trade secrecy as to the files and

6    compilation of files rather than the renderings produced by the files, defendants argue that this

7    protection is irrelevant to the reasonable measures to maintain secrecy inquiry.

8       Planner 5D has raised a dispute of material fact about whether the proprietary file format

9    posed a significant enough hurdle to constitute reasonable measures to protect its copyright.  For

10   example, Planner 5D says that its access logs show that Princeton researchers spent 6 months

11   working to figure out how to create renderings from the files because the files would be useless

12   otherwise.  This suggests that the file format is analogous to file encryption, which would be a

13   protective measure even if the encrypted files can be downloaded.  A reasonable trier of fact could

14   find this evidence compelling enough to decide in Planner 5D's favor.

15                **3.    Terms of service**

16      Defendants argue that Planner 5D disclosed its files to users without binding the recipients

17   to a confidentiality agreement, and therefore cannot claim trade secret protection.  *See Altavion,*

18   *Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 57, 171 Cal.Rptr.3d 714 (2014)

19   (misappropriation cannot exist where a party "discloses his trade secret to others who are under no

20   obligation to protect the confidentiality of the information.").

21      Planner 5D asserts that its Terms of Service, which prohibits the methods Princeton used to

22   download Planner 5D's files, is itself sufficient to establish that Planner 5D took reasonable

23   measures to protect its files.  I already found that the Terms of Service prohibited the "use [of] any

24   'deep-link,' 'page-scrape,' 'robot,' 'spider' or other automatic device, program, algorithm, or

25   methodology which perform similar functions to access, acquire, copy, or monitor any portion of

26   the Planner5D project."  FAC ¶ 57.  They also prohibited "'access[ing]" or "acquir[ing]" the

27   underlying data files.  MTD Order [Dkt. No. 90] at 11:13-16.

28      Defendants now counter that Planner 5D's Terms of Service are an unenforceable browse-

United States District Court
Northern District of California

wrap agreement, and therefore did not actually bind users to confidentiality at all, regardless of their content.  Planner 5D does not dispute that its Terms of Service were a browse-wrap agreement.  Instead, they argue that the browse-wrap agreements can be enforceable where a reasonably prudent user would be on inquiry notice of it.  "In short, the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement."  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).

Planner 5D also asserts that courts have held that use of a robot software to scrape up large amounts of data to itself evidence inquiry notice.  *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04-cv-4825, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005) (finding a scraper's repeated and automated use of site is basis for imputing knowledge of the terms).  This is because using robot software entails deliberately bypassing the intended interface, which avoids any notices an ordinary user might receive.  *Id.* at *3 ("Cairo's computer search programs cannot read the Terms of Use").  Planner 5D argues that this use exceeds any implicit permission to use the website as it was meant to be used.  *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1314 (11th Cir. 2020) (using robot to scrape insurance quotes exceeded the "implicit permission to access as many quotes as is *humanly* possible" and was trade secret misappropriation).  It marshals evidence that Princeton "built its scraping software to evade detection, by minimizing traffic, operating slowly and pacing out downloads over several days."  Oppo. 44:4-6.  *See DHI Grp., Inc. v. Kent*, No. H-16-1670, 2017 WL 4837730, at *3-4 (S.D. Tex. Oct. 26, 2017) ("defendant's conduct demonstrates that it was aware it was violating service terms").

As I understand it, the only way that Princeton was able to access P5D's files, given the various protections discussed above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and then breaking the encryption of those files. Defendants try to hide behind ordinary users of Planner 5D's website who accessed the site through the usual means and could not conceivably have accessed the files in the way Princeton did.  Defendants argue that even if they can be held to inquiry notice of the Terms of Service, that

is not sufficient because other website users who have access to P5D's files may not be held to that inquiry notice.  This is unpersuasive.  The only way defendants have demonstrated for accessing the files is by going to the lengths that Princeton did.  Any user that accesses the files in that way would be held to inquiry notice of the Terms of Service, and any user that did not access the files in that way would be hindered by the various protections Planner 5D had in place.

### 4.    Other Protective Measures

Planner 5D contends that it took additional steps to protect its files.  First, the files were always transmitted over an encrypted connection, ensuring that no one could obtain them in transit between the website and the user's computer.  Web Rep1 § 6.2.  ███████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████.  *Id*.  Finally, P5D regularly reviews its code for vulnerabilities and uses a bug bounty program to help detect potential risks.  AvE Decl Ex. 33.  The protections P5D took are sufficient to create a genuine dispute of material fact as to whether Planner 5D took reasonable protective measures. Accordingly, the motion for summary judgment concerning trade secret misappropriation is **DENIED**.

## III.    MOTIONS TO SEAL

Courts generally apply a "compelling reasons" standard when considering motions to seal documents related to a dispositive motion.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). "[A] strong presumption in favor of access is the starting point."  *Kamakana*, 447 F.3d at 1178 (quotations omitted).  To overcome this strong presumption, the party seeking to seal a judicial record attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events."  *Id.*  at 1178–79 (quotations omitted). Protecting a trade secret is one such "compelling reason."  In re Elec. Arts, Inc., 298 F. App'x 568, 569 (9th Cir. 2008).  Civil Local Rule 79-5 supplements the "compelling reasons" standard.  The party seeking to file

United States District Court
Northern District of California

1  under seal must submit "a request that establishes that the document, or portions thereof, are

2  privileged, protectable as a trade secret or otherwise entitled to protection under the law" and

3  "[t]he request must be narrowly tailored to seek sealing only of sealable material."  Civil L.R. 79-

4  5(b).  Planner 5D has shown a compelling reason to keep materials relating to this case sealed.

5  *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011) ("The publication of

6  materials that could result in infringement upon trade secrets has long been considered a factor

7  that would overcome this strong presumption."); *In re Adobe Sys., Inc. Sec. Litig.*, 141 F.R.D. 155,

8  161-62 (N.D. Cal. 1992) (compelling reasons can include the need to preserve a party's

9  "legitimate expectation that confidential business information, proprietary technology and trade

10  secrets will not be publicly disseminated").  Both requests are also narrowly tailored to seek

11  sealing only of sealable material.  Civil L. R. 79-5(b).  The motions to file under seal are

12  **GRANTED** without prejudice to defendants' argument that the alleged data files do not qualify as

13  trade secret under DTSA or CUTSA.  The parties are **ORDERED** to jointly file proposed

14  redactions to this order within 10 days.

15                                          **CONCLUSION**

16         For the foregoing reasons, defendants' motion for summary judgement is **DENIED**

17  concerning the trade secrets claims.  Defendants' motion for summary judgment is **DENIED in**

18  **part** as to the copyright claims for the scenes and scene compilations and for the objects that were

19  independently created by Planner 5D or involved a demonstrable creative choice as described in

20  this order.  Defendants' motion for summary judgment is **GRANTED in part** because I find that a

21  large portion of Planner 5D's asserted objects did not involve sufficient creativity to support a

22  valid copyright.

23         Planner 5D is **ORDERED** to narrow its asserted objects to only those objects that involve

24  a specific and demonstrable creative choice, as described in this order.  The creative choice may

25  either be the use of a mesh that noticeably visually differs from the source object or by including a

26  creative color or texture choice that is not dictated by the source object.  Planner 5D is to submit

27  its narrowed list of asserted individual objects within 14 days of this order.  This submission will

28  take the form of a chart, with a description of the specific creative choice involved in each asserted

1   object.

2       The motions to seal are **GRANTED**.

3       **IT IS SO ORDERED.**

4   Dated: September 26, 2023



    William H. Orrick
    United States District Judge

United States District Court
Northern District of California