Dale M. Cendali (S.B.N. 1969070)
dale.cendali@kirkland.com
Johanna Schmitt (admitted *pro hac vice*)
johanna.schmitt@kirkland.com
Abbey Elizabeth Quigley (admitted *pro hac vice*)
abbey.quigley@kirkland.com
Aaron Schroeder (admitted *pro hac vice*)
aaron.schroeder@kirkland.com
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Phone: (212) 446-4800

Kristen Reichenbach
kristen.reichenbach@kirkland.com
**KIRKLAND & ELLIS LLP**
555 California Street
San Francisco, CA 94104

Attorneys for Defendants
*Meta Platforms, Inc.* and
and *Facebook Technologies, LLC*

David R. Singer (S.B.N. 204699)
dsinger@jenner.com
**JENNER & BLOCK LLP**
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
Telephone: (213) 239-5100

Andrew H. Bart (admitted *pro hac vice*)
abart@jenner.com
Jacob L. Tracer (admitted *pro hac vice*)
jtracer@jenner.com
Cayman C. Mitchell (admitted *pro hac vice*)
cmitchell@jenner.com
**JENNER & BLOCK LLP**
1155 Avenue of the Americas
New York, NY 10036
Telephone: (212) 891-1600

Attorneys for Defendant
*The Trustees of Princeton University*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" d/b/a PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., FACEBOOK TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20 and XYZ UNIVERSITIES 1-20,<br><br>Defendants. | CASE NO. 3:19-CV-03132-WHO<br>CASE NO. 3:20-CV-08261-WHO<br><br>**DECLARATION OF RYAN MCKAMIE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: July 12, 2023<br>Time: 2:00 PM<br>Courtroom: 2, 17th Floor<br><br>Judge: Honorable William H. Orrick |

Pursuant to 28 U.S.C. § 1746, I, Ryan McKamie, hereby state and declare as follows:

1.     I submit this declaration in support of Defendants Meta Platforms, Inc.; Facebook Technologies, LLC; and The Trustees of Princeton University's motion for summary judgment. Unless otherwise stated, this declaration is based on my personal knowledge including my professional expertise, my understanding of the industry standards and resources I cite herein, and my review of and familiarity with the documents and records in this case. If called upon to testify, I could and would competently testify to the matters as set forth below.

## I.    Background and Expert Qualifications

2.     I have nearly eleven years of experience in the cybersecurity field, specifically in web application and product security, cloud security, Internet of Things ("IoT") security, and payment security services.

3.     I am currently the chief executive of Certus Cybersecurity Solutions, LLC ("Certus Cybersecurity"), which I co-founded in 2018. Headquartered in Redwood City, California, Certus Cybersecurity is a provider of industry-leading information security services to leading global corporations and financial institutions. It specializes in product security, a domain of information security focused on securing digital products, including web applications and their underlying infrastructure, IoT devices,[1] payment technologies, and cloud infrastructure. As part of my work for Certus Cybersecurity, I provide a range of product security services including penetration testing, secure code review, threat modeling, and cloud security assessments to corporate clients in the United States and Europe. I also consult with clients to draft and/or review their security policies.

4.     Certus Cybersecurity serves both top ten Fortune 100 corporations and innovative, high-growth businesses across a variety of industry sectors around the world. As examples of the company's work, Certus Cybersecurity supports a leading global technology company with a market capitalization of over $1 trillion, a bank with assets exceeding $2 trillion, and a global payment network responsible for more than $10 trillion of payment volume annually, providing web application security services for highly confidential software and hardware technologies and enabling business initiatives with worldwide

---

[1] IoT devices use sensors, software, or other technologies to connect and exchange data over the internet.

McKamie Decl. ISO Defendants' MSJ                    CASE NO. 3:19-cv-003132

visibility and impact.   Certus Cybersecurity also supports smaller technology-enabled businesses, including leading financial, technology, and biotechnology companies backed by some of the world's largest private investors.   As an example of my work for smaller scale clients, since 2018 I have advised an employee mobility-focused tech startup based in the United Kingdom on all aspects of its information security program, including policy, control selection, and application security testing.   I have advised the founder and technical staff of the company on the controls necessary to protect confidential information; overseen execution of annual penetration testing of the company's internet-facing web and mobile applications; and provided consultancy to help the company align with information security standards in a cost-effective manner given the budgetary constraints faced by smaller businesses.

5.      As CEO of Certus Cybersecurity, I lead an international team of 27 employees executing highly technical information security evaluations focused on securing state-of-the-art technologies.   I regularly advise Certus Cybersecurity clients on the technical information security measures appropriate to effectively secure highly confidential information, including trade secrets, online.

6.      Prior to co-founding Certus Cybersecurity, I was a director at Visa, Inc. ("Visa"), the global payments technology company, focusing on information security.   I was employed by Visa from 2015 to 2018.   While based in Visa's Singapore office, I led a program focused on working with organizations across the payments ecosystem worldwide to protect against data breaches and maintain compliance with industry standards.   In this role, I worked with organizations across Asia-Pacific, Central Europe, the Middle East, and Africa ("APCEMA") to communicate and assess compliance with global industry standards.   Earlier, while based in Visa's Foster City and London offices, I planned and executed standards-based technical information security assessments for Visa and its major international subsidiaries, such as Visa Europe Limited.   I also worked closely with Visa's Chief Information Security Officer and information security leadership team to evaluate and challenge information security controls and metrics as part of Visa's "first line of defense."   Additionally, I led information security risk reporting to Visa's executive management, Board of Directors, and Audit and Risk Committee.

7.      With a comprehensive view of Visa's information security program and regular engagement with clients and ecosystem partners around the world, my work at Visa provided me with extensive

knowledge of enterprise information security threats, risks, controls, and widely adopted global industry standards, including the National Institute of Standards and Technology's ("NIST") information security guidelines and standards, the Center for Internet Security's ("CIS") Controls, and the International Organization for Standardization's ("ISO") information security standards. My work at Visa also provided me with extensive knowledge of key information security domains including web application security, vulnerability management, security architecture, and identity and access management.

8.    Prior to joining Visa, I served as a commissioned officer in the United States Army ("U.S. Army"). I served in the U.S. Army from 2011 to 2015. During my service, I held several key information technology and information security leadership roles. For example, I led missions and exercises focused on delivery of secure information technology services in support of the U.S. Army and joint forces in Asia-Pacific, Southwest Asia, and the United States. This included secure installation, operation, and maintenance of mission-critical technology infrastructure and services for national-level ballistic missile live fires, bilateral exercises, and combat operations. My responsibilities included mitigation of information security risks and threats as a watch officer in Regional Cyber Center Southwest Asia, a major hub for cybersecurity and network operations, where I led a team responsible for information security incident response. At the completion of my military service in 2015, I was awarded the Army Commendation Medal for distinguished service. My military training included completion of the Signal Basic Officer Leadership Course at the U.S. Army's Cyber Center of Excellence.

9.    I am also frequently called on to give presentations on information security to business and technology executives and entrepreneurs. Recent presentations have included talks on information security best practices at SwiftScale, a London-based scale-up organization that connects innovative emerging companies with leading global enterprises; Relay Investments, a Boston-based private equity investor specializing in search fund investments; and Funding London, a venture capital investment fund founded by the Mayor of London and backed by various bodies, including the European Union's European Regional Development Fund. Though the missions and strategies of these organizations differ, SwiftScale, Relay Investments, and Funding London are all organizations that are primarily focused on catalyzing growth for small entrepreneurial companies (typically with less than fifty employees at the time of investment or

McKamie Decl. ISO Defendants' MSJ                    CASE NO. 3:19-cv-003132

backing), and each of these organizations maintains an investment portfolio or exclusive cohort comprising a critical mass of such companies, which range in size from seed stage companies with a handful of employees to businesses with significant venture capital investment. Earlier in my career at Visa, I also gave talks to Visa clients and major payments-related businesses across the APCEMA region.

10.    Further, I have been granted a number of active information security certifications, including the Certified Information Systems Security Professional ("CISSP"), Certified Information Security Manager ("CISM"), Certified Information Security Auditor ("CISA"), and Certified in Risk and Information Security Control ("CRISC") designations.

11.    I graduated from Temple University in 2008 with a degree in Political Science and received an MBA from Columbia Business School in 2020.

12.    Additional information regarding my education, industry and professional experience, and security certifications may be found in my *curriculum vitae*, attached to this declaration as Attachment A.

**II.    Relevant Case Background**

13.    Below is a summary of my understanding of the relevant background facts in this case. I relied on those facts in forming my opinions in this case.

14.    Planner 5D was founded in 2011 as a "user-friendly" website—located at https://planner5d.com (the "Website")—designed to allow users to "quickly and easily" create interior designs.[2]

15.    Planner 5D's Website offers its users access to a digital library of household objects (*e.g.*, sofas, beds, windows, baths, sinks, lights, and plants) and enables those users to create virtual home design scenes by dragging those objects to or around floor plans and then moving, rotating, resizing, or otherwise manipulating the objects.[3] Users can "toggle between two- and three-dimensional" renderings of their

---

[2] *UAB "Planner 5D" d/b/a Planner 5D v. Meta Platforms, Inc., et al.*, No. 19-cv-3132, Dkt. No. 53 (hereinafter, "First Amended Complaint" or "TS. Compl."), ¶ 30 (N.D. Cal.). I understand the First Amended Complaint is the operative pleading in this action for Plaintiff's trade secret claims.

[3] *Id.*

MCKAMIE DECL. ISO DEFENDANTS' MSJ                    CASE NO. 3:19-CV-003132

scenes and rotate and tilt the 3D renderings "to any desired perspective."[4]  The Website "allowed anyone" to use this "home design tool."[5]

16.     The objects and scenes visible on Planner 5D's Website are each saved as individual data files at unique uniform resource locator ("URLs") on Planner 5D's servers.[6]  The data files are JSON files, and consist of data that describe the objects and scenes displayed on Planner 5D's Website.  Planner 5D alleges that it created all the object files in its library, which exceeded 4,500 objects as of March 2020.[7]  However, all but 18 scenes were created by Planner 5D's users, who can choose whether to designate them for potential inclusion in a public gallery on Planner 5D's website.  Planner 5D alleges that it has collected "many millions of scenes."[8]

17.     Planner 5D alleges that its object files and scene files constitute trade secrets, and claims that Defendants are liable for trade secret misappropriation under federal and California state law.[9]

### III.     Planner 5D's Trade Secret Allegations

18.     I understand that Planner 5D identified six categories of information as constituting its trade secrets relevant to this action (collectively, the **"Alleged Trade Secrets"**), which it alleges Defendants misappropriated:

   a.   63,194 individual scene JSON files (individually, a **"Scene Data File"**);[10]

---

[4] Id.

[5] Id.

[6] TS Compl. ¶ 33 (object files), ¶ 37 (scene files).

[7] TS Compl. ¶ 32.

[8] UAB "Planner 5D" d/b/a Planner 5D v. Meta Platforms, Inc., et al., No. 3:20-cv-08261, Dkt. No. 1 (hereinafter "Copyright Compl."), ¶ 5 (N.D. Cal.).

[9] TS Compl. ¶¶ 36, 48, 84–99.

[10] Declaration of Johanna Schmitt, Ex. 15 at (Planner 5D's Trade Secret Disclosures) 1:23–1:24, Attachment B; see also TS Compl. ¶¶ 39, 85.  Hereinafter, all citations to "Ex. __" are citations to the exhibits attached to the Declaration of Johanna Schmitt.  I understand that Planner 5D identifies its Scene File trade secrets as a smaller subset of these individual scene JSON files (specifically, 49,479 of these files) in Plaintiff's Second Amended and Supplemental Response to Meta's Interrogatory No. 3 and the corresponding Exhibit D, attached as Ex. 6.  However, the opinions and conclusions set forth in this declaration are true and accurate regardless of whether Planner 5D's alleged Scene File trade secrets are comprised of 63,194 or 49,479 files.

b.  The URL or "web address" at which each Scene Data File at issue was available on Planner 5D's Website (a "**Scene Data File URL**");[11]

c.  3,893 individual object JSON files (individually, an "**Object Data File**");[12]

d.  The URL or web address at which each Object Data File at issue was available on Planner 5D's Website (an "**Object Data File URL**");[13]

e.  A compilation of all the Scene Data Files at issue (the "**Scene File Compilation**");[14] and

f.  A compilation of all the Object Data Files at issue (the "**Object File Compilation**").[15]

19.     Planner 5D's Trade Secret Disclosures identified two means by which Planner 5D alleged it protected the Alleged Trade Secrets.[16]  One of these alleged means was that the "structural secrecy" of Planner 5D's Website made it "impossible" to identify or access the Alleged Trade Secrets "without circumventing Planner 5D's software and penetrating non-public addresses on its servers."[17]  According to Planner 5D, such circumvention "requires the use of software developer tools to monitor and intercept communications activity between Planner 5D's software and its servers."[18]

20.     Planner 5D's Trade Secret Disclosures also alleged that Planner 5D protected its alleged trade secrets through the "terms of service" available on the Website.[19]  I offer no opinion on that issue.

---

[11] *See id.*

[12] Ex. 15 (Trade Secret Disclosures) at 1:16–1:17, Amended Attachment A.  *See also* TS Compl. ¶¶ 35, 85. I understand that Planner 5D has claimed copyright protection in 5,516 Object Data Files, *see* Ex. 6 (Amended Exhibit A to Planner 5D's Responses to Meta's First Set of Interrogatories), but states it is only alleging trade secret protection over "only those of its object versions that" were allegedly obtained by Princeton "on February 19, 2016," which consist of 3,893 Object Data Files.  Ex. 6 at 9–10 (Plaintiff's Amended and Supplemental Response to Meta's Interrogatory No. 3).

[13] *See id.*

[14] Ex. 15 (Trade Secret Disclosures) at 1:24–1:25.  *See also* TS Compl. ¶¶ 39, 93.

[15] Ex. 15 (Trade Secret Disclosures) at 1:17–1:18.  *See also* TS Compl. ¶¶ 35, 93.

[16] *See* Ex. 15 (Trade Secret Disclosures) at 4:4–4:6 ("[T]he architecture of Planner 5D's website and its Terms of Service each acted to wall off users from the location and content of Planner 5D's valuable JSON files, thus creating a barrier to access or use of the files"); *see also* TS Compl. ¶ 44 ("Acting together, the Planner 5D Terms of Service and the website architecture described above, where users are walled off from both the location and the content of Planner 5D's data files, create a rigorous barrier blocking access to, or even awareness of, the content of the underlying data files.").

[17] Ex. 15 (Trade Secret Disclosures) at 4:9–4:19.

[18] Ex. 15 (Trade Secret Disclosures) at 4:21–4:22.

[19] Ex. 15 (Trade Secret Disclosures) at 5:1.

---

**IV.    Assignment & Summary of Opinions**

21.    For the purposes of this declaration in support of Defendants' motion for summary judgment, I have been asked to opine on whether the alleged "structural secrecy" of Planner 5D's Website, as it existed in February 2016 (when the alleged misappropriation occurred),[20] in fact protected the Alleged Trade Secrets from public disclosure.

22.    As explained in this declaration, it is my opinion that:

   a.   The Website did not maintain the secrecy of Planner 5D's Alleged Trade Secrets as of February 2016.

   b.   To the contrary, Planner 5D built its Website to affirmatively transmit its Alleged Trade Secrets to *any* Internet user that visited the Website in a manner that made it possible for a user to ███████████████████████████████████████████ ██████████████████

   c.   Because of this transmission, the Alleged Trade Secrets were made available for any user of Planner 5D's Website to access and download, either individually or *en masse*.

**V.    The Alleged Trade Secrets Were Not "Secret"—They Were Transmitted To Users Of Planner 5D's Website.**

23.    As noted above, Planner 5D claims that the Alleged Trade Secrets are comprised of six categories of information: (1) each Scene Data File; (2) each Scene Data File URL; (3) each Object Data File; (4) each Object Data File URL; (5) a compilation of Scene Data Files; and (6) a compilation of Object Data Files.  However, as described in detail below, Planner 5D transmitted its Scene Data Files, Scene Data File URLs, Object Data Files, and Object Data File URLs to its users in a manner that made them accessible using ████████████████████████   Moreover, because Planner 5D's Website included a public gallery, it disclosed its alleged compilations of Scene Data Files and Object Data Files to its users as well.  Since Planner 5D's Website transmitted all its Alleged Trade Secrets to its users and made them available for acquisition and download, they were not kept secret.

---

[20] Unless otherwise noted, all references to Planner 5D's Website refer to that Website as it existed in February 2016.

24. In other words, as a direct result of the decisions made by Planner 5D when it designed its Website, Planner 5D affirmatively disclosed and sent the Alleged Trade Secrets to any person that visited the Website (whom I also refer to throughout this report as a "user" of the Website).

25. Although Planner 5D alleges that it was "impossible" for a user to identify the Alleged Trade Secrets "without circumventing Planner 5D's software and penetrating non-public addresses on its servers[,]"[21] that simply was (and is) not true.

a. ████████████████████████████████████

26. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

27. The ensuing paragraphs in my declaration describe, on a step-by-step basis, how Planner 5D publicly disclosed the Scene Data File URLs and made its Scene Data Files available for access and download by anyone who visited its Website in February 2016. My understanding of how Planner 5D's Website operated at that time is based primarily on my review of how Planner 5D's Website operated in 2022 (when I prepared my expert report in this matter), my review of materials Planner 5D made available for inspection related to the operation of its Website in 2016, my review of archived webpages of Planner 5D's Website from 2016, and my review of the deposition testimony of fact witnesses in this case who confirmed that certain aspects of the current operation of Planner 5D's Website were the same in 2016. In addition, attached to this declaration as Attachments B, C, and D are video files documenting how Planner 5D made its Alleged Trade Secrets publicly available to users of its Website, using the Mozilla Firefox (Attachment B and Attachment D) and Google Chrome (Attachment C) browsers as examples.

---

[21] TS Compl. ¶ 30.

McKamie Decl. ISO Defendants' MSJ                    Case No. 3:19-cv-003132

1
       *i. Planner 5D Made Rendered Versions of Each Scene in the Public Gallery Accessible to Any User Who Visited the Website.*

2

3
  28. All users who visited Planner 5D's publicly available Website could view the interactive,

4
three-dimensional renderings of any of the user-created scenes on Planner 5D's public gallery for free.

5
  29. One of the most prominent features of Planner 5D's Website was the public gallery.[22] To

6
access the public gallery, a user could either type in "planner5d.com/gallery" in a browser's address bar or

7
click on the "Gallery" tab from the homepage on Planner 5D's Website, as seen in the screenshot below:[23]

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

30.     Once on the "Gallery" landing page, a user could click on "Floor Plans and Home Designs" to access the gallery of renderings of publicly available scenes, as seen in the screenshot below:[24]



---

[24] Ex. 83 (S. Song Dep., Ex. 18).

31.    After clicking on that link, the user saw thumbnail images representing numerous scenes, as seen in the screenshot below:[25]



[25] Dkt. 68-9 (Englund Decl., Ex. 7).  Citations to the "Englund Decl." refer to the Declaration of Steven R. Englund, a partner at Jenner & Block LLP, submitted to the Court by Princeton in this litigation.  *See* Dkt. 68-2 (redacted version available on public docket); 70-3 (unredacted version filed under seal).  I have reviewed Mr. Englund's declaration and found it to be accurate and consistent with my review of Planner 5D's Website.  Accordingly, I am confident that Exhibit 7 to Mr. Englund's declaration is a screenshot depicting a complete, true and correct copy of Planner 5D's "Floor Plans and Home Design's" public gallery page from Planner 5D's Website, https://planner5d.com/gallery/floorplans, accessed on April 28, 2020.

32.     Each thumbnail image linked directly to the rendered version of that scene.  By clicking on one of the thumbnails, the user was directed to a three-dimensional rendering of the scene, as shown below:[26]



33.     Users were not required to register with Planner 5D or pay a fee to access Planner 5D's public gallery[27] or to access and edit the three-dimensional renderings of any of the scenes in Planner 5D's public gallery.[28]

---

[26] Att. B at 0:28. ▮▮▮▮▮ (accessed Nov. 2, 2022).  This scene is Scene ▮▮▮▮ which Planner 5D claims is one of its alleged trade secrets in this action.  Ex. 15 (Trade Secret Disclosures), Attachment A.

Planner 5D has since changed the structure of its Website to prevent this from happening.  Although I understand that Planner 5D's thumbnail images directly routed to rendered versions of the scenes in 2016, they no longer do so now.  *See* Dkt 68-09 (Englund Decl., Ex. 7); Song Decl. ¶ 6 (All citations to "Song Decl." herein refer to the Declaration of Dr. Shuran Song, dated February __, 2023, filed contemporaneously with my declaration.)

[27] Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 50:9–50:12.

[28] *Id.* 50:17–51:18.



*ii.* ███████████████████████

34. █████████████████████

29 Ex. 5 (Webster Dep. Tr.) 464:23–466:5.

30 Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 98:20–99:4.

31 *Id.* 96:19–97:3.

32 Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 97:4–97:17.

33 Att. B at 0:53.



36.

37.     For background, when someone uses a web browser to access a webpage, the browser sends a request for information about that webpage to the website server.  In response to that request, the website server provides information regarding what content should be displayed on the webpage (*i.e.*, text, images, videos, data files, etc.).  This kind of request and response between the user's browser and the website

server is illustrated in the graphic below.[34]  The information the website server provides in response to the request depends on the design of the website.



38.    Planner 5D chose to design its Website to use "client-side rendering."[35]  That means that when a user uses the Website to view a rendered version of a scene, Planner 5D transmits data files directly to the user's web browser—*i.e.*, the "client"—and relies on the user's computing device to perform the task of rendering the scene onto the screen.[36]

39.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████.[37]

40.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[34] *How The Web Works Readme*, FLATIRON SCHOOL, https://learn.co/lessons/how-the-web-works-readme (accessed Nov. 1, 2022).  *See* Ex 82 (*How The Web Works Readme*, GITHUB, https://github.com/learn-co-students/how-the-web-works-readme-london-web-111918#readme (accessed February 16, 2023))

[35] Ex. 16 (Webster Rep. (Dec. 23, 2022)) at 20–21; Ex. 5 (Webster Dep. Tr.) 60:23–61:1; Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 76:25–79:8.

[36] Ex. 16 (Webster Rep. (Dec. 23, 2022)) at 20–21; Ex. 5 (Webster Dep. Tr.) 61:2–61:7.

[37] *See* Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 69:24–70:12.

MCKAMIE DECL. ISO DEFENDANTS' MSJ                    CASE NO. 3:19-CV-003132

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ███████████████████████

6

7    1.   ████████████████████████████████████████

8    41.   ██████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████[38]

11    42.   A browser's cache is its temporary storage; any time a user visits a website, the website

12 sends certain assets from the webpage (*e.g.*, images, HTML, data files) to the user's browser, which is

13 stored in its cache.  The type and number of assets sent to the browser are determined based on the visited

14 website's design.

15    43.   ████████████████████████████████████████████

16 ████████████████████████████████████████████████████████

17

18

19

20

21

22

23

24

25

26

27

[38] *See* Englund Decl. ¶ 13.

28



44. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

45. ████████████████████████████████████████████████████████
██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██
████████████████████████████████████████████████████████████████
████████████████████████████ ████████████████████████████

[39] Att. B at 1:13.
[40] Att. B at 1:57.



46.

2.

47.

48.    In 2016, browser developer tools were included in almost all web browsers, and allowed

any user of a web browser to view a suite of information regarding the public-facing user interface for any

---

[41] Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 74:4–74:14.

1   website online.[42]   Browser developer tools are easily accessible and usable by layman Internet users, and

2   allow those users to, *inter alia*, inspect the HTML for a website, test any scripts that run on a particular

3   webpage, or view the assets the website has sent to the user's browser and how long they took to load on

4   the webpage.[43]   A user could access the developer tools on most browsers by selecting the appropriate

5   menu option, by pressing F12 on the keyboard, or by pressing CTRL+SHIFT+J on the keyboard.[44]

6   49.   ███████████████████████████████████████

7   ██████████████████████████████████████████████

8   ██████████████████████████████████████████████

9   ██████████████████████ █ ███████████████████████

---

[42] Ex. 85 (Shay Howe, Learn to Code HTML and CSS: Develop and Style Websites (1st ed. 2014)) at 67 (noting that "[m]ost browsers have what are known as *Developer Tools*," including "Google Chrome, Mozilla Firefox, Apple Safari, [and] other browsers").

[43] *Id.*; *see also, e.g.*, Ex. 86 (Jennifer Niederst Robbins, Learning Web Design: A Beginner's Guide to HTML, CSS, JavaScript, and Web Graphics (4th ed. 2012)) at 44 (describing how one can use Chrome developer tools to see every server request by a site and how long each took to load).

[44] *See, e.g.*, Ex. 85 (Shay Howe, Learn to Code HTML and CSS: Develop and Style Websites (1st ed. 2014)) at 67 (menu option opens Google Chrome developer tools); Ex. 87 (*Introduction to F12 Developer Tools*, Microsoft (Mar. 3, 2016), https://learn.microsoft.com/en-us/previous-versions/windows/internet-explorer/ie-developer/samples/gg589512(v=vs.85) (F12 opens Internet Explorer developer tools)); Ex. 88 (*The Browser Console*, Mozilla Hacks (Aug. 9, 2013), https://hacks.mozilla.org/2013/08/the-browser-console/ (Ctrl+Shift+J opens Mozilla Firefox developer tools)).

[45] *See* Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 90:18–91:6; *see also* Song Decl. ¶¶ 8, 14.



50.

51.

*iii.*

52.

---

[46] Att. C at 1:44.

**McKamie Decl. ISO Defendants' MSJ**                    **Case No. 3:19-cv-003132**



53. ████████████████████████████████

49

54. ████████████████████████████████

47 Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 100:23–101:21

48 Song Decl. ¶ 22.

49 Att. B at 2:33.

1

2  [50]

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[50] *Id.*

**MCKAMIE DECL. ISO DEFENDANTS' MSJ**                    **CASE NO. 3:19-CV-003132**

55. ███████████████████████████████ ██████████████████

████████████████████████████████████████████████████████

███████████ █████████████[53]

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

56. ███████████████████████████████████████████

████████████████████████████████████████████████

---

[51] *See* Ex. 12 at 1 (Planner 5D's Response to Princeton's Request for Admission No. 2); Ex. 18 (Planner 5D's First Request for Reconsideration) at P5D-0065221.  *See also* Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 26, 2022)) 179:11–179:15.

[52] *See* Ex. 89 (*JSON Viewer* MOZILLA FIREFOX https://firefox-source-docs mozilla org/devtools-user/json_viewer/index.html) ("Firefox includes a JSON viewer.  If you open a JSON file in the browser, or view a remote URL with the Content-Type set to application/json, it is parsed and given syntax highlighting. Arrays and objects are shown collapsed, and you can expand them using the "+" icons.") (accessed Oct. 27, 2022).

[53] Att. B at 2:30.



57.

58.

---

54 Att. C at 4:52, 4:59.
55 *Id.* at 5:16.

**McKamie Decl. ISO Defendants' MSJ**          **CASE NO. 3:19-cv-003132**



56

59.

b.

60. The scenes in Planner 5D's public gallery contain 3D objects (*e.g.*, tables, chairs, clocks, doors), which anyone who visits the Website can see. For example, the three-dimensional rendering of the

---

[56] *Id.* at 2:15.

25

McKamie Decl. ISO Defendants' MSJ                    CASE NO. 3:19-cv-003132

Planner 5D scene below includes discrete 3D objects (*i.e.*, the sofa, the TV, the lamp, the coffee table, etc.), which were arranged by the person who created the scene.[57]

61.

*i.*

62.

[58]

---

[57] Att. C at 0:40.

[58] *See* Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 71:6–73:4; Song Decl. ¶ 14.

63.



64.

**McKamie Decl. ISO Defendants' MSJ**                    **Case No. 3:19-cv-003132**



65. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮[60]

66. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮.[61]

67. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[60] Att. B at 4:01.

[61] ▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 15 (Trade Secret Disclosures), Attachment A; Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 105:11–105:15. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



68.

69.

70.



71.

*ii.*

72.

[63] Att. C at 4:00.

[64] Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 105:21–106:21.

30

73. 

[65]

74.

---

[65] Att. C at 5:30.

**McKamie Decl. ISO Defendants' MSJ**          **Case No. 3:19-cv-003132**



75.

---

[66] Att. C at 5:32, 5:35.

[67] Att. C at 6:02.

MᴄKᴀᴍɪᴇ Dᴇᴄʟ. ISO Dᴇꜰᴇɴᴅᴀɴᴛs' MSJ                    CASE NO. 3:19-ᴄᴠ-003132

76. 

c.

77.

78.

---

[68] Att. C at 4:03.

[69] Song Decl. ¶¶ 10, 18–20.

**McKamie Decl. ISO Defendants' MSJ**          **Case No. 3:19-cv-003132**

79.     HTML (which stands for Hypertext Markup Language) defines the basic structure of virtually every webpage on the Internet.[70]  The HTML of a webpage will include all elements associated with that webpage—including any text on the page, links to any image the browser should display, or the URLs for any link on a page.[71]

80.     Anyone can easily view the underlying HTML for any webpage by, for example, pressing CTRL + U on a keyboard, or by right-clicking on any webpage and selecting the "view page source" function.  By doing so, any person can see the text on the webpage, links to any image the browser should display, or the URLs for any link on a page.

81.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[72]

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

82.     ████████████████████████████████████████

████████████████████████████████████████████████████

---

[70] Ex. 86 (JENNIFER NIEDERST ROBBINS, LEARNING WEB DESIGN: A BEGINNER'S GUIDE TO HTML, CSS, JAVASCRIPT, AND WEB GRAPHICS (4th ed. 2012)) at 12.  HTML is not a programming language, but instead provides standard tags and syntax that modern web browsers (*e.g.,* Mozilla Firefox, Google Chrome) read so the browser knows where to place the various elements of a site and how to format them.  *Id.*  In other words, HTML provides information to web browsers on what the skeleton of the webpage should look like.

[71] *Id.* at 12, 26–28.

[72] Att. D at 0:54.

83.

[73] Ex. 2 (30(b)(6) Dep. Tr. (Ustyugov Aug. 25, 2022)) 115:11–116:1.
[74] Att. D at 0:54.

**McKamie Decl. ISO Defendants' MSJ**                    **Case No. 3:19-cv-003132**

84. 

85.

<hr>

[75] Att. D at 1:55.

[76] Att. D at 2:26.

**McKAMIE DECL. ISO DEFENDANTS' MSJ**                    **CASE NO. 3:19-CV-003132**



86. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████[78]

87.     Thus, Planner 5D did not maintain the secrecy of its alleged Scene Data File Compilation.

   **d.** ████████████████████████████████████████████

88. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

---

[77] Song Decl. ¶¶ 7, 10–11, 18–19. ████████████████████
████████████████████████████████████████████████████

[78] Song Decl. ¶¶ 10, 18–19.

89. ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

90. ████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████

91.     Thus, Planner 5D did not maintain the secrecy of its alleged Object Data File Compilation.

**VI.     Conclusion**

92.     As set forth above, it is my opinion that Planner 5D's Website did not maintain the secrecy of Planner 5D's Alleged Trade Secrets as of February 2016.

93.     In particular, Planner 5D's choice to maintain a public gallery with all of its scenes available to all users without authentication, and choice to implement client-side rendering, ensured that all of its Alleged Trade Secrets would be transmitted to users, both individually and as compilations.  As a result of this design, Planner 5D's Alleged Trade Secrets were transmitted to users as freely accessible public resources, when they should have been protected through basic security measures including authentication.

94.     My analysis begins and ends with disclosure.  Planner 5D's choices when creating its Website, which resulted in the transmission of its trade secrets to Internet users and permitted the acquisition and download of the Alleged Trade Secrets both individually and *en masse*, are inconsistent with its allegations that it owns enforceable trade secrets.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 16th day of February 2023, in ___Amsterdam___, Netherlands _____.

Ryan McKamie
_____
Ryan McKamie

MCKAMIE DECL. ISO DEFENDANTS' MSJ                                    CASE NO. 3:19-CV-003132