| | |
|---|---|
| **THE BUSINESS LITIGATION GROUP, P.C.**<br>MARC N. BERNSTEIN (Cal. Bar No. 145837)<br>mbernstein@blgrp.com<br>WILL B. FITTON (Cal. Bar No. 182818)<br>wfitton@blgrp.com<br>CHRISTIAN G. ANDREU-VON EUW (Cal. Bar No. 265360)<br>christian@blgrp.com<br>150 Spear Street, Suite 800<br>San Francisco, CA 94105<br>Phone: (415) 765-6633<br>Facsimile: (415) 283-4804<br><br>Attorneys for Plaintiff<br>*UAB "Planner5D"*<br><br>**KIRKLAND & ELLIS LLP**<br>Dale M. Cendali (Cal. Bar No. 1969070)<br>dale.cendali@kirkland.com<br>Abbey Gauger Quigley (*pro hac vice*)<br>abbey.quigley@kirkland.com<br>601 Lexington Avenue<br>New York, NY 10022<br>Phone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>Attorneys for Defendants<br>*Meta Platforms, Inc.* and *Facebook Technologies, LLC* | **JENNER & BLOCK LLP**<br>David R. Singer (Cal. Bar No. 204699)<br>dsinger@jenner.com<br>515 S. Flower Street, Suite 3300<br>Los Angeles, CA 90071<br>Phone: (213) 239-5100<br>Facsimile: (213) 239-5199<br><br>**JENNER & BLOCK LLP**<br>Andrew H. Bart (*pro hac vice*)<br>abart@jenner.com<br>Cayman C. Mitchell (*pro hac vice*)<br>cmitchell@jenner.com<br>1155 Avenue of the Americas<br>New York, NY 10036<br>Phone: (212) 891-1600<br>Facsimile: (212) 891-1699<br><br>Attorneys for Defendant<br>*The Trustees of Princeton University* |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" d/b/a PLANNER 5D,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>META PLATFORMS, INC.; FACEBOOK TECHNOLOGIES, LLC; THE TRUSTEES OF PRINCETON UNIVERSITY; et al.,<br><br>　　　　　Defendants. | Case No. 3:19-cv-03132-WHO (SK)<br>Case No. 3:20-cv-08261-WHO (SK)<br><br>**JOINT LETTER BRIEF RE: DISCOVERY DISPUTE**<br><br>**February 8, 2024** |

Counsel for Plaintiff UAB "Planner5D" ("Planner 5D") and Defendants Meta Platforms, Inc.; Facebook Technologies, LLC; and The Trustees of Princeton University ("Defendants") attest that before filing this letter they met and conferred and confirmed its necessity.

Dated: February 8, 2024        **JENNER & BLOCK LLP**

By: /s/ *Andrew Bart*
Andrew H. Bart (*pro hac vice*)

Attorneys for Defendant
*The Trustees of Princeton University*

Dated: February 8, 2024        **KIRKLAND & ELLIS LLP**

By: /s/ *Dale Cendali*
Dale M. Cendali (Cal. Bar No. 1969070)

Attorneys for Defendants
*Meta Platforms, Inc.* and
*Facebook Technologies, LLC*

Dated: February 8, 2024        **THE BUSINESS LITIGATION GROUP, P.C.**

By: /s/ *Marc Bernstein*
Marc N. Bernstein (Cal. Bar No. 145837)

Attorneys for Plaintiff
*UAB "Planner5D"*

**The Dispute**: The parties dispute whether Defendants may take discovery during Phase II on Planner 5D's assertion that its "proprietary file format" is a reasonable measure that protects its asserted trade secrets and, if they deem it appropriate, again move for summary judgment on that issue.

**Defendants' Position**: Since Planner 5D's belated claim that its object renderings are trade secrets and were reasonably protected by its "proprietary file format" was neither properly nor sufficiently disclosed to Defendants in Phase I, it would be a "substantial due process problem[]" to deny Defendants the opportunity to develop a full factual record on this potentially dispositive issue. Dkt. 316 at 2.[1] From the start of this case, Planner 5D has alleged that its trade secrets are its "JSON object and scene files."[2] Dkt. 218-4 (TS Disclosures) at 1; Dkt. 53 (Amend. TS Compl.) ¶¶ 85, 93. And it has alleged Defendants misappropriated those files when they wrongfully "acquir[ed]" them. Amend. TS Compl. ¶ 86; Dkt. 218-5 (Plf.'s Expert Report) at 14 (Planner 5D's trade secrets are its "downloaded files"). Indeed, Planner 5D's allegations mirror the statutory definition of misappropriation as the "[a]cquisition of a trade secret." Cal. Civ. Code § 3426.1. Planner 5D alleged it protected its files against acquisition in only two ways: (1) making it "impossible" to access them on its website "without circumventing Planner 5D's software," and (2) prohibiting users from accessing them in its Terms of Service. Amend. TS Compl. ¶¶ 33, 37, 40–41.

In its TS Disclosures, served over two and a half years ago, Planner 5D reaffirmed that it protected its alleged trade secrets only through (1) the "structural secrecy" of its website and (2) its Terms of Service, which prohibited "acquiring" the files by "downloading" them. Dkt. 218-4 at 4–6. The disclosures refer to Planner 5D's files as "JSON files" 33 times, and never as "proprietary." *See id.* at 1–6. Planner 5D does not state its renderings are trade secrets, and in fact affirmatively contrasts the public renderings with the "inaccessible" underlying files. *Id.* at 4–5. To date, Planner 5D has not amended its TS disclosures.

On summary judgment, however, Planner 5D expanded its argument about reasonable measures, asserting not only that it imposed measures to prevent the *acquisition* of files, but also that it protected its files from being *rendered* with a "proprietary file format." *See* Dkt. 250-4 (P5D SJ Opp. Br.) at 30. But

---

[1] Indeed, Planner 5D has repeatedly "hidden the ball" and refused to provide necessary discovery, resulting in discovery orders compelling it to produce testimony (*see* Dkts. 203 & 209); lengthy delays in the schedule after it belatedly produced revised copies of *all* its scenes and served supplemental disclosures (*see* Dkt. 211) and eventually the reopening of the entire question of its objects' copyrightability after it only disclosed the basis for their copyrightability *after* the close of summary judgment (*see* Dkt. 327).

[2] And the URLs corresponding to those files, but the URLs are not at issue on this motion.

the *acquisition* of Planner 5D's JSON files was the focus of the case from inception. If Planner 5D's position was that its trade secrets were protected by preventing them from being rendered, it was required to say so in its disclosures, to identify the ways that it prevented rendering, and to identify how the renderings were secret. Courts "require[]" trade secret disclosures to "'allow the trial court to control the scope of subsequent discovery,'" and to allow defendants "a fair opportunity to prepare and present their best case or defense…." *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 17-CV-00808, 2018 WL 3062160, at *4 (E.D. Cal. June 19, 2018) (citation omitted).

Below, Planner 5D contends that the rendering/format argument has always been part of its case. However, it indisputably did not include that argument in its Complaint or directly disclose it to Defendants in its trade secret disclosures. Instead, Planner 5D presented this case as one about "acquisition," Dkt. 218-4 at 4–6. So, now instead of pointing to pleadings and disclosures demonstrating that it put renderings and proprietary formats into play, Planner 5D relies on a series of obscure references: (1) the use of the words "encode," "content," and "use" in its TS disclosures without ever identifying a reasonable measure involving formats or renderings; (2) a single passage of 30(b)(6) testimony in a multi-day deposition;[3] (3) interrogatory responses about its *code module*, which was not copied and is not at issue in the case;[4] (4) attorney discussion during a fact deposition;[5] and (5) cautionary language in Defendants' expert report.[6] Planner 5D should not be allowed to preclude Defendants from conducting necessary discovery based on an argument that if one parses through the entire record, one can find clues hinting at the position it was required to state clearly in its disclosures.

---

[3] Defendants did not question Planner 5D's 30(b)(6) witness "at length;" its witness testified in a single passage that its files could not be rendered without Planner 5D's software because of a "proprietary nonstandard storage format." Dkt. 264-5 at 107:10–17. While that statement had significance as to the *copyrightability* of Planner 5D's objects, which Planner 5D alleged were in a proprietary programming language, it was not notice of a change in the theory of its *trade secrets* claim that Princeton acquired its trade secrets when it *downloaded* the raw data files. *See, e.g.*, Dkt. 53 ¶ 86; Dkt. 218-4 at 6.

[4] Planner 5D says two interrogatory responses disclosed that it used "proprietary processes" to encode its files. But those responses referred to the operation of Planner 5D's "code module" and "Javascript code." and were not a reference to a security measure of the renderings.

[5] At the deposition of Dr. Song, the parties disputed whether questions about rendering the files were relevant to Phase I. All that shows is that Defendants clearly had not received adequate disclosure of the argument and entered and left that deposition thinking renderings were a Phase II misappropriation issue.

[6] Defendants' expert wrote it was "not clear whether Planner 5D intends to argue that any alleged 'encoding method' constitutes any additional or different means of protecting the Alleged Trade Secrets."

Moreover, Planner 5D's "renderings" claim is baseless since it admittedly disclosed its renderings to every user on its website. Defendants do not agree that Planner 5D's file format is proprietary, that its data is encoded, that the files were difficult to render,[7] or that publicly-disclosed renderings can be trade secrets. More importantly, Defendants were not on notice that Planner 5D considered these allegations relevant to its trade secret claim since they did not prevent the acquisition of the files.[8]

Nevertheless, if Planner 5D may move forward on its revised trade secret claim despite having never made the disclosures required by law, *E. & J. Gallo Winery*, 2018 WL 3062160, at *4, due process demands that Defendants get the opportunity to test Planner 5D's alleged "proprietary file format" reasonable measure in discovery, and—if and only if the facts warrant it—move again for summary judgment on the basis that its "proprietary file format" does not constitute a reasonable measure as a matter of law. Defendants will suffer prejudice if the record on this issue is closed, while Planner 5D will suffer no prejudice if it is reopened.[9] The parties are already conducting discovery for Phase II. Defendants are not asking for an extension to the case schedule, for the Court to deem the belatedly-produced evidence untimely, or to preclude Planner 5D from pursuing this theory in this case. Defendants' sole ask here is to put Planner 5D's alleged "proprietary file format" measure on the same footing as other Phase II issues, with a fully developed record ready for this Court's consideration during Phase II dispositive motion practice, if Defendants move, or at trial, if Defendants do not.

**Planner 5D's Position**:

Defendants' central premise is demonstrably false. P5D timely and repeatedly claimed a trade

---

[7] Phase II discovery will show that the "six-month" period following Dr. Song's download of Planner 5D's files was not necessary to *decipher* Planner 5D's files, but rather to turn data only useful for an interior design website into data suitable for academic research on machine vision.

[8] It has been an enormous challenge for Defendants to get this issue before the Court. After the January 17 CMC, this letter has been with Planner 5D for *twice as long* as it has been with Defendants. Just yesterday, Planner 5D sent Defendants 1.5 pages of new material and a new closing argument. Defendants responded the same day with this footnote, to which Planner 5D insisted on another day to respond. But none of it changes the fact that Planner 5D's theory needed to be disclosed clearly in its trade secret disclosures in June 2021 and was not finally elucidated until this letter. If anything, Planner 5D's theory is *still unclear today* because, while it states that its file format "hinder[ed] use [of] the files," the only "use" of the files is to create renderings and the renderings are undisputedly public. In any event, given the undeniably shifting sands of Planner 5D's position, Defendants are entitled to discovery on this critical issue.

[9] Planner 5D fails to identify any prejudice below. It points to *past* delay but fails to mention that the parties *jointly stipulated* to bifurcation, Dkt. 178, that *it caused* substantial delays in Phase I, *see supra* note 1, and that if it had properly disclosed its arguments, these issues could have been resolved in Phase I.

secret in the data contained in its JSON files, and disclosed that it protects that information by encoding it in a proprietary file format. This Court itself recognized this in ruling on summary judgment:

> Defendants contend that this [proprietary file format] argument is not properly before the Court because Planner 5D failed to raise it in its pleadings or trade secret disclosures served at the outset of discovery. *See* Mot. At 29 n.18. But defendants asked Ustyugov this line of questioning during his deposition, which suggests that they had the opportunity to develop their argument regarding this file format issue. Moreover, defendants encountered this proprietary file format when attempting to make use of Planner 5D's files, and thus had notice of this protective measure even before the litigation began.

(Dkt. 278 at 18, n.6.) Yet Defendants now *again* seek relitigation of this Phase 1 issue. The Court should again affirm that Defendants have had their requested shot at trade secret measures, and should not get to try again.[10]

As far back as its June 2021 trade secret disclosures, P5D noted its use of a propriety encoding architecture to protect the data in its files. (P5D 6/9/2021 TS Discl. at 2:6-7 ("Each object JSON file comprises text strings that *encode* all of the three-dimensional characteristics of the objects") (emphasis added); 3:6-8 ("Each original scene JSON file comprises text strings that *encode* all of the three-dimensional characteristics of the scene") (emphasis added); 4:4-6 ("the architecture of Planner 5D's website . . . acted to wall off users from the location and *content* of Planner 5D's valuable JSON files, thus creating a barrier to access or use of the files.") (emphasis added).)[11] A few months later, after Defendants asked how P5D's website architecture protected secrecy, P5D elaborated that it used "proprietary processes" to encode its files. It said that its code module "parses the JSON scene file and uses *proprietary processes* to build a 3D scene," adding that this involved "a *proprietary*, *non-standard*, *encoding method* for its scene files." (P5D 10/7/21 Response to Meta ROG No. 10 at 12:15-16, 26-27 (emphasis added).) Then, on July 8, 2022, months before the close of fact discovery, P5D elaborated still further about its proprietary file format:

> [P]ortions of the Javascript code described above are compressed and obfuscated before being transmitted to the user's computer, which makes it harder to examine and understand that code and thereby impedes a reader's

---

[10] Defendants claim P5D hid the ball and tried to duck discovery obligations. But they mischaracterize events (including Dkts. 203 & 209, which denied Defendants' motion to compel and P5D's motion for more detailed 30(b)(6) topics) and ignore their own dilatory actions. (*See* Dkt. 159 (granting P5D's motion to compel regarding datasets).)

[11] P5D will provide the Court with all cited materials upon request.

ability to understand Planner 5D's proprietary .json file formats or decode the secret three-dimensional characteristics of the scenes and objects in question.

(P5D 7/8/22 2d Supp. Response to Meta Interrogatory No. 10 at 17:21-25.)[12]

These interrogatory responses described P5D's use of proprietary formatting to protect the data in its JSON files, elaborating on the reference in its trade secret disclosures to "text strings that encode all of the three-dimensional characteristics." And these responses occurred well before the close of fact discovery. Indeed, they were served thirteen months and four months before Defendants submitted their expert report. Accordingly, Defendants were provided more than sufficient notice. *See E. & J. Gallo Winery*, 2018 WL 3062160, at *4 (reviewing plaintiffs' supplemental interrogatory responses in assessing adequacy of plaintiffs' trade secret disclosures.") And in any event, "[a]s a trade secret case advances to summary judgment, however, the purposes of Section 2019.210 fall away[.]" *Celgard, LLC v. Shenzhen Sr. Tech Material Co.*, Case No. 19-cv-05784-JST, 2022 WL 19977073, at *1 (N.D. Cal. Sept. 27, 2022).

Defendants received still more notice before fact discovery closed. Phase 1 depositions addressed P5D's proprietary file formats. At an August 2022 deposition of then-Princeton researcher Shuran Song, P5D sought to question Dr. Song about the lengthy, six-month-long slog Princeton undertook to decipher P5D's obfuscated files. (S. Song 8/12/22 Depo. Tr. at 109:14-122:15.) When Princeton's counsel objected to this line of questioning as a surprise topic, P5D's counsel read into the record the same history of prior written disclosures cited above, describing P5D's obfuscation methods in increasingly explicit detail. (*See id.* at 118:1 – 119:23.) Two weeks later, defense counsel questioned P5D's corporate designee about P5D's formatting of JSON files. (A. Ustyugov 8/25/22 Depo. Tr. at 106:24–110:05; 136:9-138:3.)[13] And finally, as noted above, the Defendants' expert addressed file obfuscation in his

---

[12] Defendants suggest that P5D's interrogatory responses were about a code module not at issue in the case. This argument ignores, as the above quotation makes clear, that the response discusses P5D's proprietary file format, and the difficulty in understanding and decoding the files.

[13] Defendants argue that the designee's testimony in this area was limited, but any limitations resulted from Defendants' own strategic choices. In the first exchange on the subject, P5D's designee began to explain how P5D's file format (as described in the interrogatory response) hinders use of the files. Instead of following up, defense counsel changed the subject. (*See* A. Ustyugov 8/25/22 Depo. Tr. at 107:18-22.) When defense counsel returned to P5D's interrogatory response, he used precise questions limited to the potential *acquisition* of P5Ds' files, to avoid eliciting more testimony about barriers to the files' *use*. (*Id.* at 136:9-128-7.) It is thus incorrect for Defendants to claim that they did not have an opportunity to explore this topic. Defendants *chose* not to further interrogate P5D on these issues.

Phase 1 *opening* report. (R. McKamie 11/23/22 Expert Report at ¶¶ 24-25, 141-142.)[14] Naturally, P5D's expert then addressed it in his responsive report, and again at deposition. (B. Webster 12/23/22 Expert Report at pp. 32-35, 49 n.85, & §§ 7.3 & 8.5.5; B. Webster 1/31/23 Depo. Tr. at 356-375.)

Defendants were thus repeatedly told, in writing and in testimony, about P5D's proprietary formatting. It would violate both the spirit and the letter of the bifurcation agreement to now allow Defendants another crack at this same issue.

This was the bargain Defendants struck. They would get two rounds of summary judgment (with all the advantages that gives Defendants, and all the attendant delay), but they would not get two bites at the same apple. (*See* Dkt. 182 at 2:23-25, 2:27-3:2.) Planner 5D would get to spend Phase 2 on Phase 2 issues. Despite this, a second bite at the apple is precisely what Defendants now seek.

Defendants argue that P5D unfairly added *renderings* generated by its JSON files to its trade secrets list. This argument is a red herring.

From the outset, P5D claimed the data in its JSON files as trade secrets, including the objects' or scenes' "three-dimensional characteristics." And it disclosed the encoding of that data as a means to protect secrecy of those 3D characteristics, whether by making them harder to render or otherwise. (P5D 6/9/2021 TS Discl. at 2:6-7 ("text strings that encode all of the three-dimensional characteristics of the objects"); 3:6-8 ("text strings that encode all of the three-dimensional characteristics of the scene").) Renderings are two-dimensional representations of three-dimensional models or scenes. The evidence shows that, because P5D's data was well protected, it took Princeton's scientists many months to develop usable renderings of P5D's three-dimensional models and scenes. Because six months of work suggests the effectiveness of P5D's encoding methods, Defendants now argue that P5D never expressly claimed renderings as trade secrets. But P5D did not need to: it claims not the renderings themselves, but the underlying, and encoded, data used to generate those renderings.

---

[14] Mr. McKamie's expert report contained far more than the "cautionary language" (in the introduction) that Defendants quote above. Defendants' expert direct attacked P5D's "proprietary, non-standard, encoding method for its scene files," and concluded, "[t]hus, Planner 5D's claim that it 'encoded' its scene files does not affect my opinion that it failed to take measures to protect the alleged secrecy of the data in those files." (R. McKamie 11/23/22 Expert Report at ¶ 141.)

Relatedly, Defendants argue that the case had always been about Defendants' improper *acquisition* of P5D's JSON files, not whether Defendants could render images from them. This too is a red herring. As explained above, from the outset, P5D disclosed its efforts to hinder use the files, not just acquisition of them. (P5D 6/9/2021 TS Discl. at 4:4-6 ("the architecture of Planner 5D's website . . . acted to wall off users from the location and content of Planner 5D's valuable JSON files, thus creating a barrier to access *or use* of the files.") (emphasis added).)

Defendants have received all the process they are due. Having sought and won bifurcation, they should not get yet another round of discovery at P5D's expense, nor another summary judgment on this same issue. P5D invested significant time and money on its reasonable measures, including obfuscation. Redoing that in Phase 2 would come at the expense of establishing Phase 2 issues and preparing for trial. Defendants' resources may be effectively unlimited; P5D's, and the Court's, are not.[15]

---

[15] Defendants complain in footnote 8 about P5D's turnaround time for this motion but omit that they largely rewrote their section after receiving P5D's opposition (to omit claims P5D proved false), forcing P5D to do the same. And P5D's counsel have explained that they have had two team members preparing for or in two trials during this time. And another team member had Covid. P5D is also ten time zones away from California, which adds at least a day to the drafting and approval process.

Dated:  February 8, 2024    **JENNER & BLOCK LLP**

By: /s/ *Andrew Bart*
Andrew H. Bart (*pro hac vice*)

Attorneys for Defendant
*The Trustees of Princeton University*

Dated:  February 8, 2024    **KIRKLAND & ELLIS LLP**

By: /s/ *Dale Cendali*
Dale M. Cendali (Cal. Bar No. 1969070)

Attorneys for Defendants
*Meta Platforms, Inc.* and
*Facebook Technologies, LLC*

Dated:  February 8, 2024    **THE BUSINESS LITIGATION GROUP, P.C.**

By: /s/ *Marc Bernstein*
Marc N. Bernstein (Cal. Bar No. 145837)

Attorneys for Plaintiff
*UAB "Planner5D"*

**Attestation**

I, Andrew H. Bart, am the ECF user whose ID and password are being used to file this Joint Letter Brief Re: Discovery Dispute. In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from all signatories.

Dated: February 8, 2024 　　　　　　　　　　　　　　By: */s/ Andrew Bart*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Andrew H. Bart