| | |
|---|---|
| **THE BUSINESS LITIGATION GROUP, P.C.**<br>MARC N. BERNSTEIN (Cal. Bar No. 145837)<br>mbernstein@blgrp.com<br>WILL B. FITTON (Cal. Bar No. 182818)<br>wfitton@blgrp.com<br>CHRISTIAN G. ANDREU-VON EUW (Cal. Bar No. 265360)<br>christian@blgrp.com<br>150 Spear Street, Suite 800<br>San Francisco, CA  94105<br>Phone:           (415) 765-6633<br>Facsimile:      (415) 283-4804<br><br>Attorneys for Plaintiff<br>*UAB "Planner5D"* | **KIRKLAND & ELLIS LLP**<br>Dale M. Cendali (SBN 1969070)<br>dale.cendali@kirkland.com<br>Mary Mazzello (*pro hac vice*)<br>mary.mazzello@kirkland.com<br>Jonathan D. Brit (*pro hac vice*)<br>jonathan.brit@kirkland.com<br>Abbey Quigley (*pro hac vice*)<br>abbey.quigley@kirkland.com<br>Miriam Kontoh (*pro hac vice*)<br>miriam.kontoh@kirkland.com<br>601 Lexington Avenue<br>New York, NY  10022<br>T: (212) 446-4800<br>F: (212) 446-4900<br><br>Yan-Xin Li (SBN 332329)<br>yanxin.li@kirkland.com<br>555 California Street, 27th Floor<br>San Francisco, CA 94104<br>T: (415) 439-1400<br>*F: (415) 439-1500*<br><br>Attorneys for Defendants<br>*Meta Platforms, Inc.* and *Meta Platforms Technologies, LLC* |

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>    Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20,<br><br>    Defendants. | **Case No. 3:19-cv-03132-WHO (SK)**<br>**Case No. 3:20-cv-08261-WHO (SK)**<br><br>**JOINT LETTER RENEWING MOTION ON DATASET REVIEW**<br><br>May 13, 2024 |

**The Dispute**

Pursuant to the Court's March 28, 2024, order (ECF No. 364), Planner 5D renews its motion (ECF No. 358) to compel Meta to produce copies of datasets responsive to the Court's March 18, 2022, order (ECF No. 159), which enforces Planner 5D's Request for Production No. 29 (*id.* at 2:19–24).

**Planner 5D's Position**

Meta was ordered to produce responsive datasets, but has insisted on allowing only in-person review under source-code-level secure-room protocols. The Court ordered Planner 5D to try this arrangement and, if it proved unworkable, renew its motion to compel. P5D's expert has attempted the review and it proved unworkable. Accordingly, P5D now renews its motion. The nature of Meta's datasets and the automated statistical analysis that P5D needs to conduct together make a secure-room, air-gapped review impossible. P5D seeks leave to submit an expert declaration detailing why Meta's conditions are unworkable for the analysis he needs to conduct. At the same time, a secure room protocol is unnecessary. If Meta contends otherwise, it should be ordered to submit competent evidence meeting its burden to establish good cause for a new protective order, which is what it seeks. That evidence will show that a new protective order should be denied.

      A.      **Meta's terms make the P5D's analysis impossible.**

Planner 5D's expert, Dr. David Forsyth, visited a Meta secure review site on April 26, 2024. Dr. Forsyth lives and teaches in Urbana, Illinois, but Meta refused to establish a secure review site in Urbana, or even in Chicago, where Meta's counsel has its founding office. Instead, Meta insisted that Dr. Forsyth fly to San Francisco to review the datasets on a laptop there.

Having conducted that review, Dr. Forsyth has concluded that Meta's protocol is unworkable. As he is prepared to testify, Dr. Forsyth needs to conduct automated statistical analyses comparing Meta's datasets to SUNCG. This is incompatible with Meta's protocol for at least five separate reasons.

First, statistical analysis of hundreds of thousands of data files requires custom computer code. But Meta's protocol forbids Dr. Forsyth from uploading anything to the review computer. That means the only way Dr. Forsyth can get the code he needs onto Meta's review computer is to compose from scratch, in real time, without Internet connectivity, on a computer thousands of miles from his home. To require a senior computer vision scientist to sit at a remote computer writing code from scratch, without

1  programming tools or manuals, and without access to the tools available on the Internet, would be hugely
2  wasteful, given that Dr. Forsyth could develop the same code at home in weeks—as he will attest if
3  permitted. It would also invite errors, and place him under unwarranted pressure to create and debug a
4  body of dense and intricate code without the usual tools, on a disabled computer locked in a secure room.
5  All this is because Meta's protocol forbids Dr. Forsyth from simply adding made-in-advance software to
6  the secure computer.

7  Second, Meta's protocol denies Dr. Forsyth access to reference materials while in the secure
8  room. Dr. Forsyth is not permitted, for example, to bring his own computer into the review room.
9  Because the secure computer is not connected to the Internet, Dr. Forsyth has no way to access reference
10 information, such as guides to software or syntax for specialized programming tools. Instead, Dr. Forsyth
11 is required to call a break, leave the room, look up what he needs in online programming references, and
12 do his best to remember it upon his return. This is obviously unworkable.

13 Third, to write code analyzing the datasets, Dr. Forsyth needs the datasets. Last year, P5D asked
14 Meta to produce a few samples from each dataset, which might have allowed Dr. Forsyth to develop code
15 before the full review, in the comfort of his home and with appropriate resources. Meta refused. But even
16 such a sample production ultimately wouldn't be feasible, for at least two reasons. First, because Meta
17 forbids adding files to the secure computer, Dr. Forsyth would still need to enter his code onto the secure
18 computer *by hand*. That's time consuming and invites error. Second, to fully debug and refine his code
19 Dr. Forsyth still needs the complete datasets, not small samplings. So Dr. Forsyth is back to significant
20 time coding on Meta's secure computer.

21 Fourth, Meta's secure computer does not have nearly the computing power or memory that
22 Dr. Forsyth's analysis requires. Dr. Forsyth's work cannot realistically be done on a typical consumer
23 computer, much less the low-end laptop Meta provided. He requires a specialized machine, one with a
24 modern graphics processing unit, and especially large amounts of memory. It also requires high-speed,
25 extra-high-capacity storage units that can in reasonable time handle massive amounts of data, like Meta's
26 eight-hundred terabyte dataset (ECF No. 358 at 2:15–16). Even on an appropriately capable computer,
27 just one of the planned statistical analyses for a given dataset could run for hours or days. As a rough,
28 order-of-magnitude estimate, Dr. Forsyth anticipates that custom software, once developed, could

perform complete analysis of all datasets could be done within several days on an appropriate computer, maybe even less than a day. On the secure computer, the same tasks could require weeks or months of uninterrupted processing time. And unexpected issues would have an outsized impact because of Dr. Forsyth's limited ability to monitor the process. Again, Dr. Forsyth will testify to all this under oath if permitted.

Fifth, Meta's protocol prohibits Dr. Forsyth from removing the results of his analysis, at least without giving Meta a copy. This would defeat P5D's ability to obtain the fruits of Dr. Forsyth's efforts, as P5D cannot afford to have its expert's interim work product revealed to the other side. Nor do the federal rules allow Meta to demand this. Fed. R. Civ. P. 26(b)(4)(B).

All these serious problems are multiplied by Meta's refusal to set up its laptop in a secure facility in Urbana, Illinois, where Dr. Forsyth lives, or Chicago, where Meta's counsel has its founding office. Nor is any of this hardship justified here, given the kinds of files at issue and the protective order the parties negotiated and agreed to. (ECF No. 358 at 1:23–3:21.)

Despite the enormous and unwarranted burden Meta's protocol places on P5D, it offered Meta a compromise before filing its original motion. It offered to allow Meta to keep encrypted copies of any work product that Dr. Forsyth loads on or removes from the secure computer. This would have left Meta with a permanent record of transfers, which the Court could order decrypted if Meta ever had reason to suspect the protective order had been violated. But even this protocol will not solve the problems discussed above. There is no longer time for even a compromise secure-room protocol. At this point, Dr. Forsyth needs to conduct a full examination of the datasets on locally accessible equipment, using standard resources, including the Internet, and without having to travel thousands of miles each time he needs to visit the data.

**B.    Meta's cannot establish cause for a protection order, which is its burden.**

Meta's proposed terms are not only unworkable; they are unnecessary. Secure-room protocols were intentionally left out of the parties' negotiated protective order. (ECF No. 358 at 1:12–15; ECF No. 142-2 at 3:8-15, 21:18-22:7.) What Meta wants is a *new* protective order. For this, Meta has "the burden of proving 'good cause,' which requires a showing 'that specific prejudice or harm will result' if the protective order is not granted." *In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d 417, 424

(9th Cir. 2011) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003)). The Court "must balance the risk of inadvertent disclosure of trade secrets to competitors against the risk that the protection of such confidential information will impair prosecution of plaintiff's claims." *CBS Interactive, Inc. v. Etilize, Inc.*, 257 F.R.D. 195, 204–05 (N.D. Cal. 2009) (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)). Here, as shown, a secure room protocol would frustrate P5D's review. It would do so without truly mitigating any genuine risk to Meta, as P5D's original briefing explains. (ECF No. 358 at 1:23–3:6.) An application's source code is valuable in different ways than a machine learning dataset. And a review protocol designed for source code is a poor match for the different kinds of risks that datasets pose. If Meta contends otherwise, it must support its claims with competent evidence. Meta cannot meet its burden to establish good cause for the protective order terms it seeks.

### Conclusion

For these reasons, and those stated in Planner 5D's original brief (ECF No. 358 at 1:4–4:24), Meta's implicit motion for a protective order should be denied, and Meta should be compelled to produce complete copies of all responsive datasets. In the alternative, if the Court finds that the evidence supports a secure-room protective order, the Court upon hearing with P5D's expert in attendance should set establish specific terms for order consistent with Planner 5D's needs as outlined above.

### Reply

Meta's response makes a number of long-disputed factual assertions, as well as new assertions that P5D has not had the opportunity to test. For example, Meta makes the startling claim that it would take sixteen months to produce copies of a datasets that it also claims to have provided on a laptop in San Francisco in a fraction of that time. Due to the stark differences in factual positions, P5D believes a short evidentiary hearing is needed.

**Meta's Position:** P5D asks this Court to order Meta to provide P5D with copies of seven highly confidential datasets ("HC Datasets"), five of which belong to third parties,[1] that total about 800 terabytes (or 542,534,722 floppy disks). Meta has already made these datasets available at *two* secure review locations, one in the Northern District of California where this case is pending and the other in San Diego, where P5D requested Meta set up a review site as part of a compromise to avoid motion practice. Dkt. 358 at 5–8. In denying P5D's motion the first time, this Court ordered P5D to attempt to review the datasets in secure locations and, if it still believed it needed physical copies, petition the Court again, with the advice that P5D "should attempt to narrow the scope of the request." Dkt. 364 ("Order"). P5D neither meaningfully attempted to review the datasets nor narrowed its requests in coming to the Court again.

P5D has not explained why its expert would need to conduct an "automated statistical analysis" of the datasets, nor why it and its expert cannot use procedures similar to those parties have successfully adopted to conduct reviews of technical documents in dozens of other cases (including this one). To be clear, the HC Datasets are not alleged infringing datasets that P5D's expert needs to analyze for purportedly infringing code. Rather, this Court ordered their production solely for purposes of damages, as Meta used these other datasets in research, and so P5D wanted to determine if they were relevant comparators for its hypothetical license calculation. Dkt. 159 at 3. As such, it is not clear how an "automated statistical analysis"—requiring a comparison of each vertex of each of the hundreds of thousands of files in the HC Datasets—is relevant or necessary. Meanwhile, producing physical copies of these datasets is extremely burdensome. In fact, as explained below, Meta estimates it would take 16 months for it to produce these datasets. If the Court permits, Meta is prepared to submit declarations confirming the burden.

Therefore, for the reasons stated herein and in Meta's original opposition (Dkt. 358 at 5–8), production of physical copies of the datasets should be denied as (a) P5D failed to meaningfully comply with this Court's Order, and (b) the request is not proportional to the needs of the case, particularly considering the lack of relevance of an "automated statistical analysis," the burden, and the fact that Meta *already* prepared *two* secure review computers for P5D.

### I.      P5D Failed to Meaningfully Comply with the Order

The Order found P5D's Motion to Compel (Dkt. 358) premature and gave P5D until April 26, 2024

---

[1] Meta has confirmed that 4 of the 5 third parties support Meta's position that the HC Datasets should be inspected under secure conditions. The 5th third party has yet to respond. Meta would so attest if permitted.

to inspect the HC Datasets under secure conditions and until May 13, 2024 to renew its request by joint brief. Dkt. 364. The Court also "advise[d] Plaintiff that it should attempt to narrow the scope of the request." *Id*. Following the Order, rather than immediately scheduling inspection dates for expert review—as would be expected if the matter were as time-critical as P5D claims—P5D instead dragged its feet for ***two weeks*** before emailing Judge Kim's Chambers to request judicial intervention in the month-long review process under a provision designed for emergencies during a discovery event. *See* Dkt. 389-15. As the parties were not in a discovery event, the Court rightly did not respond to P5D's improper request. P5D then waited another ***12 days*** before notifying Meta that its expert wanted to inspect the datasets on the last possible day before the Order's April 26, 2024 deadline. This expert review lasted a mere three hours and 47 minutes—hardly enough time for a thorough and/or meaningful review of the nearly 800 terabytes of data. Moreover, P5D did not communicate any compromise narrowing its request to Meta, as advised by the Court. Instead, having failed to advance its case in a timely manner, P5D sent Meta a draft of its portion of this brief on Wednesday, May 8, 2024 at 7:21 pm PT, just two business days before P5D's deadline to move. This belated attempt to renew its motion, without properly following the Order, should be denied.

## II.     The Secure Review Protocols Are Standard and Consistent with the Protective Order

The secure review protocol P5D seeks to avoid is standard and necessary given the nature of the files at issue. At base, this Motion concerns seven datasets properly designated under the Stipulated Protective Order as HIGHLY CONFIDENTIAL – RESTRICTED ACCESS, each of which contain highly sensitive, non-public, electronic information, and most of which belong to nonparties whom P5D has admitted are direct competitors. P5D has never contended that the datasets are not so properly designated. Further, several of these datasets are only in Meta's possession pursuant to a license. Dkt. 358 at 5:5–9. Thus, secure inspection is the *only* appropriate option.

*First*, as described in the Original Motion (Dkt. 358 at 6–8), Meta's security protocol is permitted by the Federal Rules and consistent with the 2022 Order (Dkt. 159), the Stipulated Protective Order, and standard practice in this District. Fed. R. Civ. P. 34(b)(2)(B) (permitting parties to *either* produce copies of discovery material *or* make it available for inspection and copying); *see Jackson v. United Artists Theatre Cir., Inc.*, 278 F.R.D. 586, 593 (D. Nev. 2011). Meta has also provided not one, but ***two*** secure review sites for P5D to utilize in this case, the first was made available 23 months ago in San Francisco

and the second in San Diego for Mr. Andreu-von Euw's convenience as it is close to his home (he spent less than 6 hours at the site). Meta has not changed the inspection protocols since then. *See* Dkts. 390-4.

*Second*, despite numerous requests by Meta (and as confirmed in its section above), P5D points to no caselaw stating that secure review of the datasets is impermissible.

*Finally*, contrary to P5D's claims, Meta *does not and has never sought a new protective order*. The Stipulated Protective Order **permits** the parties to make Highly Confidential material "available for inspection," during which the "inspecting Party" would "identify documents it wants copied and produced." Dkt. 144 § 5.2. This is exactly what Meta has done. It made the datasets available for inspection and has provided printouts in response to requests made to Meta's counsel in this proceeding. Faced with this, P5D incorrectly argues that because the parties omitted a section of the model protective order outlining protocols for source code inspection, they cannot implement secure review protocols for certain Highly Confidential material without modifying the protective order. Not only is this faulty logic, but it ignores the similar protocols that P5D set when Defendants inspected P5D's source code in 2022.

### III. Complaints Regarding the Feasibility of the Secure Review are Unavailing

Meta's position has always been that P5D can use any publicly available tools it needs within the secure environment, but it cannot add or remove material from the review computer. P5D's demands for these capabilities would defeat the purpose of secure review and is contrary to standard practice. *See Philips N. Am. LLC v. Glob. Med. Imaging, LLC*, 343 F.R.D. 59, 67 (N.D. Ill. 2022) (rejecting protocol involving unidentified scripts where standard review tools were present). P5D has never explained why its expert must write his own code to complete his review as opposed to using commercially available programs. Nor has it explained why the code must be written while consulting the HC Datasets, rather than the dozens of other, publicly available datasets that Meta disclosed in response to P5D's requests. Using these public datasets, P5D could have conducted its analysis years ago, or at least begun to construct the code it allegedly needs for its analysis. Instead, P5D waited until the last possible day to review the datasets and then created a laundry list of **uncommunicated** and **potentially fixable** complaints[2].

This Court also held that the datasets are relevant for only a narrow purpose: damages, *i.e.*, "Meta's

---

[2] P5D never informed Meta that its analysis required a laptop with additional computing power or memory and never requested reference materials be loaded. Had it done so, Meta could have investigated and immediately responded as it did for other materials P5D requested and as is standard practice. Meta has never objected to such requests because they were never made.

***willingness to pay for datasets*** to show the value (or lack thereof) of Plaintiff's datasets." Dkt. 159 at 3. P5D has not explained how an "automated statistical analysis" of each of the hundreds of thousands of files in the datasets is relevant to showing ***what Meta would have paid*** for these datasets. This could be ascertained just as easily from a secure review by comparing, for instance, the general properties of the datasets (*e.g.*, quantity and variety of objects, etc.), and the quality of a sample of the files. P5D has never tied its damages calculation to its desire to compare *each* vertex of *each* object in *each* dataset. Dkt. 358 at 2. Put another way, secure inspection is proportional to P5D's need to assess damages; unrestrained access to the data files is not (particularly when balanced against the extreme burden discussed below). *See* Fed. R. Civ. P. 26(b).

Meanwhile, P5D's convenience-based arguments, such as inspection location, are irrelevant. *See Berkheimer v. Hewlett-Packard Co.*, No. 12-cv-9023, 2014 WL 12959469, at *1 & n.1 (N.D. Ill. Apr. 7, 2014) ("convenience-based arguments do not outweigh Defendant's legitimate concerns regarding inadvertent disclosure"). Prior to the April 26 deadline, Meta invited P5D to provide Meta with any case law relating to the required location of a review computer. P5D provided none. In any event, requiring inspection in San Francisco—where P5D chose to bring this case—is not prejudicial. Experts traveling for reviews is standard in district court litigation. Indeed, Meta's expert had to travel to inspect P5D's secure material in the Bay Area in 2022; P5D's expert must do the same. P5D also knew the location of the review computer nearly ***two years ago*** and thus had every reason to anticipate that travel would be required when it retained an Illinois-based expert, whom it did not disclose until March 12, 2024.

### IV.   Production of Copies Would Be Unduly Burdensome and Time-Consuming

Physical production is unduly burdensome and impossible to accomplish before the end of fact discovery. The requested datasets consist of about 800 terabytes; production would require an estimated 16-month process to transfer, decompress, and verify the data. Meta is prepared to submit a declaration to explain the burden involved.[3] Meanwhile, fact discovery closes on May 24.[4] And both this Court and the District Court have acknowledged that Meta's burden in responding to the Request is great. Dkts. 149, 158 at 3. The burden of physical production outweighs P5D's minimal need to inspect. In conclusion, P5D failed to meet the Court's requirements; for all of the above reasons, its hearing request and Motion should be denied.[5]

---

[3] In view of the Court's Standing Order, Meta respectfully renews its request for leave to supplement this Motion with a supporting declaration from Meta and another from counsel of record. Dkt. 358, n.9.
[4] An extension of this deadline is pending before the District Court. *See* Dkts. 388-3, 390.
[5] As Meta emailed P5D on Dec. 19, 2023, the SF computer contains 35,000 of the 171,000 zipfiles of the largest dataset, which is too large to transfer at once. Meta produced metadata of the full dataset in 2022.

| | |
|---|---|
| DATED: May 13, 2024 | **KIRKLAND & ELLIS LLP** |
| | By:  */s/ Dale Cendali* |
| | Dale Cendali |
| | Attorneys for Defendants<br>*Meta Platforms, Inc.* and *Meta Platforms Technologies, LLC* |
| DATED: May 13, 2024 | **THE BUSINESS LITIGATION GROUP, P.C.** |
| | By:  */s/ Marc N. Bernstein* |
| | Marc N. Bernstein |
| | Attorneys for Plaintiff<br>*UAB "Planner5D"* |

**Attestation**

I, Marc N. Bernstein, am the ECF user whose ID and password are being used to file this Joint Letter Brief re Dataset Motion. In compliance with Local Rule 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from all signatories.

DATED: May 13, 2024

By:     */s/ Marc N. Bernstein*
          Marc N. Bernstein
