**PUBLIC REDACTED VERSION**

Susan J. Kohlmann (*pro hac vice*)
skohlmann@jenner.com
Cayman C. Mitchell (*pro hac vice*)
cmitchell@jenner.com
Sarah L. Atkinson (*pro hac vice*)
satkinson@jenner.com
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
T: (212) 891-1600

Kara V. Brandeisky (*pro hac vice*)
kbrandeisky@jenner.com
JENNER & BLOCK LLP
1099 New York Ave NW # 900
Washington, DC 20001
T: (202) 639-3865

*Attorneys for Defendant*
*The Trustees of Princeton University*

David R. Singer (SBN 204699)
dsinger@jenner.com
JENNER & BLOCK LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
T: (213) 239-5100

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

UAB "PLANNER5D" d/b/a PLANNER 5D,

Plaintiff,

v.

META PLATFORMS, INC.; META PLATFORMS TECHNOLOGIES, LLC; THE TRUSTEES OF PRINCETON UNIVERSITY; et al.,

Defendants.

Case No. 3:19-CV-03132-WHO
Case No. 3:20-CV-08261-WHO

**THE TRUSTEES OF PRINCETON UNIVERSITY'S PHASE 2 NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: March 28, 2025
Time: 10:00 AM
Courtroom: 2, 17th Floor
Judge: Honorable William H. Orrick

<u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

TAKE NOTICE that on Friday, March 28, 2025, at 10:00 a.m. at Courtroom 2 of this Court, the Honorable William H. Orrick presiding, located at 450 Golden Gate Avenue, San Francisco, California, Defendant The Trustees of Princeton University ("Princeton" or "the University"), will move for an Order granting summary judgment in Princeton's favor and against Plaintiff UAB "Planner5D" d/b/a Planner 5D ("Planner 5D") pursuant to the Court's orders of June 22, 2022, January 3, 2024, and November 25, 2025. Dkts. 182, 316, 510.

This Motion is based upon this Notice of Motion and Motion, the below Memorandum of Points and Authorities, the concurrently filed Declaration of Cayman C. Mitchell and its associated exhibits, the pleadings and papers on file in this action, and any further evidence as may be presented at the hearing of this Motion.[1]

<u>**STATEMENT OF ISSUES FOR RELIEF**</u>

Pursuant to Local Rule 7-2(b)(3), Princeton hereby seeks an Order granting its Motion for summary judgment in Princeton's favor as it relates to the following issues:

ISSUE 1: That Planner 5D does not own a copyright in objects based on reference material—identified in Exhibits B, C, and D to Planner 5D's Narrowed Objects Lists, Dkt. 282-3.

ISSUE 2: That Planner 5D cannot show distribution of its Asserted Scene Compilation.

ISSUE 3: That Princeton is entitled to safe harbor from liability for the allegedly infringing acts of its independent researchers under 17 U.S.C. § 512(c) & (e).

ISSUE 4: That the Princeton researchers' use of Planner 5D's Asserted Copyrights is fair use under 17 U.S.C. § 107.

---

[1] Princeton preserves for appeal all arguments Defendants made at Phase 1 summary judgment.

1

2

3    DATED: January 9, 2025

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

JENNER & BLOCK LLP

*/s/ Susan J. Kohlmann*

Susan J. Kohlmann

*Attorneys for Defendant The Trustees of Princeton University*

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 2

    A.    Princeton Is a Nonprofit Institution of Higher Education Committed to Promoting the Production and Dissemination of Knowledge for the Public Good. ............................................................................................................ 2

    B.    Princeton Has a Designated DMCA Agent And Provides Its Community with Access to Network Resources Consistent with U.S. Copyright Law. ......................... 2

    C.    Planner 5D Asserts Copyright Protection in Near-Exact Replicas of Real-World Objects and a Compilation of User-Created Scenes. ................................ 3

    D.    Most of Planner 5D's Asserted Objects Were Based on Reference Materials. ............ 3

    E.    Planner 5D's Public Gallery Showcased Users' Creativity By Displaying Scenes Users Designated in Chronological Order. ...................................................... 4

    F.    Researchers in Princeton's Computer Vision and Robotics Lab Downloaded Object and Scene Files from Planner 5D's Website and Created SUNCG for the Purpose of Foundational Machine Learning Research in Computer Vision. ......... 4

    G.    The Princeton Researchers Made SUNCG Available to Other Researchers Subject to Terms Limiting Its Use to Noncommercial Research and Prohibiting Further Distribution. ................................................................. 7

    H.    Third Parties Understood That SUNCG Was Available for Noncommercial Research Only and Never Used SUNCG Commercially. ............................................... 8

    I.    Princeton Promptly Disabled Access to SUNCG Upon Receiving Notification from Planner 5D of the Researchers' Alleged Infringement. ..................................... 9

III.   LEGAL STANDARD ........................................................................................ 9

IV.    ARGUMENT ................................................................................................. 10

    A.    Planner 5D's Copyright Claims for Objects Based on Reference Materials Fail as a Matter of Law Because Planner 5D Cannot Make the Showing Required By This Court's Phase 1 Summary Judgment Order as to Any Such Object. ............ 10

        1.    Planner 5D Cannot Establish Creative Contributions in the Objects Because It Does Not Know What Reference Materials Its Modelers Used. ......................................................................................... 11

        2.    Planner 5D Has Presented No Evidence of Non-Trivial Differences Between the Asserted Objects and Possible Reference Materials. ................. 12

B.    Planner 5D's Copyright Claim for the Asserted Scene Compilation by Distribution Fails as a Matter of Law Because Princeton Did Not Distribute the Selection or Arrangement of Planner 5D's Asserted Scene Compilation. .......... 14

C.    All Copyright Claims Against Princeton Must Be Dismissed Because Princeton Is Entitled to Safe Harbor from Liability Under 17 U.S.C. § 512 for the Acts of Its Independent Researchers. .................................................. 16

    1.    Princeton Meets the Criteria for the Safe Harbor Under § 512(c). ................. 17

    2.    Section 512(e) Offers Princeton Additional Protection from Liability. ......... 18

D.    All Copyright Claims Against Princeton Must Be Dismissed Because the Princeton Researchers' Use of the Asserted Copyrights Was Fair. ........................... 20

    1.    The Princeton Researchers' Use of the Asserted Copyrights Was Noncommercial and Had a Different Purpose and Character. ....................... 20

    2.    If Planner 5D's Objects and Asserted Scene Compilation Are Copyrightable at All, They Are Far from the Core of Copyright. ................. 22

    3.    The Princeton Researchers Used the Minimum Amount of Planner 5D's Asserted Copyrights Necessary to Fulfill Their Transformative Purpose. ......................................................................................... 23

    4.    The Princeton Researchers' Use Had No Effect on the Market for Planner 5D's Asserted Copyrights and Furthered the Public Good. .............. 23

V.    **CONCLUSION** ...................................................................................... **25**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ABS Entertainment, Inc. v. CBS Corp.*,
  908 F.3d 405 (9th Cir. 2018) ..................................................................10, 13, 14

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023)..................................................................................20, 21

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994) ...............................................................................15

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..................................................................................20, 22

*Demers v. Austin*,
  746 F.3d 402 (9th Cir. 2014) .............................................................................19

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
  122 F.3d 1211 (9th Cir. 1997) ........................................................10, 11, 13, 14

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
  893 F.3d 1176 (9th Cir. 2018) ...........................................................................15, 16

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)..................................................................................14, 15

*Google v. Oracle*,
  593 U.S. 1 (2021)................................................................................. *passim*

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)..................................................................................20, 25

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
  816 F. Supp. 2d 793 (N.D. Cal. 2009) ...................................................................9

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ...............................................................................23

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967)..................................................................................16, 18

*Lowry v. City of San Diego*,
  858 F.3d 1248 (9th Cir. 2017) ...............................................................................9

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
  528 F.3d 1258 (10th Cir. 2008) .......................................................................10, 11

*Olivier v. Baca,*
    913 F.3d 852 (9th Cir. 2019) ..............................................................................9, 14

*Open Source Yoga Unity v. Choudhury,*
    No. C 03-3182 PJH, 2005 WL 756558 (N.D. Cal. Apr. 1, 2005)...........................15

*Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp.,*
    *PLC,*
    463 F.3d 478 (6th Cir. 2006) ...........................................................................15, 16

*S. Cal. Darts Ass'n v. Zaffina,*
    762 F.3d 921 (9th Cir. 2014) ...................................................................................9

*Ventura Content, Ltd. v. Motherless, Inc.,*
    885 F.3d 597 (9th Cir. 2018) .................................................................................18

*Wright v. Warner Books, Inc.,*
    953 F.2d 731 (2d Cir. 1991).....................................................................................21

**Constitutions**

U.S. Const., Article I, § 8, cl. 8..................................................................................20

**Statutes**

17 U.S.C. § 107................................................................................. *passim*

17 U.S.C. § 512................................................................................. *passim*

**Court Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................9

**Other Authorities**

H.R. Rep. No. 105-796 (1998).....................................................................................16

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

After five years of litigation and discovery, Planner 5D's copyright claims can go no further. It cannot establish copyrightability as to objects copied from reference material, and none of its claims can be enforced against Princeton without contravening core principles of copyright law: safeguarding academic freedom and protecting noncommercial research that contributes valuable knowledge to the public domain. For these reasons and those outlined below, Planner 5D's copyright claims against Princeton fail and judgment must be entered in favor of Princeton as a matter of law.

*First*, Planner 5D cannot meet the standard outlined in this Court's Phase 1 Summary Judgment Order that it must show "specific and demonstrable creative choices" in each of its objects copied from reference material. Planner 5D cannot demonstrate that any aspect of all but 187 of its objects was independently chosen, rather than copied. In any event, all elements of Planner 5D's alleged creative contributions either have already been rejected by this Court or are too trivial to be copyrightable.

*Second*, Planner 5D's claim against Princeton for distribution of its asserted compilation of scenes in its website gallery fails because Princeton did not distribute any of the allegedly copyrightable elements of Planner 5D's compilation. Planner 5D's copyright in its asserted compilation—if it exists at all—is limited to its "selection and arrangement" of scenes in its online gallery and does not include the individual scenes created by Planner 5D's users. It cannot be disputed that Princeton's researchers distributed an entirely different "selection and arrangement" of the scenes downloaded from Planner 5D's website in their SUNCG dataset. Thus, Princeton cannot be liable for distributing Planner 5D's asserted scene compilation copyright.

*Third*, all of Planner 5D's copyright claims fail in full because Princeton is entitled to safe harbor protection under the Digital Millenium Copyright Act ("DMCA"). There is no genuine dispute that Princeton is both a service provider and a nonprofit institution of higher learning entitled to special consideration under the DMCA. Congress expressly enacted a limitation on liability for nonprofit educational institutions in order to safeguard the academic freedom of faculty and graduate student researchers, by preventing copyright law from imposing liability on the University for the acts of its independent researchers. The Princeton researchers had no knowledge that their conduct was allegedly

infringing, but even if they did, that knowledge could not be attributed to Princeton as a matter of law. Because Princeton meets all the criteria required for limitations on liability under 17 U.S.C. § 512(c) and (e), Planner 5D's copyright claims against Princeton must be dismissed.

*Fourth*, the Princeton researchers' alleged copying was fair use and therefore noninfringing as a matter of law. SUNCG was part of the Princeton researchers' contribution to the literature related to designing AI models and processing and analyzing real world scans. The researchers' use of Planner 5D's data to conduct noncommercial academic research and contribute knowledge to the public domain "is not an infringement of copyright" but rather "scholarship [and] research" under the Copyright Act. 17 U.S.C. § 107. Evaluated in light of copyright's purpose—"to promote the Progress of Science and useful Arts"—weighing the statutory factors commands the conclusion that the Princeton researchers' use was fair.

Accordingly, Princeton respectfully requests that the Court enter summary judgment in its favor on all of Planner 5D's copyright claims.

## II.    FACTUAL BACKGROUND

### A.    Princeton Is a Nonprofit Institution of Higher Education Committed to Promoting the Production and Dissemination of Knowledge for the Public Good.

Princeton University is a world-renowned institution of higher learning. A critical mission of the University is promoting rigorous truth seeking and the "advancement, evaluation and dissemination of learning . . . for the benefit of national, state, and local governments and for the general public welfare." Mitchell Decl. ¶ 3;[2] *see also id.* ¶ 4. Consistent with that mission, Princeton is committed to preserving academic freedom and the independence of its faculty and students who conduct innovative and seminal research for the public good. *Id.* ¶¶ 5, 92.

### B.    Princeton Has a Designated DMCA Agent And Provides Its Community with Access to Network Resources Consistent with U.S. Copyright Law.

Since June 1999, Princeton has designated an agent to receive notifications of claimed copyright infringement and registered that agent with the Copyright Office. *Id.* ¶¶ 20–22. Princeton

---

[2] Citations to the Declaration of Cayman C. Mitchell ("Mitchell Decl.") herein include the enumerated paragraph numbers as well as the exhibits cited in those paragraphs.

1    lists the name, address, phone number, and email address of that agent on a Princeton webpage

2    accessible to the general public. Mitchell Decl. ¶ 23.

3         Princeton is a service provider and provides computing and network resources to its

4    community members. *See id.* ¶ 14. Princeton provides to its community its policies and guidelines for

5    acceptable use of University network resources, which accurately describe and promote compliance

6    with U.S. copyright law. *Id.* ¶¶ 16–19. The policies provide for penalties, including suspension of

7    network privileges, for network users who engage in repeated instances of infringement. *Id.* ¶ 17.

8

9    **C.    Planner 5D Asserts Copyright Protection in Near-Exact Replicas of Real-World Objects and a Compilation of User-Created Scenes.**

10         Planner 5D operates a web-based home design tool ("Tool") containing a library of "digitized[]

11    and realistic three-dimensional objects" depicting household items ("Objects") that allows users to

12    create virtual interior designs ("Scenes"). Phase 1 Summary Judgment Order, Dkt. 278 at 2. The

13    "Objects are near exact replicas of real-world objects." *Id.* at 14. A user may designate a Scene they

14    designed for inclusion in Planner 5D's public gallery. Dkt. 217-7 ¶¶ 21–22. Planner 5D claims

15    copyright protection in the individual Objects and a compilation of user-created Scenes on its website

16    gallery as of 2016 (the "Asserted Scene Compilation") (together, the "Asserted Copyrights").

17    **D.    Most of Planner 5D's Asserted Objects Were Based on Reference Materials.**

18         "Most" of the Objects were "modeled after existing objects" in real life or from reference

19    images on the web. Dkt. 278 at 3. But Planner 5D has no evidence of which modeler created each

20    Object or what reference materials the modeler relied upon. Mitchell Decl. ¶¶ 104, 107–12.

21         This Court's Phase 1 Summary Judgment Order concluded that Planner 5D "does not hold a

22    copyright to objects that were copied wholesale from existing sources with no creative choices." Dkt.

23    278 at 15. Pursuant to that Order, Planner 5D submitted its "Narrowed Objects Lists" reducing its

24    copyright claims to approximately 2,009 Objects (the "Asserted Objects") divided into four categories:

25    - **Exhibit A:** 187 Objects allegedly independently created from the modelers' imaginations;

26    - **Exhibit B:** Objects based on reference materials for which Planner 5D possesses at least one known reference image, depicted next to examples of some of the known reference images for each Object;

27

28

- **Exhibit C:** Objects based on reference materials for which Planner 5D has no record of the reference materials used, depicted next to 2-3 examples of possible reference images that Defendants identified in their Phase 1 Motion for Summary Judgment, Dkt. 217; and

- **Exhibit D:** Objects based on reference materials for which Planner 5D has no record of the reference materials used, depicted next to 2-3 examples of images its counsel found online using a reverse image search after the Court's Phase 1 Summary Judgment Order.

*See* Dkt. 282-2 at 2–3. The Lists were prepared by counsel for Planner 5D in consultation with two of Planner 5D's executives, neither of whom was responsible for creating any of the Asserted Objects. Mitchell Decl. ¶¶ 105–06. Princeton assumes as true for the purpose of summary judgment that the Asserted Objects on the Narrowed Objects Lists were reproduced or distributed by Princeton's researchers, but reserves the right to challenge that at trial. And based on Planner 5D's assertion that the Objects in Exhibit A were created entirely from modelers' imaginations, Princeton is not moving for summary judgment on the copyrightability of the 187 Objects in Exhibit A.[3]

Princeton moves on copyrightability of the remaining Objects in Exhibits B through D.

### E.    Planner 5D's Public Gallery Showcased Users' Creativity By Displaying Scenes Users Designated in Chronological Order.

The purpose of Planner 5D's public gallery of Scenes was to promote and showcase the capabilities of Planner 5D's Tool and the creativity of its users. *Id.* ¶¶ 29–30. Scenes were automatically included in the public gallery upon designation by the user and arranged in chronological order. Dkt. 217-7 ¶¶ 21–24. Planner 5D then purportedly "winnowed" Scenes from the public gallery based on criteria including, *e.g.*, "antirealism." Mitchell Decl. ¶ 30.[4]

### F.    Researchers in Princeton's Computer Vision and Robotics Lab Downloaded Object and Scene Files from Planner 5D's Website and Created SUNCG for the Purpose of Foundational Machine Learning Research in Computer Vision.

In or around 2014, Dr. Thomas Funkhouser, a computer science professor at Princeton, established a research group informally referred to as the Princeton "Computer Vision and Robotics Lab" (the "Lab"). *Id.* ¶ 25. Other researchers associated with the Lab included then-postdoctoral

---

[3] Notably, the total number of Objects that Planner 5D asserts were independently created from modelers' imaginations rather than copied from reference material remains unclear, as some of the Objects listed in Exhibit A are also listed in Exhibits C or D. *See* Dkt. 302-1 ¶ 18.

[4] Princeton intends to demonstrate at trial that no creative selection actually occurred as there is no contemporaneous evidence of any 'winnowing.' But that factual dispute is not relevant to this motion and Princeton assumes for the purpose of this motion that Planner 5D creatively selected Scenes for the compilation as Planner 5D testified it did.

researchers Angel Chang ("Dr. Chang") and Manolis Savva and then-Ph.D. candidates Shuran Song ("Dr. Song"), Fisher Yu, Andy Zeng, and Yinda Zhang. *Id.* ¶ 27. Researchers in the Lab were studying "a wide variety of topics," including "analyzing . . . collections of 3D shapes to understand relationships between different shapes and [to] try to infer semantics or functions . . . from shapes." *Id.* ¶ 26. One sub-area of computer vision research pursued by the Lab at that time was "scene understanding," or the study of what information can be inferred from the observation of a scene. *Id.*

In February 2016, Dr. Song located Planner 5D's website while searching online for potential data that might assist her research. Dkt. 217-4 ¶¶ 3–4. ████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
*Id.* ¶¶ 7–16. ████████████████████████████████████████████████████████████████

████████████████ Given that the data was freely available to the public, Dr. Song believed she was authorized to download the data files from Planner 5D's website. Mitchell Decl. ¶¶ 41–42. ████████
████████████████████████████████████████████████████████████████████████████
████████████████ Dkt. 217-4 ¶¶ 17–18. In total, Dr. Song downloaded data files underlying approximately 49,000 Scenes. Mitchell Decl. ¶ 40. She saved the files to a folder created and used by the Lab and stored on servers maintained by the Princeton computer science department. *Id.* ¶¶ 39–40.

After downloading, the Princeton researchers invested considerable time, effort, and creativity to convert the raw data downloaded from Planner 5D into a dataset usable for computer vision machine learning. For example, the researchers selected a subset of the downloaded Scenes. They removed duplicated or empty Scenes. *Id.* ¶ 46. To ensure that the Scenes used in their research were realistic, the researchers crowdsourced ordinary individuals through the Amazon Mechanical Turk platform to vote on whether each floor of a given Scene looked realistic. *Id.* ¶ 47. The researchers collected three votes per floor and selected for their research only those that had at least two positive votes. *Id.*

The researchers also converted the Planner 5D Scene and Object data files from the format used by the Planner 5D website into the "OBJ" object format that was more widely used by computer

vision researchers in 2016. *Id.* ¶¶ 45, 48. They manually labeled each Object according to its semantic category and added information about light sources and emissions. *Id.* ¶ 49. Dr. Chang worked with high school students hosted by the Lab to develop an annotation tool and annotate the files. *Id.* ¶ 60–61. To facilitate deep machine learning, the researchers created a version of each Object and Scene with discrete 3D pixels, where each pixel carried metadata indicating what Object (if any) occupied that pixel (also called "voxelization"). *Id.* They developed software to choose meaningful camera poses to render 2D images of each room in the dataset and generated synthetic depth maps (maps containing information about the distance of each pixel from the simulated camera). *Id.* ¶¶ 45, 50.

The result of the Princeton researchers' efforts was a dataset of approximately 45,000 scenes (the "SUNCG" dataset). *Id.* ¶ 52. The researchers then used SUNCG to pretrain machine learning models—before training them on other, real-world datasets—in connection with a series of research projects relating to scene understanding, and published their findings in a series of academic research papers. *See id.* ¶¶ 53–56. In addition to the Lab's graduate student researchers, an undergraduate student conducting an independent study used data from SUNCG for her senior thesis project. *Id.* ¶¶ 57–59.

Dr. Song's first research paper using SUNCG, *Semantic Scene Completion from a Single Depth Image*, is illustrative of the research conducted with the data. Dr. Song designed a neural network from scratch ("SSCNet") to accomplish a new task she also developed called "semantic scene completion." Semantic scene completion refers to the ability to predict, based on a 2D image of a scene from one point of view, what other parts of the scene that may be obstructed would look like (say, the legs of a chair underneath a table), and what kinds of objects would be in the scene. *Id.* ¶ 54. To accomplish this task, Song "pretrained" the neural network by feeding it "depth maps" of SUNCG scenes paired with information about 3D volume. *Id.* ¶¶ 50, 55. Then, the researchers trained, or "fine-tuned," SSCNet using real-world data of interior scenes from an unrelated, preexisting dataset called NYUv2.[5] *Id.* ¶ 55. Ultimately, SSCNet would ingest a scan of a real interior space and output a probability

---

[5] NYUv2 is a real-world dataset released in 2012 by a research team led by an NYU researcher. NYUv2 is unrelated to Planner 5D and contains no Planner 5D data. Mitchell Decl. ¶ 55.

distribution of the "voxel occupancy" and object categories for all voxels (3D pixels) inside the camera

view, *e.g.*:



*Id.* Ex. 29 at 1 fig. 1.

### G. The Princeton Researchers Made SUNCG Available to Other Researchers Subject to Terms Limiting Its Use to Noncommercial Research and Prohibiting Further Distribution.

Consistent with standard practice for computer science research, the Princeton researchers

made their research papers available, along with SUNCG, so that other researchers could review or

replicate their findings. Mitchell Decl. ¶ 62. The researchers required outside researchers to execute

the "Agreement of SUNCG Dataset" (the "SUNCG Terms") before they could receive access to the

dataset. The SUNCG Terms provided, *inter alia*:

> Before we are able to offer you access to the database, please read the following agreement and indicate your response. . . . After approval, you (the "Researcher") receive permission to use the SUNCG database (the "Database") at Princeton University. In exchange for being able to join the SUNCG community and receive such permission, Researcher hereby agrees to the following terms and conditions: . . .
>
> 1. **Researcher shall use the Database only for non-commercial research and educational purposes.** . . .
>
> 4. Researcher may provide research associates and colleagues with access to the Database provided that they first agree to be bound by these terms and conditions.

*Id.* ¶ 63 (emphasis added). The SUNCG Terms were modeled after the terms of use for earlier research

datasets incorporating third-party material downloaded from the internet. *Id.* ¶ 64. The researchers

1   required anyone who wished to access the SUNCG dataset to agree to the SUNCG terms. *Id.* ¶¶ 65–

2   66. Record evidence shows that only parties who signed the terms received access to the dataset.

3       Moreover, Princeton's researchers consistently maintained that anyone with access to SUNCG

4   must comply with the SUNCG Terms without exception. When researchers at Google and Geomagical

5   Labs inquired as to whether they could use SUNCG for research that might one day be incorporated

6   into commercial products, the Princeton researchers referred the entities to the SUNCG Terms. *Id.*

7   ¶¶ 72–74, 77–78. ██████████ inquired as to whether it would be possible to obtain a license

8   to use the data commercially, and the Princeton researchers declined. *Id.* ¶ 76.

9

10       **H.**    **Third Parties Understood That SUNCG Was Available for Noncommercial Research Only and Never Used SUNCG Commercially.**

11       There is no evidence in the record that *any* individual or entity ever used SUNCG

12   commercially. Researchers at academic institutions and commercial entities alike executed the

13   SUNCG Terms and understood that the dataset was available for noncommercial research only. *See*

14   *id.* ¶¶ 68–79. Planner 5D sought third-party discovery from multiple commercial entities whose

15   researchers requested access to SUNCG, including Apple, Adobe, and Intel, but uncovered no

16   evidence indicating that those entities or others ever used SUNCG commercially. *Id.* ¶ 68.

17       Indeed, record evidence shows the opposite. For instance, one Microsoft employee learned

18   about Planner 5D by accessing SUNCG. *Id.* ¶ 82. Because he understood that SUNCG could not be

19   used for commercial purposes, he reached out to Planner 5D directly and attempted to secure access

20   to Planner 5D's data for commercial use. *Id.* ¶¶ 83–84. ████████████████

21   ███████████████████████████████████████████████ *Id.*

22   ¶ 85. Through that evaluation, Microsoft determined that Planner 5D's data was poor quality and

23   would require significant work to make it usable for machine learning. *Id.* ¶ 86. Ultimately, Planner

24   5D declined to license its data to Microsoft for commercial use separate from a full-scale acquisition

25   of its business, so no deal was made. *Id.* ¶ 87.

26

27

28

## I.    Princeton Promptly Disabled Access to SUNCG Upon Receiving Notification from Planner 5D of the Researchers' Alleged Infringement.

Princeton became aware of Planner 5D's potential claims on or around March 14, 2019, when it received a cease-and-desist letter from Planner 5D's counsel. *Id.* ¶ 96. Prior to that date, the University had no knowledge of Planner 5D and no involvement with the Lab's research projects using SUNCG nor with enforcement of the SUNCG Terms. *Id.* ¶¶ 89–95. Other than one unrelated copyright takedown notice concerning Fisher Yu, Princeton had not received notifications of infringing activity for any of the faculty members or students who worked on SUNCG in the period from 2016 to 2019, whether about Planner 5D's data or otherwise. *Id.* ¶¶ 94–95.

Princeton disabled access to the SUNCG dataset upon notification of the alleged infringement from Planner 5D. By March 15, 2019—one day after receiving Planner 5D's letter—the SUNCG webpage was removed and visitors were automatically redirected to the Princeton University home page. *Id.* ¶¶ 97–99. Researchers who had signed the SUNCG Terms and obtained the link to SUNCG were no longer able to download it. *Id.* ¶ 100.

## III.    LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Dkt. 278 at 8. A fact is "material" only if it "might affect the outcome of the suit"; a dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014).

As the plaintiff and lacking copyright registrations, Planner 5D carries the burden of proof at trial to establish that it owns valid copyrights and that its copyrights have been infringed. *See Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 816 F. Supp. 2d 793, 797 (N.D. Cal. 2009). To prevail on summary judgment, "[Princeton] need only point out 'that there is an absence of evidence to support [Planner 5D's] case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citation omitted). The burden then shifts to Planner 5D to set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "[C]onclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment." Dkt. 278 at 8 (citing *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).

# IV.    ARGUMENT

Planner 5D's copyright claims should be dismissed as a matter of law. <u>First</u>, Planner 5D cannot satisfy its burden to establish ownership of a valid copyright in all but 187 of the Asserted Objects because the Asserted Objects are based on preexisting reference materials and Planner 5D has no evidence of specific creative choices that satisfy this Court's test as articulated in its Phase 1 Summary Judgment Order. <u>Second</u>, even if Planner 5D's Asserted Scene Compilation is copyrightable due to Planner 5D's alleged "selection and arrangement" of the user-created Scenes—which Princeton will disprove at trial—as a matter of law the Princeton researchers did not *distribute* that Asserted Scene Compilation. Rather, the Princeton researchers created SUNCG—a different compilation from Planner 5D's—and distributed only that transformed dataset. There can be no dispute that the alleged selection and arrangement of the Asserted Scene Compilation was not distributed in SUNCG.

Finally, all copyright claims against Princeton must be dismissed because Princeton is entitled as a matter of law to safe harbor protection from the allegedly infringing acts of its independent researchers under 17 U.S.C. § 512(c) and (e), and because Princeton researchers' use of Planner 5D's data for noncommercial research and scholarship was fair.

## A.    Planner 5D's Copyright Claims for Objects Based on Reference Materials Fail as a Matter of Law Because Planner 5D Cannot Make the Showing Required By This Court's Phase 1 Summary Judgment Order as to Any Such Object.

Defendants now have the evidence that was missing in Phase 1: Planner 5D's contentions about what makes its Asserted Objects copied from reference material copyrightable. Those contentions, embodied in Exhibits B through D of Planner 5D's Narrowed Objects Lists, constitute the only proof of copyrightability Planner 5D has put forward and are insufficient as a matter of law.

As this Court recognized in its Phase 1 Summary Judgment Order, Planner 5D can establish a valid copyright for only those Objects that "involve a specific and demonstrable creative choice," Dkt. 278 at 22, such that the choices "yielded an original product, or that more than one way of representing the objects would have been acceptable." *Id.* at 14; *see also ABS Entertainment, Inc. v. CBS Corp.*, 908 F.3d 405, 414 (9th Cir. 2018); *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1218–20 (9th Cir. 1997); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264–

66 (10th Cir. 2008). Mere changes in medium, no matter how laborious, are not original contributions. Dkt. 278 at 10–11; *see also Meshwerks*, 528 F.3d at 1268; *Genesis Creative*, 122 F.3d at 1219–20.

Planner 5D cannot meet its burden to identify "specific and demonstrable creative choices" as to the Asserted Objects in Exhibits B–D of the Narrowed Objects List—the Objects Planner 5D concedes were copied from reference material. Consistent with this Court's Phase 1 ruling that Planner 5D "does not hold a copyright to objects that were copied wholesale from existing sources with no creative choices," Dkt. 278 at 15, the Asserted Objects in Exhibits B–D of the Narrowed Objects Lists are uncopyrightable as a matter of law. Princeton's motion for summary judgment must be granted.

### 1. Planner 5D Cannot Establish Creative Contributions in the Objects Because It Does Not Know What Reference Materials Its Modelers Used.

This Court gave Planner 5D a renewed chance to demonstrate it made creative contributions in its Objects based on reference material. But the Narrowed Objects Lists—the only new "evidence" Planner 5D submitted—contain no more than what this Court has already said is insufficient. Since Planner 5D does not know what reference material(s) its modelers used for Objects concededly based on reference materials, Planner 5D cannot make the showing of originality required under this Court's Phase 1 Summary Judgment Order.

To understand why, consider first Planner 5D's primary argument in favor of the copyrightability of its Objects at Phase 1 summary judgment. Planner 5D asserted, and this Court accepted, that a thumbnail-by-thumbnail comparison of 2D images does not necessarily depict all possible "creative" contributions that the modelers could have made in creating the Asserted Objects in 3D. *See* Dkt. 278 at 14. Thus, as an example of a characteristic that *could* support copyrightability,[6] the Court described how a modeler might have "decide[d] what the bottom of [a] table should look like, without assistance from the version in the third-party catalog." *Id*. In other words, this Court agreed with Planner 5D that if a modeler created a portion of a 3D object not depicted in a 2D reference image, that could be a creative choice, and thus that a thumbnail-by-thumbnail comparison of a given 3D Object and its reference material was not dispositive of copyrightability.

---

[6] As the Court later clarified, in its Phase 1 Summary Judgment Order the Court did not rule on the copyrightability of any specific Objects, but rather set out examples of characteristics that "would support copyrightability." Dkt. 316 at 2.

1    But Planner 5D has *no* record evidence of *any* creative choices made by its modelers and seeks

2    to get to a jury with nothing more than the inverse of the very same thumbnail-by-thumbnail

3    comparison previously considered insufficient. It asks the Court to assume that in designing a given

4    Object, the *only references* the modelers used are the specific *2D* images on the Narrowed Objects

5    Lists, and thus that every possible difference between Planner 5D's 3D Objects and the specific 2D

6    images on the Lists *must be* a creative choice. There is no evidence to support such absurd

7    assumptions. Planner 5D does not assert that the only reference materials its modelers used are

8    contained in the Lists and even concedes its modelers could have looked at reference images in

9    addition to those depicted in Exhibits B–D. Mitchell Decl. ¶¶ 109–12.[7] Moreover, as to Exhibits C &

10    D, Planner 5D concedes the reference materials on the Lists may not have been used *at all*. Mitchell

11    Decl. ¶¶ 110–11.[8] In other words, the differences or 'choices' on the Lists may not have been

12    differences at all; those elements of the Objects may simply have been copied from reference material

13    that is not included on the Lists. Rather than citing to any record evidence of creative choices, Planner

14    5D hopes to get to the jury on mere inference and assumption. This it cannot do.

15    In short, Planner 5D's inability to identify the reference materials its modelers relied upon

16    makes the analysis that this Court has demanded it conduct impossible. Under the criteria and standard

17    laid out in this Court's Phase 1 Summary Judgment Order, Planner 5D's copyright claims with respect

18    to the Asserted Objects in Exhibits B–D of the Narrowed Objects Lists fail as a matter of law.

19

20    **2.    Planner 5D Has Presented No Evidence of Non-Trivial Differences Between the Asserted Objects and Possible Reference Materials.**

21    Entirely separate, additional reasons compel summary judgment finding the Objects in

22    Exhibits B–D uncopyrightable. The Objects based on reference material are, by definition, derivative

23    works of that reference material. To establish ownership of a copyrightable "derivative work," Planner

24    5D must show that (1) "the original aspects of a derivative work [are] more than trivial," and that (2)

25    "the original aspects of a derivative work . . . reflect the degree to which it relies on preexisting material

---

26    [7] For instance, Planner 5D modelers may have looked at additional photos depicting the Objects from different angles or in different colors, or copied off of 3D models in addition to 2D images.

27    [8] There is also no evidence that the images Planner 5D's counsel could find on the internet in 2023 are

28    representative of the kinds of images that Planner 5D's modelers would have seen on the internet as much as ten years earlier, when the Objects were originally created.

and [do] not in any way affect the scope of any copyright protection in that preexisting material." *ABS*, 908 F.3d at 414. Summary judgment is warranted where "no reasonable trier of fact could find any non-trivial artistic differences between" the original works and the copies. *Genesis Creative*, 122 F.3d at 1224. In *Genesis Creative*, the Ninth Circuit held that "some differences between the facial expressions represented on [plaintiff's] costumes and those in the underlying copyrighted characters," though artistic and creative, "in the context of the overall costume, . . . are so slight that no reasonable trier of fact would see anything but a direct replica of the underlying characters." *Id.* at 1224. Likewise, in *ABS*, the Ninth Circuit held that a remastered sound recording, while potentially different or improved from the original recording, was not a protectible derivative work where "the essential character and identity" of the original recording was unchanged. 908 F.3d at 420–22.

In its Phase 1 Summary Judgment Order, this Court held that "mesh" choices, such as the placement and number of polygons and pixels that make up a 3D model, are insufficient to establish originality, as are choices related to color, transparency, and texture where those choices are intended to create the "closest replica of the original object that can be produced in the program." Dkt. 278 at 14. Similarly, the other minor differences that Planner 5D has since identified in its Narrowed Objects Lists are precisely the type of trivial 'choices' that must be excluded as a matter of law from consideration when determining originality under *Genesis Creative* and *ABS*.[9] Consider just three illustrative examples:

| Cite | P5D Image(s) | Proposed Ref. Image(s) | Description |
|---|---|---|---|
| Ex. C (Dkt. 286-3) at 21 |  |  | Planner 5D asserts that the differences in "color and texture" and "under-seat hardware" between Planner 5D's Object and the proposed reference image demonstrate creative choices. However, Planner 5D's Object is immediately recognizable as a model of the proposed reference image. The color, texture, and inclusion or exclusion of under-seat hardware are "clearly not the defining aspect" of the Object. 122 F.3d at 1224. The "essential character |

[9] Moreover, Planner 5D modelers *set out* to make copies of the reference material. Dkt. 278 at 14; Dkt. 217-7 ¶¶ 9–12. And evidence that an alleged creator's *objective* was to "to make a copy of someone else's creation, rather than to create an original work, . . . is persuasive evidence that the final product likely contains little more than a trivial contribution and does not, in fact, result in an original work." *ABS*, 908 F.3d at 418–19.

| | | | |
|---|---|---|---|
| | | | and identity" of the reference remains unchanged, 908 F.3d at 420–22. |
| Ex. C (Dkt. 286-3) at 200 |  |  | Planner 5D asserts that the differences in "color," "undertones," and "wood grain" between the Object and proposed reference material constitute creative choices. However, Planner 5D's Object is immediately recognizable as a model of the reference image, given the same overall shape, number of shelves, and hole in the right back side of the bottom-most shelf. The color, undertones, and wood grain are "clearly not the defining aspect" of the Object, 122 F.3d at 1224. The essential character and identity of the reference remains unchanged. 908 F.3d at 420–22. |
| Ex. D (Dkt. 283-12) at 255 |  |  | Planner 5D asserts that the differences in "curvature of the stool cushion" and proportions are copyrightable creative choices. Again, Planner 5D's Object shares the same overall visual impression as the references; any slight differences in curvature of the cushion are "clearly not the defining aspect" of the Object or the reference material. 122 F.3d at 1224. |

These examples are merely illustrative of why Planner 5D cannot meet its burden to show copyrightability in all Objects created from reference material on Exhibits B–D of P5D's Narrowed Objects Lists. Princeton's motion demonstrates "that there is an absence of evidence to support [Planner 5D's]" claim to copyrightability in all Objects on Exhibits B–D, because they are not original. *Olivier*, 913 F.3d at 857. As in *ABS*, Planner 5D's Objects do not "contain[] anything of consequence owing its origin to" Planner 5D's modelers. 908 F.3d at 422.

**B.    Planner 5D's Copyright Claim for the Asserted Scene Compilation by Distribution Fails as a Matter of Law Because Princeton Did Not Distribute the Selection or Arrangement of Planner 5D's Asserted Scene Compilation.**

Planner 5D does not assert copyright protection in the individual user-created Scenes—only a compilation of users' Scenes that appeared in its public gallery in 2016 (the "Asserted Scene Compilation"). Dkt. 217-3 at 9. A compilation copyright is "thin," and "limited to the [plaintiff's] particular selection or arrangement." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–51 (1991). "Notwithstanding a valid copyright," a defendant may use the constituent works in a

1    new compilation "so long as the competing work does not feature the same selection and

2    arrangement." *Id*. at 349; *accord Open Source Yoga Unity v. Choudhury*, No. C 03-3182 PJH, 2005

3    WL 756558, at *4–5 (N.D. Cal. Apr. 1, 2005). In the Ninth Circuit, "there can be no infringement [of

4    a compilation] unless the works are virtually identical." *Apple Computer, Inc. v. Microsoft Corp.*, 35

5    F.3d 1435, 1442, 1446 (9th Cir. 1994); *accord Experian Info. Sols., Inc. v. Nationwide Mktg. Servs.*

6    *Inc.*, 893 F.3d 1176, 1186 (9th Cir. 2018). Princeton disputes the copyrightability of the Asserted

7    Scene Compilation,[10] but even if it is copyrightable, Planner 5D cannot meet its burden to show that

8    any allegedly copyrightable elements of the compilation were *distributed*.[11]

9          It cannot be disputed that the alleged selection and arrangement of the Asserted Scene

10    Compilation was not distributed by Princeton's researchers. Before distributing SUNCG, Princeton's

11    researchers applied their own selection criteria to remove thousands of Scenes that were unsuitable for

12    computer vision research. *See* Mitchell Decl. ¶¶ 45–47. *E.g.*, the researchers omitted "antirealistic"

13    Scenes because such Scenes were unhelpful for training their models. The researchers further

14    transformed individual Scenes, including by grounding objects, adding dense annotations, and

15    reformatting the underlying files. *See id.* ¶¶ 48–51. They then packaged the remaining, transformed

16    Scenes into SUNCG in a completely different arrangement from Planner 5D's chronological Asserted

17    Scene Compilation. *Compare* Mitchell Decl. ¶ 29 & Ex. 22 *with id.* ¶ 52. The works are not "virtually

18    identical," and thus there is no infringement. *Apple*, 35 F.3d at 1442, 1446.

19          *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp., PLC*, 463

20    F.3d 478 (6th Cir. 2006) is also instructive. There, the Sixth Circuit held that Lexis did not infringe on

21    a compilation of legal forms, in part because Lexis exercised "professional judgment" in selecting

22    only a subset of the original compilation and arranged the forms differently. *Id.* at 483–84. And that

23    was true even though the works were identical; here, by contrast, the researchers significantly altered

24

25    _____

  [10] Should the compilation claim survive summary judgment, evidence at trial will show that the Scenes

26    were arranged in chronological order without human input, that there is no contemporaneous evidence
*any* Scenes were actually winnowed, and that the purported selection criteria Planner 5D identified in

27    testimony were not applied. *See* Dkt. 217-7 ¶¶ 23–24.
  [11] Princeton is not moving on Planner 5D's reproduction claim as to the Asserted Scene Compilation.

28    Should that claim be tried, evidence at trial will show that Planner 5D suffered no damages from the
initial reproduction of the Asserted Scene Compilation onto the researchers' computers.

1    every underlying Scene, further making their judgment on how to select and arrange the modified

2    Scenes different from Planner 5D's.[12]

3    Because Planner 5D cannot demonstrate that SUNCG incorporated any allegedly

4    copyrightable elements of the Asserted Scene Compilation, it cannot establish a violation of its

5    exclusive distribution right as a matter of law.

6    **C.    All Copyright Claims Against Princeton Must Be Dismissed Because Princeton Is**
         **Entitled to Safe Harbor from Liability Under 17 U.S.C. § 512 for the Acts of Its**
7        **Independent Researchers.**

8    Princeton has two complete defenses to all of Planner 5D's copyright claims warranting entry

9    of summary judgment in Princeton's favor: Section 512 and fair use. The statutory safe harbor in

10   Section 512 of the Copyright Act limits the liability of service providers for infringements by users on

11   their networks. 17 U.S.C. § 512. And as a University, Princeton receives unique and additional

12   protection under § 512 because Congress recognized that "freedom of thought[] and action" and

13   "academic freedom" warranted special protection. H.R. Rep. No. 105-796, at 74 (1998); *see* 17 U.S.C.

14   § 512(e). These are not mere platitudes; universities as institutions are critical reservoirs of this

15   Nation's talent and intellectual capital, facilitating the development of groundbreaking and often

16   controversial ideas by the very act of not interfering with or directing them. As the Supreme Court has

17   repeatedly recognized, in all academic domains, the "Nation's future depends" on "safeguarding

18   academic freedom," and "universities" play a "vital role in a democracy." *Keyishian v. Bd. of Regents*

19   *of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Sweezy v. State of N.H. by Wyman*, 354

20   U.S. 234, 250 (1957); other citations omitted).

21   The "Limitation on Liability of Nonprofit Educational Institutions," 17 U.S.C. § 512(e),

22   provides that in precisely the circumstances present here, nonprofit universities like Princeton cannot

23   be held liable for copyright infringement. Here, Princeton's researchers had no knowledge that their

24   activities were infringing, but even if they did, any such knowledge could not be attributed to the

25   University as Congress expressly divorced universities from the conduct and knowledge of their

26   independent researchers.

27
28   ---
     [12] While *Ross* involved copying a smaller percentage of the plaintiff's compilation than the amount
     used here, that is not dispositive. The Ninth Circuit has held that the use of even 80% of a compilation
     cannot infringe on that compilation as a matter of law. *Experian*, 893 F.3d at 1187–88.

Because Princeton meets the eligibility requirements of § 512(c) and is afforded the added protections of § 512(e), all of Planner 5D's claims against Princeton for copyright infringement are barred as a matter of law.

### 1. Princeton Meets the Criteria for the Safe Harbor Under § 512(c).

Section 512(c) provides that service providers like Princeton[13] cannot be liable for the infringing acts of users on their networks so long as the service provider (1) maintains a designated agent to receive notifications of claimed infringement; (2) "does not have actual knowledge that the material or an activity using the material on the system or network is infringing," "in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent," or, "upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;" and (3) does not receive a "financial benefit directly attributable to the infringing activity," where the service provider has the "right and ability" to control the activity. 17 U.S.C. § 512(c)(1)–(2). Princeton meets these criteria.[14]

<u>First</u>, at all relevant times, Princeton has designated an agent to receive notifications of claimed copyright infringement with the Copyright Office, and Princeton has maintained the agent's contact information on a website accessible to the public. Mitchell Decl. ¶¶ 20–23.

<u>Second</u>, Princeton had no actual or red flag knowledge that the SUNCG dataset was allegedly infringing Planner 5D's Asserted Copyrights until it received Planner 5D's cease-and-desist letter on or around March 14, 2019. As Princeton's 30(b)(6) representative testified, Princeton University "was not involved in the SUNCG project" and had no knowledge of the researchers' conduct developing or distributing the dataset at all—much less that there was a possibility the conduct was infringing. *See* Mitchell Decl. ¶¶ 91–93. Moreover, the record demonstrates that none of the *researchers* knew their conduct to be infringing either, nor did they have any reason to suspect that their noncommercial research would be subject to a claim of infringement until Planner 5D sent its cease-and-desist letter

---

[13] It is undisputed that Princeton meets the definition of a "service provider" under § 512 because it provides online services and network access. *See* 17 U.S.C. § 512(k)(1)(b); Mitchell Decl. ¶ 14.

[14] It is undisputed that Princeton also satisfies the conditions for eligibility in Section 512(i). Princeton has "adopted and reasonably implemented" a termination policy for "repeat infringers," Mitchell Decl. ¶ 17, informs subscribers and account holders of its system or network of that policy, *id.* ¶ 18, and "accommodates and does not interfere with standard technical measures," *id.* ¶ 19.

in March 2019. *Id.* ¶¶ 41–43. Indeed, Planner 5D had not even registered its alleged works prior to sending the cease-and-desist letter. "Knowledge" under § 512 is about knowledge of infringement, not knowledge of conduct or material that is later adjudicated to be infringing. *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 608 (9th Cir. 2018). Princeton had no actual or red flag knowledge.

Nor did Princeton receive any "financial benefit directly attributable" to the researchers' use of the Asserted Copyrights or the distribution of SUNCG. The researchers used the SUNCG dataset for noncommercial research and distributed it for free, subject to noncommercial use limitations. *See* Mitchell Decl. ¶¶ 62–79. Princeton did not receive any revenues or profits associated with its researchers' creation of SUNCG or third parties' use of the dataset, and there is no indication that Princeton ever intended to do so. Finally, upon receiving the cease-and-desist letter from Planner 5D, Princeton expeditiously disabled access to the SUNCG dataset within one day. *Id.* ¶¶ 96–99.

Accordingly, as a matter of law, Princeton cannot be held liable for monetary damages by reason of the downloading or distribution of SUNCG.

### 2.    Section 512(e) Offers Princeton Additional Protection from Liability.

Congress recognized that universities acting as service providers face unique risks with respect to allegations of copyright infringement due to conduct by users of university networks. Congress knew that students and other university network users would already be deemed "users" under Section 512(c), but was specifically concerned that courts might apply the doctrine of *respondeat superior* to attribute the activities of independent faculty and graduate students to the university in those individuals' capacity as employees to the institution. *See* H.R. Rep. No. 105-796, at 74 (1998). Because "independence—freedom of thought, word and action—is at the core of academic freedom," Congress enacted § 512(e) to provide "special" protection for universities from the actions of faculty, graduate student teachers, and researchers. *Id.*; *see also Keyishian*, 385 U.S. at 603.

Section 512(e) prohibits courts from attributing the knowledge of faculty members or graduate students to a university where: (a) the infringing activities do not involve provision of "online access to instructional materials that are or were required or recommended . . . for a course taught at the institution by such faculty member or graduate student" within the last three years; (b) the institution has not received more than two notifications of claimed infringement by such faculty member or

1   graduate student within the last three years; and (c), the "institution provides to all users of its system

2   or network informational materials that accurately describe, and promote compliance with, the laws

3   of the United States relating to copyright." 17 U.S.C. § 512(e)(1). All are met here.

4       First, no faculty member or graduate student "required or recommended" access to SUNCG or

5   Planner 5D's raw data files for a course taught by that faculty member of graduate student within the

6   meaning of the statute. Princeton is not aware of any published case interpreting Section 512(e), but

7   the legislative history of § 512(e) explains that "[t]he phrase 'required or recommended' is intended

8   to refer to instructional materials that have been *formally and specifically identified in a list of course*

9   *materials that is provided to all students enrolled in the course for credit*; it is not intended, however,

10  to refer to the other materials which, from time to time, the faculty member or graduate student may

11  incidentally and informally bring to the attention of students for their consideration during the course

12  of instruction." H.R. Rep. No. 105-796, at 75 (emphasis added). Here, there is nothing in the record

13  indicating that the material was ever "formally and specifically identified" as required or

14  recommended material for any course; though there is evidence that a faculty member (Dr.

15  Funkhouser) and graduate student (now-Dr. Song) "informally" brought Planner 5D files to the

16  attention of one undergraduate conducting an independent study for credit in Dr. Funkhouser's lab and

17  one or two high school students assisting the Lab with research. *See* Mitchell Decl. ¶¶ 57–61.

18      Second, Princeton did not receive more than two notifications of claimed infringement for any

19  faculty member or graduate student that worked with Planner 5D data in 2016 to 2019 or the three

20  years preceding. *Id.* ¶¶ 94–95. Third, Princeton provided in 2016 (and today) to all users of its

21  networks informational materials that accurately describe and promote compliance with copyright law.

22  *Id.* ¶¶ 6–19.

23                                          * * *

24      Planner 5D seeks to hold Princeton responsible for the alleged infringing acts of its

25  independent researchers. But Congress has expressly foreclosed such liability in these limited

26  circumstances. Following Congress's direction, this Court must "safeguard[] academic freedom,"

27  *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014), and dismiss all Planner 5D's copyright claims

28  against Princeton.

**D.    All Copyright Claims Against Princeton Must Be Dismissed Because the Princeton Researchers' Use of the Asserted Copyrights Was Fair.**

Princeton's second complete defense to all of Planner 5D's copyright claims is fair use. The Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as . . . **scholarship, or research, is not an infringement of copyright**." 17 U.S.C. § 107 (emphasis added). This limitation on copyright has existed "[f]rom the infancy of copyright protection," and is "necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting U.S. Const., art. I, § 8, cl. 8). Fair use "requires courts to avoid rigid application of the copyright statute when . . . it would stifle the very creativity which that law is designed to foster." *Id.* at 577 (citation and alteration omitted).

The statute directs consideration of four factors to determine whether a use is fair, and therefore non-infringing:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. All four factors "are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578, but the first and fourth factors are generally the most important, *see id.* at 579; *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550, 566 (1985).

Here, three factors, including the most important two, weigh in favor of a finding of fair use, while one is neutral. The Princeton researchers' use of Planner 5D's Asserted Objects and Asserted Scene Compilation (together, the "Asserted Copyrights") was fair as a matter of law.

**1.    The Princeton Researchers' Use of the Asserted Copyrights Was Noncommercial and Had a Different Purpose and Character.**

The first factor of the fair use analysis considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The "central" question it asks is "whether the new work merely supersedes the objects of the original creation (supplanting the original), or instead adds something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S.

508, 528 (2023) (quoting *Campbell*, 510 U.S. at 579 (quotation marks and alterations omitted)). The examples provided in the preamble to § 107—which include "scholarship[] or research," 17 U.S.C. § 107—"contemplate the use of an original work to serve a *manifestly different purpose* from the work itself." *Warhol*, 598 U.S. at 528 (quotation marks and alterations omitted; emphasis added); *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991) (there is a "strong presumption" that factor one favors fair use where the use is listed in the preamble to § 107). The Supreme Court also clarified in *Warhol* that whether a use was commercial or noncommercial is critical to deciding whether the first factor weighs in favor of fair use. *See* 598 U.S. at 531–33.

As a use for the purpose of "scholarship [and] research"—specifically, to expand the corpus of knowledge regarding artificial intelligence and its ability to recognize elements and arrangements in space, *see* Mitchell Decl. ¶¶ 26, 53–56—the Princeton researchers' alleged copying and distribution of Planner 5D's data falls squarely within the archetypal examples of fair use described in the preamble to § 107—examples the Supreme Court expressly held are "manifestly different purpose[s]." *Warhol*, 598 U.S. at 528. Moreover, it cannot be disputed that Princeton is a nonprofit institution that supports noncommercial academic research, that the SUNCG dataset was used by Princeton's researchers exclusively for noncommercial academic research, and that SUNCG was distributed only to those who signed terms committing to also use the data only for noncommercial research. *See* Mitchell Decl. ¶¶ 3–5, 53–79. Neither Princeton's researchers nor Princeton profited off of the creation or distribution of SUNCG—and research using SUNCG contributed to the public domain of knowledge.

That is sufficient for factor one to overwhelmingly weigh in favor of fair use. But there is more. *Warhol* also instructed that courts must analyze "the specific 'use' . . . that is alleged to be 'an infringement.'" 598 U.S. at 511 (quoting 17 U.S.C. § 107). Here, the research that was published by the Princeton researchers *is not about SUNCG*, and certainly not about Planner 5D. As described above, SUNCG was used as one dataset among others (including real world data) to train AI models.[15] The Princeton researchers designed the algorithms that formed the AI models from scratch. The AI models would then analyze scans of real-world environments—using a variety of innovative methods developed by Princeton's researchers, such as using a dilation-based 3D context module and using

---

[15] And even SUNCG was dramatically transformed from the Asserted Copyrights. *Supra* pp. 4–7.

convolution layers to aggregate information from multiple scales[16]—and the models would output computer files that attempted to categorize and understand what it was seeing, files containing 'voxelized' representations of the real world interior space. None of this remotely relates to the purpose of Planner 5D's asserted works. Planner 5D operates a home design tool for interior designers to design interior spaces. The research at issue here is not about interior design; it does not assist with or concern home design *in any way*.

Planner 5D wants the Court to focus solely and exclusively on its data and the fact that it was copied once, and to ignore everything else. But the law forbids that. The law demands context. And with context, it is apparent that the noncommercial use of the Asserted Copyrights by Princeton's researchers was of a different purpose and character. Factor one favors fair use.

### 2.    If Planner 5D's Objects and Asserted Scene Compilation Are Copyrightable at All, They Are Far from the Core of Copyright.

Factor two, the nature of the copyrighted work, recognizes "that some works are closer to the core of [copyright] than others." *Campbell*, 510 U.S. at 586. In *Google LLC v. Oracle America, Inc.*, for example, the Supreme Court concluded that a particular type of computer code, "declaring code," "is, if copyrightable at all, further than are most computer programs . . . from the core of copyright," 593 U.S. 1, 29 (2021), and thus that factor two weighed in favor of fair use there.

Here, Planner 5D has not met its burden to show the copyrightability of its Objects or Scene Compilation. *See supra* pp. 10–15. But even if copyrightable, since the vast majority of Planner 5D's Objects are based on preexisting reference material, *see* Dkt. 282-2, Planner 5D would have a copyright *only* in the 'choices' it identified (because the copyright in every other aspect of the Objects would remain with the creator of the reference material). Similarly, the alleged copyrightability of Planner 5D's Scene Compilation is premised on the "selection and arrangement" of the user-created Scenes—the underlying Scenes are not protectible. *See supra* p. 14. Planner 5D would have protection solely in the precise selection and arrangement on its public gallery as of 2016. If copyrightable at all, those copyrights would be thin. Moreover, Planner 5D's alleged works are data files, making them

[16] Essentially, creative ways of getting the algorithm to consider larger context when it made predictions.

even "further . . . from the core of copyright" than the code at issue in *Google v. Oracle*. Factor two therefore weighs in favor of fair use.

### 3. The Princeton Researchers Used the Minimum Amount of Planner 5D's Asserted Copyrights Necessary to Fulfill Their Transformative Purpose.

Factor three, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, is neutral. According to Planner 5D, Princeton's researchers made one reproduction of the entirety of the Asserted Copyrights before creating SUNCG. But Planner 5D did not seek to register its works until after the downloading, and precisely defined the Asserted Copyrights to consist only of the downloaded works, making this measure less useful than it is in the average case.[17] Moreover, this factor also considers the purpose of the copying, such that it will not weigh against fair use where "the secondary user only copies as much as is necessary for his or her intended use." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003). As discussed above, Princeton's researchers used the files for a completely different purpose, AI training, that required large amounts of data. And Princeton's researchers did not use significant portions of Planner 5D's data, including unrealistic room layouts and furniture arrangements, incomplete or sparse scenes, and duplicative scenes. Mitchell Decl. ¶¶ 45–47. The researchers did not even use Planner 5D's original data format or structure. *Supra* pp. 5–6, 15. And as explained above, SUNCG did not retain the selection or arrangement of the Scene Compilation. *Supra* § IV.B. Princeton's researchers used the minimum amount of Planner 5D's works as was necessary to fulfill their transformative purpose, *Kelly*, 336 F.3d at 821, so factor three is neutral.

### 4. The Princeton Researchers' Use Had No Effect on the Market for Planner 5D's Asserted Copyrights and Furthered the Public Good.

The fourth factor—"the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107—considers whether the specific use is a "substitute" for the original and whether market harm would result if the defendant's use was "widespread." *Google v.*

---

[17] According to Planner 5D's own testimony, Planner 5D has thousands of other Objects ███████ ████████, Mitchell Decl ¶¶ 31–32; Dkt. 217-7 ¶¶ 14–15, so had Planner 5D registered all of those prior to the downloading, it is likely the "portion used" by Princeton would have been a much smaller portion of the whole.

*Oracle*, 593 U.S. at 37–38. In *Google v. Oracle*, the Supreme Court emphasized that this analysis "must" also consider "the public benefits the copying will likely produce." *Id.* at 35. Where copying furthers "copyright's concern for the creative production of new expression," such that permitting the plaintiff to enforce its copyrights would risk *harm* to the public by "limiting the future creativity of new programs," factor four tends to weigh in favor of fair use. *Id.* at 35, 39.

Here, the Princeton researchers' use of the data had no impact upon the potential market for or value of the Asserted Copyrights, and simultaneously furthered the fundamental goals of copyright law by contributing to the public domain of computer vision knowledge for the benefit of all. *Google*, 593 U.S. at 35. For those dual reasons, factor four clearly favors fair use.

Neither the research nor SUNCG interfered with Planner 5D's potential market for its Asserted Copyrights because SUNCG was available for noncommercial research only. Princeton's researchers only conducted noncommercial research, and anyone who requested access to SUNCG was required to first sign terms prohibiting commercial use and further distribution of the dataset. *See* Mitchell Decl. ¶¶ 62–66. Third parties understood that SUNCG was not available for commercial use. *See id.* ¶¶ 68–79, 83–84. In the instances where Princeton's researchers were asked to authorize commercial use of SUNCG, Princeton's researchers declined. *See id.* ¶¶ 72–74, 76. Tellingly, despite ample third-party discovery, Planner 5D has not identified *a single commercial use of SUNCG*.

Nor did Princeton's researchers' research compete with Planner 5D's Asserted Copyrights. In fact, the evidence shows the exact opposite, that the research using SUNCG helped *create* a market for Planner 5D's works. Companies such as Microsoft approached Planner 5D interested in securing a commercial license to use its Asserted Copyrights *because* Microsoft first learned about SUNCG. *See id.* ¶¶ 82–84. ████████████████████████████████████████████████ ████████████████████████ *See id.* ¶ 90. And Planner 5D declined to license or sell its data for reasons independent of the availability of SUNCG. *See id.* ¶¶ 87, 89.

Finally, the analysis under factor four must be considered in light of the goals of copyright law and the public benefits of the Princeton researchers' use. *Google*, 593 U.S. at 35. In creating SUNCG, using it for research, making SUNCG available subject to strict noncommercial use restrictions, but making the research and software tools *developed by Princeton's researchers* that accompanied

SUNCG freely available for anyone to use, the Princeton researchers' use of Planner 5D's Asserted Copyrights helped expand the public domain of knowledge regarding computer vision and machine learning. The research using SUNCG, in combination with other datasets, contributed to the then-nascent subfield of computer vision and helped push scholarly research in the field forward. That contribution was modest—the field was in its early years and all the techniques discussed in the relevant 2016-2018 papers have long been replaced—but real. SUNCG, though, was but a cameo in even that short film. It assisted the research but was not the object of the research. As the Supreme Court cautioned in *Google v. Oracle*, permitting a company (here, Planner 5D) to exercise a monopoly on the public domain of knowledge that underlies new developments, academic or commercial, relating to machine learning in the computer vision field would be both factually absurd and legally untenable; it would harm the public by limiting future advances and would "interfere with, not further, copyright's basic creativity objectives." 593 U.S. at 39.

Given the absence of any identifiable impact on the market or potential market for Planner 5D's works, and in light of the public benefits of the Princeton researchers' use in promoting the progress of computer vision research, factor four weighs in favor of fair use.

* * *

Since three of the four factors, including the factors that the Supreme Court considers most important, *Harper & Row*, 471 U.S. at 550, 566, *Campbell*, 510 U.S. at 578, weigh in favor of fair use, Princeton's researchers' uses were "not an infringement," 17 U.S.C. § 107.

## V.    CONCLUSION

For the foregoing reasons, Princeton respectfully requests that the Court enter summary judgment in Princeton's favor.

Respectfully submitted,

DATED: January 9, 2025

JENNER & BLOCK LLP

/s/ Susan J. Kohlmann

Susan J. Kohlmann

*Attorneys for Defendant The Trustees of Princeton University*