**KIRKLAND & ELLIS LLP**
Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (*pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (*pro hac vice*)
abbey.quigley@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
Miriam Kontoh (*pro hac vice*)
miriam.kontoh@kirkland.com
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
F: (212) 446-4900

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400
F: (415) 439-1500

Attorneys for Defendants
*Meta Platforms, Inc.* and *Meta Platforms Technologies, LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" d/b/a PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20,<br><br>Defendants. | Case No. 3:19-cv-03132-WHO (SK)<br>Case No. 3:20-cv-08261-WHO (SK)<br><br>**META'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date: March 28, 2025<br>Time: 10:00 AM<br>Courtroom: 2, 17th Floor<br><br>Judge Honorable William H. Orrick |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

PLEASE TAKE NOTICE that on March 28, 2025, at 10:00 a.m. in Courtroom 2 of this Court, the Honorable William H. Orrick presiding, located at 450 Golden Gate Avenue, San Francisco, California. Defendants Meta Platforms, Inc. and Meta Platforms Technologies, LLC (collectively, "Meta"), will move for an Order granting summary judgment in Meta's favor and against Plaintiff Planner 5D ("P5D").

This Motion is based upon this Notice of Motion and Motion, the below Memorandum of Points and Authorities, the concurrently filed Declarations and its associated exhibits, the pleadings and papers on file in this action, and any further evidence as may be presented at the hearing of this Motion.

**STATEMENT OF ISSUES FOR RELIEF**

Pursuant to Local Rule 7-2(b)(3), Meta hereby seeks an Order granting its motion for summary judgment in Meta's favor on the following issues:

Trade Secret Misappropriation

ISSUE 1: That P5D cannot establish trade secret misappropriation against Meta as a matter of law because (a) Meta merely downloaded the public dataset SUNCG *after* Princeton publicly released it and extinguished any alleged trade secret rights P5D purported to have in the information in SUNCG, (b) Meta was not in privity with Princeton, and/or (c) Meta did not know and had no reason to know that SUNCG contained any trade secrets.

Direct Copyright Infringement:

ISSUE 2: That P5D cannot establish copyright infringement of its asserted scene compilation as a matter of law because P5D has not satisfied its burden to prove that the selection of scenes Meta used is substantially similar to the selection of scenes in P5D's asserted scene compilation.

ISSUE 3: That P5D cannot establish copyright infringement of its asserted objects as a matter of law because (a) its objects are copied wholesale from existing sources and Planner 5D admitted that the allegedly creative choices it identified in the objects are merely speculative, and/or (b) P5D cannot establish substantial similarity.

ISSUE 4: That P5D cannot establish copyright infringement of the 18 individual scenes it purports to own as a matter of law because it cannot establish substantial similarity.

Indirect Copyright Infringement

ISSUE 5: That P5D cannot establish contributory liability against Meta as a matter of law because (a) there is no direct infringement, and/or (b) P5D has offered no evidence that any third parties used SUNCG because of Meta's conduct.

1

ISSUE 6: That P5D cannot establish vicarious liability against Meta as a matter of law because (a) there is no direct infringement, and/or (b) Meta received no financial benefit from its research activities at issue in this case.

Affirmative Defenses

ISSUE 7: That summary judgment should be granted to Meta on Meta's affirmative defense of fair use with respect to all of P5D's copyright claims.

Dated: January 9, 2025

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Dale M. Cendali*
**KIRKLAND & ELLIS LLP**
Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (*pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (*pro hac vice*)
abbey.quigley@kirkland.com
Miriam Kontoh (*pro hac vice*)
miriam.kontoh@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
F: (212) 446-4900

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400
F: (415) 439-1500

Attorneys for Defendants
*Meta Platforms, Inc.* and *Meta Platforms Technologies, LLC*

2

# TABLE OF CONTENTS

I.   Factual Background ...................................................................................................... 2

    A.   Meta's Longstanding Practice of Conducting Noncommercial Scientific Research ........... 2

    B.   P5D Is An Interior Design Platform Where Users Can Create Home Designs ................... 3

    C.   Princeton Downloaded and Transformed the Publicly Available Scenes Created by P5D's Users into the Machine Learning Dataset SUNCG ............................................... 5

    D.   Meta, Like Many Entities, Used SUNCG for Limited Noncommercial Research ............ 7

II.   Summary Judgment Standard .................................................................................... 8

III.   Summary Judgment on the Trade Secret Claims is Warranted ............................ 9

    A.   Meta Is Not Liable For Trade Secret Misappropriation As It Merely Downloaded SUNCG After Princeton Publicly Released the Dataset ................................................. 9

    B.   Meta Was Not In Privity with Princeton .................................................................... 11

    C.   P5D's Claim That Meta Is Liable Because It Had Reason to Believe SUNCG Contained Trade Secrets Acquired by Improper Means Also Fails. ............................. 12

IV.   P5D Cannot Establish Direct Copyright Infringement ....................................... 14

    A.   P5D Cannot Meet Its Burden of Showing Meta Infringed Its Alleged Compilation ........ 14

        1.   P5D Cannot Prove SUNCG's Compilation Is Substantially Similar to P5D's .............................................................................................................. 14

        2.   P5D Cannot Prove the SUMO Compilation Is Substantially Similar to P5D's .............................................................................................................. 15

    B.   P5D Cannot Meets Its Burden of Establishing that Meta Infringed Its Objects. ............ 16

        1.   P5D Cannot Prove that It Exercised Creativity in Modeling the Objects ............. 16

        2.   P5D Cannot Meet Its Burden of Showing Substantial Similarity Between the P5D Objects/Object Files and the SUNCG or SUMO Objects/Object Files ........................................................................................................... 18

    C.   P5D Offers No Evidence that Meta Infringed the 18 Scenes It Allegedly Created ......... 19

V.   P5D Cannot Establish Indirect Copyright Infringement ..................................... 19

    A.   Meta Did Not Commit Contributory Copyright Infringement as There Was No Direct Liability and it Did Not Induce Copyright Infringement by Third Parties. ............ 19

    B.   Meta Did Not Commit Vicarious Copyright Infringement as There Was No Direct Liability and It Did Control or Financially Benefit From Any Direct Infringer ............... 20

VI.   Meta's Use of SUNCG Is Fair Use .......................................................................... 20

    A.   Meta's Use Is Transformative and Noncommercial ..................................................... 21

    B.   P5D's Purported Copyrighted Works Are at the Lowest End of Creativity ................... 23

    C.   Meta Used Only as Much as Necessary for Its Transformative Purpose ....................... 23

    D.   Meta's Conduct Did Not Interfere With P5D's Market ............................................... 23

VII.   Conclusion .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................................9

*Andy Warhol Found. v. Goldsmith*,
   598 U.S. 508 (2023)..........................................................................................................24

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
   350 F.3d 640 (7th Cir. 2003)............................................................................................23

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)..............................................................................................22

*Bespaq Corp. v. Haoshen Trading Co.*,
   No. 04 Civ. 3698, 2004 WL 2043522 (N.D. Cal. Sept. 13, 2004)....................................17

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).....................................................................................................21, 23

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) ......................................................................................14, 18

*DVD Copy Control Assn., Inc. v. Bunner*,
   31 Cal. 4th 864 (2003), *as modified* (Oct. 15, 2003) ......................................................10

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
   122 F.3d 1211 (9th Cir. 1997) ....................................................................................16, 18

*Erickson Prods., Inc. v. Kast*,
   921 F.3d 822 (9th Cir. 2019)............................................................................................20

*Evans v. Presidio Trust*,
   No. 19 Civ. 8025, 2019 WL 11270441 (N.D. Cal. Dec. 23, 2019) ....................................8

*Experian v. Nationwide Mktg. Servs. Inc.*,
   893 F.3d 1176 (9th Cir. 2018) ..........................................................................................15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991).....................................................................................................15, 16

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006)................................................................................25

*George S. Chen Corp. v. Cadona Intern., Inc.*,
   No. 06 Civ. 55536, 2008 WL 152651 (9th Cir. Jan. 17, 2008) .........................................17

*Google LLC v. Oracle America, Inc.*,
   593 U.S. 1 (2021)....................................................................................................... *passim*

*GSI Tech., Inc. v. United Memories, Inc.*,
    No. 13 Civ. 1081, 2015 WL 5655092 (N.D. Cal. Sep. 21, 2015)..................................13

*Harper & Row Publishers v. Nation Enters.*,
    471 U.S. 539 (1985)..................................24

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989) ..................................15

*Hearn v. Meyer*,
    664 F. Supp. 832 (S.D.N.Y. 1987)..................................18

*Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*,
    No. 18 Civ. 5031, 2019 WL 1767329 (N.D. Cal. Apr. 22, 2019) ...............10, 11, 12

*Hunley v. Instagram, LLC*,
    73 F.4th 1060 (9th Cir. 2023) ..................................19

*Infogroup, Inc. v. DatabaseLLC*,
    95 F. Supp. 3d 1170 (D. Neb. 2015)..................................13

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC*,
    816 F. Supp. 2d 793 (N.D. Cal. 2009) ..................................8

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ..................................21, 22, 23, 25

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
    143 F. Supp. 3d 898 (E.D. Miss. 2015) ..................................25

*Lowry v. City of San Diego*,
    858 F.3d 1248 (9th Cir. 2017) ..................................9

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
    528 F.3d 1258 (10th Cir. 2008) (Gorsuch, J.)..................................16

*Olivier v. Baca*,
    913 F.3d 852 (9th Cir. 2019) ..................................8

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ..................................22

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) ..................................20

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007) ..................................20

*Religious Tech. Ctr. v. Lerma*,
    908 F. Supp. 1362 (E.D. Va. 1995) ..................................9, 10, 11, 14

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    923 F. Supp. 1231 (N.D. Cal. 1995) ..................................9, 10, 12

iii

*S. Cal. Darts Ass'n v. Zaffina*,
    762 F.3d 921 (9th Cir. 2014) ...............................................................................8

*Sega Enters. Ltd v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ............................................................................22

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ......................................................................21, 25

*SocialApps, LLC v. Zynga, Inc*.,
    No. 11 Civ. 4910, 2012 WL 381216 (N.D. Cal. Feb. 6, 2012)..............................9

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
    709 F.3d 1273 (9th Cir. 2013) ......................................................................21, 25

*Space Data Corp. v. X*
    No. 16 Civ. 3260, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017)...........................9

*Thornhill Publ'g Co., Inc. v. GTE Corp.*,
    594 F.2d 730 (9th Cir. 1979) ................................................................................9

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020) ..................................................................21, 23, 25

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ..............................................................................22

*Veronica Foods Co. v. Ecklin*,
    No. 16 Civ. 7223, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ...........................9

**Statutes**

17 U.S.C. § 102.....................................................................................................18

17 U.S.C. § 107.....................................................................................................20

18 USC §1839(5)(A), (B)(ii) ..................................................................................12

Cal. Code §3426.1(b)(1), (2)(B)(i) ..........................................................................12

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................8

*All emphasis added unless otherwise noted.*

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|:---:|:---|
| | **EXHIBITS TO THE DECLARATION OF MARY MAZZELLO** |
| 1 | Excerpts from August 4, 2022 Deposition of Viacheslav Kondaurov |
| 2 | Excerpts from August 5, 2022 Deposition of Viacheslav Kondaurov |
| 3 | Excerpts from November 10, 2022 Deposition of Alexey Sheremetyev |
| 4 | Excerpts from June 25, 2024 Deposition of Alexey Sheremetyev |
| 5 | Excerpts from June 26, 2024 30(b)(6) Deposition of Alexey Sheremetyev |
| 6 | Excerpts from November 15, 2024 Deposition of David Forsyth |
| 7 | Excerpts from June 11, 2024 Deposition of Daniel Huber |
| 8 | Excerpts from June 5, 2024 Deposition of Georgia Gkioxari |
| 9 | Excerpts from July 2, 2024 Deposition of Jonas Gavelis |
| 10 | Excerpts from February 12, 2024 Deposition of Julian Straubs |
| 11 | Excerpts from June 7, 2024 Deposition of Konstantin Ketko |
| 12 | Excerpts from September 6, 2024 30(b)(6) Deposition of Richard Newcombe |
| 13 | Excerpts from June 14, 2024 Deposition of Shuran Song |
| 14 | Excerpts from June 17, 2024 Deposition of Tauvydas Andrikys |
| 15 | Excerpts from July 30, 2024 Deposition of Thomas Funkhouser |
| 16 | META_0002433 |
| 17 | META_0004031 |
| 18 | META_0021995 |
| 19 | P5D-0065387 |
| 20 | P5D-0065391 |
| 21 | P5D-0065411 |
| 22 | P5D-0065464 |
| 23 | P5D-0177427 with Enlargement |
| 24 | P5D-0079765 |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 25 | P5D-0080390 |
| 26 | P5D-0177435 |
| 27 | P5D-0177440 |
| 28 | P5D-0218287 |
| 29 | PRIN00004562 |
| 30 | PRIN00032698 |
| 31 | SONG00000214 |
| 32 | Opening Expert Report of David Forsyth, dated October 3, 2024, without exhibits |
| 33 | Objects in P5D Narrowed Objects List But Not in SUNCG |
| 34 | P5D Trade Secret Disclosures, dated June 10, 2021 |
| 35 | Amended Attachment A to P5D Trade Secret Disclosures, dated September 7, 2022 |
| 36 | Attachment B to P5D Trade Secret Disclosures, dated June 10, 2021 |
| 37 | P5D's Objections and Responses to Facebook Parties' 1st Interrogatories, dated October 7, 2021 |
| 38 | Princeton's First Supplemental Responses and Objections to P5D's First Interrogatories, dated November 11, 2021 |
| 39 | SONG00003754 |
| 40 | Amended Added Objects in P5D's Amended Objects Trade Secret Disclosure |
| 41 | Princeton's Fourth Supplemental Interrogatory Responses and Objections to P5D's First Interrogatories, dated February 25, 2022 |
| 42 | Meta's Amended Objections and Responses to P5D's Third Interrogatories, dated April 22, 2022 |
| 43 | P5D's Responses and Objections to Princeton's First Requests for Admission, dated August 30, 2022 |
| 44 | Amended Exhibit D to P5D's Responses to Meta's First Interrogatories, September 7, 2022 |
| 45 | P5D's Fifth Supplemental Amended Objections and Responses to Princeton's First Interrogatories, dated July 31, 2024 |
| 46 | P5D's Fifth Supplemental Responses to Princeton's Second Interrogatories, dated November 18, 2022 |

| EXHIBIT | DESCRIPTION |
|---|---|
| 47 | P5D's Eighth Supplemental Objections and Responses to Meta's First Interrogatories, dated July 31, 2024 |
| 48 | P5D's First Supplemental Objections and Responses to Meta's Third Interrogatories as to ROG 19 & 23, dated May 5, 2024 |
| 49 | Meta's Fifth Supplemental Responses and Objections to P5D's Second ROGs, dated June 28, 2024 |
| 50 | Semantic Scene Compilation from a Single Depth Image (Song Research Paper) |
| 51 | AI For Interior Design Webpage |
| 52 | Common Fellowship Questions Webpage |
| 53 | Building Generalizable Agents with a Realistic and Rich 3D Environment (House3D Paper) |
| 54 | Sharing new research, models, and datasets from Meta FAIR Article |
| 55 | Facebook AI Research Article |
| 56 | Meta AI Publications Webpage |
| 57 | Meta Models and Libraries Webpage |
| 58 | Events - AI at Meta Webpage |
| **EXHIBITS TO THE DECLARATION OF DANIEL LOPRESTI** | |
| A | Opening Expert Report of Daniel Lopresti, dated October 3, 2024 ("Lopresti Op.") |
| B | Rebuttal Expert Report of Daniel Lopresti, dated November 5, 2024 ("Lopresti Reb.") |
| **EXHIBITS TO THE DECLARATION OF ULRICH NEUMANN** | |
| A | Rebuttal Expert Report of Ulrich Neumann, dated November 5, 2024 ("Neumann") |
| **EXHIBITS TO THE DECLARATION OF KIMBERLY SCHENK** | |
| A | Opening Expert Report of Kimberly Schenk, dated October 3, 2024 ("Schenk Op.") |

META'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:19-CV-03132

## MEMORANDUM OF POINTS AND AUTHORITIES

P5D operates a home design tool that allows users to design 3D scenes with everyday objects (like couches and tables) that are virtual copies of real-world furniture items. This dispute arises from a PhD candidate at Princeton downloading P5D's objects and user-created scenes from P5D's public website and transforming them into a machine learning dataset called "SUNCG," which she publicly released in 2017. Meta, like hundreds of other researchers, downloaded SUNCG a few months after Princeton released it and used it as one of many datasets for noncommercial, academic research related to training AI on how to navigate through virtual spaces. As soon as P5D complained, Meta ceased its use. Yet for the simple act of downloading a dataset from one of the most well-respected research institutions in the country, and using it to conduct scientific research that Meta shared with the research community through academic papers, P5D claims Meta committed trade secret misappropriation and copyright infringement, and owes more than $300 million in damages. P5D's claims fail as a matter of law.

***Trade Secrets.*** It is black letter law that, once a trade secret is public, it is no longer a trade secret. Thus, downstream users of information published by an intermediary actor ***cannot be liable*** for misappropriation. That is Meta. Meta's noncommercial researchers downloaded and used SUNCG only ***after*** Princeton publicly released it. Thus, by the time Meta accessed SUNCG, it contained no secrets. P5D's claim that Meta had "reason to believe" SUNCG contained trade secrets is therefore legally meritless (and factually untrue) as Meta cannot be liable for using publicly disclosed information regardless of what P5D speculates Meta should have known. To the extent P5D owned a trade secret at all, its recovery for misappropriation cannot come from Meta.

***Copyright.*** It is undisputed that P5D does not own copyrights in the individual scenes its users created. Therefore, aside from 18 scenes its employees allegedly created, P5D's purported copyright in the scenes is limited to its *selection* of 49,811 scenes on its public gallery. P5D's copyright claims against Meta fail, as P5D cannot show that *Meta* ever copied *that compilation* of scenes. Rather, Meta only had the compilation of scenes that *Princeton selected* to create SUNCG, which is not substantially similar to P5D's asserted compilation, as it consists of fewer scenes selected for a different purpose.

P5D's copyright claims also fail as to the individual objects. Although the Court instructed P5D to identify "specific and demonstrable creative choices" it made in modeling the objects, it did not. P5D

admittedly has no idea how its objects differ from the references it copied as it has no records of what those references were. As the Copyright Office denied P5D a registration, it is P5D's burden to establish copyrightability and it cannot do that with conclusory allegations of creativity, especially as its practice was to replicate real-world objects. P5D also has not proven substantial similarity. In fact, 526 of its claimed objects do not appear in SUNCG at all, and thus were never copied by Meta. For the others, P5D has failed to meet its burden of proof on substantial similarity under the Ninth Circuit's test.

P5D likewise cannot establish contributory or vicarious liability against Meta because there is no direct infringement and Meta did not create, promote, or distribute SUNCG or financially benefit from third parties using it. Meta was merely one of hundreds of researchers using this free, public dataset.

Finally, summary judgment to Meta on P5D's copyright claims should also be granted because Meta's conduct is quintessential fair use. On Factor 1 (purpose of use), Meta used SUNCG to train AI to understand how to move through virtual environments for noncommercial research, which is an entirely different purpose than P5D's operation of a home design tool. Factor 2 (nature of the work) also favors Meta, as P5D's asserted works barely meet the threshold for creativity, if at all. On Factor 3 (amount used), Meta did not use P5D's alleged scene compilation and used no more of the alleged objects than necessary to achieve its transformative purpose. On Factor 4 (market harm), P5D could not be harmed by Meta's use of the scenes because P5D *does not own or have the right* to license them. P5D also did not lose any opportunities as a result of Meta using the objects or scene compilation in SUNCG. To the contrary, no one even contacted P5D about potentially licensing its data until *after* SUNCG launched and cited P5D as the source of the data.

After five years of litigation, P5D has had every opportunity to prove its claims against Meta. It still cannot. Summary judgment should be granted to Meta in full.

## I.    FACTUAL BACKGROUND

### A.    Meta's Longstanding Practice of Conducting Noncommercial Scientific Research

Meta builds technology that helps people connect, find communities, and grow businesses. In 2013, Meta established a noncommercial research laboratory, Facebook Artificial Intelligence Research ("FAIR"), which focuses on long-term research problems surrounding AI for the benefit of the academic research community. Ex. 12 (Newcombe) 269:9-17; Ex. 8 (Gkioxari) 264:17-265:22. FAIR engages with

the research community through publications, open-source software, participation in conferences, and collaborations with colleagues in academia. Exs. 55-58. Its employees are academic researchers, and often share appointments with well-known academic institutions. FAIR is a distinct division within Meta focused on academic, non-commercial research, separate from Meta's commercial product development teams. Ex. 12 (Newcombe) 269:9-17, 228:9-229:15. Over the past decade, FAIR researchers have explored a variety of AI research problems, such as how to train AI agents to gain the intelligence to navigate virtual buildings in response to prompts (e.g., "find the car") and text-to-music generation models. Ex. 49 (Meta ROG 14 Resp.) at 10-14; Ex 54. FAIR does not research or work on home design AI applications.

### B.    P5D Is An Interior Design Platform Where Users Can Create Home Designs

P5D offers a "user-friendly home design tool that allow[s] anyone to quickly and easily create their own home, office, or landscape designs" (the "Tool"), through its website. Dkt. 53 ¶30 ("TS Compl."); No. 20 Civ. 08261 Dkt. 1 ¶31 ("CR Compl."). Using the Tool, users can create "three-dimensional [interior designs]" ("Scenes") by dragging and dropping "three-dimensional . . . . lifelike models of furniture, appliances, plants, people, lighting, or other objects that could occupy the interior or exterior of a digitally depicted room or structure" ("Objects") available on the Tool. CR Compl. ¶6, 31. P5D does not claim to own a copyright in user-created Scenes, nor could it. The Scenes were created by P5D's **users**, not P5D, and P5D's Terms of Service did not assign ownership of the Scenes to P5D. They merely granted P5D a royalty-free license to the Scenes solely for purposes of "**providing and promoting the Services**; and/or exercising the rights granted in these Terms." Ex. 23 at 4. Services is defined as "your use of Planner 5D project for any purpose whatsoever." *Id.* at 3.

The Objects in the Tool were created by P5D employees using a free and open-source 3D modeling software. Ex. 47 (P5D ROG 1 Resp.) at 2; *see also* Ex. 1 (Kondaurov) 86:20–87:1. P5D created the Objects to "reflect [or resemble] some real life object[]" that "can be found in [the] real world." Ex. 3 (Sheremetyev) 108:3-9. The "general practice" of modelers was to use "reference images" of real-world objects when creating a 3D model of that item. *Id.* at 64:25-65:10. Some of these reference images were supplied by P5D clients—who hired P5D to create 3D models that match their products "as close as possible." (the "B2B Objects"). Ex. 1 (Kondaurov) 22:25-23:5, 110:20-23. Other reference images P5D

1   copied from the websites of online retailers, such as IKEA. (the "Non-B2B Objects"). Ex. 3 (Sheremetyev)

2   64:25-65:10; Ex. 28 at -325. P5D does not have records of the reference material used for Non-B2B

3   Objects. Dkt. 282-02; Ex. 46 (P5D ROG 10 Resp.) at 7. But, in all cases, P5D's goal when modeling

4   Objects was to replicate pre-existing, real-world items. Ex. 2 (Kondaurov) 275:17-24.

5        P5D's Objects and Scenes are encoded in JSON files, which is a type of publicly available data-

6   interchange format created by a third party. Ex. 43 (P5D's RFA 1, 2 Resp.) at 1; Lopresti Op. ¶7. In this

7   litigation, P5D claims copyright protection in 2,009 Objects/Object files, *a compilation* of 49,479 Scenes

8   that allegedly appeared on its public gallery as of February 17, 2016, and 18 individual Scenes that were

9   allegedly created by P5D employees. CR Compl. ¶¶104-105, 107; Dkt. 282-02–Dkt. 282-09; Ex. 47 (P5D

10   ROG 1 and 2 Resp.) at 5-6. P5D does not own a copyright registration in any of these works, as the

11   Copyright Office denied its applications. Ex. 21; Ex. 22; Ex. 19 at -388; Ex. 20 at -393. Aside from the

12   18 employee-created Scenes, P5D does not claim to own a copyright in any individual scenes. P5D also

13   claims trade secret ownership of various object files, scene files, and file compilations and URLs where

14   such files are stored. TS Compl. ¶¶84-113; Ex. 44 (P5D ROG 3 Resp.) at Am. Ex. D; Exs. 34-36 (Trade

15   Secret Disclosures); Ex. 40 (P5D's Am. Added Objects List to Trade Secret Disclosures).

16        Unsurprisingly given P5D's focus on interior design and the restrictions in its Terms of Services,

17   P5D is not in the business of licensing or selling its Scenes/Scene files (or its Objects/Object files) for AI

18   machine learning. ████████████████████████████████

19   ████████████████████████████ (Sheremetyev) 434:12-18, 436:6-12. ████

20   ████████████████████████████████████████████████

21   ████████████████████████████ *Id.* at 483:2-484:20, 491:12-492:23,

22   494:7-496:8; Ex. 25 at -392. ████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████ P5D. Ex. 24 at -765; Ex. 5 (Sheremetyev)

27   463:5-471:2. ████████████████████

28   ████████████████████████████████████████████████

1    ███████ Ex. 5 (Sheremetyev) 483:20-484:20, 491:12-492:23, 495:3-496:8; Lopresti Op. ¶¶217-223.

2       P5D also is not in the market of training AI robots to independently navigate real world or virtual

3    environments or releasing academic research. Lopresti Op. ¶¶83-85. Rather, to the limited extent P5D

4    subsequently dabbled in machine learning or AI, it has done so to facilitate its own interior design-focused

5    platform. Ex. 51; Ex. 14 (Andrikys) 201:18-202:6; Ex. 4 (Sheremetyev) 269:16-271:14, 273:8-25, 274:16-

6    22, 276:15-277:24, 278:19-279:15. For example, even its website refers to its AI work as "Interior Design

7    AI Tools," such as a tool to make suggestions on how to decorate a room, and "AI Floor Plan Recognition"

8    to convert a 2D plan into a 3D scene. Ex. 51.

9       ### C.    Princeton Downloaded and Transformed the Publicly Available Scenes Created by
10       P5D's Users into the Machine Learning Dataset SUNCG

11       In 2016, Shuran Song was a PhD candidate at Princeton whose doctoral research focused on using

12    AI algorithms to look at 2D images of 3D scenes and generate volumetric information for, and identify

13    every object depicted in, that scene. Ex. 38 (Princeton ROG 1 Resp.) at 3, 5; Ex. 50 (Song Research Paper)

14    at 1. In February 2016, as part of her work, Dr. Song searched the internet for potential collections of floor

15    plan data to train AI algorithms. Ex. 38 (Princeton ROG 1 Resp.) at 4-5. In doing so, she found that P5D's

16    website contained a public gallery of user-generated scenes and that the data files underlying those scenes

17    and objects were freely accessible. *Id.* Dr. Song and her research team (hereinafter referred to as

18    "Princeton") then wrote software to identify and download the JSON data files for those scenes and the

19    objects (e.g., furniture) within them. *Id.*

20       Upon review of these data files, Princeton determined that the data was not in a condition suitable

21    for academic research. For example, it lacked labels and annotations identifying the objects (e.g., data that

22    identified a couch and chair in a scene as "couch" and "chair"). Ex. 15 (Funkhouser) 103:24-104:16; Ex.

23    13 (Song) 459:10-21. Without those, AI could not learn the identity of each object in a scene. To train the

24    AI, it requires labels to tell it "this is a couch" and "this is a chair." Lopresti Op. ¶92. Problematically,

25    P5D's data also: (i) contained unrealistic room layouts (such as a dinosaur trampling a living room or a

26    rubber duck floating in water), (ii) had faulty object placement (such as floating objects), and (iii) lacked

27    the color and depth images necessary for the type of research Princeton conducted. Ex. 15 (Funkhouser)

28    86:17-87:9, 142:11-19, 159:23-160:15; Ex. 13 (Song) 488:13-489:17; Lopresti Op. ¶16, 108, 110.

META'S MOTION FOR SUMMARY JUDGMENT                                    CASE NO. 3:19-CV-03132

Princeton therefore spent the next several months significantly altering P5D's data and filtering the modified data to: (1) make it usable for Dr. Song's machine learning research and (2) focus on the most informative and useful scene images available. Ex. 38 (Princeton ROG 2 Resp.) at 6-7; Ex. 13 (Song) 488:13-489:10; Ex. 15 (Funkhouser) 159:15-160:15; Ex. 50 (Song Research Paper) at 5, Fig. 13.

Princeton called its resulting collection of transformed data files the "SUNCG" dataset. Even by P5D's telling, SUNCG consisted of a different set of objects and scenes than those Princeton downloaded. Specifically, there are allegedly at least 49,479 Scenes in P5D's asserted compilation whereas SUNCG included 45,622 scenes, many of which were individually different from the Scenes P5D selected for its gallery, as they had different textures, door openings, and objects per scene. Ex. 37 (P5D ROG 11 Resp.) at Ex. C; Ex. 6 (Forsyth) 230:17-235:5, 241:5-23; Ex. 32 (Forsyth Op.) ¶¶70-77, 231, 232. And SUNCG contained only 1,564 of the 3,893 Objects (i.e., 40%) in which P5D claims to have copyright or trade secret rights. Ex. 37 (P5D ROG 11 Resp.) at Ex. B.

On November 28, 2016, Dr. Song and colleagues published a research paper concerning Dr. Song's SUNCG research. Ex. 50 (Song Research Paper). They made the SUNCG dataset publicly available shortly thereafter. Ex. 39. Researchers could access SUNCG after signing Princeton's Terms of Service, which allowed use of SUNCG for free for noncommercial research and educational purposes. Ex. 30. While SUNCG was available, it was downloaded ███████████████████████ ████████████████████████████████████████████████ ███████████ (Princeton ROG 5 Resp.) at Am. Ex. A.

Meta had no involvement in or knowledge of SUNCG before it was publicly released. Although Dr. Song received a Facebook Fellowship ("Fellowship") in 2015—which is a tuition and stipend grant available to PhD students, Ex. 13 (Song) 296:14-22—neither the Fellowship ██████████████ ███████████ mentions P5D or gives Meta any role in or oversight over Dr. Song's research. Ex. 31; Ex. 29; Ex. 52 (Fellowship information explaining "There is nothing extra expected of you, and your research agenda is driven entirely by you, without any external influence or expectation from Facebook."). As Dr. ████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 13 (Song) 556:18-558:11. ██ ████████████████████████████████████████████████

1  ████████████████████████████████████████████████████████████

2  ██████████████████████ *Id.*

3       **D.    Meta, Like Many Entities, Used SUNCG for Limited Noncommercial Research**

4      Meta first learned of SUNCG through Dr. Song's research paper. Ex. 8 (Gkioxari) 14:10-16. ██

5  ████████████████████████████████████████████████ Ex. 42 (P5D ROG 15

6  Resp.) at 6. ████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████ Ex. 10 (Straub) 92:24-93:2.

9      The researchers who used SUNCG did so for limited, noncommercial scene navigation and

10 embodied AI research projects connected to training AI robots to independently navigate virtual

11 environments and understand how to accomplish basic tasks in those environments. Ex. 49 (Meta ROG

12 14 Resp.) at 5-10; Ex. 8 (Gkioxari) 268:25-269:8, 270:14-17; Ex. 12 (Newcombe) 232:15-17. For

13 example, in 2018, in collaboration with UC Berkeley, FAIR researchers built House3D—a virtual 3D

14 environment that enabled AI agents (i.e., virtual robots) to explore indoor spaces to learn about elements

15 within those spaces. Ex. 49 (Meta ROG 14 Resp.) at 5. House3D transformed scenes of indoor spaces into

16 a navigable environment and was compatible with multiple datasets. Ex. 53 (House3D Paper) at 3. In other

17 words, researchers could load various datasets, including SUNCG, into the House3D simulator, which

18 would then turn those datasets into a 3D environment through which a virtual agent could navigate to test

19 and train algorithms developed by researchers. *Id.* Although House3D was compatible with SUNCG, Meta

20 did not distribute SUNCG as a part of House3D. Ex. 17. Meta also published its research using House3D,

21 as well as publicly shared the python API script used to operate House3D. Ex 49 (Meta ROG 14 Resp.)

22 at 5. House3D—like all of Meta's research using SUNCG—was for research with no commercial role.

23 Ex. 49 (Meta ROG 14 Resp.) at 5.

24     From 2018-2019, Meta also used SUNCG to generate a new dataset to rally collaboration among

25 research institutions involved in AI research (including Stanford, Virginia Tech, and Princeton), to

26 develop algorithms related to understanding "360-degree RGB-D panoramas," as part of an event called

27 the Scene Understanding and Modeling ("SUMO") Challenge. *Id.* at 6. The SUMO dataset was comprised

28 of 2D, 360-degree visualizations of a subset of SUNCG scenes from various vantage points, akin to the

view captured by a rotating camera. *Id.* Like SUNCG, Meta only used SUMO for noncommercial research, and ensured other users of SUMO did the same by requiring participants of the SUMO challenge to agree to Terms of Use which expressly restricted use to "non-commercial research and educational purposes." Ex. 16 at -433.

Meta ceased use of SUNCG and SUMO in 2019 after receiving a cease-and-desist letter from P5D. Ex. 49 (Meta ROG 14 Resp.) at 7. The projects that used SUNCG also used, or were compatible with, other datasets, meaning that this did not impact Meta's research. *Id.* at 10. And, in any event, the research projects for which Meta used SUNCG were only a small fraction of the dozens of computer vision research projects that Meta conducted with different datasets. *Id.* at 10-14 (identifying dozens of computer vision research projects that did ***not*** use SUNCG).

SUNCG's limited noncommercial use within Meta was unsurprising, given the shortcomings of the data for its research. To accomplish embodied AI and/or scene recognition tasks, the AI algorithms must be trained and tested on realistic environments. Lopresti Op. ¶111; Neumann ¶36. For interior home scenes, realism—at least—requires that the layout have household objects in logical, realistic places (e.g., a bed in a bedroom and a couch in a living room) and a realistic number of objects within a scene. Lopresti Op. ¶¶57, 96; Neumann ¶37. SUNCG failed in both areas. Lopresti Op. ¶¶97-98; Neumann ¶43.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it would "affect the outcome of the suit," and a dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014).

As the plaintiff, P5D carries the burden of proof and persuasion at trial to establish its claims of copyright infringement and trade secret misappropriation. *See Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, 816 F. Supp. 2d 793, 797 (N.D. Cal. 2009); *Evans v. Presidio Trust*, No. 19 Civ. 8025, 2019 WL 11270441, at *2 (N.D. Cal. Dec. 23, 2019). To prevail on summary judgment, "[Meta] need only point out 'that there is an absence of evidence to support [P5D's] case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019). The burden then shifts to P5D to set forth "specific facts showing that there is a genuine issue for trial." *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). "The mere

existence of a scintilla of evidence in support of [P5D]'s position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Conclusory and speculative testimony" also does not suffice. Dkt. 281 at 8 (citing *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).

### III.    Summary Judgment on the Trade Secret Claims is Warranted

Under the Defend Trade Secrets Act and California's Uniform Trade Secrets Act, to succeed on its trade secret misappropriation claims, P5D must prove that (1) it possessed a trade secret, (2) Meta misappropriated the trade secret, and (3) damage. *Space Data Corp. v. X,* No. 16 Civ. 3260, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017). P5D's claims against Meta fail as Meta downloaded the publicly available dataset, SUNCG, only after Princeton publicly released it, just like hundreds of other researchers. By that time, any alleged trade secret rights to the data in SUNCG were extinguished. Thus, summary judgment to Meta is proper, as Meta did not use, acquire, or share any purported trade secrets and P5D did not possess any trade secret rights in the data in SUNCG by the time Meta downloaded it.

### A.    Meta Is Not Liable For Trade Secret Misappropriation As It Merely Downloaded SUNCG After Princeton Publicly Released the Dataset.

It is trade secret 101 that downloading public data from a public website does not constitute trade secret misappropriation. *See, e.g. SocialApps, LLC v. Zynga, Inc*., No. 11 Civ. 4910, 2012 WL 381216, at *2 (N.D. Cal. Feb. 6, 2012) (striking allegations that information was a trade secret as it was publicly available on plaintiff's website); *Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va. 1995) (granting summary judgment; "person who originally posted a trade secret on the Internet may be liable," but one "who merely downloads Internet information cannot be liable for misappropriation because there is no misconduct involved in interacting with the Internet"). This is so even if the public data contains or was derived from information that was once a trade secret. Once a trade secret is publicly released, it loses protection and the owner's only recourse is against the person who disclosed the secret. Indeed, as many courts have explained, "evidence that another individual has put the alleged trade secrets into the public domain prevents [the trade secret owner] from further enforcing its trade secret rights in those materials." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1256-57 (N.D. Cal. 1995); *see also Veronica Foods Co. v. Ecklin*, No. 16 Civ. 7223, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) (granting motion to dismiss as to publicized list of customers as "[o]nce the information is

in the public domain and the element of secrecy is gone, the trade secret is extinguished . . . .") (citation omitted); *DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 900 (2003), *as modified* (Oct. 15, 2003) (concurring) ("Courts that have considered the matter have agreed that, generally speaking, a party not involved in the initial misappropriation of a trade secret cannot be prosecuted under trade secret law for downloading and republishing proprietary information posted on the Internet, primarily because the information is in the public domain and is no longer secret.").

This premise may raise the question, as it has before, "why should [a trade secret owner] have the trade secret status taken away because a perpetrator stole and then published it?" *Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*, No. 18 Civ. 5031, 2019 WL 1767329, at *2 (N.D. Cal. Apr. 22, 2019) (granting motion to dismiss). The Court in *Hong Kong* responded with a simple answer: "[the trade secret owner is] not precluded from pursuing relief against [a defendant] for his publication of the trade secrets *in the first instance*." *Id*. (emphasis added). It, however, has no cause of action against subsequent users of the publicly disclosed information. *See Netcom*, 923 F. Supp. at 1256 (Although "those who made the original postings likely gained the information through improper means … this does not negate the finding that, once posted, the works lost their secrecy."); *DVD Copy Control*, 31 Cal. 4th at 900 (concurring); *see also Lerma*, 908 F. Supp. at 1368 (E.D. Va. 1995). Such is the case here.

It is undisputed that in January 2017, Dr. Song made SUNCG readily available online for free to anyone who signed the Terms of Use. Ex. 39; Ex. 47 (P5D ROG 16 Resp.) at 22 (Princeton posted SUNCG "to a publicly-accessible URL"). There is also no dispute that Meta did not download SUNCG until *three months later*. Ex. 41 (Princeton ROG 5 Resp.) Am. Ex. A at 1. ████████████████████████████████████████████████████████████████████████████████████████████████ *Id*.

Accordingly, regardless of whether SUNCG incorporated or utilized any trade secrets during its creation by Princeton, P5D's claims against *Meta* fail, as Meta only downloaded a public dataset that, by definition, could not contain any trade secrets. Summary judgment to Meta on P5D's trade secret claim is proper. *See Lerma*, 908 F. Supp. at 1369 (granting summary judgment; defendant only "quote[d] from publicly available materials"); *see also Hong Kong*, 2019 WL 1767329, at *2 (granting motion to dismiss where defendant used information disclosed by third party).

10

**B.      Meta Was Not In Privity with Princeton.**

To avoid this straightforward conclusion, P5D has alleged that Meta is liable because it allegedly acted in privity with Princeton. TS Compl. ¶73. This argument is baseless. ███████████████████████████████████████████████████████████████████████████████████████████ Ex. 13 (Song) 556:18-557:19; Ex. 8 (Gkioxari) 14:3-15:21; Ex. 12 (Newcombe) 243:13-244:19; Ex. 7 (Huber) 32:10-34:23. ██████████████████████████████████████████████████████ Ex. 13 (Song 6/14/24) 556:18-557:19. ████████████████████████████████████████ *Id*. Rather, Meta only became aware of SUNCG through Dr. Song's publicly released paper and had to request access to SUNCG and sign SUNCG's Terms of Agreement, *just like everybody else*. *See* Ex. 8 (Gkioxari) 14:2-15:21; *Hong Kong*, 2019 WL 1767329, at *2 (dismissing trade secret claims against Def. B as it "was not one [of Def. A's] privies" because it "had no material relationship with [Def. A]" and at the time of the theft and publication "stood in the same position as a member of the public."). Therefore, Meta did not act in concert with Princeton to acquire, use, or disclose P5D's alleged trade secrets, or have any material relationship with Dr. Song or Princeton. Nor is there a scintilla of evidence showing otherwise. *Id.*; *see also Lerma,* 908 F. Supp. at 1369 (granting summary judgment as "there is no possible liability for [the defendant] in its acquisition of the information" when there was "no evidence that [the defendant] . . . committed any [] improper act in gathering information from the [trade secret] or down loading [sic] information from the Internet."). Rather, at the time Meta downloaded SUNCG, it stood in the same position as the general public.

P5D will likely point to the academic Fellowship that Meta granted Dr. Song in 2015 to argue that the parties acted together or had a material relationship. Ex. 31. But this Fellowship merely provided Dr. Song (and other students) with tuition and a stipend while she worked toward her PhD. Ex. 29. It did not give Meta control of or involvement in her work, or create any rights or obligations between Meta and Dr. Song, nor is there any evidence stating it did. *See, e.g.*, Ex. 31; Ex. 29. In fact, in an interview Meta published with a Facebook Fellow, the Fellow explicitly explained to candidates: "There is nothing extra expected of you, and your research agenda is driven entirely by you, without any external influence or expectation from Facebook." Ex. 52. ██████████████████████████████████████████████████████████████████████████████████████████

1  ██████████ Ex. 13 (Song) 344:9-21, 347:10-16. ██████████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████ *Id.* at 557:17-558:9; Ex. 31. P5D's and Meta's experts also agree that researchers

4  typically keep autonomy over their work even when they receive fellowships, as Dr. Song did.[1]

### C.    P5D's Claim That Meta Is Liable Because It Had Reason to Believe SUNCG Contained Trade Secrets Acquired by Improper Means Also Fails.

P5D has also alleged that Meta is liable because it purportedly "knew or had reason to know" the data in SUNCG was a trade secret acquired by purportedly "improper means." 18 USC §1839(5)(A), (B)(ii); Cal. Code §3426.1(b)(1), (2)(B)(i); TS Compl. ¶73. Leaving aside that there is no evidence of this, P5D's argument is legally irrelevant. The key fact is Princeton released SUNCG to the world and thus extinguished any supposed trade secrets information in the dataset. *Supra* III.A. Once the cat is out of the bag, subsequent users who are not in privity with the first actor cannot be liable because the information is no longer a secret. *Supra* III.A. *Hong Kong* is instructive. 2019 WL 1767329. There, defendant Bin misappropriated trade secrets and incorporated them into a published patent. *Id.* at *1. The plaintiff argued that another defendant, uCloud, was also liable because it "knew or should have known" Bin stole the trade secrets based on Bin's deposition testimony, yet continued to sell products using the trade secrets anyway. *Id.* The Court disagreed, holding that Bin's patent "*published* the trade secrets and, upon publication, any trade secret status was lost prior to the time of Bin's deposition; thus, uCloudlink could not be a wrongdoer because, by the time it got involved, there was no trade secret." *Id.* at *2. Even though uCloud should have known Bin acted improperly, the trade secret owner's only recourse was against Bin, who published the secret. *Id.*; *see also Netcom*, 923 F. Supp. at 1256. So too here. The widespread disclosure of SUNCG negates P5D's claim.

In any case, even if any purported trade secrets in SUNCG had not been extinguished before Meta downloaded it (they were), P5D's "reason to know" argument would still fail because Meta had no reason to know SUNCG contained trade secrets acquired by improper means. "[A] party has reason to know that

---

[1] P5D's expert testified that (a) he received research grants from many companies, but none controlled or directed his research, (b) researchers receiving fellowship are "very largely" able to "act independent of whoever is funding the research," and (c) he was "not aware of *any* direct control of Dr. Song's activities by Meta." Ex. 6 (Forsyth) 210:25-215:9, 219:22-220:14. Meta's expert stated that "the funder does not dictate the project and/or work and has limited interactions with the award recipient." Lopresti Reb. ¶75.

12

information is a trade secret only if known facts would have made a reasonably prudent acquirer suspicious." *GSI Tech., Inc. v. United Memories, Inc*., No. 13 Civ. 1081, 2015 WL 5655092, *10 (N.D. Cal. Sep. 21, 2015). Rather than being suspicious, the facts show that *hundreds* of researchers downloaded SUNCG *without* concern, including a student that P5D's *own expert* supervised. Ex. 6 (Forsyth) 167:13-169:14. In addition, Dr. Song was not secretive about her use of P5D material. Her paper explicitly stated that the dataset contained scenes from P5D's public platform and included a link to P5D's website where P5D *publicly* displayed its user-created scenes. Ex. 50 at 5, 11. There was no reason to believe public material was a trade secret. And a well-respected research institution (Princeton) released the dataset, a further sign that the data was trustworthy. Ex. 7 (Huber) 162:25-163:14.

P5D's expert points to Dr. Song's Fellowship application as an indication that Meta "should have known" SUNCG contained trade secrets acquired by improper means. But this application proves the opposite. *It does not mention P5D or scraping at all*. Ex. 31. ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████ *Id.* at -214. Given the prevalence of crowdsourcing data, which P5D's own expert confirmed, this statement gave no reason for Meta to suspect that a dataset created by Dr. Song and Princeton would contain trade secrets or any information acquired by improper means. Ex. 6 (Forsyth) 224:12-13 ("there was a fair amount of building crowd-sourced datasets" at the time); *see also* Lopresti Reb. ¶72 (Meta's expert confirming that "there were many public 3D model repositories").[2] Rather, the Fellowship indicates that Dr. Song would download *public* data crowd-sourced from the public. Ex. 31.

P5D has also indicated it will rely ██████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ *Id.*

---

[2] Similarly, Meta is aware of no case in the 2016-2019 timeframe holding that web-scraping constituted trade secret misappropriation. Rather, in *Infogroup, Inc. v. DatabaseLLC*, the court denied the plaintiff's preliminary injunction because it was not "likely to be able to prove that purchasing or using lists that were obtained by 'webscraping' is 'misappropriation[.]'" 95 F. Supp. 3d 1170, 1182 (D. Neb. 2015).

META'S MOTION FOR SUMMARY JUDGMENT                              CASE NO. 3:19-CV-03132

As public information is not a trade secret, this email does not establish that Meta knew or had reason to know SUNCG supposedly contained trade secrets.[3] P5D's reliance on it is misplaced.

Summary judgment to Meta on P5D's trade secret misappropriation claim is warranted. *Lerma*, 908 F. Supp. at 1368 (entering summary judgment for defendants).

## IV.  P5D CANNOT ESTABLISH DIRECT COPYRIGHT INFRINGEMENT

To succeed on its copyright infringement claims against Meta, P5D must establish (a) ownership of a copyrightable work, (b) copying, and (c) substantial similarity between the copyrighted work and the work in Meta's possession. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). As set forth below, P5D's claim: (i) fails as to its asserted compilation because P5D cannot show substantial similarity and (ii) fails as to the Objects because P5D cannot show that the vast majority of the Objects are copyrightable or show substantial similarity.

### A.  P5D Cannot Meet Its Burden of Showing Meta Infringed Its Alleged Compilation.

P5D claims Meta infringed its asserted scene compilation through both SUNCG and SUMO. This claim fails, as P5D cannot show either dataset is substantially similar to P5D's alleged compilation.

### 1.  P5D Cannot Prove SUNCG's Compilation Is Substantially Similar to P5D's

P5D's purported compilation consists of a "***selection***" of 49,479 scenes displayed on P5D's public gallery. Ex. 47 (P5D ROG 4 Resp.) at 11. P5D concedes that it ***does not hold a copyright*** to the individual Scenes (besides 18 allegedly created by its employees). Ex. 47 (P5D ROG 2 Resp.) at 6-7. P5D did not "select" these scenes from scratch or arrange them in any particular order. Rather, users of its website first selected scenes that they wanted included in the public gallery. Ex. 45 (P5D ROG 1 Resp.) at 1. P5D's employees *then* purportedly culled that list further to identify scenes that would "showcase the [Tool's] capabilities, and to provide templates for users who don't want to start their floor plans from scratch." CR Compl. ¶45. P5D claims the remaining scenes are its copyrightable compilation.

_____

[3]

META'S MOTION FOR SUMMARY JUDGMENT                    CASE NO. 3:19-CV-03132

1    In the Ninth Circuit, it is well-established that, where a compilation "consist[s] largely of"

2    elements to which the claimant does not hold a copyright, the copyright protection in the compilation will

3    be thin. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989) ("extremely limited

4    copyright protection"). As a result, copyright infringement of a compilation requires "bodily appropriation

5    of expression," i.e., "copying or unauthorized use of *substantially the entire item*." *Id.*; *Experian v.*

6    *Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1181-82 (9th Cir. 2018) (finding on summary judgment that

7    80% match rate insufficient). Thus, to establish infringement, P5D must prove that Meta copied

8    "substantially the entire item" of P5D's asserted selection of scenes. It cannot.

9    **First**, Meta never possessed P5D's asserted compilation. Meta only possessed SUNCG. P5D

10   admits that SUNCG only contains 45,622 of the 49,479 Scenes from its asserted compilation. Ex. 37 (P5D

11   ROG 11 Resp.) at Ex. C. That is not "substantially the entire item," and should alone resolve the issue.

12   **Second**, the scene compilation in SUNCG is a *different* compilation from P5D's because it

13   contains scenes Princeton modified and selected based on different criteria. Princeton selected scenes

14   based on what would be useful for its machine learning work. This included broad considerations, like

15   whether a scene had a large number of objects, but also more granularly assessed whether the depth area

16   of the scene was larger than 70% of the image area and whether the object area was smaller than 30% of

17   the image area. Ex. 50 (Song Research Paper) at 5. P5D's selection of scenes used entirely different

18   criteria. For example, P5D looked for bare scenes that users could use as "templates," and also assessed

19   scenes for "artistic value." CR Comp. ¶¶45-46. Those qualities have no value for computer vision machine

20   learning. Lopresti Op. ¶111. In other words, Princeton did not merely whittle down P5D's compilation; it

21   created a *new* compilation based on *different* criteria. Thus, SUNCG is not substantially similar to P5D's

22   asserted compilation. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (subsequent

23   compiler "free to use the facts contained in another's publication to aid in preparing a competing work, so

24   long as the competing work does not feature the same selection and arrangement.").

25          2.    **P5D Cannot Prove the SUMO Compilation Is Substantially Similar to P5D's**

26   P5D's claim that SUMO infringes its alleged compilation also fails. P5D cannot establish

27   substantial similarity as to SUMO because Meta created SUMO by selecting a small subset of scenes *from*

28   *SUNCG*. Ex. 7 (Huber) 79:9-22, 91:16-92:2; Ex. 49 (Meta ROG 14 Resp.) at 6-7. A fraction of the scenes

15

in SUNCG, which is only a portion of the scenes from P5D's gallery, is not "substantially the entire item" of P5D's asserted work. Nor has P5D offered any expert testimony or analysis that the compilation of scenes in SUMO is substantially similar to its alleged compilation. Indeed, it has not even identified how many of the scenes in its alleged compilation appear in SUMO. Furthermore, as with SUNCG, the compilation of scenes in SUMO is a fundamentally different compilation from the one P5D asserts. It was created based on different criteria—scenes that Meta believed would be appropriate for the SUMO Challenge's scene reconstruction task—and Meta significantly modified the scenes in SUMO. *Id*.

### B.    P5D Cannot Meets Its Burden of Establishing that Meta Infringed Its Objects.

P5D also claims Meta infringed 2,009 individual Objects/Object files through both SUNCG and SUMO. This claim also fails as P5D cannot meet its burden of showing (a) the copyrightability for 1,197 of these Objects, (b) substantial similarity between *any* Object as it exists in P5D's records and the objects as they exist in SUNCG, and (c) substantially similarity as to *any* Object with respect to SUMO.

### 1.    P5D Cannot Prove that It Exercised Creativity in Modeling the Objects

As the Court acknowledged, "because the Copyright Office did not grant a registration for the relevant works, P5D cannot rely on a presumption of validity" for ownership. Dkt. 281 at 9. Defendants previously moved on the copyrightability of the Objects because discovery showed they were mere copies of real-world items. Dkt. 220 at 4-5. The Court agreed that "a large portion . . . did not involve sufficient creativity," and ordered P5D to "narrow its asserted objects" to only those containing a "specific and demonstrable creative choice" *not* dictated by reference material. Dkt. 281 at 14-15, 22. Simply converting a 2D image to a 3D model would not suffice. *See* Dkt. 52 at 13 (citing *Feist*, 499 U.S. at 359-60); *see also Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264-65 (10th Cir. 2008) (Gorsuch, J.) ("digital wire-frame models" that are "copies of" car designs not protectable); *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1222-23 (9th Cir. 1997) (turning 2D characters into 3D costumes took "thought" and "creative decisions" for costume to reflect the source, but those were "functional considerations," not original). With the benefit of the Order, P5D concocted a "Narrowed Object List" that it claimed identified the "specific and demonstrable creative choice[s]" for 1,917 Objects ("NOL"). Dkt. 282-02–Dkt. 282-09. This evidence is insufficient to meet P5D's burden.

***First***, P5D cannot establish creativity as to Exhibits B-D of the NOL because it does not know

16

what creative choices it made, if any, that were not dictated by reference material.

**NOL Exs. C & D**: Exhibits C and D show Objects P5D's modelers made based on references next to images of furniture found online years later. Dkt. 282-02, Dkt. 282-05–09; Ex. 5 (Sheremetyev) 375:15-376:6, 393:14-402:17. To establish copyrightability, P5D must establish that these models "contain[] some original differences from the object depicted." Compendium 923.1. P5D cannot meet this burden *because it is undisputed that P5D does not know the references used to make these Objects*. P5D's 30(b)(6) witness confirmed this fact. After admitting he could not say if a purported "choice" stated in the NOL reflected an actual difference between the reference and the 3D model, he was asked:

> Is that true for all of the objects in Exhibit D, that **P5D cannot state how the object differs from the original image because the original image is unavailable** other than the fact that one is 2D, and one is 3D?

He responded:

> "**That's applicable for actually all questions about all models from all exhibits**, which might include original references if they ever existed, because we stated that, I think in one of the interrogatory at one time that we do not store references. We never had this goal. We never remember them, except some of those which we found were B2B."

Ex. 5 (Sheremetyev) 401:16-402:17. Instead, to identify alleged creative choices, P5D compared its Objects to images found online years later using reverse image search tools. Dkt. 282-02. As this falls well short of P5D's burden, summary judgment to Meta is proper. *See George S. Chen Corp. v. Cadona Intern., Inc.*, No. 06 Civ. 55536, 2008 WL 152651, *1 (9th Cir. Jan. 17, 2008) (granting summary judgment where plaintiff "failed to identify any elements of the dolphin or frog that it selected that are not common place or dictated by the idea of a swimming dolphin or sitting frog sculpture"); *see also Bespaq Corp. v. Haoshen Trading Co.*, No. 04 Civ. 3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004) (no likelihood of success on merits as plaintiff failed to explain what it "added to its miniature furniture that were not otherwise present in preexisting full-size furniture pieces").

**NOL Ex. B**: P5D similarly fails to meet its burden for the Objects on Exhibit B, which represent B2B models commissioned by third parties. Dkt. 282-02. While P5D *knows* the reference used to create these Objects, it has no evidence it made creative choices when modeling them. As clients commissioned the Objects on Exhibit B, the modeler's goal was to copy the reference "as close as possible." Ex. 1 (Kondaurov) 22:25-23:5, 110:20-23. Although Exhibit B identifies portions of the Objects that allegedly

1   differ from the reference, P5D admitted it does not know what differences resulted from a modeler's

2   *creative choice* versus a change dictated by the client, or copied from other sources. Ex. 5 (Sheremetyev)

3   375:15-388:23, 396:4-402:17. As a result, P5D cannot meet its burden to prove originality.

4       ***Second***, P5D cannot establish copyrightability for the additional reason that the alleged creative

5   choices on Exhibits B-D fall short of copyright's originality requirement. For example, there are several

6   instances where P5D contends its only creative contribution was a change in color. *See, e.g.*, Dkt. 286-03

7   ███████████████████████████████████████ "[M]erely add[ing] or chang[ing] a few colors" is not a

8   creative contribution. Compendium § 313.4(K); *see also Hearn v. Meyer*, 664 F. Supp. 832, 836 (S.D.N.Y.

9   1987) (reproduction of "Wizard of Oz" image not original, despite different coloring). P5D also contends

10  that creating a "3-dimensional doll" from a "two dimensional" image reflects creativity, when the Ninth

11  Circuit has explicitly held otherwise. Dkt. 285-03 ███████; *Ent. Rsch. Grp.*, 122 F.3d at 1222–23. In

12  some cases, P5D identifies no creative choices at all—just the absence of something from the reference.

13  *See, e.g.*, Dkt. 286-03 (█████ (cabinet lacking a key), █████ (cart lacking bottles), █████ (shelf lacking

14  screws)). Copyright does not protect the absence of material. 17 U.S.C. § 102.

15      Accordingly, summary judgment to Meta on P5D's copyright claims regarding the Objects in NOL

16  Exhibit B-D should be granted because P5D cannot establish the copyrightability of those Objects.

17
18  **2.      P5D Cannot Meet Its Burden of Showing Substantial Similarity Between the P5D Objects/Object Files and the SUNCG or SUMO Objects/Object Files**

19      Summary judgment is also proper because P5D cannot meet its burden to establish that the

20  objects/object files in SUNCG or SUMO are substantially similar to P5D's claimed Objects/Object files.

21  In the Ninth Circuit, courts start by applying the "extrinsic test" to assess substantial similarity. Under this

22  test, the Court must filter out the non-protectible elements of a copyrighted work before analyzing

23  similarity. *Cavalier*, 297 F.3d at 822. Because P5D has not—and cannot—prove what elements of its

24  Objects are original versus copied, it necessarily cannot prove substantial similarity. In other words, it

25  cannot prove that Meta copied *protectable* elements of its Objects/Object files as opposed to *unprotectable*

26  elements because it cannot state what the protectable elements are. *Supra* IV.B.1. Thus, P5D cannot meet

27  its burden of establishing substantial similarity.

28      P5D also has not offered any evidence, expert or otherwise, comparing *each* of its Objects/Object

file to those in SUNCG or SUMO. ***For SUMO***, despite Meta's requests in discovery, P5D has not even identified *which* Objects from the NOL it contends SUMO infringes. Ex. 48 (P5D ROG 20 Resp.) at 2-3; Ex. 6 (Forsyth) 252:23-253:11. This type of comparison is required. It is not enough to say that Princeton downloaded all the files; P5D must show ***Meta*** had substantially similar copies of each file. Had P5D conducted this analysis, it would realize that at least 526 of the Objects/Object files in which P5D claims rights *do not appear in* SUNCG, at all. Ex. 33. P5D thus cannot show Meta infringed those Objects/Object files. For the remainder, P5D has not offered any evidence of substantial similarity under the extrinsic/intrinsic test, and thus summary judgment for Meta is warranted as to those objects as well.

### C. P5D Offers No Evidence that Meta Infringed the 18 Scenes It Allegedly Created

P5D likewise has not shown that the Scenes/Scene files for the 18 scenes allegedly created by P5D's employees are substantially similar to scenes/files in SUNCG or SUMO, nor can it. ***First***, P5D has offered no evidence as to which part of its scenes are allegedly "creative."[4] Without it, P5D cannot satisfy the first step of the extrinsic test, namely, filtering out the unprotectable elements of its alleged works. ***Second***, P5D also has not conducted a scene-by-scene analysis, comparing P5D's claimed Scenes/Scene files to those in SUNCG or SUMO. Nor has P5D identified which of its Scenes correspond to scenes in SUMO at all. Summary judgment is thus warranted.

## V. P5D CANNOT ESTABLISH INDIRECT COPYRIGHT INFRINGEMENT

### A. Meta Did Not Commit Contributory Copyright Infringement as There Was No Direct Liability and it Did Not Induce Copyright Infringement by Third Parties.

P5D claims that Meta is liable for contributory infringement by "knowingly inducing and causing" third parties "to make copies, distribute, publicly display and/or create derivative works from the Copyrighted Works, and by materially contributing to these activities." CR Compl. ¶110. P5D cannot meet its burden on this claim either. To establish indirect copyright infringement, P5D must make a "threshold showing" of direct infringement. *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1077 (9th Cir. 2023). As discussed above, P5D cannot establish that neither SUNCG nor SUMO infringed its asserted copyright works. *See supra* IV. Accordingly, summary judgment to Meta is proper.

In addition, with respect to SUNCG, despite months of discovery, there is not a single piece of

---

[4] P5D's developer also admitted he based a scene on the TV show House. Ex. 11 (Ketko) 285:7-286:2.

evidence indicating that anyone downloaded or used SUNCG because of Meta. Instead, Meta was merely one of hundreds of entities that used SUNCG in academic research. Thus, P5D's contributory liability claim against Meta with respect to SUNCG fails for the additional reason that there is no evidence of any "direct connection" between third parties using or downloading SUNCG and Meta. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007) ("direct connection" required).

### B.    Meta Did Not Commit Vicarious Copyright Infringement as There Was No Direct Liability and It Did Control or Financially Benefit From Any Direct Infringer

P5D also claims Meta "vicariously infringed" because it purportedly "had the right and the ability to supervise and control" third party use of SUNCG/SUMO and "financially benefitted from" third party use of these datasets. CR Compl. ¶111. P5D cannot meet its burden of establishing this claim.

***First,*** P5D's vicarious liability claim fails because it cannot make the required "threshold showing" of direct infringement. *Supra* IV. ***Second***, Meta received no financial benefit from third party use of SUNCG or SUMO. Rather, Meta never offered SUNCG to the public (Princeton did) and, in any case, SUNCG was free. *Supra* I.C, I.D. The SUMO Challenge was also free and provided Meta *no* revenue. Ex. 49 (Meta ROG 14 Resp.) at 6. Neither drew customers to Meta, as they were scientific research tools, not customer products. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019); *Perfect 10, Inc.. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). ***Finally,*** with respect to SUNG, Meta had no right and ability to supervise the alleged infringement as it had ***no*** role in creating or distributing SUNCG and no ability to "take away the tools" to download SUNCG from ***Princeton's*** servers. Ex 13 (Song) 556:18-558:11; *Erickson*, 921 F.3d at 829.

## VI.    META'S USE OF SUNCG IS FAIR USE

To promote the progress of science and useful arts, copyright law balances the rights of authors of original works with the right of the public to use those works "for purposes such as criticism, comment, news reporting, teaching[,] ***scholarship, or research***." 17 U.S.C. § 107. To determine if use is fair, and thus non-infringing, courts consider: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* No one factor

20

is dispositive; courts balance the factors considering "relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 19 (2021).

Here, Meta's use of SUNCG/SUMO was purely for noncommercial **research** and **scholarship**, two of the few enumerated uses explicitly *permitted* under the fair use doctrine. It should come as no surprise then that Meta's use falls squarely within the fair use doctrine and each of the fair use factors favors Meta. Thus, summary judgment should be granted as there is no dispute as to the material facts establishing Meta's defense. Courts in the Ninth Circuit routinely grant summary judgment on fair use in such circumstances. *See e.g.*, *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (granting summary judgment in light of "the limited and transformative nature of the use and the work's nonprofit educational purposes"); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176-1179 (9th Cir. 2013) (granting summary judgment where use was "not simply a quotation or republication" and was not overly commercial); *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278-1280 (9th Cir. 2013) (granting summary judgment as use of clip was transformative and not a threat to plaintiff's business model); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 822 (9th Cir. 2003) (granting summary judgment as use of plaintiff's images as "thumbnails" in search engine was fair use).

## A.    Meta's Use Is Transformative and Noncommercial

The first fair use factor considers whether the secondary use: (i) "adds something new, with a further purpose or different character, altering" the work "with new expression, meaning or message" (i.e., whether it is transformative) and (ii) is "for nonprofit educational purposes." *Google*, 593 U.S. at 29; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Here, Meta's use was both transformative and for noncommercial research and scholarship—which is quintessential fair use.

*First,* Meta used SUNCG *solely* for noncommercial scientific research and scholarship, often times collaborating with academic institutions. *See, e.g.*, Ex. 49 (Meta ROG 14 Resp.) at 5-10 *supra* I.D. After exhaustive discovery of all uses made of SUNCG, there is not a single piece of evidence showing that Meta's research was for a commercial product. Moreover, Meta's research was published as scholarship and, thus, made available to others for free in the scientific and technical community to build off and replicate. *Id.*; Lopresti Op. ¶227. That each of Meta's published research papers cites back to Dr. Song's paper introducing SUNCG underscores that Meta's research was conducted for the purpose of building

public knowledge and advancing science. Lopresti Op. ¶227. Thus, Meta's use "promote[d] the progress of science and useful arts." *Google*, 593 U.S. at 30 (cleaned up).  This weighs heavily in favor of fair use. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 209 (2d Cir. 2015) (search engine that enabled researchers to identify books and made "possible new forms of research" was fair use).

**Second**, Meta's use of SUNCG was for a transformative purpose. Meta used SUNCG to conduct machine learning research to train models to independently navigate scenes. *Supra* I.D. P5D's purported works, on the other hand, were created for the purpose of promoting and using its interior design platform. CR Compl. ¶45; Ex. 4 (Sheremetyev) 119:23-121:14. These are fundamentally different uses, and, thus, transformative. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168, 1165 (9th Cir. 2007) (though an image may be "created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information."); *Kelly*, 336 F.3d at 818–20 (use transformative as plaintiff's images had an artistic purpose and defendant's use in a search engine had the purpose of improving access to information); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (creation of copies of unaltered student papers for use with a computer program that detects plagiarism held transformative).[5]

**Third**, to the extent that P5D made any creative contributions to its purported works, and those contributions made it into SUNCG, Meta did not use SUNCG for those features. For example, P5D contends that its Objects are creative due to flourishes such as the shape of a drawer knob. Dkt. 285-03 at 28, 79, 206. But machine learning researchers are not interested in those flourishes. They only care that a drawer is a drawer, or a knob, a knob. Lopresti Op. ¶¶54-63. In other words, Meta used SUNCG for the *functional* aspects of objects, not any purported artistry. *See Sega Enters. Ltd v. Accolade, Inc.*, 977 F.2d 1510, 1522 (9th Cir. 1992) (copying software to discover "functional requirements for compatibility" fair use). With respect to the asserted compilation, Meta's use focused on *individual* scenes—which P5D **does**

---

[5] P5D may argue that it too is in the "machine learning" space, but that is misleading and an overstatement. Its asserted works were not created for machine learning. Lopresti Op. ¶¶75-79 (unrebutted opinion); *see also* Ex. 4 (Sheremetyev) 121:5-14 (P5D created for interior designs). The field of "machine learning" is also too broad to make the purposes similar, as nearly every industry uses AI. It is undisputed that P5D's business is providing an interior design platform, and its purported "machine learning" work has been in pursuit of this same service, distinctly *not* in service of developing AI agents to understand how to independently navigate 3D spaces. *Supra* I.B. Even if P5D wanted to do more in AI, it could not. Its Terms of Service only give it the right to use user-generated Scenes for the purpose of "providing and promoting [its] Services." Ex. 23 at 4.

META'S MOTION FOR SUMMARY JUDGMENT                                    CASE NO. 3:19-CV-03132

*not own*—not the entire compilation. This too cuts in favor of fair use, as Meta only "extract[ed] noncopyrighted material" and did not copy "to go into competition with [P5D]." *Assessment Techs. of WI, LLC v. WIREdata, Inc.,* 350 F.3d 640, 644-45 (7th Cir. 2003) (copying database fair use).

### B.     P5D's Purported Copyrighted Works Are at the Lowest End of Creativity

This factor looks at the degree of creativity in the copyrighted work. *Google*, 593 U.S. at 19. Here, P5D's asserted works are at the extremely low end of creativity, if copyrighted at all. Its Objects are functional files derived from copying real-world furniture with no identifiable creative additions. *Supra* IV.B.1. And its alleged copyright in the asserted compilation extends only to the *selection* of the Scenes that *users* created and chose for inclusion in the gallery. This factor thus favors fair use.

### C.     Meta Used Only as Much as Necessary for Its Transformative Purpose

The third factor considers "the amount and substantiality of the portion used" (both quantitatively and qualitatively) in recognition of the fact that the extent of permissible copying "varies with the purpose and character of the use." *Tresóna*, 953 F.3d at 650 (quoting *Campbell*, 510 U.S. at 586).

*Quantitatively,* Meta did not use P5D's asserted scene compilation at all. Rather, as set forth above, it used the compilation created by Princeton, which involved different underlying scenes and an entirely different criteria for selecting scenes. *Supra* IV.A.1. As to the Objects, Meta used only as much as necessary to achieve its transformative research purpose, as its various research projects used only as many scenes—and thus objects—as necessary for the particular research task. *See* Ex. 8 (Gkioxari) 267:20-268:6 (explaining multiple projects used just a few hundred scenes); *Kelly*, 336 F.3d at 820–21.

*Qualitatively*, Meta did not use the "heart" of P5D's original works. *Tresóna*, 953 F.3d at 650. The "heart" of the work would be the individual scenes, but P5D concededly does not own them. It only (purportedly) owns a thin compilation in the *selection* of scenes. But, as discussed above, Meta did not copy that selection. *Supra* IV.A.1. And for the Objects, Meta had no interest in—and did not make use of—P5D's purported creative contributions to the Objects. It used the Objects as functional features of a 3D floorplan for AI training. This factor thus favors fair use.

### D.     Meta's Conduct Did Not Interfere With P5D's Market

The fourth factor focuses on the "effect" of the copying in the "market for or value of the copyrighted work." *Google*, 593 U.S. at 35. This "can require a court to consider the amount of money

that the copyright owner might lose" and "the public benefits" of the copying. *Id.*

The amount of money that P5D stood to lose from Meta's use is zero. This is because, as much as P5D may argue it *could have* licensed its scene compilation or Objects if not for SUNCG, that simply is not true. The Scenes were created by P5D's users, and P5D's Terms of Service gave it *no right* to license the Scenes for research. Rather, P5D could sublicense Scenes only for the limited purpose of "providing and promoting" the user's "*use of the [P5D] projec*t." Ex. 23 at 3-4. Therefore, P5D could not license its scene compilation, which necessarily would have required licensing the Scenes.[6] Further, as the Objects are only useful to the extent included in Scenes, there was no market for the free-standing Objects either.

Regardless, even assuming P5D could license the scenes (it cannot), there is no market harm to P5D because Meta's use of SUNCG did not deprive P5D of *any* market opportunities. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Ex. 9

(Gavelis) 235:18-236:11. ████████████████████████████████████

████████████████████████████████████████████████████ Ex. 4

(Sheremetyev) 232:24-236:24; Ex. 5 (Sheremetyev) 494:4–496:8. This is very different from Supreme Court cases regarding fair use where the defendant's use *extinguished* a plaintiff's licensing opportunity. *See, e.g., Andy Warhol Found. v. Goldsmith*, 598 U.S. 508, 512 (2023) (AWF's licensing of Prince image to magazine extinguished Goldsmith's opportunity to do the same); *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 556 (1985) (Nation's use of quotes from copyrighted manuscript extinguished plaintiff's licensing opportunity with Time magazine for article on excerpt of manuscript). Here, by contrast, Princeton could not, and did not, harm a market.[7]

Nor can P5D claim that it was harmed because Meta failed to pay it a license fee for its use of the data in SUNCG. As the Supreme Court and Ninth Circuit have explained, a theoretical lost licensing fee is insufficient to show market harm; that is a tautological argument that would cut against fair use in every

---

[6] Following this litigation, P5D modified its terms to give itself ownership of the scenes, a tacit acknowledgement that it did not previously have such rights. Ex. 26 ; Ex. 27 at -440.

[7] ████████████████████████████████████████████████████████████ Ex. 24; Lopresti Op. ¶¶86-124; *Google*, 593 U.S. at 36 (failed attempt to enter market favored fair use).

case. *See, e.g., Google*, 593 U.S. at 38 (noting the "danger of circularity posed" by considering unrealized licensing opportunities in the fair use analysis, as plaintiff could argue such a loss in every case); *Tresóna*, 953 F.3d at 652 ("[I]t is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar.").

There also was *no paying market* for the noncommercial use of data in 2016-2019. Lopresti Op. ¶¶210-16. Datasets available for scene navigation machine learning research were free.[8] *Id.*; *see Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 912 (E.D. Miss. 2015) (industry practice of allowing "free license" weighed in favor of fair use); *see also Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1121 (D. Nev. 2006) (no market because plaintiff made "the works available to the public for free in their entirety"). Consistent with this, ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████ Ex. 24.

Fundamentally, this is a matter of ships passing in the night. Meta is not in the interior design business and did not use SUNCG to compete with P5D or create an interior design platform. Instead, it used SUNCG for the public benefit through academic research. There also is no evidence that anyone ever sought to license or obtain data from Meta *rather than* P5D, which makes sense given that Meta did not release SUNCG and SUMO was designed for a narrow research project. Meanwhile, P5D's interior design business has *grown* significantly in revenue, users, and employees since Meta used SUNCG. Schenk Op. ¶¶148-49. Thus, this factor favors fair use.

Accordingly, regardless of whether P5D can prove direct or indirect copyright infringement (it cannot), P5D is barred from recovery on its copyright infringement claims against Meta because Meta's conduct was fair use. *Google*, 593 U.S. at 40 Summary judgment to Meta on its affirmative defense of fair use should be granted. *See Tresóna*, 953 F.3d at 652 (fair use on summary judgment); *Kelly*, 336 F.3d at 822 (same); *Seltzer*, 725 F.3d at 1175-1179 (same); *SOFA Ent.*, 709 F.3d at 1278-1280 (same).

## VII.    CONCLUSION

For the foregoing reasons, Meta's motion for summary judgment should be granted.

---

[8] Free datasets in the 2016-2019 period include PASCAL Visual Object Classes, ImageNet, NYU-v2, SUN RGB-D, SceneNet RGB-D, SceneNN, ScanNet, Matterport3D, and Gibson. Lopresti Op. ¶218.

Dated: January 9, 2024

KIRKLAND & ELLIS LLP

_/s/  Dale M. Cendali_
Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (*pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (*pro hac vice*)
abbey.quigley@kirkland.com
Miriam Kontoh (*pro hac vice*)
miriam.kontoh@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
F: (212) 446-4900

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400
F: (415) 439-1500

Attorneys for Defendants
*Meta   Platforms,   Inc.* and *Meta   Platforms Technologies, LLC*