1    MARC N. BERNSTEIN (SBN 145837)
     mbernstein@blgrp.com
2    WILL B. FITTON (SBN 182818)
     wfitton@blgrp.com
3    CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
     christian@blgrp.com
4    THE BUSINESS LITIGATION GROUP, P.C.
     4 Embarcadero Center, Suite 1400
5    San Francisco, CA 94111
     Telephone: 415.765.6633
6    Facsimile: 415.283.4804

7    Attorneys for Plaintiff
     UAB "PLANNER5D"

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                          SAN FRANCISCO DIVISION

11   UAB "PLANNER5D" dba PLANNER 5D,          **Case No. 3:19-cv-03132-WHO (SK)**
                                              **Case No. 3:20-cv-08261-WHO (SK)**
12                  Plaintiff,

13           v.                               **PLANNER 5D'S MOTION FOR**
                                              **SUMMARY JUDGMENT**
14   META PLATFORMS, INC., META PLATFORMS
     TECHNOLOGIES, LLC, THE TRUSTEES OF
15   PRINCETON UNIVERSITY, DOES 1-200, ABC
     CORPORATIONS 1-20, and XYZ UNIVERSITIES
16   1-20.

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTS ................................................................................................................. 2

III.    SUMMARY JUDGMENT STANDARD............................................................ 4

IV.     ARGUMENT ...................................................................................................... 4

        A.    Princeton does not qualify for the DMCA safe harbor it asserts. ........... 4

              1.    Princeton's liability is not "by reason of" hosting SUNCG. ................. 6

              2.    Princeton had control over the infringement and benefited from it........ 9

              3.    SUNCG was required or recommended for Dr. Funkhouser's courses.......... 9

        B.    It was not fair use for Defendants to scrape P5D's works, repackage them into SUNCG, and distribute them freely.................................................. 11

              1.    Defendants' use was not transformative in purpose or character. ......... 11

              2.    The nature of Planner 5D's work is expressive, not factual. ................ 17

              3.    Defendants used and distributed most of P5D's works. ...................... 17

              4.    Defendants' infringement harms potential markets for P5D's works. .......... 18

        C.    Princeton is liable for the initial scraping of Planner 5D's data. ..................... 19

              1.    Princeton admits to scraping P5D's scene compilation and objects.................... 19

              2.    Planner 5D's scene compilation, and many of its objects, are copyrightable....... 20

V.      CONCLUSION.................................................................................................... 21

**Planner 5D's Motion for Summary Judgment**          **Case No. 3:19-cv-03132-WHO (SK)**

# TABLE OF AUTHORITIES

## Cases

*Andersen v. Stability AI Ltd.,*
700 F. Supp. 3d 853 (N.D. Cal. 2023) ................................................................. 19

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023)......................................................................... 11, 14, 15

*Aqua Creations USA Inc. v. Hilton Hotels Corp.,*
No. 10-cv-246, 2011 WL 1239793 (S.D.N.Y. Mar. 28, 2011)......................... 20

*Aqua Creations USA Inc. v. Hilton Worldwide, Inc.,*
487 F. App'x 627 (2d Cir. 2012) ......................................................... 20

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015)............................................................ 15

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ..................................................................... 14, 18

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................. 4

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ........................................................ 4, 8

*Crawford-El v. Britton,*
523 U.S. 574 (1998)................................................................ 4, 21

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) ......................................................... 12

*Dr. Seuss Enters., L.P. v. ComicMix LLC,*
983 F.3d 443 (9th Cir. 2020) ......................................................... 18

*Far Out Prods., Inc. v. Oskar,*
247 F.3d 986 (9th Cir. 2001) ......................................................... 4, 21

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
499 U.S. 340 (1991).................................................................... 20

*Fox News Network, LLC v. Tveyes, Inc.,*
883 F.3d 169 (2d Cir. 2018)........................................................... 18

*Hachette Book Grp., Inc. v. Internet Archive,*
115 F.4th 163 (2d Cir. 2024) .......................................................... 16, 18

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985)................................................................... 18

*Home Legend, LLC v. Mannington Mills, Inc.,*
784 F.3d 1404 (11th Cir. 2015) ........................................................ 21

*Jonathan Browning, Inc. v. Venetian Casino Resort LLC,*
No. 07-cv-3983, 2009 WL 1764652 (N.D. Cal. June 18, 2009) .......................... 20

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.,*
676 F.3d 841 (9th Cir. 2012) ................................................................................ 21

*Leadsinger, Inc. v. BMG Music Publ'g,*
512 F.3d 522 (9th Cir. 2008) ................................................................................ 11

*Mavrix Photographs, LLC v. Livejournal, Inc.,*
873 F.3d 1045 (9th Cir. 2017) ....................................................................... 5, 9, 11

*Monge v. Maya Magazines, Inc.,*
688 F.3d 1164 (9th Cir. 2012) .............................................................................. 18

*Narell v. Freeman,*
872 F.2d 907 (9th Cir. 1989) ................................................................................ 19

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.,*
701 F.2d 95 (9th Cir. 1983) ............................................................................. 4, 21

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.,*
668 F.3d 1148 (9th Cir. 2012) .............................................................................. 19

*S. Cal. Gas Co. v. City of Santa Ana,*
336 F.3d 885 (9th Cir. 2003) .................................................................................. 5

*Skidmore v. Led Zeppelin,*
952 F.3d 1051 (9th Cir. 2020) .............................................................................. 20

*Stewart v. Abend,*
495 U.S. 207 (1990) .............................................................................................. 17

*UAB "Planner5D" v. Facebook, Inc.,*
534 F. Supp. 3d 1126 (N.D. Cal. 2021) ............................................................... 20

*Worldwide Church of God v. Philadelphia Church of God, Inc.,*
227 F.3d 1110 (9th Cir. 2000) ......................................................................... 16, 17

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................... 4

**STATUTES**

17 U.S.C.
§ 101 ............................................................................................................... 11, 20
§ 106(2) ................................................................................................................... 6
§ 106(1) ................................................................................................................... 6
§ 106(3) ................................................................................................................... 6
§ 107 ...................................................................................................................... 11
§ 512(c) ........................................................................................................... 5, 6, 8, 9
§ 512(c)(1) ............................................................................................................... 5
§ 512(c)(1)(A) ...................................................................................................... 5, 9
§ 512(c)(1)(A)(i) ..................................................................................................... 4
§ 512(c)(1)(A)(ii) .................................................................................................... 4

§ 512(c)(1)(B) ................................................................................................................ 5
§ 512(c)(A) .................................................................................................................... 8
§ 512(e) ......................................................................................................................... 9
§ 512(e)(1) ..................................................................................................................... 5
§ 512(e)(1)(A) ............................................................................................................... 9
§ 512(c)(1)(b) ............................................................................................................... 9

**Other Authorities**

1 M. Nimmer & D. Nimmer, *Copyright* §§ 2.01[A], [B] (1990) ........................................... 20

3 David Nimmer, *Nimmer on Copyright* § 12.10[B][1] ....................................................... 20

**Planner 5D's Motion for Summary Judgment          Case No. 3:19-cv-03132-WHO (SK)**

**NOTICE OF MOTION**

This motion will be heard March 26, 2025, 2:00 pm, in Courtroom 2, San Francisco Courthouse.

Planner 5D moves for summary judgment: (1) against Princeton's affirmative defense under the Digital Millenium Copyright Act; (2) against Defendants' affirmative defenses for fair use; and (3) in favor of Planner 5D's claim for copyright infringement against Princeton based on its scraping and repackaging of P5D's works.

**MEMORANDUM**

**I.    INTRODUCTION**

With Meta's backing, Princeton's agents scraped Planner 5D's collections of objects and scenes and repackaged them into the SUNCG dataset. They then promoted SUNCG's distribution to other researchers, directing them to download the dataset from a Princeton website and providing other access. Because of its website's small, supporting role in this program, Princeton now claims that the widescale copyright infringement its program wreaked is immunized by the DMCA. But the DMCA does not excuse Princeton's infringement merely because it used its website to commit it. Also, Princeton's larger infringement program put it on notice that it was hosting infringing material, which is separately disqualifying under the DMCA.

Defendants also contend it was fair use to appropriate, repackage, and widely distribute Planner 5D's works. But P5D's works were copied wholesale and merely reformatted, without changing their character or meaning. Further, Princeton's "new" work, SUNCG, served a purpose for which P5D, too, uses its works: AI training. This is not fair use.

Finally, Princeton concedes it downloaded Planner 5D's works and repackaged them into the SUNCG dataset. There is also no genuine question that P5D created its scene compilation through a creative selection process that exceeded the minimal threshold for copyrightability, which is a question for the Court. Accordingly, the Court can and should now find that Princeton, as it concedes, copied P5D's scene compilation by downloading it, and, as the undisputed evidence shows, that the scene compilation was copyrightable. That is, the Court can and should now enter judgment against Princeton for this infringement.

## II.    FACTS

Planner 5D operates the leading platform for AI-powered interior design. P5D uses machine learning in research and development, including using its own objects and scenes as training data. Based on that work, P5D offers tools that make it easy and engaging for users without technical knowledge to create impressive designs, such as by recognizing existing room configurations, suggesting layout options, and producing photo realistic renderings of user designs.[1]

Since 2011, Planner 5D has operated an interior design tool at www.planner5d.com. The design tool offers a library of thousands of household objects that were digitally sculpted by the company's human modelers. Planner 5D's users can select these objects, choose colors and textures, and drag them onto customized floor plans, rotating, resizing, and placing them where they wish.

When users create scenes, they can flag them for inclusion in Planner 5D's public gallery. From the company's founding through February 17, 2016, when P5D's Scenes Work was completed, users flagged some 63,000 scenes. P5D co-founders, Alexey Sheremetyev and Sergey Nosyrev, reviewed each of these 63,000 scenes and chose the subset of 49,811 scenes that make up the Scenes Work. Mr. Sheremetyev and Mr. Nosyrev selected scenes to show off their software's scope, quality, and power to potential users.[2] Selection criteria included artistic value, humor, variety, novelty, diversity, creativity, completeness, fun, and realism.[3]

Machine learning is a way to teach computers to do things, and do them better and better, using training datasets.[4] Computer vision researchers use visual data to train models that can recognize people or things in a picture or track them in a video, transform a two-dimensional picture into a three-

---

[1] Declaration of Richard A. De Liberty in Support of Planner 5D's Motion for Summary Judgment ("RAD Decl.") Ex. 1 (Andrikys Dep) at 194:9–211:7; *id.* Ex. 2 (Sheremetyev Dep. (June 25, 2024)) at 269:16–281:2. *See also infra*, p. 14 n.46.

[2] *Id.* Ex. 3 (Sheremetyev Dep. (Nov. 10, 2022)) 36:6–37:4.

[3] *Id.* Ex. 3 at 153:13–154:16, 170:4–173:14; *id.* Ex. 4 (P5D's 5th Supp. Resp. to Meta's Interrog. 1 (Aug. 30, 2022)) at 5:11–22.

[4] Declaration of David Forsyth in Support of Planner 5D's Motion for Summary Judgment ("Forsyth Decl.") Ex. A (hereinafter "Forsyth Report") ¶¶ 22–23.

dimensional model, navigate a space, and more.[5] For these applications, datasets that are very large and realistic are mission critical.[6]

Finding a large computer vision dataset was a top priority for computer vision researchers at Princeton. Their efforts were backed by Meta and other big technology companies that were investing in computer vision research. For example, in 2015, Princeton won a three-year grant from Intel and the National Science Foundation. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████.”[9]

With Meta's backing, that's just what Song did. Working under the direction of Princeton professor Dr. Thomas Funkhouser, Song and her Princeton colleagues found the training data they were looking for in Planner 5D's website. But they did not approach P5D. Instead, in 2016, Princeton scraped P5D's complete library of objects and scenes.[10] They repackaged those files into a dataset they named SUNCG. Song's 2016 SUNCG release paper acknowledges: "Our SUNCG dataset contains 45,622 different scenes with realistic room and furniture layouts that are manually created though the Planner5D platform."[11]

---

[5] *Id.* Ex. A ¶¶ 26–27.

[6] *Id.* Ex. A ¶¶ 28–39.

[7] RAD Decl. Ex. 5 (PRIN00003048) at 3074.

[8] *Id.* Ex. 5 at 3123.

[9] *Id.* Ex. 6 (SONG00000214); *see also* Forsyth Report ¶ 135.

[10] RAD Decl. Ex. 7 (Princeton's 1st Supp. Resp. Interrog. 1) at 3:16–5:22.

[11] Shuran Song et al., *Semantic Scene Completion from a Single Depth Image*, arXiv (Nov. 28, 2016), at 5, https://arxiv.org/pdf/1611.08974.

1    Princeton distributed SUNCG to researchers at other academic and commercial institutions by

2 directing them to download it from a Princeton website and in other ways. Princeton distributed over

3 800 copies to third parties.[12] And, of course, distribution multiplied from there.

4    On March 14, 2019, Planner 5D sent Princeton a cease-and-desist letter, which included a

5 DMCA takedown notice.[13] Princeton's counsel responded in a March 20, 2019, e-mail, stating that the

6 website and SUNCG dataset had been taken down pending University review.[14]

## III.    SUMMARY JUDGMENT STANDARD

8    Summary judgment on a claim or defense is appropriate if the movant shows there is no genuine

9 dispute about any material fact and so is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

10 Once this is shown, the opposing party must identify "specific facts showing that there is a genuine issue

11 for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The opposing party "may not simply

12 question the credibility of the movant," but rather must "by its own evidence 'set forth specific facts

13 showing that there is a genuine issue for trial.'" *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th

14 Cir. 2001). *Accord Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Nat'l Union Fire Ins. Co. of

15 Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).

## IV.    ARGUMENT

### A.    Princeton does not qualify for the DMCA safe harbor it asserts.

18    Princeton cannot meet its prima facie burden to establish that it qualifies for the safe harbor

19 found in the Digital Millenium Copyright Act.

20    In specified circumstances, the DMCA shields web hosts from liability for copyright

21 infringement committed by their users. To qualify for this harbor, a web host must meet several

22 conditions, two of which matter here. First, the host must neither have actual knowledge of the

23 infringing activity, 17 U.S.C. § 512(c)(1)(A)(i), nor be "aware of facts or circumstances from which

24 infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii). This latter awareness is often called "red

25 flag" knowledge. *E.g.*, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013).

26

27 ───────────

[12] RAD Decl. Ex. 8 (Princeton's 4th Supp. Resp. Interrog. 5) at 4:18–25, Ex. A.
[13] *Id.* Ex. 9 (P5D-0065621).
28 [14] *Id.* Ex. 10 (P5D-0065572).

Second, the host must not "receive a financial benefit directly attributable to the infringing activity, in a case in which the [host] has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). A host meeting these and other qualifications "shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material" on the host's network. 17 U.S.C. § 512(c)(1).

By the safe harbor's terms, if a web host's *own agent* posts infringing material, the safe harbor generally doesn't apply. *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1053–54 (9th Cir. 2017). This is because the agent's knowledge of the infringement is imputed to the host, and that knowledge is disqualifying under the DMCA. *Id.*; 17 U.S.C. § 512(c)(1)(A). A nonprofit educational institution, however, is in some cases shielded from its agents' knowledge: "[W]hen a faculty member or graduate student who is an employee of such institution is performing a teaching or research function, . . . such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution." 17 U.S.C. § 512(e)(1). This exception applies only in listed circumstances. One such circumstance is that the faculty member's or graduate student's infringing activities "do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student." 17 U.S.C. § 512(e)(1)(A).

Because the DMCA subsection (c) safe harbor is an affirmative defense, the defendant "must establish 'beyond controversy every essential element,' and failure to do so will render [the defendant] ineligible for the § 512(c) safe harbor's protection." *Mavrix*, 873 F.3d at 1052 (quoting *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003)).

Here, Princeton does not qualify for the DMCA safe harbor, for three main reasons:

First, Princeton's original copying of P5D's data and repackaging it to create SUNCG necessarily occurred before SUNCG was posted to any Princeton website. Even after, Princeton's agents did far more than simply post SUNCG: They publicized SUNCG, directed users to it, approved individual downloads, and purported to license the dataset for noncommercial use. The DMCA's protections do not reach such infringement, which is not "by reason of" Princeton's hosting role. This non-hosting infringement also put Princeton on actual or red-flag notice that it was hosting infringing material, which disqualifies Princeton for DMCA protection even in its hosting role.

**Planner 5D's Motion for Summary Judgment**                    **Case No. 3:19-cv-03132-WHO (SK)**

Second, Princeton benefited financially from the infringing material and had the ability to control the employees who posted it. In such cases, the DMCA does not apply.

Third, even if there were some purely hosting activity that fell within the DMCA here, Princeton is ineligible for the special exemption that can shield nonprofit universities from their agents' bad acts. This is because SUNCG was used extensively for relevant university course work, which disqualifies Princeton from the university exemption. Princeton is thus charged with its agents' knowledge of the infringement, and ineligible for the DMCA safe harbor.

### 1.    Princeton's liability is not "by reason of" hosting SUNCG.

#### a.    Princeton is liable for scraping Planner 5D's works, repackaging them as SUNCG, and other non-hosting infringing activity.

Under subsection 512(c), a service provider that meets the listed requirements is exempted from liability for "infringement of copyright *by reason of the storage* at the direction of a user." By these terms, this safe harbor does not protect an entity from liability flowing from non-hosting activities. In this case, Princeton's agents did much more than post SUNCG to a website. First and foremost, Princeton's team scraped the entirety of Planner 5D's then-available works, which is copying, and thus infringement. 17 U.S.C. § 106(1). As discussed below, Princeton concedes this scraping.[15] Princeton's agents then repackaged P5D's works as SUNCG, which is also infringing. *See* 17 U.S.C. § 106(1), (2). Princeton's DMCA defense is inapplicable to these pre-distribution and other non-hosting acts.

Further, Princeton's DMCA defense fails to protect it from liability even for distribution through the website. This is because Princeton's agents directly facilitated SUNCG's widespread distribution, *see* 17 U.S.C. § 106(3), not just by the web posting itself, but also through talks and articles promoting SUNCG, e-mails, and private meetings.[16]

Song's team even distributed SUNCG to many without using Princeton's website. For example, as early as March 2016, ██████████████████████████████████████ ████████████████████████████████████████████████

---

[15] *See* Part C, *infra*.

[16] *See, e.g.*, RAD Decl. Ex. 11 (PRIN00019806) ████████████████████████ ████████████████████████████████████████████████████ ███).



None of these infringing activities by Princeton's agents involves web hosting, and thus none even implicates the DMCA safe harbor. Princeton is thus liable for all of these activities of its agents notwithstanding the DMCA.

**b.    Princeton directed people to the website and otherwise induced infringing downloads of SUNCG from its website.**

Even where distribution of Planner 5D's works did pass through the Princeton website, Princeton's liability is not "by reason of" its hosting role. Princeton's liability is "by reason of" its agents' encouraging researchers to use SUNCG and directing them to get a copy from the website. The posting to the website, all by itself, likely didn't lead to any distribution at all; no one downloaded SUNCG because they just happened on the website. People went to the website because Princeton

---

[17] *Id.* Ex. 12 (SONG00000386) (██████████████████████████████████████████████; *id.* Ex. 13 (PRIN00000356) (March 27, 2016, email linking to same viewer); *id.* Ex. 14 ██████████████████████).

[18] *See, e.g.*, *id.* Ex. 15 (PRIN00020956) at 20957 ██████████████████████████; *id.* Ex. 16 (PRIN00000632) (Song using Stanford server for work on SUNCG); *id.* Ex. 17 (SONG00003878) at 3879 ████████████████████ *id.* Ex. 18 (META_0001848) ██████████████████████; *id.* Ex. 19 (PRIN00000263) at 265 (Chang sending Stanford server link to SUNCG models http://dovahkiin.stanford.edu/scannet/p5d-part-annotations).

[19] *See, e.g.*, *id.* Ex. 17 at 3879 ████████████████████████████.

[20] *Id.* Ex. 20 (PRIN00019726).

[21] *Id.* Ex. 21 (SONG00003596) at 3598 ██████████████████; *id.* Ex. 18 ████████████; *id.* Ex. 22 (META_0002217) ████████████████████; *id.* Ex. 23 (META_0002108) (same).

promoted it, such as in Song's SUNCG article, which announced: "The dataset and code is available at http://sscnet.cs.princeton.edu."[22] ███████████████████████████████████████████ ███████████████████████████████████████████.[23] And Princeton's team promoted SUNCG in other articles, public talks, and other fora.[24] ███████████████████████ ██████████████████████████████████████████████████████████ ██████████████.[25]

Princeton is thus liable not "by reason of the storage" on its website, but by reason of its extensive encouragement and coordination of SUNCG's distribution. *See Columbia Pictures*, 710 F.3d at 1043–44 (web host who "actively encourage[ed] infringement, by urging his users to both upload and download particular copyrighted works," was ineligible for subsection 512(c) safe harbor).

### c. Princeton's extensive non-hosting acts of infringement gave it actual or "red flag" knowledge that it was hosting infringing materials.

As shown above, Princeton is liable for a broad range of infringing activities unrelated to its narrow hosting role, such as the scraping of Planner 5D's works, repackaging them as SUNCG, and encouraging and coordinating SUNCG's distribution. By virtue of these non-hosting infringing activities by its agents—which are not covered by subsection 512(c)—Princeton had actual or "red flag" knowledge that it was hosting infringing materials. *See Columbia Pictures*, 710 F.3d at 1043–44. This separately disqualifies Princeton from DMCA protection for any purely hosting-related infringement that might otherwise have been covered. *Id.*; 17 U.S.C. § 512(c)(A).

---

[22] Shuran Song et al., *Semantic Scene Completion from a Single Depth Image*, CVPR (July 21–26, 2017), at 1746, https://openaccess.thecvf.com/content_cvpr_2017/papers/Song_Semantic_Scene_Completion_CVPR_2017_paper.pdf .

[23] RAD Decl. Ex. 24 (PRIN00036279); Instructions for Princeton's public SUNCG software toolbox, https://github.com/angelxuanchang/SUNCGtoolbox/blob/master/README.md ("Please see our webpage [suncg.cs.princeton.edu] and paper for more details about the data.").

[24] *See, e.g.*, *id.* Ex. 25 (Song Dep. (June 14, 2024) Ex. 64) (promotional article on Princeton's website); Shuran Song, *Semantic Scene Completion from a Single Depth Image*, Computer Vision Foundation Videos (Jul. 26, 2017), https://www.youtube.com/watch?v=Aq7hLLIz5a0 ; RAD Decl. Ex. 26 (Adobe_5D_0001454) (joint paper by Princeton and Adobe researchers); *id.* Ex. 27 (PRIN00023617) (joint paper by Princeton and Stanford researchers).

[25] *See, e.g.*, *id.* Ex. 28 (SONG00003283) ████████████████████████████████ *id.* Ex. 29 (PRIN00000691); *id.* Ex. 30 (Song Dep. (June 14, 2024)) 431:13–433:13; *id.* Ex. 31 (Funkhouser Dep.) 279:5–282:4.

### 2. Princeton had control over the infringement and benefited from it.

The DMCA subsection 512(c) safe harbor does not apply if the host "receive[s] a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. 512(c)(1)(b). Like any employer, Princeton *does* have the right and ability to control its professors and graduate student employees. Indeed, Princeton claims that it *did* put a stop to its employees' infringing activity upon receiving P5D's cease-and-desist letter.[26]

And Princeton *did* receive financial benefits attributable to the infringing activity. ████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████[28] As a condition of continued funding, Princeton was required to submit annual reporting about its research to NSF and to present its research to Intel at annual retreats.[29] Princeton's work on SUNCG—including its distribution on the Princeton website—was thus instrumental to maintaining this funding from Intel and NSF.

### 3. SUNCG was required or recommended for Dr. Funkhouser's courses.

As noted, the DMCA safe harbor generally doesn't apply when a web host's *own agent* posts infringing material. *Mavrix*, 873 F.3d at 1053–54. This is because subsection 512(c) only exempts web hosts for "infringement of copyright by reason of the storage *at the direction of a user*," and because subsection 512(c)(1)(A) disqualifies hosts with actual or "red flag" knowledge of the infringement. Universities are shielded in some cases from imputed knowledge of their professors' actions. 17 U.S.C. § 512(e). But there's no such shield if the professor teaches course in which the infringing materials are recommended instructional materials. 17 U.S.C. § 512(e)(1)(A).

---

[26] *See* RAD Decl. Ex. 32 (Princeton's 6th Supp. Resp. Interrog. 9) at 6:2–4.
[27] *Id.* Ex. 5 at 3048–3049.
[28] *Id.* Ex. 5 at 3123.
[29] *Id.* Ex. 33 (PRIN00033790) (explaining that both Princeton and Berkeley were required to submit annual reports to the NSF as a condition of funding); *id.* Ex. 34 (PRIN00000634) (email from Intel listing the planned agenda for the annual retreat for VEC grant recipients); *id.* Ex. 35 (PRIN00002208) (Funkhouser emailing Berkeley researchers that they were "on the hook" to give a presentation at the Intel annual VEC retreat).

9

Here, Funkhouser used SUNCG for student coursework in at least three instances, each time beginning well before SUNCG was publicly posted to Princeton's website and continuing while it remained available there.

First, in the Fall semester of 2016, a few months before SUNCG was publicly posted, Professor Funkhouser taught a course entitled "Advanced Computer Vision." At least one Princeton doctoral student in that class, Kyle Genova used SUNCG for a course project, which was due on January 17, 2017.[30] Shortly thereafter, on April 7, 2017, now-Dr. Genova published an article co-authored by Funkhouser showcasing his research with SUNCG.[31]

Second, Professor Funkhouser used Planner 5D's data to instruct undergraduate ███████ in a two-semester independent study course. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[35]

Finally, Song's work on SUNCG was part of her own course of study for her dissertation as a doctoral student at Princeton. Professor Funkhouser oversaw that work as Song's Ph.D. advisor. Song's doctoral work may or may not have been part of a formally defined course on Song's transcript. But it was part of her coursework under Funkhouser's instruction. There is no principled basis to treat a supervised course of study differently from any other coursework just because a university chooses not to assign it a course number.

---

[30] RAD Decl. Ex. 36 (PRIN00036364); *id.* Ex. 37 (PRIN00019479).

[31] Kyle Genova, Manolis Savva, Angel X. Chang, and Thomas Funkhouser, *Learning Where to Look: Data-Driven Viewpoint Set Selection for 3D Scenes*, Apr. 7, 2017, https://arxiv.org/pdf/1704.02393; https://gfx.cs.princeton.edu/pubs/Genova_2017_LWT/index.php .

[32] RAD Decl. Ex. 38 (PRIN00019720); *id.* Ex. 39 (PRIN00019722).

[33] *Id.* Ex. 40 (PRIN00022264); *id.* Ex. 41 (PRIN00022265); *id.* Ex. 42 (PRIN00019506); *id.* Ex. 43 (PRIN00022884).

[34] *Id.* Ex. 44 (PRIN00022885) at 22889.

[35] *Id.* Ex. 42 at 19508.

Because Planner 5D's data was used for coursework under Professor Funkhouser's instruction in at least three cases, his knowledge is imputed to Princeton notwithstanding subsection 512(e). As a result, Princeton is not entitled to the DMCA safe harbor. *See Mavrix*, 873 F.3d at 1053–54.

**B.    It was not fair use for Defendants to scrape P5D's works, repackage them into SUNCG, and distribute them freely.**

Courts consider four factors in evaluating whether the use of a copyrighted work is fair:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. "Fair use is a mixed question of law and fact, but it is well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citation omitted).

**1.    Defendants' use was not transformative in purpose or character.**

"The central question" under this first factor is whether the new work is transformative— whether it "merely supersede[s] the objects of the original creation . . . (supplanting the original), or instead adds something new, with a further purpose or different character." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–28, 529 (2023) (citations and internal quotation marks omitted). "Although new expression may be relevant to whether a copying use has a sufficiently distinct purpose or character, it is not, without more, dispositive of the first factor." *Id.* at 525. This is because a copyright owner has the exclusive right to prepare derivative works, which are works "based upon one or more preexisting works," which may take any "form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. *See Warhol*, 598 U.S. at 529–30. To avoid swallowing such rights, "the degree of transformation required . . . must go beyond that required to qualify as a derivative." *Id.* at 529–30. *See also id.* at 541. In particular, the use of the plaintiff's work must be "justified," meaning that the "copying is reasonably necessary to achieve the user's new purpose." *Id.* at 531–32. Finally,

**Planner 5D's Motion for Summary Judgment                Case No. 3:19-cv-03132-WHO (SK)**

whether a work is commercial is an additional element that is relevant, but not dispositive of the first factor. *Id.* at 530–31.

### a. Princeton's technical tweaks did not change the works' purpose or character.

What Princeton stole and what it distributed are the fundamentally same. And Princeton could have used Planner 5D's works for its intended purpose of machine learning without changes— particularly if it had licensed the works from P5D and understood how they were encoded. Indeed, as discussed, Planner 5D uses its works internally for AI training without problem.

The main thing Princeton did to P5D's works had no effect on their expressive content. Princeton converted the files from P5D's trade secret format to a more standard format. This was a change of encoding, not substance, akin to converting an image from GIF to JPG format. Dr. Forsyth found a "degree of correspondence . . . indicat[ing] that [the] process of reformatting P5D's data into the SUNCG data was essentially an act of rote copying, and not one involving substantive changes."[36] It is well-established that such reformatting, which leaves the expressive content intact, is not transformative. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017) (encoding movies from DVDs and Blu-ray discs into streaming files was not transformative).

As for Princeton's other tweaks, it's clear that they didn't fundamentally change Planner 5D's works, because Princeton left nearly all of Planner 5D's objects and scenes untouched. That means that nearly all of P5D's files were *already* suitable for AI training. Even the minor tweaks Princeton made to a minority of scenes demonstrated that Princeton wasn't trying to use those scenes differently. The tweaks were made to make that small minority of scenes work more like the majority did. Further, many of those tweaks were needed because Princeton didn't properly understand the *encoding* of P5D's scenes.[37] Far from giving P5D's works "a further purpose or different character," Princeton's tweaks gave P5D's works *more of the same* purpose and character.

Dr. Forsyth confirms that Princeton's changes were minor and did not change the overall function or character of P5D's works. First, Dr. Forsyth confirmed that the *objects* in SUNCG and

---

[36] Forsyth Report ¶ 235.
[37] *See* Forsyth Report ¶¶ 109–114; Forsyth Decl. Ex. C (hereinafter, "Forsyth Rebuttal Report") ¶ 61.

1  P5D's objects are identical: "every object in SUNCG, except for one, was functionally identical to a

2  corresponding P5D file."[38] Defendants' experts do not dispute this.[39] Second, the *scenes* in SUNCG

3  were also copied wholesale from P5D. For about 90% (40,925 of 45,622) of the scenes in SUNCG,

4  Dr. Forsyth found no differences at all.[40] Where scenes had changes, they were very minor. In some

5  cases, an object or two, out of a hundred or more in a typical scene, was removed.[41] In others, an

6  object's position was shifted up or down by a few millimeters or centimeters.[42] This, too, is

7  undisputed.[43] These small vertical object adjustments were likely only needed because Princeton didn't

8  fully understand P5D's trade secret file format.[44] Dr. Forsyth's analysis thus confirms that Princeton's

9  tweaks merely served to advance the existing purpose and character of P5D's works.

10       In support of its fair use argument, Princeton contends that its assignment of one of 84 labels to

11  each of P5D's objects, such as "sofa," "refrigerator," and so on, was transformative. However, the labels

12  were not actually included in SUNCG at all, but were placed elsewhere by Princeton for those who

13  accessed them.[45] Moreover, Planner 5D had already itself assigned labels to its objects, right within its

14  own tool. That Princeton chose to label the objects itself rather than use P5D's existing labels is not

15  evidence of transformative use. Labeling a sofa, "sofa," or a refrigerator, "refrigerator," does not

16  transform the objects themselves. It certainly doesn't justify the theft and wholesale distribution of the

17  expressive content of these objects, much less the scenes.

18

19

---

20  [38] Forsyth Report ¶ 212.

21  [39] RAD Decl. Ex. 45 (Garfinkel Dep.) 57:18–58:1 ("I don't dispute his argument that the objects that are in the SUNCG dataset are the same objects that are in the Planner 5D data"); *id.* Ex. 46 (Lopresti Dep.

22  (Nov. 22, 2024)) 66:6–67:25 (did not find any differences in vertices, normal, or the characteristics of object files).

23  [40] Forsyth Report ¶ 232.

    [41] *Id.* ¶ 233.

24  [42] Forsyth Report ¶¶ 239–241; Second Errata to the Expert Report of David Forsyth ("Forsyth Errata.") Ex. B (hereinafter "Forsyth Errata") (correcting ¶ 241).

25  [43] RAD Decl. Ex. 45 (Garfinkel Dep.) 57:18–58:1 ("I don't dispute that for the most part the objects

26  have the same location in the scenes that they have in the Planner 5D data, although sometimes they have a different height."); 61:1–9 (does not dispute cited paragraphs of Forsyth report); *id.* Ex. 46 70:8–

27  74:2 (does not dispute cited paragraphs of Forsyth report or "Dr. Forsyth's assertions about the number of objects that moved or the distance they moved?").

28  [44] Forsyth Report ¶¶ 109–114, 239–241; Forsyth Errata (correcting ¶ 241); Forsyth Rebuttal Report ¶ 61.
    [45] *See* Forsyth Report ¶ 208 (describing contents of SUNCG).

Because Defendants cannot establish that SUNCG added anything with a further purpose or different character, they cannot establish transformative use.

### b. Like Defendants, P5D used its works for AI training.

In its recent *Warhol* decision, the Supreme Court clarified that a claim of transformativeness is negated if the infringer uses a copyrighted work for the same *purpose* as the original author. *Warhol*, 598 U.S. at 532–36, 550. *Warhol* involved an iconic photograph of Prince by Lynn Goldsmith and an artistically altered silkscreen version created by Andy Warhol. Goldsmith previously licensed her photo to illustrate a magazine story about Prince. *Id.* at 535. Years later, the Andy Warhol Foundation licensed Warhol's silkscreen version of Goldsmith's photo for another magazine article about Prince. The Court found that because "the original photograph and AWF's copying use of it share substantially the same purpose," AWF's could not be transformative. *Id.* at 526; *see also id.* at 534–36, 550.

Here, Planner 5D itself used its works for machine learning beginning no later than 2017.[46] Since then, Planner 5D has continued to work on multiple artificial intelligence projects, some of which have been released on its platform, most of which used its own works as training data.[47] This defeats Defendants' argument that their use of P5D's works for machine learning was different in purpose or character than P5D's use. Princeton's copying simply duplicated P5D's existing purpose rather than creating a distinct one, defeating any claim of transformativeness.

### c. Defendants cannot justify using *P5D's* works.

In nearly every case where transformative use has been found, the transformation required the particular work that was copied, for example because the new work commented on *that particular work*. Parody well illustrates this concept. "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination[.]" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580–81 (1994). Google Books is another clarifying example: "Google's

---

[46] *See* RAD Decl. Ex. 1 at 194:9–211:7 (discussing the evolution of P5D's machine learning work from early projects in 2017 through a suite of product offerings); *id.* Ex. 2 at 269:16–281:2 (discussing same). *id.* Ex. 47 (P5D-0222441) (chat discussing AI project "Bernard"); *id.* Ex. 48 (P5D-0222483) (chat discussing neural network project); *id.* Ex. 49 (P5D-0222466) (November 2017 Github commits for AI projects).

[47] *Id.* Ex. 2 at 271:4–281:2; *id.* Ex. 1 at 194:24–211:7.

14

1  copying of the original copyrighted books" was "highly transformative" because its purpose "is to make

2  available significant information *about those books*." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216–

3  17 (2d Cir. 2015). In these and the overwhelming majority of cases, uses are found to be transformative

4  because they target the original in some way, and thus would fail without copying a justifiable amount

5  of the original work. Other works would not have served the purpose.

6        This is why the Supreme Court rejected Warhol's claim that using Goldsmith's photo was fair.

7  The Court contrasted another work by Warhol, his famous *Campbell's Soup Cans*, which, it noted,

8  presumably *did* make transformative use of Campbell's label because the label was a *target* of Warhol's

9  commentary. *Warhol*, 598 U.S. at 525, 538–40. Because Warhol was commenting *on Campbell's soup

10  can and label*, some other labeled can would not work. In contrast, when Warhol used Lynn

11  Goldsmith's Prince photo to create his derivative print, it wasn't a commentary on *the

12  particular original photo. Id.* at 535–36, 540. It was a commentary on Prince himself and his fame. *Id.* at

13  535–36, 540, 550. Even though Warhol altered Goldsmith's original photo with new expression, there

14  was still no justification for copying *Goldsmith's* photo rather than some other image. *Id.*

15        So here. Princeton may have needed *some* objects and scenes for SUNCG. But it didn't need

16  *Planner 5D's* works, such as to comment on them, provide new information about them, or make them

17  easier to find. Planner 5D's works may have been especially useful and valuable for Princeton's

18  purposes. But it is not enough that "copying might have been helpful to convey a new meaning or

19  message." *Warhol*, 598 U.S. at 547–48. "[A] secondary author is not necessarily at liberty to make

20  wholesale takings of the original author's expression merely because of how well the original author's

21  expression would convey the secondary author's different message." *Id.* at 548 (*quoting Authors Guild*,

22  804 F.3d at 215). Princeton may have considered P5D's works particularly well-suited for its purpose.

23  But there was nothing intrinsic about Planner 5D's works to justify Princeton's wholesale copying of

24  P5D's works rather than some others. Princeton's use of Planner 5D's works thus was not

25  transformative.

26

27

28

15

1

2

### d.    Defendants used P5D's works for commercial ends.

Finally, the commercial or nonprofit nature of a defendant's use is relevant to the first factor, but not dispositive. *Warhol*, 598 U.S. at 531. "[T]he mere fact that a use is educational and not for profit does not insulate it from a finding of infringement," particularly when the use is not transformative. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 184–86 (2d Cir. 2024) (finding use was noncommercial but still not fair use). Because there is no evidence of transformativeness here, this first fair use factor would not favor Princeton even if its use was found to be noncommercial.

But Princeton's use *was* commercial. "[I]n an academic setting, profit is ill-measured in dollars. Instead, what is valuable is recognition because it so often influences professional advancement and academic tenure." *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989). It is enough that Princeton "gained an 'advantage' or 'benefit'. . . without having to account to the copyright holder." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (finding church's use commercial because it benefited from it without accounting to rights holder). Here, despite being an academic institution, Princeton and its researchers benefited handsomely from their research in computer vision, including their use of SUNCG. This research burnished reputations, attracted funding, landed scholarships and jobs, and much more.[48]

Meta is a commercial entity, so its use of SUNCG was necessarily commercial. Meta claims its work with SUNCG was not commercial because the dataset was not incorporated into a specific product. But even Meta's so-called "non-commercial" research was still designed to bring financial benefits, even if indirect ones in the long term, including in some cases explicitly identified commercial applications.[49]

---

[48] RAD Decl. Ex. 50 (Rexford Dep.) 43:9–47:25 (discussing Rexford Dep. Ex. 7, attached), 216:7–24, 224:23–226:4, 233:1–236.21, 261:1–15; *id.* Ex. 51 (META_0057224) (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬); *id.* Ex. 52 (PRIN00004761) (Meta email seeking to recruit Shuran Song); *id.* Ex. 53 (PRIN00002991) (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬); *id.* Ex. 54 (PRIN00002957) (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬); *id.* Ex. 55 (PRIN00002859) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
[49] *Id.* Ex. 56 (Schenk Dep.) 209:23–211:4 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬); Meta, *Introducing Meta Reality: A Look at the Technologies Necessary to Convincingly Blend the Virtual and Physical Worlds*, Meta Quest Blog (Dec. 19, 2022), https://www.meta.com/blog/quest/mixed-reality-definition-passthrough-scene-understanding-

### 2.     The nature of Planner 5D's work is expressive, not factual.

"In general, fair use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495 U.S. 207, 237 (1990). The second factor thus considers whether the content of the plaintiff's work is creative versus factual in nature. Here, Planner 5D's works were original objects created by human modelers and a compilation of user-created scenes selected by human curators based on subjective, aesthetic criteria.[50] Moreover, Defendants stole the objects and scene compilation *for their expressive content,* rather than any incidental factual information.[51] This second factor favors Planner 5D.

### 3.     Defendants used and distributed most of P5D's works.

The third factor also favors Planner 5D. "While 'wholesale copying does not preclude fair use per se,' copying an entire work 'militates against a finding of fair use.'" *Worldwide Church of God*, 227 F.3d at 1118.

Here, Princeton, with help from Meta, stole Planner 5D's entire available library of objects and scenes, saved exact copies to its computers, incorporated them virtually wholesale into SUNCG, and then distributed SUNCG, expressive content and all.[52] Meta distributed the SUNCG-derived SUMO dataset and actively promoted SUNCG's distribution, including by distributing tools that worked only with SUNCG or required a downloaded copy of SUNCG.[53] The third factor militates strongly against

---

spatial-anchors/ (purpose of Meta's research efforts to deliver technologies to consumers); Meta, *How Facebook Researchers' Realistic Simulations Help Advance AI and AR* (June 14, 2019), https://tech.facebook.com/reality-labs/2019/6/facebook-reality-labs-replica-simulations-help-advance-ai-and-ar/ (tying research goals to real life product goals); RAD Decl. Ex. 57 (META_0058114) at 58114 ██████ ██████; RAD Decl. Ex. 58 (META_0001988) at 1988–1989 ██████ ████████████████████████████████████████; *id.* Ex. 59 (META_0012538) at 12541 ████████████████.

[50] RAD Decl. Ex. 60 (Ketko Dep. (June 8, 2024)) at 265:13–16 ("Q. Right. You wanted the objects on the Planner5D catalog to look logical? A. Yes, sure. Logical, aesthetic, and beautiful."); *id.* Ex. 3 at 36:6–37:4, 153:13–154:16, 170:4–173:14.

[51] Shuran Song et al., *Semantic Scene Completion from a Single Depth Image*, arXiv (Nov. 28, 2016), at 5 § 4.1, https://arxiv.org/pdf/1611.08974 (highlighting user-curated designs); Yi Wu et al., *Building Generalizable Agents With a Realistic and Rich 3D Environment*, arXiv (Apr. 8, 2018), at 1, https://arxiv.org/pdf/1801.02209 (same).

[52] Forsyth Report ¶¶ 212, 232, 233; RAD Decl. Ex. 45 at 57:18–58:1, 61:1–9; *id.* Ex. 46 at 66:6–67:25, 70:8–24.

[53] *See, e.g.*, Yi Wu et al., *Building Generalizable Agents With a Realistic and Rich 3D Environment*, arXiv (Apr. 8, 2018), at 1, https://arxiv.org/pdf/1801.02209 ("House3D leverages the SUNCG dataset (Song et al., 2017) which contains 45K *human-designed* real-world 3D house models, ranging from

1  fair use. *Hachette Book Grp., Inc.* 115 F.4th at 187–89; *Fox News Network, LLC v. Tveyes, Inc.*, 883

2  F.3d 169, 179 (2d Cir. 2018) (copying entirety of television news programs and distributing news

3  segments not fair use).

4              **4.    Defendants' infringement harms potential markets for P5D's works.**

5              The fourth and final fair use factor is "undoubtedly the single most important element of fair

6  use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). *Accord Sedlik v.*

7  *Drachenberg*, No. 21-cv-1102, 2023 WL 6787447, at *5 (C.D. Cal. Oct. 10, 2023).

8              This factor considers harm to potential markets for the plaintiff's work, *even if the plaintiff itself*

9  *never participates in those markets.* "The potential market exists independent of the copyright owner's

10  present intent." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020) (internal

11  punctuations omitted) (quoting *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012)).

12  An author "certainly has the right to 'the artistic decision not to saturate those markets with variations of

13  their original,' and it has the right 'to change its mind.'" *Id.* (internal citations omitted). "Since fair use is

14  an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use

15  without favorable evidence about relevant markets." *Campbell*, 510 U.S. at 590.



16

17

18  [54]

19  [55] Thus, even though for purposes of the

20  market harm analysis P5D was free to abstain from the market for object and scene training data, *Seuss*,

21  983 F.3d at 461, P5D in fact participated in it.

22  _____

23  single studios to houses with gardens."); Facebook Research, House3D/README.md, GitHub (May 16,
   2018),

24  https://web.archive.org/web/20180516031213/https://github.com/facebookresearch/House3D/blob/master/README.md (linking users to download the full dataset at suncg.cs.princeton.edu);Abhishek Das et

25  al,, *Embodied Question Answering*, arXiv (Dec. 1, 2017), at 2, https://arxiv.org/pdf/1711.11543 ("We
   evaluate our agents in House3D, a rich, interactive 3D environment based on human-designed indoor

26  scenes from SUNCG."); RAD Decl. Ex. 61 (Meta's 5th Supp. Resp. to P5D's Interrog. 14 (June 28,
   2024)) 7:3–19; Forsyth Report ¶¶ 138–170.

27  [54] RAD Decl. Ex. 62 ⬛⬛⬛⬛⬛); *id.* Ex. 63 ⬛⬛⬛⬛⬛); *id.* Ex. 64
   ⬛⬛⬛⬛; *id.* Ex. 65 (Schenk Report) ¶¶ 94–105; *id.* Ex. 66 (Green Rebuttal Report)

28  ¶¶ 156–160.
   [55] *Id.* Ex. 68 ⬛⬛⬛⬛⬛), 63, 64; *id.* Ex. 65 ¶¶ 94–105; *id.* Ex. 66 ¶¶ 156–160.

18

1   There are thus both actual and potential markets for P5D's works as training data. By distributing

2   P5D's entire dataset freely, Princeton and Meta harmed any potential market for P5D's works.

3   Prospective partners or acquirers had no incentive to license what Princeton was giving away for free.

4   Accordingly, the fourth fair use factor decisively favors P5D.

5   **C.    Princeton is liable for the initial scraping of Planner 5D's data.**

6   **1.    Princeton admits to scraping P5D's scene compilation and objects.**

7   Princeton concedes it scraped P5D's then-available object and scenes, a fact that can be found

8   now on summary judgment.

9   If a defendant admits to "copying of the substance of the entire work," copying is established

10  without the need for further analysis. *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) (citing

11  cases). Such direct evidence of *wholesale* copying obviates the need for any analysis of "substantial

12  similarity," which is not an element of a copyright infringement claim. *Range Rd. Music, Inc. v. E.*

13  *Coast Foods, Inc.*, 668 F.3d 1148, 1153–54 (9th Cir. 2012). *Cf. Andersen v. Stability AI Ltd.*, 700 F.

14  Supp. 3d 853, 866–68 (N.D. Cal. 2023) (Orrick, J.) (distinguishing the wholesale copying of *Range* from

15  preparing a derivative work, which still must be proven to "bear some similarity to the original work or

16  *contain the protected elements of the original work*.") (emphasis added).

17  Here, Princeton's agents scraped all of Planner 5D's then-available object and scene files from

18  its public gallery of scenes. Defendants do not dispute this. Princeton admits it in an interrogatory

19  response, explaining that Song's software identified hash values "for scenes on each page of

20  Planner 5D's public gallery," "use[d] those hash values to obtain downloads" of the scenes,"

21  downloaded objects identified in the scene files, and "substantially completed this process" in February

22  2016.[56] Song's academic paper releasing SUNCG also indicates that her team copied Planner 5D's

23  complete scene compilation before removing scenes they deemed duplicate, empty, or invalid.[57] At her

24  depositions, Dr. Song admitted that she copied all of the Planner 5D objects she could identify, and all

25  scenes in its entire public gallery.[58]

26  _____

27  [56] RAD Decl. Ex. 7 at 5:14–18.

    [57] Shuran Song et al., *Semantic Scene Completion from a Single Depth Image*, arXiv (Nov. 28, 2016), at

28  5, https://arxiv.org/abs/1611.08974.

    [58] RAD Decl. Ex. 67 (Song Dep. (Aug. 12, 2022)) at 57:12–72:11.

It is thus irrefutable that Princeton downloaded all of P5D's available P5D objects and a complete copy of Planner 5D's scene compilation. Because Princeton scraped these files in their entirety, the only remaining question is whether the material copied contained protected expression. The answer, as we now show, is yes.

### 2. Planner 5D's scene compilation, and many of its objects, are copyrightable.

There can be no reasonable dispute that P5D's scene compilation is copyrightable.

Copyrightability is generally a pure question of law, to be decided by the trial judge. *Jonathan Browning, Inc. v. Venetian Casino Resort LLC*, No. 07-cv-3983, 2009 WL 1764652, at *1 (N.D. Cal. June 18, 2009). "[T]o the extent that the defendant challenges the *quantum* of plaintiff's originality or creativity as a matter of law, or urges other such legal challenges to copyright subsistence, these matters should be resolved solely by the judge." 3 David Nimmer, *Nimmer on Copyright* § 12.10[B][1]. *Accord Browning*, 2009 WL 1764652, at *1. *See also UAB "Planner5D" v. Facebook, Inc.*, 534 F. Supp. 3d 1126, 1134 (ECF 112 at 11:13–17) (N.D. Cal. 2021) (courts "make an independent determination as to copyrightability") (*quoting Aqua Creations USA Inc. v. Hilton Hotels Corp.*, No. 10-cv-246, 2011 WL 1239793, at *3 (S.D.N.Y. Mar. 28, 2011), *aff'd sub nom. Aqua Creations USA Inc. v. Hilton Worldwide, Inc.*, 487 F. App'x 627 (2d Cir. 2012)).

Accordingly, the copyrightability of Planner 5D's scene compilation is ripe for decision now. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). A "modicum" is enough, "'no matter how crude, humble or obvious' it might be." *Id.* at 345–46 (*quoting* 1 M. Nimmer & D. Nimmer, *Copyright* §§ 2.01[A], [B] (1990)). "[I]t is not difficult to meet the famously low bar for originality." *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020). A compilation is a collection of "preexisting materials . . . that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Compilations of even uncopyrightable elements are copyrightable if they embody "a minimal degree of creativity." *Feist*, 499 U.S. at 348 ("a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement"). *Accord L.A.*

20

1  *Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 850 (9th Cir. 2012) ("original selection,

2  coordination, and arrangement . . . is protectible," citing *Feist*, 499 U.S. at 362); *Home Legend, LLC v.*

3  *Mannington Mills, Inc*., 784 F.3d 1404, 1409 (11th Cir. 2015).

4      Here, P5D curated a selection of some 49,000 scenes for its public gallery out of the more than

5  63,000 nominated by its users. As P5D's Alexey Sheremetyev testified, this selection was based on

6  numerous creative and expressive criteria, including artistic value, humor, variety, novelty, diversity,

7  creativity, completeness, fun, and, in most cases, realism.[59]

8      Defendants have no evidence that P5D did not curate its selection of scenes as it says it did.[60]

9  Defendants have questioned the credibility of Planner 5D's testimony.[61] But the mere questioning of

10  credibility cannot defeat summary judgment. *Crawford-El*, 523 U.S. at 600; *Far Out Prods.*, 247 F.3d at

11  997; *Nat'l Union Fire Ins.*, 701 F.2d at 97. Defendants cannot produce sufficient evidence to create a

12  material factual dispute.

13      As shown. there is thus no material dispute that Princeton scraped Planner 5D's scene

14  compilation in its entirety or that the compilation contained copyrightable content. When combined with

15  P5D's ownership of the compilation—because P5D created it—Princeton's acts constitute copyright

16  infringement. The Court can and should grant summary judgment on this claim against Princeton now.

17      And while the copyrightability of P5D's *objects* work is an issue for trial, the Court should grant

18  summary judgment against Princeton for infringing all objects found at trial to be copyrightable.

19  **V.    CONCLUSION**

20      For these reasons, the Court should enter judgment for Planner 5D and against Defendants on

21  (1) Princeton's DMCA safe harbor defense,[62] (2) Defendants' fair use defenses,[63] and (3) Planner 5D's

22  claim for infringement by Princeton of its Scene Work and of all objects in its Object Work that are

23  found copyrightable at trial.

24

25

26  [59] RAD Decl. Ex. 3 at 36:6–37:4, 153:13–154:16, 170:4–173:14.
    [60] ECF 278 at 16:5–13.

27  [61] ECF 265 at 12 n.24.
    [62] ECF 115, Princeton's 7th Aff. Def.

28  [63] ECF 115, Princeton's 6th Aff. Def.; ECF 116 & 20-cv-8261 ECF 20 Meta's 4th Aff. Def.

21

1  Respectfully submitted,

2

3  DATED: January 9, 2025                    THE BUSINESS LITIGATION GROUP, P.C.

4
                                            By:        /s/ *Marc N. Bernstein*
5                                                      Marc N. Bernstein

6                                           Attorneys for Plaintiff
                                            UAB "PLANNER5D"
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Planner 5D's Motion for Summary Judgment**                    **Case No. 3:19-cv-03132-WHO (SK)**