Susan J. Kohlmann (*pro hac vice*)
skohlmann@jenner.com
Cayman C. Mitchell (*pro hac vice*)
cmitchell@jenner.com
Sarah L. Atkinson (*pro hac vice*)
satkinson@jenner.com
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
T: (212) 891-1600

Kara V. Brandeisky (*pro hac vice*)
kbrandeisky@jenner.com
JENNER & BLOCK LLP
1099 New York Ave NW # 900
Washington, DC 20001
T: (202) 639-3865

David R. Singer (SBN 204699)
dsinger@jenner.com
JENNER & BLOCK LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071
T: (213) 239-5100

*Attorneys for Defendant*
*The Trustees of Princeton University*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

UAB "PLANNER5D" d/b/a PLANNER 5D,

Plaintiff,

v.

META PLATFORMS, INC.; META PLATFORMS TECHNOLOGIES, LLC; THE TRUSTEES OF PRINCETON UNIVERSITY; et al.,

Defendants.

Case No. 3:19-CV-03132-WHO
Case No. 3:20-CV-08261-WHO

**THE TRUSTEES OF PRINCETON UNIVERSITY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLANNER 5D'S PHASE 2 MOTION FOR SUMMARY JUDGMENT**

Hearing Date: March 28, 2025
Time: 10:00 AM
Courtroom: 2, 17th Floor
Judge: Honorable William H. Orrick

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... 1

**II. FACTUAL BACKGROUND** .......... 2

**III. LEGAL STANDARD** .......... 2

**IV. ARGUMENT** .......... 3

A. Princeton Qualifies for the Safe Harbor Under the DMCA. .......... 3

1. Congress Enacted Section 512(e) to Safeguard Academic Freedom and Protect Universities from Liability for the Allegedly Infringing Acts of Independent Researchers. .......... 4

2. The Researchers' Allegedly Infringing Conduct Is "By Reason of the Storage at the Direction Of a User." .......... 5

3. Section 512(e) Forecloses Planner 5D's Agency Theory. .......... 7

a. Even if Common Law Agency Principles Applied, Princeton's Researchers' Conduct Cannot Be Attributed to Princeton. .......... 8

4. Princeton Did Not Have Actual or "Red Flag" Knowledge of Allegedly Infringing Material on its Systems or of Activities Using That Material. .......... 8

5. Princeton Neither Received a Financial Benefit Directly Attributable to the Allegedly Infringing Activities Nor Had the Right and Ability to Control Such Activities. .......... 9

a. Princeton Does Not Have the Right and Ability to Control the Conduct of its Researchers. .......... 10

b. Princeton Did Not Receive a Financial Benefit Directly Attributable to the Infringing Activity. .......... 11

6. The Use of SUNCG by Certain Students Does Not Disqualify Princeton from the Protection of Section 512(e). .......... 12

B. Princeton's Researchers' Use of the Asserted Copyrights Was Fair. .......... 14

1. Scholarship Is a Quintessentially Transformative Purpose and Character. .......... 15

a. Princeton's Researchers Transformed Planner 5D's Works by Using Them for Scholarship. .......... 15

b. Planner 5D's Use of AI Functionality in Its Home Design Tool Differs in Purpose from Princeton's Researchers' Use of Planner 5D Data in Academic Scholarship. .......... 17

c. Princeton's Researchers Need Not Justify Using Planner 5D's Works Rather Than Other Interior Scenes. .......... 18

d. The Scholarship Was Noncommercial. .......... 19

2. Princeton's Researchers Did Not Use Planner 5D's Works for Their Expressive Content. .......... 20

3. Princeton's Researchers Had a Transformative Purpose for Using the Amounts of the Works They Did. .......... 21

4. Princeton's Researchers' Use Did Not Harm Any Potential Commercial Market, and, if Anything, Increased Demand for Planner 5D's Works. .......... 22

C. Planner 5D Is Not Entitled to Summary Judgment for the Initial Downloading. .......... 22

1. Planner 5D Has Not Established the Contents, Copyrightability, or Copying of the Asserted Scene Compilation. .......... 23

2. Planner 5D Has Not Established That Its Objects Are Copyrightable or That the Asserted Objects Were Copied. .......... 25

**V. CONCLUSION .......... 25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) ........................................ 3

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
82 F.4th 1262 (D.C. Cir. 2023) ........................................ 16, 17, 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................ 2

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........................................ *passim*

*Apple Computer, Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994) ........................................ 23

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ........................................ 15, 20

*BWP Media USA, Inc. v. Clarity Digital Grp., LLC*,
820 F.3d 1175 (10th Cir. 2016) ........................................ 7

*Capitol Records, LLC v. Vimeo, Inc.*,
125 F.4th 409 (2d Cir. 2025) ........................................ 10

*Chou v. University of Chicago*,
254 F.3d 1347 (Fed. Cir. 2001) ........................................ 8

*Cline v. Reetz-Laiolo*,
329 F. Supp. 3d 1000 (N.D. Cal. 2018) ........................................ 25

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ........................................ 6, 7, 9, 10

*Dow Chem. Co. v. Allen*,
672 F.2d 1262 (7th Cir. 1982) ........................................ 5

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ........................................ 11

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
893 F.3d 1176 (9th Cir. 2018) ........................................ 23

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........................................ 23

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........................................ 14, 19, 21

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ....................20

*Keck v. Mix Creative Learning Ctr., L.L.C.*,
116 F.4th 448 (5th Cir. 2024) ....................18

*Larson v. Dorland*,
693 F. Supp. 3d 59 (D. Mass. 2023) ....................22

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ....................7, 8, 9, 10

*Moran v. Screening Pros*,
LLC, 25 F.4th 722 (9th Cir. 2022)....................24

*Nunez v. Caribbean Int'l News Corp.*,
235 F.3d 18 (1st Cir. 2000)....................22

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ....................6

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ....................11

*Regents of Univ. of Michigan v. Ewing*,
474 U.S. 214 (1985)....................5

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
923 F. Supp. 1231 (N.D. Cal. 1995) ....................20

*Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp., PLC*,
463 F.3d 478 (6th Cir. 2006) ....................23

*Sweezy v. State of N.H. by Wyman*,
354 U.S. 234 (1957)....................5

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) .................... *passim*

*Ventura Content, Ltd. v. Motherless, Inc.*,
885 F.3d 597 (9th Cir. 2018) ....................8, 9

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989)....................19, 20

**Statutes**

17 U.S.C. § 107.................... *passim*

17 U.S.C. § 512.................... *passim*

**Other Authorities**

H.R. Rep. No. 105-796 (1998) .......... 4, 7, 12, 13, 14

Oxford English Dictionary (Dec. 2024) .......... 13

U.S. Const. Article I, § 8, cl. 8 .......... 14

Webster's Third New International Dictionary (1961) .......... 13

Zhirong Wu et al., *3D ShapeNets: A Deep Representation for Volumetric Shapes* (2015), https://3dshapenets.cs.princeton.edu/paper.pdf (2015 paper co-authored by Song releasing analysis of "3D ShapeNets" model trained on new "ModelNet" dataset, composed of 151,128 unique 3D models from 3D Warehouse and Yobi3D) .......... 11

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The parties agree that no genuine issues of fact preclude the entry of summary judgment with respect to Princeton's affirmative defenses: the DMCA safe harbor and fair use. This Court should dismiss Planner 5D's copyright claims as a matter of law for the reasons set forth below and in Princeton's Phase 2 Motion for Summary Judgment, ECF No. 532 ("Princeton's MSJ").

**DMCA Safe Harbor.** Princeton meets all the requirements to receive protection under the limitation on liability in Title 17 for infringement "by reason of the storage at the direction of a user" under § 512(c), and for the additional protection provided to nonprofit educational institutions in § 512(e). Planner 5D's motion ignores the statutory text and purpose of § 512(e), and proposes strained interpretations of the safe harbor that, if adopted, would result in no university ever receiving its protection. If Section 512(e) is to mean anything, it must cover the allegedly infringing conduct and material here.

Planner 5D's arguments to the contrary fail. First, the allegedly infringing conduct falls within the scope of the 'storage' safe harbor, which covers all activities using material on Princeton's networks, not just storage itself. Second, Princeton's researchers' conduct and knowledge cannot be attributed to the University under § 512(e), and in any event, the researchers were not Princeton's agents. Third, Princeton had no right and ability to control the conduct of its independent researchers, and unrestricted funding the researchers received for computer vision research was not directly attributable to the allegedly infringing conduct. Fourth, SUNCG was never required or recommended as instructional material for a course within the meaning of § 512(e), meaning Princeton retains entitlement to its protection.

**Fair Use.** As Princeton explained in its summary judgment motion, Princeton researchers' alleged copying was fair use and noninfringing as a matter of law, because the researchers' use of Planner 5D's data to conduct noncommercial academic research and contribute knowledge to the public domain "is not an infringement of copyright" but rather "scholarship [and] research" under the Copyright Act. 17 U.S.C. § 107. Nothing in Planner 5D's motion changes that conclusion. Planner 5D misconstrues *Warhol* and errs by focusing on how much the Princeton researchers altered Planner

5D's works, without considering the manifestly different purpose of Princeton's use: noncommercial scholarship. And on the most important fourth factor, Planner 5D can show no market harm.

**Infringement for Initial Downloading.** The Court need not address Planner 5D's infringement arguments if it grants summary judgment to Princeton on either of its affirmative defenses. But if the Court does reach them, on this record no reasonable jury could conclude that Planner 5D's scene compilation is copyrightable. Planner 5D concedes its scene compilation was arranged chronologically, asserting copyrightability solely based on Planner 5D's alleged creative selection of Scenes. But even construing its asserted evidence of creative selection in the light most favorable to Planner 5D, that evidence is inconsistent on its face. The Court should grant summary judgment in *Princeton's* favor finding the compilation is uncopyrightable or was not copied. On the Objects, as explained in Princeton's MSJ, all but 187 are ineligible for copyright protection as a matter of law, and the Court should find those are uncopyrightable. As to the remaining 187, Planner 5D has not proved which (if any) elements are copyrightable or proved those elements were copied. At a minimum, Planner 5D has failed to demonstrate *its* entitlement to summary judgment for infringement based on Princeton's researchers' initial downloading of the Asserted Scene Compilation or Asserted Objects from Planner 5D's website, and its motion must be denied.

## II. FACTUAL BACKGROUND

For a summary of facts relevant to this opposition, *see* Princeton's MSJ, § II.[1]

## III. LEGAL STANDARD

A nonmoving party may defeat summary judgment by coming forward with affirmative evidence from which a reasonable jury could render a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). All justifiable inferences are to be drawn in favor of the nonmoving party. *Id.* Moreover, judgment in the *nonmoving* party's favor is appropriate when, viewing the evidence in the light most favorable to the *moving* party, no genuine issues of material fact remain and

---

[1] Rather than take up the Court's time here, Princeton expressly reserves the right to contest at trial Planner 5D's presentation of the evidence, which is often distorted and unsupported. As but one example, Planner 5D uses an email six months *prior* to the release of SUNCG as evidence of the distribution of SUNCG. *See* Pl.'s Mot. Summ. J. ("P5D's MSJ") at 6 & n.16 (Jan. 9. 2025) (ECF No. 552); ECF No. 551-9 (RAD Decl. Ex. 11).
All capitalized terms used herein have the same meaning as in Princeton's MSJ.

the nonmoving party is entitled to judgment as a matter of law, even if there is no cross-motion pending. *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014).

## IV. ARGUMENT

### A. Princeton Qualifies for the Safe Harbor Under the DMCA.

Planner 5D does not challenge the basic elements of Princeton's eligibility for the safe harbor under 17 U.S.C. §§ 512(c), (e): Planner 5D does not challenge that Princeton is a service provider under Section 512, that Princeton satisfies the eligibility criteria in Section 512(i), and that Princeton at all times maintained a designated agent to receive notifications of claimed infringement. Nor does Planner 5D contest that Princeton as an institution and everyone in Princeton's administration had no knowledge of the use of Planner 5D's materials. Princeton's MSJ at 9. And nor does Planner 5D challenge that within ***one day*** of receiving Planner 5D's cease-and-desist letter concerning the data at issue here, Princeton took down the allegedly infringing material. *Id.*; P5D's MSJ at 4 & n.14 (acknowledging Princeton's takedown). Indeed, by all accounts, this is a textbook case of the DMCA working precisely as Congress envisioned.

Unable to challenge Princeton's eligibility for the safe harbor or its expeditious takedown of the allegedly infringing content, Planner 5D grasps at four straws: (1) that the allegedly infringing conduct is not "by reason of the storage at the direction of a user," and so outside the scope of the safe harbor entirely, P5D's MSJ at 6–8; (2) that Princeton had actual or red flag knowledge of infringement because its researchers were agents, *id.* at 8; (3) that Princeton "benefited financially from the infringing material and had the ability to control" its researchers, *id.* at 6, 9; and (4) that Princeton is ineligible for the limitation on liability for nonprofit educational institutions under Section 512(e) because "SUNCG was used extensively for relevant university course work," *id.* at 6, 9–11.

Each argument is easily rejected as matter of law, even under Planner 5D's spin of the facts. But more fundamentally, to find otherwise is wholly at odds with the protection Congress has given nonprofit education institutions in Section 512(e). Section 512(e) insulates Princeton from liability for infringement by faculty or graduate students "performing a teaching or research function." 17 U.S.C. § 512(e)(1). Under Planner 5D's interpretation, no university could ever receive its protection. Such a

result would be contrary to the plain text of the statute, to Congress's intent, and to the judiciary's responsibility to protect academic freedom. It cannot be the law.

### 1. Congress Enacted Section 512(e) to Safeguard Academic Freedom and Protect Universities from Liability for the Allegedly Infringing Acts of Independent Researchers.

Section 512(e)'s text and purpose modify and expand the § 512(c) safe harbor in circumstances like those here. The premise of § 512(e) is that universities like Princeton receive safe harbor from the "infringing activities" and "knowledge" of their "faculty member[s and] graduate student[s]" when those faculty or graduate students are "performing a teaching or research function," even when they are "employee[s]." 17 U.S.C. § 512(e)(1). In other words, when analyzing whether a university is liable for copyright infringement by its faculty and graduate students, courts are to treat those faculty and graduate students as "users" under § 512(c), and courts cannot attribute the acts or knowledge of those researchers to the university. The legislative history further explains:[2]

> Ordinarily, a service provider may fail to qualify for the liability limitations in [§ 512] **simply because the knowledge or actions of one of its employees may be imputed to it under basic principles of respondeat superior and agency law. The special relationship which exists between universities and their faculty members (and their graduate student employees) when they are engaged in teaching or research is different from the ordinary employer-employee relationship. Since independence–freedom of thought, word and action–is at the core of academic freedom**, the actions of university faculty and graduate student teachers and researchers warrant special consideration in the context of this legislation. This special consideration is embodied in new subsection (e) which provides special rules for determining whether universities, in their capacity as a service provider, may or may not be liable for acts of copyright infringement by faculty members or graduate students in certain circumstances.
>
> Subsection (e)(1) provides **that the online infringing actions of faculty members or graduate student employees, which occur when they are "performing a teaching or research function," will not be attributed to an institution of higher education** in its capacity as their employer for purposes of section 512, if certain conditions are met.

H.R. Rep. No. 105-796, at 74 (1998).

Here, all the allegedly infringing conduct was committed by faculty and graduate students in the course of their "teaching [and] research function[s]." Therefore, under Section 512(e), neither the researchers' acts nor knowledge can be attributed to Princeton for the purposes of evaluating liability for infringement or for disqualifying Princeton from entitlement to the 512(c) safe harbor.

[2] In interpreting § 512, the Ninth Circuit has held that courts should consider the DMCA's legislative history and legislative intent. *See UMG Recordings*, *Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1016, 1028 (9th Cir. 2013).

Moreover, any ambiguity in the interpretation of § 512(e) must be read in light of the strong public policy protecting universities' rights to academic freedom. In the First Amendment context, the Supreme Court has emphasized that courts have a "responsibility to safeguard" "educational institutions[']…academic freedom." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985); *see also id.* at 226 n.12 ("Academic freedom thrives…on autonomous decisionmaking by the academy itself." (citation omitted)). Similarly, in a due process case, the Supreme Court wrote that the "essentiality of freedom" in universities was "self-evident," and that "[t]eachers and students must always remain free to inquire [and] to study." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) (plurality). And the Seventh Circuit has quashed an administrative subpoena to researchers at a university in part because it "threaten[ed] substantial intrusion into the enterprise of university research." *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982). Those principles are actuated in the Copyright Act through Section 512(e).

Planner 5D does not attempt to reconcile its arguments with the plain text of the statute, its purpose, or its legislative history. Indeed, Planner 5D's position would turn the statute on its head. It asks the Court to find that conduct such as (1) drafting academic research articles; (2) giving academic talks; (3) developing software tools to analyze data; and (4) giving data to other doctoral and undergraduate students conducting research *disqualify* Princeton from entitlement to the safe harbor. P5D's MSJ at 6–8. But those are the very activities § 512(e) protects. Such a holding would effectively delete § 512(e) from the statute and erase the protection Congress has expressly granted to nonprofit educational institutions. The Ninth Circuit has warned against adopting interpretations of the § 512 safe harbor requirements that "nullif[y]" their very protection, *UMG Recordings*, 718 F.3d at 1024, and this Court should reject Planner 5D's similar attempt to nullify § 512(e).

**2. The Researchers' Allegedly Infringing Conduct Is "By Reason of the Storage at the Direction Of a User."**

Section 512(c) immunizes service providers like Princeton from liability for infringement "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). Planner 5D asserts that Princeton is only protected as a "web host" and that its researchers' conduct downloading data from Planner

5D's website, transformation of that data into SUNCG, and "talks and articles promoting SUNCG" are all "non-hosting activities" excluded from the safe harbor entirely. P5D's MSJ at 5–6.

But the Ninth Circuit has already squarely rejected that argument in *UMG Recordings*, holding that § 512(c) does not require "that the infringing content *be* storage" and does not solely cover "web hosts"; rather, § 512 "is broader" and includes "activities that go beyond storage." 718 F.3d at 1016, 1019 (emphasis in original). Indeed, by the statute's plain text, an "*activity using the material*" on the system or network is within the scope of the safe harbor. *Id.* at 1019 (emphasis in original).

Every allegedly infringing act that Planner 5D asserts is "non-hosting" or not "using Princeton's website" is nevertheless conduct that used the material Planner 5D alleges to be infringing on Princeton's systems and networks, and thus falls within the scope of § 512(c). When researchers downloaded data from Planner 5D's website, P5D's MSJ at 7–8, they did so using Princeton's systems and saved the data to Princeton servers. When Princeton's researchers "direct[ed]" other researchers "to get a copy [of SUNCG] from [Princeton's] website," promoted links to SUNCG and code associated with SUNCG stored on a Princeton server, or posted software tools compatible with SUNCG on GitHub, P5D's MSJ at 7, they were using material stored on Princeton's networks. Other conduct Planner 5D raises—such as the researchers giving "public talks" about their research—is not even potentially infringing because speech about material that does nothing *with* the material cannot violate a copyright holder's exclusive rights. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) (distribution requires "'actual dissemination' of a copy" (citation omitted)).

That the data was *also* stored on Stanford's servers or that Stanford researchers worked with Planner 5D's data, P5D's MSJ at 6–7, is irrelevant. Any alleged infringement by Stanford researchers or by reason of the storage of material on Stanford's systems and networks has no bearing on Princeton's liability. Moreover, the Ninth Circuit rejected an analogous argument in *Columbia Pictures Indus., Inc. v. Fung*, holding that a service provider was not ineligible for the 512(c) safe harbor merely because "the infringing material does not actually reside on [Defendant's] servers," since 512(c) covers activities using the material. 710 F.3d 1020, 1042 (9th Cir. 2013). Princeton's researchers at all times used Princeton's computers, Princeton's on-campus internet network, and Princeton's servers to conduct their research, even as they sometimes also accessed copies of Planner

5D data on Stanford's servers. All such conduct is clearly within the scope of § 512(c) as a matter of law.

**3. Section 512(e) Forecloses Planner 5D's Agency Theory.**

To get around the necessary conclusion that the researchers' conduct is within the scope of § 512(c), Planner 5D asserts that all of the researchers were Princeton's agents, such that all of the researchers' conduct is attributed to Princeton. But § 512(e) forecloses that argument. As discussed *supra*, § IV.A.1, Section 512(e) grants safe harbor over the acts and knowledge of faculty and graduate students even when they are "employee[s]." The statute is explicit: ordinary principles of agency do not apply when considering the liability for copyright infringement of a nonprofit education institution for the teaching or research activities of that institution's faculty and graduate students. The legislative history confirms this, distinguishing faculty and graduate students from "ordinary employer-employee relationship[s]" and overriding "basic principles of respondeat superior and agency law" in this narrow context. H.R. Rep. No. 105-796, at 74 (1998). Congress made plain its intent; whatever "principles of…agency law" may operate in an ordinary case to attribute the knowledge of agents to their principal, courts may not apply those principles to attribute the "online infringing actions" or knowledge of faculty or graduate students to a university when those faculty and graduate students are "performing a teaching or research function." *Id.*[3]

The only cases on which Planner 5D relies for its agency theory are *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) and *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017). Neither call for a different conclusion. *Fung* observed that in the unrelated context of inducement liability of a peer-to-peer file sharing protocol, an entity defendant's intent is "defined by traditional agency law principles." 710 F.3d at 1038. That does not bear on the question here. In *Mavrix*, the Ninth Court applied agency law to the question of whether a service provider was liable for the acts of its moderators, but the Ninth Circuit recognized that statutes may "disturb the common law" if "the language of [the] statute is clear and explicit." 873 F.3d at 1053 (citation

[3] To the extent Planner 5D is arguing (P5D's MSJ at 9) that a service provider's agents can *never* be "users" under § 512(c), that too is foreclosed in this context because § 512(e) expressly contemplates that the nonprofit educational institution's faculty and graduate students will be treated as users under 512(c). *See also, e.g.*, *BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1181 (10th Cir. 2016) (rejecting the argument that an agent or employee cannot be a 'user' under § 512).

omitted). As discussed above, § 512(e) clearly and explicitly provides that the common law of agency should not apply in these limited circumstances.

**a. Even if Common Law Agency Principles Applied, Princeton's Researchers' Conduct Cannot Be Attributed to Princeton.**

Even if common law agency were to apply, Planner 5D's argument still fails. As an initial matter, Planner 5D fails to conduct any agency analysis whatsoever. Nor could it. There is no evidence that Princeton granted any of the researchers actual or apparent authority, as would be required to create an agency relationship, *Mavrix*, 873 F.3d at 1054; indeed, it is undisputed that Princeton as an institution had no knowledge of the relevant research and did not authorize or supervise any specific research projects, much less manifest to any third parties that Princeton authorized specific research. Mitchell Decl. ISO Princeton's Opp. to P5D's MSJ ¶¶ 4–5, filed herewith ("Mitchell Opp. Decl."). Similarly, there is no evidence that Princeton exercised any control over the researchers in the conduct of their research, an "essential ingredient" in finding the presence of an agency relationship. *Mavrix*, 873 F.3d at 1055 (citation omitted); *see also, e.g.*, *Chou v. University of Chicago*, 254 F.3d 1347, 1361–62 (Fed. Cir. 2001) ("[U]niversity faculty are not agents of the university with respect to the selection and conduct of their research projects.").

**4. Princeton Did Not Have Actual or "Red Flag" Knowledge of Allegedly Infringing Material on its Systems or of Activities Using That Material.**

Planner 5D asserts, citing *Fung*, that because the researchers were agents, their infringing activities gave Princeton actual or 'red flag' knowledge that it was hosting infringing materials "[b]y virtue of these [] infringing activities by its agents." P5D's MSJ at 8. Again, § 512(e) expressly forecloses that argument: "[a] faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution." 17 U.S.C. § 512(e).

But even without § 512(e), Planner 5D cannot show actual or 'red flag' knowledge. Because the DMCA places the burden of policing copyright infringement on the copyright owner, not service providers, the copyright owner also bears the burden of proving that the service provider had knowledge of the specific infringing material. *UMG Recordings*, 718 F.3d at 1022–23; *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 603 (9th Cir. 2018). Actual knowledge is subjective—

whether the service provider in fact knew of specific infringement, *Fung*, 710 F.3d at 1043—and cannot be shown here because it requires knowledge of *infringement*, not knowledge of conduct or material that is later adjudicated to be infringing. *Ventura Content*, 885 F.3d at 608 (website owner who admittedly reviewed and knew about the material at issue did not have actual or apparent knowledge it was infringing). Planner 5D never asserts (and there is no evidence) that the *researchers* knew their conduct to be infringing, much less that Princeton did, so there is no actual knowledge.

'Red flag' or 'apparent' knowledge turns on "whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Fung*, 710 F.3d at 1043 (citation omitted). "Red flag" knowledge is a "high bar," and the infringement must be "immediately apparent to a non-expert." *Mavrix*, 873 F.3d at 1058 (citations omitted). Planner 5D makes no showing that a reasonable person would have found the use of Planner 5D's data to be obviously infringing. Planner 5D had not put copyright notices on its data nor registered its works, so as to alert the public that it asserted copyright protection in them. Mitchell Opp. Decl. ¶ 8. Hundreds of researchers—including Planner 5D's own expert, who in 2018 downloaded and analyzed SUNCG with a student—downloaded SUNCG knowing it was based on data from Planner 5D without finding it to be obviously infringing. *Id.* ¶ 11, 13.[4] And as soon as Princeton did receive Planner 5D's March 2019 cease-and-desist letter, Princeton immediately took action to disable access to the material. Princeton's MSJ at 9. Princeton did not have apparent knowledge of any infringing activity.

#### 5. Princeton Neither Received a Financial Benefit Directly Attributable to the Allegedly Infringing Activities Nor Had the Right and Ability to Control Such Activities.

A service provider is eligible for the safe harbor if it "does not receive a financial benefit directly attributable to the infringing activity, [where it] has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Princeton meets that criterion. Princeton's MSJ at 18.

[4] In fact, it appears that infringement was not obvious even to Planner 5D; discovery revealed that Planner 5D learned about the use of its data in SUNCG at least by January 2018, Mitchell Opp. Decl. ¶ 16, but did not alert Princeton that it believed the research to be infringing until over a year later.

**a. Princeton Does Not Have the Right and Ability to Control the Conduct of its Researchers.**

Lacking any *evidence* of control, Planner 5D asserts (without support): "Like any employer, Princeton *does* have the right and ability to control its professors and graduate student employees." P5D's MSJ at 9 (emphasis in original). As with agency, § 512(e) forecloses Planner 5D's argument, because it expressly covers faculty and graduate students in their capacity as "employee[s]." The mere existence of an employer-employee relationship between a university and its faculty and graduate students does not create a 'right and ability to control' under § 512(c)(1)(B). Moreover, even without § 512(e), there is simply no evidence of the type of "substantial influence on the activities of" the researchers needed to find a 'right and ability to control' under Ninth Circuit precedent. *UMG Recordings*, 718 F.3d at 1030; *see also Capitol Records, LLC v. Vimeo, Inc.*, 125 F.4th 409, 425 (2d Cir. 2025) (no right and ability to control when the service provider does "not restrict the freedom of users" with respect to posting content).

Planner 5D's assertion that Princeton "put a stop to its employees' infringing activity upon receiving P5D's cease-and-desist letter," P5D's MSJ at 9, fares no better. The Ninth Circuit has repeatedly rejected the argument that taking content down is evidence of right and ability to control. *See UMG Recordings*, 718 F.3d at 1027–31; *Mavrix*, 873 F.3d at 1058; *Fung*, 710 F.3d at 1045. This is demanded by the structure of the statute. "Congress could not have intended for" a service provider to "lose[] immunity under the safe harbor…because it engages in acts that are specifically required by the DMCA to obtain safe harbor protection." *UMG Recordings*, 718 F.3d at 1027 (citations omitted).[5]

As a matter of law, Princeton had no right and ability to control the conduct of its researchers.

[5] Although not necessary to decide this motion, as a factual matter, Planner 5D's assertion is contrary to the undisputed record. In response to Planner 5D's cease-and-desist letter, Princeton disabled access to the allegedly infringing material Planner 5D identified *on its own systems and networks*, as required by the DMCA. *See* P5D Decl. Ex. 32 (refiled at ECF No. 567). Planner 5D sent *separate cease-and-desist letters* directly to the researchers, and those researchers acquiesced to Planner 5D's request to disable access to other content under their control. Mitchell Opp. Decl. ¶¶ 22–27. In fact, by the time Planner 5D sent its cease-and-desist letters, neither Dr. Song nor Dr. Funkhouser were still affiliated with Princeton and Princeton could not have had any control over them. *Id.* ¶¶ 25–27.

### b. Princeton Did Not Receive a Financial Benefit Directly Attributable to the Infringing Activity.

Because Princeton had no right and ability to control its researchers, the Court need not reach the question of whether it received a "financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B). Nonetheless, Princeton did not receive such a benefit.

To show ineligibility under this prong, a plaintiff must show that the *specific* alleged infringing material *in the present case* caused a direct financial benefit—not just infringement by the defendant in general. *See Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673–74 (9th Cir. 2017). In other words, there must be a "causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).

It is undisputed that Princeton's researchers' use of Planner 5D's works was noncommercial and that Princeton did not receive any revenues or profits associated with the creation or distribution of SUNCG. Princeton's MSJ at 18. Unable to show any moneys received *for* SUNCG, Planner 5D points to a 2015 grant from Intel and the National Science Foundation that Princeton's Computer Vision and Robotics Lab (the "Lab") received to investigate scene understanding generally, P5D's MSJ at 9 & nn.27–29, and a 2015 fellowship application from Shuran Song to conduct object recognition, P5D's MSJ at 3 n.9, neither of which mention Planner 5D or SUNCG. It is true that the Lab was funded in part by this grant and fellowship (and others) that were awarded to the Lab with the understanding that the funds would be used to fund the Lab's research, which was focused exclusively on computer vision and robotics, of which scene understanding and object recognition were large parts. *See also* Princeton's MSJ at 4–5. But the Lab did a substantial amount of computer vision and scene understanding research wholly unrelated to Planner 5D. *E.g.*, Mitchell Opp. Decl. ¶¶ 43–46. Indeed, the fellowship application on which Planner 5D relies discussed an entirely different project: the creation of an AI model called "3D ShapeNets" trained on a dataset of 3D objects (not scenes) sourced from websites other than Planner 5D. 3D ShapeNets was published by Song and others later in 2015, before any researcher was even aware of Planner 5D.[6] This is a far cry from the "causal"

[6] *Compare* P5D's MSJ at 9 & n.9 (RAD Decl. Ex. 6 (SONG00000214)) (Song application for Facebook Fellowship proposing creation of "3D ShapeNets" model trained on dataset of 3D objects), *with* Zhirong Wu et al., *3D ShapeNets: A Deep Representation for Volumetric Shapes* (2015), https://3dshapenets.cs.princeton.edu/paper.pdf (2015 paper co-authored by Song releasing analysis of "3D ShapeNets" model trained on new "ModelNet" dataset, composed of 151,128 unique 3D models

relationship required to show a direct financial benefit. Moreover, Congress was fully aware that universities received external funding to support research and yet enacted § 512(e) anyway. Congress cannot have intended for unrestricted grants and fellowships of the type the Lab received to disqualify Princeton from entitlement to the safe harbor.

#### 6. The Use of SUNCG by Certain Students Does Not Disqualify Princeton from the Protection of Section 512(e).

Section 512(e)'s limitation on liability has several conditions, only one of which Planner 5D challenges: that certain students "used SUNCG for student coursework." P5D's MSJ at 10. But Planner 5D fails to grapple with the statutory language or the legislative history relevant to its analysis or explain how these instances violate the statutory condition. They do not.

Section 512(e)(1)(A) states that the protection of § 512(e) will only apply if the "faculty member's or graduate student's infringing activities do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student." As explained in Princeton's MSJ at 19, Princeton is unaware of any published case interpreting this language (and Planner 5D cites none), but the legislative history explains:

> The phrase 'required or recommended' is intended to refer to instructional materials that have been **formally and specifically identified in a list of course materials that is provided to all students enrolled in the course for credit**; it is not intended, however, to refer to the other materials which, from time to time, the faculty member or graduate student may incidentally and informally bring to the attention of students for their consideration during the course of instruction.

H.R. Rep. No. 105-796, at 75 (1998) (emphasis added). In other words, Congress envisioned that a university would not receive protection if the allegedly infringing materials were formally identified on a course syllabus by the relevant faculty or graduate student as required or recommended material for that course. This condition must inherently be narrow, because § 512(e) expressly *covers* the same faculty or graduate student using the same allegedly infringing material when "teaching."

---

from 3D Warehouse and Yobi3D). Perhaps because this fellowship is so obviously inapplicable, Planner 5D relies on it only in its statement of facts, but not in its argument about financial benefit.

No reasonable jury could credit Planner 5D's assertions that three instances of students using SUNCG violate this condition. First, Planner 5D points to a doctoral student in a class taught by Dr. Thomas Funkhouser who used SUNCG for a course project and subsequently published research with Dr. Funkhouser and others about SUNCG. P5D's MSJ at 10 & nn. 30–31. But the statute does not concern itself with the independent, self-directed conduct of students *in* a course, it refers solely to the conduct of the faculty member or graduate student *teaching* the course—whether the instructor *provided* the material to all students and informed them the material was required or recommended. This course project fails to violate § 512(e)(1)(A).

Second, Planner 5D raises the research of an undergraduate student who conducted research in Princeton's Computer Vision Lab. P5D's MSJ at 10 & nn. 32–34. The student used SUNCG for an independent study and thesis project—a project Dr. Funkhouser "proposed," *id.* at 10—and received credit toward her degree for that research. *Id.* For one, this independent study was not a 'course.'[7] For two, Dr. Funkhouser did not "formally and specifically identif[y]" SUNCG or Planner 5D data as required or recommended "in a list of course materials." H.R. Rep. No. 105-796, at 75 (1998). And Planner 5D does not assert otherwise; it argues that Dr. Funkhouser "used Planner 5D's data to instruct [the] undergraduate," P5D's MSJ at 10, but as discussed, § 512(e)(1) *shields* use of the allegedly infringing materials for "teaching," so informal instruction is insufficient to violate the condition.

Third, Planner 5D argues that then-graduate student Song, the principal researcher developing SUNCG, was herself a student, and that her dissertation under the supervision of Dr. Funkhouser was her own "course of study." P5D's MSJ at 10. This argument fails because it would render the statute's protection meaningless; any graduate student's research entitled to protection under (e)(1) would be disqualified for protection under (e)(1)(A). Such a reading would "nullif[y]" the safe harbor and must be rejected. *UMG Recordings*, 718 F.3d at 1024. It also fails for the very reason Planner 5D concedes:

[7] Neither the statute nor legislative history defines "course," and the Ninth Circuit has looked to "general usage dictionaries" to interpret other undefined terms in § 512. *UMG Recordings*, 718 F.3d at 1026 (relying on Webster's Third). Webster's Third New International Dictionary (1961) defines "course" as "an educational unit…consisting of a series of instruction periods (as lectures, recitations, and laboratory sessions) dealing with a particular subject" and the Oxford English Dictionary (Dec. 2024) similarly defines "course" as a "series of lectures, lessons, or instructional sessions in a particular subject." Independent research conducted under the supervision of faculty where there are no lessons, lectures, or other instructional sessions—even where a student earns credit for that research—would not qualify as a "course" as that term is ordinarily understood.

the doctoral work was not "part of a formally defined course." P5D's MSJ at 10. Indeed, this proves the untenability of Planner 5D's expansive reading of the 'course' limitation. In Planner 5D's view, any research and teaching necessarily constitutes disqualifying coursework. Planner 5D may think "[t]here is no principled basis to treat a supervised course of study differently from any other coursework," P5D's MSJ at 10, but Congress disagreed. Congress expressly stated that academic freedom *is* a principled basis for treating research differently from formally assigned course materials, H.R. Rep. No. 105-796, at 74 (1998), and has mandated that courts so distinguish them, 17 U.S.C. § 512(e)(1)(A).

**B. Princeton's Researchers' Use of the Asserted Copyrights Was Fair.**

The Constitution grants Congress the power to regulate copyrights to "promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. To achieve this aim, the Copyright Act contains several provisions "balancing" the "benefits of incentives to create" with "the costs of restrictions on copying." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023). Chief among those is "fair use," which provides that "the fair use of a copyrighted work, including…[for] criticism, comment, news reporting, teaching…**scholarship, or research, is not an infringement of copyright**." 17 U.S.C. § 107 (emphasis added). Since Princeton's researchers used Planner 5D's works for scholarship to promote the progress of science, their use was paradigmatically fair.

It is undisputed that Planner 5D offers its users an interior design tool that includes "a library of thousands of household objects" that users can "select" and "drag" to create "customized floor plans, rotating, resizing, and placing them where they wish." P5D's MSJ at 2. Princeton's researchers downloaded the text data files underlying these Objects and Scenes and "repackaged" them to create a new dataset called SUNCG. *Id.* at 3. Princeton's researchers then used SUNCG to train machine learning models, *see id.* at 2–4, with the ultimate purpose of publishing academic literature contributing to the public corpus of knowledge about artificial intelligence and scene understanding, *see, e.g.*, *id.* at 3 & n.11, 10 & n.31, 17 & n.51. Considering the four fair use factors, the researchers' use was not infringing but "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021). To hold

otherwise would allow Planner 5D to lock out scholarship and charge a ransom for academic inquiry in the name of copyright law, and thus "stifle the very creativity which that law is designed to foster." *Warhol*, 598 U.S. at 527 (citation omitted).

**1. Scholarship Is a Quintessentially Transformative Purpose and Character.**

The first of four factors to be considered in the fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The "central" question of the first fair use factor is "whether the new work merely supersedes the objects of the original creation (supplanting the original), or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528 (citations and alterations omitted). "A use that has a further purpose or different character is said to be 'transformative.'" *Id.* at 529 (citation omitted). "[S]cholarship [and] research" are among the statutory examples of "purposes" that are considered "fair," 17 U.S.C. § 107, examples the Supreme Court has said "serve a manifestly different purpose from the [original] work," *Warhol*, 598 U.S. at 528 (citation and alterations omitted). "Criticism of a work, for instance, ordinarily does not supersede the objects of, or supplant, the work. Rather, it uses the work to serve a distinct end." *Id.* Likewise, scholarship is a new and distinct end that does not supersede the original work. Planner 5D cites no case—and Princeton is aware of none—in which use of a commercial copyrighted work in pure academic scholarship has ever been held to be infringing and not fair use. So too here.

**a. Princeton's Researchers Transformed Planner 5D's Works by Using Them for Scholarship.**

Planner 5D argues that the Princeton researchers' use was not transformative because they 'only' reformatted the data, removed Objects from Scenes, changed Objects' positioning, and assigned labels to Objects. P5D's MSJ at 12–13. Planner 5D contends that "it's clear that [Princeton's researchers] didn't fundamentally change Planner 5D's works, because Princeton left nearly all of Planner 5D's objects and scenes untouched." *Id.* at 12. But "[t]he word 'transformative' cannot be taken too literally." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (finding digitizing of copyright-protected works was fair use). Planner 5D answers the wrong question. The question is not *how* a user transformed a copyrighted work, but *why*—what *purpose* the transformation served.

In *Warhol*, the Supreme Court decisively rejected the test that Planner 5D applies. *Warhol* considered whether it was fair use for famed pop artist Andy Warhol to create a series of silkscreen portraits of the music artist Prince, based on a photograph taken by Lynn Goldsmith, without a license from Goldsmith. *See Warhol*, 598 U.S. at 515–18. The district court initially granted summary judgment to Warhol's successor-in-interest Andy Warhol Foundation, holding that Warhol's silkscreen portraits "employ new aesthetics with creative and communicative results distinct from Goldsmith's," which "transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure." *Id.* at 522–23 (citation omitted). The Second Circuit reversed, and the Supreme Court affirmed. The Supreme Court made clear that simply "add[ing] a new aesthetic or new expression to its source material" is not enough to make a secondary work "transformative," *id.* at 543 (citation omitted), and that the "subjective intent of the user" does not govern," *id.* at 544. Instead, the north star is the *purpose of the use*: "The same copying may be fair when used for one purpose but not another." *Id.* at 533. In *Warhol*, both portraits of Prince were "used in magazines to illustrate stories about Prince." *Id.* at 535. Since the purposes were the same, Warhol's use was not fair. *See id.* at 526.

Although Princeton's researchers invested considerable resources in altering Planner 5D's data to make it suitable for their scholarship, this Court need not decide whether to credit Planner 5D's expert's testimony that any changes Princeton's researchers made were "very minor" and "only needed because Princeton didn't fully understand P5D's trade secret file format." P5D's MSJ at 13. Princeton disagrees with Planner 5D, but that is beside the point. Regardless of *how* or *how much* Princeton's researchers altered Planner 5D's works—indeed, even if the researchers had just copied Planner 5D's works wholesale without modification—Princeton's researchers still used Planner 5D's works for a new, distinct, and inherently transformative *purpose*: academic scholarship. *Cf. Warhol*, 598 U.S. at 534 n.10 ("Had [Warhol's] use been solely for teaching purposes, that clearly would affect the analysis, and the statute permits no other conclusion."). Planner 5D does not and cannot dispute this.

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.* is instructive. 82 F.4th 1262 (D.C. Cir. 2023). The plaintiffs, standard-developing organizations, brought an infringement action against a nonprofit that disseminated legal materials concerning the verbatim copying and distribution of some of their copyrighted standards that had subsequently been incorporated into the Federal

Register as binding regulations. *Id.* at 1265–66. Relying on *Warhol*, the D.C. Circuit found that factor one "strongly" favored fair use because the use was for "nonprofit, educational purposes" and because the purposes of the uses were "fundamental[ly]" different: the copyright holder was publishing what it regarded as "current best practices" in its industry, while the defendant republished them because the standards were "what the law is" and "to provide the public with a free and comprehensive repository of the law." *Id.* at 1268–69. In other words, even verbatim copying was transformative where the purposes of the uses were different.

Planner 5D also argues that Princeton's researchers must have "commented on" Planner 5D's works for the purpose of their use to be different. P5D's MSJ at 14–15. Not so. Whether a use "targets" and "comment[s] on" the original "work itself" is just one of several possible "further justification[s]" for fair use. *Warhol*, 598 U.S. at 539–40. Indeed, in *Public.Resource.Org*, the D.C. Circuit found the defendant had a transformative purpose under *Warhol* even though it copied the original works verbatim without commentary. 82 F.4th at 1268. Similarly, Planner 5D misreads the example of Warhol's Campbell's Soup Cans series: The reason that is likely fair is not because Warhol's works comment on the visual art of the Campbell label, but because the *purposes* differ: the label's is to advertise soup, the art's is "an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup." *Id.* at 539.

Since Planner 5D indisputably did not use its works for academic scholarship, it does not matter whether Princeton or Planner 5D is right about the amount of effort Princeton's researchers exerted to make the Planner 5D data suitable for research, or whether Princeton "commented" on Planner 5D's works; the first factor strongly weighs in favor of fair use.

#### b. Planner 5D's Use of AI Functionality in Its Home Design Tool Differs in Purpose from Princeton's Researchers' Use of Planner 5D Data in Academic Scholarship.

Planner 5D's primary purpose was to offer its users "an interior design tool" with "a library of thousands of household objects" that users could use to create "customized floor plans." P5D's MSJ at 2. But assuming *arguendo* that Planner 5D *also* "used its works for AI training," *id.* at 14,[8] the

[8] Although unnecessary to resolve for purposes of this motion, Planner 5D's assertion that the purpose of its works was machine learning and that Princeton's researchers "simply duplicated" that "existing purpose," P5D's MSJ at 14 & nn. 46–47, strains credulity. The record in no way supports that claim.

Princeton researchers still used the Planner 5D works for an inherently different purpose than Planner 5D. There is no evidence that Planner 5D has used its works in scholarship to advance the field's understanding of how computers process and interpret information, as the Princeton researchers did. Planner 5D has not published any papers or analysis, or contributed software freely to the public domain, as Princeton's researchers did.

Planner 5D has purportedly pursued "multiple artificial intelligence projects, some of which have been released on its platform, most of which used its own works as training data." P5D's MSJ at 14. But even if so, there is a difference in kind between the internal, commercial, research and product development that Planner 5D describes, and the academic scholarship published by Princeton researchers—which is by nature public, open-source, peer-reviewed, and undertaken for the common good. To cast both parties' uses as "machine learning" "oversimplifies *Warhol*'s inquiry into objectives." *Keck v. Mix Creative Learning Ctr., L.L.C.*, 116 F.4th 448, 455 (5th Cir. 2024) (finding use of paintings in educational art kits was fair). The distinct purpose of the Princeton researchers' use is obvious from the results of their use: advances in academic scholarship in the then-nascent field of computer vision, contributing to the enrichment of public knowledge about artificial intelligence. That Planner 5D has decided to pursue its own commercial artificial intelligence projects to offer additional features to users of its interior design platform does not entitle it to put a price on academic inquiry.

**c. Princeton's Researchers Need Not Justify Using Planner 5D's Works Rather Than Other Interior Scenes.**

Planner 5D also tries to invent a requirement that Princeton must justify its researchers' use of Planner 5D's works *in particular*. P5D's MSJ at 14–15. Princeton agrees with Planner 5D that there was "nothing intrinsic" or unique about Planner 5D's data and that Princeton's researchers "didn't need Planner 5D's works." *Id.* at 15. But Planner 5D provides no support for the proposition that someone engaging in fair use needs to justify use of the given work rather than some other work. It

---

First, Planner 5D does not assert it began using its works for AI projects until at least 2017, *after* Princeton's researchers' use. *Id.* at 14 & n.46. Second, Planner 5D's purpose and business model is plainly to sell consumers a home design platform. Even the "AI" projects Planner 5D claims to have built using its Scenes as training data all relate to designing floorplans: "recognizing existing room configurations, suggesting layout options, and producing photo realistic renderings of user designs." *Id.* at 2. None of these resemble the type of AI models that are the subject of Princeton's researchers' scholarship.

would be untenable to require Princeton to prove that Planner 5D's works were better for the researchers' purposes than *every other scene dataset in existence* to show that factor one favors Princeton. No case requires that. For instance, the Supreme Court did not ask whether Warhol could have used any other brand of soup—or any other consumer product—to comment on consumerism. *Id.* at 539.

* * *

Ultimately, the dispositive question is whether a use "furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* at 531. Any "use that has a distinct purpose" may meet that standard. *Id.* Scholarship is a distinct, presumptively fair purpose explicitly enumerated in the Copyright Act, and Princeton's researchers "promote[d] the progress of science," *id.*, with their research, without diminishing the incentive to create works for a home design platform.

**d. The Scholarship Was Noncommercial.**

On top of its transformative purpose, the research was noncommercial. Congress provided that the evaluation of "the purpose and character of the use" should "includ[e] whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Oracle*, 593 U.S. at 32; *accord Warhol*, 598 U.S. at 531. The Princeton researchers' use of Planner 5D's works was plainly noncommercial; the researchers created and used the SUNCG dataset only for noncommercial academic research, and only distributed the dataset to those who signed terms agreeing to limit their use to noncommercial research. Princeton's MSJ at 7–8; P5D's MSJ at 8 (SUNCG was "for noncommercial use" under the researchers' terms). It is undisputed neither Princeton nor its researchers derived any profits from the use of Planner 5D's works.

Unable to contest this, Planner 5D argues that for academic institutions, "profit" should be measured by "recognition" rather than "dollars." P5D's MSJ at 16 (quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)). *Weissmann* is inapposite. "[R]ecognition" was held to be analogous to 'profit' in *Weissmann* because the defendant professor "attempted to pass off the [plaintiff's scholarship] as his own, substituting his name as author in place of hers." *Weissmann*, 868

F.2d at 1324. Here, Princeton's researchers did not attempt to take credit for creating Planner 5D's raw Scenes or Objects, and indeed expressly credited Planner 5D in their papers. *See* P5D's MSJ at 17 n.51.[9] Any "recognition" gained from their published research was a result of their own independent labor, not Planner 5D's or Planner 5D's users'. Unlike Weissman, Princeton's researchers "pa[id] the usual price that accompanies scientific research and writing, that is to say, by the sweat of [their] brow[s]." *Weissmann*, 868 F.2d at 1324; *see also Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1244 (N.D. Cal. 1995) (holding *Weissman* was not applicable where the defendant did not take credit for the plaintiffs' works); *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 186 (2d Cir. 2024) (same).

Academic scholarship is not "commercial" just because it has "burnished reputations, attracted funding, [and] landed scholarships and jobs." P5D's MSJ at 16. Such a rule would result in a finding that almost every use of a copyrighted work is commercial, because, for instance, criticism and comment may improve the reputation of the critic too. *See Religious Tech. Ctr.*, 923 F. Supp. at 1244. Indeed, the Second Circuit recently held that "advancing [one's] mission and bolstering [one's] reputation" are "nonmonetary benefits that attend most [] legitimate, secondary uses" and are noncommercial. *Hachette*, 115 F.4th at 186. Under Planner 5D's interpretation, all nonprofit scholarship could be said to improve reputations or attract funding. This is untenable, and unnecessary: The indisputably noncommercial nature of the use confirms factor one strongly favors fair use. 17 U.S.C. § 107(1).[10]

### 2. Princeton's Researchers Did Not Use Planner 5D's Works for Their Expressive Content.

The second factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). While "[t]he second factor [] rarely play[s] a significant role," *Authors Guild*, 804 F.3d at 220, Planner 5D

---

[9] Moreover as to Planner 5D's only truly original authorship—its home design tool that rendered the Object and Scene Files—Princeton's researchers did not copy it at all. The researchers designed and implemented from scratch their own rendering software that would work with open-source 3D scenes and objects, which they then freely contributed to the public domain. Mitchell Opp. Decl. ¶¶ 47–52.

[10] Planner 5D is correct that the "mere fact" that a use is noncommercial "does not insulate" the use from a finding of infringement. P5D's MSJ at 16 (citing *Hachette*, 115 F.4th at 184–86). But unlike in *Hachette*, where the Second Circuit held the noncommercial nature of the use did not *override* the *lack* of transformativeness, here the use is *both* noncommercial *and* transformative.

mischaracterizes the "nature" of its works and the scope of its rights. The only copyrights Planner 5D holds—if any—are in the precise "creative choices" in its Objects, and to the "choices as to selection and arrangement" of the compilation of scenes. Order Granting in Part Def.'s Mot. Summ. J., at 15 (Sept. 26, 2023) (ECF No. 278). Even if copyrightable, *contra infra* § IV.C.2, the Princeton researchers did not use the Objects or Scene Compilation for these purportedly creative choices. Rather, the researchers used the data files to teach their AI how to recognize objects generally within an interior space. Planner 5D has no protection in the object layouts of the Scenes, which were created by users, or in the dense annotations created by the researchers on which their AI model relied.[11] The Asserted Works are plain text data files with, at most, thin copyright protection as to limited aspects of the works. They are far "from the core of copyright," *Google*, 593 U.S. at 29, and Princeton's researchers did not use them for whatever limited expressive content they do have. "[T]he nature of the copyrighted work" strongly weighs in favor of fair use.

**3. Princeton's Researchers Had a Transformative Purpose for Using the Amounts of the Works They Did.**

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), and will generally favor fair use where the copying has a "transformative[] purpose." *Oracle*, 593 U.S. at 34. Even copying an "entire work" may be "reasonable in relation to the purpose of the copying." *Public.Resource.Org*, 82 F.4th at 1269.[12] Scholarship is a *prima facie* valid and transformative purpose, and as Planner 5D acknowledges, "datasets that are very large and realistic are mission critical" to model training. P5D's MSJ at 2–3. Thus, even if the researchers downloaded all of Planner 5D's works, the third factor is, at most, neutral.

[11] Indeed, there is no evidence the researchers' AI model relied on aspects such as the color or wood grain of an Object. Nor did the model consider Planner 5D's selection of the compilation because the model processed only the different selection of Scenes by the researchers.

[12] As Princeton argued in its MSJ, the amount of the works used is overstated in this case, since Planner 5D only registered its works after the Princeton researchers had already downloaded them, and only registered the works downloaded. *See* Princeton's MSJ at 23.

**4. Princeton's Researchers' Use Did Not Harm Any Potential Commercial Market, and, if Anything, Increased Demand for Planner 5D's Works.**

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Here, while there may have been actual and potential markets to license scenes generally, Planner 5D cannot show that Princeton's researchers caused any harm to these markets because SUNCG was only available for noncommercial research. Mitchell Decl. ISO Princeton's Phase 2 MSJ ¶¶ 3–5, 53–79 (Jan. 9, 2025), (ECF No. 533). Indeed, in the same breath that Planner 5D claims that "[p]rospective partners or acquirers had no incentive to license what Princeton was giving away for free," Planner 5D admits that "Microsoft, Apple, and Adobe each expressed interest in acquiring Planner 5D's object and scenes files." P5D's MSJ at 18–19. These three licensing conversations took place *after* the release of SUNCG and *during the time* SUNCG was publicly available for noncommercial use. In fact, it was the Princeton researchers' transformative use of Planner 5D's works for noncommercial, scholarly research that *sparked* a market for Planner 5D's data. Planner 5D does not dispute that prior to the release of SUNCG, it had never licensed its data for AI training and had never been contacted by any entity for the purpose of licensing its data. Where copying "has, if anything, increased demand" for the original work, the fourth factor weighs in favor of a finding of fair use. *Larson v. Dorland*, 693 F. Supp. 3d 59, 83 (D. Mass. 2023) (citing *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000)).

Moreover, the Supreme Court has recognized that the fourth factor is correlated with the first, since "[a] secondary use that is more different in purpose and character is less likely to usurp demand for the original work or its derivatives." *Warhol*, 598 U.S. at 536 n.12. As discussed above, the researchers' use here was transformative and noncommercial, and did not usurp demand for Planner 5D's original works. The fourth factor also weighs in the Princeton researchers' favor.

**C. Planner 5D Is Not Entitled to Summary Judgment for the Initial Downloading.**

As it has throughout this litigation, Planner 5D refuses to grapple with its threshold burden of proof on questions of copyrightability and the identification of the actual material that it claims were in fact copied. Instead, Planner 5D essentially asks the Court to hold Princeton liable for its researchers' conduct *without* meeting its burden to prove the copyrightability of Planner 5D's Asserted

Scene Compilation or Asserted Objects, or specifically identifying what was purportedly copied. Planner 5D's arguments legally and factually fail.

**1. Planner 5D Has Not Established the Contents, Copyrightability, or Copying of the Asserted Scene Compilation.**

Planner 5D asserts that Princeton's researchers downloaded a single copy of "all of Planner 5D's then-available object and scene files from its public gallery of scenes," and that Princeton "do[es] not dispute this." P5D's MSJ at 19. That is false. Princeton does not dispute that its researchers downloaded *many* Scene and Object Files from Planner 5D's website in February 2016, but they did not download 'all' of them, and Planner 5D has yet to prove whether the files downloaded consist of the Asserted Scene Compilation or the Asserted Objects.

As explained in Princeton's Phase 2 summary judgment motion, a compilation copyright is "thin," and "limited to the [plaintiff's] particular selection or arrangement," since the copyright in each individual scene remains with the user who created it. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–51 (1991); Princeton's MSJ at 14–16. To establish copyrightability, Planner 5D must establish what Scenes the Asserted Scene Compilation consists of, and how they were creatively selected. And to establish infringement, Planner 5D must establish that the set of Scenes copied by Princeton's researchers were "virtually identical" to the Asserted Scene Compilation. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442, 1446 (9th Cir. 1994). Contrary to Planner 5D's assertion, the undisputed record demonstrates that Dr. Song downloaded the data files underlying only the first 1,000 pages of Planner 5D's website gallery. ECF No. 217-4 ¶¶ 17–18. Neither Planner 5D itself nor Dr. Song knows how many pages its gallery had at the time of the downloading in February 2016. *Id.*; Mitchell Opp. Decl. ¶ 36. Yet, Planner 5D's Asserted Scene Compilation is defined as containing "all unique scenes that appeared in Planner 5D's public scene gallery on February 17, 2016." Mitchell Opp. Decl. ¶ 39. If Princeton's researchers downloaded some subset of the Asserted Scene Compilation, there would be no infringement. *See, e.g.*, *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1187–88 (9th Cir. 2018); *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp., PLC*, 463 F.3d 478, 483–84 (6th Cir. 2006); Princeton's MSJ at 15–16 & n.12.

First, Planner 5D cannot establish copyrightability. Its only claim to creative selection is that from the Scenes designated by users for inclusion in the public gallery (purportedly more than 63,000), Planner 5D states that it "winnowed" approximately 14,000 Scenes and thereby "curated" a selection of approximately 49,000 Scenes. P5D's MSJ at 21. Planner 5D's principal testified that he applied creative and expressive criteria to create this selection. *Id.* But he *also* testified that Planner 5D did not begin winnowing Scenes from the public gallery until 2017, *after* the downloading at issue in the case. Mitchell Opp. Decl. ¶ 41. Obviously, any creative selection that was after February 17, 2016 is not part of the Asserted Scene Compilation. In light of that testimony, and because Princeton's researchers downloaded only the Scenes in the first 1,000 pages of the gallery, it is far more likely that the 'missing' Scenes were on pages 1,001 and up. Other record evidence confirms this. Planner 5D admitted in interrogatory responses that it could not identify *a single Scene* that was flagged by a user for inclusion in the public gallery but excluded by Planner 5D before February 17, 2016. *Id.* ¶ 43. Instead, what Planner 5D did in the course of this litigation was compare its records of Scenes in the public gallery in 2019 with what was *downloaded* in 2016, and declared that any Scene *not* downloaded by Princeton's researchers *must have been winnowed* before February 17, 2016. *Id.* That is pure speculation, but still, Planner 5D came up with only 332 scenes it "determine[d]" were "winnowed" from the public gallery prior to the date of the downloading, *id.*, and even that conclusion simply is not supported by the record. Indeed, *all 332 of those scenes were downloaded by Princeton's researchers*, and *312* appear in SUNCG. *Id.* ¶¶ 42–46. It is literally impossible that Planner 5D "winnowed" these scenes prior to the downloading, since they were in fact downloaded.

Thus, other than the conclusory and self-serving testimony by Planner 5D's principal that he creatively selected scenes for the Asserted Scene Compilation, all other evidence indicates that no selection occurred prior to February 17, 2016. "[N]o reasonable fact finder" could conclude on this record that Planner 5D's Asserted Scene Compilation was creatively selected. *Moran v. Screening Pros*, LLC, 25 F.4th 722, 728 (9th Cir. 2022). The Asserted Scene Compilation is not copyrightable.

Second, even if copyrightable, there is no evidence in the record establishing copying of the Asserted Scene Compilation, because there is no evidence that the Scene Files downloaded correspond to the entire set of Scenes that were in Planner 5D's public gallery as of February 17, 2016. Since

Planner 5D has produced no evidence that *that* compilation was copied, and not some other selection of the user-designed Scenes, it cannot demonstrate copying (and thus infringement) of its compilation as a matter of law.

As Planner 5D now concedes, copyrightability is a pure question of law, P5D's MSJ at 20, and so the Court should grant *Princeton* summary judgment that the Asserted Scene Compilation is uncopyrightable and has not been infringed.

**2. Planner 5D Has Not Established That Its Objects Are Copyrightable or That the Asserted Objects Were Copied.**

As Princeton's MSJ (at 10–14) demonstrates, all but 187 of Planner 5D's Objects are uncopyrightable as a matter of law. But even as to the Objects in Exhibit A to Planner 5D's Narrowed Objects Lists—which Planner 5D claims were not copied from reference images—Planner 5D has yet to meet its burden to prove that any aspect of any Object is original and copyrightable. Merely showing copying is insufficient; Planner 5D must show "copying of constituent elements of the work that are original." *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1035 (N.D. Cal. 2018) (citation omitted).

In any event, Planner 5D has *not* established as it must that all the Objects it includes in its Narrowed Objects Lists were copied. As discussed above, the researchers did not copy all of Planner 5D's Objects, they copied those contained in Scenes within the first 1,000 pages of Planner 5D's public gallery. Indeed, Planner 5D's initial list of Asserted Objects consisted of 5,516 Object Data Files, which represented 3,719 unique Asserted Objects. ECF No. 217-7 ¶ 15. But the parties agree that SUNCG contains only 2,644 Objects, P5D's MSJ at 3 n.11, at 5, strong evidence nowhere close to 3,719 Objects were downloaded. Moreover, even Planner 5D's own records reflect that around 500 Objects in Planner 5D's Narrowed Objects Lists are *not* in SUNCG. ECF No. 541 at 19 & Ex. 33. Therefore, Planner 5D is not entitled to summary judgment for infringement of "all objects found at trial to be copyrightable." P5D's MSJ at 21. It still must establish that those Objects (and specifically their copyrightable elements) were copied.

## V. CONCLUSION

For the foregoing reasons, Princeton respectfully requests that the Court deny Planner 5D's motion for summary judgment, ECF No. 552, and enter summary judgment in Princeton's favor.

DATED: February 6, 2025

Respectfully submitted,

JENNER & BLOCK LLP

*/s/ Susan J. Kohlmann*

Susan J. Kohlmann

*Attorneys for Defendant The Trustees of Princeton University*