MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
christian@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.765.6633
Facsimile: 415.283.4804

Attorneys for Plaintiff
UAB "PLANNER5D"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.<br><br>Defendants. | **Case No. 3:19-cv-03132-WHO (SK)**<br>**Case No. 3:20-cv-08261-WHO (SK)**<br><br>**PLANNER 5D'S OPPOSITION TO META'S MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**


I. INTRODUCTION ........ 1

II. FACTS ........ 1

A. Meta exploits open source and academic research for commercial ends. ........ 1

B. Meta's Third-Party Data Policy ........ 3

C. Meta supports the work of Princeton's Shuran Song ........ 3

D. Princeton begins accepting requests for access to SUNCG. ........ 4

E. Meta had a contractual business relationship with Princeton. ........ 4

F. Meta Derives SUMO from SUNCG. ........ 6

G. SUNCG-based projects at Meta advance its commercial goals and drive SUNCG's distribution. ........ 7

1. Habitat ........ 7

2. House3D ........ 8

3. The SUMO Challenge ........ 8

III. ARGUMENT ........ 9

A. Meta misappropriated P5D's trade secrets. ........ 9

1. P5D's data did not lose its secrecy before Meta took it. ........ 9

2. Meta was in privity with Princeton. ........ 10

3. Meta knew or should have known Princeton acquired P5D's trade secrets by improper means. ........ 11

4. Meta does not challenge other bases of misappropriation. ........ 13

B. SUNCG and SUMO both infringe P5D's Objects Work and Scenes Work ........ 13

1. SUNCG and SUMO infringe P5D's Scenes Work. ........ 14

2. Meta is jointly and severally liable for damages proximately caused by Princeton's theft of P5D's works whether or not SUNCG infringes. ........ 15

3. Meta infringed the 18 scenes that P5D created. ........ 16

4. SUNCG's and SUMO's object files are substantially similar to P5D's. ........ 16

a. Wholesale copying of P5D's objects is conceded. ........ 16

b. As illustrated by Meta's Van Gumster report, P5D modeler necessarily made numerous demonstrable, creative choices that could not have been dictated by any reference image ........ 17

c. Demonstrable creative choices are identified for each object in P5D's Narrowed Objects List ........ 21

C. Meta is liable for indirect copyright infringement. ........ 22

1. Meta induced others to download and use SUNCG and SUMO. ........ 22

2. Meta vicariously infringed SUNCG and SUMO. ........ 22

D. Meta's use is not fair. ........ 23

IV. CONCLUSION ........ 25

**Cases**

*Andersen v. Stability AI Ltd.*,
700 F. Supp. 3d 853 (N.D. Cal. Oct. 20, 2023) .......... 14

*AT&T Corp. v. Dataway Inc.*,
577 F. Supp. 2d 1099 (N.D. Cal. Aug. 14, 2008) .......... 23

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*,
157 F. Supp. 3d 407 (D.N.J. Jan. 16, 2016) .......... 12

*Bespaq Corp. v. Haoshen Trading Co.*,
No. 04-cv-3698, 2004 WL 2043522 (N.D. Cal. Sept. 13, 2004) .......... 21

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) .......... 21

*Cable/Home Corp. v. Network Prods., Inc.*,
902 F.2d 829 (11th Cir.1990) .......... 24

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) .......... 14

*Computer Assoc. Intern., Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992) .......... 12

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) .......... 24

*DVD Copy Control Ass'n v. Bunner*,
116 Cal. App. 4th 241 (2004) .......... 9, 10

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) .......... 21

*George S. Chen Corp. v. Cadona Int'l, Inc.*,
266 F. App'x 523 (9th Cir. 2008) .......... 21

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) .......... 15

*Hearn v. Meyer*,
664 F. Supp. 832 (S.D.N.Y. July 20, 1987) .......... 21

*Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*,
No. 18-cv-5031, 2019 WL 1767329 (N.D. Cal. Apr. 22, 2019) .......... 10, 11

*Kittrich Corp. v. Chilewich Sultan, LLC*,
No. 12-cv-10079, 2013 WL 12131376 (C.D. Cal. Feb. 20, 2013) .......... 9

*Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*,
528 F.3d 1258 (10th Cir. 2008) .......... 20

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) .......... 24

*Pinkerton Tobacco Co., LP v. Kretek Int'l, Inc.*,
No. 20-cv-8729, 2022 WL 17224677 (C.D. Cal. Oct. 27, 2022) .... 12

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*,
668 F.3d 1148 (9th Cir. 2012) .... 13, 14, 17

*Religious Tech. Ctr. v. Lerma*,
908 F. Supp. 1362 (E.D. Va. 1995) .... 10

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
923 F. Supp. 1231 (N.D. Cal. 1995) .... 10

*Underwater Storage, Inc. v. United States Rubber Co.*,
371 F.2d 950 (D.C. Cir. 1966) .... 10

*Veronica Foods Co. v. Ecklin*,
No. 16-cv-7223, 2017 WL 2806706 (N.D. Cal. June 29, 2017) .... 10

**Statutes**

17 U.S.C. § 102 .... 22

18 U.S.C.
§ 1839(5)(A), (B)(ii) .... 12
§ 1839(5)(B)(ii)(II)–(III) .... 13

Cal. Civ. Code
§ 3426.1(b)(1), (2)(B)(i) .... 12
§ 3462.1(b)(2)(B)(ii)–(iii) .... 13

**Other Authorities**

Restatement of Torts § 757 (1939) .... 12

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.14 (2001) .... 21

# I. INTRODUCTION

Meta is a social media juggernaut anxious to also dominate the world of augmented and virtual reality. It has invested more than *$51 billion* in computer vision research in recent years. It acquired the SUNCG dataset, a library of interior objects and scenes that Princeton scraped from Planner 5D and repackaged for widespread distribution. Meta drove thousands to download copies of SUNCG, by signaling its support for the dataset and distributing tools for use with it. This was clear copyright infringement and trade secret misappropriation.

Meta now hides behind the fair use doctrine, contending that its work with SUNCG was "purely" and "solely" for "noncommercial scientific research and scholarship." This bald claim, supported only by Meta's own interrogatory response, is neither admissible nor credible. It is certainly not the stuff of summary judgment. Meta fares no better with the other fair use factors, each of which favors P5D.

Meta is also wrong that SUNCG is not infringing. Like Princeton, Meta contends that by trimming or tweaking a tiny percentage of P5D's scenes, Princeton created a new, non-infringing work. Yet SUNCG clearly captures virtually all of P5D's creatively curated scenes. P5D's aesthetic judgments live as fully in SUNCG as they did in the original work. SUNCG infringes P5D's scene compilation. It also infringes P5D's objects, both because it copies each asserted object wholesale and because each one satisfies the court's test of demonstrable creative differences.

Finally, Meta fails to show as a matter of law that P5D's files had lost their secrecy by the time Meta took them. Meta researchers were among the first to obtain SUNCG, at a time when each dataset was individually dispensed to requesting researchers. Whether secrecy was lost at that early stage is a fact question that depends on circumstances. Meta does not remotely establish secrecy was lost, much less demonstrate it as a matter of law.

Meta's second run at summary judgment fails on the merits and should be rejected.

# II. FACTS

## A. Meta exploits open source and academic research for commercial ends.

Since 2013, Meta's Facebook Artificial Intelligence Research (FAIR) has headed Meta's public-facing research in artificial intelligence and its collaboration with open source and academic communities. Meta calls FAIR a "noncommercial research laboratory." (ECF 541 at 2:25–28.) But

FAIR also touts its importance to Meta's long-term business strategy. FAIR's website explains that it develops "advanced machine intelligence (AMI) *to accelerate the potential of future Meta products*."[1] FAIR's founder, Meta's Chief AI scientist, boasts that "a lot of systems that Meta is built around now are based on research projects that started at FAIR."[2]

Meta has several mechanisms to enable its research teams to help its product teams, a process that it calls [redacted].[5]

Such academic and open-source research partnerships and initiatives are central to Meta's long-term business strategy. In a recent earnings call, Meta CEO Mark Zuckerberg explained "how we benefit from open sourcing the results of our research."[6] First, he explained how Meta works to control standardization: "open source software often becomes an industry standard." "When *companies standardize on building with our stack*, that then becomes easier to integrate new innovations into our products." Second, "people want to work on open systems that will be widely adopted, so *this helps us recruit the best people at Meta* . . . ." Third, Meta's "main advantages" are its "unique data and . . . product integrations"—that is, its huge user base and their investment in Meta's ecosystem—aren't reduced by "providing infrastructure[s] . . . as open source." Finally, Meta understands that it takes time

[1] Declaration of Christian Andreu-von Euw ("CAvE Decl.") Ex. 36 (https://ai.meta.com/research/) (emphasis added). Unless otherwise noted, all cited exhibits are attachments to the CAvE Declaration.
[2] Ex. 38 (*Yann LeCun: Dark Matter of Intelligence and Self-Supervised Learning*, Lex Fridman Podcast #258) at 1:51:26.
[3] Ex. 8 at 101:3–111:6. *Id.* at 106:8–9 ("[redacted]
[4] *Id.* at 109:16–11:6 (109:23–25 & 111:5–6).
[5] *Id.* at 106:3–107:1 (106:24–25 ("[redacted]")).
[6] The Mark Zuckerberg quotes in this paragraph come from Meta's February 1, 2024, Results Conference Call. Ex. 37 at 2–4 (emphases added).

for these kinds of investments to pay off. "[O]ur playbook is just taking a long-term approach towards development" and maintaining "a portfolio of multi-year investments and research projects." One of those multi-year investments was Meta's computer vision unit. [redacted]" (ECF 551-61 at 210:3-20.)

**B. Meta's Third-Party Data Policy**

[redacted]

**C. Meta supports the work of Princeton's Shuran Song.**

[redacted] (ECF 538-6.) [redacted] (*Id.*) [redacted][13] [redacted]. (ECF 552-8 at 3:23–5:18; ECF 551-81

---

[7] Ex. 69 at 203:19–25.
[8] Ex. 34 at 58932.
[9] *Id.* at 58933.
[10] *Id.* at 58935–36 (emphasis in original); *see also id.* at 58933.
[11] Ex. 9 at 249:11–251:6.
[12] Ex. 34 at 58932–33, 58937.
[13] Ex. 35 at 4566; Ex. 57 at 8:27, 9:1, 9:3 ([redacted]).)

at 57:12–72:11.) In a major research paper, Song announced Princeton's use of P5D's data in SUNCG and acknowledged Facebook's support. (ECF 546-21 at 5 (fig.6 caption, § 4.1), 9.)

**D. Princeton begins accepting requests for access to SUNCG.**

That paper, submitted in November 2016, describes SUNCG, which was not yet available. (ECF 546-21, Abstract ("The dataset, code and pretrained model will be available online *upon acceptance*.") (emphasis added).) Starting in early 2017, Princeton made the dataset available on request and subject to approval. (ECF 538-8 (Song Jan. 4, 2017, email).) Applicants filled out a form, signed the SUNCG Terms of Use, and e-mailed them to Song.[14] (*Id.*) When Song granted access, requesters received a Princeton link to instructions and a script that, in turn, would download the dataset.[15] [redacted] (ECF 538-8.) [redacted] (ECF 538-9 at 4, Am. Ex. A at 1.) [redacted]. (*Id.*) Dr. Gkioxari was familiar with Song's 2016 paper and the SUNCG dataset, and wanted it for her work at Meta. (ECF 545-8 at 14:2–16, 15:2–12.) [redacted].[16] [redacted] (ECF 538-9 at Am. Ex. A at 1–2.) As discussed below, Dr. Huber played a key role in the joint Meta–Princeton project called Enigma, and later admitted "guessing" that Princeton had scraped the data.

**E. Meta had a contractual business relationship with Princeton.**

In July 2016, six months before Song started granting access requests to SUNCG, Meta reached out to Princeton's Thomas Funkhouser about "a unique opportunity with Facebook's Building 8 team."[17] Headed by Regina Dugan, Building 8 was a Meta division that aimed to research and develop virtual reality hardware, partnering with universities to accelerate work toward commercialization.[18] By September 2016, Princeton and Meta were discussing "a collaboration on scanning real-world spaces for

---

[14] Ex. 6 at 410:20–411:25 (Dr. Song testifying about ECF 533-31 (SUNCG Terms of Use agreement for Facebook download)), 426:1–3, 427:2–9 (Dr. Song testifying about SUNCG Terms of Use agreement form signed to get access through a script to SUNCG data).

[15] *Id.*; *see also* Ex. 7 (Dr. Funkhouser testifying about access to SUNCG through Song).

[16] Ex 17.

[17] Ex. 18 at 479 (attaching signed NDA, *id.* at 480).

[18] Ex. 50; Ex. 51.

virtual world applications," where "Facebook would follow up with a proposed plan."[19] [redacted][20] [redacted].[21]

Meta's technical lead for the collaboration was Frank Dellaert.[22] Together, Dellaert and Funkhouser developed Meta's Enigma project. [redacted]

[redacted]

[redacted]

---

[19] Ex. 19 at 509.

[20] Ex. 20 (Meta-Princeton SARA).

[21] *Id*. at 2863–64 (Sections 5.3(a) and (b)).

[22] Ex. 21.

[23] Ex. 22 at 919–20; Ex. 23 (meeting about the collaboration discussed in Ex. 22).

[24] Ex. 22 at 920–21 (second article listed).

[25] Ex. 24 at 1023.

[26] Ex. 25 at 42002, 42004, 42035, *passim*.

[27] *Id.* at 42035–36, 42040, 42042.

[28] *Id.* at 42040, 42042.

[29] Ex. 26; *see also* Ex. 20 at 2884–93 (Princeton copy of SOW attached to SARA).

[30] Ex. 26 at 2841–42 (Sec. 4 ("Deliverables") and Sec. 5 ("Payments")).

[31] Ex. 27.

[redacted] (ECF 538-9 at Am. Ex. A at 2.) [redacted]."[32]

Despite knowing from Song's paper that P5D was the source of the SUNCG data, Meta didn't ask Princeton how it got the data until [redacted]

F. **Meta Derives SUMO from SUNCG.**

A key consequence of the Enigma collaboration was an AI coding competition called the SUMO challenge. SUMO competitors were asked to design AI algorithms tasks using the SUNCG-derived SUMO dataset.[37] SUMO comprised about 59,000 perspectives (which SUMO calls "scenes") from SUNCG's apartments and houses (which SUNCG calls "scenes").[38] For each perspective, SUMO includes repackaged SUNCG data including 3D models (called "mesh models"), simplified 3D models (called "voxels grids" and "bounding boxes"), and renders (called "cubemaps").[39]

---

[32] Ex. 28.
[33] Ex. 29 at 631.
[34] *Id.* at 630.
[35] Ex. 30.
[36] *Id.*
[37] Ex. 49 ("The SUMO Challenge targets the development of algorithms for comprehensive understanding of 3D indoor scenes . . .").
[38] *Id.* at Dataset ("The SUMO challenge dataset is derived from processing scenes from the SUNCG dataset . . . 59 K Indoor Scenes").
[39] *Id.* (the SUNCG scenes are processed "to produce 360° RGB-D images represented as cubemaps and corresponding 3D mesh models . . . further processed into a bounding box and voxel-based representation").

### G. SUNCG-based projects at Meta advance its commercial goals and drive SUNCG's distribution.

Meta used SUNCG for at least three discrete projects with explicit long-term commercial aims: Habitat, House3D, and the SUMO challenge. These projects also drove SUNCG's distribution.

#### 1. Habitat

"Habitat" was a research project Meta built around SUNCG and released to the public. It contained tools that allowed researchers to view and navigate interior scenes on their screens, and an application programming interface (API) to facilitate research. (ECF 551-65.) [redacted] (ECF 551-65 at 1988) [redacted][40] This is consistent with Meta's stated strategy of encouraging "companies [to] standardize on building with our stack."[41]

From the start, Habitat was intended to advance Meta's commercial offerings. [redacted] (ECF 551-65 at 1989.) Soon after, these ideas were echoed by Meta's CEO Zuckerberg, who, in a public presentation, promised "AR glasses" that can answer questions like, "where is my favorite mug?"[42] In the years since, Meta has even developed a prototype product.[43]

Although Habitat is compatible with other datasets, SUNCG was one of three datasets with which Habitat would function when it was released, the largest dataset by far,[44] and the most important. [redacted] And for almost two

---

[40] Ex. 15.

[41] Ex. 37 at 2.

[42] Ex. 43 (*Meta (Facebook) Connect 2021 Metaverse Event Transcript*) at 1:08:38.

[43] Ex. 39 (*Introducing Orion, Our First True Augmented Reality Glasses*).

[44] SUNCG had over 45,000 scenes. The other two inaugural datasets had 572 and 90 scenes. *See* Ex. 41 at 5 (Gibson dataset has 572 scenes); Ex. 42, Abstract (Matterport3D has 90 scenes).

[45] Ex. 15 at 11405 at Setbacks, Data ([redacted])."); *see also* Ex. 33.

years after this lawsuit was filed, Meta surreptitiously continued supporting SUNCG in Habitat.[46] This contradicts Meta's claim that "[a]s soon as P5D complained, Meta ceased its use." (ECF 541 at 1:8.)

**2. House3D**

"House3D" was another set of tools that Meta released to the public. House3D rendered SUNCG's rooms and houses and simulated movement through them.[47] House3D required users to download a copy of SUNCG, and thousands did.[48] [redacted] (ECF 552-60 at 12541 (describing [redacted]

**3. The SUMO Challenge**

Meta's SUMO challenge was the computer vision competition based on SUNCG that is discussed above.[50] Like most of Meta's "open" research, SUMO leveraged others' work to further Meta's business goals. As the SUMO project leader put it, Meta's strategy was: "Get everyone else to solve your problem."[51] He explained: [redacted][52] The SUMO Challenge terms of use assured that this work was available for Meta's commercial projects,

[46] Ex. 44 at dhruvbatra on May 29, 2019 (Habitat leader explaining, "SUNCG continues to be supported by our code. We removed [SUNCG download instructions] to avoid any confusion—that SUNCG data needs to be requested from the original source and not from us."); Ex. 45 at 5 (Meta employeeeundersander on Nov 30, 2020: "I chatted with . . . FB legal and she says this will be fine. What I'm trying to do here is not break the SUNCG loading codepath . . .").

[47] Ex. 40 (https://ai.meta.com/tools/house3d/).

[48] Ex. 46 (House 3D instructions); ECF 540-12 ¶¶ 142–152.

[49] Ex. 12 at 9954.

[50] Ex. 49 (https://sumochallenge.org/).

[51] Ex. 16 at 20902; Ex. 70 (*The First SUMO Challenge Workshop*) at 8 (December 2018 presentation using the same slide as Ex. 16 at 20902)).

[52] Ex. 16 at 20902.

requiring participants to give Meta a "perpetual, royalty-free, no-cost license and right to use and otherwise exploit the Submission . . . for any other *commercial* or non-commercial purpose."[53]

In addition to advancing Meta's long-term business goals, these projects drove thousands of new downloads of SUNCG. (ECF 540-12 ¶¶ 138–182.) Even beyond these specific efforts, Meta's early visible endorsement encouraged SUNCG's adoption as a reference dataset for computer vision work, dramatically increasing its further distribution and use. (ECF 540-12 ¶ 140.)

## III. ARGUMENT

### A. Meta misappropriated P5D's trade secrets.

#### 1. P5D's data did not lose its secrecy before Meta took it.

Meta's cat-out-of-the-bag defense fails because the law recognizes that secrets can dissipate over time, raising a fact question over how generally known P5D's secrets were before Meta got them. Here, Meta was among the first to get SUNCG, making summary determination of lost secrecy improper.

The trade secrecy requirement is "generally treated as a relative concept and requires a fact-intensive analysis." *DVD Copy Control Ass'n v. Bunner*, 116 Cal. App. 4th 241, 251 (2004). "Widespread, anonymous publication . . . over the Internet may destroy its status as a trade secret." *Id.* But "the inquiry is not whether the alleged trade secret has been publicly disclosed *at all*." *Kittrich Corp. v. Chilewich Sultan, LLC*, No. 12-cv-10079, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013) (emphasis in original) (*citing DVD Copy*). The key question is "whether the information has retained its value to the creator in spite of the publication." *DVD Copy*, 116 Cal. App. 4th at 251. Even "[p]ublication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value." *Id.*

Applying this standard, SUNCG was not generally known when Meta acquired it in March 2017. Song started accepting requests for SUNCG in January 2017 in a "limited" fashion, *DVD Copy*, 116 Cal. App. 4th at 251, one person at a time, confirming each person signed SUNCG's Terms of Use before

[53] Ex. 11 at 3668 § 5 (emphasis added).

she provided a script that could be used to download the dataset.[54] (ECF 538-8; ECF 538-9 at 4, Am. Ex. A at 1.) By the time Meta's Dr. Gkioxari downloaded SUNCG, around March 29, 2017, access had only been given to 21 other people in the world, all but one, academics. (ECF 538-9 at Am. Ex. A at 1.) Meta offers no contrary evidence. Meta thus cannot show that P5D's files lost their trade secret status by allegedly becoming "generally known to the relevant people" as of January 6, 2017, when the first person got access, or by March 29, 2017, when Meta did. (*Id.*) *DVD Copy*, 116 Cal. App. 4th at 251, 255–56 (remanding denial of preliminary injunction for a trial on trade secret status and theft).

Meta's cases are inapt. (ECF 541 at 9:13–10.) In each, the alleged trade secrets were posted to an overtly public Internet website with no access limitation, exposed directly to millions of people, or published in a patent, for which open public knowledge is the purpose. *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1255–57 (N.D. Cal. 1995) (documents posted openly on Internet); *Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1364–65, 1368 (E.D. Va. 1995) (same) *Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*, No. 18-cv-5031, 2019 WL 1767329, at *1–2 (N.D. Cal. Apr. 22, 2019) (public patent); *Veronica Foods Co. v. Ecklin*, No. 16-cv-7223, 2017 WL 2806706, at *2, 13–14 (N.D. Cal. June 29, 2017) (customers openly disclosed on websites). In contrast to these widespread, overt disseminations, when Meta first acquired SUNCG, only 21 others had been given access, each upon approval.

**2. Meta was in privity with Princeton.**

Wholly apart from whether P5D's data lost its secrecy before March 2017, Meta is in privity with Princeton, and has been since before the scraping of P5D's files. It is thus on the hook for misappropriation even after any alleged loss of secrecy. "[A] misappropriator or his privies can[not] 'baptize' their wrongful actions by general publication of the secret. Nor do[es] . . . destruction of the secret prevent[] the continued use by the misappropriator or his privies from being a continuing wrong vis-a-vis the original possessor of the secret." *Underwater Storage, Inc. v. United States Rubber Co.*, 371 F.2d 950, 955 (D.C. Cir. 1966) (reversing summary judgment and remanding for trial).

[54] *See, e.g.*, Ex. 6 at 410:20–411:25, 426:1–3, 427:2–9 (Song testifying about Terms of Use form used to get access through a script to SUNCG data).

For purposes of trade secret misappropriation, an original and subsequent misappropriator are in privity if there is a "material relationship" between them such that the latter is not "in the same position as a member of the public." *uCloudlink*, 2019 WL 1767329, at *2. Here, Song's Facebook Fellowship and Funkhouser's collaboration on Meta's Enigma virtual reality project are material relationships relating to SUNCG that establish privity between Princeton and Meta. [redacted][55] (*See, e.g.*, ECF 538-6 (Facebook Fellowship Application Proposal); ECF 551-81 at 57:12–72:11 (testifying about scraping); ECF 546-21 (SUNCG paper identifying P5D as the data source).) [redacted][56] [redacted][57] Meta is thus wrong to argue that it had no "material relationship" with Princeton and "stood in the same position as a member of the public," as required to escape trade secret liability. (ECF 541 at 11:10–13 (*quoting uCloudlink*).)

**3. Meta knew or should have known Princeton acquired P5D's trade secrets by improper means.**

Meta is also wrong that even if P5D's files were trade secrets when it got them, it did not misappropriate them. (ECF 541 at 12:5–14:4.) Meta was on notice that Princeton acquired P5D's trade secrets by "improper means." Meta's employees suspected that P5D's files had been scraped by Princeton, and admitted as much. (*Id.* at 13:21–14:2, 14 n.3.) Not only did Meta's employees not investigate, but their inaction also violated Meta's own principles, which required them to ensure that

---

[55] Ex. 57 at 8:27, 9:1, 9:3 [redacted].

[56] *See, e.g.*, Ex. 19 at 509, *passim* (Aug.–Sept. 2016 collaboration discussion email); Ex. 20 (Oct. 2016 Meta–Princeton Sponsored Academic Research Agreement); Ex. 22 (Dec. 2016 email).

[57] Ex. 22 [redacted]; Ex. 25 at 42002, 42004, 42035–36, 42040, 42042 [redacted]).

data obtained from third parties like Princeton had not been scraped and did not breach any terms of use. Such willful blindness cannot excuse Meta's misappropriation.

Misappropriation of a trade secret includes "acquisition . . . by a person who knows or has reason to know that the trade secret was acquired by improper means," or "[d]isclosure or use . . . without . . . consent by a person who," "[a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was" "derived from or through a person who had used improper means to acquire the trade secret [.]" 18 U.S.C. § 1839(5)(A), (B)(ii); Cal. Civ. Code § 3426.1(b)(1), (2)(B)(i). This "reason to know" may be shown by actual or constructive notice, or willful blindness. Constructive notice entails information from which to reasonably infer a breach of confidence, or circumstances that would cause a reasonable person to inquire, and that reasonable inquiry would disclose the improper conduct. *Computer Assoc. Intern., Inc. v. Altai, Inc.*, 982 F.2d 693, 718 (2d Cir. 1992) (*citing* Restatement of Torts § 757 (1939)). Alternatively framed, willful blindness to "circumstances indicating" improper acquisition of trade secrets would show Meta had reason to know. *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 426 (D.N.J. Jan. 16, 2016) (denying summary judgment); *see also Pinkerton Tobacco Co., LP v. Kretek Int'l, Inc.*, No. 20-cv-8729, 2022 WL 17224677, at *7 (C.D. Cal. Oct. 27, 2022) (*citing Baxter*, 157 F. Supp. 3d at 426) (denying defendant's summary judgment motion claiming no "reason to know" and ordering jury trial).

Here, Meta's deep connections to Princeton from 2016 to 2018 put Meta on inquiry notice that Princeton acquired P5D's data for SUNCG by improper means; Meta was willfully blind to Princeton's malfeasance. [redacted] (ECF 538-6.) Song then announced in her keystone paper that the SUNCG data came from P5D. (ECF 546-21 at 9 ("Acknowledgment").) Meta's Gkioxari, Dellaert, and Huber were all familiar with the SUNCG paper and therefore knew the data came from P5D.[58] (ECF 545-8 at 14:2–16, 15:2–12 (Gkioxari).) Thus, when each of these employees acquired SUNCG, Meta was on inquiry notice that Princeton had scraped P5D's data without authorization and in violation of P5D's terms of use. [redacted] at

[58] *E.g.*, Ex. 17; Ex. 22; Ex. 25; Ex. 29; Ex. 30.

[redacted] They failed that duty. [redacted]"[60] [redacted].[62] This is classic willful blindness. A jury could easily find Meta "knew or had reason to know" that Princeton acquired P5D's data by "improper means."

**4. Meta does not challenge other bases of misappropriation.**

Misappropriation also occurs without a required finding of "improper means," such as when trade secrets are acquired "under circumstances giving rise to a duty to maintain [their] secrecy or limit [their] use," or when they are "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]" Cal. Civ. Code § 3462.1(b)(2)(B)(ii)–(iii); *see also* 18 U.S.C. § 1839(5)(B)(ii)(II)–(III). Meta does not move for summary judgment under these provisions. (*Compare* ECF 541 at 12:5–14:4 (Meta's motion) *with* ECF 53 ¶¶ 87, 95, 103, 110 (P5D's claims). The jury could find, for example, that P5D's Terms of Service obligated defendants to maintain the secrecy of P5D's data. Accordingly, apart from how the Court rules on the misappropriation theories Meta does discuss, summary judgment is improper on those it does not.

**B. SUNCG and SUMO both infringe P5D's Objects Work and Scenes Work.**

"Copyright infringement is established by showing: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012). Despite what Meta argues (ECF 541 at 14:6–8), "substantial similarity" is not an element of this standard. *Range*, 668 F.3d at 1153. Rather, direct evidence of *wholesale* copying obviates the need for any consideration of "substantial similarity." *Id.* at 1154. This is because wholesale copying of an original work necessarily entails its protectable elements.

---

[59] *See* Ex. 34 [redacted] at 58932–33, 58935–37; Ex. 9 at 249:11–251:6 [redacted]

[60] Ex. 29.

[61] Ex. 29; Ex. 30.

[62] Ex. 34 at 53932–33 [redacted], 58935–37 [redacted]

Meta incorrectly claims that substantial similarity is an element, citing *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). (ECF 541 at 14:8.) The court in *Cavalier* merely states that "[c]opying *may* be established by showing" access and substantial similarity. *Id.* (emphasis added). It's an option. Direct evidence of wholesale copying is another option. *Range*, 668 F.3d at 1154.

Substantial similarity may also play an evidentiary role if direct evidence establishes copying, but only of parts of the original work. Such partial copying is only infringing if it includes protectible elements of the original. Substantial similarity is one way to establish this. As the *Range* court put it: if the "allegedly infringing work appropriates elements of an original without reproducing it *in toto,*" the doctrine of substantial similarity "helps courts adjudicate whether copying of the 'constituent elements of the work that are original' actually occurred." *Id. Accord Andersen v. Stability AI Ltd.*, 700 F. Supp. 3d 853, 866–68 (N.D. Cal. Oct. 20, 2023) (Orrick, J.) (distinguishing the wholesale copying of *Range* from preparing a derivative work, which still must be proven to "bear some similarity to the original work or *contain the protected elements of the original work*.") (emphasis added).

Here, the infringement of P5D's *Objects* Work requires no showing of substantial similarity. All of the objects in SUNCG and SUMO come from P5D. They thus necessarily contain protectible elements from P5D's Objects Work. The proof of *wholesale* copying is sufficient to establish this.

For P5D's *Scenes* Work, *copying* is established by direct evidence. Princeton scraped all P5D's then-available scenes, and repackaged virtually all of them as SUNCG. Meta then repackaged a portion into SUMO. At each step, copying is undisputed. Every scene in SUNCG and SUMO comes from P5D.

Despite this, Meta argues that because SUNCG and SUMO omit some scenes, they aren't substantially similar to P5D's compilation, implying no "constituent elements of the work that are original" were copied. But as shown below both SUNG and SUMO *do* retain protectable elements, and thus, are substantially similar to P5D's compilation in the relevant sense.

**1. SUNCG and SUMO infringe P5D's Scenes Work.**

Meta contends P5D's Scenes Work enjoys only "thin" copyright protection, so that P5D must show SUNCG and SUMO contain "substantially the entire item." (ECF 541 at 15:1–9; 15:25–16:2.) But as detailed in P5D's opposition to Princeton's motion (P5D Opp. TPU MSJ § III.A.1.), this is incorrect. First, P5D's Scenes Work is not a "thin" copyright that is only infringed by a virtually identical copy;

second, SUNCG nonetheless *is* a virtually identical copy; and third, SUNCG and SUMO are derivative works. Meta is also jointly and severally liable for Princeton's infringement and resulting damages.

P5D's Scenes Work is made up of non-public-domain scenes that are composed of P5D's own copyrighted objects. P5D's selection was based on subjective, creative judgments about the scenes' expressive content across a rich set of criteria. P5D's Scenes Work thus enjoys thicker copyright protection, and was infringed by the more-than-substantially similar SUNCG dataset. (*Id.* §§ III.A.1-3.) Further, because the Scenes Work's elements are not public domain and copying is established, there is no risk that common elements are the result of coincidence rather than copying. These and other facts distinguish Defendants' cases, which involve compilations of facts or other public domain elements and thus require a high degree of overlap to prove that copying took place. (*Id.* § III.A.1.) *Cf. Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 203–05 (9th Cir. 1989) (thin copyright for work made up of public-domain blank forms, calendars, and area code maps).

That said, even under the heightened similarity standard of fact compilation cases, SUNCG is infringing. SUNCG and P5D's work are over 92% identical. Disregarding duplicates, they are 97.3% identical. (P5D Opp. TPU MSJ § III.A.2.)

Finally, SUNCG and SUMO are also illegal derivative works of P5D's Scenes Work. P5D's Princeton opposition shows this for SUNCG. (*See id.* § III.A.3.) It is true of SUMO for the same reasons. Meta's copying and distribution of these works is thus infringing. It can't matter that only Princeton may have originally copied the full Scenes Work. Otherwise, once one party creates derivative works from a stolen copy, they could be freely distributed by everyone else.

**2. Meta is jointly and severally liable for damages proximately caused by Princeton's theft of P5D's works whether or not SUNCG infringes.**

As a privy acting in concert with Princeton (*see supra* § III.A.2), Meta is jointly and severally liable with Princeton for Princeton's original scraping of the complete P5D's Scenes Work, its distribution of SUNCG, and all resulting damages—even if SUNCG is not found independently infringing. This is because, like Princeton, Meta is liable for the damages proximately caused by Princeton's original infringing download of P5D's Scenes Work. (*See* P5D Opp. TPU MSJ § III.A.4.)

**3. Meta infringed the 18 scenes that P5D created.**

P5D identified each P5D scene's author and described its creation.[63] This is sufficient evidence of originality. Meta is wrong to argue that more is required. Even if P5D's designers wanted to exactly replicate a real scene, creative judgment would be unavoidable. This is because P5D's scene creation tools only allow users to choose from pre-designed objects, with limited free-form tools.[64] This makes compromises and approximations necessary even if the goal were to replicate a real scene, thereby requiring copyrightable choices. Given that Dr. Forsyth's programmatic comparison showed that every scene in SUNCG is essentially identical to its corresponding P5D scene, SUNCG unquestionably infringes these scenes. (ECF 540-12 ¶¶ 226–241.) This would include the eighteen P5D scenes.[65]

**4. SUNCG's and SUMO's object files are substantially similar to P5D's.**

In its Phase 1 summary judgment order, the Court set forth the standards for copyrightability that P5D's objects must meet. If P5D shows that an object was independently created, the Court found, Planner 5D holds a valid copyright in that work. (ECF 278 at 15:14–15.) P5D asserts that these are the objects in Exhibit A to its Narrowed Objects List (NOL). (ECF 282-2 at 2:2–5.) Defendants' present motions do not challenge this list (ECF 532 at 4:7–11), leaving that issue for trial (ECF 316 at 2:27–3:1).

For P5D's objects based on one or more references—those commissioned by retail clients ("B2B Objects"), Ex. B to the NOL (ECF 282-2 at 2:7–10), and those inspired by one or more other references ("Inspired Objects"), Exs. C & D to the NOL (ECF 282-2 at 2:12–3:8)—the Court found that "Planner 5D holds a valid copyright in any objects that involved a demonstrable creative choice, such as the color of the table in the example above." (ECF 278 at 14:28-15:1.)[66] Defendants do now challenge the copyrightability of objects in these categories.

**a. Wholesale copying of P5D's objects is conceded.**

All but one of the objects in SUNCG are direct copies of objects in Planner 5D's Objects Work. ECF 540-12 ¶ 212.) Princeton, which created SUNCG, concedes this for summary judgment. (ECF 532

---

[63] Ex. 1 at 130:4–132:24; Ex. 59.

[64] CAvE Decl. ¶¶ 61–62; Ex. 2 at 118:25–119:14.

[65] CAvE Decl. ¶ 61; Ex. 59.

[66] P5D's copyrighted works are not 2D thumbnails nor even 2D projections from a 3D viewer, but rather the fully three-dimensional objects themselves. P5D expressly reserves, and does not waive, including for appeal, its argument that all its three-dimensional works are copyrightable. (*See* ECF 282-2 at 1.)

at 4:7–9.) There is thus no need for P5D to show substantial similarity. *See Range*, 668 F.3d at 1154. Meta also admits that SUMO is a subset of SUNCG that contains "59K indoor [views]"[67] and that its objects are from Planner 5D's Objects Work.[68] (*See* ECF 540-12 ¶¶ 153–156.) There is thus no need for P5D to show substantial similarity as to these objects, whether in SUNCG or SUMO. *See Range*, 668 F.3d at 1154. Meta is wrong to argue otherwise. (*See* ECF 541 at 18:19–20.)

Meta argues that, even if all objects in SUMO are P5D's, P5D still must show *which* of its objects are in SUMO. (*Id.* at 18:28–19:7.) But P5D has shown that SUMO was derived from SUNCG, a dataset that exactly replicates all but one of P5D's objects. It follows that SUMO infringes P5D's Objects Work. Moreover, the fact that every object in SUMO is a P5D object, including all copyrightable elements in that object, is sufficient to defeat summary judgment and let a jury decide.

**b. As illustrated by Meta's Van Gumster report, P5D modelers necessarily made numerous demonstrable, creative choices that could not have been dictated by any reference image.**

Creating 3D models inherently requires original subjective choices independent of any reference images, disposing of Meta's theory that P5D must produce its original reference images to establish demonstrable creative choices. (ECF 541 at 16:28–18:3.) Given the nature of the modeling process, many choices cannot be dictated by a reference image. As Meta's own expert's examples illustrate, subjective human judgments, especially in mesh and texture choices, are always required.[69] Each object in NOL Exhibits B through D thus necessarily reflects demonstrable, creative choices. (Meta's motion does not challenge objects in NOL Exhibit A.)

In his recent report, Meta expert Jason van Gumster illustrates why creating any 3D model in a platform like Blender, even from a reference image, requires particularized mesh choices that are both demonstrable and creative. As part of his analysis, Mr. van Gumster modeled six of P5D's objects.[70] His report describes this process in detail, demonstrating the choices a modeler must make when designing a

---

[67] Ex. 49 ("The SUMO challenge dataset is derived from processing scenes from the SUNCG dataset.").
[68] *See id. See also* Declaration of David Forsyth in Opposition to Defendants' Motions for Summary Judgment ("DAF Decl.") Ex. 1¶¶ 161–170.
[69] Ex. 58 ¶¶ 61–150 (detailing modeling process).
[70] *Id.*

three-dimensional object from a 2D reference.[71] P5D's computer vision expert, David Forsyth, compared Van Gumster's objects with Planner 5D's objects in Blender's 3D environment and noted the differences in approach with illustrations.[72]

A prime example is P5D's model [redacted], a round table with tablecloth, which also made an appearance for a different point in the Court's prior summary judgment order.




The image at left shows the thumbnail Defendants claim was a reference image. (ECF 224-1 at 153.) The two images in the second column show P5D's model for a similar table, with the top image making the mesh choices visible.[73] The images in the third and fourth columns show views of two similar tables Van Gumster created.[74] A table like this presents any modeler with an inherent choice: how to model the curves and folds of the tablecloth. Short of 3D scanning to replicate each curve and fold—a process P5D never used[75]—modelers are required to create their own set of cloth curves and folds. The above images show three very different solutions, no two of which will be exactly identical. Properly viewed in a 3D environment, the different choices are even starker.

[71] *Id.*
[72] DAF Decl. Ex. 1 ¶¶ 247–274.
[73] *Id.* ¶¶ 254–255.
[74] *Id.*
[75] Ex 3 at 361:19–363:5, 365:20–367:25, 371:8–373:19; Ex. 4 at 190:16–192:24, 297:3–299:24.

| Potential Reference Image | P5D's Object | Van Gumster's Version |
|---|---|---|
|  |  |  |

Another example is the piranha taxidermy object above, [redacted]. At left is a possible reference image proposed in NOL Exhibit D. (ECF 283-12 at 183.) In the middle is P5D's model.[76] At right is Van Gumster's version of P5D's object.[77] One obvious challenge for a reference image like the one at left is how to represent the fish's ridged surface. One choice is to fashion ridges into the model itself, *i.e.*, shape its mesh to include them. In that case no two ridged surfaces will be exactly the same. Another choice is to select a 2D image and apply it to the fish's surface. This was the choice of both P5D's modeler and Van Gumster.[78] Even so, because they chose different texture images, the result is very different. P5D also made an additional choice of shaping its fish's mesh to better accommodate the texture.[79] These creative choices are inevitable in modeling, no matter the reference source.

| Reference Image | P5D's Object | Van Gumster's Version |
|---|---|---|
|  |  |  |
|  |  |  |

---

[76] DAF Decl. Ex. 1 ¶ 258.

[77] Ex. 58 ¶ 82.

[78] *Id.*; DAF Decl. Ex. 1 ¶ 259.

[79] DAF Decl. Ex. 1 ¶ 259.

The final example shows inherent choices even for a simple slatted bench, [redacted], for which Meta proposed an IKEA reference image. Meta's reference is at left (ECF 224-1 at 74); P5D's model, in the middle;[80] Van Gumster's copy of P5D's model, at right.[81] The first obvious choice for the modeler is how to represent the wood grain. Van Gumster applied a repeating texture.[82] P5D's modeler chose a single wood grain image.[83] Once a texture is chosen, there are further choices among different ways to stretch, wrap, or tile the flat image over the 3D surface.[84] Each of these choices is demonstrable, each is creative, yet none is dictated by the reference image. There are a host of acceptable solutions.

What's true in these examples is true for modeling generally. Even models that aim to stay true to reference images inherently require choices: mesh choices to approximate irregular shapes and contours, texture choices, and choices of tiling, stretching, and wrapping. These choices demonstrate, as the Court required, that P5D's "modelers' choices yielded an original product" and that "more than one way of representing the objects would have been acceptable." (ECF 278 at 13:23–14:2.)

*Meshwerks* decisively supports P5D's position. *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258 (10th Cir. 2008). The *Meshwerks* plaintiff collected "copious measurements" of Toyota cars then added "tightening" details to hew even more closely to the original, resulting, after 80 to 100 hours of effort per model, in "completely unadorned digital replicas." *Id.* at 1260–61, 1270. The court recognized that "[t]here's little question that digital models *can* be devised of Toyota cars with copyrightable features, whether by virtue of unique shading, lighting, angle, background scene, or other choices." *Id.* at 1270 (emphasis added). But Meshwerks' technicians made no "decisions regarding lighting, shading . . . or the like . . . that can make depictions . . . new expressions subject to copyright protection" *Id.* at 1265. The key to the court's ruling was that the modelers "deliberately d[id] not include anything original of their own." *Id.* at 1260. The court made clear that 3D models *are* copyrightable when they contain *any* creative choices at all. They need only not be 3D photocopies of their subjects. *Id.* at 1260–61, 1264–65, 1269–70.

[80] DAF Decl. Ex. 1 ¶ 252.
[81] Ex. 58 ¶ 76.
[82] Ex. 58 ¶¶ 73–75; DAF Decl. Ex. 1 ¶ 253.e.
[83] DAF Decl. Ex. 1 ¶ 253.e.
[84] Ex. 58 ¶¶ 61(4)-75; DAF Decl. Ex. 1 ¶ 266.b.

Here, as shown above and as borne out by P5D modeler testimony,[85] P5D did not create 3D photocopies. It did not spend scores of hours stamping out all differences. Rather, P5D's models required the very creative choices the *Meshwerks* modelers methodically irradicated. P5D's and Van Gumster's required choices are the very ones that bestow copyrightability.

As explained in Planner 5D's Princeton opposition, the original creative contributions in P5D's objects also distinguish the costume designs in *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1222–23 (9th Cir. 1997). (*See* P5D Opp. TPU MSJ § III.B.)

**c. Demonstrable creative choices are identified for each object in P5D's Narrowed Objects List.**

These are the kinds of creative choices that Planner 5D details in NOL Exhibits B through D. (ECF 282-2.) In this list, P5D identifies the demonstrable creative choices apparent in each object. For example, many B2B Objects were designed from very basic and sparse line drawings. (*See, e.g.,* ECF 283-6 at 15–37 (line drawings from B2B client).) Additional representative examples from P5D's NOL showing creative differences are provided in Exhibit 61 to the CAvE Declaration. The choices shown in the NOL and in the above examples distinguish P5D's works from the cases Meta cites, in each of which the plaintiffs were unable to identify any creative additions. (ECF 541 at 17:17–23.) *See George S. Chen Corp. v. Cadona Int'l, Inc.*, 266 F. App'x 523, 524 (9th Cir. 2008); *Bespaq Corp. v. Haoshen Trading Co.*, No. 04-cv-3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004).

Meta also misstates how color changes affect copyrightability. Meta suggests that these never can be creative choices (ECF 541 at 18:5–9), but this isn't the law.[86] "An original combination or arrangement of colors should be regarded as an artistic creation capable of copyright protection." *Boisson v. Banian, Ltd*., 273 F.3d 262, 271 (2d Cir. 2001) (*quoting* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.14, at 2–178.4 (2001)). Meta misstates the holding of *Hearn v. Meyer*, 664 F. Supp. 832, 836 (S.D.N.Y. July 20, 1987). In *Hearn,* technicians sought "to recreate the precise colors originally employed . . . in the first edition of the 'Wizard of Oz.'" *Id.* Like the

[85] Ex. 3 at 361:19–363:5, 365:20–367:25, 371:8–373:19; Ex. 4 at 190:16–192:24, 297:3–299:24.

[86] *See* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §§ 313.4(K), 906.3 (3d ed. 2021), https://www.copyright.gov/comp3/docs/compendium.pdf.

reproduction in *Meshworks*, this took a lot of effort. But any variation reflected not originality, but a technical failure.

Finally, Meta is wrong that copyright can't protect the absence of material. (ECF 541 at 18:11–14.) Meta's claim is not supported by its citation to the Copyright Act, 17 U.S.C. § 102, or any other authority. Indeed, creativity may easily be expressed by the omission of features appearing in an inspirational image, particularly where additional changes are made, as P5D did in creating the three objects that Meta cites as examples [redacted]). (*See* ECF 541 at 18:11–14; ECF 286-4 at 9, 156, 243.)

**C. Meta is liable for indirect copyright infringement.**

There is substantial evidence that Meta induced others to download and use SUNCG. There is also substantial evidence that Meta (a) supervised or controlled others' use of SUNCG and (b) financially benefited from it. Meta's contrary claims are incorrect.

**1. Meta induced others to download and use SUNCG and SUMO.**

Meta's Habitat and House3D projects allowed users to render the SUNCG interior spaces and simulate walking through them. Both projects instruct users to download SUNCG, inducing their thousands of users to infringe P5D's copyrights.[87] Princeton's records show that many of these downloaders identified these Meta projects as their reason for requesting SUNCG.[88] (Meta claims House 3D could use other datasets but its source code and instructions show that it only works with SUNCG.)[89]

**2. Meta vicariously infringed SUNCG and SUMO.**

Meta also exercised extensive supervision and control of SUNCG via its Habitat and House3D projects. Meta instructed users to download SUNCG for use with these projects, and then the House3D and Habitat code controlled users' precise manner of using SUNCG. (ECF 540-12 ¶¶ 142–182; *see also supra* § II.G.) Meta also financially benefited from both SUNCG and SUMO, by establishing standards

---

[87] *See* Ex. 46 (House3D instructions); Ex. 47 (Habitat instructions); Ex. 48 (EQA instructions). *See also* ECF 540-12 ¶¶ 142–182.

[88] *See, e.g.*, Ex. 13; Ex. 14 [redacted]

[89] The usage instructions tell users to download SUNCG specifically. Ex. 46 at Usage Instructions. The code was designed for SUNCG and cannot work with other datasets without significant modifications. DAF Decl. Ex. 1 ¶¶ 147–160; *see also* ECF 540-12 ¶¶ 142–152.

and developing technologies that advanced its commercial product plans and by using the label of "open" research to get others to do Meta's work for it. (*See supra* § II.A.)

**D. Meta's use is not fair.**

P5D has moved for summary judgment against both Defendants' fair use defenses. (ECF 552 at 11:4–19:4.) In its summary judgment motion in favor of its fair use defense, Meta mimics many of Princeton's arguments, to which Planner 5D adequately responds in its opposition to Princeton's motion. P5D responds only to Meta's few novel points here.

In discussing factor one, the nature of Defendants' use, Meta asserts that it "used SUNCG *solely* for noncommercial, scientific research and scholarship" and that "not a single piece of evidence show[s] that Meta's research was for a commercial product." (ECF 541 at 21:22–25.) As shown above, Meta's public-facing research supports its commercial products and control of technology standards. [redacted] To counter this showing of commercial use, Meta points exclusively to its denial in its own interrogatory response (ECF 541 at 21:22–22:4), which is hearsay. *See AT&T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099, 1109 (N.D. Cal. Aug. 14, 2008). The Court should find that Meta's use was commercial, as the only admissible evidence shows.

Meta also argues that Defendants' machine learning relied exclusively on the functional aspects of P5D's works, and not any creative contributions. (ECF 541 at 22:16–23.) This is simply not true, and certainly not supported by Meta's cited evidence. Creative choices create unexpected elements—like a flourish in a drawer knob—that are critical to train AI models, whose job is to accurately classify varied instances of objects in messy, real-life situations. Meta's own expert discusses this in the very passage of his report that Meta cites. (ECF 537-15 ¶¶ 59–62.) Planner 5D's expert explains it too. (ECF 540-12 ¶¶ 29–32.) It was thus critical to machine learning that Planner 5D's objects and scenes were designed by humans, and not sterilely functional. This is clear from the literature emphasizing as SUNCG's strength that it was "manually created" and "human-designed." (*See*, *e.g.*, ECF 546-21 at 5 (SUNCG contains "realistic room and furniture layouts that are manually created though the Planner5D platform."); ECF 546-24 at 4 ("House3D leverages the SUNCG dataset (Song et al., 2017) which

contains 45K *human-designed* real-world 3D house models, ranging from single studios to houses with gardens, in which objects are fully labeled with categories.") (emphasis in original)).

In discussing factor four, the effect on the potential market, Meta makes an ironic argument. Meta asserts that under Planner 5D's terms of service, Planner 5D's users did not grant the right to use their scenes for research. (ECF 541 at 24:4–6.) Of course, if P5D lacked its users' permission, Defendants lacked it all the more. That said, the terms as written do allow P5D to conduct the type of machine learning research P5D does and has done. Users who post content grant Planner 5D "a nonexclusive, royalty-free, perpetual, irrevocable and fully sublicensable right to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform and display such Content in connection with: providing and promoting the Services; and/or exercising the rights granted in these terms." (ECF 545-23 at 4.) P5D's own machine learning research focuses on improving its design tool, and thus falls clearly within the "in connection with" clause on which Meta relies. The license is also "fully sublicensable." (*Id.*) Thus Meta has no basis to assert that the terms gave P5D "no right to license the Scenes for research." (ECF 541 at 24:4–5.) Even if the terms were interpreted as requiring research sublicenses to have a connection to providing or promoting P5D's service, P5D would still be left with broad sublicensing rights. Further, like most terms of service, P5D's terms were not set in stone. P5D retained the right to change its terms. (ECF 545-23 at 5–6.) Indeed, P5D's sublicensing rights in its current terms of service are no longer subject to the "in connection with" language.[90] Given P5D's ability to make such changes, there has always been a *potential* market for machine learning licenses.

Finally, in assessing fair use, "the law does not limit the scope of the relevant market to products that are already made or in the pipeline." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020). "'[P]otential market' means either an immediate or a delayed market[.]" *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012) (*quoting Cable/Home Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir.1990)). Thus, even if Meta could establish that there was no "paying market

[90] Ex. 54 (Planner 5D Terms of Service).

for the noncommercial use of data in 2016–2019," it would be irrelevant to fair use. (ECF 541 at 25:5–6.) Even harm to nascent or future potential markets weighs against fair use.

**IV. CONCLUSION**

For the foregoing reasons, Meta's summary judgment motion should be denied, and Planner 5D's summary judgment motion should be granted.

Respectfully submitted,

DATED: February 6, 2025

THE BUSINESS LITIGATION GROUP, P.C.

By: /s/ *Marc N. Bernstein*
Marc N. Bernstein

Attorneys for Plaintiff
UAB "PLANNER5D"