MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
christian@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.765.6633
Facsimile: 415.283.4804

Attorneys for Plaintiff
UAB "PLANNER5D"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.<br><br>Defendants. | **Case No. 3:19-cv-03132-WHO (SK)**<br>**Case No. 3:20-cv-08261-WHO (SK)**<br><br>**PLANNER 5D'S OPPOSITION TO PRINCETON'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I. INTRODUCTION .... 1

II. FACTS .... 1

III. ARGUMENT .... 1

A. Princeton infringed P5D's Scenes Work. .... 1

1. P5D's scene selection copyright is not thin. .... 1

2. SUNCG contains substantially all of P5D's Scenes Work. .... 4

3. SUNCG is an infringing derivative work of P5D's compilation. .... 5

4. Princeton is liable for distributing SUNCG wholly apart from whether SUNCG infringes. .... 5

5. Princeton is liable for infringing the eighteen scenes authored by P5D. .... 6

6. Experian was wrongly decided. .... 6

B. P5D's Objects Work is copyrightable. .... 6

C. Princeton does not qualify for the DMCA safe harbor. .... 7

1. Princeton's liability is not "by reason of" any webhosting role. .... 7

2. Princeton knew that SUNCG was infringing, and had red flag notice. .... 8

3. Princeton had control over the infringement and benefited from it. .... 9

4. SUNCG was required or recommended instructional material. .... 9

5. The adequacy of Princeton's informational materials is disputed. .... 10

D. Princeton's use was not fair. .... 10

1. Princeton's repackaging of P5D's works was not transformative. .... 10

2. Planner 5D's works do not consist of facts or ideas, dissemination of which is favored. .... 13

3. Princeton's verbatim and wholesale copying weighs against fair use. .... 14

4. Defendants' infringement harms potential markets for P5D's works. .... 14

IV. CONCLUSION .... 15

# TABLE OF AUTHORITIES

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004, 1018 (9th Cir. 2001) .......... 15

*ABS Entm't., Inc. v. CBS Corp.*,
908 F.3d 405 (9th Cir. 2018) .......... 7

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 10, 11, 12

*Apple Comput., Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994) .......... 2

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 10, 15

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) .......... 8, 9

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .......... 14

*Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) .......... 7

*Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*,
893 F.3d 1176 (9th Cir. 2018) .......... 2, 4, 6

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .......... 1, 2

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 2, 13

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .......... 11

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 13

*Infogroup, Inc. v. DatabaseLLC*,
956 F.3d 1063 (8th Cir. 2020) .......... 4

*Infogroup, Inc. v. DatabaseUSA.com LLC*,
No. 14-cv-49, 2018 WL 6624217 (D. Neb. Dec. 18, 2018) .......... 4

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) .......... 14

*Open Source Yoga Unity v. Choudhury*,
No. 03-cv-3182, 2005 WL 756558 (N.D. Cal. Apr. 1, 2005) .......... 2

*Oracle Int'l Corp. v. Rimini St., Inc.*,
123 F.4th 986 (9th Cir. 2024) ........ 5

*Oracle USA, Inc. v. SAP AG*,
No. 07-cv-1658, 2010 WL 334446 (N.D. Cal. Jan. 28, 2010)........ 6

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004). ........ 6

*Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp.*,
463 F.3d 478 (6th Cir. 2006) ........ 3

*Ventura Content, Ltd. v. Motherless, Inc.*,
885 F.3d 597 (9th Cir. 2018). ........ 8, 9

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006). ........ 14

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989)........ 11

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000). ........ 11, 14

**Statutes**

17 U.S.C.
§ 101........ 5
§ 106(2)........ 5
§ 512(c)(1) ........ 7
§ 512(e)........ 10
§ 512(e)(1)(A)........ 9
§ 512(e)(1)(C) ........ 10

**Legislative Materials**

H.R. Rep. No. 105-796 (1998) (Conf. Rep.)........ 9

**Other Authorities**

2 William F. Patry, *Patry on Copyright* (2024)
§ 3:67 ........ 1
§ 3:68 ........ 6

1 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 3.04[B][2][b][iii] (2024)........ 5, 6

## I. INTRODUCTION

Princeton concedes it copied the entirety of Planner 5D's scenes, but contends that because it trimmed a small number of them before creating SUNCG, SUNCG is not infringing. As P5D shows, SUNCG infringes under any measure.

Princeton also admits it stole thousands of P5D's objects, but says the objects lacked sufficient creativity for copyright protection. Each object, however, meets the Court's benchmark of demonstrable creative choices. The expert report of Meta's own modeling expert illustrates this vividly.

Princeton falls back on two ill-fitting affirmative defenses—that its misconduct fell within the DMCA's safe harbor, and that the misconduct was fair use. The DMCA defense fails because that act protects only infringement due to a defendant's hosting duties. Princeton's infringement, by contrast, was mainly accomplished through extra-hosting conduct, such as Princeton's original scraping of P5D's works, and its subsequent campaign to publicize and distribute them. Princeton's fair use defense fails because, among other reasons, Princeton did not transform P5D's works but used them for the same thing P5D did—as AI training data. It also fails because it is obvious that flooding the world with free copies of P5D's training data harms both actual and potential markets for the data.

Princeton's summary judgment motion should be denied.

## II. FACTS

The facts relevant to this opposition are set forth in Planner 5D's own summary judgment motion. (ECF 552 at 2:1–4:6.)

## III. ARGUMENT

### A. Princeton infringed P5D's Scenes Work.

#### 1. P5D's scene selection copyright is not thin.

Princeton incorrectly asserts that all compilations deserve "thin" copyright protection. (*See* TPU Ph. 2 MSJ (ECF 532) at 14:24–16:5.) But "a highly original selection, coordination, or arrangement is as deserving of 'fat' copyright as any other work." 2 William F. Patry, *Patry on Copyright* § 3:67 (2024). "There is thus no per se rule that protection in compilations is invariably thin." *Id.*

*Feist* does not hold otherwise. It observes that "the *facts themselves*" are unprotectable, and "do not become original through association." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348–

49 (1991) (emphasis added). "This inevitably means that the copyright in a *factual* compilation is thin," and the "expressive element" in a selection of unprotectable facts is narrow. *Id.* (emphasis added). Protection is "thin" in that "'[n]o matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking.'" *Id.* (citation omitted).

Princeton is thus wrong that all compilations must be nearly identically copied to be infringed. (ECF 532 at 14:28–15:4.) *Feist*'s reasoning applies only to compilations of "public domain materials," like facts. *See* 499 U.S. at 354. *Experian's* holding is also limited to compilations of facts, which are public domain. *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1185 (9th Cir. 2018) (database of 250 million consumer name-address pairings). *See also Google LLC v. Oracle Am., Inc*., 593 U.S. 1, 21 (2021) (virtually identical copying required for "*factual* compilations") (emphasis added).

Princeton's other cases involve ideas, which, like facts, are in the public domain. *Apple* concerned a graphical user interface (GUI), which was analogized to a compilation. *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442, 1445–47 (9th Cir. 1994). Apple's GUI was made up not of unprotectable facts, but of unprotectable ideas, which are equally in the public domain. *Id.* at 1443–44, 1447. The Apple compilation also included elements Microsoft had licensed from Apple, and was thus also free to use. *Id* at 1440–41. The Ninth Circuit concluded that the GUI's remaining elements "are afforded only 'thin' protection because the range of possible expression is narrow." *Id*. at 1446–47. Similarly, the district court in *Choudhury* found that a sequence of public domain yoga poses was entitled to only thin protection, because "the range of protectable expression is narrow." *Open Source Yoga Unity v. Choudhury*, No. 03-cv-3182, 2005 WL 756558, at *4 (N.D. Cal. Apr. 1, 2005).

Here, P5D's compilation is made up of non-public scenes that, in turn, are composed of P5D's copyrighted objects. This contrasts sharply with cases involving compilations made up of public domain elements. Two parties working entirely independently, each drawing from facts or ideas in the public domain, are likely to come up with compilations that overlap greatly just by selecting using similar criteria. In such cases, courts are understandably reluctant to attribute similarities to copying rather than coincidence unless the copies are nearly identical. Princeton's copying presents no such concerns.

This explains the result in *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Group.*, 463 F.3d 478 (6th Cir. 2006), cited by Princeton. After several years of licensing LawMode's database of Michigan legal forms, Lexis created its own database. None of LawMode's original forms found their way into Lexis's database. But Lexis did include many of the same official Michigan state forms—61% of the forms in LawMode's database. Lexis also added at least thirty-five forms that LawMode's compilation omitted—a fact Princeton misses. (*See* ECF 532 at 15:21–22.) Considering both the quantitative overlap and "nonquantitative aspects of the two compilations," the Sixth Circuit held that "Lexis used sufficient judgment and creativity to compel a reasonable fact finder to conclude that one compilation is not a copy of the other." 463 F.3d at 482.

Here, Princeton did not use independent judgment and creativity to select from a wider set of public domain items that P5D also selected from. Princeton started with P5D's own selection of its users' scenes, which were not in the public domain, and trimmed around the edges, mostly to correct for its misunderstandings of P5D's encoding. (*See* ECF 552 at 12:3–14:2.) This is nothing like Lexis's judgment and creativity in creating its own new compilation from the public domain. And unlike Lexis, Princeton can't argue that its compilation and P5D's are similar by coincidence, despite independent creation. Princeton copied P5D's compilation. It admits this. Princeton's copying is unquestionably what accounts for the overlap.

P5D's Scenes Work is a curated selection of home interiors that are creatively designed using P5D's copyrighted objects. (ECF 278 at 1:16-19.) P5D created eighteen scenes itself. (*Id.* at 3:16-19.) These are not facts or ideas from the public domain. Users flagged 63,000 scenes for potential inclusion.[1] P5D's founders reviewed each and every one of them, filtering out some 14,000 based on artistic value, humor, variety, novelty, diversity, creativity, completeness, fun, realism, and other subjective criteria. (ECF 552-4 at 36:6–37:4; 153:13–154:16, 170:4–173:14.) In so doing, they created a diverse, artistic, realistic grouping of scenes involving far more creative judgment than a list of name-address pairings. Further, while public policy favors the free exchange of facts and ideas, privately created scenes featuring P5D objects are not in the public domain. Compared to the public-domain fact

[1] Declaration of Christian Andreu-von Euw in Support of P5D's Oppositions to Defendants' Motions for Summary Judgment ("CAvE Decl") Ex. 3 at 544:17–545:19.

and idea compilations of Princeton's cases, P5D's Scenes Work deserves far broader copyright protection.

Under Princeton's contrary theory, anyone could openly steal any compilation and get away with commercializing it, royalty free, simply by first trimming some set percentage. An anthologist who published *The 1000 Best Road Trips* could find her work on a bookstore shelf next to *The 920 Best Road Trips*, featuring 920 road trips from the original volume. She'd be furious, and rightly so. Yet this is just what Princeton admits it did here: it stole 100% of P5D's scenes and repackaged 92% of them into its own work.

Ignoring duplicate scenes, that percentage climbs to 97%, as we describe next.

**2. SUNCG contains substantially all of P5D's Scenes Work.**

Although virtual identical copying is not required to infringe a creative compilation like P5D's Scenes Work, in fact Princeton copied, virtually identically, P5D's Scenes Work. Princeton scraped all 49,811 of P5D's then-available scenes. (ECF 552-8 at 3:16–5:22.) It repackaged 45,622 of them into SUNCG. (ECF 540-12 ¶¶ 200–03, 231; ECF 533-29 § 4.1, at 5.) This constitutes 92% of P5D's scenes, substantially more than the 80% that the *Experian* court found insufficient. *Experian*, 893 F.3d at 1187.

Further, although Princeton tries to paint as consequential its removal of 4,189 scenes, 2,917 of the removals were duplicates.[2] Disregarding these, SUNCG comprises 97.3% of P5D's Scene Work.[3] And Princeton scraped 100% of the scenes in SUNCG from P5D. Princeton admits this, and expert analysis confirms it. (ECF 540-12 ¶¶232–241; ECF 553-2 (correcting ¶ 241 of ECF 540-12).) By any reasonable standard, this is "bodily appropriation" or "virtually identical" copying. *See Infogroup, Inc. v. DatabaseUSA.com LLC*, No. 14-cv-49, 2018 WL 6624217, at *12 (D. Neb. Dec. 18, 2018), *aff'd sub nom. Infogroup, Inc. v. DatabaseLLC*, 956 F.3d 1063 (8th Cir. 2020) (finding verbatim copying based on factors including statistical samples suggesting 95% copying; contrasting *Experian's* 80%).

---

[2] CAvE Decl. Ex. 1 ¶¶ 125–126, 128–129.

[3] 45,622 (scenes in SUNCG) ÷ 46,894 (49,811 downloaded scenes – 2,917 duplicate scenes) = 97.3%.

### 3. SUNCG is an infringing derivative work of P5D's compilation.

While Princeton concedes that it copied P5D's Scenes Work *in toto*, it contends that its distribution was not infringing because it trimmed and repackaged the compilation before distributing it. (ECF 532 at 14:22–16:5.) But this only shows that SUNCG is an infringing derivative work.

The Copyright Act defines a "derivative work" as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. The right to prepare derivatives of copyrighted works belongs to the copyright holder alone. 17 U.S.C. § 106(2). *Accord Oracle Int'l Corp. v. Rimini St., Inc.*, 123 F.4th 986, 994 (9th Cir. 2024) ("A copyright owner has the exclusive right to prohibit or authorize the preparation of derivative works."). Princeton's account of SUNCG's creation perfectly describes an "abridgement" or "condensation" of P5D's work, which is an infringing derivative work. *See* 1 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 3.04[B][2][b][iii] n.76.19 (2024) (observing that an abridgement of a compilation constitutes "an unauthorized derivative work").

Princeton does not contend that it compiled SUNCG from some larger universe of user scenes, making its own independent selection without reference to P5D's curation of its Scenes Work. Princeton acknowledges it scraped P5D's already-curated collection and simply trimmed it further. (ECF 532 at 15:10–17 & n.11.) This is the very definition of an "abridgement" or "condensation." Princeton has created an infringing derivative work.

### 4. Princeton is liable for distributing SUNCG wholly apart from whether SUNCG infringes.

Princeton concedes its initial wholesale copying, which infringed P5D's Scenes Work. (*E.g.*, ECF 532 at 15:6-8 & n.11 (contesting copyrightability but not wholesale copying of P5D's Scenes Work); ECF 552-8 at 3:16–5:22 (describing wholesale copying).) This concession moots Princeton's theory that creating and distributing SUNCG was not infringing. (ECF 532 at 14:22–16:5.) As we've just seen, SUNCG *is* infringing. But even if it were not, Princeton would still be liable for its creation and distribution. Princeton could not have created or distributed SUNCG without first scraping P5D's

Scenes Work in its entirety. Princeton's widespread distribution of SUNCG was the direct and proximate result of that initial infringing act. Princeton is thus liable for the resulting damages regardless of whether SUNCG is separately infringing. *See Oracle USA, Inc. v. SAP AG*, No. 07-cv-1658, 2010 WL 334446, at *1 (N.D. Cal. Jan. 28, 2010) (copyright damages incorporate all of the general tort principles of causation and damages) (citing *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (copyright damages depend on the "causal link" between infringement and damages).)

**5. Princeton is liable for infringing the eighteen scenes authored by P5D.**

Unlike Meta (ECF 541 at 19:9–16), Princeton does not seek summary judgment on P5D's claim for infringement of the eighteen individual scenes authored by P5D. (*See* ECF 532.) Because Princeton scraped these scenes and included them in SUNCG, Princeton is liable for their infringement. (ECF 540-16 at 3:27–4:3; ECF 540-12 ¶¶ 231–232.)[4]

**6. Experian was wrongly decided.**

Although *Experian* is distinguishable because P5D's Scenes Work is not a factual compilation and SUNCG is, in any event, a near-identical copy, *Experian* is widely criticized and was wrongly decided. *See* 1 *Nimmer on Copyright* § 3.04[B][2][b][iii] (finding "no warrant" for *Experian*'s treatment of directory copyrights as "anorexic," or its requirement of "verbatim copying of plaintiff's entire work"); 2 *Patry on Copyright* § 3:68 (*Experian* "illustrates the perils and errors of much of the infringement analyses of compilations since *Feist*").

**B. P5D's Objects Work is copyrightable.**

As shown in P5D's opposition to Meta's summary judgment motion, and as confirmed by the report of Meta's digital modeling expert, Jason Van Gumster, P5D's modelers had to make many subjective, original choices that could not be dictated by any reference image. P5D's objects are therefore copyrightable. (P5D's Opposition to Meta's Motion for Summary Judgment ("P5D Opp. Meta MSJ") § III.B.4.b.) Accordingly, P5D has met its burden and set forth specific material facts showing that there is a genuine issue for trial.

[4] CAvE Decl ¶ 62; Exs. 59, 60.

Princeton cites *Genesis*, which is distinguishable. *Entm't Research Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1214, 1214 n.2 (9th Cir. 1997). The plaintiff in *Genesis* manufactured three-dimensional costumes based on two-dimensional images of copyrighted corporate mascots. After a former customer found a new manufacturer for its costumes, the plaintiff sued both. The court found that "the differences in form, texture and proportionality" between the costumes and original mascots were "solely—or at least primarily—driven by the functional considerations necessitated by the fact that a human body must fit inside the costumes." *Id.* at 1223. Those elements were thus not copyrightable. Here, in contrast, the contributions of P5D's modelers were not dictated by any reference materials. Rather, as illustrated by the Van Gumster report and Dr. Forsyth's analysis of it, P5D's modelers were required to make many subjective choices among widely varying "way[s] of representing the objects [that] would have been acceptable."[5] (ECF 278 at 13:23–14:2; *see* P5D Opp. Meta MSJ § III.B.4.b.)

Princeton's citation to *ABS* is likewise unavailing. *ABS Entm't., Inc. v. CBS Corp.*, 908 F.3d 405 (9th Cir. 2018). In *ABS*, the plaintiff's engineers remastered a pre-1972 sound recording "in order to allow for digital distribution and compilation albums and to take advantage of the improvements enabled by digital technology." *Id.* at 421. The court held that the remaster failed to add protectable contributions to the recording, and was not protectable. *Id.* Here, P5D did not merely repackage an existing virtual model into a new format or otherwise process an existing model using new technology. P5D's modelers created new three-dimensional objects that required a multitude of subjective creative contributions.

### C. Princeton does not qualify for the DMCA safe harbor.

Princeton cannot make a prima facie case that it qualifies for the DMCA safe harbor, as P5D shows in its own summary judgment motion. (ECF 552 at 4:17–11:3.) Princeton certainly cannot establish that undisputed facts entitle it to summary judgment in its favor.

#### 1. Princeton's liability is not "by reason of" any webhosting role.

Subsection 512(c) only shields webhosts from copyright liability "by reason of the storage [of material] at the direction of a user." 17 U.S.C. § 512(c)(1). This is the safe harbor's scope and its core limitation. Yet Princeton offers no proof that P5D's claims fall within it. They do not. As P5D's motion

[5] CAvE Decl. Ex. 58 at ¶¶ 61–150; DAF Decl. Ex. 1 at ¶¶ 239–276.

shows, Princeton's liability is not "by reason of" its webhosting activity. (ECF 552 at 6:8–8:10.) Rather, Princeton is liable for scraping P5D's data, repackaging it as SUNCG, and other infringing activity unconnected to any post on Princeton's website. (*Id*. at 6:8–7:12.) Even when SUNCG's distribution was facilitated by the website, Princeton is liable because its agents directed people to the website in articles and other fora outside Princeton's network, and thus outside the DMCA's aegis. (*Id*. at 7:13–8:10.)

Princeton's failure to make a prima facie case that its infringing conduct falls within the safe harbor's scope is fatal to Princeton's motion. It also entitles Planner 5D to summary judgment in its favor. This would be true even if Princeton met all other requirements under the DMCA—which it does not, as shown both in P5D's motion and below.

**2. Princeton knew that SUNCG was infringing, and had red flag notice.**

Princeton had actual and "red flag" knowledge that SUNCG was infringing by virtue of its active encouragement and other non-hosting infringing activity. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043–44 (9th Cir. 2013) (holding that defendant's inducement of infringement put it on red flag notice). P5D has already shown this in its own motion. (ECF 552 at 8:11–20.) Princeton argues that it is not enough to have "knowledge of conduct or material that is later adjudicated to be infringing," relying on *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597 (9th Cir. 2018). (ECF 532 at 18:2–4.) This case is like *Columbia Pictures*, not *Ventura*. In *Ventura*, users uploaded clips of Ventura's movies to the defendant's site, but those clips bore no evidence that Ventura owned the copyright or that the clips were otherwise infringing. The court in *Ventura* held that red flag knowledge is not established merely because it is apparent that the host's site *could* be used for infringement; the specific infringement claimed by the plaintiff must be apparent. *Ventura*, 885 F.3d at 608–11. Even if it appeared that some clips on the site might be infringing, it was not apparent that *the Ventura clips* were. *Id.* The court thus found no red flag knowledge. *Id.* The *Ventura* court distinguished *Columbia Pictures*, where films listed on the defendant's site were recognizable big studio productions, and the defendant actively encouraged users to upload and download particular copyrighted works. *Id.* at 611–12.

Here, Princeton's agents accessed P5D's servers and surreptitiously scraped its objects and its complete public gallery of scenes. Princeton had to know that the works it was scraping belonged to

Planner 5D. It certainly knew that it never asked for permission or even contacted P5D. (ECF 252-1 at 164:16–165:1.) Princeton's agents then actively encouraged others to download its infringing SUNCG dataset. These are the very bases on which the *Ventura* court distinguished *Columbia Pictures*. *Id.* Thus, as in *Columbia Pictures*, Princeton's conduct put it on actual or red flag notice of the infringement.

**3. Princeton had control over the infringement and benefited from it.**

Princeton *did* receive financial benefits attributable to the infringing activity and, of course, *does* have the right and ability to control its employees. P5D shows this in its own motion. (ECF 552 at 3:3–14, 9:1–15.) Despite its denial (ECF 532 at 18:5–10), Princeton cannot establish otherwise.

**4. SUNCG was required or recommended instructional material.**

As P5D's motion shows, Princeton Professor Thomas Funkhouser used SUNCG for coursework in at least three cases, which disqualifies Princeton from the enhanced protection enjoyed by universities under subsection 512(e)(1)(A). (ECF 552 at 9:16–11:3.) Princeton seeks to narrow this disqualifying clause by mischaracterizing a passage in a House conference report. (ECF 532 at 19:4–17.) In the referenced passage, the report discusses the statute's "required or recommended" language, considering two hypotheticals. At one extreme, a university is clearly disqualified if the material is in the syllabus for a multi-student class: "The phrase 'required or recommended' is intended to refer to instructional materials that have been formally and specifically identified in a list of course materials that is provided to all students enrolled in the course for credit." H.R. Rep. No. 105-796, at 75 (1998) (Conf. Rep.). At the other extreme is an instructor's mere mention of material in passing: the phrase "is not intended . . . to refer to the other materials which, from time to time, the faculty member or graduate student may incidentally and informally bring to the attention of students for their consideration during the course of instruction." *Id.* Between those two extremes the report offers no guidance.

Here, as P5D's motion shows, Professor Funkhouser taught two courses in which student projects centered on SUNCG at Funkhouser's recommendation. (ECF 552 at 10:1–16.) In a third instance, Funkhouser supervised Shuran Song's doctoral work, giving guidance as she identified and scraped P5D's works, repackaged them as SUNCG, and wrote a Ph.D. dissertation about SUNCG and

her work with it.[6] There is no principled reason to treat a course like these differently than a multi-student class where the syllabus lists the infringing work.

Funkhouser's knowledge of the infringement should be imputed to Princeton notwithstanding subsection 512(e). Princeton cannot meet its burden to establish otherwise.

**5. The adequacy of Princeton's informational materials is disputed.**

Princeton also fails to meet its burden to show that it "provides to all users of its system or network informational materials that accurately describe, and promote compliance with, the laws of the United States relating to copyright." 17 U.S.C. § 512(e)(1)(C). Princeton points to evidence that an acceptable use policy existed and was "available on the website on the Princeton campus." (ECF 529-4 ¶ 18; *see* ECF 532 at 19:20–21.) But Princeton offers no evidence that this information was "provide[d] . . . to all users" of its network" in any meaningful sense. (*Id.*) In fact, at their depositions, Dr. Song testified that she had never been provided with these materials before she scraped, nor could Dr. Funkhouser recall receiving them.[7] Princeton has thus failed to meet its burden to establish that this element is materially undisputed.

**D. Princeton's use was not fair.**

P5D has moved for summary judgment against Princeton's fair use defense. (ECF 552 at 11:4–19:4.) Princeton's own motion simply confirms that Princeton lacks prima facie evidence to support fair use. Princeton's motion should be denied, and P5D's should be granted. P5D responds here only to arguments that its own motion may not already fully address.

**1. Princeton's repackaging of P5D's works was not transformative.**

The central issue in the first fair use factor is whether the new work's use of the original is "transformative." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–29 (2023). Princeton's creation of the SUNCG dataset is in no way transformative, as P5D's motion shows. (ECF 552 at 11:15–16:22.) Unable to refute this, Princeton distracts with several side shows.

First, while relevant, the commercialism of a defendant's use is not decisive of the first factor. *Warhol*, 598 U.S. at 531; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (reversing court

---

[6] CAvE Decl. Ex. 62 at Abstract, Acknowledgements, Table of Contents § 5.2.

[7] CAvE Decl. Ex. 6 at 294:12–295:7, 496:12–25; Ex. 7 at 319:22–322:17.

of appeals for "giving virtually dispositive weight to [new work's] commercial nature"). In particular, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement," particularly where, as here, the use is not transformative. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 184–86 (2d Cir. 2024) (use noncommercial but still not fair). Princeton tries to shift this peripheral question to the center, asserting that commercialism is "critical" to the first factor. (ECF 532 at 21:6–8.) For this novel claim, Princeton cites *Warhol*, 598 U.S. at 531–33. But *Warhol* confirms that "transformativeness" plays the "central" role. *Warhol*, 598 U.S. at 527–29. Commercialism has just a supporting part: "The commercial nature of the use is not dispositive," but rather "is to be weighed against the degree to which the use has a further purpose or different character." *Id.* at 531.

Second, Princeton reduces the proper inquiry—whether *its use of P5D's works* was commercial or nonprofit—to an irrelevant question—whether *Princeton as an institution* is. This conflation is improper. *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (finding commercial use where nonprofit church benefited from it without accounting to rights holder); *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (holding professor's copying of scholarly work for professional advancement wasn't nonprofit). Such neat lines between academic and commercial work make little sense, especially in today's world, where universities partner with big tech companies, like Meta, to advance the companies' commercial research goals in return for grant money and job placement. (*See* P5D Opp. Meta MSJ §§ II.A., II.C., II.E.) For purposes of fair use, Princeton's use *was* commercial, as P5D's motion shows. (ECF No. 552 at 16:8–17.)

Third, Princeton claims that *no one else* used SUNCG commercially just because Princeton's terms of use said not to. (ECF 532 at 24:10–17.) This isn't true. To start, not everyone with access to SUNCG even signed Princeton's terms.[8] What's more, in spite of its terms, Princeton gave SUNCG to many commercial enterprises, including [redacted] and of course Meta. (ECF 551-7 at Am. Ex. A.) When Google asked if "results of [its

[8] *Compare* ECF 551-7 at Am. Ex. A (list of individuals who signed the SUNCG terms of use) *with* ECF 537-12 at 5:7–9:9 (identifying 17 Meta researchers who access SUNCG and do not appear in Am. Ex. A); ECF 540-12 ¶¶ 149-152, 170–182 (identifying hundreds more SUNCG downloaders and providing relevant background); CAvE Decl. ¶ 73.

SUNCG] work, for example, papers, algorithms, etc. could eventually be used in a product or service," Princeton avoided the question. (ECF 533-33; *see* ECF 532 at 8:4–6.)

Also, companies *did* use SUNCG for commercial work. [redacted][9] Adobe also obtained many patents using SUNCG and has several more pending.[10] Intel also filed patent applications developed using SUNCG.[11] Over 30 domestic and foreign patents and patent applications describe development work using SUNCG.[12] A patent is quintessentially commercial, even if the patentholder never develops a product with it. Patents can be used to block competitors or collect royalties. That said, these patents likely were for technologies intended to be used in products. For example, the holder of a patent application that used SUNCG data for "autonomous driving agents" and "robot-friendly-buildings" sells autonomous robots and headquarters in a robot-friendly-building.[13] Ample evidence thus shows that SUNCG was used commercially, including by companies on Princeton's access list.

Fourth, Princeton suggests its liability depends only on using P5D's data and related research to train AI models. (*See* ECF 532 at 21:20–22:6.) Although such use would not qualify as fair,[14] Princeton did not just train and distribute AI models. Princeton distributed P5D's data *itself* to thousands of others. The wholesale distribution in this case makes it fundamentally different from the case Princeton imagines—and from other prominent AI cases in which an AI model is trained on copyrighted works. Here, Princeton did not distribute an AI model trained on P5D's works; it distributed P5D's works *themselves*. This use was unfair.

Again, the central question under factor one is transformativeness. *See Warhol*, 598 U.S. at 527–29. As P5D's motion shows, P5D's works were already suitable for machine learning. (ECF 552 at

---

[9] *See, e.g.*, CAvE Decl. Ex. 31; Ex. 32 at 144.

[10] Declaration of Will B. Fitton Regarding Patent Publications Exs. 1, 2, 3, 7, 8, 10, 15, 16, 22, 30.

[11] *Id.* Exs. 13, 24, 29.

[12] *See id.* ¶¶ 2–5; Exs. 1–32.

[13] *Id.* Ex. 12; CAvE Decl. Ex. 5 at 231:12–232:13; Ex. 55 at 4 ("As the world's first robot-friendly building, 1784 is a tech convergence platform where all of NAVER's future technologies, such as robotics, autonomous driving, AI and cloud, from various divisions. . . will interact."); Ex. 56 at 4–7 (showing "an autonomous driving robot that provides various services to people in NAVER's second headquarters" and other autonomous robots).

[14] *See* CAvE Decl. Ex. 52; Ex. 53.

12:3–13:9.) Princeton was able to use most scenes as they were. It made minor changes to a small subset of scenes so that they would work more like the majority already worked. Princeton thus did nothing to P5D's works to make them suitable for a new and different purpose. It did nothing transformative.

Princeton's use of P5D's works in particular, rather than some others, was not justified. (*See* ECF 552 at 14:18–15:25 (explaining that use can sometimes be fair, as in parody, if only the particular original work could serve the copyist's purpose).) Princeton now admits that it could have, and did, use other datasets: "the research that was published by the Princeton researchers *is not about SUNCG*, and certainly not about Planner 5D." (ECF 532 at 21:22–24 (emphasis in original).) Princeton thus concedes that, for purposes of factor one, its use of P5D's works in particular was not justified.

Princeton's wholesale repackaging of P5D's works into the SUNCG dataset was not transformative, and Princeton cannot meet its burden to show otherwise.

**2. Planner 5D's works do not consist of facts or ideas, dissemination of which is favored.**

The second fair use factor recognizes an important policy: "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985) (holding that verbatim quotes from presidential memoir were not fair use). This policy does not help Princeton, which stole P5D's works for their expressive content, not any factual or newsworthy information. (ECF 552 at 17:1–8 & n.51.)

Princeton appeals in vain to the Supreme Court's decision in *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021). (*See* ECF 532 at 22:14–23:2.) In creating its new Android software platform, Google copied a portion of Oracle's Java platform called the "declaring code," which labels and organizes different programing tasks. *Id.* at 9–10. Google did not copy Oracle's "implementing code," which does the work of carrying out those tasks. *Id.* at 9, 13. Using the same labels and organization as Oracle's Java meant that programmers already fluent in its programming conventions could use Google's Android platform without needing "to learn an entirely new system to call up the same tasks." *Id.* at 13–14. Thus, Google did not really take advantage of Oracle's original contributions to the Java language; Google leveraged computer programmers' widespread fluency in that language. Forcing programmers to learn arbitrarily different words for the same things wouldn't advance copyright's goals.

Here, in stealing P5D's works, Princeton was not capitalizing on a shared vocabulary, as in *Google*, or on other facts or ideas that belong in the public domain. It was capitalizing on expressive content. The nature of Planner 5D's works therefore cannot excuse Princeton's theft.

**3. Princeton's verbatim and wholesale copying weighs against fair use.**

Factor three recognizes that "copying an entire work militates against a finding of fair use." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006) (*quoting Worldwide Church*, 227 F.3d at 1118). Here, Princeton repackaged 2,548 of P5D's objects and 40,925 of P5D's scenes verbatim. (ECF 540-12 ¶¶ 212–244, 266.) Princeton included another 4,697 of P5D's scenes with minor technical changes. (*Id.* ¶¶ 232-233.) This represented 92% percent of the scenes in P5D's collection at the time—97.3% if duplicates are disregarded.

Princeton tries to excuse its verbatim and wholesale copying by claiming that it "used the files for a completely different purpose, AI training." (ECF 532 at 23:13–14.) But as P5D has shown, it too used its works for AI training. (ECF No. 552 at 2:2–6, 2 n.1, 14:12–18, 14 n.46.) Princeton also did much more than AI training with P5D's works. Princeton distributed them to thousands of others. To facilitate that distribution, Princeton repackaged P5D's data into a more common format, which is not fair use. (ECF 540-12 ¶ 235.) *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017). But as shown, P5D's data was already suitable for AI training. And Princeton was not justified in using P5D's works in particular, such as to comment on them. Princeton's repackaging thus was not at all transformational. Given this, Princeton does not fall within the narrow class of cases in which verbatim copying is necessary for a truly transformational use, such as thumbnails of copyrighted images for visual search engine results. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003).

**4. Defendants' infringement harms potential markets for P5D's works.**

Princeton harmed potential markets for P5D's works by its free, wholesale distribution. P5D's motion shows this. (ECF 552 at 18:4–19:4.) Princeton argues that it licensed P5D's works only for noncommercial use, and that this somehow negates any effect on the potential market. (ECF 532 at 24:10–17.) But even noncommercial exploitation can harm potential markets. Not only is there a *potential* market for noncommercial licensing, there's an *existing* market. Meta itself has entered paid

licenses for objects and scenes for machine learning with nominal noncommercial restrictions.[15] Further, as shown, Princeton's noncommercial restrictions meant nothing in practice. (*See* ECF 552 at 16:1–22.)

Even if infringement publicizes an original work and *increases* markets for it, that does not weigh in favor of fair use. This is well established. *E.g.*, *Campbell*, 510 U.S. at 590 n.21 (observing that if a "film producer's appropriation of a composer's previously unknown song . . . turns the song into a commercial success[,] the boon to the song does not make the film's simple copying fair."); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1018 (9th Cir. 2001) ("[I]ncreased sales of copyrighted material attributable to unauthorized use should not deprive the copyright holder of the right to license the material."). Thus, even if Princeton could establish that the publicity from its infringement enhanced markets for Planner 5D's works, it would not favor fair use. (ECF 532 at 24:18–24.)

## IV. CONCLUSION

For the foregoing reasons, Princeton's summary judgment motion should be denied, and Planner 5D's summary judgment motion should be granted.

Respectfully submitted,

DATED: February 6, 2025

THE BUSINESS LITIGATION GROUP, P.C.

By: /s/*Marc N. Bernstein*
Marc N. Bernstein

Attorneys for Plaintiff
UAB "PLANNER5D"

[15] *E.g.*, CAvE Decl. ¶ 12; Ex.10 [redacted]).