Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (*pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (*pro hac vice*)
abbey.quigley@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
Miriam Kontoh (*pro hac vice*)
miriam.kontoh@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400

*Attorneys for Defendants Meta Platforms, Inc. and Meta Platforms Technologies, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

UAB "PLANNER5D" dba PLANNER 5D,

Plaintiff,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20,

Defendants.

Case No. 3:19-cv-03132-WHO (SK)

**META'S OPPOSITION TO PLANNER 5D'S PHASE 2 MOTION FOR SUMMARY JUDGMENT**

Hearing Date: March 28, 2025
Time: 10:00 AM
Courtroom: 2, 17th Floor

Honorable William H. Orrick

## TABLE OF CONTENTS

**I. INTRODUCTION ........ 1**

**II. FACTUAL BACKGROUND ........ 3**

**A. Meta Conducts Curiosity-Driven Academic Research through FAIR ........ 3**

**B. P5D Operates an Online Home Design Tool ........ 3**

**C. Princeton Transforms P5D Data Into SUNCG ........ 5**

**D. Meta's Noncommercial Academic Research Use of SUNCG ........ 7**

**E. P5D's Business Continues Uninterrupted ........ 9**

**III. SUMMARY JUDGMENT STANDARD ........ 11**

**IV. SUMMARY JUDGMENT FOR META ON ITS FAIR USE DEFENSE IS WARRANTED ........ 11**

**A. Meta's Noncommercial Research Use of SUNCG and SUMO was Transformative. ........ 12**

1. All of Meta's Research Done Using SUNCG and SUMO Was Noncommercial . 12

2. Meta's Use of SUNCG and SUMO Was Transformative. ........ 14

3. Meta's Use of SUNCG Was Justified ........ 18

**B. P5D's Asserted Works Are Not Creative, and It Has No Evidence Otherwise ........ 19**

**C. Meta's Use (If Any) of P5D's Works Was Limited to the Amount Necessary to Achieve its Transformative Purpose. ........ 20**

**D. P5D Was Not Harmed by Meta's Use of SUNCG. ........ 22**

**V. P5D'S MOTION ON COPYRIGHTABILITY SHOULD BE DENIED ........ 24**

**A. P5D's Motion on the Copyrightability of its Compilation is Procedurally Improper. ........ 24**

**B. P5D Cannot Meet Its Burden to Establish Copyrightability of the Scene Compilation. ........ 24**

**VI. CONCLUSION ........ 25**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, No. CV 24-1895, 2024 WL 4374117 (E.D. Pa. Oct. 2, 2024)....13, 16

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021)....23

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023).... *passim*

*Author's Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)....13, 14, 18, 23

*Author's Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)....23

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)....22

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)....12, 14, 16, 20

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013)....18

*Celotex v. Catrett*, 477 U.S. 317 (1986)....2, 11, 21

*Crawford-El v. Britton*, 523 U.S. 574 (1998)....25

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc,.* No. 23 Civ. 3402, 2025 WL 86370 (8th Cir. Jan. 14, 2025)....14, 16, 24

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017)....17

*Dr. Suess Enters. V. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020)....23

*Far Out Prods., Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001)....25

*Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006)....13, 22

*Fisher v. Dees*,
794 F.2d 432 (9th Cir. 1986) .....22

*Fox News Network, LLC v. TVEyes, Inc.*
883 F.3d 169 (Feb. 27, 2018).....21

*Google LLC v. Oracle America, Inc.*,
593 U.S. 1 (2021)..... *passim*

*Graves v. Arpaio*,
623 F.3d 1043 (9th Cir. 2010) .....11

*Hachette Book Gr., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) .....21

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .....25

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) .....19

*Keck v. Mix Creative Learning Ctr.*,
116 F.4th 448 (5th Cir. 2024) .....16

*Kelly v. Ariba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) .....17, 23

*Kennedy v. Gish, Sherwood & Friends, Inc.*,
143 F. Supp. 3d 898 (E.D. Miss. 2015) .....22

*Lenz v. Universal Music Corp.*,
815 F.3d 1145 (9th Cir. 2015) .....11

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
701 F.2d 95 (9th Cir. 1983) .....25

*Northland Fam. Plan Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
868 F. Supp. 2d 962 (C.D. Cal. 2012) .....16

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .....15, 17

*Righthaven, LCC v. JAMA*,
No. 2:10 Civ. 1322, 2011 WL 1541613 (D. Nev. 2011) .....16

*Sega Enters. Ltd. V. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .....15

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) .....17

*Teradyne, Inc. v. Astronics Test Sys., Inc.*,
No. 2:20 Civ. 2713, 2023 WL 9284863, at *22 (C.D. Cal. 2023) .......... 19, 20, 24

*Thornhill Publ'g Co., Inc. v. GTE Corp.*,
594 F.2d 730 (9th Cir. 1979) .......... 25

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020) .......... 16, 18, 23

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) .......... 15

**Statutes**

17 U.S.C. § 107 .......... 1, 12

Copyright Act .......... 12

## DEFINED TERMS FOR EXHIBITS

Pleadings, expert reports, and frequently cited exhibits filed with Meta's opening Motion for Summary Judgment are defined as follows. All other exhibits are cited by either Docket or Exhibit Number.[1]

**Pleadings**

| Docket Entry | Defined Term | Document Title |
|---|---|---|
| Dkt. 537-03 | Meta's Motion or Meta Mot. | Meta's Notice of Motion and Motion for Summary Judgment and Memorandum of Points and Authorities Thereof |
| Dkt. 550-03 | P5D Mot. | Planner 5D's Motion for Summary Judgment |
| Case No. 20 Civ. 08261, Dkt. 1 | CR Compl. | Complaint for Copyright Infringement |
| Dkt. 53 | TS Compl. | First Amended Complaint for Misappropriation of Individual Trade Secrets (DTSA); Misappropriation of Compilation Trade Secrets (DTSA); Misappropriation of Individuals Trade Secrets (CUTSA); & Misappropriation of Compilation Trade Secrets (CUTSA) |

**Expert Reports**

| Docket Entry | Defined Term | Document Title |
|---|---|---|
| Dkt. 537-15 | Lopresti Op. | Phase 2 Opening Expert Report of Dr. Daniel P. Lopresti |
| Dkt. 537-11 | Forsyth Op. | Expert Report of David Forsyth |
| Dkt. 537-18 | Schenk Op. | Expert Report and Disclosure of Kimberly J. Schenk |
| Dkt. 537-16 | Lopresti Reb. | Phase 2 Rebuttal Expert Report of Dr. Daniel P. Lopresti |

**Deposition Transcripts**

| Docket Entry (Ex. No.) | Defined Term | Document Title |
|---|---|---|
| Dkt. 537-08 (Ex. 13) | Song Dep. | Deposition of Shuran Song |
| Dkt. 540-08 (Ex. 15) | Funkhouser Dep. | Deposition of Thomas A. Funkhouser, Ph.D. |
| Dkt. 545-08 (Ex. 8) | Gkioxari Dep. | Deposition of Georgia Gkioxari |
| Dkt. 537-07 (Ex. 12) | Meta 30(b)(6) | 30(b)(6) Deposition of Dr. Richard Newcombe |

**Discovery Responses**

| Docket Entry (Ex. No.) | Defined Term | Document Title |
|---|---|---|
| Dkt. 537-14 (Ex. 49) | Meta ROG 14 | Defendant Meta Platforms, Inc. and Meta Platforms Technologies, LLC's Fifth Supplemental Objections and Responses to Plaintiff Planner 5D's Second Set of Interrogatories (No.14) |

[1] Ex. 1 to Ex. 58 refer to exhibits filed with Meta's opening brief and attached to the Declaration of M. Mazzello, Dkt. Nos. 545 and 546. Ex. 59 to Ex. 106 refer to exhibits submitted with this opposition and attached to the Declaration of M. Mazzello. "P5D Ex." refers to exhibits P5D submitted with its opening brief.

| Docket Entry (Ex. No.) | Defined Term | Document Title |
|---|---|---|
| Dkt. 538-09 (Ex. 41) | Princeton ROG Ex. A | The Trustees of Princeton University's Fourth Supplemental Responses and Objections to Planner 5D's First Set of Interrogatories |

**Research Papers**

| Docket Entry (Ex. No.) | Defined Term | Document Title |
|---|---|---|
| Dkt. 546-21 (Ex. 50) | Song Paper | Semantic Scene Completion from a Single Depth Image |
| Dkt. 546-24 (Ex. 53) | House3D Paper | Building Generalizable Agents with a Realistic and Rich 3D Environment |

# I. INTRODUCTION

Before the Court are three requests for summary judgment on the matter of fair use: one from Meta, one from Princeton, and one from P5D against both Meta *and* Princeton. Defendants moved for summary judgment separately because the facts and circumstances of each defendant's use require an independent look. P5D's motion, however, seeks to blur the line between Meta's conduct and Princeton's, and broadly contends that Meta is accountable for all of Princeton's conduct. But the undisputed evidence after extensive discovery shows that Meta, like many third parties, merely used Princeton's free, public dataset, SUNCG, for noncommercial academic research, and shared that research to advance science. Thus, separate from any analysis of whether Princeton's use was fair, Meta's use is quintessential fair use and serves the core goal of copyright of promoting the progress of science.

Courts balance four factors to determine fair use. 17 U.S.C. § 107. Here, each factor weighs in Meta's favor. The first factor, "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," favors Meta because Meta used SUNCG, and an adapted subset of the SUNCG dataset called SUMO, for purely *noncommercial* academic research and scholarship, which are core goals of the fair use doctrine, expressly named in the fair use statute. There is not a shred of evidence that Meta used SUNCG or SUMO for any commercial purpose, nor does P5D identify any (it does not address SUMO on this issue, at all). Rather, P5D contends that Meta's use was "necessarily" commercial because Meta is a commercial entity. That misstates the law. Because Meta did not profit from its use of SUNCG or SUMO, its use is noncommercial as a matter of law. Meta's use was also for a transformative purpose. Meta used the datasets to conduct machine learning research to train virtual robots to autonomously navigate scenes, whereas P5D used its works to promote and operate its home design tool. Although P5D contends that it too (eventually) did machine learning, that work was all connected to its home design interface, which is a fundamentally different purpose from Meta's use. There is no substitution or competition given the different uses. Thus, this factor heavily favors fair use.

The second factor, "the nature of the copyrighted work," also favors Meta as P5D's asserted works barely meet the threshold for creativity, if at all. Its purported "scene" work is merely a "*compilation*" of scenes that *users* created and chose for inclusion in the gallery. Aside from 18 specific scenes, *P5D does not claim ownership rights in the individual scenes*; it claims rights only in its purported *selection* of which

scenes to include in the public gallery. P5D's objects, moreover, are functional files derived from copying real-world furniture with no identifiable creative additions, and therefore are not creative. These asserted works are far from the core of what copyright seeks to protect. This factor favors Meta.

The third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," favors fair use as well. With respect to the scene compilation, Meta *did not use* P5D's alleged compilation at all. It instead used the ***different*** compilation that Princeton released in SUNCG and the ***different, much smaller*** compilation Meta created to make SUMO. As for the objects, hundreds of those on P5D's website did not even appear in SUNCG or SUMO and Meta used the objects only to the extent necessary as reasonable for its specific scientific research goals. P5D contends that this factor favors it because Meta "helped" Princeton download P5D's library of objects and scenes and then distributed or promoted distribution of SUNCG/SUMO. But P5D cites no evidence for its conclusory claim that Meta helped Princeton download P5D's files; nor could it, as the evidence shows that Meta had no involvement in making SUNCG. And any purported "distribution" is irrelevant to this factor. Under *Celotex v. Catrett*, speculative, conclusory claims like P5D's cannot advance to trial. 477 U.S. 317 (1986).

As to the fourth factor, the effect "upon the potential market for or value of the copyrighted work," there is no harm here. The only thing P5D arguably lost from Meta's use of the datasets was the licensing fee it would have charged Meta, which does *not* count as market harm in the fair use analysis. As many courts have explained, including the Supreme Court, such a circular argument would lead to a finding of harm in every case and is not sufficient. There also *is no market* for licensing data for noncommercial research, as datasets for such work are routinely free. Meta's use of SUNCG and SUMO also served the public benefit by promoting the progress of science. P5D makes no argument as to SUMO, conceding it caused no harm. It claims SUNCG's "distributi[on]" harmed P5D. But Meta did not distribute SUNCG. Princeton did. Nor does P5D's claim that SUNCG (which Meta did not release) interfered with P5D's ability to license its data have merit. Before SUNCG's release, no one contacted P5D about a license, nor did P5D attempt to license its data. ***Afterward***, three entities contacted it about paying for commercial use of the data. As all factors weigh in Meta's favor, Meta's motion for summary judgment on fair use should be granted, and P5D's denied.

P5D's motion for summary judgment on the copyrightability of its asserted scene compilation

should also be denied. P5D already made this request in Phase 1 and lost. The Court held that P5D lacked sufficient evidence to win as a matter of law. If P5D wanted to move again, it needed to seek permission, but it did not. Dkt. 182. And nothing material changed since Phase 1. P5D's request should also be denied on the independent grounds that, as this Court already found, there are genuine disputes of material fact concerning copyrightability, including whether P5D's alleged "selection" criteria were creative, whether it applied the criteria, and inconsistencies in sworn testimony regarding the purported selection.

## II. FACTUAL BACKGROUND

### A. Meta Conducts Curiosity-Driven Academic Research through FAIR

The Facebook Artificial Intelligence Research ("FAIR") group is a division within Meta focused on "academic oriented, noncommercial research," separate from Meta's commercial product development teams. Meta 30(b)(6) 269:9-17, 228:9-229:15; Ex. 67 (Meta 30(b)(6)) 71:6-8. FAIR's mission is to benefit the academic research community through its work on long-term research problems surrounding AI. Ex. 100 ("We created [FAIR]… to focus on advancing the science and technology of AI, and we've always done this by collaborating with local academic communities… researchers have the freedom to control their own agenda."); *see also* Ex. 59 (Batra) 184:21-22. Its researchers are there to do "curiosity driven research . . . whatever intrigue[s] [them]." Gkioxari Dep. 265:1-6. They have "no incentives to work for any products or any commercial applications and products," nor are they asked or directed to do so. *Id.* 265:17-19; Meta 30(b)(6) 269:9-17; Ex. 66 (Newcombe) 112:4-7 (no [redacted]).

FAIR benefits the academic research community in numerous ways. It publishes articles for academic conferences and journals; releases open-source software that anyone (competitors included) can use; participates in scientific conferences; and collaborates with colleagues in academia. Exs. 55-58. This is not uncommon. Many technology companies have noncommercial, academic-oriented research labs that focus on research for the public good rather than commercial products. Lopresti Op. ¶197.

### B. P5D Operates an Online Home Design Tool

P5D offers a "user-friendly home design tool that allow[s] anyone to quickly and easily create their own home, office, or landscape designs" (the "Tool"). TS Compl. ¶30; CR Compl. ¶31. Users can create "three-dimensional [interior designs]" (or "scenes") by dragging and dropping three-dimensional

"objects" into a floorplan on P5D's Tool. CR Compl. ¶¶6, 31. In other words, P5D's tech allows users to see how their furniture might fit in a given room. [redacted] Ex. 80 at -587-588.

P5D first launched this Tool in 2012 in 2D format. Ex. 69 (Sheremetyev) 91:23-92:15. It then hired modelers to create 3D objects. As P5D's founder testified, "the purpose of creating the 3D objects was so users were able to add objects from Planner 5D's catalog to scenes they created in Planner 5D's platform." Ex. 4 (Sheremetyev) 119:8-14. He further explained that "the purpose of Planner 5D platform is" that it "allows anyone to create interior designs, furniture placement, and other related to home improvement things and tasks without training needed." *Id.* at 119:23-120:12.

P5D modeled its objects to "reflect [or resemble] some real life object[]." Ex. 3 (Sheremetyev) 108:3-9. Thus, when modeling the objects, P5D used "reference images" of real-world objects. *Id.* at 64:25-65:10. Some were supplied by P5D furniture clients, who hired P5D to create models matching their products "as close as possible." Ex. 1 (Kondaurov) 22:25-23:5, 110:20-23. Others, P5D copied from the websites of online retailers, such as IKEA. Ex. 3 (Sheremetyev) 64:25-65:10; Ex. 28 at -325. In all cases, P5D's goal was to replicate real-world items. Ex. 2 (Kondaurov) 275:17-24.

In addition to the interior design Tool, P5D's website also features a "public gallery" where anyone can view user-created scenes. CR Compl. ¶6; Ex. 68 (Sheremetyev) 36:11-23. P5D states the purpose of this gallery is to "showcase the program's capabilities, and to provide templates for users who don't want to start their floor plans from scratch." CR Compl. ¶45. Users selected scenes they created for potential inclusion in the gallery. P5D asserts that it then reviewed the scenes in a "two step[]" process. Ex. 68 (Sheremetyev) 154:17-155:18. First, it approved or denied inclusion during its "primary selection" shortly after the scenes were flagged, and then it conducted the "secondary selection" where it "winnow[ed]" scenes already made public. *Id*. P5D purportedly used specific criteria (*e.g.*, artistic value, absence of offensive content) to select scenes. *Id*. 154:7-16; P5D Mot. at 21. Yet many scenes in the gallery do not meet these alleged standards. Lopresti Op. ¶110 (noting violent scenes, nudity).

P5D claims copyright protection in 2,009 objects, *a compilation* of user-created scenes that appeared on its public gallery in February 2016, and 18 individual scenes allegedly created by P5D

employees (together, the "Works"). CR Compl. ¶¶104-105, 107; Dkt. 282-02–09; Ex. 47 (P5D ROG 1-2) at 5-6. The Copyright Office, however, denied its applications to register these Works. Exs. 19-22. P5D also does not claim to own the 49,461 user-created scenes in the compilation, nor could it. Users did not assign ownership to P5D. The Terms of Service merely granted P5D a royalty-free license to the scenes solely for "**providing and promoting the Services**; and/or exercising the rights granted in these Terms," with Services defined as "**your use** of [P5D] project for any purpose whatsoever." Dkt. Ex. 23 at 3-4.

### C. Princeton Transforms P5D Data Into SUNCG

Shuran Song is a well-respected researcher in the field of computer science and Assistant Professor at Stanford University. In 2016, as part of her doctoral research at Princeton, now-Dr. Song searched the internet for potential collections of floor plan data to train AI algorithms. Ex. 38 (Princeton ROG 1) at 4-5. In doing so, she found P5D's public gallery of user-made scenes. *Id.* Dr. Song and her research team (hereinafter referred to as "Princeton") then wrote software to identify and download the freely accessible JSON data files for the scenes in the public gallery and the objects (e.g., furniture). *Id.*

After reviewing the files, Princeton determined that the data was not in a condition suitable for Dr. Song's semantic scene completion research, which Dr. Song described as training AI algorithms to look at a 2D image of a 3D scene and identify (a) the depth and volume of objects in the scene, and (b) the common name (e.g., "couch," "chair") of every object in the scene. Ex. 38 (Princeton ROG 1) at 3, 5; Song Paper at 1. The as-downloaded P5D data was unusable for that purpose. For example, P5D's allegedly copyrightable data files had no information identifying the objects in a scene (called "labels"). Funkhouser Dep. 103:24-104:16; Song Dep. 459:10-21. Without labels, AI could not learn how to identify each object in a scene. As Meta's expert explained, "[t]his would be like trying to teach toddlers to identify fruits by feeding them fruit, but never telling them what they are eating." Lopresti Op. ¶92.

The data also fell short because it lacked color and depth images necessary for the type of research Dr. Song wanted to do. Lopresti Op. ¶16. Many scenes also lacked the realism needed for her (and later, Meta's) research. Funkhouser Dep. 86:17-87:9, 142:11-19, 159:23-160:15; Song Dep. 488:13-489:17; Lopresti Op. ¶¶16, 108, 110. This makes sense, as the gallery was created to promote P5D's service, not create a collection of scenes suitable for machine learning. Ex. 68 (Sheremetyev) 36:11-23. For example, some scenes in the gallery defy the laws of physics, such as by having objects float. Lopresti Op. ¶¶81,

108. Others have odd, nonrealistic designs or object placements, such as rooms with no doors. *Id.* ¶106. Others are fantastical (e.g., including a dinosaur), as users used the Tool as a "toy," making environments they would not encounter in the real world. Ex. 60 (Escos) 92:24-93:7; Lopresti Op. ¶¶16, 178. Other researchers found similar flaws that made the scenes unsuitable for computer vision machine learning.[2]

Princeton spent the next several months altering P5D's data and filtering the modified data to make it usable for research like Dr. Song's. Among other things, it: (1) developed software to convert files into formats used in computer vision research; (2) developed software to detect and repair object placements that violated physics; (3) labeled the objects in each scene; (4) "voxeliz[ed]" the files, transforming them into a 3D grid of cubes representing depth information, and labeling every cube as the object name (or empty space); and (5) filtered out unhelpful scenes multiple times. Ex. 38 (Princeton ROG 2) at 6-7; Song Dep. 488:13-489:17; Funkhouser Dep. 86:17-87:9, 159:23-160:6; Song Paper at 5, Fig. 13.

Princeton called its resulting collection of transformed data files the "SUNCG" dataset. On November 28, 2016, Dr. Song and colleagues published a research paper concerning Dr. Song's SUNCG research. Song Paper. They made the SUNCG dataset publicly available shortly thereafter. Ex. 39. Researchers could access SUNCG after signing Princeton's Terms of Service, which allowed use of SUNCG for free for noncommercial research and educational purposes. Ex. 30.

P5D concedes that SUNCG consisted of a different set of objects and scenes than those Princeton downloaded. P5D Mot. at 2, 3. There are thousands of scenes in P5D's alleged compilation that do not appear in SUNCG, and many scenes in SUNCG were individually different from those P5D selected for its gallery. P5D Mot. at 3, 21; Ex. 37 (P5D ROG 11) at Ex. C; Ex. 6 (Forsyth) 230:17-235:5, 241:5-23; Forsyth Op. ¶¶70-77, 231, 232. SUNCG also contained only 40% of the objects in which P5D claims to have copyright or trade secret rights. Ex. 37 (P5D ROG 11) at Ex. C.

Meta did not back, support, or even have knowledge of SUNCG before it was publicly released. Gkioxari Dep. 14:3-16; Song Dep. 556:18-558:11. Although Dr. Song received a Facebook Fellowship in 2015—a tuition and stipend grant available to PhD students, Song Dep. 296:14-22—neither the fellowship

---

[2] [redacted].

nor Dr. Song's application mentioned P5D or scraping, or gave Meta any role in or oversight over Dr. Song's research. Exs. 29, 31, 52. As Dr. Song testified, Meta was not consulted about, involved in, or otherwise apprised of the creation of SUNCG, including the collection of data from P5D's website. Song Dep. 556:18-558:11.[3] Meta also did not direct Dr. Song's research or ask her to find or download object files or scene files for machine learning. *Id.*

**D. Meta's Noncommercial Academic Research Use of SUNCG**

From 2017-2019, when Princeton made SUNCG available, at least 798 people from over 350 entities, including many universities and corporations, sought to download it. Princeton ROG Ex. A. It became a "known entity" in the scientific community, which made it an easy and convenient source (despite its flaws, discussed below). Ex. 64 (Huber) 169:10-24; *see also* Ex. 71 (Straub) 271:18-273:6.

Meta first learned of SUNCG through Dr. Song's published research paper, and the first person from Meta to download it was noncommercial FAIR researcher Dr. Gkioxari. Gkioxari Dep.14:2-15:21; Ex. 39; Ex. 42 (P5D ROG 15) at 6. Although a few other Meta researchers also downloaded SUNCG, they only did so after signing Princeton's Terms of Service (which limited use to noncommercial research). Ex. 16 at -433. Not all of the Meta researchers who downloaded SUNCG used it, including because it was not useful for the research they were doing. Ex. 10 (Straub) 92:24-93:2. Those who did use it did so largely because it was in use by other researchers. Ex. 64 (Huber) 169:10-24; Ex. 71 (Straub) 271:18–273:6; Ex. 59 (Batra) 103:15-104:6; *see also* Lopresti Op. ¶234. Even then, however, they used only *some* of the SUNCG scenes and *some* of the objects, as many scenes were not useful due to lack of realism. Some projects also did not require so many scenes. Gkioxari Dep. 267:20-268:6 (multiple projects used just a few hundred scenes); Ex. 64 (Huber) 79:10-80:17 ("subset of the scenes"); Ex. 95 (EQA Paper) at 4 ("pruned subset"); Ex. 96(SplitNet Paper) Table A1 (990 training, 905 testing scenes); Ex. 97 (Learning Exploration Paper) at 5 (20 houses). SUNCG also was not the only dataset Meta's noncommercial researchers used. There were many free datasets available for noncommercial research, such as ImageNet, ScanNet, and Gibson, that Meta used. Meta ROG 14 at 10.

The Meta researchers who used SUNCG did so for limited, noncommercial scene navigation and

[3] Dr. Song's fellowship application also said nothing about P5D. Ex. 31 at 1. It merely refers to "retriev[ing]" models "from the Internet" by "downloading" from public "crowd-sourc[ed]" data. *Id.* There were many crowd-sourced public 3D model repositories at the time. Lopresti Reb. ¶72.

embodied AI research connected to training AI robots to independently navigate virtual environments and understand how to accomplish basic tasks in those environments. *Id*. at 5-10; Gkioxari Dep. 268:25-269:8, 270:14-17; Meta 30(b)(6) 232:15-17. Meta never used SUNCG in any commercial project. Meta ROG 14 at 5-10; Gkioxari Dep. 270:14-17. Indeed, even P5D's expert admitted he could not find any evidence that SUNCG actually contributed to Meta's commercial product, Oculus. Ex. 61 (Forsyth) 313:9-12. Rather, given FAIR's public research focus, Meta *published* its research with SUNCG and *shared the tools* it used for free, for all researchers (including competitors) to use. *See* Lopresti Op. ¶¶192-93; Exs. 95-97; Ex. 63 (Gkioxari) 188:21-22. Meta, however, *never distributed SUNCG*. Its research using SUNCG also did not involve training AI to do interior design or developing interior design platforms. Lopresti Op. ¶188.

For example, in 2018, in collaboration with UC Berkeley, FAIR researchers built House3D—a "simulator" that transformed static scenes of indoors spaces into navigable 3D environments through which virtual AI agents (i.e., virtual robots) could maneuver. House3D Paper at 4. Simulators like this enable researchers to train and test algorithms they develop for scene navigation. *Id.* at 1. Researchers could use House3D with multiple datasets, including SUNCG, but SUNCG was not built into House3D and Meta never distributed SUNCG. Ex. 17. Meta publicly shared the House3D script and its related research for free, so others could use it in their research. Meta ROG 14 at 5; Ex. 63 (Gkioxari) 188:21-22.

Similarly, in collaboration with Intel, Georgia Institute of Technology, Simon Fraser University, and UC Berkeley, Meta built Habitat, a free, open-source, 3D simulator. Ex. 98 (Habitat Paper). As a former Meta researcher testified, the purpose of the Habitat project was to support "3D datasets that the research community was already using to study research problems" and help "create a benchmark" across the research community. Ex. 59 (Batra) 103:15–104:6. Consistent with this goal, Meta publicly shared the simulator and research papers about Habitat. Meta ROG 14 at 5. Although Habitat was initially compatible with SUNCG (among other datasets), that is no longer the case. *Id*.[4]

From 2018-2019, Meta also used SUNCG to generate a new dataset for an event called the Scene Understanding and Modeling ("SUMO") Challenge, which was part of a workshop at the non-profit Conference on Computer Vision and Pattern Recognition. Meta ROG 14 at 6-7; Ex. 104 (SUMO

[4] Meta was not alone in using SUNCG. While Meta created House3D, two other research groups created simulators supporting SUNCG. Ex. 85. When Meta published its first paper referencing SUNCG, there were already 27 papers referencing Dr. Song's SUNCG paper, including from Google. Lopresti Reb. ¶122.

webpage); Ex. 64 (Huber) 77:4-24, 141:18-142:20. The purpose of the challenge was to rally collaboration among researchers (e.g., Stanford, Virginia Tech) to try to develop algorithms to solve a question that had been confounding scientists: training AI to derive 3D scenes based on 2D 360-degree images of those scenes taken from a single vantage point coupled with 2D depth maps. Meta ROG 14 at 6; Ex. 64 (Huber) 77:4-24. The hope was that whoever solved the problem would share a paper on the algorithm used or otherwise publicly describe how the researcher got a successful result. Ex. 64 (Huber) 145:8-20. In the end, however, the question was so complicated that only three research teams submitted results. Ex. 88 (Meta ROG 1) at 5. Even today, researchers still grapple with this issue. *See e.g.*, Ex. 99 (Adobe Article).

Developing SUMO was an exhaustive process. Ex. 64 (Huber) 79:10-80:17. Meta first identified usable scenes in SUNCG, as many were not useful, including because they had empty rooms, uncommon environments (dungeons), or odd furniture or room placement. *Id.* at 79:10-80:17, 91:16-92:2. It then had to create a 360-degree photograph for each scene. *Id.* at 79:10-80:17. It also had to reprocess objects to fix their exteriors and assign each pixel of the 2D images to semantic categories, e.g., couch, chair, etc. *Id.* at 79:10-80:17, 95:6-23. Meta also labeled object symmetries and the sides of the objects. *Id.* at 89:20-90:7; Ex. 88 (Meta ROG 3) at 8. In the end, SUMO consisted of 2D, 360-degree visualizations of only a "few thousand" SUNCG scenes. Ex. 64 (Huber) 91:16-92:2; Meta ROG 14 at 7.

Meta used SUMO for noncommercial research only, and ensured others did the same. Ex. 16 at -433 (participants agreed to use SUMO for "non-commercial research and educational purposes"). Meta ceased use of SUNCG and SUMO in 2019 after receiving a letter from P5D. Meta ROG 14 at 7.

**E. P5D's Business Continues Uninterrupted**

While the scientific community used SUNCG (as one of many datasets for noncommercial research), P5D's business grew. [redacted]. Schenk Op. Tab 4; *see also* Ex. 69(Sheremetyev) 224:1-5, 237:10-238:1, 262:5-7.

In 2017, *after* Princeton released SUNCG, P5D also began to dabble in AI. P5D Mot. at 14. P5D concedes, however, that its machine learning endeavors focus on "interior design," consistent with the function and purpose of its Tool. P5D Mot. at 2:2, 14:13; Ex. 14 (Andrikys) 201:18-202:6; Ex. 4 (Sheremetyev) 269:16-271:14, 273:8-25, 274:16-22, 276:15-277:24, 278:19-279:15; Ex. 62 (Gavelis)

237:14-238:4. For example, its website refers to its AI as "Interior Design AI Tools," such as a tool that makes suggestions for furniture placement, and another that "enhances the design journey" by allowing users to visualize their designs with 3D representations. Ex. 103; *see also* P5D Ex. 1 (Andrikys) 194:9-211:7; P5D Ex. 2 (Sheremetyev) 269:16-281:2.[5] Even P5D's chat assistant is described as "Your AI Interior Design Assistant" and operates to help users with "home improvement or renovation questions."[6] Ex. 103; P5D Ex. 1 (Andrikys) 204:2-17. P5D has not been and is not in the market of training AI agents to autonomously navigate real or virtual environments to accomplish tasks (like independently locating a car in the garage of a multi-room house) or releasing academic research. Lopresti Op. ¶¶83-85.

P5D's business does not generate revenue from licensing or selling scenes for machine learning research. Although P5D attempted to use its data for AI research, it discovered that its raw data was not well-suited for machine learning training. P5D's AI developer and now-CTO admitted [redacted] Ex. 105 (Andrikys) 215:16-216:16, 221:5-19. [redacted] Ex. 83at -165 [redacted].

Following Princeton's release of SUNCG, P5D also *for the first time* received inquiries about licensing its data for commercial machine learning research. [redacted]. Ex. 5 (Sheremetyev) 434:12-18, 436:6-12. This is unsurprising, given that P5D's business concerns user-created interior designs and its Terms of Service do not give it the right to license scenes for this purpose. *Supra* II.B. [redacted]; Ex. 79 at -103; Ex. 81. [redacted]

[5] Other tools are "AI Floor Plan Recognition" to convert blueprints into 3D interiors and [redacted]. P5D Ex. 2 (Sheremetyev) 271:4-12, 278:22-279:2.

[6] [redacted]. Its CPO did not even "know what that is." P5D Ex. 2 (Sheremetyev) at 270:15-271:3. In any case, P5D's limited AI work was all built toward interior design. P5D Mot. at 2.

[redacted]

[redacted], which makes sense, as there is no paying market for noncommercial use of data in machine learning research. Lopresti Op. ¶¶210-16. Rather, datasets for noncommercial research were routinely free in the 2016-2019 timeframe (and continue to be today). *Id.* ¶¶217-23 (listing 13 examples). In fact, P5D's own expert admitted that he has never paid for a dataset over his entire career. Ex. 61 (Forsyth) 254:8-20.

## III. SUMMARY JUDGMENT STANDARD

When parties cross-move, the court "evaluate[s] each motion independently" and the nonmoving party in each instance receives "the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (citation omitted). A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The moving party must present its arguments in its opening motion; those "raised for the first time in a reply brief are waived." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010).

## IV. SUMMARY JUDGMENT FOR META ON ITS FAIR USE DEFENSE IS WARRANTED

Through fair use, copyright law "balances the benefits of incentives to create against the costs of restrictions on copying," for the benefit of promoting the progress of science and art. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 509 (2023). The statute enumerates examples of uses that "courts and Congress most commonly ha[ve] found to be fair uses," which include "criticism,

comment, news reporting, teaching ... , scholarship, or research," and requires consideration of four factors. *Id.*; 17 U.S.C. § 107. No one factor is dispositive. *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 19 (2021). But in this case, each factor favors Meta.

**A. Meta's Noncommercial Research Use of SUNCG and SUMO was Transformative.**

"The first fair use factor, 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes,' § 107(1), considers the reasons for, and nature of, the copier's use of an original work. The central question it asks is whether the use 'merely supersedes the objects of the original creation ... (supplanting the original), or instead adds something new, with a further purpose or different character'" (i.e., whether it is transformative). *Warhol*, 598 U.S. at 1261 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). The Copyright Act lists "the sorts of copying that courts and Congress" have found to be "fair" because they involve using works for a "manifestly different purpose.'" *Id.* at 1274. Such list explicitly includes "scholarship, or research[.]" 17 U.S.C. § 107. Meta's use of SUNCG and SUMO for scholarship and noncommercial research, which it freely shared for the greater public good, is quintessential fair use. P5D's contrary arguments fail.

1. <u>All of Meta's Research Done Using SUNCG and SUMO Was Noncommercial</u>

Meta's use of the data in SUNCG and SUMO constitutes fair use under Factor 1 as its use was solely for noncommercial, research purposes. Every current and former Meta employee who was asked about Meta's work with the datasets testified that the work was purely for noncommercial, research purposes and never crossed the line into a commercial product.[7] P5D aggressively pursued discovery into any link between Meta's commercial work (particularly on Oculus) and its use of SUNCG. *See, e.g.*, Exs. 86-87, 92 (P5D ROG 4, 10-11, 13-14, 19-20). Yet although Meta identified every person that had access to SUNCG/SUMO and searched the records of 50 custodians for documents about projects that used SUMO/SUNCG (or even referenced it in passing), there is no evidence that Meta used them in a commercial product or to create a commercial product. Tellingly, P5D's technical and damages experts both conceded that there was no evidence to support that theory. Ex. 61 (Forsyth) 313:9-12 (Q: "[D]o you have any evidence that research on SUNCG actually contributed to Meta's Oculus product?" A: "I have

[7] Ex. 63 (Gkioxari) 268:25-269:8, 270:14-17 ("your use of SUNCG was limited to noncommercial uses only, right? A: Correct."); Ex. 64 (Huber) 233:7-10; Ex. 67 (Meta 30(b)(6)) 232:15-17; Ex. 66 (Newcombe) 264:16-18; *see also* Ex. 59 (Batra) 284:5-289:3 (SUNCG in published research only).

seen no such evidence."); Ex. 65 (Kennedy) 117:4-15 (Q: "Are you aware of any evidence that the SUNCG dataset was ever used for a commercial product or service?"… A: "I haven't – I'm not aware of, and I think Dr. Forsyth testified that he hasn't seen any evidence, I believe, of it in a product.").

Meta's conduct was consistent with its noncommercial goals and Princeton's Terms of Use. It (a) published articles about its research for anyone to review; (b) shared SUNCG-compatible simulators with non-Meta researchers; (c) collaborated with universities on research using SUNCG, Lopresti Op. ¶193; (d) worked with other companies on SUNCG research, *id.*; and (e) limited use of SUNCG to the noncommercial SUMO challenge and FAIR, which operates independently from Meta's commercial division. Gkioxari Dep. 265:13-22; Meta 30(b)(6) 228:9-229:15, 269:9-17; Meta ROG 14 at 5-10. One would not expect this collaboration and publication if Meta used SUNCG or SUMO for commercial goals. Lopresti Op. ¶192. Meta also used interns for much of this work, including so they could "*continue to pursue the research problems*" they started at FAIR after their internships. Ex. 66 (Newcombe) 78:24-79:5. This would not make sense if Meta planned to use the research for commercial benefit.

*Finally*, as Dr. Lopresti explained "given the state of computer vision machine learning research in 2017 to 2019, Meta's research was simply too nascent and rudimentary to have any practical application in a commercial product." Lopresti Op. ¶200. Researchers "were grappling with basic questions, including whether this type of training was even possible[.] There simply is no indication that anything coming out of this research had real world applications during the timeframe in question." *Id.*

P5D cannot dispute this evidence. Instead, without any evidence of commercial use, its Hail Mary argument is a conclusory claim that as a "commercial entity," Meta's use was "necessarily commercial." P5D Mot. at 16. But courts have long recognized that for-profit entities engage in noncommercial work when there is "no evidence [the company] profited in any way by the use of any of [plaintiff's] works," as here. *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1120 (D. Nev. 2006) (factor 1 favored Google); *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, No. CV 24-1895, 2024 WL 4374117, at *10 (E.D. Pa. Oct. 2, 2024) ("for-profit company['s]" use largely "noncommercial" and transformative); *see also Author's Guild v. Google, Inc.*, 804 F.3d 202, 219 (2d Cir. 2015) ("no reason in this case why Google's overall profit motivation should prevail as a reason for denying fair use"). P5D's claim that Meta's research was "designed to bring financial benefits" is similarly unsupported. It cites Meta's damages

expert, but she testified that, via FAIR, Meta [redacted] P5D Ex. 56 (Schenk) 210:15-19.[8]

The inconvenient truth for P5D is that Meta's work with SUNCG and SUMO indisputably "promote[d] the progress of science and useful arts," *Google*, 593 U.S. at 30 (cleaned up), which weighs heavily in favor of fair use. *Authors Guild*, 804 F.3d at 209 (search engine that enabled researchers to identify books and made "possible new forms of research" was fair use); *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc,*. No. 23 Civ. 3402, 2025 WL 86370 at *3 (8th Cir. Jan. 14, 2025) (dissemination of floorplans got "information to more people it could benefit"). Academic research is best advanced by using *existing* datasets and publishing research results so that others can recreate, build off of, and replicate that research. Lopresti Op. ¶¶230, 233. That is precisely what Meta did. It used a dataset made public by Princeton (*that was in use by hundreds in the academic research community*), repeatedly and openly shared its research with the world for free and cited back to Dr. Song's paper introducing SUNCG as the source of its data. *Id.* at ¶227. Meta's research was conducted for the purpose of building public knowledge and advancing science, and Meta received no profit from it. *Id.*

2. Meta's Use of SUNCG and SUMO Was Transformative.

**a. Meta's Use Was For a Different Purpose Than P5D's**

The first factor also strongly favors Meta because Meta used the Works in a transformative way.[9] The "'central' question" on transformativeness is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. at 527-528 (cleaned up). The Supreme Court explained that this "relates to the problem of substitution—copyright's bête noire. The use of an original work to

[8] The documents P5D cites are similarly irrelevant. It cites two blog posts, but one does not mention FAIR and neither discuss a connection between FAIR's noncommercial research using SUNCG and Meta's products. Exs. 101-102. In fact, one emphasizes that Meta made Habitat *open source*, consistent with the noncommercial, scientific goals of the research. Ex. 101. [redacted]. Meta's commercial team operates separately from FAIR. Ex. 66 (Newcombe) 282:23-286:5. Another document (P5D Ex. 58) discusses Habitat, a simulator that could be used with multiple datasets (not just SUNCG), and stopped being compatible with SUNCG in 2019. Meta ROG 14 at 10, 11. A document about potential uses of *Habitat*, does not establish plans *for SUNCG*. Lastly, P5D cites a conversation (P5D Ex. 59) with Dr. Gkioxari discussing research projects that used SUNCG, but it does not mention future product applications.

[9] Factor 1 can favor fair use even when use is commercial if it is transformative. *Google*, 593 at 1; *see also Campbell*, 510 U.S. at 584 (commerciality does not "carr[y] presumptive force against" fair use).

achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' [it]." *Id.* Meta used SUNCG and SUMO for a transformative purpose.

***First***, Meta's use was for scholarship and research, two of the enumerated fair use, which the Supreme Court recognized "contemplate the use of an original work to 'serv[e] a manifestly different purpose from the [work] itself.'" *Id.* ***Second***, Meta used SUNCG and SUMO for machine learning research to train models to autonomously navigate scenes. *Supra* II.D. Princeton similarly created SUNCG for this purpose, as it selected scenes for SUNCG using criteria relevant to machine learning (e.g., realism) and formatted SUNCG to promote compatibility with machine learning tasks. Lopresti Op. ¶137. By contrast, P5D *admits* that its alleged Works were created for the purpose of its interior design platform: modelers made objects for the "purpose" of users having objects to place in scenes and the gallery existed to "showcase" the platform and provide templates. *Supra* II.B. These are fundamentally different purposes, and no supplanting occurred. *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (search engine "transforms" image with an "entertainment, aesthetic, or informative function . . . into a pointer"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (using copies of unaltered student papers with software that detects plagiarism transformative). ***Third,*** Meta used the datasets to teach its AI agents basic, noncopyrightable information about interiors, such as which room is the garage or where in a house to find the bed. Lopresti Op. ¶200; Gkioxari Dep. 268:13-24. Just as humans need to see houses to understand these "facts of the world," machine learning agents also learn such "facts" by interacting with interiors. Lopresti Op. ¶¶48-63, 68-70. It is well-established that using a copyrighted work for purposes of accessing *noncopyrightable* information or facts is transformative. *Sega Enters. Ltd. V. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992).[10] ***Fourth***, Meta's use of SUNCG and SUMO did not "substitute for, or 'supplan[t],'" P5D's Works, as Meta did not offer an interior design platform or data for use in interior design. *Warhol*, 598 U.S. at 528.

P5D nonetheless contends that Meta's use is not transformative because P5D also used its data for machine learning. But P5D admits that it did not begin any machine learning work until *after* Princeton released SUNCG. P5D Mot. at 14 Its explicit testimony is also that the Works were made for a purpose

[10] P5D cites (at 17) Dr. Song's paper and Meta's House3D Paper to claim that Defendants used the Works "*for their expressive content*." The papers do nothing of the sort. They merely state that the scenes were *user* created, but make no mention of any expressive elements in the *Works*. Song Paper; House3D Paper.

*other than* machine learning, namely, the use and promotion of its interior design Tool. *Supra* II.B.

In any case, the Supreme Court made clear in *Warhol* that the test considers the purpose of the "specific use at issue" and not a broad general category like "machine learning." *Warhol*, 598 U.S. at 545 (comparing "commercial licensing of [Warhol's artwork] to appear on the cover of Condé Nast's special commemorative edition" to "illustrat[ing] a magazine about Prince with a portrait of Prince"). Post-*Warhol*, courts have emphasized the importance of analyzing the purpose of the *specific* uses at issue, rather than resorting to broad characterizations. For example, in *Keck v. Mix Creative Learning Center*, the Fifth Circuit rejected plaintiff's characterization of defendant's use as "online, e-commerce sales," stating that "oversimplifies *Warhol's* inquiry into objectives and fails to distinguish the commercial-nature inquiry from the *more nuanced inquiry into whether a secondary use has a further purpose or different character*." 116 F.4th 448, 454-55 (5th Cir. 2024); *see also Am. Soc'y for Testing*, 2024 WL 4374117, at *10 (rejecting stated purpose as "provid[ing] information to the architecture, engineering, and construction communities" in favor of specific purpose to make "the law freely accessible and educat[e] the public on the contents of binding laws," which was transformative). Thus, merely stating that P5D engaged in machine learning is not enough to show Meta's use was non-transformative.

Meta's and P5D's machine learning served different purposes: P5D eventually engaged in machine learning to support its home design Tool; Meta engaged in noncommercial academic research to train virtual robots to autonomously navigate scenes. *Supra* II.D, II.E. Meta's fundamentally different purpose makes its use transformative. *Campbell*, 510 U.S. at 579 (use of song in rap parody transformative); *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 648-650 (9th Cir. 2020) (use of song from a fantasy musical in a choir show telling a different story transformative); *Righthaven, LCC v. JAMA*, No. 2:10 Civ. 1322, 2011 WL 1541613, at *2 (D. Nev. 2011) (re-publication of plaintiff's news article transformative); *Northland Fam. Plan Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962 (C.D. Cal. 2012) (use of clips from plaintiff's video in defendant's video transformative); *Keck*, 116 F.4th at 455 (use of plaintiff's painting in educational art kits transformative); *Designworks Homes,* 2025 WL 86370 at *3 (use of floorplans for constructing homes to sell homes transformative).

**b. P5D's Focus on Physical Transformation Is Misplaced and Inaccurate**

P5D also claims that SUNCG is not transformative because the files Princeton downloaded are

"fundamentally [the] same" as SUNCG. P5D Mot. at 12. This argument misses the mark. The question under the transformative use analysis is not whether a defendant physically transformed a work; it is whether the defendant put the work to a new or different purpose (which, Meta did). *See Warhol*, 598 U.S. at 541-547 (rejecting argument that use was transformative because it physically transformed plaintiff's photograph). In such cases, even verbatim copying—which SUNCG is not—is transformative. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) (work that made "few physical changes" transformative); *Perfect 10, Inc.*, 508 F.3d at 1165 ("that Google incorporates the entire Perfect 10 image . . . does not diminish the transformative nature of Google's use."); *Kelly v. Ariba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) ("exact replications" transformative).

Although the Court need not reach this question, SUNCG and the Works are *not* fundamentally the same. P5D improperly focuses on whether individual scenes are similar. P5D Mot. at 13-14. But aside from 18 scenes its employees allegedly created, P5D admittedly does not own individual scenes. Instead, it asserts ownership in a scene *compilation*. Princeton substantially changed this compilation by selecting a different set of scenes for SUNCG based on different criteria. Meta Mot. at 14-15.[11] P5D also makes no argument about SUMO, again trying to lump it together with SUNCG. But P5D's silence concedes that the unique compilation of 2D, 360-degree panoramas Meta created from a few thousand SUNCG scenes physically transformed P5D's Works.

For the objects, Princeton did not simply "reformat" the Objects as P5D suggests. It added substantial new material to each, including extensive labelling and voxelization data, which was necessary to make the files usable for the machine learning tasks Princeton studied. Lopresti Op. ¶¶86-124. As a result, the SUNCG Object files are encoded in *multiple* files compared to P5D's asserted *single* JSON file. *Id*. ¶167.[12] Researchers who used SUNCG emphasized the importance of the added labels that were not in P5D's data. House3D Paper at 4; Ex. 63 (Gkioxari) 101:5-17; Ex. 73 at -981-983; Ex. 94 at 4-5.[13]

---

[11] P5D's expert also admits Princeton modified the [redacted] in many scenes. Ex. 61 (F
P5D scene files and found only 31% of the content overlaps with SUNCG. Lopresti Op. ¶¶160-65.

[12] P5D claims (at 13) Meta's expert does not dispute that all objects but one were "functionally identical," but Meta's expert explained at length that the files have different functions. Lopresti Op. ¶¶135-168.

[13] P5D's reliance on *Disney Enterprises, Inc. v. VidAngel, Inc.* is misplaced. That case concerned distribution of filtered versions of plaintiff's movies for-profit, in direct competition with plaintiff. 869 F.3d 848, 855 (9th Cir. 2017). Defendant did not "add[] something new" to the work—it only removed content—and there was evidence that defendant's work substituted for plaintiff's. *Id.* at 861. Here,

3. Meta's Use of SUNCG Was Justified

In *Warhol,* the Supreme Court explained that "a use that has a distinct purpose is justified because it furthers the goal of copyright . . . without diminishing the incentive to create." 598 U.S. at 579; *see also Author's Guild*, 804 F.3d at 214 ("The more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives[.]"). For the reasons discussed, Meta's use was justified and would not diminish incentives. Meta used the data in SUNCG, the majority of which was adapted from scenes P5D's *users* own, purely for noncommercial, research purposes and not for interior design purposes. *Supra* II.D.

Meta's use of SUNCG was also justified given the context in which Meta acquired it. As Meta's expert explained without rebuttal, "[u]sing existing datasets, and improving them for new computer vision tasks, is a common practice in the computer vision research community" that facilitates collaboration and "allows researchers to more easily discuss and exchange their research." Lopresti Op. ¶¶230, 233. Meta used SUNCG after Princeton released it because many others used it and it, thus, became an easy tool for comparison across researchers. *Id.* ¶234; Ex. 64 (Huber) 169:10-24; Ex. 71 (Straub) 271:18-273:6; Ex. 59 (Batra) 103:15-104:6; Princeton ROG Ex. A. SUNCG therefore helped Meta achieve its purpose of promoting the progress of science by facilitating Meta's collaboration.

Notably, although P5D includes the heading "Defendants cannot justify using P5D's works" in its brief, the section that follows does not include a single assertion that *Meta's* use of SUNCG or SUMO was unjustified. P5D only argues facts as to *Princeton* and loops Meta in as an afterthought. It makes sense that P5D has no argument as to Meta, given that it was merely a downstream user of SUNCG, like hundreds of others. P5D's argument about "justification" also misstates the law. It claims use is only transformative if the new work comments on the original or it was necessary to use the original. But as the Second Circuit explained, "[t]he law imposes no requirement that a work comment on the original or its author in order to be considered transformative." *Cariou v. Prince,* 714 F.3d 694, 706 (2d Cir. 2013); *see also Tresóna*, 953 F.3d at 648-50 (finding use transformative despite not commenting on plaintiff's song). In any case, *Meta's* use of SUNCG was necessary to be current with other researchers using it.

---

Princeton added new material, Meta used it for a new purpose, and SUNCG did not usurp P5D's market.

**B. P5D's Asserted Works Are Not Creative, and It Has No Evidence Otherwise.**

Factor two looks at the degree of creativity in the copyrighted work. *See Google*, 1201-02 (factor favored fair use as code was "further" from the "core of copyright"). Here, P5D's asserted works are far from the core of what copyright seeks to protect. Its objects are functional files, which the Court previously found to be "'computer programs' because the works consist of code that instructs computers to render specific 3D images." Dkt. 278 at 9; *see Teradyne, Inc. v. Astronics Test Sys., Inc.*, No. 2:20 Civ. 2713, 2023 WL 9284863, at *22 (C.D. Cal. 2023) (finding fair use on summary judgment as computer programs are "utilitarian articles"). Furthermore, the objects are derived from copying real-world furniture with no identifiable creative additions, as shown in the example below. Meta Mot. at 16-18.

P5D object s/1017:  Third-Party Product: 

This Court already concluded that "a large portion" of P5D's objects "did not involve sufficient creativity," causing P5D to concede that nearly half of its objects contain *no* creative additions. Dkt. 278 at 22. The remainder are copyrightable only to the extent P5D can identify "a specific and demonstrable creative choice" not dictated by reference material, *id.* at 22-23, but as set forth in Meta's Motion, P5D has not, and cannot. Meta Mot. at 16-18. Tellingly, the *only* evidence cited in P5D's Motion to support that its objects are creative is a general statement from a modeler about wanting the objects to look pleasing. P5D Mot. at n.50. That is not evidence of copyrightability, let alone evidence that P5D's basic objects fall anywhere other than on the extremely low end of creativity.

P5D's 18 scenes are also merely 3D representations of basic home designs. One was even modelled off of a scene from the television show *House*. Ex. 11 (Ketko) 285:7-286:2. P5D's Motion makes *no* argument about the creativity of these scenes. It does not even identify which scenes they are.

Finally, P5D's alleged copyright in the scene compilation extends only to the purported *selection* of scenes that users created and chose for inclusion in the gallery. P5D does not claim to own a copyright in the individual scenes, which were created by its users. Any copyright in this compilation is extremely thin. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989). And as set forth below, P5D lacks evidence that it actually selected the scenes in a creative way. *Infra* V.B. Because P5D's asserted Works are far from the core of copyright, this factor favors fair use.

### C. Meta's Use (If Any) of P5D's Works Was Limited to the Amount Necessary to Achieve its Transformative Purpose.

The third factor considers "the amount and substantiality of the portion used" (both quantitatively and qualitatively), as the extent of permissible copying "varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586. ***Quantitatively*,** Meta never used or possessed P5D's asserted compilation. Rather, it used the compilation created by Princeton, which involved a different set of scenes and different criteria for selecting scenes. *Supra* II.D; *see also* Meta Mot. at 14-15. As to the objects, Meta did not use all 3,983 that Dr. Song downloaded. Rather, SUNCG contained only 2,644 objects, many of which P5D concedes are not copyrightable. Song Paper at 5; Dkt. 282-02–09; Ex. 33. And Meta used only the portion needed for its research, which was often just a fraction of scenes, and thus a fraction of objects, including in the case of SUMO. *Supra* II.D.

***Qualitatively*,** the "heart" of P5D's data was the user-created scenes, which P5D does not own. *See supra* II.D (collecting evidence of Meta's focus on individual scenes); Song Paper (emphasizing user-created scenes and not a compilation); *Campbell*, 510 U.S. at 587 (factor considers if defendant used the "heart" of the work). Those scenes are what drew researchers to P5D, not the compilation (which had many *unhelpful* scenes, *supra* II.C) or individual objects. *See* Song Paper. Meta also merely used the objects as functional components of a 3D floorplan for its AI agents to practice navigation and object identification, "not because of their creativity, their beauty, or even (in a sense) because of their purpose." *Teradyne*, 2023 WL 9284863, at *24 (quoting *Google*, 141 S. Ct. at 1204-05).

P5D does not argue that Meta's research projects used too much of P5D's data, likely because it knows those projects used only a fraction of SUNCG, which is itself only a fraction of P5D's purported data. P5D also does not address whether the data used was *qualitatively* important. Instead, it contends (a) Meta allegedly helped Princeton download P5D's data, and (b) Meta allegedly promoted the distribution of SUNCG and SUMO via its research. Both arguments are unsupported and incorrect as a matter of law.

***First***, there is no evidence that Meta "help[ed]" Princeton download P5D's Works. Rather, as detailed in Meta's Motion, the evidence unequivocally shows that Meta was not involved in, and had no knowledge of, Princeton's download. Song Dep. 556:18-558:11; Meta Mot. at 11-12; *see also supra* II.C. P5D misleadingly cites several documents and testimony at the end of the sentence referring to Meta's

purported involvement, but all of those cites concern the degree of similarity between P5D's Works and SUNCG, not whether Meta "helped" Princeton. *See* P5D Mot. at 17 n.52.[14] P5D cannot defeat Meta's motion for summary judgment by making factual assertions without support—it must come forward with evidence in the record, which it cannot do. *Celotex,* 477 U.S. at 323.

***Second***, P5D's claim that Meta "distributed SUMO" does not help its argument. This has no bearing on factor 3, which considers how much of P5D's works were copied. In any case, as Dr. Huber, whose team prepared the SUMO challenge, testified, SUMO contained only "a few thousand" adaptations of SUNCG scenes. Ex. 64 (Huber) 91:16-92:2, 79:9-80:17. Therefore, conducting the SUMO challenge plainly did not involve distribution of P5D's purported compilation 49,479 scenes or distribution of all of its objects. Meta used only as much of SUNCG as needed for the noncommercial SUMO research goals. The distribution was also done for the limited purpose of facilitating the SUMO challenge, and only made to participants who agreed to Meta's terms. *Supra* II.D.

***Third*,** Meta's purported distribution of SUNCG is similarly irrelevant to this factor. But contrary to P5D's claim, Meta also *never did* distribute or promote the distribution of SUNCG. It merely released research (like hundreds of others) and simulators that used SUNCG. Forsyth Op. ¶251 (identifying 1357 cites to Song's Paper on Google Scholar); Princeton ROG Ex. A; Ex. 85 (describing other simulators). It is standard practice for academic researchers to identify the data used (or usable) with the research task, which is all Meta did. Lopresti Op. ¶227.[15] There is no evidence anyone used SUNCG because of Meta, let alone that Meta *distributed* SUNCG. As discussed above, SUNCG also does not contain P5D's compilation or all of the objects in which P5D claims protection. This is a far cry from the issues of mass public distribution of "all of the Fox programming that [users] seek" in *TVEyes*, 883 F.3d at 179, or taking of copyrighted works "in their entirety and distribut[ing] those copies to the public in full," in *Internet Archive*, 115 F.4th at 188, both of which P5D cites. Factor 3 favors fair use.

---

[14] Further, as the cases P5D cites show, the relevant issue "is the amount of copyrighted material *made available to the public* rather than the amount of material *used by the copier*." *Hachette Book Gr., Inc. v. Internet Archive*, 115 F.4th 163, 188 (2d Cir. 2024) (quoting *Fox News Network, LLC v. TVEyes, Inc.,* 883 F.3d 169, 179 (Feb. 27, 2018)). Thus, regardless of Meta's role in making SUNCG (it had none), this factor favors Meta as SUNCG and SUMO *do not contain* the claimed compilation or many of the objects.

[15] P5D cites to Meta's Github page concerning House3D to argue Meta distributed SUNCG. But this page just states Meta's scenes were "sourced from the SUNCG dataset" and directs viewers to *Princeton's* SUNCG website. Ex. 106 (House3D Github). SUNCG was not downloadable from Meta's GitHub page.

### D. P5D Was Not Harmed by Meta's Use of SUNCG or SUMO.

The fourth factor focuses on the "effect" of the copying in the "market for or value of the copyrighted work." *Google*, 593 U.S. at 35. This factor disfavors fair use only where the market is impaired because the material serves as a consumer substitute. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006); *Fisher v. Dees*, 794 F.2d 432, 438 (9th Cir. 1986) (economic effect of use should focus on whether it "fulfills the demand for the original").

Meta did not harm any actual or potential market for P5D's data. ***First,*** there was no market for the noncommercial use of data to train AI in 2016-2019. Such datasets were free. Lopresti Op. ¶¶210-16; Ex. 61 (Forsyth) 254:8-20. Even the one time P5D licensed its data for noncommercial use (after Princeton released SUNCG) it did so on a *royalty-free* basis. Ex. 24 at -765; *Kennedy v. Gish, Sherwood & Friends, Inc.*, 143 F. Supp. 3d 898, 912 (E.D. Miss. 2015) (industry practice of "free license[s]" favored fair use); *Field*, 412 F. Supp. 2d at 1121 (no market as plaintiff made "the works available to the public for free").

***Second*****,** regardless of whether a market existed (it did not), P5D could not participate in it. P5D did not have the right to license its user-generated scenes for that purpose. Without that right, it could not license the compilation or the objects, as the utility of the objects was their use within scenes. P5D's raw data also was not in a usable state for the type of research that researchers could conduct with SUNCG. It lacked labels and contained many other flaws, such as empty rooms, broken mesh, and lacked methods to determine whether furniture overlaps in an unrealistic way. *See supra* II.C. Even after learning of these flaws, P5D's founder and 30(b)(6) witness could not identify any steps P5D took to create a usable dataset. Ex. 70 (Sheremetyev) 500:7-20, 501:22-25, 504:12-506:22; *see also* Ex. 62 (Gavelis) 236:6-11 (licensing scenes and objects not part of product and marketing director "agenda"). And the few licensing discussions into which it entered—all *after* Princeton released SUNCG and informed the research community of P5D's existence—broke down without any commercial license being entered. *Supra* II.E; *see Google*, 593 U.S. at 36 (no market harm where the plaintiff tried and failed to enter the potential market).

***Third***, Meta *did not distribute* SUNCG; it only *used* it pursuant to Princeton's noncommercial license. *Supra* IV.A.1. The only purported loss because of *Meta* is a lost licensing fee theory. This is not market harm under Factor 4, as such a circular argument would result in a finding of harm in every case. *See e.g.*, *Google*, 593 U.S. at 38 (noting the "danger of circularity," as plaintiff could argue such a loss in

every case); *Tresóna*, 953 F.3d at 652 ("[I]t is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar.").[16]

***Finally***, Meta's conduct did not interfere with, compete with, or substitute for P5D's business. Meta did not use SUNCG or SUMO to build an interior design platform or agents that make design suggestions or interpret blueprints. There is no evidence that anyone came to Meta for data or services instead of P5D. Thus, Meta's conduct did not cause P5D to lose any deal or opportunity. Rather, P5D's business *grew* substantially after the publication of SUNCG. Schenk Op. at Fig. 15. *See Kelly*, 336 F.3d at 821 (factor 4 favored fair use as defendant "does not sell or license its thumbnails to other parties"); *Tresóna*, 953 F.3d at 651 (fair use as a consumer interested in plaintiff's music would not purchase the sheet music for defendant's work); *Author's Guild*, 804 F.3d at 224-225 (fair use, as it would be a "rare case" in which defendant's book search tool would be a "significant substitute" for the book); *Author's Guild v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014) (factor 4 favored fair use "because the full-text search function does not serve as a substitute for the books that are being searched").[17]

P5D's *only* argument as to this factor is that "by distributing P5D's entire dataset freely, Princeton and Meta harmed any potential market for P5D's works." P5D Mot. at 19. But as described above, Meta did *not* distribute SUNCG, nor did SUNCG contain "P5D's entire dataset." As P5D has no other argument regarding Meta's conduct (including as to SUMO), it concedes that Meta's conduct did *not* cause harm.

[redacted] *Supra* II.E.[18] P5D's claim that "prospective partners or acquirers had no incentive to license what Princeton was giving away for free," *id.*, is also demonstrably false, as each of these entities approached P5D *even though* SUNCG was free. This is not like cases where the plaintiff lost a chance at a license. *See, e.g., Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir.

---

[16] Meta participated in making SUMO available, but this dataset was substantially different from P5D's data as it used only a few thousand scenes. Ex. 64 (Huber) 79:10-24, 91:16-92:2. Meta's work related to SUMO also constitutes fair use for the other reasons described herein.

[17] *Dr. Seuss Enterprises V. ComicMix LLC* is thus distinguishable because, there, the defendant's work "intentionally targeted and aimed to capitalize on the same" market. 983 F.3d 443, 460 (9th Cir. 2020).

[18] [redacted]

2021). In sum, there is no evidence that P5D suffered any harm because of Meta's research; there is only evidence that P5D's business flourished. Meanwhile, Meta's use served the public benefit, because it freely shared its noncommercial research with the scientific community to promote the progress of science—precisely what fair use is designed to do. *Google*, 593 U.S. at 35; *Teradyne*, 2023 WL 9284863, at *26-27 (considering if the public benefit of use "relate[s] to copyright's concern" for "new expression"); *Designworks Homes*, 2025 WL 86370 at *7 (no market harm where defendants' use added value to works).

With all four factors in its favor, Meta's motion on fair use should be granted, and P5D's denied.

## V. P5D'S MOTION ON COPYRIGHTABILITY SHOULD BE DENIED

In its motion against Princeton, P5D claims that its asserted compilation is copyrightable as a matter of law. This request is procedurally improper and has already been denied by this Court.

### A. P5D's Motion on the Copyrightability of its Compilation is Procedurally Improper.

Under the Court's Bifurcation Order, this matter was split into two phases. Phase 1 concerned, among other things, whether P5D's works had the "*originality* necessary to bestow copyrightability." Dkt. 182 at 1:14-15. Phase 2 concerned all other issues. The order is clear that "subject to approval of the Court,"—which Meta received for its motion—parties may move for summary judgment after Phase 2 only if such subsequent motion "*not seek summary judgment of Phase 1 issues*." *Id.* at 2-3.

***First,*** the copyrightability of the compilation was a Phase 1 issue. *Id.* at 1. Yet P5D did not seek the Court's approval to move for summary judgment on it. Therefore, P5D's motion on this basis is a violation of the Court's Bifurcation Order and should be denied for this reason alone. ***Second,*** in opposition to Defendants' Phase 1 summary judgment motion, P5D requested a judgment that "[its] scene compilation work is copyrightable[.]" Dkt. 250-04 at 13. In its Clarification Order, the Court stated, "I did not find that P5D owned a copyright in the Asserted scene Compilation" and that "issue[] will be resolved at trial." Dkt. 316 at 3. P5D's attempt to undermine that ruling is improper and should be rejected.

### B. P5D Cannot Meet Its Burden to Establish Copyrightability of the Scene Compilation.

P5D's motion on copyrightability should also be denied because—as the Court recognized—Meta has arguments "to the merits that are disputed." *Id.* at 3. ***First,*** P5D's alleged criteria for selecting scenes—"artistic value, humor, variety, novelty, diversity, creativity, completeness, fun, and, in most cases, realism," P5D Mot. at 21:5-7—do not meet the threshold for creativity. Dkt. 264-03 at 12 n.24. ***Second***,

there is substantial evidence that P5D did not actually use this criteria. Meta's expert applied the purported criteria to 20 random scenes, yet successfully identified only 40% for inclusion/exclusion, "no better than random guessing." Lopresti Op. ¶¶130-33. Review of P5D's scenes makes the reason for this low success rate clear—it kept a scene of a giant rubber duck and dinosaur trampling a living room, but excluded scenes of normal looking homes. *See id.* P5D also contends it excluded scenes with "offensive or indecent content," yet scenes of a naked woman and a blood-covered man were included. Lopresti Op. ¶9; Ex. 93.

***Third***, there is a genuine dispute as to whether P5D's evidence on the compilation is credible. At the start of this case, Meta moved to dismiss the copyright claims as, among other things, the compilation was "merely a 'repository' of all of the Scenes created by" users. Dkt. 33 at 15. This Court agreed and dismissed P5D's complaint. Dkt. 52 at 13-14. P5D then drudged up a claimed selection process, but in discovery, its claims about that process constantly changed. It originally asserted that its compilation contained 63,179 scenes, but later decided it contained 49,479. Ex. 47 (P5D ROG 1) at 9; Ex. 72 (Ustyugov) 178:25-179:3. When asked to identify which scenes P5D allegedly excluded, P5D originally stated that it "[wa]s unable to," but later changed course. Ex. 47 (P5D ROG 1); Ex. 89 (ROG 3) at 10; Ex. 91 (ROG 3) at Ex. D; Ex. 90 (ROG 1) at Ex. A. Given P5D's inconsistency regarding what scenes were in its compilation, or why, there is a genuine dispute of fact as to copyrightability that the jury must decide. Dkt. 281 at 8:1-3 (quoting *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)) ("In deciding a motion for summary judgment, '[c]redibility determinations… are jury functions, not those of a judge."); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).[19]

## VI. CONCLUSION

For the foregoing reasons, P5D's motion for summary judgment should be denied, and Meta's cross-motion on fair use granted.

[19] The cases P5D cites involve attempts to defeat summary judgment with "mere assertions" of fraud, "general attacks" on credibility, and an "unspecified hope" of undermining a witness at trial. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001); *Crawford-El v. Britton*, 523 U.S. 574, 597 (1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). In contrast, Meta points to *specific evidence* that a genuine dispute exists due to P5D's shifting sands.

Dated: February 6, 2025

*/s/ Dale M. Cendali*

Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary C. Mazzello (admitted *pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (admitted *pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (admitted *pro hac vice*)
abbey.quigley@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
Miriam Kontoh (admitted *pro hac vice*)
miriam.kontoh@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400

*Attorneys for Defendants Meta Platforms Inc. and Meta Platforms Technologies, LLC*