MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
christian@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.765.6633
Facsimile: 415.283.4804

Attorneys for Plaintiff
UAB "PLANNER5D"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UAB "PLANNER5D" dba PLANNER 5D,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.<br><br>Defendants. | **Case No. 3:19-cv-03132-WHO (SK)**<br>**Case No. 3:20-cv-08261-WHO (SK)**<br><br>**REPLY TO PRINCETON'S OPPOSITION TO PLANNER 5D'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Princeton does not qualify for the DMCA safe harbor it asserts. ........ 2

1. Princeton's liability is not "by reason of" hosting SUNCG. ........ 2

2. Because of its wider program of infringement outside the safe harbor, Princeton had actual or "red flag" knowledge of any infringement that fell within the safe harbor's scope. ........ 4

3. Respondeat superior makes Princeton liable for its faculty's and graduate students' infringement in the course of their "teaching and research functions." ........ 6

4. Princeton had control over the infringement and benefited from it. ........ 8

5. SUNCG was required or recommended for Dr. Funkhouser's courses. ........ 8

6. Princeton's "academic freedom" cases do not support its broad immunity claims based on subsection 512(e). ........ 8

7. Princeton must meet its burden on all elements of its DMCA defense. ........ 8

B. It was not fair use for Defendants to scrape P5D's works, repackage them into SUNCG, and distribute them. ........ 9

1. The challenged use by Princeton is its scraping, reformatting, and distribution of P5D's works, which were not transformative and not fair use; scholarship based on the works is not relevant. ........ 9

2. Princeton's work with SUNCG was commercial. ........ 11

3. The expressive content of P5D's works is what Princeton wanted. ........ 12

4. The amount of Princeton's copying weighs against fair use. ........ 12

5. Potential markets were harmed by Princeton's use. ........ 13

C. Princeton is liable for the initial scraping of Planner 5D's data. ........ 13

1. Princeton scraped all the scenes in P5D's work ........ 13

2. P5D's scenes work was complete before Princeton's infringement: the work was created by culling 14,000 scenes, none of which was done after Princeton's scraping. ........ 14

3. Princeton scraped many objects from P5D's objects work. ........ 15

III. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

## Cases

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ... 9, 10, 11

*ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ... 12

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ... 11

*BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175 (10th Cir. 2016) ... 7

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ... 11, 13

*Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ... 2, 3, 5

*De Fontbrune v. Wofsy*, 39 F.4th 1214 (9th Cir. 2022) ... 9, 10

*Dow Chem. Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982) ... 8

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) ... 11

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ... 11

*Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ... 11

*Keck v. Mix Creative Learning Ctr., LLC*, 116 F.4th 448 (5th Cir. 2024) ... 10

*Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017) ... 7

*Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985) ... 8

*Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957) ... 8

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*, No. 20-cv-613, 2025 WL 458520, (D. Del. Feb. 11, 2025) ... 1, 10

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) ... 2, 3, 4, 5

*Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ..... 12

**Statutes**

17 U.S.C.
§ 512(c)(1) ..... 2
§ 512(c)(1)(A)(i)–(ii) ..... 4, 7
§ 512(c)(1)(A)(ii) ..... 3
§ 512(c)(1)(C) ..... 2
§ 512(e) ..... 7, 8
§ 512(e)(1) ..... 4
§ 512(e)(1)(A) ..... 8

**Treatises**

Restatement (Third) of Agency § 2.04 ..... 6

## I. INTRODUCTION

Despite what Princeton may wish, the DMCA does not bestow universities with all-purpose immunity. The safe harbor does not protect the theft of copyrighted material just because university computers were used to do it. It does not protect the storage of infringing materials on non-university websites and other universities' servers. And it does not protect inducements to infringe made in articles and talks. In any event, Princeton does not qualify for the DMCA safe harbor because it had at least red flag knowledge and because SUNCG was recommended or required for university course work. The Court should grant summary judgment for P5D on Princeton's DMCA defense.

The fair use defense is likewise not a get-out-of-jail-free card simply because a university's infringement leads to an academic article. Transformativeness under factor one focuses on the infringing use, not downstream uses or subjective intent. Here, Princeton's wholesale copying and free distribution of P5D's works is the use on which P5D's damage claim is based. That infringing use did not transform the works, did harm markets for them, and was not fair. AI training with P5D's works is also not fair use, as the Delaware District Court recently found in remarkably similar circumstances. *Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*, No. 20-cv-613, 2025 WL 458520, at *7–8, 10 (D. Del. Feb. 11, 2025). That Princeton may publish academic scholarship about its infringement does not ipso facto excuse the infringement. Princeton fails to carry its burden to show fair use.

Finally, having admitted that it scraped vast tracts of P5D's works, Princeton cannot escape liability by denying it scraped every last scene or object. For one thing, Princeton *did* scrape every last one of P5D's scenes. The evidence of this is irrefutable: every scene in P5D's work was found on Princeton's drives, as we show below. As to P5D's objects, because each of them was created and is owned by P5D, Princeton would be liable if it scraped just one. Yet Princeton concedes it scraped thousands. The Court should grant summary judgment for P5D.

## II. ARGUMENT

### A. Princeton does not qualify for the DMCA safe harbor it asserts.

#### 1. Princeton's liability is not "by reason of" hosting SUNCG.

The subsection 512(c) safe harbor shields a host from copyright liability "by reason of the storage at the direction of a user of material" on the host's website. 17 U.S.C. § 512(c)(1). Although these terms focus on "the storage . . . of material," the safe harbor protects something more: the public's access to that material. This broader function guides the safe harbor's construction, as explored in a pair of Ninth Circuit opinions argued the same day and decided by the same panel: *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) and *Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013). Princeton wrongly relies on both decisions for an expansive reading of the DMCA's scope.

In *UMG*, the defendant ran a video-sharing site. When a user uploaded a video, the site did more than just store it. It automatically processed the video to make it more accessible, breaking it into more manageable "chunks," converting it into widely playable formats, and adding searchable tags from extracted metadata and user-added information. *UMG*, 718 F.3d at 1012. UMG argued that these automated processes weren't technically "storage," and thus weren't protected by subsection (c). *Id*. at 1016. The court disagreed, reasoning that 512(c) "presupposes that service providers will provide access to users' stored material." *Id.* at 1017–18. For example, a notified provider isn't required to remove the infringing material to avoid liability, as one would expect if storage were the focus; it can just "disable access." *Id.* at 1018–19 (discussing 17 U.S.C. § 512(c)(1)(C)). The court thus held that "by reason of the storage" encompasses such "access-facilitating processes that automatically occur" when material is uploaded to storage. *Id*. at 1016.

*Columbia Pictures* is also based on the recognition that the DMCA is as much about public access as it is about storage. The defendant, Fung, was accused of inducing infringement by hosting "torrent" files, which contain no infringing material themselves but enable access to pirated content on a peer-to-peer network of private computers. *Columbia Pictures*, 710 F.3d at 1027, 1042–43. Because Fung's servers did not store the infringing content itself, Columbia argued that subsection 512(c) did not apply. The court disagreed. To start, it was *not* disqualifying that Columbia's claim was for inducement,

rather than direct infringement. The DMCA is not limited to direct infringement claims. *Id.* at 1039–40. And the inducement claim against Fung was "by reason of" hosting torrents, at least some of which were uploaded by users. *Id.* at 1042–43. Thus, Fung "would be at least facially eligible for the safe harbor" for hosting such user-uploaded torrents. *Id.* at 1043. Yet the court still held Fung ineligible for protection under the DMCA. This was because Fung did not merely host the torrents, but "actively encourage[ed] infringement, by urging users to both upload and download particular copyrighted works, providing assistance to those seeking to watch copyrighted films, and helping his users burn copyrighted material onto DVDs." *Id.* These inducing actions gave Fung "red flag" knowledge of infringement, which is disqualifying under the DMCA. *Id.* (discussing 17 U.S.C. § 512(c)(1)(A)(ii)). (For further discussion, *see* ECF 552 at 7:13–8:20; ECF 589 at 8:11–9:4.)

Princeton wrongly relies on *UMG* and *Columbia Pictures* to argue that the DMCA protects not just automated, access-facilitating processes, but actions by human agents for any purpose, as long they are "using material on Princeton's networks." (ECF 583 at 1:15-16, at 6:8–7:2.) Based on this extraordinary reading, Princeton claims DMCA protection when it "directed other researchers to get a copy of SUNCG from Princeton's website" and "promoted links to SUNCG and code associated with SUNCG stored on a Princeton server." (*Id.* at 6:12–15 (markups omitted).) Princeton argues that the DMCA even shields activity on other websites, like GitHub, and servers at other universities, like Stanford. (*Id.* at 6:14–15, 6:20–7:2.) It's enough, Princeton urges, that its researchers used Princeton computers to access those other sites and servers. On that novel theory, Princeton even claims immunity for its original wrongdoing of accessing and scraping Planner 5D's servers. (*Id.* at 16:10–12.)

Unlike the video format conversion and tagging in *UMG*, none of Princeton's actions were automatic processes to facilitate the public's access to user-posted material. Neither *UMG*'s holding nor its reasoning supports such a radical extension of the DMCA. Indeed, in the companion *Columbia Pictures* case, non-hosting inducement like Princeton's was *disqualifying* under the DMCA's red-flag knowledge provision.

Princeton also wrongly claims that *Columbia Pictures* supports its argument that DMCA protections extend even to its infringing activity on GitHub and Stanford's servers. In *Columbia Pictures*, as discussed, Fung's site did not store pirated content directly. But it did store torrents that

enabled access to pirated content on a peer-to-peer network. Although the torrents may not have been infringing themselves, the inducement claims against Fung were literally "by reason of the storage" of the torrents on Fung's website, as 512(c) requires. In contrast, when Princeton scraped P5D's works from P5D's servers, Princeton's resulting liability is not "by reason of" storing anything on Princeton's own servers, or facilitating public access to them, automatically or otherwise. Nor was it an automatic access-facilitating process when Princeton's researchers chose to store copies of P5D's works on Stanford's server and to post SUNCG-related tools on GitHub. Accordingly, neither *UMG* nor *Columbia Pictures* supports Princeton's claimed immunity for stealing and distributing P5D's works merely because it used its own computers to do so. It's simply not enough for Princeton to somehow work its computer network into the story—not a hard exercise in today's world.

Finally, Princeton claims support in the statutory text, pointing to a reference to "activity using the material on the system." (ECF 583 at 6:6-7.) But that quoted language doesn't describe what's in the DMCA's scope. Rather, Princeton quotes from a clause that *limits* the safe harbor. It provides that a web host is *disqualified* from the safe harbor if it has "actual [or red flag] knowledge that the material *or an activity using the material on the system* or network is infringing." 17 U.S.C. § 512(c)(1)(A)(i)–(ii) (emphasis added). While this text makes *knowledge* of any infringing activity using the material *dis*qualifying, it does not sweep all such infringing activity into the safe harbor. By its terms, the safe harbor only precludes liability for infringement "by reason of the storage at the direction of a user of material" on the host's network.

**2. Because of its wider program of infringement outside the safe harbor, Princeton had actual or "red flag" knowledge of any infringement that fell within the safe harbor's scope.**

Only for purposes of the 512(c) safe harbor and only if other requirements are met, subsection (e) shields a nonprofit university from its "faculty member's or graduate student's *knowledge or awareness* of his or her infringing activities." 17 U.S.C. § 512(e)(1) (emphasis added). In a 512(c) case, subsection (e) does not abrogate general principles of agency law more broadly—contrary to Princeton's assertion. (*See* ECF 583 at 7:4–8:2.)

When subsection (e) refers to a university member's "awareness of his or her infringing activities," a natural reading is that it refers to infringing activities *that otherwise fall within the DMCA's*

*safe harbor*. After all, *those* infringing activities are the statute's topic. Princeton argues that "infringing activities" means something different in this one clause than it does in the rest of the statute. In this one clause, Princeton argues that "infringing activities" should be construed to refer to any infringing activity of any kind, including activity far outside of the 512(c) safe harbor. In particular, Princeton argues that subsection (e) should shield it from its agents' knowledge during such unprotected infringing and infringement-inducing conduct such as "(1) drafting academic research articles; (2) giving academic talks; (3) developing software tools to analyze data; and (4) giving data to other doctoral and undergraduate students conducting research." (ECF 583 at 5:14–17.)

None of the activities that Princeton lists falls within the safe harbor, as P5D has just shown. (*See also* ECF 552 at 6:8–8:20.) Princeton is thus liable for its members' infringement in these contexts. If Princeton's reading were correct, it would simultaneously be liable for infringement that is outside subsection (c) and legally ignorant of it under subsection (e). This would be an unnatural reading of the text. It's also bad policy. If university members are engaged in a widespread program of infringement and inducement that is outside of the DMCA, there's no reason to invent new legal fictions to carve out one step in that program. Subsection (e) should be construed to prevent imputed knowledge only of infringing activities within the scope of the statute. Under this more natural reading, Princeton is charged with knowledge of the infringement for which it is liable. That knowledge disqualifies Princeton from the safe harbor for any sliver of its program of infringement that might otherwise fall within 512(c)'s scope.

Princeton denies that even its researchers knew about their infringement. (ECF 583 at 9:5–18.) Princeton's researchers scraped objects and scenes from P5D's servers and knew that they had done so. They understood the works were copyrighted and that they had no authorization to download or use them. (*See, e.g.*, ECF 530-5 (Song: "[redacted]).) They thus had specific knowledge of their particular infringing activity, which is all that is required to show actual knowledge. *See UMG*, 718 F.3d at 1021–22. They certainly were "aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person," which establishes "red flag" knowledge. *Columbia Pictures*, 710 F.3d at 1043.

Princeton's attempt to distinguish *Columbia Pictures v. Fung* (*see* ECF 583 at 8:17–9:5), is adequately addressed in P5D's opposition to Princeton's motion. (*See* ECF 589 at 8:11-9:4.)

Finally, Princeton is wrong to claim that P5D waited a year after learning of Princeton's infringement before responding. (*See* ECF 583 at 9 n.4 & ECF 582-2 ¶ 16.) Princeton falsely states that P5D "learned about the use of its data in SUNCG" by January 2018. (ECF 583 at 9 n.4.) In fact, in the very deposition Princeton cites, P5D's witness testified that while he learned at that time that P5D was mentioned in an academic article, he did not read the article and did not know P5D's data had been used.[1] That knowledge did not come until a year later in February of 2019.[2]

**3. Respondeat superior makes Princeton liable for its faculty's and graduate students' infringement in the course of their "teaching and research functions."**

Contrary to Princeton's contention, a showing of actual or apparent authority is not always required. An employer is liable for its employees' actions within the scope of their employment. Restatement (Third) of Agency § 2.04. Professor Funkhouser was a Princeton faculty member when he supervised Dr. Song's scraping. Song was a graduate student employed as a teaching and research assistant.[3] Princeton does not dispute these things. And it concedes that "all the allegedly infringing conduct was committed by faculty and graduate students in the course of their 'teaching and research functions'" (ECF 583 at 4:23–24 (markups omitted))—that is, within their employment's scope.

Because Funkhouser and Song were employees acting within the scope of their employment, no further showing of authority is required, despite what Princeton argues. (*See* ECF 583 at 8:5–16.) Even so, there is plenty of such evidence. Princeton itself treats faculty and students as agents. For example, Princeton's rules and procedures provide: "The University shall own all rights in any discovery or invention resulting from research carried on by any Faculty member, employee, or student," if it was supported in any way by Princeton's resources, including by any "funds administered by the University." (ECF 533-1 at PRIN00035773, § c.1.) [redacted]

---

[1] *See* Declaration of Christian Andreu von-Euw in support of P5D's Replies (CAvE Reply Decl.) Ex. 72 at 532:14-533:15. Unless otherwise noted, all cited exhibits are attachments to the CAvE Reply Declaration.

[2] *Id.* at 532:11-13.

[3] Ex. 85.

[redacted]. (ECF 551-59 at PRIN00002862.) This and other evidence leave no doubt that Funkhouser, Song, and their team did their SUNCG work as Princeton's agents.

Princeton argues that even if it would otherwise have respondeat superior liability, 512(e) changes that in some unspecified way. As discussed, one of subsection (c)'s requirements is that the web host "does not have actual knowledge that the material or an activity using the material on the system or network is infringing." Subsection (e) carves a narrow exception to this no-knowledge requirement for nonprofit universities and similar institutions. When a university meets 512(e)'s requirements, then "for the purposes of subsection[] (c) . . . such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution." As this language makes clear, subsection (e) does not, as Princeton suggests, reject common law principles of agency altogether. (*See* ECF 583 at 7:3–8:2.) It only affects whether knowledge is imputed for purposes of subsection (c)(1)(A)(i) and (ii). In all events, as shown elsewhere, Princeton does not qualify for 512(e), whatever its effects might be. (*See, supra,* §§ A.1, A.2, A.5.)

Finally, Princeton seeks support from dicta in a Tenth Circuit opinion that was rejected by the Ninth Circuit in *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1053 n.8 (9th Cir. 2017) (discussing *BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1180–81 (10th Cir. 2016)). (*See* ECF 583 at 7 n.3.) The Tenth Circuit in *BWP* held that certain contractors for a provider were not its employees, and thus were users under subsection (c). This is consistent with Ninth Circuit law. The *BWP* court added, however, that it might not be disqualifying if the contractors *were* employees. The court did not explain what it meant, *see BWP*, 820 F.3d at 1181, but it may have had in mind employees acting outside the scope of their employment. Whatever the Tenth Circuit meant in *BWP*, Ninth Circuit law is clear: infringing posts by a host's own agents are not "at the direction of a user." *Mavrix*, 873 F.3d at 1053 n.8. In this Circuit, the DMCA does not protect a host's agents' posts.

**4. Princeton had control over the infringement and benefited from it.**

As just shown, Funkhouser and Song were employees, and their infringing actions were within the scope of their employment. Princeton thus had the right and ability to control those actions. As also shown, Princeton *did* benefit financially from the infringing activity. (ECF 552 at 3:3–14, 9:1–15.)

**5. SUNCG was required or recommended for Dr. Funkhouser's courses.**

As P5D's motion shows, Princeton is disqualified from the enhanced protection for universities under 512(e), because SUNCG was used by Professor Funkhouser for coursework at least three times. 17 U.S.C. § 512(e)(1)(A). (*See* ECF 552 at 9:16–11:3.) Princeton argues that the legislative history adds restrictions to the disqualification clause that do not appear in the statute. (ECF 583 at 12:5–14:8.) It does not, as P5D has shown in its opposition to Princeton's cross-motion. (ECF 589 at 9:9–10:4.)

**6. Princeton's "academic freedom" cases do not support its broad immunity claims based on subsection 512(e).**

With the DMCA, Congress articulated a balance between copyright protection and academic freedom for the Internet era. Its text protects a nonprofit university for infringing posts on its networks even if the post is by qualifying professors or graduate students within the scope of their employment. The text does *not* protect a university from anything that touches its computers or networks. Today, that's everything. And the text excludes required or recommended course material. The ideals of academic freedom do not require this safe harbor's expansion any more than copyright's ideals require its contraction. None of Princeton's "academic freedom" cases (ECF 583 at 5:11-12) involves the DMCA, principles of agency, or intellectual property. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985) (due process challenge to medical student's dismissal); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234 (1957) (professor questioned about socialist beliefs and affiliations); *Dow Chem. Co. v. Allen*, 672 F.2d 1262 (7th Cir. 1982) (university subpoenaed about research related to Dow Chemical's products). These cases shed no light on 512(e) and do not support the immunity Princeton seeks.

**7. Princeton must meet its burden on all elements of its DMCA defense.**

Princeton wrongly claims that P5D does not challenge some elements of the DMCA safe harbor. (*See* ECF 583 at 3:5–12.) This is an affirmative defense, which is Princeton's burden to prove. P5D *does* contest Princeton's ignorance as an institution of the scraping and exploitation of P5D's works. P5D

*does* contest the speed and completeness of Princeton's compliance with P5D's cease-and-desist letter. And P5D *does* contest Princeton's technical compliance with the statute. Princeton must produce prima facie evidence on these elements. And P5D will dispute these elements at trial.

**B. It was not fair use for Defendants to scrape P5D's works, repackage them into SUNCG, and distribute them.**

**1. The challenged use by Princeton is its scraping, reformatting, and distribution of P5D's works, which were not transformative and not fair use; scholarship based on the works is not relevant.**

In evaluating the purpose and character of the defendant's use, "[t]he 'use' at issue is the allegedly infringing one[.]" *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1224 (9th Cir. 2022). *Accord Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533–34, 534 n.10 (2023). "The 'end-user's utilization of the product is largely irrelevant.'" *De Fontbrune*, 39 F.4th at 1224. Thus, in *Warhol,* Lynn Goldsmith took a series of photos of Prince, selling or licensing some over the years. *Warhol*, 598 U.S. at 515, 520. Vanity Fair licensed one of the photos for use in one illustration, which it hired Andy Warhol to create. *Id.* at 517. Warhol made the one Vanity Fair illustration plus fifteen unauthorized works based on the photo. *Id.* at 517–18. Thirty years later, just after Prince's death, Warhol's foundation sold a license to one of the fifteen other works for a special-run commemorative magazine cover. *Id.* at 519. Warhol's unauthorized *creation* of the fifteen works—including the newly licensed one—was not at issue. Goldsmith sued only over the unauthorized *license*. *Id*. at 526.

In a concurrence, Justice Gorsuch argued that the purpose and character of Warhol's print didn't matter to the Court's decision. *Id.* at 556. The foundation's licensing is what Goldsmith challenged, and that licensing competed with Goldsmith's own licensing efforts. *Id*. at 556–58. To Gorsuch, that cut the fair use analysis short. The majority agreed that the foundation's licensing was the relevant use. *Id.* at 526, 533–34. But in analyzing that use, the majority also considered how Warhol altered the photograph, deciding it was not transformative. (In dissent, Justice Kagan ignored the license, and focused only how Warhol altered the original. *Id.* at 592–93; *see also id.* at 534 n.10.)

Here, P5D challenges Princeton's scraping of its works and its distribution of SUNCG, which are the bases of P5D's damage claim. Princeton's AI training on P5D's works and the resulting models are also infringing and not fair use—as a landmark decision recently found. *Thomson Reuters*, 2025 WL

458520, at *10. (*See* P5D's Reply to Meta Opp. § II.A.1.) But Princeton's "ultimate purpose of publishing academic literature" (ECF 583 at 14:23–26) is not the issue, and "is largely irrelevant." *See De Fontbrune*, 39 F.4th at 1224 (holding that book's use of artwork photos was not rendered fair because it was "intended for" use in criticism, scholarship, or research). Further, P5D's works were already usable and used for AI training, as P5D has shown. (ECF 552 at 2:2–6, 2 n.1, 14:12–18, 14 n.46; ECF 589 at 14:11–21.)

Trying to shift the focus from its infringing activity to its subjective research motives, Princeton incorrectly cites *Keck v. Mix Creative Learning Center, LLC*, 116 F.4th 448, 455 (5th Cir. 2024). (*See* ECF 583 at 18:11–13.) Keck created original "Dog Art" collages suitable for décor. Mix sold at-home art learning kits. One kit featured Keck's work. It included supplies, a lesson plan, and printed-out PowerPoint slides with a biography of Keck and images of her work. Compared to the décor purpose served by Keck's originals, Mix's kits with their slide print-outs served a "distinct, educational purpose." *Id.* at 455. Given these objective differences, the court found "little threat that the art kits would serve as substitutes for the originals." *Id.* This is why the kits were found to be a transformational use. In contrast here, P5D's works and SUNCG both can, and do, serve the same function: as AI training material. Princeton's use thus not only threatens to, but does, serve as a substitute for P5D's original.

Princeton incorrectly contends that in evaluating transformation, "[t]he question is not *how* a user transformed a copyrighted work, but *why*—what *purpose* the transformation served." (ECF 583 at 15:27–28.) In fact, the inquiry is about *both* the work's purpose *and* its character. Does it objectively serve a further purpose? (*See* P5D's Reply to Meta Opp. § II.A.2.) And how is its character changed? In his *Warhol* concurrence, Justice Gorsuch frames the analysis in nearly the exact terms that Princeton rejects: "It's a comparatively modest inquiry focused on *how* and for what reason a person is using a copyrighted work in the world[.]" *Warhol*, 598 U.S. at 554 (emphasis added). And the *Warhol* majority did consider *how* Warhol targeted the copyrighted subject of his Soup Cans prints, but not the copyrighted subject of his Prince prints. That's why one was transformative and the other was not. It thus matters a lot *how* the original work is transformed. The answer here is, not much. Princeton copied P5D's works wholesale and, other than irrelevant minor tweaking and reformatting, used them as-is.

Princeton concedes that its use wasn't justified by anything particular to P5D's objects and scenes such that it couldn't have used others instead. (ECF 583 at 18:21–23.) But it argues that it is not required to justify using P5D's works in particular. (*Id.* at 18:18–19:5.) Absolutes in fair use law are rare. Yet a critical role is played by justification for targeting, as the Supreme Court emphasized in *Warhol*, 598 U.S. at 546–47, 547 n.21. The Court observed that Warhol's Prince print may well be a commentary on the dehumanizing nature of celebrity. But "it 'has no critical bearing on' Goldsmith's photograph." *Id.* at 546 (*quoting Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994)). As a result, "[t]he asserted commentary is at *Campbell*'s lowest ebb," and its "'claim to fairness in borrowing from' her work 'diminishes accordingly (if it does not vanish).'" *Id.* at 546–47 (*quoting Campbell*, 510 U.S. at 580). It weighed against fair use that Warhol's foundation was unable to meet its burden to offer any "independent justification, let alone a compelling one, for copying the photograph, other than to convey a new meaning or message." *Id.* at 547.

Princeton mischaracterizes P5D as arguing that fair use requires the infringer to have commented on the original. (ECF 583 at 17:8–21.) But targeting of other kinds can also justify using a particular work. For example, a use may be justified if it "provides otherwise unavailable information about the original." *Warhol*, 598 U.S. at 545 (*citing Authors Guild v. Google, Inc.*, 804 F.3d 202, 215–16 (2d Cir. 2015)). It is also justifiable if the new work uses the original to enable "programs to speak to each other" and "programmers . . . to use their acquired skills." *Id.* at 533 n.8 (*quoting Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 31 (2021)). (*See* ECF 589 at 13:19–14:3.) Commentary thus is not the only way to justify taking a particular work. But as "fair use is an affirmative defense," Princeton "bears the burden to justify its taking . . . with some reason other than, 'I can make it better.'" *Warhol*, 598 U.S. at 547 n.21. That burden of justification is even higher when the original works were stolen, as they were here. *See Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 563, 569 (1985) (magazine's use of "purloined manuscript" was not fair). Princeton does not and cannot meet that burden of justification.

**2. Princeton's work with SUNCG was commercial.**

Especially because Princeton's use is not transformative, "the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 184–86 (2d Cir. 2024). (*See also* ECF 589 at 10:25–11:20.) Further,

"[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000). If Princeton's only benefits came from enhanced reputations for good scholarship, this might be a harder case. But Princeton's commercial ties are much stronger than that. [redacted] (*See* ECF 552 at 16:13–17 & n.48.) Princeton knowingly distributed SUNCG to commercial entities, including Meta. (ECF 551-7 at Am. Ex. A; ECF 589 at 11:21–12:12.) And Princeton collaborated with Meta's product-development-focused Building 8 group on the Enigma project. (*See* ECF 588 at 4:18–6:20.)

**3. The expressive content of P5D's works is what Princeton wanted.**

P5D's works are original sculptured three-dimensional objects and a curated selection of interior design scenes using those objects, including eighteen scenes wholly created by P5D. The original, expressive aspects of both the scenes and the objects are critical to machine learning, as P5D has shown. (ECF 588 at 23:18–24:2; *see also* P5D's Reply to Meta Opp. § II.A.4.) Princeton is thus wrong to argue that its AI training using the works wasn't driven by the expressive content. (ECF 583 at 20:21–21:12.)

**4. The amount of Princeton's copying weighs against fair use.**

"[W]holesale copying," as Princeton did here, "militates against a finding of fair use." *Worldwide Church*, 227 F.3d at 1118. This is well established. Princeton nonetheless claims that its wholesale copying was reasonable, relying on *ASTM v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1269 (D.C. Cir. 2023). (ECF 583 at 21:13–21.) *ASTM* was a unique case, and doesn't help Princeton here. The plaintiffs in *ASTM* were private setters of industry standards that are often incorporated into regulations. Non-profit Public.Resource.Org's mission is "to provide the public with a free and comprehensive repository of the law." *ASTM*, 82 F.4th at 1268. Consistent with that mission, "Public Resource posts standards that government agencies have incorporated into law—no more and no less." *Id.* at 1269. "[L]egal text 'falls plainly outside the realm of copyright protection.'" *Id.* at 1268. "And because incorporated standards have legal force, they too fall, 'at best, at the outer edge of copyright's protective purposes.'" *Id.* "If an agency has given legal effect to an entire standard, then its entire reproduction is reasonable." *Id.* at 1269. "Given the 'nature' of the works at issue, 'the fact that the entire work is

reproduced does not have its ordinary effect of militating against a finding of fair use.'" *Id.* Here, unlike ASTM's standards, P5D's works haven't been propelled into the public domain by public rulemaking.

**5. Potential markets were harmed by Princeton's use.**

It's Princeton's burden to establish a lack of harm to actual or potential markets for P5D's works. *Campbell*, 510 U.S. at 590. Princeton is thus wrong to talk about what harm P5D can or "cannot show." (ECF 583 at 22:3–6.) Princeton concedes that "there may have been actual and potential markets to license scenes generally." (*Id.*) Princeton's use harmed those markets, and it cannot meet its burden to show otherwise, as P5D's other papers show. (ECF 552 at 18:4–19:4; ECF 589 at 14:22–15:10.)

**C. Princeton is liable for the initial scraping of Planner 5D's data.**

**1. Princeton scraped all the scenes in P5D's work**

Princeton infringed P5D's scenes compilation by scraping it in its entirety. Princeton already admits that Dr. Song downloaded the "scenes on *each* page of Planner 5D's public gallery." (ECF 552-8 at 5:14–18 (emphasis added).) Princeton's own records confirm that Song scraped the whole work: all 49,479 scenes were found on Princeton's servers.[4]

Despite this incontrovertible evidence, Princeton contends that it scraped only a subset of P5D's scenes based on the incorrect assertion that Song took only the first 1,000 pages of scenes from Planner 5D's gallery. (ECF 583 at 23:24–25, 24:26–25:3.) But Princeton's contention is wrong. Each page has 16 scenes; therefore, 1,000 pages have 16,000 scenes—fewer than one-third of the 49,479 P5D scenes found on Princeton's drive.[5] Princeton gets this wrong because it incorrectly assumes that Song only ran her scene-stealing software once. Princeton also looks only at the last version of the software, which was configured to download only 1,000 pages. In fact, to download everything, Song ran her program multiple times, configuring it differently each time.[6] The forensic evidence confirms this.[7] In the end, Song scraped 100% of Planner 5D's scenes work.

[4] CAvE Reply Decl. ¶¶ 26–33; *compare* ECF 540-18 (list of every scene in Scenes Work) *with* Ex. 83 (locations of each scene in Scenes Work on Princeton's network drive) and Ex. 82 (location of every scene file on Princeton drive); *see also* ECF 540-12 ¶¶ 201–203 (confirming downloaded scene files are the same as P5D scenes files).

[5] CAvE Reply Decl. ¶¶ 14-20; Declaration of A. Ustyugov in support of P5D's Replies ¶¶ 3–6 & Ex. 1.

[6] *See* CAvE Reply Decl. ¶¶ 21–22 & Ex. 73.

[7] *Id.* ¶ 25.

Because Princeton did copy all 49,479 scenes, it's a red herring for Princeton to argue that it would be relieved of liability if it scraped only a subset of P5D's scenes work. (ECF 583 at 23:11–28.) This argument is also wrong legally, as P5D details elsewhere. (ECF 589 at 1:21–3:9.)

**2. P5D's scenes work was complete before Princeton's infringement: the work was created by culling 14,000 scenes, none of which was done after Princeton's scraping.**

Princeton contends that P5D did not complete its scenes work until after Song's scraping, wrongly asserting that P5D's culling to create the work didn't occur until afterwards. (ECF 583 at 24:3.) In fact, P5D's Scenes Work was completed before Princeton's infringement. Princeton confuses two steps in P5D's selection process. First, P5D regularly "vetted" all scenes right after users first added them to the gallery. Second, P5D occasionally "winnowed" more scenes, going back and removing previously approved scenes.[8] Starting in 2012 and up to Princeton's scraping, in these two ways, P5D culled approximately 14,000 scenes, first vetting all scenes and later winnowing out a few more.[9] Princeton is thus wrong to claim that all were "winnowed" or that none were culled until after the scraping. (ECF 583 at 24:3 (emphasis added.)) That is not what P5D said. (*Compare* ECF 583 at 24:3 *with* ECF 552 at 21 (no mention of "winnowing").) The vast majority of the 14,000 scenes were culled through vetting, not winnowing; and all culling occurred before Princeton's scraping, not after.[10]

The 332 scenes that Princeton focuses on (ECF 583 at 24:13–20) are not part of P5D's Scenes Work and are thus irrelevant here.[11] Princeton has known this for years. In September 2022, P5D gave Defendants a precise list of each specific scene in its Scenes Work. The 332 scenes that Princeton now complains about were never on that list, and never part of P5D's Scenes Work.[12] And P5D has never claimed the 332 scenes were culled before the scraping.[13]

---

[8] *Id.* ¶¶ 34–36.
[9] *Id.*
[10] *Id.*
[11] *Id.* ¶¶ 37–39.
[12] *Id.*
[13] *Id.*

### 3. Princeton scraped many objects from P5D's objects work.

Princeton admits it copied thousands of objects from P5D's Objects Work. (*E.g.*, ECF 583 at 23:7–8; ECF 533-29 at 5.) Given that, and contrary to Princeton's argument, it's irrelevant that Dr. Song failed to copy every object in the work. (ECF 583 at 23:7–9.) Each of the work's objects is a 3D model owned by P5D. The work is not a compilation of public domain facts. This is thus not a case where two works must be "virtually identical" to show that copying occurred. (*See* ECF 589 at 1:21–3:9.)

Princeton is thus not absolved just because Dr. Song failed to find and download every last one of P5D's objects. Princeton is liable for each object that she did download. And identifying which objects Princeton took is easy: they are on Princeton's network drive, which it produced in this case.[14] (*See also* ECF 540-12 ¶¶ 202–204.) For each of these downloads, the Court should grant summary judgment against Princeton, contingent only on a finding of copyrightability at trial.

None of this is altered by a misstatement in P5D's opening brief, which we now correct. P5D's brief correctly explained that "Dr. Song admitted that she copied all of the Planner 5D objects she could identify, and all the scenes in its entire public gallery." (ECF 552 at 19:24–25.) But this was then imprecisely summarized as "scrap[ing] all of Planner 5D's then-available object and scene files from its public gallery of scenes." (*Id.* at 19:17–18.) More precisely, Dr. Song downloaded every one of P5D's then-available scene files and all of the object files that *she could identify*.

## III. CONCLUSION

For these reasons, the Court should enter judgment against Princeton's DMCA and fair use defenses and in favor of Planner 5D's infringement claim based on Princeton's scraping of P5D's Scenes Work and of all objects from its Object Work that are found copyrightable at trial.

Respectfully submitted,

DATED: March 5, 2025

THE BUSINESS LITIGATION GROUP, P.C.

By: /s/*Marc N. Bernstein*
Marc N. Bernstein

Attorneys for Plaintiff
UAB "PLANNER5D"

[14] *Id.* ¶¶ 31–32 & Ex. 84.