MARC N. BERNSTEIN (SBN 145837)
mbernstein@blgrp.com
WILL B. FITTON (SBN 182818)
wfitton@blgrp.com
CHRISTIAN G. ANDREU-VON EUW (SBN 265360)
christian@blgrp.com
THE BUSINESS LITIGATION GROUP, P.C.
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.765.6633
Facsimile: 415.283.4804

Attorneys for Plaintiff
UAB "PLANNER5D"

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

UAB "PLANNER5D" dba PLANNER 5D,

Plaintiff,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20.

Defendants.

**Case No. 3:19-cv-03132-WHO (SK)**
**Case No. 3:20-cv-08261-WHO (SK)**

**REPLY TO META'S OPPOSITION TO PLANNER 5D'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 1

A. It was not fair use for Meta to download, exploit, distribute, and promote SUNCG and SUMO. ........ 1

1. AI training is not fair use, as a recent landmark decision just held. ........ 1

2. Meta's use was not transformative. ........ 2

3. Commercial ends motivated Meta's use, and even nonprofit use is not fair where, as here, it is not transformative. ........ 4

4. The nature of Planner 5D's work is expressive, not factual. ........ 8

5. Meta's infringement harms potential markets for P5D's works. ........ 8

B. The Court should find P5D's scene compilation is copyrightable. ........ 9

III. CONCLUSION ........ 10

## TABLE OF AUTHORITIES

### Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ........ 4

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........ 3

*ASTM v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ........ 5, 6

*ASTM v. UpCodes, Inc.*,
No. 24-cv-1895, 2024 WL 4374117 (E.D. Pa. Oct. 2, 2024) ........ 5

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ........ 6

*Crawford-El v. Britton*,
523 U.S. 574 (1998) ........ 9

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*,
126 F.4th 589 (8th Cir. 2025) ........ 4

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ........ 3, 8

*Far Out Prods v. Oskar*,
247 F.3d 986 (9th Cir. 2001) ........ 9

*Field v. Google Inc.*,
412 F. Supp. 2d 1106(D. Nev. 2006) ........ 5

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........ 2

*Keck v. Mix Creative Learning Ctr., LLC*,
116 F.4th 448 (5th Cir. 2024) ........ 4

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811(9th Cir. 2003) ........ 4

*Nat'l Union Fire Ins. v. Argonaut Ins. Co.*,
701 F.2d 95 (9th Cir. 1983) ........ 9

*Northland Fam. Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
868 F. Supp. 2d 962 (C.D. Cal. 2012) ........ 3, 4

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 4

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ........ 2

*Seltzer v. Green Day Inc.*,
725 F.3d 1170 (9th Cir. 2020) .......... 3

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*,
No. 20-cv-613, 2025 WL 458520 (D. Del. Feb. 11, 2025).......... 1, 2

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020) .......... 3, 4

## I. INTRODUCTION

Meta hopes to persuade the Court—and avoid persuading a jury—that altruism alone drove its investments of billions of dollars in computer vision research. Mounds of evidence and simple common sense say otherwise. Meta clearly expects rich long-term commercial rewards from its research projects, including those that used P5D's works.

Even apart from its commercial motives, Meta's use of P5D's works was not transformative. It also clearly harmed the market for P5D's works as AI training data. In a remarkably similar case, the District Court of Delaware recently rejected a fair use defense as a matter of law, granting summary judgment for the plaintiff. *Thomson Reuters Enter. Ctr. GMBH v. Ross Intelligence Inc.*, No. 20-cv-613, 2025 WL 458520, at *10 (D. Del. Feb. 11, 2025) (Bibas, 3d Cir. J., by designation). The court found that AI training is not transformative even if the final product does not incorporate the copied works. *Id.* at *7–8. The court also found that AI training harms the potential market for training data even if that plaintiff never used the copyrighted work in that way. *Id.* at *10. As discussed below, Meta's case for fair use is weaker than Ross's. Among other things, unlike Ross, Meta is directly and indirectly liable for distributing P5D's works themselves.

The Court should enter summary judgment for P5D on Meta's fair use defense.

## II. ARGUMENT

### A. It was not fair use for Meta to download, exploit, distribute, and promote SUNCG and SUMO.

#### 1. AI training is not fair use, as a recent landmark decision just held.

Using copyrighted works to train AI models is not fair use. This follows from an application of the four fair use factors, as scholarship has shown. (*See* ECF 590-52.[1]) Courts have now begun to confirm this analysis. In a landmark opinion less than a month ago, the Delaware District Court granted summary judgment of no fair use in *Thomson Reuters*, 2025 WL 458520, at *10. The court found that Ross Intelligence's AI training using Thomson Reuters' copyrighted Westlaw headnotes was not transformative even though those headnotes were not incorporated into Ross's final product. *Id.* at *7–8.

[1] The cited article was written by one of P5D's counsel of record in this case.

The purpose and character of Ross's use thus weighed against fair use. The court also found that "the effect on a potential market for AI training data" weighed against fair use. *Id.* at *10. The machine learning work that Thomson Reuters did or did not do "does not matter." *Id.* Ross had failed to meet its burden to show that these markets and potential markets would not be affected. *Id.* Some factors favored Ross. Westlaw headnotes are factual and involve minimal editorial creativity. *Id.* at *9. And while Ross copied the headnotes, it did not make them available to the public. *Id.* Nonetheless, the court granted summary judgment in Thomson Reuters' favor. *Id.* at *10. The court held that AI training is not transformational and necessarily affects potential markets for AI training data.

Here, as in *Thomson Reuters*, the AI training was not transformative and necessarily affected potential markets for AI training data. Further, *unlike* Westlaw headnotes, P5D's objects and scenes are not compilations of facts, but of creative and expressive designs. And P5D's works *were* incorporated into SUNCG and SUMO and made available to others. Meta directly distributed SUMO, induced distribution of SUNCG, and is indirectly liable for Princeton's distribution. (*See* ECF 588 at 7:1–9:6, 13:17–15:27, 22:9–23:2.) Accordingly, here, not just two but all four factors weigh against fair use.

**2. Meta's use was not transformative.**

Meta claims that it uses P5D's works to teach AI agents "facts of the world," which it argues is transformational, citing *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992). (*See* ECF 597 at 15:15–19.) But in *Sega*, Accolade copied Sega's program to learn unprotected facts *about that program* and how it worked. That use was justified because "no other method of studying [the program's functional] requirements was available." *Id.* at 1522–23. In such cases, fair use "provid[es] a context-based check that can help to keep a copyright monopoly within its lawful bounds." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22 (2021) (citing *Sega*). Here, P5D's works are special, but they aren't the exclusive source of "facts of the world." Meta could have created its own designs or used someone else's. And P5D can't be accused of monopolizing facts about how the world works. Defendants thus were not forced to target P5D's works by the kind of exigency faced by Accolade in *Sega*.

Meta also incorrectly argues that its use of P5D's works was transformational merely because its motivations were different than P5D's, even though P5D's works were already suitable for AI training. (ECF 597 at 14:16–16:26.) In fact, both Meta and P5D were ultimately trying to improve their products

through computer vision AI training. But even if their aims were different, transformativeness "cannot turn merely on . . . stated or perceived intent." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 545 (2023). It's the challenged use that matters. (*See* P5D's Reply to Princeton Opp. § II.B.1.) This is clear because an author can decline to participate in a potential derivative market, and her rights are still protected. *E.g.*, *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 461 (9th Cir. 2020). Given this, the subjective purpose for creating a work can't be the test of transformation. *Cf. Warhol*, 598 U.S. at 536 n.12 (observing interconnection between factor one's "substitutable purposes" and factor four's potential "market substitution"). Transformation is instead about the *objective* purposes *potentially served* by the work, even if the original author wished it would never be used for some of those purposes. Here, P5D's works were already usable for AI training, and, although it's not required to defeat fair use, P5D in fact uses them for that purpose, as P5D has shown. (ECF 552 at 2:2–6, 2 n.1, 14:12–18, 14 n.46; ECF 589 at 14:11–21.)

None of Meta's citations supports its argument that different subjective motives are enough to make its use transformational, as we now show.

In three of Meta's cases, the original work was transformed with substantial new expression and meaning. That is not true here. In *Tresóna*, a music arranger took pieces of multiple songs, including twenty seconds of the plaintiff's "four-minute and twenty-two second song," and reworked them to create "an entirely different theatrical work" performed by a high school glee club. *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 649–50 (9th Cir. 2020). The arranger did not "'simply omit portions' of the original work while retaining the 'same intrinsic entertainment value,'" but rather "use[ed] a portion . . . by adding 'new expression, meaning, and message.'" *Id.* (original markups omitted). Similarly, in *Northland*, the court found it was parody and transformative for anti-abortion videos to use clips from a family planning clinic's original video "in alternation with macabre images of abortion procedures to deride the original work's message." *Northland Fam. Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 972 (C.D. Cal. 2012). And in *Seltzer*, the court found transformative Green Day's use of the defendant's drawing of a face on a brick wall backdrop to which artists added graffiti throughout "what is essentially a street-art focused music video about religion." *Seltzer v. Green Day Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2020). Unlike the diverse

secondary works in *Tresóna*, *Northland*, and *Seltzer*, SUNCG and SUMO retain the same intrinsic character of P5D's works without adding new expression, meaning, and message.

In the rest of Meta's cases, the original work was not altered artistically, but was still used in a way that prevented the secondary work from serving as a substitute for the original. Thus, in *Keck*, an art learning kit with supplies and printed slides with an artist biography and example images did not serve as a substitute for the plaintiff's original collages for décor. *Keck v. Mix Creative Learning Ctr., LLC*, 116 F.4th 448, 455 (5th Cir. 2024). (*See* P5D's Reply to Princeton Opp. § II.B.1.) In both *Kelly* and *Perfect 10*, thumbnail images shown in search engine results did not serve as substitutes for original photographs. *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821–22 (9th Cir. 2003); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th Cir. 2007). In *Designworks*, simplified, two-dimensional floorplans used by sales agents to inform potential buyers about existing homes were not a substitute for the detailed, three-dimensional plans used to build those homes. *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 126 F.4th 589, 595–96 (8th Cir. 2025). And in *Vanderhye*, reports scoring the likelihood of plagiarism did not serve as a substitute for individual students' previously submitted papers that were included in the defendant's database—along with other Internet content—used to generate such reports. *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 634, 644 (4th Cir. 2009). Unlike any of these cases, SUNCG did not consist of thumbnails. Or flattened, simplified sketches. Or an analytic score based on myriads of works. SUNCG and SUMO consisted of wholesale copies of P5D's works, which were already suitable for AI training. SUNCG and SUMO thus could and did serve a substitutional purpose for P5D's original works.

**3. Commercial ends motivated Meta's use, and even nonprofit use is not fair where, as here, it is not transformative.**

Meta claims that it "used SUNCG and an adapted subset of SUNCG called SUMO, for purely *noncommercial* academic research and scholarship." (ECF 597 at 1:14–15 (emphasis in original).) This is false. As P5D has shown, Meta sought commercial advantages through its collaborations with the open-source and academic communities. (*See* ECF 588 at 1:25–3:5.) This includes Meta's FAIR laboratories, which used SUNCG on projects with explicit product-development goals. (*See* ECF 552 at

16 n.49; ECF 588 at 7:1–9:6, 23:8–17.) And Meta's Enigma project, including the SUMO challenge, was not part of FAIR; it was part of Meta's product-focused Building 8 group. (ECF 588 at 4:18–6:20.)

Meta asserts that courts have found work by for-profit companies to be non-commercial. (*See* ECF 597 at 13:21-27.) But as shown, Meta's research was commercial. Moreover, in the decisions Meta cites, the courts don't find that commercial entities' uses were fair because they were not profitable, as Meta suggests. (*See* ECF 597 at 13:21–27.) Rather, as we show below, the uses in those cases were highly transformative, which diminished the importance of the defendants' commercialism.

Thus, in *Field*, the plaintiff published a work on his website and claimed infringement when a copy of it was cached by Google's crawler. *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1119 (D. Nev. 2006). Google uses such cached copies to allow users to view content that they cannot access directly, for example because of network problems or local censorship. *Id.* at 1111. Google allows websites to opt out of caching simply by including a "no archive" tag in a robots.txt file on the site. *Id.* at 1112–13. The plaintiff knew this was an option but decided against it. *Id.* at 1116. That choice, the court found, granted Google an implied license. Google's cached link was also found to be fair use. A cached link "serves different and socially important purposes in offering access." *Id.* at 1119. "[B]illions of Web pages choose to permit" this, signaling that caching aligns with their wishes. *Id.* Because Google's use was so transformative and socially important, the court found that "[t]he fact that Google is a commercial operation is of only minor relevance in the fair use analysis." *Id.* at 1120. Here, Meta has no claim to an implied license, and its use is neither transformative nor aligned with P5D's interests.

Meta also cites *ASTM v. UpCodes, Inc.*, No. 24-cv-1895, 2024 WL 4374117 (E.D. Pa. Oct. 2, 2024). The issue presented in *UpCodes* is nearly identical to that in *ASTM v. Public.Resource.Org, Inc.*, 896 F.3d 437, 450 (D.C. Cir. 2018). In *Public.Resource.Org* fair use was found, as summarized in section II.B.4 of P5D's Princeton reply. Like Public.Resource.Org, UpCodes offered free online access to portions of ASTM's copyrighted standards that had been incorporated into law. But unlike Public.Resource.Org, UpCodes was a for-profit company. This was ASTM's one basis for distinguishing its previous loss in *Public.Resource.Org*. The court found that it was not enough, holding that "UpCodes' transformative use outweighs the significance of the fact that it is a for-profit company." *UpCodes*, 2024 WL 4374117, at *10. Transformation is in the driver's seat. Commercial or nonprofit

motive is along for the ride. This is the real lesson of *UpCodes* and *Public.Resource.Org.* In both cases, what mattered is that public rulemaking enshrined technical standards into law and made their free publication transformational. Here, no legislation propelled P5D's works into the public domain. Nor is the use of P5D's works in SUNCG or SUMO transformative in any other way. Thus, even if Meta could argue with a straight face that it had solely altruistic and scholarly motives, it would still lose under factor one. Meta's claim to solely selfless motives is also provably false. Meta used SUNCG and SUMO for commercial ends. (*See* ECF 552 at 16 n.49; ECF 588 at 1:25–3:5, 4:18–9:6, 23:8–17.)

A use that was highly transformative also drove the outcome in another case Meta cites, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015). In *Authors Guild*, Google Books was found to be fair use. Google's justification for "copying from the works of others is to provide otherwise unavailable information *about the originals*." *Id.* at 215 (emphasis added). That made targeting those specific works essential. Google's use was thus highly transformative. Because of that, Google's "overall profit motivation" was less important. *Id.* at 219. Here, it is conceded that the targeting of P5D's works was not justified by anything intrinsic about them. (ECF 583 at 18:21–23.) The non-transformational nature of Meta's use weighs decisively against fair use. Meta's demonstrable commercial motives just put another nail in its fair use coffin.

As to SUMO, Meta tries to bolster the claim that its use was "for noncommercial research only" by pointing to the restrictions on challenge *entrants* in the "SUNCG-SUMO User Registration Form." (ECF 597 at 9:17–19; ECF 537-9.) Of course, Meta subjected itself to no such restrictions. Instead, in Meta's Official Rules for the challenge, Meta grants itself unfettered rights to use entry materials "for any . . . commercial or non-commercial purpose." (ECF 590-11 at 3668 § 5.) And as discussed in P5D's opposition, SUMO was part of Meta's Enigma project, which included the Sponsored Academic Research Agreement (SARA) collaboration between Princeton and Meta's Building 8 group. (*See* ECF 588 at 4:18–6:20). Meta CEO Mark Zuckerberg described Building 8 as "apply[ing] DARPA-style breakthrough development at the intersection of science and products to our mission. This method is

characterized by aggressive, fixed timelines, extensive use of partnerships with universities, small and large businesses, and *clear objectives for shipping products at scale*."[2]

Finally, as shown, Meta's SUNCG-related research had explicit product-development goals, which establishes the commercialism of that work. (*See* ECF 552 at 16 n.49; ECF 588 at 1:25–3:5, 4:18–6:20, 7:1–9:6, 23:8–17.) Meta describes several of its witnesses as testifying that their research was noncommercial. (*See* ECF 597 at 12 n.7.) But several of those witnesses did not even work in Meta's research-focused FAIR group. They worked in commercial, product development groups—such as Meta's product-focused Building 8, where Daniel Huber worked. (ECF 588 at 4:18–6:13.) Those witnesses' SUNCG-related work was obviously commercial. Further, each of Meta's witnesses could only testify about his or her own domain: None could account for the work of dozens or hundreds of others at Meta who worked with SUNCG.[3] SUNCG was "accessible to all researchers at FAIR" and "Reality Labs, Surreal." ECF 537-12 at 5:25, 6:27. Meta also named dozens whom it knows downloaded, saved, shared, or otherwise personally accessed SUNCG. *Id.* at 4:25-9:7. None of Meta's witnesses could testify how SUNCG was used by others, whether by the hundreds of researchers with access at FAIR and Surreal, or the dozens of researchers Meta specifically identified. *See* Ex. 74 at 93:21-94:21 (only has knowledge of her collaborators access to SUNCG); Ex 75 at 59:4–78:6 (same); Ex. 76 at 289:19–25 (did not know anyone who used SUNCG outside of House3D team and his team); Ex. 77 at 288:5–289:3 (not aware of uses of SUNCG other than House3D and projects he was personally involved in); Ex. 78 at 223:23-228:11 (30(b)(6) witness only informed of SUNCG work involving SUMO), 234:3-235:3 ("I am not aware of anybody in my team using SUNCG.").

---

[2] Declaration of Christian Andreu-von Euw in Support of P5D's Replies to Defendants' Oppositions to P5D's Motion for Summary Judgment ("CAvE Reply Decl.") Ex. 86 (emphasis added). Unless otherwise noted, all cited exhibits are attachments to the CAvE Reply Declaration.

[3] SUNCG was [redacted]" ECF 537-12 at 5:25, 6:27. [redacted] *Id.* at 4:25-9:7. [redacted] *See* Ex. 74 at 93:21-94:21 ([redacted]; Ex 75 at 59:4–78:6 (same); Ex. 76 at 289:19–25 ([redacted]); Ex. 77 at 288:5–289:3 [redacted]); Ex. 78 at 223:23-228:11 (30(b)(6) witness only informed of SUNCG work involving SUMO), 234:3-235:3 ([redacted]

If, as Meta claims, P5D "aggressively pursued discovery into any link" between SUNCG-derived technology and specific products (ECF 597 at 12:19–21), Meta successfully blocked that discovery, pleading irrelevance. (*Compare* ECF 597 at 12:20–21 (citing Interrogatories 19 and 20) *with* ECF 467 at 2:16–3:13 (denying motion to enforce those same interrogatories; *see also* ECF 371 (denying other discovery into relevant development).)[4] Having won discovery rulings on that basis, Meta should now be judicially estopped from contending that specific product links are needed to establish commercial use. In any event, no such linkage is required. There is manifest evidence that Meta had commercial aims. And it is Meta's burden to establish that it did not. It cannot meet that burden.

**4. The nature of Planner 5D's work is expressive, not factual.**

Meta tries to minimize the protection due to P5D's works by characterizing them as functional or like a compilation of facts from the public domain. (ECF 597 at 19:1–28.) But as shown, P5D's objects are expressive, sculptural works. (ECF 588 at 17:11–22:8.) And P5D's scene library is a curated selection of creative designs that incorporate P5D's copyrighted objects, eighteen scenes of which P5D created itself. It is thus deserving of far more protection than a compilation of public domain facts, as P5D has shown. (*See* ECF 589 at 1:21–3:9.)

**5. Meta's infringement harms potential markets for P5D's works.**

Meta urges that there was no market for datasets with commercial use restrictions. (ECF 597 at 11:13–14, 22:7–12.) This argument fails at several levels. First, factor four is about *potential* markets. The market need not exist at the time or ever, and if it does, the plaintiff needn't participate. *E.g.*, *Dr. Seuss*, 983 F.3d at 461. (*See also* ECF 552 at 18:4–19:4; ECF 588 at 24:21–25:2.) Second, as shown, Meta's use of SUNCG and SUMO was *not* restricted to non-commercial ends. (*See* ECF 552 at 16 n.49; ECF 588 at 1:25–3:5, 4:18–9:6, 23:8–17.) Third, Meta itself entered paid licenses with non-commercial restrictions. (*See, e.g.*, ECF 585-9; ECF 589 at 14:26–15:1, 15 n.15.) Meta's contention that there are no paid markets for noncommercial datasets is thus not only irrelevant, but false.

---

[4] In general, Meta refused to disclose any records not explicitly referencing "SUNCG." *See* ECF 371 at 2:24. [redacted]. *See, e.g.*, ECF 382-13 [redacted])."). 

### B. The Court should find P5D's scene compilation is copyrightable.

Meta questions the credibility of the testimony establishing P5D's original curation process. But such questioning cannot defeat summary judgment. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Far Out Prods v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001); *Nat'l Union Fire Ins. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). Meta tries once again to invent questions about P5D's disclosure of *the number of scenes* in its compilation. (ECF 597 at 25:7–19, n.19.) But P5D has put such questions to bed as many times as Meta has raised them. Planner 5D gave Defendants a precise list of the 49,479 scenes in P5D's Scenes Work in September 2022.[5] In any event, testimony about *how* scenes were selected can't be questioned based on counsel's disclosures about the *number* of scenes in the work. Defendants simply have no evidence that P5D did not select the scenes as it says it did.

Meta's objection to P5D raising copyrightability is misdirected. All parties move for summary judgment on P5D's copyright infringement claims. (ECF 552 at 1:4–6; ECF 541 at 14:5–19:16; ECF 532 at 10:16–16:5.) In their motions, Meta and Princeton both argue that P5D's Scenes Work either barely meets or does not meet the threshold for copyrightability. (ECF 541 at 15:1–8; ECF 532 at 14:22–16:5.) Defendants are wrong because P5D's Scenes Work is a curated selection of home interiors that are creatively designed using P5D's copyrighted objects, including eighteen scenes that P5D created itself. (ECF 552-4 at 36:6–37:4, 153:13–154:16, 170:4–173:14; ECF 590-1 at 130:4–132:4.) That curation was based on richer, more subjective aesthetic judgments than those involved in the decisions Defendants cite, which involved selections of public domain facts, like names and addresses. (*See* ECF 588 at 13:17–15:20; ECF 589 at 1:23–4:9.)

These undisputed facts, which rebut Defendants' arguments about thinness, also establish that P5D's Scenes Work is copyrightable. (*See* ECF 552 at 20:5–21:18.) If the Court nonetheless decides that the copyrightability of P5D's Scenes Work must await trial, it should still find that Princeton's scraping infringed P5D's Scene Work, contingent only on a finding of copyrightability at trial.

[5] CAvE Reply Decl. ¶¶ 26–27; ECF 540-21 at 10:20–11:5; ECF 540-18 (Exhibit D to ECF 540-21).

## III. CONCLUSION

For these reasons, the Court should enter judgment for Planner 5D on Meta's fair use defense.

Respectfully submitted,

DATED: March 5, 2025

THE BUSINESS LITIGATION GROUP, P.C.

By: /s/*Marc N. Bernstein*
Marc N. Bernstein

Attorneys for Plaintiff
UAB "PLANNER5D"