Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary Mazzello (*pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (*pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (*pro hac vice*)
abbey.quigley@kirkland.com
Emily Sheffield (*pro hac vice*)
emily.sheffield@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400

*Attorneys for Defendants Meta Platforms, Inc. and Meta Platforms Technologies, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

UAB "PLANNER5D" dba PLANNER 5D,

Plaintiff,

v.

META PLATFORMS, INC., META PLATFORMS TECHNOLOGIES, LLC, THE TRUSTEES OF PRINCETON UNIVERSITY, DOES 1-200, ABC CORPORATIONS 1-20, and XYZ UNIVERSITIES 1-20,

Defendants.

Case No. 3:19-cv-03132-WHO (SK)

**META'S REPLY BRIEF IN SUPPORT OF ITS PHASE 2 MOTION FOR SUMMARY JUDGMENT**

Hearing Date: March 28, 2025
Time: 10:00 AM
Courtroom: 2, 17th Floor

Honorable William H. Orrick

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. P5D CANNOT PROVE TRADE SECRET MISAPPROPRIATION AGAINST META ........ 1

A. When Meta Downloaded SUNCG, Any Alleged Trade Secrets Were Extinguished. ........ 1

B. Meta Was Not in Privity with Princeton ........ 3

C. Meta Had No Reason To Suspect Princeton Acquired Trade Secrets Improperly ........ 5

D. P5D's Claim Meta Should Have Known Princeton Had a Duty Not to Disclose Fails ........ 6

III. P5D CANNOT PROVE SUBSTANTIAL SIMILARITY ........ 7

A. P5D Did Not Establish Substantial Similarity Between Its Works and SUMO ........ 8

B. P5D Did Not Establish Substantial Similarity Between Its Works and SUNCG ........ 9

IV. P5D DID NOT PROVE OWNERSHIP OF ITS OBJECTS OR 18 SCENES ........ 10

V. P5D CANNOT PROVE INDIRECT COPYRIGHT INFRINGEMENT ........ 11

VI. META'S USE OF SUNCG AND SUMO IS FAIR USE ........ 12

A. P5D Cannot Dispute That Meta's Use Was Transformative and Noncommercial. ........ 12

B. P5D Does Not Dispute, and Thus Concedes, Meta's Arguments on Factors 2 or 3. ........ 14

C. There Is No Genuine Dispute that P5D Has Suffered No Market Harm. ........ 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andersen v. Stability AI Ltd.*,
700 F. Supp. 3d 853 (N.D. Cal. 2023) ....8

*Apple Comput., Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994) ....8

*Bespaq Corp. v. Haoshen Trading Co.*,
No. 04 Civ. 3698, 2004 WL 2043522 (N.D. Cal. Sept. 13, 2004) ....11

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
1 F. Supp. 3d 224 (S.D.N.Y. 2014) ....3

*Boisson v. Banian, Ltd.*,
273 F.3d 262 (2d Cir. 2001) ....11

*Broad. Music, Inc. v. Behulak*,
651 F. Supp. 57 (M.D. Fla. 1986) ....8

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*,
227 F.R.D. 313 (C.D. Cal. 2004) ....7

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002) ....7, 9

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc*,
No. 23 Civ. 3402, 2025 WL 86370 (8th Cir. Jan. 14, 2025) ....13

*Desire, LLC v. Manna Textiles, Inc.*,
986 F.3d 1253 (9th Cir. 2021) ....8

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ....15

*DVD Copy Control Ass'n v. Bunner*,
116 Cal. App. 4th 241 (2004) ....2, 3

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ....10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ....9, 11

*Field v. Google Inc.*,
412 F. Supp. 2d 1106 (D. Nev. 2006) ....12

*George S. Chen Corp. v. Cadona Int'l, Inc.*,
266 Fed. Appx. 523 (9th Cir. 2008) ....................10

*Google v. Oracle*,
593 U.S. 1 (2021) ....................14, 15

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) ....................8

*HiRel Connectors, Inc. v. United States*,
No. 01-CV-11069, 2006 WL 3618011 (C.D. Cal. Jan. 25, 2006) ....................2, 3

*Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*,
No. 18-CV-5031, 2019 WL 1767329 (N.D. Cal. Apr. 22, 2019) ....................3

*Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*,
No. 18-CV-5031, 2019 WL 4345912 (N.D. Cal. Sept. 12, 2019) ....................3

*Hunley v. Instagram, LLC*,
73 F.4th 1060 (9th Cir. 2023) ....................11

*Infogroup, Inc. v. DatabaseLLC*,
95 F. Supp. 3d 1170 (D. Neb. 2015) ....................5

*Keck v. Mix Creative Learning Ctr.*,
116 F.4th 448 (5th Cir. 2024) ....................13

*Kittrich Corp. v. Chilewich Sultan, LLC*,
CV-12-10079, 2013 WL 12131376 (C.D. Cal. Feb. 20, 2013) ....................2

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) ....................7, 8

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) ....................15

*Perfect 10, Inc. v. Amazon.com*,
508 F.3d 1146 (9th Cir. 2007) ....................12, 14

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ....................11, 12

*Range Rd. Music, Inc. v. E. Coast Foods, Inc.*,
668 F.3d 1148 (9th Cir. 2012) ....................7

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) ....................14

*Skidmore v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) ....................7

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .......... 12

*Space Data Corp. v. X*, No. 16-CV-3260, 2017 WL 5013363 (N.D. Cal. Feb. 16, 2017) .......... 2

*Teradyne, Inc. v. Astronics Test Sys., Inc.*, CV 20-2713, 2023 WL 9284863 (C.D. Cal. Dec. 6, 2023), *aff'd,* 2025 WL 341828 (9th Cir. Jan. 30, 2025) .......... 1

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, No. 20-CV-613, 2025 WL 458520 (D. Del. Feb. 11, 2025) .......... 14

*Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772 (N.D. Cal. 2024) .......... 8

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638 (9th Cir. 2020) .......... 13

**Statutes**

17 U.S.C. § 102 .......... 11

17 U.S.C. § 107 .......... 12

**Other Authorities**

Nimmer on Copyright (2025) .......... 7

*Note: All emphasis is added unless stated otherwise.*

*Defined terms have the same meaning ascribed to them in Meta's opening briefing, unless otherwise defined.*

## DEFINED CITATIONS

Pleadings defined as follows. All exhibits are cited by either Docket or Exhibit Number.[1]

**Pleadings**

| Docket Entry | Defined Term | Document Title |
|---|---|---|
| Dkt. 537-03 | Meta's Motion or Meta Mot. | Meta's Notice of Motion and Motion for Summary Judgment and Memorandum of Points and Authorities Thereof |
| Dkt. 550-03 | P5D Mot. | Planner 5D's Motion for Summary Judgment |
| Case No. 20 Civ. 08261, Dkt. 1 | CR Compl. | Complaint for Copyright Infringement |
| Dkt. 585-03 | P5D Opp. | Planner 5D's Opposition to Meta Phase Two Motion for Summary Judgment |
| Dkt. 587-03 | P5D Princeton Opp. | Planner 5D's Opposition to Princeton Phase Two Motion for Summary Judgement |
| Dkt. 594-03 | Meta Opp. | Meta's Opposition to Planner 5D's Phase 2 Motion for Summary Judgment |

[1] Ex. 1 to Ex. 58 refer to exhibits filed with Meta's opening brief and attached to the Declaration of M. Mazzello filed concurrently therewith, Dkt. Nos. 545 and 546. Ex. 59 to Ex. 106 refer to exhibits submitted with Meta's opposition to P5D's Motion for Summary Judgment and attached to the Declaration of M. Mazzello submitted therewith, Dkt. No. 598. Ex. 107 to 117 refer to documents attached to the Declaration of M. Mazzello filed concurrently with this reply brief.

# I. INTRODUCTION

P5D's opposition reflects fundamental failures of proof. As to trade secrets, there is no dispute that SUNCG was already public by the time Meta downloaded it. Thus, Meta could not have committed trade secret misappropriation. There also is no proof Meta worked with Princeton to create SUNCG. In fact, during the nine months Dr. Song spent creating SUNCG, there is not a single document or communication with Meta about this work. Dr. Song also testified that Meta was not involved in creating SUNCG.

As to copyright infringement, P5D offers no evidence the datasets Meta used – SUNCG and SUMO – are substantially similar to any of P5D's works. Instead, it argues substantial similarity is not required, but that is a gross misstatement of law at odds with years of caselaw requiring substantial similarity, including law from this very Court. On copyright ownership, it relies on general statements that making 3D objects and scenes necessarily requires creativity, but fails to provide *any* evidence of "specific and demonstrable creative choices" it made in preparing such works, despite this Court requiring it do so.

Finally, on fair use, P5D offers no arguments or evidence in response to Meta's proof that Factors 2 and 3 favor Meta. Its opposition also concedes that P5D lost *zero* licensing opportunities and suffered *no* market harm from Meta's use of SUNCG or SUMO. And P5D offers nothing more than conclusory assertions that Meta's use of SUNCG and SUMO was commercial. Meanwhile, evidence shows Meta used SUNCG and SUMO solely for non-commercial, academic, scientific research. Indeed, the Ninth Circuit recently upheld a summary judgment decision on fair use that did not even reach the other copyright issues. *Teradyne, Inc. v. Astronics Test Sys., Inc.*, CV 20-2713, 2023 WL 9284863 (C.D. Cal. Dec. 6, 2023), *aff'd,* 2025 WL 341828 (9th Cir. Jan. 30, 2025). This Court can do the same.

Under *Celotex*, P5D had to come forward with evidence of its claims, not conclusory assertions. It failed. Nearly six years of litigation has proven what Meta maintained at the outset: P5D lacks any evidence to support its claims against Meta. Summary judgment on all claims should be granted.

# II. P5D CANNOT PROVE TRADE SECRET MISAPPROPRIATION AGAINST META

## A. When Meta Downloaded SUNCG, Any Alleged Trade Secrets Were Extinguished.

Summary judgment on P5D's trade secret claims is proper because P5D fails to come forward with evidence that P5D still had trade secrets when Meta downloaded SUNCG. P5D based its claims on the public disclosure of its alleged secrets via SUNCG. Dkt. 53 ¶14 ("public disclosure and dissemination of

[P5D's] core asset has caused catastrophic and potentially permanent damage"); *see also* Ex. 47 at 22 (Princeton "posted a dataset containing [the trade secrets] to a publicly accessible URL"). Yet now, after Meta explained that it could not be liable because the alleged trade secrets were extinguished by the time it downloaded SUNCG, P5D argues they somehow "retained" their value after Princeton's publication. P5D Opp. at 9-10. P5D cannot have it both ways. SUNCG either destroyed the alleged secrets, so Meta is not liable, or it did not disclose them, in which case no one is liable for purported dissemination.

Summary judgment should be granted, as the undisputed facts show widespread disclosure of SUNCG by Princeton before Meta downloaded it. The dataset was the subject of a popular article in November 2016. Ex. 50; Dkt. 537-11 ¶251 ("cited 1357 times."). Numerous researchers contacted Dr. Song about accessing SUNCG. Dkt. 538-08. She then made it available to anyone who contacted her with signed terms of use, and gave researchers instructions for downloading SUNCG that they could easily share without any technical restrictions. Dkt. 590-06 426:21-427:22. *At least* 21 researchers (plus Princeton) downloaded SUNCG before Meta, including IBM. P5D Opp. at 10; Ex. 41 (Ex. A). By the time of the SUMO challenge, hundreds of researchers had downloaded it. Ex. 41 (Ex. A). Thus, P5D's trade secret claims ***against Meta*** fail because P5D no longer had any secrets due to Princeton's disclosure.

P5D's strained arguments do not save its claim. P5D asserts (at 10) that "Meta cannot show that P5D's files lost their trade secret status," yet it forgets that it is ***P5D's*** burden to prove it had trade secrets when Meta downloaded SUNCG. *Space Data Corp. v. X*, No. 16-CV-3260, 2017 WL 5013363, at *1 (N.D. Cal. Feb. 16, 2017). Its argument (at 9-10) that dissemination of SUNCG was "limited" because "only" 21 people downloaded it before Meta also fails. The dataset was referenced in a popular article, and then given to anyone who contacted Dr. Song, including nearly ***two dozen researchers*** before Meta. Courts have held that disclosure to even ***one*** relevant entity can extinguish a trade secret. *See, e.g.*, *HiRel Connectors, Inc. v. United States*, No. 01-CV-11069, 2006 WL 3618011, at *10 (C.D. Cal. Jan. 25, 2006).

P5D cites no contrary law. *Kittrich Corp. v. Chilewich Sultan, LLC* merely states that disclosure must be to relevant people, i.e., competitors or people for whom the information has value. CV-12-10079, 2013 WL 12131376, at *4 (C.D. Cal. Feb. 20, 2013). This is easily met here, as Dr. Song did not send SUNCG to random individuals. She sent it to people specifically interested in the dataset. P5D cites *DVD Copy Control Ass'n v. Bunner* for the same proposition, claiming it "remand[ed] denial of [a] preliminary

injunction[.]" P5D Opp. at 10. It in fact reversed a preliminary injunction because it was ***unlikely*** plaintiff could prove it had trade secrets after they were revealed online. 116 Cal. App. 4th 241, 251-53 (2004).

P5D's argument that the Terms of Use for SUNCG prevented the purported trade secrets from being extinguished fares no better. Its own expert found the terms ***inadequate*** to limit disclosure because Princeton did not police them. Dkt. 537-11 ¶130. The terms also explicitly stated that researchers *could* share SUNCG with other researchers and colleagues who agreed to be bound by the terms, and thus contained no secrecy requirement. Ex. 30 ¶4. The Terms of Use also cannot change the fact that at least 20 researchers downloaded SUNCG ***before*** anyone at Meta. *HiRel*, 2006 WL 3618011, at *10; *Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014) (no secret after disclosure to "over 16" third parties and in Indian patent application) *aff'd* 610 F. App'x 69 (2d Cir. 2015).

**B. Meta Was Not in Privity with Princeton.**

Because the alleged trade secrets were public when Meta downloaded SUNCG, P5D's trade secret claims can only survive summary judgment if Meta was in "privity" with Princeton/Dr. Song when she downloaded data and created and released SUNCG. *Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*, No. 18-CV-5031, 2019 WL 1767329, at *2 (N.D. Cal. Apr. 22, 2019). This means showing Meta was "a wrongdoer from the outset – i.e., conspiring with [Princeton]." *Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*, No. 18-CV-5031, 2019 WL 4345912, at *5, fn. 5 (N.D. Cal. Sept. 12, 2019). P5D has not, and cannot, show "privity."

Despite years of discovery, there is ***no evidence*** that Meta oversaw, controlled, requested, provided tools for, or even knew about SUNCG before Dr. Song released her research paper. It took nine months to make SUNCG and author this paper, yet during that time there is not a ***single*** communication with Meta about the dataset. Nor is there any testimony suggesting Meta's involvement. Rather, all evidence is to the contrary. *First*, Dr. Song testified that she "did not" "work with" or "consult with" Meta on collecting data from P5D or creating SUNCG. Ex. 13 at 556:18-557:7. *Second,* Meta did not fund SUNCG. Rather, Dr. Song's SUNCG paper states, "This work is supported by Intel, Adobe, and NSF" and "hardware was donated by NVIDIA and Intel." Ex. 50 at 9. *Third*, Dr. Gkioxari, the first Meta researcher to download SUNCG, testified that she learned about SUNCG from Dr. Song's paper—not some relationship with Princeton. Ex. 8 at 14:3-16. *Finally*, a year after Dr. Song released SUNCG, [redacted]

[redacted] Ex. 18 at -'995. This would not have been necessary if it acted in concert with Dr. Song.

Yet P5D asks this Court to find Meta liable for everything Dr. Song did in developing SUNCG. Its position is baseless. It points to a tuition and stipend fellowship Meta granted Dr. Song a year before she even downloaded data from P5D to argue that Meta was in "privity" with Dr. Song. But Dr. Song was merely one of 10 people to receive this fellowship and her fellowship application ***did not mention*** P5D, SUNCG, or scraping. Ex. 31; Ex. 110. Dr. Song also maintained her autonomy throughout the fellowship, which both parties' experts explained is typical. Meta Mot. at 11-12.[1] P5D does not dispute this. Instead, it falsely claims Dr. Song's application "promised" she would "scrap[e] P5D's scene and object files." P5D Op. at 3. It did not. Ex. 31. All it said is that due to "crowd-sourcing efforts on the Internet, there are now web sites from which it is possible to download" models. *Id*. at 1. A general reference to downloading "***crowd sourced***" data cannot make Meta liable for misappropriation of P5D's purported trade secrets. Finding otherwise would only stifle research and deter companies from granting future fellowships.

P5D also relies on agreements and discussions between Princeton and Meta for a *different* project called "Enigma" that involved collecting real-world data, not computer-generated data, like SUNCG, to argue that Meta was in "privity." P5D Opp. at 4-5, 10-11. This argument suffers from several fatal flaws. [redacted], over ***five months after*** Dr. Song downloaded data from P5D. Dkt. 590-18 at '478-79; Ex. 13 at 346:11-17. And the parties entered the Sponsored Academic Research Agreement on October 31, 2016, ***eight months after*** Dr. Song downloaded the data. Dkt. 586-09 at '883.

*Second*, the few Enigma-related documents that P5D cites from ***before*** Dr. Song released her paper ***do not mention*** SUNCG. Nor do they mention P5D, Dr. Song, or the creation of a synthetic dataset. Dkt. 590-19 at '509 (discussion of "scanning real-world spaces"); Dkt. 590-18 (scheduling emails); Dkt. 590-21 (same); Dkt. 586-09 at '859, '873(Oct. 31, 2016 SARA regarding the "future performance of scientific research").[2] This only reinforces Meta's point that if Meta were involved in creating SUNCG, one would expect to see communications between Meta and Princeton discussing it, just as there are communications discussing this real-world data collection project. But there are none because Meta was not involved.

*Third*, Enigma-related documents from ***after*** Dr. Song released her paper only confirm that Meta

[1] Granting fellowships to Ph.D. candidates is common practice in academia. Ex. 6 at 214:7-19.

[2] A statement of work for Enigma was signed in June 2017, but even this did not mention SUNCG. It stated Princeton would "provide guidance" on annotating datasets "such as ScanNet." Dkt. 585-16 at '840.

was not aware of or involved in the creation of SUNCG. [redacted]. Dkt. 585-13 at '919-21. [redacted]. Dkt. 585-17. [redacted]. Dkt. 585-19. These documents do not establish privity. They instead show Meta's lack of involvement in SUNCG. Otherwise, it would not have had to ask these questions.

At bottom, P5D asks this Court to find Meta acted in privity because it discussed a different project with Princeton, months after Dr. Song collected data, and discussed SUNCG *after* Dr. Song publicly released it. P5D cites no cases finding privity based on such scant evidence. Summary judgment is proper.

**C. Meta Had No Reason To Suspect Princeton Acquired Trade Secrets Improperly.**

Because P5D's alleged trade secrets were extinguished before Meta accessed SUNCG and Meta and Princeton were not in privity, Meta ***is not liable*** for misappropriation, regardless of what P5D claims Meta knew or should have known about how the data was acquired. Meta Mot. at 12. P5D does not dispute this legal principle or cite any contrary law. Thus, the Court need not address what Meta knew or had reason to know to rule for Meta. In any case, P5D did not meet its burden of providing evidence that Meta knew or had reason to know Princeton (allegedly) acquired P5D's purported secrets by improper means.

P5D does not even try to prove Meta *knew* Princeton acquired P5D's data by scraping. Instead, it argues that Meta was on "inquiry notice" of scraping. But P5D's fundamental error is that it relies on the premise that researchers would have agreed scraping was "improper" under the law. P5D Opp. at 11-13. The evidence is to the contrary. *First*, Princeton's expert confirmed that it was common practice for researchers to use scraping in 2016. Ex. 117 ¶156. *Second*, P5D's own expert testified that he *co-authored* papers based on datasets created from scraping, including as recently as 2020. Ex. 108 at 199:8-206:17. *Third*, the only case either party cites concerning scraping found the plaintiff likely would ***not*** be able to prove that use of information "obtained by 'webscraping'" constituted misappropriation. *Infogroup, Inc. v. DatabaseLLC*, 95 F. Supp. 3d 1170, 1182 (D. Neb. 2015). P5D does not rebut this evidence or law. Thus, its argument that Meta was on "inquiry notice" that Princeton acted improperly fails as there is no

proof a reasonable researcher would have believed Dr. Song acted improperly in scraping public data.

P5D also has not shown Meta was on "inquiry notice." Dr. Song's fellowship application did not put Meta on notice of possible misappropriation. It just states she would "download" "crowd-sourc[ed]" data, Ex. 31, which is data people freely share with one another and has nothing to do with scraping. As P5D's expert explained, "[t]here was a fair amount of building crowd-sourced datasets" at the time. Ex. 6 at 224:12-13. Nor did Dr. Song's paper put researchers on notice of possible misappropriation. It ***openly disclosed*** that SUNCG contained scenes from the "Planner 5D platform," which one would not expect if the data had been acquired improperly, and included a link to the platform showing the scenes were public. Ex. 50 at 5, 11. Further, the paper confirmed that SUNCG came from a respected institution, Princeton. Meta also did not stand alone. Tellingly, P5D presents no evidence that any of the ~800 people that downloaded SUNCG had concerns about the data, not even P5D's own expert, who did not "think there was anything wrong with [a student he oversaw] downloading SUNCG [at the time]." Ex. 6 at 169:2-5.

Contrary to P5D's claim, [redacted] also does not show that "Meta was on inquiry notice from the start." P5D Opp. at 13. [redacted] Dkt. 585-19 at '631. [redacted] *Id*. at '630. "Public" information is not a "secret."

Finally, P5D's reliance (at 11-13) on [redacted] is also misplaced. P5D claims these [redacted] Dkt. 585-22 at '936-37. These conditions were met here.

**D. P5D's Claim Meta Should Have Known Princeton Had a Duty Not to Disclose Fails.**

P5D argues that its theory that Meta should have known Princeton had a "duty" to keep P5D's files secret survives summary judgment. Not so. Meta moved that P5D cannot prove *any* trade secret claim because the alleged secrets were extinguished and there is no privity. Meta Mot. at 9. P5D also abandoned this theory. Its interrogatory answer states, "Meta misappropriated P5D's trade secrets by, with knowledge

that they were acquired by improper means and without consent, using them[.]" Ex. 114 at 5-6. P5D ***did not mention*** a "duty" argument, so cannot rely on one now.[3] As discussed, Meta also had no reason to think Princeton was "bound" not to disclose the purported secrets. Dr. Song openly identified P5D as the data source, the opposite of what you would expect if she was bound to keep the data secret. Meta Mot. at 13. Summary judgment for Meta on P5D's overreaching trade secret claims should be granted.

## III. P5D CANNOT PROVE SUBSTANTIAL SIMILARITY

To succeed on its copyright claims, P5D must prove (a) ownership, (b) copying, and (c) unlawful appropriation, i.e., substantial similarity between the copyrighted work and the work in Meta's possession. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). Indeed, it is copyright 101 that "even where the fact of copying is conceded, ***no legal consequences will follow*** from that fact ***unless the copying is substantial***." Nimmer §13D.10. P5D's assertion that it need not prove substantial similarly is just wrong. As the Ninth Circuit explained, although courts sometimes collapse factual "copying" and "unlawful appropriation" (proven through substantial similarity) they "are *distinct* concepts." *Skidmore*, 952 F.3d at 1064. When it comes to "derivative works" like SUNCG and SUMO, P5D Opp. at 14; P5D Mot. at 19-20, proof of substantial similarity is required and must be shown as to each of P5D's claimed works. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) (plaintiff "must show substantial similarity" to prove defendant made an infringing "derivative work"); *Cavalier*, 297 F.3d at 822 (lack of substantial similarity must be shown on a work-by-work basis).

P5D's fundamental error is based on a misreading of *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148 (9th Cir. 2012). There, defendant performed a musical work verbatim and the Ninth Circuit held that "in a case like this one," substantial similarity is irrelevant. *Id*. at 1154. This makes sense. Substantial similarity is indisputably met when the copying is verbatim. But SUNCG and SUMO are *not* exact replicas, they are alleged "derivatives" (P5D Opp. at 15), so substantial similarity is required.

P5D tries to wriggle out of this requirement by asserting that Princeton downloaded an exact copy of its purported works, and SUNCG and SUMO "derive" from that copy, so "substantial similarity" is not required. P5D Opp. at 14. That is not the law. In fact, this Court ***already rejected*** P5D's argument. In

[3] *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 323-25 (C.D. Cal. 2004) (holding that information not disclosed in response to an interrogatory concerning the plaintiff's "theories of liability" and evidence in support cannot create a triable issue of fact to defeat summary judgment).

*Andersen v. Stability AI Ltd.*, plaintiff argued that under *Range Road* it need not show substantial similarity between its works and "outputs" from an AI tool trained on exact copies of its works because the outputs were "necessarily derivative" of the copies. 700 F. Supp. 3d 853, 867 (N.D. Cal. 2023). This Court disagreed, and dismissed plaintiff's claims for not alleging substantial similarity. *Id.* at 868. Other courts have reached similar holdings. *See, e.g.*, *Litchfield*, 736 F.2d at 1357 (substantial similarity required); *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 778 (N.D. Cal. 2024) (plaintiff alleged outputs were "derivative work[s]", so "must show substantial similarity").[4]

P5D also makes a second misstatement of law regarding substantial similarity. It concedes that it does not own the scenes within its purported compilation (Dkt. 546-18) and instead claims rights only in its *selection* of scenes. Any resulting copyright in the compilation is thus "thin" and P5D must show that Meta copied "substantially the entire item" to succeed on its claim. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989). Without any authority, P5D contests this rule, claiming it does not apply because the scenes in its compilation are not public domain material. P5D Opp. at 15. That does not matter. *See Harper House,* 889 F.2d at 205; *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442, 1445 (9th Cir. 1994) (copyright was "thin" and protected only against "virtually identical copying" even though the work consisted of licensed material, not public domain material). Whether the scenes are public domain or user-owned, P5D must show "virtually identical copying" of the selection.

**A. P5D Did Not Establish Substantial Similarity Between Its Works and SUMO.**

P5D's copyright infringement claims as to SUMO fail because it has not shown substantial similarity between any of its purported Works and the SUMO dataset. P5D does not even identify *which* Objects, individual scenes, or compilation of scenes appear in SUMO, let alone do a work-by-work comparison. P5D Opp. at 14-15. Instead, P5D merely states that SUMO is a "derivative" because it was

---

[4] Recognizing that its copyright claims against Meta fail, P5D makes a last-ditch effort to hold Meta liable for *Princeton's* download under joint and several liability. P5D Opp. at 15. But among the requirements is that the parties "joined in or contributed to *a single infringement*[.]" *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1263 (9th Cir. 2021). As discussed, the evidence shows Meta did not act in concert with Princeton and P5D did not meet its burden of opposing Meta's motion with evidence proving otherwise (nor did it move on this issue). Meta was merely a "downstream" user of SUNCG, which does not make it jointly or severally liable. *Id.* (retailers not liable for upstream infringement); *Broad. Music, Inc. v. Behulak*, 651 F. Supp. 57 (M.D. Fla. 1986) (no joint and several liability for investor that had no oversight/control day-to-day). Dismissal of all copyright claims against Meta is proper.

made from SUNCG, which was made from Princeton's download. *Id.* at 15. That is not enough. *Supra* at 7-8. P5D must offer *evidence* of substantial similarity between each of its Works and SUMO. Because it does not do so, summary judgment to Meta on P5D's SUMO claims is appropriate.[5]

**B. P5D Did Not Establish Substantial Similarity Between Its Works and SUNCG.**

P5D's copyright claims as to SUNCG also fail for lack of proof of substantial similarity.

Alleged Compilation: Subsequent compilers are "free to use the [material] contained in another's publication" if the new compilation "does not feature the same selection and arrangement." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991). Such is the case here. P5D does not claim any creative *arrangement* in its compilation. And as to selection, P5D *does not dispute* that Princeton selected scenes for SUNCG using ***different*** criteria than P5D used for its alleged compilation. Meta Mot. at 15. Instead, it states that SUNCG is a "derivative," but again, that does not prove its case. *Supra* at 7-8. P5D's claim (at 15) that 92% of the user-created scenes in SUNCG are also in P5D's asserted compilation (more if duplicates are excluded) is also not enough to establish that SUNCG is *nearly identical* to P5D's claimed selection, especially when the selection criteria differ. Nor does P5D cite any law otherwise.

Objects: P5D offers no evidence contradicting that 526 of P5D's claimed Objects ***do not appear*** in SUNCG, so Meta ***could not*** have infringed them. Ex. 33. For the remainder, P5D contends it need not prove substantial similarity, which fails. *Supra* at 7-8. Under the Ninth Circuit's test, the Court must filter out the non-protectible elements of a copyrighted work before analyzing similarity. *Cavalier*, 297 F.3d at 822. Because P5D does not dispute that it has ***no*** evidence, expert or otherwise, of an object-by-object comparison to prove Meta copied protectable elements of P5D's Objects, it cannot prove substantial similarity as to its Objects and those in SUNCG and summary judgment is warranted. *Id.*

18 Scenes: P5D concedes it has not done a scene-by-scene comparison. It instead claims (at 16) Dr. Forsyth conducted a "programmatic comparison" (comparing files generally, without a comparison of the 18 specific scenes) which found that every scene in SUNCG is "essentially identical" to P5D's. This misstates Dr. Forsyth's report. He, in fact, found that although the files in SUNCG "encode essentially identical information," Dkt. 537-11 ¶234, there were *numerous* scenes in SUNCG that *differed* from those

[5] It also does not dispute that SUMO is a *different* compilation of only a small subset of adapted SUNCG scenes that may not contain any protected Objects created using *different* criteria. Meta Mot. at 15-16.

in P5D's gallery.[6] Thus, this comparison does not establish substantial similarity as to these 18 scenes.

## IV. P5D DID NOT PROVE OWNERSHIP OF ITS OBJECTS OR 18 SCENES

As the Court acknowledged, "because the Copyright Office did not grant a registration for the relevant works, P5D cannot rely on a presumption of validity" for ownership. Dkt. 278 at 9. P5D, however, has not established that it exercised creativity in making its claimed Objects and 18 Scenes. Therefore, regardless of substantial similarity, summary judgment for Meta on these works is appropriate.

Objects: P5D admits that it modeled Objects by copying real-world images, including from online retailers like IKEA that it found on the Internet. Ex. 3 at 64:25-65:10; Ex. 28 at '325. Leaving aside that this shows P5D clearly did not think it was wrong to copy from the public internet (while it sues Meta based on Princeton's use of material from the public internet), this admission also led the Court to order P5D to come forward with evidence that it made a "specific and demonstrable creative choice" for ***each Object*** that "differs from" or is "not dictated by the source" to establish copyright ownership. Dkt. 278 at 22. Its fundamental failing is that it cannot do so. It concedes that it "***cannot*** state how the object differs from the [reference] image because the [reference] image is unavailable." Ex. 5 at 401:16-402:17; Meta Mot. at 17. This, alone, warrants summary judgment.

Faced with this record, P5D asserts a conclusory argument that "subjective human judgment" is "always required" in the modeling process, so P5D necessarily exercised creativity. P5D Opp. at 17. This does not satisfy P5D's burden. *First*, this Court instructed that P5D must show "specific" creative choices as to "*each object,*" not vague generalizations. Dkt. 316 at 2-3; *see also* Dkt. 278 at 22. *Second*, this Court already rejected P5D's plea that "mesh" choices are creative. Dkt. 278 at 13-14. *Third*, P5D's argument assumes (without authority) that converting a 2D image into a 3D model always involves creativity. The Ninth Circuit has rejected this argument, *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1222-23 (9th Cir. 1997) (turning 2D characters into 3D costumes took "functional considerations," not original ones), and also made clear that the plaintiff must affirmatively "identify any elements" of the claimed work that are not "commonplace" or dictated by pre-existing material. *George S. Chen Corp. v. Cadona Int'l, Inc.*, 266 Fed. Appx. 523, 524-25 (9th Cir. 2008) (summary judgment as plaintiff failed to

---

[6] These include [redacted] Ex. 6 at 232:4-235:25, 238:3-241:23.

do so); *see also Bespaq Corp. v. Haoshen Trading Co.*, No. 04 Civ. 3698, 2004 WL 2043522, at *2 (N.D. Cal. Sept. 13, 2004) (no likelihood of success as plaintiff failed to explain what it "added to its miniature furniture that were not [] present in preexisting full-size furniture pieces").[7]

P5D also claims that because Meta's modeling expert's models differ from P5D's, it proves P5D's are creative. That is nonsense. Meta's expert merely assessed the time it would take to model objects ***similar*** to P5D's. He was not trying to make exact replicas and testified that his choices were technical, not creative. Ex. 116 at 67:22-69:25, 119:1-120:1, 123:13-125:23, 139:14-142:24. Regardless, it is ***P5D's*** burden to prove it made "specific and demonstrable creative choice[s]" for *each* Object, but it has not.[8]

18 Scenes: P5D cannot meet its burden on the 18 Scenes because it presented no evidence of creative choices, just a list of employees who allegedly authored the scenes. Dkts. 590-01 at 130:4-132:24, 584-06. P5D cannot prove creativity by claiming it is "unavoidable." *Feist*, 499 U.S. at 361.

## V. P5D CANNOT PROVE INDIRECT COPYRIGHT INFRINGEMENT

P5D's contributory and vicarious liability claims fail for the gating reason that P5D failed to establish the "threshold" requirement of any secondary liability claim: direct infringement by third parties. *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1077 (9th Cir. 2023). It has no evidence of valid copyrights or substantial similarity, nor proof of how these third parties allegedly used SUNCG or SUMO. This alone warrants summary judgment to Meta. P5D has also failed to prove the remaining elements of either claim.

Contributory Liability: P5D offers no evidence or argument that Meta committed contributory infringement with SUMO; it only mentions SUMO in a header in its brief. As for SUNCG, P5D offers no evidence that Meta had knowledge, or reason to know, of third-party infringement. This is not surprising. Princeton controlled access to SUNCG and had the information about who downloaded it, not Meta. Dkt. Ex. 41 (Ex. A). P5D also has not shown that Meta "materially contribute[d] to or induce[d]" infringement. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 670 (9th Cir. 2017). Meta merely made a simulator

[7] P5D contends Meta's cases are inapposite because it identified creative choices, but those purported choices are mere guesswork made by comparing P5D's models to images found online years later using reverse image search tools. Dkt. 282-02. ***But P5D does not know if these were the actual source materials.*** Ex. 5 at 401:16-402:17. Speculation cannot defeat Meta's Motion. Dkt. 278 at 8.

[8] *Boisson v. Banian, Ltd*. is irrelevant, as it concerns a creative *arrangement* of colors, which is not the issue here. 273 F.3d 262 (2d Cir. 2001). P5D claims its selection of a particular color for an Object is copyrightable, when it is not as a matter of law. Meta Mot. at 18. P5D is also wrong that the absence of material is protectible; copyright only protects material *fixed* in a tangible medium. 17 U.S.C. § 102.

compatible with *multiple* datasets (not only SUNCG as P5D claims) available for the legitimate goal of scientific research. Ex. 53 at 3. That people told Princeton they would use SUNCG in this simulator is not enough to prove contributory liability. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984) (VCR enabling substantial noninfringing uses did "not constitute contributory infringement").

Vicarious Liability: P5D contends that Meta exercised "supervision and control" of SUNCG via its simulators. P5D Opp. at 22. This makes no sense. The simulators did not include SUNCG and third parties chose for themselves whether to use them with SUNCG. Ex. 107 at 33:12-24; Ex. 106. P5D cites no evidence that Meta could control or supervise what others did with the simulators. It is also undisputed that SUNCG could only be downloaded from Princeton's website, P5D Opp. at 4, which Meta did not supervise or control. *Perfect 10,* 847 F.3d at 673 (ability to "supervise" infringing conduct required).

P5D also did not show Meta received a "direct financial benefit" from third party use of SUMO or SUNCG, as required. *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1173-75 (9th Cir. 2007). P5D's experts admit that there is no evidence SUNCG or SUMO contributed to *any* commercial product. Meta Opp. at 12-13. It is also absurd to think Meta *financially benefitted* from Google (or others) using SUNCG.

## VI. META'S USE OF SUNCG AND SUMO IS FAIR USE

### A. P5D Cannot Dispute That Meta's Use Was Transformative and Noncommercial.

The first fair use factor favors Meta as a matter of law. Meta's use of SUNCG and SUMO was noncommercial and for a different purpose than offering a home design tool, namely, the purpose of scholarship and scientific research, two of the enumerated uses explicitly *permitted* under the fair use doctrine. Meta Opp. at 12-16; 17 U.S.C. §107. P5D cites no contrary evidence.

Noncommercial Use: Despite years of discovery, P5D's opposition confirms it lacks a single piece of evidence or testimony proving that Meta "profited in any way [from] the use of any of [P5D's] works." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1120 (D. Nev. 2006). P5D's own experts agreed there is *no* evidence SUNCG *actually* contributed to a commercial product. Ex. 61 at 313:9-12; Ex. 65 at 117:4-15. Every witness asked about this said the same.[9] P5D cannot refute Meta's evidence of noncommercial use.

P5D gripes that Meta cited its interrogatory response as evidence of noncommercial use. But,

[9] Ex. 111 (Green) 216:18-217:1; Ex. 115 (Schenk) 224:10-13; Ex. 109 (Garfinkel) 216:4-14; Ex. 63 (Gkioxari) 270:14-17; Ex. 113 (Lopresti) 184:12-21; Ex. 67 (Newcombe) 232:11-17.

contrary to P5D's claim, Meta submitted ample, undisputed evidence in addition to that. *See, e.g.*, Meta Mot. at 7-8; Meta Opp. at 7-9, 12-14. While P5D speculates that Meta used SUNCG in projects with the "aim of enabling or improving planned commercial products," P5D Opp. at 23, it has no proof this actually happened. It cites recent statements about Meta's general AI research that *do not mention SUNCG* or bear on how Meta used SUNCG *6-8 years ago*.[10] The [redacted] which are simulators that operate with many datasets, not just SUNCG.[11] These do not show *actual* use of SUNCG research in a commercial product or profit therefrom.

P5D frames project Enigma as its silver bullet, but the *only* Enigma project using SUNCG was SUMO, a ***free, public*** research challenge in the academic community that had no impact on a commercial product.[12] P5D nonetheless implies that Meta used SUMO and Enigma results for commercial benefit because an agreement with Princeton gave Meta the right to exercise an *option,* upon notice, to use the Enigma work commercially. But that agreement also did not concern SUNCG or SUMO; it concerned creating a dataset from photos of *real-world* (not user-created) homes. Dkt. 586-09 at '863-864. P5D also presented ***no evidence*** Meta exercised the commercial option, making the whole discussion pointless.

Transformativeness: Meta used SUNCG and SUMO for a transformative purpose. It used SUNCG to conduct academic, scientific research to train AI models to independently navigate scenes and SUMO to facilitate an academic research challenge. Meta Mot. §I.D. P5D's purported works were created for the promotion and use of its interior design platform. CR Compl. ¶45; Ex. 4 at 119:23-121:14. Thus, Meta's use was for a different purpose and transformative. *See Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n,* 953 F.3d 638, 648-50 (9th Cir. 2020) (using song from fantasy musical in a choir show telling a different story transformative); *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc,* No. 23 Civ. 3402, 2025 WL 86370 at *3 (8th Cir. Jan. 14, 2025) (dissemination of floorplans got "information to more people it could benefit"); *Keck v. Mix Creative Learning Ctr.*, 116 F.4th 448,

---

[10] Dkt. 590-36 (2025 website); Dkt. 590-38 (2022 interview); Dkt. 590-37 at 14 (2024 call about work in 2021-23); Dkt. 590-43 (event 2 years after Meta stopped using SUNCG); Dkt. 590-39 (2024 article).

[11] P5D claims Meta used SUNCG to "develop" Habitat/House3D, but this misunderstands what simulators are. Simulators are not developed from datasets. They are tools to turn static, non-navigable 3D images in datasets into environments that AI agents can "move" through. *See* Ex. 107 at 33:12-24; Dkt. 537-15 ¶27.

[12] Ex. 112 at 25:18-22, 136:12-16 [redacted] Dkt. 586-09 at '85; Ex. 112 at 22:14-25:22.

454-55 (5th Cir. 2024) ("educational purpose. . . significantly different from" art's "decorative purpose").

In response, P5D focuses on whether Princeton physically transformed its data and contends (without support) that SUNCG cannot be transformative because P5D's data was "already suitable for machine learning." P5D Princeton Opp. at 12. This fails. As an initial matter, physically transformation is not determinative. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) ("few physical changes" transformative); *Perfect 10*, 508 F.3d at 1165 (use of "entire" work transformative); Meta Opp. at 16-17. It is the ***purpose*** of the use that matters and Meta's purpose differed from P5D's home design tool. P5D's data also was not "suitable for machine learning." [redacted] Ex. 105 at 215:16-216:16, 221:5-19. [redacted] Ex. 74 at '268.

P5D also has not shown that Meta used the Works (if at all) for anything other than unprotectable elements (e.g., that a table has legs). It claims Meta's expert stated that creative flourishes are important, but he in fact stated such flourishes "would not benefit a computer scientist." Dkt. 537-15 ¶59. P5D's claim that researchers were interested in alleged creative aspects of its *scenes* because they were "human designed" highlights that researchers cared about something P5D does not own—its users' creativity.

### B. P5D Does Not Dispute, and Thus Concedes, Meta's Arguments on Factors 2 or 3.

P5D does not dispute that, if copyrighted at all, its asserted Works are at the extremely low end of creativity. This, alone, puts factor 2 in Meta's favor. *Google v. Oracle*, 593 U.S. 1, 29 (2021).

Factor 3 favors Meta because Meta never used P5D's asserted compilation; it used SUNCG and SUMO (and even then, only as much as necessary for its transformative purpose). Meta Mot. at 23. Meta also did not use the "heart" of P5D's works. It used *scenes*, which P5D does not own. *Id*. The oppositions do not address either argument, or say how much of P5D's works Meta used. This factor favors Meta.

### C. There Is No Genuine Dispute that P5D Has Suffered No Market Harm.

P5D's oppositions do not dispute that: (1) Meta's use of SUNCG and SUMO did not compete with or substitute for P5D's market;[13] (2) there was no market for noncommercial use of data from 2016-19[14]

[13] This case is thus very different from the recent decision in *Thomson Reuters Enterprise Center GMBH v. Ross Intelligence Inc.*, where the defendant sought "to compete" with the plaintiff by "developing a market substitute." No. 20-CV-613, 2025 WL 458520, at *10 (D. Del. Feb. 11, 2025).

[14] [redacted]

because such datasets were free; (3) prior to SUNCG's release, P5D did not participate in any market for licensing machine learning data (if any existed) because it was "never" on "[its] agenda; (4) after the release of SUNCG, third parties in fact approached P5D to license data for ***commercial*** research; and (5) Meta's use of SUNCG benefitted the public. P5D also offers *no evidence* that it lost *any* licensing opportunities or suffered *any* market harm as a result of Meta's use of SUNCG or SUMO. As a result, this is truly a case of ships passing in the night. Tellingly, P5D does not dispute that its business has only *blossomed* in the years since SUNCG's release. Meta Mot. at 25. Against this record, the logical conclusion is that P5D is here to get a windfall from Meta; not cure an actual harm suffered.

P5D's *only* theory of harm is that it lost a theoretical licensing opportunity in "nascent or future potential markets." P5D Opp. at 24. This fails. As a threshold matter, P5D lost nothing, as it was never approached about a license and made no effort to license its data prior to SUNCG's release. Regardless, a theoretical lost license is a circular argument, insufficient to show market harm. *Google*, 593 U.S. at 38. [redacted]. The cases on which P5D relies to support its vague argument as to a theoretical lost license are inapposite. In both, plaintiffs had a history of licensing. *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 460-461 (9th Cir. 2020); *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012). P5D has *no* such history; [redacted] Ex. 24.

Faced with the inconvenient truth that P5D's terms of service did not grant P5D the right to use user-created scenes for third-party machine learning research, P5D is forced to argue that its terms were "not set in stone," and its ***current*** terms *do* grant P5D that right. P5D Opp. at 24. But this shows that P5D lacked the right to license scenes during the relevant time period, which means it *could not have licensed* its asserted scene compilation or Objects (as the objects are only useful to the extent they are included in scenes). Thus, P5D cannot dispute that it stood to lose *no money* from Meta's use of SUNCG.[15]

With all four factors favoring Meta, summary judgment for Meta on fair use is warranted.

---

[redacted]. *Id*. at '129.

[15] P5D's claim that it could use user-generated scenes to support machine learning for its *own* tool is irrelevant. What matters is whether P5D could license the scenes to third parties, and it could not.

Dated: March 5, 2025

*/s/ Dale M. Cendali*

Dale M. Cendali (SBN 1969070)
dale.cendali@kirkland.com
Mary C. Mazzello (admitted *pro hac vice*)
mary.mazzello@kirkland.com
Jonathan D. Brit (admitted *pro hac vice*)
jonathan.brit@kirkland.com
Abbey Quigley (admitted *pro hac vice*)
abbey.quigley@kirkland.com
Emily Sheffield (admitted *pro hac vice*)
emily.sheffield@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800

Yan-Xin Li (SBN 332329)
yanxin.li@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
T: (415) 439-1400

*Attorneys for Defendants Meta Platforms Inc. and Meta Platforms Technologies, LLC*